## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC.; SPECIALTY PHYSICIANS OF ILLINOIS, LLC,; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; <br><br> - and - <br><br> STATE OF TEXAS; STATE OF WISCONSIN; STATE OF NEBRASKA; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; and STATE OF KANSAS, <br><br>     *Plaintiffs,* <br><br> v. <br><br> SYLVIA BURWELL, Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br>     *Defendants.* | Civ. Action No. _____ <br><br><br> **COMPLAINT** |

## INTRODUCTION AND NATURE OF THE ACTION

This lawsuit challenges a new Regulation ("Regulation" or "Rule") issued by the Department of Health and Human Services ("HHS") that seeks to override the medical judgment of healthcare professionals across the country. On pain of significant financial liability, the Regulation forces doctors to perform controversial and sometimes harmful medical procedures ostensibly designed to permanently change an individual's sex—including the sex of children. Under the new Regulation, a doctor must perform these procedures even when they are contrary to the doctor's medical judgment and could result in significant, long-term medical harm. Thus, the Regulation represents a radical invasion of the federal bureaucracy into a doctor's medical judgment.

HHS attempts to impose these dramatic new requirements by redefining a single word used in the Affordable Care Act: "sex." For decades, across multiple federal statutes, Congress has consistently used the term "sex" to refer to an individual's status as male or female, as determined by a person's biological sex at birth. But in the Regulation, HHS redefines "sex" to include "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." 45 C.F.R. § 92.4. Thus, with a single stroke of the pen, HHS has created a massive new liability for thousands of healthcare professionals unless they cast aside their medical judgment and perform controversial and even harmful medical transition procedures. And HHS has done this despite the fact that Congress has repeatedly rejected similar

attempts to redefine "sex" through legislation, and federal courts have repeatedly rejected attempts to accomplish the same goal through litigation.

The Regulation not only forces healthcare professionals to violate their medical judgment, it also forces them to violate their deeply held religious beliefs. Plaintiffs include the Christian Medical & Dental Associations, which include over 17,000 healthcare professionals, and Franciscan Alliance, a network of religious hospitals founded by the Sisters of St. Francis of Perpetual Adoration. These religious organizations are deeply committed to the dignity of every human person, and their doctors care for everyone with joy and compassion. They eagerly provide comprehensive care to society's most vulnerable populations, but their religious beliefs will not allow them to perform medical transition procedures that can be deeply harmful to their patients. Tragically, the Regulation would force them to violate those religious beliefs and perform harmful medical transition procedures or else suffer massive financial liability.

The Regulation also undermines the longstanding sovereign power of the States to regulate healthcare, ensure appropriate standards of medical judgment, and protect its citizens' constitutional and civil rights. Under this Rule, States are now required to force all healthcare professionals at state-run facilities to participate in medical transition procedures (including hormone therapy, plastic surgery, hysterectomies, and gender reassignment surgery), and to cover those procedures in the States' health insurance plans, even if a doctor believes such procedures are harmful to the patient. The Rule exposes the States to litigation by its employees and

patients, despite the fact that neither Congress nor the States expressed any intent to waive the States' sovereign immunity in this area. And the Rule threatens to strip the States of billions of dollars in federal healthcare funding—over $42.4 billion a year for Texas alone—jeopardizing the availability of healthcare for the nation's most vulnerable citizens.

Ultimately, this case boils down to a very simple question of statutory interpretation: Can HHS redefine the term "sex" to thwart decades of settled precedent and impose massive new obligations on healthcare professionals and sovereign States? The answer is "no," and the new Regulation must be set aside as a violation of the Administrative Procedure Act and multiple other federal laws and constitutional provisions.

## I. PARTIES

1.      Texas has a significant role to play in regulating and protecting the integrity of the medical profession within its borders. Moreover, Texas zealously protects the physician-patient relationship through numerous laws and regulations ensure that physicians honor their duties to their patients and exercise appropriate medical judgment when treating patients under their care. Texas also employs thousands of healthcare employees through its constituent agencies. As an employer, generally, Texas provides health benefits to hundreds of thousands of its employees and their families through its constituent agencies. Moreover, Texas oversees and controls several agencies and healthcare facilities that receive federal funding subject to Title IX and the new Rule. Specifically, Texas operates healthcare facilities,

programs, and schools of health education that receive federal funding administered by HHS. For example, North Texas State Hospital is a mental healthcare facility of the State of Texas and the largest state hospital in the Texas mental health system. It consists of two campuses in northern Texas. It provides psychiatric services for mentally ill persons and persons with mental illness and mental retardation throughout the North Texas area, as well as the entire State. The campus in Wichita Falls serves patients with mental illness and mental illness/mental retardation who have been screened and referred by their local mental health facility, and forensic psychiatric patients primarily referred for competency restoration. The Wichita Falls campus is also Medicare certified. The Vernon campus provides maximum security adult forensic psychiatric services to adults and secured forensic services to adolescents referred from throughout the State.

2.      The Plaintiffs State of Wisconsin, State of Nebraska, and State of Kansas are all similarly situated to Texas in that they also have promulgated laws and standards demonstrating their sovereign interest in the practice of medicine within their borders. They are also subject to Title VII as the employers of thousands of healthcare employees through their constituent agencies, oversee and control several agencies and healthcare facilities that receive federal funding subject to Title IX and the new Rule, and/or operate healthcare facilities, programs, and schools of health education that receive federal funding administered by HHS.

3.      Governor Matthew G. Bevin brings this suit on behalf of the Commonwealth of Kentucky pursuant to the Kentucky Constitution, which provides

that the "supreme executive power" shall be vested in the Governor. KY. CONST. § 69. The Commonwealth of Kentucky is similarly situated to Texas and the other Plaintiff States in that it has promulgated laws and standards demonstrating its sovereign interest in the practice of medicine within their borders. It is also subject to Title VII as the employer of thousands of healthcare employees through its constituent agencies, oversees and controls several agencies and healthcare facilities that receive federal funding subject to Title IX and the new Rule, and/or operates healthcare facilities, programs, and schools of health education that receive federal funding administered by HHS.

4.       Plaintiff the Christian Medical & Dental Society is an Illinois non-profit corporation doing business as the Christian Medical & Dental Associations. It has many members who will be subject to the Regulation because they receive federal funds, provide medical services that may be requested as part of a medical transition, and provide health coverage for employees.

5.       The Franciscan Alliance ("Franciscan") is a Roman Catholic nonprofit hospital system founded by a Roman Catholic order, the Sisters of St. Francis of Perpetual Adoration, and organized exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Franciscan is incorporated in Indiana, with its principal place of business in Mishawaka, Indiana.

6.       The Sisters of St. Francis of Perpetual Adoration were themselves founded in 1863 by Mother Maria Theresia Bonzel in Olpe, Germany. Twelve years

later, in 1875, Mother Theresia sent six Sisters to Lafayette, Indiana, to bring St. Francis of Assisi's ministry of healthcare and education to the Midwest United States. The first hospital building served as both a convent and a hospital. Three weeks after their arrival, the Sisters admitted their first patient. They have continued their healthcare ministry ever since.

7.     Franciscan is now one of the strongest health systems in the country. Franciscan provides approximately 900 million dollars in Medicare and Medicaid services annually to the poor, disabled, and elderly. Annually, it performs more than 4 million outpatient services and cares for more than 80,000 inpatients. Its major service locations have at least 2,900 beds and have a significant presence in their respective healthcare markets. Franciscan also receives annually approximately $300,000 in HHS grants.

8.     Specialty Physicians of Illinois, LLC ("Specialty Physicians") provide a myriad of physician specialist services in the South Suburban Chicago area. Specialty Physicians is a nonprofit Illinois limited liability company with its principal place of business in Chicago Heights, Illinois. Specialty Physicians is a member managed limited liability company, of which Franciscan is the sole member. Specialty Physicians is organized exclusively for charitable, religious, and scientific purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code. Specialty Physicians provides over $6 million dollars in Medicare and Medicaid services annually to the poor, disabled, and elderly. Annually, it performs approximately 90,000 outpatient services.

9.     Defendants are appointed officials of the United States government and United States governmental agencies responsible for the issuance and implementation of the challenged Regulation.

10.    Defendant Sylvia Burwell is the Secretary of the United States Department of Health and Human Services. She is sued in her official capacity only.

11.    Defendant the United States Department of Health and Human Services is the agency that promulgated and now enforces the challenged Regulation.

## II. JURISDICTION AND VENUE

12.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1361.

13.    Venue lies in this district pursuant to 28 U.S.C. § 1391.

## III. FACTUAL BACKGROUND

### A.     The Affordable Care Act and Related Federal Statutes.

14.    In March 2010, Congress passed, and President Obama signed into law, the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act" or "ACA."

15.    Section 1557 of the ACA states that no individual can be denied certain federally-funded health benefits because of the individual's race, color, national origin, sex, age, or disability. 42 U.S.C.A. § 18116. Section 1557 does not add a new non-discrimination provision to the United States Code, but merely incorporates by reference pre-existing provisions under Title VI, Title IX, the Americans with Disabilities Act, and the Rehabilitation Act. Section 1557 does not independently

define terms such as "sex." Section 1557's sole basis for prohibiting sex discrimination is based on its reference to Title IX, 20 U.S.C.A. § 1681 *et seq.*

16.    Title IX does not apply to covered entities "controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C.A. § 1681.

17.    Title IX also states that it cannot be "construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C.A. § 1688.

18.    At the time that the ACA was enacted in 2010, no federal courts and no federal agencies had interpreted "sex" in Title IX to include gender identity.

19.    At the time that the ACA was enacted, and to this day, Congress has repeatedly rejected attempts to expand the term "sex" in Title IX. Lawmakers have also rejected multiple attempts to amend the Civil Rights Act to add the new categories of "sexual orientation" and "gender identity." The first such attempt was in 1974, and there have been dozens of such attempts since then. All have failed.

20.    The ACA states that "nothing in this title (or any amendment made by this title), shall be construed to require a qualified health plan to provide [abortion coverage] as part of its essential health benefits for any plan year." 42 U.S.C.A. § 18023.

21.    Federally-funded programs may not require an "individual to perform or assist in the performance of any sterilization procedure or abortion if his performance or assistance in the performance of such procedure or abortion would be

contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(b). Congress has also mandated that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity funded in whole or in part under a program administered by the Secretary of Health and Human Services if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d).

### B.    The Regulation.

22.    On September 8, 2015, HHS proposed a new rule to "interpret" Section 1557 of the Affordable Care Act (ACA), to extend Title IX's definition of "sex" to include "gender identity," "sex stereotypes," and "termination of pregnancy," among other things. 45 C.F.R. § 92.4.

23.    The Rule was published as final May 18, 2016, and it expanded the definition of "gender identity" even further from the proposed definition to mean an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." *Id.* HHS stated in the Rule that "gender identity spectrum includes an array of possible gender identities beyond male and female," and individuals with "non-binary gender identities are protected under the rule." Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31375, 31392, 31384 (May 18, 2016). HHS cited as authority the "Dear Colleague" letter issued

jointly by the Department of Education (DOE) and Department of Justice (DOJ) just five days earlier.[1]

24.     The Rule also defines "sex" to include discrimination based upon "termination of pregnancy" in covered programs. HHS declined to add an explicit carve-out for abortion and abortion-related services parallel to the carve-out included in Title IX; it merely noted the existence of conscience protections in federal law and ACA limitations on requirement for abortion coverage. *Id.* at 31388.

25.     This new Regulation applies to any entities or individuals that operate, offer, or contract for health programs and activities that receive any Federal financial assistance from HHS.[2] In light of this sweeping application, HHS has estimated the Rule will "likely cover[] almost all licensed physicians because they accept Federal financial assistance," including payments from Medicare and Medicaid.[3] Other observers have estimated that the Rule will apply "to over 133,000 (virtually all) hospitals, nursing homes, home health agencies, and similar provider facilities, about 445,000 clinical laboratories, 1,200 community health centers, 171 health-related schools, state Medicaid and CHIP programs, state public health agencies, federally facilitated and state-based marketplaces, at least 180 health insurers that market

---

[1] U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter, May 13, 2016, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[2] 45 C.F.R. § 92.4.

[3] 80 Fed. Reg. 54171, 54195 (proposed Sept. 8, 2015); 81 Fed. Reg. at 31445.

policies through the FFM and state-based marketplaces, and up to 900,000 physicians."[4]

26. The new Rule requires covered entities to provide health programs or activities in accordance with HHS's expansive and unwarranted definition of "sex." This includes a number of new requirements.

### 1. Healthcare professionals must perform or refer for medical transition procedures.

27. The Rule requires covered employers, and their healthcare providers and professionals, to perform (or refer for) medical transition procedures (such as hysterectomies, mastectomies, hormone treatments, plastic surgery, etc.), if a physician or healthcare provider offers analogous services in other contexts. For example, in the preamble, HHS stated, "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals."[5] HHS explained that a hysterectomy in this medical transition context would be "medically necessary to treat gender dysphoria,"[6] thereby declaring medical

---

[4] Timothy Jost, *Implementing Health Reform: HHS Proposes Rule Implementing Anti-Discrimination ACA Provisions (Contraceptive Coverage Litigation Update)*, Health Affairs Blog (Sept. 4, 2015), http://healthaffairs.org/blog/2015/09/04/implementing-health-reform-hhs-proposes-rule-implementing-anti-discrimination-aca-provisions/.

[5] 81 Fed. Reg. at 31455.

[6] *Id.* at 31429.

necessity, benefit, and prudence as a matter of federal law, and without regard to the opinions, judgment, and conscientious considerations of the many medical professionals that hold views to the contrary.

28.     Despite the widespread, well-documented debate about the medical risks and ethics associated with various medical transition procedures, even within the transgender community itself, the new Rule attempts to preempt the serious medical and moral debate by concluding in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care."[7] The Regulation also improperly preempts the prerogative of the States not only to regulate the healing professions, but also to maintain standards of care that rely upon the medical judgment of health professionals as to what is in the best interests of their patients.

29.     Furthermore, a number of commenters requested that HHS make clear that health services need only be covered if they are deemed to be "medically necessary" or "medically appropriate" in the professional opinion of those charged with the care of the patient at issue. But HHS refused to make this clarification, stating that some procedures "related to gender transition" may be required even if they were not "strictly identified as medically necessary or appropriate."[8] Thus, under the Regulation, if a doctor would perform a mastectomy as part of a medically-

---

[7] *Id.* at 31435; *see also id.* at 31429.

[8] *Id.*

necessary treatment for breast cancer, it would be illegal for the same doctor to decline to perform a mastectomy for a medical transition, even if the doctor believed that removing healthy breast tissue was contrary to the patient's medical interest.

30.     Because Plaintiffs provide hysterectomies to patients diagnosed with uterine cancer, the Regulations would simultaneously force them to provide a hysterectomy (and remove an otherwise healthy uterus) for a medical transition, notwithstanding the serious potential harm to the patient. Elective hysterectomies increase a number of health risks for the patient. Moreover, such a procedure also renders an individual permanently sterile. Nevertheless, the Regulations would require Plaintiffs to perform that procedure even when they believed it was not in the best interests of the patient. Such a standard turns the venerable medical oath to "do no harm" on its head.

31.     And while Plaintiffs such as Franciscan provide hormone treatments to patients for medical reasons, these health professionals have serious medical and religious concerns with offering hormone treatment for a medical transition.

### 2.     Healthcare facilities and professionals must alter their speech and medical advice.

32.     As discussed above, HHS has concluded, in the context of physicians offering "health services," that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care."[9] In so doing, HHS has seriously curbed a physician's ability to offer a contrary view, even if

---

[9] *Id.*

such a view is based on the physician's professional training and best medical judgment. This Regulation would thus force healthcare providers to alter speech and medical advice to comply with the Rule.

33.   HHS stated that a covered entity's "refusal to use a transgender individual's preferred name and pronoun and insistence on using those corresponding to the individual's sex assigned at birth constitutes illegal sex discrimination if such conduct is sufficiently serious to create a hostile environment."[10]

### 3. Certain employers and insurance providers must offer employee benefits covering medical transition procedures.

34.   The Regulation prohibits certain employers, health programs, or insurance plans from exercising judgment as to what they cover. HHS stated, "[A]n explicit, categorical (or automatic) exclusion or limitation of coverage for all health services related to gender transition is unlawful on its face."[11]

35.   For example, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer or insurance plan would be required to cover the procedure on the same basis that it would cover it for other conditions (like cancer).[12] HHS also stated that the "range of transition-related services, which includes treatment for gender dysphoria, is not limited to surgical

---

[10] *Id.* at 31406.

[11] *Id.* at 31429.

[12] *Id.*

treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual."[13] As such, coverage is required under the new Rule notwithstanding the rights of employers that only offer employee health benefits consistent with the religious beliefs and values of their organization.

36.    This conflict with religious or otherwise conscientious employers extends beyond treatment surrounding gender dysphoria, because some required procedures (such as elective hysterectomies) result in sterilization, and the new Rule also extends to "termination of pregnancy." 45 C.F.R. § 92.4. Although HHS states that laws protecting religious objections to abortion (or "termination of pregnancy") will apply, HHS recently approved California forcing all insurers to include abortion coverage, even for objecting religious institutions. And HHS could have included, but explicitly chose to exclude, a clear regulatory carve-out for services related to abortion that parallels the carve-out in Title IX.

37.    This health benefit requirement of the new Rule applies to any of the following types of employers who receive HHS funding: 1) any entity principally involved in providing or administering health services (including hospitals, nursing homes, counseling centers, physicians' offices, etc.), 2) any type of employer who receives HHS funding for the primary purpose of funding an "employee health benefit program," or 3) any entity such as a university with a health training or research

---

[13] *Id.* at 31435-36.

program that receives Federal financial assistance—including student Pell grants—for that "health program or activity."[14]

38.    Thus, employers who have always offered employee health benefits that reflect their religious or conscientious beliefs, and excluded medical transition procedures from employee benefits, will now be considered discriminatory under the Regulation.

      **4.**      **Sex-specific healthcare facilities or programs, including shower facilities or hospital wards, must be opened to individuals based on gender identity.**

39.    With regard to facilities, the new Rule states that even for sex-specific facilities such as "shower facilities" offered by healthcare providers, individuals may not be excluded "based on their gender identity."[15]

40.    When Title IX—the foundation for the new Rule—was enacted, Congress was significantly concerned about protecting and preserving the privacy rights of individuals in intimate areas. *See* 20 U.S.C. § 1686, 117 Cong. Rec. 30407 (1971), 117 Cong. Rec. 39260 (1971), 117 Cong. Rec. 39263 (1971), and 118 Cong. Rec. 5807 (1972). And the predecessor agency of HHS, the Department of Health, Education, and Welfare (HEW), promulgated regulations guaranteeing the privacy of individuals in intimate areas. *See* 34 C.F.R. § 106.32(b); 34 C.F.R. § 106.33 ("A recipient may provide separate toilet, locker room, and shower facilities on the basis

---

[14] *Id.* at 31472, 45 C.F.R. § 92.208; *see also* 81 Fed. Reg. at 31437.

[15] 81 Fed. Reg. at 31409.

of sex . . . ."). Yet, HHS wholly disregarded any "legal right to privacy" that could be violated "simply by permitting another person access to a sex-specific program or facility which corresponds to their gender identity."[16]

41.     With regard to other health programs, HHS stated that sex-specific health programs or activities are allowable only where the covered entity can demonstrate an exceedingly persuasive justification, *i.e.*, that the sex-specific program is substantially related to the achievement of an important health-related or scientific objective. HHS stated that it "will expect a covered entity to supply objective evidence, and empirical data if available, to justify the need to restrict participation in the program to only one sex," and in "no case will [HHS] accept a justification that relies on overly broad generalizations about the sexes."[17]

### 5.     Covered entities must provide assurances of compliance and post notices of compliance.

42.     Through HHS-690 Form, which now references Section 1557, a covered entity seeking federal financial assistance must now certify, in relevant part, that "no person in the United States shall, on the ground of race, color, national origin, sex, age, or disability be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity for which the Applicant receives Federal financial assistance from the Department."[18]

---

[16] *Id.* at 31389, 31409.

[17] *Id.* at 31409.

[18] HHS, Assurance of Compliance, https://www.hhs.gov/sites/default/files/hhs-690.pdf.

43. The Rule will require covered entities to post notices regarding compliance with the Rule in conspicuous locations by October 16, 2016 (90 days from the effective date). HHS provided a sample notice in Appendix A to the new Rule, which states in relevant part that the covered entity "does not exclude people or treat them differently because of race, color, national origin, age, disability, or sex."[19]

### 6. Enforcement Mechanisms and Remedial Measures.

44. Covered entities are required to record and submit compliance reports to HHS's Office of Civil Rights ("OCR") upon request.[20]

45. Covered entities that are found to violate the Regulation may lose their federal funding, be barred from doing business with the government, or risk false claims liability.[21]

46. Covered entities are subject to enforcement proceedings by the Department of Justice.[22]

47. Covered entities are also subject to individual lawsuits from patients who believe the covered entity has violated the new Rule.[23]

---

[19] *Id.* at 31472, 45 C.F.R. § 92, App. A, https://www.federalregister.gov/articles/ 2016/05/18/2016-11458/nondiscrimination-in-health-programs-and-activities#h-139.

[20] 81 Fed. Reg. at 31439, 31472, 45 C.F.R. § 92.301.

[21] 81 Fed. Reg. at 31472, 45 C.F.R. § 92.301 ("The enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964 . . . shall apply for purposes of Section 1557.")

[22] 81 Fed. Reg. at 31440.

[23] *Id.* at 31472, 45 C.F.R. § 92.301.

### 7.   No Religious Exemption.

48.   Section 1557 does not independently prohibit discrimination on the basis of sex. Instead, Congress specifically invoked Title IX, 20 U.S.C.A. § 1681 *et seq.*, which includes both a ban on sex discrimination and a generous carve-out for religious organizations. In this Regulation interpreting Section 1557, however, HHS has "interpreted" Congress's reference to Title IX to include the ban, but not the religious exemption.

49.   Although HHS was asked to include a religious exemption in the Regulation due to the obvious implications for religious healthcare providers, HHS declined to do so, stating instead that religious objectors could assert claims under existing statutory protections for religious freedom.[24] HHS also failed to provide any mechanism by which a religious entity could determine if it was entitled to any existing religious protections under the law.

### C.   The New Rule's Impact on States.

50.   The new Regulation runs headlong into established standards of medical care, usurps the States' legitimate authority over its medical facilities, and makes it impossible for States to comply with conflicting federal law, among other harms.

### 1.   Standard of Care.

51.   "[T]he State has a significant role to play in regulating the medical profession, *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), as well as "an interest in

---

[24] 81 Fed. Reg. at 31376.

protecting the integrity and ethics of the medical profession." *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). This includes "maintaining high standards of professional conduct" in the practice of medicine. *Barsky v. Bd. of Regents of Univ. of N. Y.*, 347 U.S. 442, 451 (1954).

52. For example, Texas zealously protects the physician-patient relationship. Numerous Texas laws and regulations ensure that physicians honor their duties to their patients. The statewide standard of medical practice rests on the principle that Texas doctors must exercise "independent medical judgment" when treating patients under their care. *See, e.g.*, *Murk v. Scheele*, 120 S.W.3d 865, 867 (Tex. 2003) (*per curiam*).

53. Amid increasing consolidation in the healthcare industry caused by the ACA, the Texas Legislature redoubled its longstanding commitment to physician-patient autonomy. *See Garcia v. Tex. State Bd. of Med. Exam'rs*, 384 F. Supp. 434, 439 (W.D. Tex. 1974) (upholding regulations designed to preserve the "vitally important doctor-patient relationship"). In 2011, the Legislature prohibited medical organizations from interfering with, controlling, or directing "a physician's professional judgment," Tex. Occ. Code § 162.0021, and it mandated that they permit physicians to exercise "independent medical judgment when providing care to patients," *Id.* § 162.0022.

54. In furtherance of these objectives, Texas hospitals must appoint a chief medical officer to supervise "all matters relating to the practice of medicine." Tex. Health & Safety Code § 311.083. The chief medical officer is responsible for adopting

policies to ensure that physicians have the ability to exercise independent medical judgment. *Id.* This officer must report to the Texas Medical Board ("TMB")—the executive agency responsible for regulating the practice of medicine in Texas—any action or event that constitutes a compromise of the independent medical judgment of a physician in caring for a patient. *Id.*

55.     TMB has reaffirmed the standard of practice provided through its rulemaking authority. TMB regulations provide that doctors retain "independent medical judgment and discretion in providing and supervising care to patients," and may not be disciplined for "reasonably advocating for patient care." 22 Tex. Admin. Code § 177.5. In addition, they reserve important decisions concerning quality assurance, the medical necessity of treatment, credentialing and peer review to the physician-only boards that direct health organizations. *Id.* §§ 177.3, 177.5.

56.     Every person should be treated with dignity and respect, especially when in need of medical attention. The standard of care established in Texas, and around the country, enables patients to obtain quality healthcare as determined by medical professionals, and not those outside the doctor-patient relationship. The Regulation, however, usurps this standard of care. It discards independent medical judgment and a physician's duty to his or her patient's permanent well-being and replaces them with rigid commands.

57.     The Regulation will force physicians to subject their patients to procedures that permanently alter or remove well-functioning organs, even though the physicians' independent medical judgment advises against such a course of

action. And beyond compelling physicians to act against their medical judgment, the Regulation requires them to express opinions contrary to what they deem to be in the patient's best interest or to avoid even describing medical transition procedures as risky or experimental. Yet, physicians are "under a duty to make reasonable disclosure of that diagnosis, and risk of the proposed treatment . . ., as would have been made by a reasonable medical practitioner under the circumstances." *Jacobs v. Theimer*, 519 S.W.2d 846, 848 (Tex. 1975) (citing *Wilson v. Scott*, 412 S.W.2d 299 (Tex. 1967); W. M. Moldoff, Annotation, *Malpractice: physician's duty to inform patient of nature and hazards of disease or treatment*, 79 A.L.R.2d 1028 (1961)). Patients deserve better—and are treated more humanely—under State law.

### 2.    Control over Facilities.

58.    Every State provides healthcare services directly to citizens through various mechanisms of government. Texas, for example, provides health services directly to patients through the Health and Human Services Commission ("HHSC"). Tex. Gov't Code § 531.0055; Tex. Health & Safety Code § 12.0115. HHSC superintends operations and resource allocation at many healthcare facilities, which are owned by Texas and receive federal funding administered by HHS, Tex. Gov't Code §§ 531.008, 531.0055, including the North Texas State Hospital.

59.    These covered entities, which exist across the country, will now be covered under the Regulation with respect to "all of the operations" of such entities. Thus, these entities will have to offer all manner of (and referrals for) medical transition procedures and treatments. As a result, Texas and other States will be

forced to allocate personnel, resources, and facility spaces to offer and accommodate the myriad medical transition procedures now required to be performed under the new Rule. Healthcare facilities will also be required to open up sex-separated showers, locker rooms, or other facilities based on individual preference. This is true even in controlled medical locations where patient access to intimate facilities is often under the control of healthcare professionals that are supposed to act in the best interests of the patient. Thus, the requirements of the new Rule amount to a substantial interference in the control that Texas and other States legitimately exercise over their healthcare facilities.

### 3.   Conflicting Federal Law.

60.    Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits employment discrimination based on religion. 42 U.S.C. § 2000e-2. To comply with Title VII, employers must reasonably accommodate an employee's religious belief, observance, or practice unless such accommodation imposes an undue hardship on the employer's business. *Id.* at § 2000e-1; *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015) (providing that Title VII requires reasonable religious accommodations).

61.    But the Regulation in many circumstances makes such accommodation illegal, placing employers between a legal Scylla and Charybdis. On the one hand, employers are required under Title VII to reasonably accommodate their employees' religious and conscientious objections. On the other hand, the Regulation requires medical employers to provide (or refer for) medical transition procedures even when

doing so would violate the religious or conscientious objections or concerns of its employees. HHS refused to affirm the principles of religious accommodation in its new Rule even when asked to do so. Thus, it forces employers, like Texas and the North Texas State Hospital, to choose between violating the Regulation or violating Title VII.

### 4. Additional Harms.

62. The Regulation is costly and burdensome on Texas and other States for a variety of additional reasons, to wit:

63. Texas and other States operate as employers that offer covered health benefits to hundreds of thousands of its employees and their families through its constituent agencies. The new Rule will require Texas and other States to provide insurance coverage for medical transition procedures.

64. The new Rule also purports to require Texas and other States to provide abortion coverage through its employee health benefits. HHS states that a State's Medicaid program constitutes a covered "health program or activity" under the Rule. Thus, "the State will be governed by Section 1557 in the provision of employee health benefits for its Medicaid employees." 81 Fed. Reg. at 31437. Texas and other States will also have to offer these types of employee benefits to employees at other state-controlled healthcare entities.

65. The exclusions Texas and other States currently possess in their employee insurance policies related to pregnancy termination and medical transition

procedures will now be illegal under the new Rule. As a result, Texas and other States will be required to change their insurance coverage.[25]

66.     In order to receive federal healthcare funding, Texas and other States must submit assurances, notices of compliance, and other information, demonstrating that their health programs and activities satisfy the requirements imposed by the Regulation. 81 Fed. Reg. at 31392, 31442.

67.     The costs of personnel training will be significant, even by HHS's very modest estimates. HHS estimates that 7,637,306 state workers will need to receive training under the new Rule, and that the cost of this training in the first two years of implementation alone will be $17.8 million.

68.     The penalties for noncompliance are so severe as to make the Regulation coercive. Texas, as an example, faces the loss of over $42.4 billion a year in healthcare funding to serve its most vulnerable citizens.[26] For example, "the Medicaid program pays for more than half of all births in Texas, a cost that otherwise would be shouldered primarily at the local and provider level," and "the Emergency Medicaid program pays for the emergency conditions of indigent noncitizens (undocumented

---

[25] Texas and other States do not provide health coverage to their employees for the termination of a pregnancy, absent certain medically compelled circumstances. *See, e.g.*, HealthSelect of Texas, Master Benefit Plan Document, at pp. 87–88 (effective Jan. 1, 2016), http://healthselectoftexas.welcometouhc.com/assets/pdf/HS%20In-Area%201-2016%20MBPD%20Revised%20FINAL.pdf.

[26] Tex. Health and Human Servs. Comm'n, *Texas Medicaid and CHIP in Perspective* 8-9 (10th ed. 2015), http://www.hhsc.state.tx.us/medicaid/about/PB/PinkBook.pdf.

immigrants and LPRs) who meet all Medicaid eligibility criteria other than citizenship."[27]

69. Finally, the new Rule could subject Texas and other States to private lawsuits for damages and attorney's fees, even though Texas and other States did not and could not have known or consented to this waiver of their sovereign immunity.

### D. The effect on the Christian Medical & Dental Association.

70. Founded in 1931, and with a current membership of over 17,000, the Christian Medical & Dental Association ("CMDA") provides a variety of programs and services supporting its mission to "change hearts in healthcare." CMDA promotes positions and addresses policies on healthcare issues; serves others through overseas medical mission projects; coordinates a network of Christian healthcare professionals for fellowship and professional growth; sponsors student ministries in medical and dental schools; distributes educational resources; provides continuing education for doctors serving missions in developing countries; and conducts academic exchange programs overseas. Its members sign a statement of faith to join CMDA and allow CMDA to serve as a voice for membership values.

71. On the issue of sexual identity, CMDA's National Convention recently adopted an Ethics Statement that was approved by its House of Delegates

---

[27] Tex. Health and Human Servs. Comm'n & Tex. Dep't of Ins., *Impact on Texas If Medicaid Is Eliminated* 20 (2009), http://www.hhsc.state.tx.us/hb-497_122010.pdf.

unanimously.[28] In this Statement, CMDA "affirms the obligation of Christian healthcare professionals to care for patients struggling with gender identity with sensitivity and compassion." The Statement also makes clear that "attempts to alter gender surgically or hormonally for psychological indications, however, are medically inappropriate," and "CMDA opposes medical assistance with gender transition" for a number of medical, ethical, and religious reasons.

72.    Regarding medical concerns, the Statement observes that "[h]ormones prescribed to a previously biologically healthy child for the purpose of blocking puberty inhibit normal growth and fertility. Continuation of cross-sex hormones, such as estrogen and testosterone, during adolescence is associated with increased health risks including, but not limited to, high blood pressure, blood clots, stroke, and some types of cancer." In addition, "Although current medical evidence is incomplete and open to various interpretations, some studies suggest that surgical alteration of sex characteristics has uncertain and potentially harmful psychological effects and can mask or exacerbate deeper psychological problems." Furthermore, "Many diseases affect men and women differently, according to biological sex phenotype. Transgender designations may conceal biological sex differences relevant to medical risk factors, recognition of which is important for effective healthcare and disease prevention." Finally, "[w]hereas treatment of anatomically anomalous sexual phenotypes is

---

[28] Christian Medical & Dental Associations, *Transgender Identification Ethics Statement*, https://cmda.org/resources/publication/transgender-identification-ethics-statement (last visited Aug. 22, 2016).

restorative, interventions to alter normal sexual anatomy to conform to transgender desires are disruptive to health."

73.     Regarding ethical concerns, the CMDA Ethics Statement observes that "CMDA is especially concerned about the increasing phenomenon of parents of children who question their gender intervening hormonally to inhibit normal adolescent development. Children lack the developmental cognitive capacity to assent or request such interventions, which have lifelong physical, psychological, and social consequences." Thus, CMDA states that "prescribing hormonal treatments to children or adolescents to disrupt normal sexual development for the purpose of gender reassignment is ethically impermissible, whether requested by the child or the parent." *Id.*

74.     In its Ethics Statement, CMDA expresses concern "that efforts to compel healthcare professionals to affirm transgender ideology, provide medical legitimization for transgender psychology, or cooperate with requests for medical or surgical sex reassignment threaten professional integrity." In addition, CMDA is concerned "that efforts to impose transgender ideology on all society by excluding, suppressing, marginalizing, intimidating, or portraying as hateful those individuals and organizations which, on scientific, moral, or religious grounds, reasonably disagree, are contrary to the freedoms of speech and religious liberty that lie at the very foundation of a just and democratic society." *Id.*

75.     As a result of medical, ethical, and religious concerns, "CMDA affirms that healthcare professionals should not be coerced or mandated to provide or refer

29

for services that they believe to be morally wrong or harmful to patients." CMDA also makes clear that "[t]o decline to provide a requested gender-altering treatment that is harmful or is not medically indicated does not constitute unjust discrimination against persons." *Id*.

76.     Many of CMDA's members will be impacted by this Rule, both based on their ability to engage in speech advising patients of their medical judgment with regard to gender transition procedures, as well as to avoid being forced to offer services or facilities in furtherance of gender transitions.

77.     CMDA has members who object to participation in medical transitions and who provide services such as hysterectomies, breast reconstruction, and hormone therapy for other medical reasons. Those members would be required to provide those services as part of a medical transition procedure under the Regulation.

78.     CMDA has members who currently provide healthcare coverage for employees, coverage which excludes medical transition procedures. Those members will be impacted by the Regulation.

79.     CMDA has members who have treated or currently treat transgender individuals, and who may be liable for failure to provide or refer for medical transition procedures.

### E.     The Effect on Franciscan Alliance.

80.     Since its founding over 140 years ago, Franciscan Alliance has remained fully committed to continuing the ministry of Jesus Christ through healthcare. Each of Franciscan's hospitals provides resources to accommodate the

spiritual needs of employees, patients, and their families. For instance, St. Anthony's hospital at Crown Point administers sacraments daily upon request, provides daily Mass, and maintains 24-hour access to the Corpus Christi Chapel to provide a sacred space for individuals of all faiths to pray and meditate. Franciscan's hospital in Munster, Indiana, provides spiritual care staff to visit with all newly admitted patients, offers opportunities for prayer and spiritual support, and maintains a Franciscan priest on staff for Catholic patients and staff who wish to participate in Catholic Mass or receive the sacraments of Holy Communion, Reconciliation, or Anointing of the Sick.

81.     Franciscan serves and respects individuals of all faith communities, seeking to ensure that patients and their families can access the resources of their own faith traditions to assist in the healing and recovery process, and to make critical decisions about matters such as end-of-life care and clinical ethics.

82.     Franciscan's infusion of faith into healthcare is not limited to spiritual support. All of Franciscan's healthcare services, and all of Franciscan's physicians and employees, follow the values of the Sisters of St. Francis.

83.     These values include:

- Respect for life: treating each person with respect, dignity, fairness, and compassion so that each person is consciously aware of being loved.

- Fidelity to Franciscan's mission: in the tradition of St. Francis of Assisi, bringing Christ's ministry of healing care to each patient, co-worker, and hospital visitor.

- Compassionate concern: caring for the welfare of patients, especially the aged, the poor, and the disabled.

- Christian stewardship: providing a just and fair allocation of human, spiritual, physical, and financial resources in a manner that respects the individual, serves society's needs, and follows the teaching of the Church.

84.     In accordance with these values, all Franciscan facilities are operated in a manner that abides by *The Ethical and Religious Directives for Catholic Healthcare Services*, as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop.

85.     Franciscan strives to provide top-quality care to its patients. Its facilities have earned designations as Centers of Excellence, Five-Star Awards, and top state and national rankings. In December of 2011, Franciscan was selected by the Center for Medicare & Medicaid Services ("CMS") as one of thirty-two Pioneer Accountable Care Organizations ("ACOs"). ACOs are groups of doctors, hospitals, and other healthcare providers who work together voluntarily to give coordinated, high-quality care to their Medicare patients. The goal of the program is to ensure patients get timely, accurate care while preventing medical errors and unnecessary duplicative services. The 2014 Quality Performance Report by CMS showed Franciscan placing in the top 6 for quality scores among all Pioneer ACOs.

86.     One of Franciscan's specialties is in Women's and Children's healthcare, a specialty which Franciscan advances in part by its Spirit of Women program. The program provides innovative clinical care, education, and wellness services.

87.     Franciscan provides a wide variety of services specifically for women, such as obstetrics and gynecology services, hysterectomies, hormone treatments, and reconstructive surgery.

88.     Franciscan is also affiliated with pediatric providers.

89.     This new Rule will impact Franciscan by 1) requiring Franciscan to offer medical services that violate its best medical judgment and religious beliefs, and 2) requiring Franciscan to provide insurance coverage for services that violate its religious beliefs.

### 1.     Compulsory Medical Services.

90.     Franciscan provides all of its standard medical services to every individual who needs and qualifies for its care, including to individuals who identify as transgender. Thus, for instance, if a transgender individual required cardiac care, Franciscan would provide the same full spectrum of compassionate care for that individual as it provides for every other cardiac patient. And, just as it does for every other cardiac patient, Franciscan would appropriately tailor that care to the biologically sex-specific health needs of the patient.

91.     But Franciscan holds religious beliefs that sexual identity is an objective fact rooted in nature as male or female persons. Like the Catholic Church it serves, Franciscan believes that a person's sex is ascertained biologically, and not by one's beliefs, desires, or feelings. Franciscan believes that part of the image of God is an organic part of every man and woman, and that women and men reflect

God's image in unique, and uniquely dignified, ways. Franciscan does not believe that government has either the power or the authority to redefine sex.

92.     Further, in its professional medical judgment, Franciscan believes that optimal patient care—including in patient education, diagnosis, and treatment— requires taking account of the biological differences between men and women. For instance, optimal prevention of and treatment for heart disease in women requires monitoring for different warning signs, accounting for different risk factors, and providing different counseling than it would for men. Part of the success of Franciscan's award-winning heart-health treatment program is driven by its recognition that women have unique biological composition and health needs that require different diagnosis and treatment than men.

93.     In Franciscan's best medical judgment, providing or assisting with gender transition services is not in keeping with the best interests of its patients. Franciscan does not offer the full continuum of care related to gender transition procedures, and thus would not be able to provide ideal care to patients seeking that care.

94.     Providing such services would also substantially burden the religious exercise of Franciscan.

95.     Accordingly, after careful review of this issue, Franciscan developed the following policy entitled the Sex Reassignment Interventions Policy: "Sexual reassignment interventions require a complex set of psychological, psychiatric and ancillary care services that are not available at Franciscan facilities. Therefore, it

would be medically imprudent to perform or otherwise facilitate any clinical interventions addressing sexual re-assignment needs. To provide or otherwise facilitate these services would also violate our deeply held religious beliefs."

96.     Franciscan employs physicians who offer endocrinology hormone services, hysterectomies, mastectomies, and psychiatric support. The new Rule would force Franciscan to offer these services as part of a medical transition, which would violate both Franciscan's best medical judgment and its religious beliefs.

97.     Some of the procedures required under the Rule, including hysterectomies for gender transition, would result in the sterilization of the patient. Since Franciscan does not believe such a hysterectomy is medically necessary, being forced to provide such a sterilization procedure would violate Franciscan's best medical judgment and religious beliefs.

98.     The Rule also prohibits discrimination on the basis of "termination of pregnancy." Franciscan performs surgical procedures for women who have miscarried a baby, such as dilation and curettage (D&C) procedures. However, Franciscan would be unwilling to offer the same service if the goal of the procedure was to terminate a pregnancy. The Rule forces Franciscan to provide abortion-related procedures in violation of Franciscan's best medical judgment and religious beliefs.

## 2. Required Insurance Coverage.

99. Franciscan has over 17,000 employees, over 500 of which are physicians. Approximately 15,000 of these employees are eligible for health insurance benefits from Franciscan.

100. Franciscan has a health benefits plan that is administered by a third party administrator.

101. In accordance with Franciscan's religious beliefs, Franciscan's employee health benefit plan specifically excludes coverage for:

- any "[t]reatment, drugs, medicines, services, and supplies related to gender transition";

- Sterilizations;

- Abortions.

102. Franciscan sincerely believes that providing insurance coverage for gender transition, sterilization, and abortion would constitute impermissible material cooperation with evil.

103. Franciscan must now choose between (a) following its faith and its best medical judgment, or (b) following the Regulation. If it follows its faith and its medical judgment, Franciscan will be subject to lawsuits and penalties. Most significantly, Franciscan annually provides approximately 900 million dollars in Medicare and Medicaid services to the poor, disabled, and elderly, and it also receives approximately $300,000 in HHS grants. If Franciscan refuses to both deny its faith and lower its standard of care, it risks losing that funding and suffering a

corresponding severe reduction in its capacity to carry out its religious mission to serve the poor, disabled, and elderly.

104.    The Regulation also makes it more expensive for Franciscan to do business with its third party administrator. The Regulation subjects the third party administrator to potential liability for administering Franciscan's religious health plan, and thus Franciscan will be forced to indemnify its third party administrator from this liability. This constitutes an additional substantial burden on its religious exercise.

**F.      The Effect on Specialty Physicians.**

105.    Specialty Physicians is a member managed limited liability company, of which Franciscan is the sole member. Specialty Physicians shares Franciscan's religious beliefs. As such, all of Specialty Physicians' facilities are operated in a manner that abides by The Ethical and Religious Directives for Catholic Health Care Services as promulgated by the United States Conference of Catholic Bishops and interpreted by the local Bishop and as modified from time to time.

106.    Specialty Physicians has also approved the same Sex Reassignment Intervention Policy as Franciscan.

107.    Specialty Physicians provides over $6 million in Medicare and Medicaid services annually to the poor, disabled, and elderly. Annually, it performs approximately 90,000 outpatient services.

108.    Specialty Physicians offers many services, such as endocrinology services, which will result in Specialty Physicians being impacted by the Regulation

in the same manner as Franciscan, in that it will be forced to offer medical services that violate its religious beliefs under the new Regulation.

109.    Specialty Physicians has approximately 300 employees who are eligible for health insurance benefits. Of those employees, approximately 60 are physicians and 15 are advanced practice providers.

110.    Specialty Physicians will likely have the same insurance plan as Franciscan as of January 1, 2017, with the same exclusions related to gender transition, abortion, and sterilization. Thus, Specialty Physicians will face the same penalties as Franciscan for exercising its religious beliefs regarding its insurance policy under the Regulation.

## IV. CLAIMS

### A. Alleged by All Plaintiffs.

### COUNT I

### Violation of the Administrative Procedure Act
### Agency Action Not in Accordance with Law

111.    The Plaintiffs incorporate by reference all preceding paragraphs.

112.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

113.    The APA prohibits agency actions that are "not in accordance with law." 5 U.S.C. § 706(2)(A). Under the APA, courts "review questions of law freely and are under no obligation to defer to the agency's legal conclusions. *Inst. for Tech. Dev. v.*

*Brown*, 63 F.3d 445, 450 (5th Cir. 1995). In such a context, a court's "review is effectively *de novo.*" *Id.*; *see also Velasquez-Tabir v. I.N.S.*, 127 F.3d 456, 459 n.9 (5th Cir. 1997) (under the APA, "[r]eview of a question of law is de novo"); *Meadows v. S.E.C.*, 119 F.3d 1219, 1224 (5th Cir. 1997) (noting that when reviewing agency action, "legal conclusions are for the courts to resolve" (internal quotation mark omitted)). The Regulation is not in accordance with law for a number of independent reasons.

114.    HHS has explained that the Regulation will require physicians to perform medical transition procedures regardless of whether those procedures are "medically necessary" or even "medically appropriate." It is not in accordance with law, within the meaning of 5 U.S.C. § 706(2)(A), for the federal government to require medical professionals to perform procedures that may not be necessary or appropriate, and may in fact be harmful to the patients. This violates constitutional and statutory rights of medical professionals, including substantive due process rights and freedom of speech protections, as well as the sovereign prerogatives of the States, which play a significant role in overseeing the promulgation and administration of appropriate standards of care within the healthcare community. Courts scrutinize particularly closely agency action that raises constitutional concerns.

115.    The Regulation also states that a physician's view of medical transition procedures as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429.  It is not in accordance with law,

within the meaning of 5 U.S.C. § 706(2)(A), for the federal government to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, and to dictate what constitutes best standards of care in an area of science and medicine that is being hotly debated in the medical community. This violates constitutional and statutory rights of medical professionals, including substantive due process rights and freedom of speech protections.

116.    The Regulation is not in accordance with Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) or Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*. Section 1557 does not, on its own terms, prohibit discrimination on the basis of "sex." Instead, it prohibits discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX, in turn, prohibits discrimination "on the basis of sex . . . except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a), (a)(3).

117.    Neither Section 1557 nor Title IX uses the term "sex" to include "gender identity." Thus, HHS's attempt to expand the definition is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

118.    HHS's failure to include in the Regulation a religious exemption that parallels the religious exemption in Title IX is also not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).

119.    HHS's failure to include an exclusion for sterilization and sterilization-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b), which protect the right of healthcare entities who receive federal funding to refuse to participate in or assist with sterilizations.

120.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the plain language of Title IX, which prohibits requiring coverage, payment, or the use of facilities for abortion.

121.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. §300a-7(b), which protect the right of healthcare entities who receive federal funding to refuse to participate in or assist with abortions.

122.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with Section 245 of the Public Health Service Act, 42 U.S.C. § 238(n), which prohibits the federal government and any state or local government receiving federal financial assistance from discriminating against any healthcare entity on the basis that the entity refuses to perform abortions, provide referrals for abortions, or to make arrangements for such abortions.

123.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Weldon Amendment, which has been readopted or incorporated by reference in every HHS appropriations act since 2005,[29] and provides that no funds may be made available under HHS appropriations act to a government entity that discriminates against an institution or individual physician or healthcare professional on the basis that the entity or individual "does not provide, pay for, provide coverage of, or refer for abortions."

124.    HHS's failure to include an exclusion for abortion and abortion-related services is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with Section 1303(b)(4) of the ACA, 42 U.S.C. § 18023, which states that "[n]o qualified health plan offered through an Exchange may discriminate against any individual health care provider or health care facility because of its unwillingness to provide, pay for, provide coverage of, or refer for abortions."

125.    The Regulation is not in accordance with Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.). Title VII prohibits employers from discriminating against employees on the basis of religion. 42 U.S.C. § 2000e-2. This means that employers, including Plaintiffs, have a duty to reasonably accommodate their employees' religious practices unless doing so would cause undue hardship to

---

[29] *See* Consolidated Appropriations Act, 2016, H.R. 2029, 114th Cong. § 507(d) (2015).

the employer. Plaintiffs employ individuals who have religious or conscientious objections to performing medical transition procedures. It should not be an undue hardship on Plaintiffs to accommodate these employees' religious beliefs, but the new Regulation will in many cases make it illegal for Plaintiffs who receive HHS funds to accommodate their employees in accordance with Title VII. Thus, the Regulation is not in accordance with Title VII.

126.   The Regulation states that a physician's view of medical transition procedures as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429. It is not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A) for the federal government to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, and to dictate what constitutes best standards of care and what services physicians must offer in an area of science and medicine that is being hotly debated in the medical community. This violates constitutional and statutory rights of medical professionals, including a medical professional's freedom of speech to offer candid professional advice about the experimental nature and dangerous health outcomes associated with medical transition procedures, and freedom not to be compelled to speak in favor of or make referrals for such procedures.

127.   The Regulation also forces physicians to provide medical services related to gender transition. This is not in accordance with substantive due process rights protecting a medical professional's right to not perform a procedure he or she believes to be experimental, ethically questionable, and potentially harmful.

128.   The Regulation is not in accordance with the First Amendment because the Regulation is overbroad and not narrowly tailored to a compelling governmental interest.

129.   The Regulation is not in accordance with the First Amendment and Fifth Amendment because it is void for vagueness.

130.   The Regulation is not in accordance with the First Amendment because it violates Plaintiffs' rights not to be subjected to a system of unbridled discretion when engaging in speech or religious exercise.

131.   The Regulation is not in accordance with the Tenth Amendment, which prohibits the federal government from co-opting a state's control over budgetary processes and legislative agendas.

132.   The Regulation is contrary to the First Amendment because it imposes an unconstitutional condition on Plaintiffs' receipt of federal funding. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2331, 186 L. Ed. 2d 398 (2013).

133.   The Regulation is contrary to the First Amendment because violates Plaintiffs' freedom of association protections.

134.   The Regulation is contrary to law because it violates the Religious Freedom Restoration Act.

135.   The Regulation is contrary to law because it violates the Free Exercise clause of the First Amendment.

136.    The Regulation is contrary to law because it violates the Fifth Amendment Due Process and Equal Protection clauses.

137.    The Regulation is contrary to the protections of the Spending Clause.

138.    The Regulation is an unlawful abrogation of sovereign immunity.

139.    The Regulation is contrary to the protections of the Tenth Amendment.

140.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

141.    Plaintiffs have no adequate remedy at law.

142.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT II

### Violation of the Administrative Procedure Act
### Agency Action In Excess of Statutory Authority and Limitations

143.    The Plaintiffs incorporate by reference all preceding paragraphs.

144.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

145.    The APA prohibits agency actions that are "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). The Regulation is in excess of statutory jurisdiction, authority, and limitations for a number of reasons.

146.    For the reasons described above, there is no statutory authority or jurisdiction for HHS to require medical professionals and facilities to perform

procedures (or refer for the same) that may not be necessary or appropriate, and may in fact be harmful to the patients.

147.   For the reasons described above, there is no statutory authority or jurisdiction for HHS to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, or to dictate what constitutes best standards of care in an area of science and medicine that is being hotly debated in the medical community.

148.   For the reasons described above, HHS's decision to interpret Section 1557's reference to "sex" discrimination to include "gender identity" is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

149.   For the reasons described above, HHS's failure to include a religious exemption in the Regulation that parallels the religious exemption in Title IX is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

150.   For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

151.   For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is

inconsistent with the plain language of Title IX, which prohibits requiring coverage, payment, or the use of facilities for abortion.

152.    For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

153.    For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with Section 245 of the Public Health Service Act, 42 U.S.C. § 238(n),

154.    For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with the Weldon Amendment, which has been readopted or incorporated by reference in every HHS appropriations act since 2005.[30]

155.    For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is inconsistent with Section 1303(b)(4) of the ACA, 42 U.S.C. § 18023.

---

[30] *See* Consolidated Appropriations Act, 2016, H.R. 2029, 114th Cong. § 507(d) (2015).

156.    For the reasons described above, HHS's decision to require Plaintiffs to act in violation of Title VII by not accommodating their employees' religious and conscientious objections to participating in (or referring for) medical transition treatment or procedures is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C).

157.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates Plaintiffs' freedom of speech.

158.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates Plaintiffs' substantive due process rights.

159.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates the First Amendment because it is overbroad and not narrowly tailored to a compelling governmental interest.

160.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) as it violates the First Amendment because it is overbroad and not narrowly tailored to a compelling governmental interest.

161.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is void under the First and Fifth Amendment for vagueness.

162.   For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates Plaintiffs' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

163.   For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it co-opts states' control over budgetary processes and legislative agendas contrary to the Tenth Amendment.

164.   For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it imposes an unconstitutional condition on Plaintiffs' receipt of federal funding contrary to the First Amendment.

165.   For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates Plaintiffs' First Amendment freedom of association.

166.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates the Religious Freedom Restoration Act.

167.   For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates the Free Exercise clause of the First Amendment.

168.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it violates the Fifth Amendment Due Process and Equal Protection clauses.

169.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is contrary to the protections of the Spending Clause.

170.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is an unlawful abrogation of sovereign immunity.

171.    For the reasons discussed above, the Regulation is in excess of statutory jurisdiction, authority, and limitations within the meaning of 5 U.S.C. § 706(2)(C) because it is contrary to the protections of the Tenth Amendment.

172.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

173.    Plaintiffs have no adequate remedy at law.

174.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT III

### Violation of the Administrative Procedure Act
### Agency Action that is Arbitrary, Capricious and an Abuse of Discretion

175.    The Plaintiffs incorporate by reference all preceding paragraphs.

176.    Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and

constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704.

177.   The APA prohibits agency actions that are "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A). The Regulation is arbitrary and capricious agency action for a number of reasons.

178.   HHS has explained that the Regulation will require physicians to perform medical transition procedures regardless of whether those procedures are "medically necessary" or even "medically appropriate." It is arbitrary and capricious for the federal government to require medical professionals to perform (or refer for) procedures that the physician believes may not be necessary or appropriate, and that may even be harmful to the patient.

179.   For the reasons discussed above, it is arbitrary and capricious for HHS to dictate appropriate medical views on the necessity and experimental nature of medical transition procedures, and to dictate what constitutes best standards of care.

180.   For the reasons discussed above, HHS's inclusion of "gender identity" in its interpretation of "sex" is an arbitrary and capricious interpretation of Section 1557 of the Affordable Care Act (42 U.S.C. § 18116) and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.*

181.   For the reasons discussed above, HHS's failure to include a religious exemption in the Regulation that parallels the religious exemption in Title IX is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

182.   For the reasons discussed above, HHS's failure to include an exclusion for sterilization and sterilization-related services is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is inconsistent with the Church Amendments, 42 U.S.C. § 300a-7(b).

183.   For the reasons discussed above, HHS's failure to include an exclusion for abortion and abortion-related services is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

184.   For the reasons described above, HHS's decision to require Plaintiffs to act in violation of Title VII by not accommodating their employees' religious objections to participating in medical transition procedures is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A).

185.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates Plaintiffs' freedom of speech.

186.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates Plaintiffs' substantive due process rights.

187.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) as it violates the First Amendment because it is overbroad and not narrowly tailored to a compelling governmental interest.

188.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is void under the First and Fifth Amendment for vagueness.

189.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates Plaintiffs' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

190.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it co-opts States' control over budgetary processes and legislative agendas contrary to the Tenth Amendment.

191.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it imposes an unconstitutional condition on Plaintiffs' receipt of federal funding contrary to the First Amendment.

192.   The Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates Plaintiffs' First Amendment freedom of association.

193.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates the Religious Freedom Restoration Act.

194.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates the Free Exercise Clause of the First Amendment.

195.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it violates the Fifth Amendment Due Process and Equal Protection clauses.

196.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is contrary to the protections of the Spending Clause.

197.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is an unlawful abrogation of sovereign immunity.

198.   For the reasons discussed above, the Regulation is arbitrary and capricious within the meaning of 5 U.S.C. § 706(2)(A) because it is contrary to the protections of the Tenth Amendment.

199.   Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

200.   Plaintiffs have no adequate remedy at law.

201.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

**B. Alleged by CMDA,  Franciscan, and Specialty Physicians only**

## COUNT IV

**Violation of the First Amendment of the United States Constitution
Freedom of Speech
Compelled Speech and Compelled Silence**

202.   The Plaintiffs incorporate by reference all preceding paragraphs.

203.   The Plaintiffs plan to continue using their best medical and ethical judgment in treating and advising patients. Performing (or referring for) medical transition procedures is contrary to their best medical and/or ethical judgment.

204.   The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429.

205.   The Regulation would prohibit the Plaintiffs from expressing their professional opinions that medical transition procedures are not the best standard of care or are experimental.

206.   Performing (or referring for) medical transition procedures is also contrary to the religious and conscientious beliefs of the Plaintiffs, and their beliefs prohibit them from conducting, participating in, or referring for such procedures.

207.   The Regulation would compel the Plaintiffs to conduct, participate in, refer for, or otherwise facilitate medical transition procedures.

208.    The Regulation would prohibit the Plaintiffs from expressing their religious views that medical transition procedures are not the best standard of care or are experimental.

209.    The Regulation would compel the Plaintiffs to speak in ways that they would not otherwise speak.

210.    The Regulation thus violates the Plaintiffs right to be free from compelled speech as secured to them by the First Amendment of the United States Constitution.

211.    The Regulation's compelled speech requirement is not justified by a compelling governmental interest.

212.    Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

213.    Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT V

**Violation of the First Amendment of the United States Constitution
Freedom of Speech and Free Exercise Clause
Viewpoint Discrimination**

214.    The Plaintiffs incorporate by reference all preceding paragraphs.

215.    The Plaintiffs' sincere religious and conscientious beliefs prohibit them from facilitating or participating in medical transition procedures.

216.    The Plaintiffs' medical judgment is that, in general, it is harmful to encourage a patient to undergo medical transition procedures.

217.   The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429.

218.   The Regulation would prohibit the Plaintiffs from expressing their religious or conscientious viewpoint that medical transition procedures are not the best standard of care.

219.   The Regulation withholds funding based on an intent to restrict Plaintiffs' speech.

220.   The Regulation's viewpoint discrimination is not justified by a compelling governmental interest.

221.   Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

222.    Defendants' actions thus violate the Plaintiffs rights as secured to them by the First Amendment of the United States Constitution.

223.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT VI

**Violation of the First and Fifth Amendments of the United States Constitution
Freedom of Speech and Due Process
Overbreadth**

224.   Plaintiffs incorporate by reference all preceding paragraphs.

225.   The Regulation regulates protected speech.

226.   The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429.

227.   This exposes the Plaintiffs to penalties for expressing their medical and moral views of medical transition procedures. It also prohibits Plaintiffs from using their medical judgment to determine the appropriate standard of care for interactions with their patients.

228.   Plaintiffs believe that the Regulation restricts their speech regarding the best standard of care for patients.

229.   The Regulation states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent."

230.   The Regulation chills the Plaintiffs' speech.

231.   The Regulation's overbreadth is not justified by a compelling governmental interest.

232.   Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

233.   Defendants have therefore violated the Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment by prohibiting speech that would otherwise be protected.

234.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT VII

## Violation of the First and Fifth Amendments of the United States Constitution
## Freedom of Speech and Due Process
## Void for Vagueness

235.   The Plaintiffs incorporate by reference all preceding paragraphs.

236.   The Regulation requires that a covered entity apply "neutral, nondiscriminatory criteria that it uses for other conditions when the coverage determination is related to gender transition" and "decline[s] to limit application of the rule by specifying that coverage for the health services addressed in § 92.207(b)(3)–(5) must be provided only when the services are medically necessary or medically appropriate." 81 Fed. Reg. at 31435.

237.   Without allowing Plaintiffs to use their judgment about what is medically necessary or appropriate, the Regulation is ambiguous in the types of services Plaintiffs are required to provide and perform.

238.   Requiring the Plaintiffs apply "neutral, nondiscriminatory criteria that it uses for other conditions" is a subjective standard without a limiting construction. *Id.*

239.   The Regulation states, in the context of physicians offering "health services" that a "categorization of all transition-related treatment, for example as experimental, is outdated and not based on current standards of care." *Id.*; *see also id.* at 31429.

240.   The Regulation does not provide a limiting construction for what the current standard of care is, nor does it provide guidance as to how physicians can rely on their best medical judgment when it conflicts with the Regulation.

241.   The Regulation is not justified by a compelling governmental interest.

242.   Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

243.   Because Plaintiffs are unable to determine what kind of procedures and services they will be required to provide and perform, Defendants have violated the Plaintiffs' rights secured to them by the Free Speech Clause of the First Amendment and the Due Process Clause of the Fifth Amendment.

244.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT VIII

### Violation of the First Amendment of the United States Constitution
### Free Exercise Clause and Freedom of Speech
### Unbridled Discretion

245.   The Plaintiffs incorporate by reference all preceding paragraphs.

246.   The Regulation "applies to every health program or activity, any part of which receives Federal financial assistance provided or made available by the Department; every health program or activity administered by the Department; and every health program or activity administered by a Title I entity." 45 C.F.R. 92.2(a).

247.   The Regulation also states: "The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." 81 Fed. Reg. at 31377.

248.   The Regulation also says: "Insofar as the application of any requirement under this part would violate applicable Federal statutory protections for religious freedom and conscience, such application shall not be required." 45 C.F.R. 92.2(b)(2).

249.   Because the Defendants have sole discretion over financial assistance provided or made available, and because Defendants have sole discretion over the application of the Regulation and any religious freedom protection that applies, the Regulation vests unbridled discretion over which organizations will have their First Amendment interests accommodated.

250.   In Title IX of the Education Amendments of 1972, Congress precluded discrimination on the basis of "sex" in federally funded education programs, "except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681(a)(3). Defendants have exercised unbridled discretion by declining to apply the clear religious freedom protections of Title IX.

251.   In Title IX of the Education Amendments of 1972, Congress banned sex discrimination in federally funded education programs, except that it made clear that "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of

facilities, related to an abortion. Nothing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion." 20 U.S.C. § 1688. Defendants have exercised unbridled discretion by declining to apply the clear abortion protections of Title IX.

252.    Defendants' actions therefore violate the Plaintiffs' rights not to be subjected to a system of unbridled discretion when engaging in speech or when engaging in religious exercise, as secured to them by the First Amendment of the United States Constitution.

253.    Absent injunctive and declaratory relief against the Regulation, Plaintiffs have been and will continue to be harmed.

## COUNT IX

### Violation of the First Amendment to the United States Constitution
### Free Speech Clause
### Unconstitutional Conditions

254.    The Plaintiffs incorporate by reference all preceding paragraphs.

255.    The Regulation imposes an unconstitutional condition on Plaintiffs' receipt of federal funding. *See Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321, 2331 (2013).

256.    The Regulation applies to any healthcare provider who accepts federal funding from any source for any program.

257.    The Regulation requires the Plaintiffs to adopt policies regarding standards of care for patients that violate Plaintiffs' religious and conscientious

beliefs, as well as their medical judgment, and also interfere with the Plaintiffs' practice of medicine.

258.    Defendants' actions therefore impose an unconstitutional condition on Plaintiffs' receipt of federal funding and violate Plaintiffs' rights as secured to them by the First and Fourteenth Amendments of the United States Constitution.

259.    Absent injunctive and declaratory relief against the Regulation, Plaintiffs have been and will continue to be harmed.

## COUNT X

**Violation of the First Amendment
Freedom of Speech
Expressive Association**

260.    The Plaintiffs incorporate by reference all preceding paragraphs.

261.    The Plaintiffs believe and teach that participating in actions, procedures, and services with the goal of transitioning from one sex to another violate their religious beliefs.

262.    The Plaintiffs believe and teach that participating in actions, procedures, and services that result in elective sterilizations violate their religious beliefs.

263.    The Plaintiffs believe and teach that participating in actions, procedures, and services related to abortion violate their religious beliefs.

264.    The Transgender Mandate would compel the Plaintiffs to participate in procedures, services, and activities that contradict the Plaintiffs' religious beliefs and message.

265.    The Transgender Mandate would compel the Plaintiffs to offer insurance coverage for procedures, services, and activities that violate Plaintiffs' religious beliefs and message.

266.    Defendants' actions thus violate Plaintiffs' rights of expressive association as secured to them by the First Amendment of the United States Constitution.

267.    Absent injunctive and declaratory relief against the Transgender Mandate, the Plaintiffs have been and will continue to be harmed.

268.    The Regulation exposes the Plaintiffs to civil suits that would hold them liable for practicing and expressing their sincerely held religious beliefs.

269.    The Regulation furthers no compelling governmental interest.

270.    The Regulation is not the least restrictive means of furthering Defendants' stated interests.

## COUNT XI

**Violation of the Religious Freedom Restoration Act**
**Compelled Medical Services**

271.    The Plaintiffs incorporate by reference all preceding paragraphs.

272.    The Religious Plaintiffs' sincerely held religious beliefs prohibit them from deliberately offering services and performing (or referring for) operations or other procedures required by the Regulation. The Plaintiffs' compliance with these beliefs is a religious exercise.

273.   The Plaintiffs' sincerely held religious beliefs prohibit them facilitating medical transition procedures. The Plaintiffs' compliance with these beliefs is a religious exercise.

274.   The Plaintiffs' sincerely held religious beliefs prohibit them facilitating sterilization procedures. The Plaintiffs' compliance with these beliefs is a religious exercise.

275.   The Plaintiffs' sincerely held religious beliefs prohibit them facilitating abortion-related services. The Plaintiffs' compliance with these beliefs is a religious exercise.

276.   The Regulation creates government-imposed coercive pressure on the Plaintiffs to change or violate their religious beliefs.

277.   The Regulation chills the Plaintiffs' religious exercise.

278.   The Regulation exposes the Plaintiffs to the loss of substantial government funding as a result of their religious exercise.

279.   The Regulation exposes the Plaintiffs to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

280.   The Regulation exposes the Plaintiffs to criminal penalties under 18 U.S.C. § 1035.

281.   The Regulation exposes the Plaintiffs to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

282.   The Regulation thus imposes a substantial burden on the Plaintiffs' religious exercise.

283.    The Regulation furthers no compelling governmental interest.

284.    The Regulation is not the least restrictive means of furthering Defendants' stated interests.

285.    The Regulation violates the Plaintiffs rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

## COUNT XII

### Violation of the Religious Freedom Restoration Act
### Compelled Insurance Coverage

286.    The Plaintiffs incorporate by reference all preceding paragraphs.

287.    For the same reasons discussed above, Plaintiffs' sincerely held religious beliefs prohibit them from deliberately offering health insurance that would cover gender transition procedures, sterilization procedures, or abortion-related procedures.

288.    Plaintiffs specifically exclude coverage of any services related to gender transition procedures, sterilization procedures, or abortion-related procedures in their insurance plans.

289.    The Plaintiffs' compliance with these beliefs by maintaining these exclusions is a religious exercise.

290.    Under the Regulation, insurance exclusions related to gender transition are facially invalid.

291.    Under the Regulation, insurance exclusions related to sterilization are facially invalid.

292.    Under the Regulation, insurance exclusions related to abortion services are facially invalid.

293.    The Regulation exposes the Plaintiffs to the loss of substantial government funding as a result of their religious exercise.

294.    The Regulation also makes it much more expensive for Franciscan and Specialty Physicians to do business with a third party administrator for a health benefits plan. The Regulation subjects third party administrators to potential liability for administering religious health plans like Franciscan's, and thus Franciscan and Specialty Physicians will be forced to indemnify any third party administrator from this liability. This constitutes an additional substantial burden on its religious exercise.

295.    The Regulation exposes the Plaintiffs to substantial penalties under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

296.    The Regulation exposes the Plaintiffs to criminal penalties under 18 U.S.C. § 1035.

297.    The Regulation exposes the Plaintiffs to civil suits that would hold them liable for practicing their sincerely held religious beliefs.

298.    The Regulation thus imposes a substantial burden on the Plaintiffs' religious exercise.

299.    The Regulation furthers no compelling governmental interest.

300.    The Regulation is not the least restrictive means of furthering Defendants' stated interests.

301.    The Regulation violates the Plaintiffs rights secured to them by the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb *et seq.*

## COUNT XIII

**Violation of the First Amendment to the United States Constitution Free Exercise Clause**

302.    The Plaintiffs incorporate by reference all preceding paragraphs.

303.    Plaintiffs object to providing, facilitating, or otherwise participating in medical transition procedures.

304.    The Regulation imposes substantial burdens on the Plaintiffs by forcing them to choose between federal funding and their livelihood as healthcare providers and their exercise of religion.

305.    The Regulation seeks to suppress the religious practice of individuals and organizations such as the Plaintiffs, while allowing exemptions for similar conduct based on secular and non-religious reasons. Thus, the Regulation is neither neutral nor generally applicable.

306.    The Regulation is not justified by a compelling governmental interest.

307.    Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

308.    Defendants' actions thus violate the Plaintiffs' rights secured to them by the Free Exercise Clause of the First Amendment of the United States Constitution.

309.    Absent injunctive and declaratory relief against the Regulation, Plaintiffs have been and will continue to be harmed.

## <u>COUNT XIV</u>

**Violation of the Fifth Amendment to the United States Constitution
Due Process Clause
Substantive Due Process**

310.   Plaintiffs incorporate by reference all preceding paragraphs.

311.   The United States has a deeply rooted tradition of honoring physicians' rights to provide medical treatment in accordance with their moral and religious beliefs.

312.   Plaintiffs possess a fundamental right of liberty of conscience.

313.   Plaintiffs possess a fundamental right not to be coerced to provide medical procedures and services in violation of their conscience.

314.   The Regulation coerces Plaintiffs to provide medical procedures and services in violation of their conscience.

315.   Defendants' conduct cannot be justified by a compelling governmental interest.

316.   The Regulation is not justified by a compelling governmental interest.

317.   Even if HHS has a compelling government interest, the Regulation is not narrowly tailored to achieve that interest.

318.   Defendants' actions therefore violate Plaintiffs' rights to substantive due process.

319.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## COUNT XV

### Violation of the Fifth Amendment to the United States Constitution
### Due Process and Equal Protection

320.   The Plaintiffs incorporate by reference all preceding paragraphs.

321.   The Due Process Clause of the Fifth Amendment mandates the equal treatment of all religious faiths and institutions without discrimination or preference.

322.   The Regulation discriminates on the basis of religious views or religious status by refusing to recognize religious exemptions that exist in the law.

323.   The Regulation discriminates on the basis of religious views or religious status by refusing to recognize valid medical views of religious healthcare professionals on medical transition procedures.

324.   The Defendants' actions thus violate the Plaintiffs' rights secured to them by the Fifth Amendment of the United States Constitution.

325.   Absent injunctive and declaratory relief against the Regulation, the Plaintiffs have been and will continue to be harmed.

## C. Alleged by Government Plaintiffs Only.

## COUNT XVI

### Violation of Constitutional Standards of Clear Notice
### Under the Spending Clause

326.   The Plaintiffs incorporate by reference all preceding paragraphs.

327.   When Congress exercises its Spending Clause power against the States, the United States Supreme Court has held that principles of federalism require

conditions on Congressional funds given to States must enable a state official to "clearly understand," from the language of the law itself, what conditions the State is agreeing to when accepting the federal funds. *Arlington Cent. Sch. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.''" *NFIB v. Sebelius*, 132 S. Ct. 2566, 2602 (2012) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Defendants' *ex-post* Regulation is not in accord with the understanding that existed when the States chose to begin accepting Medicare and Medicaid as payment for medical services provided. *Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (providing that a state's obligation under cooperative federalism program "generally should be determined by reference to the law in effect when the grants were made").

328.   The text employed by Congress does not support understanding the term "sex" in the manner put forth by Defendants. While Congress has expressed its intent to cover "gender identity," as a protected class, in *other* pieces of legislation, *see, e.g.*, 18 U.S.C. § 249(a)(2)(A); 42 U.S.C. § 13925(b)(13)(A), it has not done so regarding Title IX. In *other* legislation, Congress included "gender identity" along with "sex," thus evidencing its intent for "sex" in Title IX to retain its original and only meaning—one's immutable, biological sex as acknowledged at or before birth.

329.   The Regulation was passed under the authority Congress delegated to HHS in Section 1557 of the Affordable Care Act. Section 1557 does not add a new non-discrimination provision to the federal code, but merely incorporates by reference

pre-existing provisions under Title VI, Title IX, the Americans with Disabilities Act, and the Rehabilitation Act. Section 1557 does not independently define terms such as "sex."

330.    At the time that the ACA was passed in 2010, no federal courts or agencies had interpreted "sex" in Title IX to include gender identity.

331.    Title IX also provides that "Nothing in this chapter shall be construed to require . . . any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C.A. § 1688.

332.    Thus, no State could fathom, much less "clearly understand," that the ACA would impose on it the conditions created by HHS's new Regulation—namely, a new "gender identity" requirement, as well as a provision to require coverage, funding, or facilities for abortion. Accordingly, the new Regulation violates the Spending Clause.

333.    Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)–(C). Thus, the Spending Clause violations articulated herein provide the Court with an additional basis to set aside the new Rule under the APA.

## <u>COUNT XVII</u>

### Unlawful Abrogation of Sovereign Immunity

334.   Plaintiffs incorporate by reference all preceding paragraphs.

335.   The federal government may not abrogate a state's sovereign immunity unless it makes that intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under § 5 of the Fourteenth Amendment. *See, e.g.*, *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726, 728 n.2 (2003).

336.   The abrogation referenced herein was not unmistakably clear in the language of the relevant statutes, and Defendants did not act pursuant to a valid exercise of federal power under § 5 of the Fourteenth Amendment.

337.   In enacting Section 1557 of the ACA, Congress did not make findings regarding "gender identity," but merely incorporated existing law under Title IX, which does not extend to "gender identity." Congress has in fact declined to pass specific "gender identity" legislation on numerous occasions.

338.   The Regulation abrogates the sovereign immunity of the States by subjecting them to lawsuits from their employees. It does so without clear authorization from Congress, and its expansion of the definition of "sex" to include "gender identity" is not supported by Congressional findings.

339.   The Regulation abrogates the sovereign immunity of the States by subjecting them to lawsuits from non-employees, including spouses and dependents of its employees, students at health-related schools run by the States, and patients

at state-run hospitals and medical facilities. It does so without clear authorization from Congress, and its expansion of the definition of "sex" to include "gender identity" is not supported by Congressional findings.

340. Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)–(C). Thus, the improper abrogation of the States' sovereign immunity articulated herein provides the Court with an additional basis to set aside the new Rule under the APA.

## COUNT XVIII

### Violation of the Spending Clause
### The Regulation is Unlawful and Unconstitutionally Coercive

341. Plaintiffs incorporate by reference all preceding paragraphs.

342. The federal government cannot use its Spending Clause powers to coerce the States, even when proper notice procedures are followed.

343. The Supreme Court struck down a similar attempt under the ACA because "such conditions take the form of threats to terminate other significant independent grants," and are therefore "properly viewed as a means of pressuring the States to accept policy changes." *NFIB*, 132 S. Ct. at 2604.

344.   The Regulation threatens other independent grants, such as general Medicare and Medicaid funds, as well as other health-related grants.

345.   By placing in jeopardy a substantial percentage of the State's budget if it refuses to comply with the Regulation, Defendants have left the State no real choice but to acquiesce in such policy. *See NFIB*, 132 S. Ct. at 2605 ("The threatened loss of over 10 percent of a State's overall budget, in contrast, is economic dragooning that leaves the States with no real option but to acquiesce. . . .").

346.   Such compulsion is excessive under the Spending Clause, even in the presence of clear notice. "Congress may use its spending power to create incentives for [entities] to act in accordance with federal policies. But when 'pressure turns into compulsion,' the legislation runs contrary to our system of federalism." *NFIB*, 132 S. Ct. at 2602 (quoting *Steward Machine Co. v. Davis*, 301 U.S. 548, 590 (1937)) (internal citation omitted). "That is true whether Congress directly commands a State to regulate or indirectly coerces a State to adopt a federal regulatory system as its own." *Id.*

347.   The compulsion is also improper because the Regulation changes the conditions for the receipt of federal funds *after* the States had already accepted Congress's original conditions. But "[t]he legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.'" *NFIB*, 132 S. Ct. at 2602 (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)).

348.   Moreover, Defendants are "agencies" under the APA, 5 U.S.C. § 551(1), and the new Regulation complained of herein is a "rule" under the APA, *id.* § 551(4), and constitutes "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704. The APA requires the Court to hold unlawful and set aside any agency action that is "contrary to constitutional right, power, privilege, or immunity" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(B)–(C). Thus, the Spending Clause violations articulated herein provide the Court with an additional basis to set aside the new Rule under the APA.

## COUNT XIX

### The Regulation Unlawfully Commandeers the States

349.   Plaintiffs incorporate by reference all preceding paragraphs.

350.   With the Regulation, Defendants have "commandeer[ed] a State's legislative or administrative apparatus for federal purposes." *NFIB*, 132 S. Ct. at 2602.

351.   Such commandeering exceeds powers delegated to Congress under Article I and invades the powers reserved to the States in the Tenth Amendment.

## COUNT XX

### Unconstitutional Exercise of Federal Power in Violation of the Tenth Amendment

352.   Plaintiffs incorporate by reference all preceding paragraphs.

353.   State Plaintiffs cannot afford the exorbitant and unfunded costs of the Regulation, but has no choice other than to participate.

354. By effectively co-opting the Plaintiffs' control over their budgetary processes and legislative agendas through compelling them to assume costs they cannot afford, the new Rule invades their sovereign sphere.

355. The new Rule violates the Tenth Amendment of the Constitution of the United States, and runs afoul of the Constitution's principle of federalism, by commandeering the State Plaintiffs and their employees as agents of the federal government's regulatory scheme at the States' own cost.

## V. PRAYER FOR RELIEF

Wherefore, Plaintiffs pray the Court:

a.   Declare that the challenged Regulation is invalid under the Administrative Procedure Act;

b.   Declare that the challenged Regulation is invalid under the Religious Freedom Restoration Act;

c.   Declare that the challenged Regulation is invalid under the First Amendment to the United States Constitution;

d.   Declare that the challenged Regulation is invalid under the Fifth Amendment of the United States Constitution;

e.   Declare that the challenged Regulation is invalid under the Fourteenth Amendment of the United States Constitution;

f.   Issue a permanent injunction enjoining Defendants from enforcing the challenged Regulations against Plaintiffs, those acting in concert with Plaintiffs, and all States;

g.      Award actual damages;

h.      Award nominal damages;

i.      Award Plaintiffs the costs of this action and reasonable attorney's fees;

and

j.      Award such other and further relief as it deems equitable and just.

## VI. JURY DEMAND

Plaintiffs hereby request a trial by jury on all issues so triable.

Respectfully submitted this the 23rd day of August, 2016.

| | |
|---|---|
| /s/ Luke W. Goodrich<br>Luke W. Goodrich<br>DC Bar No. 977736<br>(N.D. Tex. admission pending)<br>The Becket Fund for Religious Liberty<br>1200 New Hampshire Ave. NW<br>Suite 700<br>Washington, DC 20036<br>(202) 955-0095<br>(202) 955-0090<br>lgoodrich@becketfund.org<br><br>*Counsel for Plaintiffs Christian Medical & Dental Associations, Franciscan Alliance, Inc., Specialty Physicians of Illinois, LLC* | KEN PAXTON<br>Attorney General of Texas<br><br>JEFFREY C. MATEER<br>First Assistant Attorney General<br><br>BRANTLEY STARR<br>Deputy First Assistant Attorney General<br><br>PRERAK SHAH<br>Senior Counsel to the Attorney General<br><br>ANDREW D. LEONIE<br>Associate Deputy Attorney General for Special Litigation<br><br>AUSTIN R. NIMOCKS<br>Associate Deputy Attorney General for Special Litigation<br><br>/s/ Austin R. Nimocks<br>AUSTIN R. NIMOCKS<br>Texas Bar No. 24002695<br>Austin.Nimocks@texasattorneygeneral.gov<br><br>MICHAEL C. TOTH<br>Senior Counsel for Special Litigation<br><br>Special Litigation Division<br>P.O. Box 12548, Mail Code 009<br>Austin, Texas 78711-2548<br>(512) 936-1414<br><br>*ATTORNEYS FOR PLAINTIFFS STATE OF TEXAS; STATE OF WISCONSIN; STATE OF NEBRASKA; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; and STATE OF KANSAS* |