**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC.; SPECIALITY PHYSICIANS OF ILLINOIS, LLC,; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; <br><br> - and - <br><br> STATE OF TEXAS; STATE OF WISCONSIN; STATE OF NEBRASKA; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; and STATE OF KANSAS, <br><br>        *Plaintiffs*, <br>   v. <br><br> SYLVIA BURWELL, Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES <br><br>        *Defendants*. | Civ. Action No. 7:16-cv-00108-O |

<u>**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO INTERVENE OF RIVER CITY GENDER ALLIANCE AND ACLU OF TEXAS**</u>

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ....................................................................................................................... 1

BACKGROUND ........................................................................................................................ 2

MOVANTS .................................................................................................................................. 7

ARGUMENT .............................................................................................................................. 9

    I.   Movants Satisfy the Requirements for Intervention As Of Right ..................................... 10

        A.  The Motion to Intervene is timely and will not prejudice the parties. ........................ 10

        B.  Movants have several legally protectable interests in this case. ................................. 12

            1.  Movants' members have several legally protectable interests at stake. ................ 12

            2.  Movants may assert the interests of their members. .............................................. 17

        C.  Disposition of the action could impair the interests of Movants' members. .............. 18

        D.  Defendants do not adequately represent the interests of movants' members. ............ 19

    II.  Alternatively, Movants Should Be Granted Permission to Intervene. .............................. 23

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

42 U.S.C. § 1395dd ................................................................................................ 16, 22

*ACLU of Massachusetts v. Sebelius*,
    705 F.3d 44 (1st Cir. 2013) ............................................................................. 21

*ACLU of Massachusetts v. Sebelius*,
    821 F. Supp. 2d 474 (D. Mass. 2012) .............................................................. 21

*Adkins v. City of New York*,
    143 F. Supp. 3d 134 (S.D.N.Y. 2015) ......................................................... 14, 22

*Arizona Christian Sch. Tuition Org. v. Winn*,
    563 U.S. 125 (2011) ........................................................................................ 14

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*,
    627 F.3d 547 (5th Cir. 2010) .......................................................................... 17

*Barber v. Bryant*,
    -- F. 3d --, 2016 WL 4375014 (5th Cir. Aug. 12, 2016) ...................................... 15

*Barber v. Bryant*,
    -- F. Supp. 3d --, Cause No. 3:16-CV-417-CWR-LRA, 2016 WL 3562647 (S.D. Miss.
    June 30, 2016) ...................................................................... 15, 19, 21, 22

*Black Firefighters Association v. City of Dallas*,
    19 F.3d 992 (5th Cir. 1994) ........................................................................ 13, 14

*Bowen v. Kendrick*,
    487 U.S. 589 (1988) ........................................................................................ 15

*Brumfield v. Dodd*,
    749 F.3d 339, (5th Cir. 2014) ................................................................... passim

*Campaign for S. Equal. v. Bryant*,
    64 F. Supp. 3d 906 (S.D. Miss. 2014) ............................................................. 18

*Cleland v. Bronson Health Care Grp., Inc.*,
    917 F.2d 266 (6th Cir. 1990) ........................................................................... 16

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ........................................................................................ 21

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. Unit B 1981) ................................................................ 19

*Edwards v. City of Houston*,
   78 F.3d 983 (5th Cir. 1996) ................................................................. 10, 14, 19

*Elrod v. Burns*,
   427 U.S. 347 (1976) .................................................................................... 19

*Erickson v. Bartell Drug Co.*,
   141 F. Supp. 2d 1266 (W.D. Wash. 2001).................................................. 22

*Estate of Thornton v. Caldor*,
   472 U.S. 703 (1985) .................................................................................... 21

*Flast v. Cohen*,
   392 U.S. 83 (1968) ...................................................................................... 15

*Fund for Animals, Inc. v. Norton*,
   322 F.3d 728 (D.C. Cir. 2003) .............................................................. 19, 20

*Glenn v. Brumby*,
   663 F.3d 1312 (11th Cir. 2011) ............................................................ 14, 22

*In re Lease Oil Antitrust Litig.*,
   570 F.3d 244 (5th Cir. 2009) ...................................................................... 11

*John Doe No. 1 v. Glickman*,
   256 F.3d 371(5th Cir. 2001) .................................................................. 10, 11

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
   884 F.2d 185 (5th Cir. 1989) ...................................................................... 24

*Marketfare (St. Claude), L.L.C. v. United Fire & Cas. Co.*,
   2011 WL 3349821 (E.D. La. August 3, 2011)............................................ 24

*Michigan State AFL-CIO v. Miller*,
   103 F.3d 1240 (6th Cir. 1997) .................................................................... 23

*Mova Pharm. Corp. v. Shalala*,
   140 F.3d 1060 (D.C. Cir. 1998).................................................................. 11

*Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*,
   903 F. Supp. 2d 446 (N.D. Tex. 2012) ....................................................... 18

*Newby v. Enron Corp.*,
   443 F.3d 416 (5th Cir. 2006) ...................................................................... 12

*Sierra Club v. Espy*,
   18 F.3d 1202 (5th Cir. 1994) .............................................................. 10, 11, 18

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ............................................................................ 14

*Tex. Democratic Party v. Benkiser*,
    459 F.3d 582 (5th Cir. 2006) ............................................................................ 17

*Texas Monthly, Inc. v. Bullock*,
    489 U.S. 1 (1989) .............................................................................................. 14

*Texas v. United States*,
    805 F.3d 653 (5th Cir. 2015) ..................................................................... passim

*The Arkansas Project v. Shaw*,
    Civil Action No. C-10-75, 2010 WL 2522415 (S.D. Tex. June 17, 2010)........... 11

*Trbovich v. United Mine Workers*,
    404 U.S. 528 (1972).......................................................................................... 19

*Turic v. Holland Hospitality, Inc.*,
    85 F.3d 1211 (6th Cir. 1996) ............................................................................ 22

*United States v. Miami Univ.*,
    294 F.3d 797 (6th Cir. 2002) ............................................................................ 19

*United States v. Oregon*,
    839 F.2d 635 (9th Cir. 1988) ............................................................................ 23

*Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*,
    – F.3d –, 2016 WL 4435631 (5th Cir. Aug. 22, 2016) ........................... 11, 13, 18

**Statutes**
42 U.S.C. § 18116............................................................................................... 4, 5

45 C.F.R. § 92.301 .............................................................................................. 5, 13

45 C.F.R. § 92.4 ...................................................................................................... 4

**Other Authorities**
Debra B. Stulberg et al., *Referrals for Services Prohibited in Catholic Health Care Facilities*,
    48 Perspectives on Sexual & Reproductive Health (2016)...................................... 4

Lambda Legal, Professional Organization Statements Supporting Transgender People in
    Health Care (2013)................................................................................................. 2

U.S. Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health
    Care Services (5th ed. 2009).................................................................................. 4

Movants River City Gender Alliance and the ACLU of Texas (collectively, "Movants") seek to intervene as defendants of right pursuant to Federal Rule of Civil Procedure 24(a)(2). Alternatively, Movants request permission to intervene under Federal Rule of Civil Procedure 24(b). Defendants oppose the motion to intervene as of right and are not in a position to state their position on Movants' request for permissive intervention; Plaintiffs are not able to state their position on the Motion for Intervention without seeing the motion papers. Movants provide the following points and authorities.

## INTRODUCTION

As part of the Affordable Care Act, Congress passed a landmark antidiscrimination provision ("Section 1557") that prohibits discrimination on the basis of sex in health care programs receiving federal funds. After a detailed notice-and-comment process, the U.S. Department of Health & Human Services ("HHS") issued a final rule (the "Regulation") explicitly prohibiting covered entities from discriminating against patients and employees because they are transgender or because they seek reproductive care.[1] Plaintiffs now seek, through this lawsuit, to eliminate those protections root and branch. Although Plaintiffs' Complaint comes cloaked in the mantle of religious liberty and states' rights, their legal challenge is nothing more than a petition to discriminate with taxpayer dollars. Plaintiffs' claims are entirely unfounded, but—even more than that—the relief Plaintiffs request would violate the Constitution's Equal Protection and Establishment Clauses, as well as the Emergency Medical Treatment and Active Labor Act ("EMTALA").

Movants seeking intervention here are: River City Gender Alliance ("RCGA"), an Omaha-based membership organization that provides peer support to transgender and gender

---

[1] Women, transgender men, and gender non-conforming people all experience sex discrimination for seeking reproductive healthcare.

non-conforming people; and the ACLU of Texas, a state affiliate of the American Civil Liberties

Union, which has 10,000 members across Texas dedicated to protecting the fundamental liberties

and basic civil rights guaranteed by the U.S. Constitution and our nation's civil rights laws.

Movants' members include transgender people and women seeking reproductive healthcare—the

individuals whom Section 1557 and the Regulation sought to protect, and against whom

Plaintiffs seek to discriminate. Movants are entitled to intervene in this action to protect the

rights of their members, many of whom will be affected in profound ways if Plaintiffs succeed in

frustrating Section 1557's promise of an end to discrimination in healthcare.

## BACKGROUND

### Sex Discrimination in Healthcare

Section 1557 and its implementing Regulation were meant to address the persistent

problem of discrimination in healthcare, including sex discrimination against transgender people

and women seeking reproductive care. Like anyone else, transgender people need preventive

care to stay healthy and acute care when they become sick. Some transgender individuals may

also require transition-related healthcare as medically necessary treatment for gender dysphoria.

Expert medical organizations such as the American Medical Association, the American

Psychological Association, the American Psychiatric Association, the American Academy of

Family Physicians, the Endocrine Society, the American College of Obstetricians and

Gynecologists, and the World Professional Association for Transgender Health agree that

transition-related care is medically necessary for many transgender people. Lambda Legal,

Professional Organization Statements Supporting Transgender People in Health Care (2013).[2]

---

[2] http://www.lambdalegal.org/sites/default/files/publications/downloads/ll_trans_professional
_statements.rtf_.pdf

As documented by HHS, transgender people have experienced and continue to experience multiple forms of discrimination in access to healthcare services, insurance coverage, and facilities. Even when seeking medical care for treatments unrelated to gender dysphoria, transgender individuals experience significant discrimination from entities providing healthcare. Moreover, some entities providing insurance or healthcare discriminate against transgender patients by refusing to cover medically necessary treatments for gender dysphoria in accordance with accepted standards of care. Under these exclusions, the same types of surgeries, hormones, and preventive screenings that are used to provide medically necessary care to non-transgender individuals, are excluded from insurance coverage when used as medically necessary treatment for gender dysphoria. *See* 81 Fed. Reg. 31,375, 31,460. For example, a number of Catholic facilities (such as Plaintiff Franciscan Alliance, Inc.) refuse to treat patients diagnosed with gender dysphoria with the same standard of medical care that is routinely provided to non-transgender patients. Compl. ¶¶ 95–97. As a result of this discrimination in healthcare, transgender people are more likely to lack health insurance and suffer significant health disparities, such as high rates of untreated mental health needs, suicide attempts, violence, and HIV. 81 Fed Reg. at 31,460.

Patients seeking access to reproductive care also encounter significant sex discrimination in the healthcare system. For instance, hundreds of Catholic hospitals and hospital systems around the country—nearly all of which receive Medicare and Medicaid funds—prohibit a range of reproductive health services, including sterilization and abortion, even when a person's health or life is at risk. U.S. Conference of Catholic Bishops, Ethical and Religious Directives for

Catholic Health Care Services, Directives 45 and 53 (5th ed. 2009).[3] In many instances, these hospitals refuse even to provide information about emergency medical conditions or provide patients with referrals to other healthcare providers. *See id.*, Directive 28; *see also* Debra B. Stulberg et al., *Referrals for Services Prohibited in Catholic Health Care Facilities*, 48 Perspectives on Sexual & Reproductive Health (2016).[4] In this case, Plaintiffs seek to refuse abortion services in all circumstances, even when the patient's life is in jeopardy, and might even seek to refuse to provide emergency stabilizing care to patients who are experiencing rare complications from an abortion that has already been performed. *See* Compl. ¶ 98.

### Section 1557 and the Regulation

On March 23, 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148, also known as the Affordable Care Act. Section 1557 of the Affordable Care Act prohibits discrimination in federally financed health care programs and activities on the basis of race, sex, color, national origin, age, or disability. 42 U.S.C. § 18116. On May 18, 2016, HHS published a final rule, "Nondiscrimination in Health Programs and Activities," implementing Section 1557 (the "Regulation"). 81 Fed. Reg. 31,376. The Regulation states that Section 1557's prohibition against sex discrimination includes "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." *Id.* at 31,467; 45 C.F.R. § 92.4.

The Regulation further provides that, under Section 1557's sex discrimination prohibition, "providers of health services may no longer deny or limit services based on an individual's sex, without a legitimate nondiscriminatory reason." 81 Fed. Reg. at 31,455. For

---

[3] http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.
[4] https://reujq2sar5z38mfxc343rf51-wpengine.netdna-ssl.com/wp-content/uploads/2016/08/Stulberg_et_al-2016-Perspectives_on_Sexual_and_Reproductive_Health.pdf.

example, "[a] provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." *Id*. Similarly, with respect to healthcare coverage, the Regulation "specifies that a categorical coverage exclusion or limitation for all health care services related to gender transition is discriminatory on its face." *Id*. at 31,456. And the Regulation states that "individuals may not be excluded from health programs and activities for which they are otherwise eligible based on their gender identity." *Id*. at 31,409.

Section 1557 adopts the same enforcement mechanisms available under Title VI of the Civil Rights Act of 1964, Title VII of the Civil Rights Act of 1964, Title IX of the Education Amendments Act of 1972, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975. 42 U.S.C. § 18116(b). These include both informal mechanisms, such as the submission of compliance reports to HHS's Office for Civil Rights, and formal mechanisms, such as the loss of federal funding and the initiation of enforcement proceedings by the Department of Justice. 81 Fed. Reg. at 31,439, 31,472, 31,440. Based on the statutory language of Section 1557, the Regulation provides that a private right of action and damages are available under Section 1557 to the same extent such remedies are available under Title VI, Title IX, Section 504 of the Rehabilitation Act, or the Age Discrimination Act with respect to recipients of federal financial assistance. *Id*. at 31,439; 45 C.F.R. § 92.301.

**Plaintiffs' Lawsuit**

On August 23, 2016, Plaintiffs brought this lawsuit against Secretary Burwell and the U.S. Department of Health and Human Services ("Defendants") challenging the Regulation on a number of constitutional and statutory grounds. Plaintiffs may be divided into two groups. The

first group comprises the State of Texas, the State of Wisconsin, the State of Nebraska, Governor

Matthew G. Bevin on behalf of the Commonwealth of Kentucky, and the State of Kansas

(collectively, "State Plaintiffs"). The second group includes: Franciscan Alliance, Inc.

("Franciscan"), a Roman Catholic hospital system; Specialty Physicians of Illinois, LLC

("Specialty Physicians"), a member managed limited liability company of which Franciscan is

the sole member; and the Christian Medical & Dental Associations ("CMDA"), an Illinois

nonprofit corporation that provides a variety of professional programs and services for its

members (collectively, "Private Plaintiffs").

Plaintiffs allege, *inter alia*, that the Regulation: impermissibly prohibits healthcare

entities, including public hospitals and religiously affiliated hospitals, from refusing to perform

or refer for transition-related care and reproductive healthcare, Compl. ¶¶ 27–31, 58–59, 90–98;

impermissibly requires state governments and religiously affiliated healthcare entities to provide

their employees with healthcare coverage for transition-related care and reproductive care, *id.* ¶¶

34–38, 63–65, 99–104, 110; impermissibly prohibits healthcare entities from discriminating

against transgender people by requiring them to use healthcare facilities that are inconsistent

with their gender identity, *id.* ¶¶ 39–41, 58–59, 76; impermissibly requires healthcare entities to

provide or refer for reproductive healthcare, *id.* ¶98; and impermissibly requires healthcare

entities, including public hospitals and religiously affiliated hospitals, to ensure that employees'

religious beliefs do not conflict with the healthcare entity's ability to provide healthcare to

transgender people and women seeking reproductive care on a nondiscriminatory basis, *id.* ¶¶

60–61, 125. Based on these allegations, Plaintiffs claim that the Regulation violates the

Administrative Procedure Act, the federal Religious Freedom Restoration Act ("RFRA"), the

First Amendment's Free Speech and Free Exercise Clauses, the Fourteenth Amendment's Due

Process Clause, the Spending Clause, and the Tenth Amendment, and also that the Regulation unlawfully abrogates the State Plaintiffs' sovereign immunity. *Id.* ¶ 111–355. Among other things, Plaintiffs seek a judicial declaration that the Regulation is invalid and a permanent injunction prohibiting Defendants from enforcing the Regulation.

## MOVANTS

### River City Gender Alliance ("RCGA")

Founded in 1986, RCGA is an Omaha-based, nonprofit membership organization that provides peer support for transgender and gender non-conforming people. Exh. 1, Declaration of Katherine Parrish ("Parrish Decl.") ¶ 2. RCGA currently has more than 150 members, spanning all age ranges. *Id.* Its members belong to a variety of different faiths, and some belong to no faith. *Id.* RCGA holds monthly membership meetings, provides information relating to issues affecting transgender people, and offers referrals to support groups, healthcare providers, emergency hotlines, and other resources for the transgender community. *Id.* ¶ 4. RCGA advocates for the equal rights of transgender people, and seeks to further social acceptance of transgender people through community outreach and social activities. *Id.*

RCGA has several members who have a medical need for treatment related to gender transition and who anticipate needing treatment over the next year. *Id.* ¶ 3. One of these members is a Nebraska state employee who receives healthcare coverage through their employee healthcare plan, and who has been denied insurance coverage for their hysterectomy and hormone therapy. *Id.* At least one of these members works at a Catholic hospital and receives healthcare coverage through their employee healthcare plan. *Id.* At least one of these members receives primary care at a public hospital. *Id.* At least one of these members receives primary care at a Catholic hospital. *Id.* And at least one of these members was subject to discrimination

related to their transgender status while receiving care at a hospital. *Id.* If Plaintiffs succeed in striking down the regulation, RCGA fears that its members will be subject to discrimination in transition-related services or coverage for transition-related services. *Id*. ¶ 5.

### ACLU of Texas

The ACLU of Texas is a nonprofit, nonpartisan organization dedicated to defending the principles embodied in the Constitution and our nation's civil rights laws. Exh. 2, Declaration of Cheryl Newcomb ("Newcomb Decl.") ¶ 2. It is the Texas affiliate of the American Civil Liberties Union. *Id.* The ACLU of Texas has more than 10,000 members throughout the state, including areas of the state with few medical providers. *Id.* ¶ 2. The ACLU of Texas advocates on behalf of transgender people, people seeking reproductive healthcare, and religious freedom, including by fighting to prevent discrimination in healthcare and to eliminate religious restrictions on access to care. *Id.* ¶ 7.

If Plaintiffs succeed in striking down the Regulation, the ACLU of Texas fears that its members will be discriminated against in both coverage and services for transition-related care and reproductive care. *Id.* ¶ 3. Multiple ACLU of Texas members are transgender, including at least one member who relies on public hospitals for emergency healthcare needs and multiple members who anticipate requiring medical treatment related to gender transition for themselves or their dependents within the next year. *Id.* ¶ 4. The ACLU of Texas also has multiple members who anticipate requiring reproductive care within the next year. *Id.* ¶ 5. One ACLU of Texas member has a history of high-risk pregnancies requiring emergency miscarriage treatment, including abortion, and relies on public hospitals for her emergency healthcare needs; another member's current medical circumstances would make any pregnancy a medical emergency for her. *Id.* Finally, the ACLU of Texas has members of many different faiths and members of no

faith, including Texas taxpayers who object to the use of their taxpayer dollars to fund religiously motivated discrimination at public hospitals. *Id.* ¶ 6.

## ARGUMENT

Movants' request for intervention should be granted. Movants meet all the requirements for intervention as of right under Rule 24(a)(2). First, the Motion to Intervene—filed less than one month after the Complaint, and before any other significant litigation events have occurred in this case—is undoubtedly timely. Second, Movants' members have several legally protectable interests at stake in this case, including interests in protecting their rights under the Regulation, ensuring their equal access to healthcare, protecting their rights under the Equal Protection and Establishment Clauses, and ensuring their access to stabilizing care for emergency medical conditions. Third, resolution of the case could impair the ability of Movants' members to protect those interests, including by subjecting them to discrimination in healthcare and violations of their constitutional rights. Finally, Defendants will not adequately represent the interests of Movants' members. In particular, Movants seek to raise defenses under the Equal Protection and Establishment Clauses, as well as EMTALA, that they do not expect Defendants to litigate.

Even if the Court concludes that Movants may not intervene as of right, it should permit them to intervene permissively under Rule 24(b)(1)(B). Allowing Movants to intervene would not unduly delay this action or prejudice the adjudication of the existing parties' rights. And Movants share common defenses with Defendants regarding the legality of the Regulation. Moreover, this controversy is about access to healthcare for Movants' members and people like them. Movants are well situated to illuminate the legal issues in this case, particularly as they impact the rights of transgender people and women seeking reproductive care. In particular,

9

Movants intend to raise additional legal issues that will need to be addressed in evaluating Plaintiffs' challenge to the Regulation.

## I.     Movants Satisfy the Requirements for Intervention As Of Right.

To intervene as of right pursuant to Rule 24(a)(2), an applicant must satisfy four requirements: "(1) [t]he application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; and (4) the applicant's interest must be inadequately represented by the existing parties to the suit." *Brumfield v. Dodd*, 749 F.3d 339, 341 (5th Cir. 2014) (citations and internal quotation marks omitted).

In applying these criteria, "Rule 24 is to be liberally construed" in favor of intervention. *Id.*; *see also John Doe No. 1 v. Glickman*, 256 F.3d 371, 375 (5th Cir. 2001). "[I]ntervention of right must be measured by a practical rather than technical yardstick." *Edwards v. City of Houston*, 78 F.3d 983, 999 (5th Cir. 1996) (en banc) (citation and internal quotation marks omitted). The inquiry "is a flexible one, which focuses on the particular facts and circumstances surrounding each application." *Id.* (citation and internal quotation marks omitted). Courts generally allow intervention where "no one would be hurt and greater justice could be attained." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994) (citation and internal quotation marks omitted). Here, Movants satisfy each of the four factors.

### A.  The Motion to Intervene is timely and will not prejudice the parties.

The Motion to Intervene is timely. To determine timeliness, the court must consider: (1) the length of time between the movant's learning that its interest is no longer protected by the existing parties and its filing of a motion to intervene; (2) the extent of prejudice to the existing

10

parties from allowing late intervention; (3) the extent of prejudice to the movant if intervention denied; and (4) any unusual circumstances. *E.g.*, *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 247–48 (5th Cir. 2009).

Here, Movants requested intervention less than one month after Plaintiffs filed their Complaint. The Fifth Circuit has repeatedly held that motions filed with such promptness should be deemed timely. *See, e.g.*, *John Doe No. 1 v. Glickman*, 256 F.3d 371, 377–78 (5th Cir. 2001) (holding that motion to intervene was timely when filed within one month of proposed intervenor's discovery that it had a stake in the litigation) (collecting cases); *see also, e.g.*, *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998) ("Upjohn sought to intervene a few weeks after Mova initiated its action, and before the district court ruled on the preliminary injunction; this cannot be regarded as untimely.").

In judging whether intervention would prejudice the parties, the court should consider only whether Movants' delay in seeking intervention would prejudice the parties, not whether intervention would simply prove inconvenient. *Espy*, 18 F.3d at 1206. Given Movants' alacrity in seeking intervention, the existing parties cannot complain that they have been prejudiced by any delay: No other substantive motions or pleading have been filed in this action, and no status conference has been held or briefing schedule set. *See, e.g.*, *Wal-Mart Stores, Inc. v. Texas Alcoholic Beverage Comm'n*, -- F.3d --, 2016 WL 4435631, at *2 (5th Cir. Aug. 22, 2016) (holding that motion to intervene filed before discovery progressed was timely); *Arkansas Project v. Shaw*, Civil Action No. C-10-75, 2010 WL 2522415, at *3 (S.D. Tex. June 17, 2010) (holding that motion to intervene would not prejudice parties, given that it was filed before the deadline for joinder of parties and that no other essential deadlines had passed). On the other hand, denial of intervention would prejudice Movants and their members, as set forth below.

11

**B.  Movants have several legally protectable interests in this case.**

To intervene as of right, a movant must demonstrate a "legally protectable interest," which is defined as an interest "that the law deems worthy of protection, even if the intervenor does not have an enforceable legal entitlement or would not have standing to pursue her own claim." *Texas v. United States*, 805 F.3d 653, 659 (5th Cir. 2015); *see also Newby v. Enron Corp.*, 443 F.3d 416, 422 (5th Cir. 2006) (holding that intervenors need not demonstrate Article III standing, but only a legally protectable interest). As described below, Movants' members have a number of legally protectable interests at stake in this case, and the public interest also strongly supports their intervention. Additionally, Movants may assert these interests on behalf of their members.

*1.  Movants' members have several legally protectable interests at stake.*

Movants' members have several legally protectable interests at stake in this litigation, including: (1) their rights protected under Section 1557 and the Regulation; (2) their ability to access healthcare services, coverage, and facilities on a nondiscriminatory basis; (3) their right to be free from government discrimination; (4) their right to be free from the harms imposed by government endorsement of religion; (5) their interest in making sure their state tax dollars are not used to fund religious discrimination at public hospitals; and (6) their right to appropriate stabilizing care, including abortion, for emergency medical conditions. Additionally, the public interest supports intervention to resolve the important constitutional and statutory questions presented by this litigation.

First, Movants' members have an interest in defending the Regulation because they are its intended beneficiaries. *See* 81 Fed. Reg. at 31,460. In *Texas*, for example, the Fifth Circuit held that undocumented individuals who potentially qualified for deferred action status had

standing to intervene in a lawsuit challenging the federal government's deferred action program, even though they had no legal entitlement to deferred action, because they were the challenged program's intended beneficiaries. 805 F.3d at 660. Along the same lines, the Fifth Circuit recently held in *Wal-Mart* that the Texas Package Stores Association had a legally protectable interest justifying intervention as of right in Wal-Mart's constitutional challenge to Texas's comprehensive licensing and regulatory scheme governing the sale of alcoholic beverages because, "according to Wal-Mart, the Association is the scheme's beneficiary." *Wal-Mart*, -- F.3d --, 2016 WL 4435631, at *3; *see also Brumfield*, 749 F.3d at 344 (holding that parents whose children received school vouchers under a Louisiana program had a legally protectable interest in intervening to defend the program because they and their children were its primary intended beneficiaries). Indeed, Movants' members are not only beneficiaries under the challenged Regulation; they are entitled to enforce its antidiscrimination provisions through a private right of action. 81 Fed. Reg. at 31,439; 45 C.F.R. § 92.301. If the Regulation is struck down, the legal rights Movants' members enjoy under the Regulation will be abrogated.

Second, Movants' members have an interest in protecting their right of equal access to healthcare services, coverage, and facilities. The Fifth Circuit has repeatedly held that nonparties may intervene to assert rights of equal access, even if they do not have a vested property interest at stake in the litigation. In *Black Firefighters Association v. City of Dallas*, for instance, a group of firefighters sought intervention to challenge a consent decree that would have required the city to guarantee a specified number of promotions based on race, which the proposed intervenors argued would interfere with their own promotion opportunities. 19 F.3d 992, 994 (5th Cir. 1994). Even though the proposed intervenors did not have a legally enforceable right to the promotions, the Fifth Circuit held that the proposed intervenors satisfied Rule 24(a)(2) because "[a] decree's

13

prospective interference with promotion *opportunities* can justify intervention." *Id.* (emphasis

added); *accord Edwards*, 78 F.3d at 1004. The same principles apply with equal force here—

striking down the Regulation will interfere with the ability of Movants' members to access

healthcare on a nondiscriminatory basis.

Third, Movants' members have an interest under the Equal Protection Clause in ensuring

that the State Plaintiffs do not discriminate against them in the provision of public services or

employment benefits. Courts have routinely held that discrimination against transgender

individuals is a form of sex discrimination and subject to heightened scrutiny under the Equal

Protection Clause, *Glenn v. Brumby*, 663 F.3d 1312, 1320 (11th Cir. 2011); *Smith v. City of

Salem*, 378 F.3d 566, 575 (6th Cir. 2004). Courts have also held that transgender status is

independently a quasi-suspect classification requiring heightened scrutiny. *See, e.g.*, *Adkins v.

City of New York*, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015). Even if heightened scrutiny is not

applied, denying medically necessary treatment to transgender patients in accordance with

accepted standards of care lacks even a rational basis. Here, the State Plaintiffs declare an intent

to engage in facially discriminatory practices that infringe the equal protection rights of

Movants' members. These members have an interest in ensuring that their equal protection rights

are recognized as a compelling governmental interest supporting the statute and regulations.

Fourth, Movants' members have an interest in avoiding the concrete harms that would be

imposed on them if Plaintiffs succeed in obtaining their requested religious accommodations. It

is well established that, "[i]f an establishment of religion is alleged to cause real injury to

particular individuals, the federal courts may adjudicate the matter." *See Arizona Christian Sch.

Tuition Org. v. Winn*, 563 U.S. 125, 145 (2011); *see also, e.g.*, *Texas Monthly, Inc. v. Bullock*,

489 U.S. 1, 8 (1989) (holding that a general interest magazine had standing to raise an

Establishment Clause challenge to state sales tax exemption for religious periodicals). As described above, Movants' members will not only lose federally guaranteed protections if Plaintiffs receive their requested religious accommodation, they will also continue to face discrimination in access to healthcare services, coverage, and facilities. Moreover, a decision granting Plaintiffs' requested religious accommodations would impose concrete psychological consequences on Movants' members, stemming from their "exclusion or denigration on a religious basis within the political community.'" *Barber v. Bryant*, -- F. Supp. 3d --, Cause No. 3:16-CV-417-CWR-LRA, 2016 WL 3562647, at *14 (S.D. Miss. June 30, 2016) (citation and internal quotation marks omitted), *stay pending appeal denied*, --- F.3d. ----, 2016 WL 4375014 (5th Cir. Aug. 12, 2016).

Fifth, Movants' members have an interest in preventing their tax dollars from being used to fund religiously motivated discrimination at public hospitals. As the Supreme Court has made clear, taxpayers have an interest in ensuring that their tax dollars are not used in a manner that violates the Establishment Clause. *See Bowen v. Kendrick*, 487 U.S. 589, 618–21 (1988) (holding that plaintiffs had federal taxpayer standing to challenge whether grants authorized under the Adolescent Family Life Act were disbursed by HHS, and used by grantees, in a manner that violated the Establishment Clause); *Flast v. Cohen*, 392 U.S. 83, 105 (1968) (holding that taxpayers had standing to bring an Establishment Clause challenge to expenditures made pursuant to the Elementary and Secondary Education Act of 1965, which were distributed by a federal agency to state and local educational agencies that used the money to provide services and materials to religious schools) ("We believe a taxpayer will have a clear stake as a taxpayer in assuring that [the Establishment Clause is] not breached by Congress."). Here, Movants' members have an interest in making sure that public hospitals do not engage in

religiously motivated discrimination against transgender people and women seeking reproductive care.

Sixth, Movants' members have an interest in receiving stabilizing care for their emergency medical conditions. The Emergency Medical Treatment and Active Labor Act ("EMTALA") imposes a screening and stabilization requirement on hospitals that participate in the Medicare program and operate an emergency department. 42 U.S.C. § 1395dd. If a covered hospital determines that an individual has an emergency medical condition, it must "stabilize the medical condition before transferring (or discharging) a patient." *Cleland v. Bronson Health Care Grp., Inc.*, 917 F.2d 266, 268 (6th Cir. 1990) (citing 42 U.S.C. § 1395dd(b)(1), (c)(1)). To stabilize a patient with such a condition, the hospital must "assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer [or discharge] of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). In some cases involving emergency pregnancy complications, the appropriate stabilizing treatment necessary to prevent material deterioration of the condition is termination of pregnancy. But Plaintiffs here seek authorization to deny abortion treatment across the board, even in circumstances where it is necessary to save the patient's life. *See* Compl. ¶ 98. Movants' members have a legally protectable interest in challenging that assertion and protecting their rights under EMTALA. *See* 42 U.S.C. § 13955dd(d)(2)(A) (providing a private right of action).

Finally, the public interest in this case strongly supports Movants' intervention. "The interest requirement may be judged by a more lenient standard if the case involves a public interest question or is brought by a public interest group. The zone of interests protected by a constitutional provision or statute of general application is arguably broader than are the protectable interests recognized in other contexts." *Brumfield*, 749 F.3d at 344 (citations and

internal quotation marks omitted). Here, Movants seek to intervene not only to protect their members' rights under Section 1557 and the implementing Regulation, but also to assert rights under the Constitution's Equal Protection and Establishment Clauses, as well as rights under EMTALA. The significant public interest in making sure that these constitutional and statutory questions are properly resolved weighs heavily in favor of Movants' intervention. *See id.* (holding that parents whose children received school vouchers under a state program should be allowed to intervene as of right to defend the program's constitutionality).

### 2.   *Movants may assert the interests of their members.*

Movants may assert their members' legally protectable interests. "Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006). Here, all three requirements are met.

First, RCGA and the ACLU of Texas have members who would independently meet the legally protectable interest requirement for intervention as of right under Rule 24(a)(2), as described above. Second, the interests Movants seek to assert here are highly germane to the respective missions of the RCGA and the ACLU of Texas. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 550 n.2 (5th Cir. 2010) (stating that the germaneness requirement is not demanding). The RCGA focuses specifically on issues confronting transgender people. Parrish Decl. ¶ 4. The ACLU of Texas has a strong and longstanding interest in protecting the rights of transgender people and people seeking reproductive healthcare in Texas, as well as the right to religious freedom. Newcomb Decl. ¶ 7.

Finally, Movants' individual members need not participate in the litigation because the questions presented by the case are primarily legal. *See Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 918 (S.D. Miss. 2014); *Nat'l Solid Wastes Mgmt. Ass'n v. City of Dallas*, 903 F. Supp. 2d 446, 458 (N.D. Tex. 2012).

### C. Disposition of the action could impair the interests of Movants' members.

The interests of Movants' members could be severely impaired by the outcome of this case. If the Regulation is struck down, Movants' members will lose the significant legal protections afforded them under the Regulation. *See, e.g.*, *Wal-Mart*, 2016 WL 4435631, at *2; *Texas*, 805 F.3d at 660–61. Moreover, as discussed above, they will face discrimination in access to healthcare services, coverage, and facilities; they will be subject to unconstitutional discrimination by the State Plaintiffs; they will suffer concrete harms imposed by the government's endorsement of discriminatory religious beliefs; their tax dollars will be used to fund religiously motivated discrimination at public hospitals; and they may be exposed to the serious risk that they will be denied access to abortion-related care even in emergency circumstances.

Movants should not be forced to wait until the conclusion of this lawsuit to vindicate these interests. "It would indeed be a questionable rule that would require prospective intervenors to wait on the sidelines until after a court has already decided enough issues contrary to their interests. The very purpose of intervention is to allow interested parties to air their views so that a court may consider them before making potentially adverse decisions." *Brumfield*, 749 F.3d at 344–45; *see also Espy*, 18 F.3d at 1207 (acknowledging that a prospective intervenor's interest may be "impaired by the *stare decisis* effect" of a court's ruling on subsequent proceedings). Even if Movants "could reverse an unfavorable ruling by bringing a separate

lawsuit, there is no question that the task of reestablishing the status quo if [Plaintiffs] succeed[] in this case will be difficult and burdensome." *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 735 (D.C. Cir. 2003). Moreover, the intervening harm to Movants' Equal Protection Clause and Establishment Clause rights would be irreparable. *See Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B 1981) (holding that the violation of constitutional rights imposes irreparable harm) (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *United States v. Miami Univ.*, 294 F.3d 797, 818 (6th Cir. 2002) ("Once personally identifiable information has been made public, the harm cannot be undone."); *Barber*, 2016 WL 3562647, at *32 (holding that Equal Protection Clause and Establishment Clause violations impose irreparable harm).

### D.      Defendants do not adequately represent the interests of Movants' members.

Finally, Defendants do not adequately represent the interest of Movants' members. The Supreme Court has held that this "requirement of the Rule is satisfied if the applicant shows that representation of his interest 'may be' inadequate; and the burden of making this showing should be treated as minimal." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972). The Fifth Circuit recognizes two presumptions of adequate representation. *Brumfield*, 749 F.3d at 345 (citing *Edwards*, 78 F.3d at 1005). "One presumption arises when the would-be intervenor has the same ultimate objective as a party to the lawsuit." *Texas*, 805 F.3d at 661. The other presumption arises "when the putative representative is a governmental body or officer charged by law with representing the interests of the proposed intervenor." *Id.* (citation and internal quotation marks omitted). A proposed intervenor may rebut either presumption by showing "that its interest is in fact different from that of the [current party] and that the interest will not be represented by [it]." *Id.* at 662 (alterations in original) (citation and internal quotation marks omitted).

Here, although both Movants and the federal government "vigorously oppose dismantling the [Regulation], their interests may not align precisely." *Brumfield*, 749 F.3d at 345 (holding that parents seeking to uphold school voucher program were entitled to intervention as of right because the state did not adequately represent their interests, even though both parties sought to defend school voucher program). The federal government has an interest "in securing an expansive interpretation of executive authority, efficiently enforcing the [healthcare] laws, and maintaining its working relationship with the States." *Texas*, 805 F.3d at 663 (holding that undocumented immigrants with minor children living in the United States were entitled to intervene as of right to defend the federal government's Deferred Action for Parents of Americans program, because the federal government did not adequately represent their interests).

By contrast, Movants are principally concerned with protecting their members' rights under Section 1557 and the Regulation, under the Constitution's Equal Protection and Establishment Clauses, and under EMTALA. While the federal government may take the concerns of Movants' members "into account," that "does not mean giving them the kind of primacy that [Movants] would give them." *Fund for Animals*, 322 F.3d at 736 (internal quotation marks omitted). In *Brumfield*, for example, the Fifth Circuit noted that the state defendants had "many interests in this case—maintaining the Scholarship Program but also its relationship with the federal government and with the courts that have continuing desegregation jurisdiction," while the parents' "only concern [was] in keeping the vouchers." *Brumfield*, 749 F.3d at 346. The court need not "say for sure that the state's more extensive interests [would] *in fact* result in inadequate representation, but surely they might [have], which is all that the rule require[d]." *Id.*

Moreover, the difference between the federal government's interests and the interests of Movants' members will likely lead to different approaches in litigation. *See Texas*, 805 F.3d at

663; *Brumfield*, 749 F.3d at 346. First, Movants plan to raise an affirmative defense under the

Establishment Clause. Proposed Ans. in Intervention, Sixth Defense. Movants intend to argue

here that a decision allowing Plaintiffs to discriminate against and harm members of the public

without recourse would violate the Establishment Clause by granting a religious accommodation

without due regard for the harm caused to non-beneficiaries by that accommodation. *See Cutter*

*v. Wilkinson*, 544 U.S. 709, 720 (2005) ("[C]ourts must take adequate account of the burdens a

requested accommodation may impose on nonbeneficiaries, and they must be satisfied that the

Act's prescriptions are and will be administered neutrally among different faiths." (citing *Estate*

*of Thornton v. Caldor*, 472 U.S. 703, 709–10 (1985)); *see also Barber*, 2016 WL 3562647, at

\*27–32 (holding, on motion for preliminary injunction, that a state law authorizing religiously

motivated discrimination against LGBT people and unmarried people likely violated the

Establishment Clause). Movants have little reason to expect that the federal government will

raise this argument. Indeed, just a few years ago, the U.S. Department of Health and Human

Services argued that the Establishment Clause does not restrict its authority to award contracts to

organizations that impose religious restrictions on access to healthcare. *ACLU of Massachusetts*

*v. Sebelius*, 821 F. Supp. 2d 474 (D. Mass. 2012) (holding that HHS violated the Establishment

Clause by permitting the United States Conference of Catholic Bishops to impose religious

restrictions on access to reproductive care in administering a Trafficking Victims Protection Act

grant), *vacated as moot*, 705 F.3d 44 (1st Cir. 2013).

Second, Movants plan to raise an affirmative defense under the Equal Protection Clause.

Proposed Ans. in Intervention, Seventh Defense. Movants intend to argue that the State

Plaintiffs' challenge to the Regulation is based on their intention to engage in unconstitutional

discrimination against transgender people and women seeking access to reproductive care. *See*

*Glenn*, 663 F.3d at 1320; *Adkins v. City of New York*, 143 F. Supp. 3d at 139; *Barber*, 2016 WL 3562647, at *18-23 (holding, on motion for preliminary injunction, that state law authorizing discrimination against LGBT people and unmarried people likely violated the Equal Protection Clause); *see also Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1213–14 (6th Cir. 1996) (holding that an employer who discriminates against an employee based on her decision to have an abortion violates Title VII's prohibition against sex discrimination); *Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1271–72 (W.D. Wash. 2001) (holding that the exclusion of prescription contraceptives from an otherwise comprehensive prescription benefit plan discriminates on the basis of sex). Along similar lines, Movants intend to defend Section 1557 and the Regulation based on Congress's power to enforce Section 5 of the Fourteenth Amendment.

Third, Movants intend to argue that Plaintiffs' requested relief on their statutory claims would violate EMTALA. Proposed Ans. in Intervention, Eighth Defense. As discussed above, EMTALA requires hospitals that participate in the Medicare program and operate emergency departments to provide appropriate stabilizing care, including abortion in some cases, to patients experiencing emergency medical conditions. *See* 42 U.S.C. § 1395dd. Here, Plaintiffs apparently seek authorization to refuse abortion-related care in all circumstances, including when the patient's life is at risk. *See* Compl. ¶ 98. Movants intend to respond by arguing that EMTALA prohibits any statutory religious accommodation that would allow Plaintiffs to deny stabilizing abortions and abortion-related procedures to patients experiencing emergency medical conditions.

As in *Brumfield* and *Texas*, the presence of these "real and legitimate additional or contrary arguments[] is sufficient to demonstrate that the representation *may* be inadequate."

22

*Texas*, 805 F.3d at 663 (quoting *Brumfield*, 749 F.3d at 346) (internal quotation marks omitted); *see also, e.g.*, *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1247 (6th Cir. 1997) (stating that, to establish inadequacy of representation, "it may be enough to show that the existing party who purports to seek the same outcome will not make all the prospective intervenor's arguments"); *United States v. Oregon*, 839 F.2d 635, 638 (9th Cir. 1988) (holding that representation is inadequate when the existing party's "arguments will not include the constitutional deficiencies raised by the [proposed intervenors]"). For all these reasons, Movants are entitled to intervene as of right pursuant to Rule 24(a)(2).

## II.    Alternatively, Movants Should Be Granted Permission to Intervene.

In the alternative, Movants seek permissive intervention under Federal Rule of Civil Procedure 24(b)(1)(B). That rule authorizes permissive intervention on a timely motion, where the applicant "has a claim or defense that shares with the main action a common question of law or fact." *Id.* To obtain permissive intervention under the Rule, the proposed intervenor must demonstrate that: (1) the Motion to Intervene is timely; (2) an applicant's claim or defense has a question of law or fact in common with the existing action; and (3) intervention will not delay or prejudice adjudication of the existing parties' rights. *Id.*; *see United States v. LULAC*, 793 F.2d 636, 644 (5th Cir. 1986) ("Although the court erred in granting intervention as of right, it might have granted permissive intervention under Rule 24(b) because the intervenors raise common questions of law and fact.").

Movants satisfy these conditions. First, for the reasons already set out above, the motion is timely. *See* Section I.A. Second, because Movants are making this Motion to Intervene before any responsive pleadings have been filed, before any status conferences have been held, and before any briefing schedules have been set, granting the motion will not cause any delay or

23

prejudice the existing parties' rights. *See id.* Finally, Movants and Defendants will address many of the same legal issues relating to the Regulation's validity—although Movants may present a different perspective on those questions than the existing parties, and Movants will make additional arguments based on different legal principles. *See* Section I.D.

In considering whether to grant permissive intervention, courts should also consider "(1) whether an intervenor is adequately represented by other parties; and (2) whether intervention is likely to to contribute significantly to the development of the underlying factual issues." *Marketfare (St. Claude), L.L.C. v. United Fire & Cas. Co.,* 2011 WL 3349821, at *2 (E.D. La. August 3, 2011) (citing *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 884 F.2d 185, 189 (5th Cir. 1989)). These factors provide additional support for granting permissive intervention in this case. As already discussed, Movants have a significant interest in protecting their members' regulatory, statutory, and constitutional rights. *See* Section I.B. And these concerns are not likely to be adequately represented by Defendants. *See* Section I.D. Movants' ability to address these concerns would contribute significantly to the just and equitable resolution of the legal questions presented. In particular, Movants would raise additional legal issues that bear significantly on Plaintiffs' challenge to the Regulation. *See id.* Thus, even if the Court concluded that Movants are not entitled to intervene as of right, it should grant Movants' request for permissive intervention.

## CONCLUSION

For the foregoing reasons, Movants respectfully request that the Court grant their motion for intervention as of right pursuant to Federal Rule of Civil Procedure 24(a), or, in the alternative, their motion for permissive intervention pursuant to Rule 24(b).


Respectfully submitted this 16th day of September, 2016.


/s/ Rebecca L. Robertson
Rebecca L. Robertson
AMERICAN CIVIL LIBERTIES
  UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
(713) 942-8146


Kali Cohn
AMERICAN CIVIL LIBERTIES
  UNION OF TEXAS
P.O. Box 600169
Dallas, TX 75360
(214) 346-6577


Daniel Mach*
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
915 15th Street, N.W.
Washington, D.C. 20005
(202) 548-6604

Brian Hauss*
Joshua Block*
Brigitte Amiri*
James D. Esseks*
Louise Melling*
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500


Amy Miller*
AMERICAN CIVIL LIBERTIES
  UNION OF NEBRASKA
134 S. 13th St., #1010
Lincoln, NE 68508
(402) 476-8091


*Counsel for Movants*

*Applications for admission forthcoming.

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC.;<br>SPECIALITY PHYSICIANS OF ILLINOIS,<br>LLC,;<br>CHRISTIAN MEDICAL & DENTAL<br>ASSOCIATIONS;<br><br>- and -<br><br>STATE OF TEXAS;<br>STATE OF WISCONSIN;<br>STATE OF NEBRASKA;<br>COMMONWEALTH OF KENTUCKY, by<br>and through Governor Matthew G. Bevin; and<br>STATE OF KANSAS,<br><br>          *Plaintiffs*,<br>    v.<br><br>SYLVIA BURWELL, Secretary of the United<br>States Department of Health and Human<br>Services; and UNITED STATES<br>DEPARTMENT OF HEALTH AND HUMAN<br>SERVICES<br><br>          *Defendants*. | Civ. Action No. 7:16-cv-00108-O |

## DECLARATION OF KATHERINE M. PARRISH

1.      I am the President of the River City Gender Alliance ("RCGA"), which is

moving for intervention in the above-captioned action. I have personal knowledge of the

matters stated in this declaration based on my relationships with RCGA's members.

2.      Founded in 1986, RCGA is an Omaha-based nonprofit organization that

provides peer support, friendship, and understanding for transgender and gender non-

conforming people. We currently have more than 150 members, spanning all age ranges. We have members of many different faiths and members of no faith.

3.     · RCGA has several members residing in Nebraska who have a medical need for treatment related to gender transition and who anticipate needing treatment over the next year. At least one of these members is a Nebraska state employee who receives healthcare coverage through their employee healthcare plan, and who has been denied insurance coverage for their hysterectomy and hormone therapy. At least one of these members works at a Catholic hospital and receives healthcare coverage through their employee healthcare plan. At least one of these members receives primary care at a public hospital. At least one of these members receives primary care at a Catholic hospital. At least one of these members was subject to discrimination related to their transgender status while receiving care at a hospital.

4.     RCGA provides support for transgender and gender non-conforming people. We hold monthly membership meetings, provide information on issues affecting the transgender community, and referrals to support groups, healthcare providers, emergency hotlines, and other resources. We also advocate for social acceptance of transgender and gender non-conforming people through community outreach and social events. RCGA plans to continue to provide support and advocacy for transgender people and gender non-conforming people in Nebraska, Iowa, Missouri, South Dakota, and Kansas.

5.     If Plaintiffs succeed in striking down the U.S. Department of Health and Human Service's final rule, "Nondiscrimination in Health Programs and Activities,"

RCGA reasonably fears that its members will be discriminated against in healthcare based on their gender identity.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on September 13TH, 2016.

By: _Katherine M. Daniel_

Katherine M. Parrish

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC.;<br>SPECIALITY PHYSICIANS OF ILLINOIS,<br>LLC,;<br>CHRISTIAN MEDICAL & DENTAL<br>ASSOCIATIONS;<br><br> - and -<br><br>STATE OF TEXAS;<br>STATE OF WISCONSIN;<br>STATE OF NEBRASKA;<br>COMMONWEALTH OF KENTUCKY, by<br>and through Governor Matthew G. Bevin; and<br>STATE OF KANSAS,<br><br>               *Plaintiffs*,<br>    v.<br><br>SYLVIA BURWELL, Secretary of the United<br>States Department of Health and Human<br>Services; and UNITED STATES<br>DEPARTMENT OF HEALTH AND HUMAN<br>SERVICES<br><br>               *Defendants*. | Civ. Action No. 7:16-cv-00108-O |

**DECLARATION OF CHERYL NEWCOMB**

    1.       I am the Deputy Director of the ACLU of Texas Inc. ("ACLU of Texas"),

which is moving for intervention in the above-captioned action. Before becoming Deputy

Director in 2015, I was the Director of Development for five years. In performing my duties as Development Director and then Deputy Director, I have interacted with ACLU of Texas members often, and I regularly work with the staff members responsible for carrying out the mission of the organization.  I have personal knowledge of the matters stated in this declaration.

2.      The ACLU of Texas is a nonpartisan, nonprofit organization dedicated to defending the principles embodied in our Constitution and our nation's civil rights laws. It is the Texas state affiliate of the American Civil Liberties Union. The ACLU of Texas has more than 10,000 members throughout the state, including areas of the state with few medical providers.

3.      If Plaintiffs succeed in striking down the U.S. Department of Health and Human Service's final rule, "Nondiscrimination in Health Programs and Activities," the ACLU of Texas fears that its members will be subject to discrimination in healthcare.

4.      The ACLU of Texas has multiple members who are transgender, including at least one member who is transgender and has informed me that he must rely on public hospitals for emergency healthcare needs.   The ACLU of Texas also has members who have informed me that they anticipate requiring medical treatment related to gender transition for themselves or their dependants within the next year.

5.      The ACLU of Texas has multiple members who have informed me that they anticipate requiring reproductive care within the next year. One ACLU of Texas member has informed me that she has a history of high-risk pregnancies requiring emergency miscarriage management, including abortion, and that she must rely on public hospitals for emergency healthcare needs. Another ACLU of Texas member has informed

me that her current medical circumstances would make any pregnancy a medical emergency for her.

6.     The ACLU of Texas has members of many different faiths and members of no faith, who are Texas taxpayers. At least one of these members has informed me that she objects to the use of her taxpayer dollars to fund religiously motivated discrimination at public hospitals.

7.     The ACLU of Texas advocates on behalf of transgender people, people seeking reproductive healthcare, and religious freedom. Through our litigation, lobbying, and advocacy efforts, we have fought to prevent discrimination in healthcare and to eliminate religious restrictions on access to care. The ACLU of Texas plans to continue to fight discrimination against transgender people and women seeking access to reproductive care in Texas, and to oppose the government establishment of religion.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury of the laws of the United States of America that the foregoing is true and correct.

Executed on this 15th day of September 2016.

_____
Cheryl Newcomb