# APPENDIX

## Appendix Table of Contents

Lambda Legal, *Professional Organization Statements Supporting Transgender People in Health Care*....................................................................................................................1

United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* ........................................................................................................5

Stulberg, et al., *Referrals for Services Prohibited in Catholic Health Care Facilities* ....................48


**Lambda Legal**
making the case for equality

## PROFESSIONAL ORGANIZATION STATEMENTS
## SUPPORTING TRANSGENDER PEOPLE IN HEALTH CARE[1]

**American Medical Association**

Resolution: Removing Financial Barriers to Care for Transgender Patients
http://www.ama-assn.org/resources/doc/hod/a08resolutions.pdf

> "An established body of medical research demonstrates the effectiveness and medical necessity of mental health care, hormone therapy and sex reassignment surgery as forms of therapeutic treatment for many people diagnosed with GID ... Therefore, be it RESOLVED, that the AMA supports public and private health insurance coverage for treatment of gender identity disorder."

**American Psychological Association**

Policy on Transgender, Gender Identity & Gender Expression Non-Discrimination
http://www.apa.org/news/press/releases/2008/08/gender-variant.aspx

> As stated in the Policy on Transgender, Gender Identity & Gender Expression Non-Discrimination, the APA "opposes all public and private discrimination on the basis of actual or perceived gender identity and expression and urges the repeal of discriminatory laws and policies" and "calls upon psychologists in their professional roles to provide appropriate, nondiscriminatory treatment to transgender and gender variant individuals and encourages psychologists to take a leadership role in working against discrimination towards transgender and gender variant individuals[.]"

> The "APA recognizes the efficacy, benefit and medical necessity of gender transition treatments for appropriately evaluated individuals and calls upon public and private insurers to cover these medically necessary treatments."

**American Academy of Family Physicians**

Resolution: Transgender Care
http://www.aafp.org/online/etc/medialib/aafp_org/documents/membership/special/2007resolutio
ns.Par.0001.File.tmp/2007NCSCSummActions-new-seal.pdf

---

[1] Compiled by Lambda Legal. For more information, contact Dru Levasseur, Transgender Rights Attorney, Lambda Legal, 120 Wall Street, 19th Floor, New York, NY 10005, (212) 809-8585 (telephone), (212) 809-0055 (fax), dlevasseur@lambdalegal.org.

1



**Lambda Legal**
making the case for equality

In 2007, an AAFP Commission declared that the association has a policy opposing any form of patient discrimination and stated its opposition to the exclusion of transgender health care: "RESOLVED, That the American Academy of Family Physicians endorse payment by third party payors to provide transsexual care benefits for transgender patients."

## National Association of Social Workers

Committee on Lesbian, Gay, Bisexual, and Transgender Issues, NASW, Position Statement, Transgender and Gender Identity Issues
http://www.socialworkers.org/da/da2008/finalvoting/documents/Transgender%202nd%20round%20-%20Clean.pdf

> "NASW supports the rights of all individuals to receive health insurance and other health coverage without discrimination on the basis of gender identity, and specifically without exclusion of services related to transgender or transsexual transition…in order to receive medical and mental health services through their primary care physician and the appropriate referrals to medical specialists, which may include hormone replacement therapy, surgical interventions, prosthetic devices, and other medical procedures."

## World Professional Association for Transgender Health

Clarification on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the U.S.A.
http://www.wpath.org/documents/Med%20Nec%20on%202008%20Letterhead.pdf

> WPATH found that decades of experience with the Standards of Care show gender transitions and related care to be accepted, good medical practice and effective treatment. In a 2008 clarification, WPATH stated:
>
> "Sex reassignment, properly indicated and performed as provided by the Standards of Care, has proven to be beneficial and effective in the treatment of individuals with transsexualism, gender identity disorder, and/or gender dysphoria. Sex reassignment plays an undisputed role in contributing toward favorable outcomes, and comprises Real Life Experience, legal name and sex change on identity documents, as well as medically necessary hormone treatment, counseling, psychotherapy, and other medical procedures...
>
> The medical procedures attendant to sex reassignment are not 'cosmetic' or 'elective' or for the mere convenience of the patient. These reconstructive procedures are not optional in any meaningful sense, but are understood to be medically necessary for the treatment of the diagnosed condition."



## National Commission on Correctional Health Care

Position Statement: Transgender Health Care in Correctional Settings
http://www.ncchc.org/resources/statements/transgender.html

> "The health risks of overlooking the particular needs of transgender inmates are so severe that acknowledgment of the problem and policies that assure appropriate and responsible provision of health care are needed...
>
> Because prisons, jails, and juvenile justice facilities have a responsibility to ensure the physical and mental health and well-being of transgender people in their custody, correctional health staff should manage these inmates in a manner that respects the biomedical and psychological aspects of a gender identity disorder (GID) diagnosis."

## American Public Health Association

The Need for Acknowledging Transgendered Individuals within Research and Clinical Practice
http://www.apha.org/advocacy/policy/policysearch/default.htm?id=204

> The APHA issued a policy statement concluding that "transgendered individuals are not receiving adequate health care, information, or inclusion within research studies because of discrimination by and/or lack of training of health care providers and researchers; therefore..."
>
> The APHA thus "Urges researchers and health care workers to be sensitive to the lives of transgendered individuals and treat them with dignity and respect, and not to force them to fit within rigid gender norms. This includes referring to them as the gender with which they identify;
>
> Urges researchers, health care workers, the National Institutes of Health, and the Centers for Disease Control and Prevention to be aware of the distinct health care needs of transgendered individuals; and
>
> Urges the National Institutes of Health and the Centers for Disease Control and Prevention to make available resources, including funding for research, that will enable a better understanding of the health risks of transgendered individuals, especially the barriers they experience within health care settings..."

## American College of Obstetricians and Gynecologists

The American College of Obstetricians and Gynecologists, *Committee Opinion No. 512: Health Care for Transgender Individuals*, 118 OBSTETRICS AND GYNECOLOGY 1454 (2011).
http://www.ncfr.org/news/acog-releases-new-committee-opinion-transgender-persons


**Lambda Legal**
making the case for equality

"Transgender individuals face harassment, discrimination, and rejection within our society. Lack of awareness, knowledge, and sensitivity in health care communities eventually leads to inadequate access to, underutilization of, and disparities within the health care system for this population. Although the care for these patients is often managed by a specialty team, obstetrician-gynecologists should be prepared to assist of refer transgender individuals with routine treatment and screening as well as hormonal and surgical therapies. The American College of Obstetricians and Gynecologists opposes discrimination on the basis of gender identity and urges public and private health insurance plans to cover the treatment of gender identity disorder."

**Last Revised June 8, 2012**

4



*Issued by USCCB, November 17, 2009*

*Copyright © 2009, United States Conference of Catholic Bishops.*
*All rights reserved.*

*To order a copy of this statement, please visit* www.usccbpublishing.org *and click on*
*"New Titles."*

# Ethical and Religious Directives for Catholic Health Care Services

## *Fifth Edition*

United States Conference of Catholic Bishops

# CONTENTS

Preamble

General Introduction

Part One: The Social Responsibility of Catholic Health Care Services

Part Two: The Pastoral and Spiritual Responsibility of Catholic Health Care

Part Three: The Professional-Patient Relationship

Part Four: Issues in Care for the Beginning of Life

Part Five: Issues in Care for the Seriously Ill and Dying

Part Six: Forming New Partnerships with Health Care Organizations and Providers

Conclusion

PREAMBLE

Health care in the United States is marked by extraordinary change. Not only is there continuing change in clinical practice due to technological advances, but the health care system in the United States is being challenged by both institutional and social factors as well. At the same time, there are a number of developments within the Catholic Church affecting the ecclesial mission of health care. Among these are significant changes in religious orders and congregations, the increased involvement of lay men and women, a heightened awareness of the Church's social role in the world, and developments in moral theology since the Second Vatican Council. A contemporary understanding of the Catholic health care ministry must take into account the new challenges presented by transitions both in the Church and in American society.

Throughout the centuries, with the aid of other sciences, a body of moral principles has emerged that expresses the Church's teaching on medical and moral matters and has proven to be pertinent and applicable to the ever-changing circumstances of health care and its delivery. In response to today's challenges, these same moral principles of Catholic teaching provide the rationale and direction for this revision of the *Ethical and Religious Directives for Catholic Health Care Services.*

These Directives presuppose our statement *Health and Health Care* published in 1981.[1] There we presented the theological principles that guide the Church's vision of health care, called for all Catholics to share in the healing mission of the Church, expressed our full commitment to the health care ministry, and offered encouragement to all those who are involved in it. Now, with American health care facing even more dramatic changes, we reaffirm the Church's commitment to health care ministry and the distinctive Catholic identity of the Church's institutional health care services.[2] The purpose of these *Ethical and Religious*

3

7

*Directives* then is twofold: first, to reaffirm the ethical standards of behavior in health care that flow from the Church's teaching about the dignity of the human person; second, to provide authoritative guidance on certain moral issues that face Catholic health care today.

The *Ethical and Religious Directives* are concerned primarily with institutionally based Catholic health care services. They address the sponsors, trustees, administrators, chaplains, physicians, health care personnel, and patients or residents of these institutions and services. Since they express the Church's moral teaching, these Directives also will be helpful to Catholic professionals engaged in health care services in other settings. The moral teachings that we profess here flow principally from the natural law, understood in the light of the revelation Christ has entrusted to his Church. From this source the Church has derived its understanding of the nature of the human person, of human acts, and of the goals that shape human activity.

The Directives have been refined through an extensive process of consultation with bishops, theologians, sponsors, administrators, physicians, and other health care providers. While providing standards and guidance, the Directives do not cover in detail all of the complex issues that confront Catholic health care today. Moreover, the Directives will be reviewed periodically by the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops), in the light of authoritative church teaching, in order to address new insights from theological and medical research or new requirements of public policy.

The Directives begin with a general introduction that presents a theological basis for the Catholic health care ministry. Each of the six parts that follow is divided into two sections. The first section is in expository form; it serves as an introduction and provides the context in which concrete issues can be discussed from the perspective of the Catholic faith. The second section is

4

in prescriptive form; the directives promote and protect the truths of the Catholic faith as those truths are brought to bear on concrete issues in health care.

## GENERAL INTRODUCTION

The Church has always sought to embody our Savior's concern for the sick. The gospel accounts of Jesus' ministry draw special attention to his acts of healing: he cleansed a man with leprosy (Mt 8:1-4; Mk 1:40-42); he gave sight to two people who were blind (Mt 20:29-34; Mk 10:46-52); he enabled one who was mute to speak (Lk 11:14); he cured a woman who was hemorrhaging (Mt 9:20-22; Mk 5:25-34); and he brought a young girl back to life (Mt 9:18, 23-25; Mk 5:35-42). Indeed, the Gospels are replete with examples of how the Lord cured every kind of ailment and disease (Mt 9:35). In the account of Matthew, Jesus' mission fulfilled the prophecy of Isaiah: "He took away our infirmities and bore our diseases" (Mt 8:17; cf. Is 53:4).

Jesus' healing mission went further than caring only for physical affliction. He touched people at the deepest level of their existence; he sought their physical, mental, and spiritual healing (Jn 6:35, 11:25-27). He "came so that they might have life and have it more abundantly" (Jn 10:10).

The mystery of Christ casts light on every facet of Catholic health care: to see Christian love as the animating principle of health care; to see healing and compassion as a continuation of Christ's mission; to see suffering as a participation in the redemptive power of Christ's passion, death, and resurrection; and to see death, transformed by the resurrection, as an opportunity for a final act of communion with Christ.

For the Christian, our encounter with suffering and death can take on a positive and distinctive meaning through the redemptive power of Jesus' suffering and death. As St. Paul says, we are "always carrying about in the body the dying of Jesus, so that the life of Jesus may also be manifested in our body" (2 Cor 4:10). This truth does not lessen the pain and fear, but gives confidence and grace for bearing suffering rather than being overwhelmed by it. Catholic

6

health care ministry bears witness to the truth that, for those who are in Christ, suffering and death are the birth pangs of the new creation. "God himself will always be with them [as their God]. He will wipe every tear from their eyes, and there shall be no more death or mourning, wailing or pain, [for] the old order has passed away" (Rev 21:3-4).

In faithful imitation of Jesus Christ, the Church has served the sick, suffering, and dying in various ways throughout history. The zealous service of individuals and communities has provided shelter for the traveler; infirmaries for the sick; and homes for children, adults, and the elderly.[3] In the United States, the many religious communities as well as dioceses that sponsor and staff this country's Catholic health care institutions and services have established an effective Catholic presence in health care. Modeling their efforts on the gospel parable of the Good Samaritan, these communities of women and men have exemplified authentic neighborliness to those in need (Lk 10:25-37). The Church seeks to ensure that the service offered in the past will be continued into the future.

While many religious communities continue their commitment to the health care ministry, lay Catholics increasingly have stepped forward to collaborate in this ministry. Inspired by the example of Christ and mandated by the Second Vatican Council, lay faithful are invited to a broader and more intense field of ministries than in the past.[4] By virtue of their Baptism, lay faithful are called to participate actively in the Church's life and mission.[5] Their participation and leadership in the health care ministry, through new forms of sponsorship and governance of institutional Catholic health care, are essential for the Church to continue her ministry of healing and compassion. They are joined in the Church's health care mission by many men and women who are not Catholic.

Catholic health care expresses the healing ministry of Christ in a specific way within the local church. Here the diocesan bishop exercises responsibilities that are rooted in his office as pastor, teacher, and priest. As the center of unity in the diocese and coordinator of ministries in the local church, the diocesan bishop fosters the mission of Catholic health care in a way that promotes collaboration among health care leaders, providers, medical professionals, theologians, and other specialists. As pastor, the diocesan bishop is in a unique position to encourage the faithful to greater responsibility in the healing ministry of the Church. As teacher, the diocesan bishop ensures the moral and religious identity of the health care ministry in whatever setting it is carried out in the diocese. As priest, the diocesan bishop oversees the sacramental care of the sick. These responsibilities will require that Catholic health care providers and the diocesan bishop engage in ongoing communication on ethical and pastoral matters that require his attention.

In a time of new medical discoveries, rapid technological developments, and social change, what is new can either be an opportunity for genuine advancement in human culture, or it can lead to policies and actions that are contrary to the true dignity and vocation of the human person. In consultation with medical professionals, church leaders review these developments, judge them according to the principles of right reason and the ultimate standard of revealed truth, and offer authoritative teaching and guidance about the moral and pastoral responsibilities entailed by the Christian faith.[6] While the Church cannot furnish a ready answer to every moral dilemma, there are many questions about which she provides normative guidance and direction. In the absence of a determination by the magisterium, but never contrary to church teaching, the guidance of approved authors can offer appropriate guidance for ethical decision making.

8

Created in God's image and likeness, the human family shares in the dominion that Christ manifested in his healing ministry. This sharing involves a stewardship over all material creation (Gn 1:26) that should neither abuse nor squander nature's resources. Through science the human race comes to understand God's wonderful work; and through technology it must conserve, protect, and perfect nature in harmony with God's purposes. Health care professionals pursue a special vocation to share in carrying forth God's life-giving and healing work.

The dialogue between medical science and Christian faith has for its primary purpose the common good of all human persons. It presupposes that science and faith do not contradict each other. Both are grounded in respect for truth and freedom. As new knowledge and new technologies expand, each person must form a correct conscience based on the moral norms for proper health care.

9

PART ONE

## The Social Responsibility of Catholic Health Care Services

**Introduction**

Their embrace of Christ's healing mission has led institutionally based Catholic health care services in the United States to become an integral part of the nation's health care system. Today, this complex health care system confronts a range of economic, technological, social, and moral challenges. The response of Catholic health care institutions and services to these challenges is guided by normative principles that inform the Church's healing ministry.

First, Catholic health care ministry is rooted in a commitment to promote and defend human dignity; this is the foundation of its concern to respect the sacredness of every human life from the moment of conception until death. The first right of the human person, the right to life, entails a right to the means for the proper development of life, such as adequate health care.[7]

Second, the biblical mandate to care for the poor requires us to express this in concrete action at all levels of Catholic health care. This mandate prompts us to work to ensure that our country's health care delivery system provides adequate health care for the poor. In Catholic institutions, particular attention should be given to the health care needs of the poor, the uninsured, and the underinsured.[8]

Third, Catholic health care ministry seeks to contribute to the common good. The common good is realized when economic, political, and social conditions ensure protection for the fundamental rights of all individuals and enable all to fulfill their common purpose and reach their common goals.[9]

10

Fourth, Catholic health care ministry exercises responsible stewardship of available health care resources. A just health care system will be concerned both with promoting equity of care—to assure that the right of each person to basic health care is respected—and with promoting the good health of all in the community. The responsible stewardship of health care resources can be accomplished best in dialogue with people from all levels of society, in accordance with the principle of subsidiarity and with respect for the moral principles that guide institutions and persons.

Fifth, within a pluralistic society, Catholic health care services will encounter requests for medical procedures contrary to the moral teachings of the Church. Catholic health care does not offend the rights of individual conscience by refusing to provide or permit medical procedures that are judged morally wrong by the teaching authority of the Church.

**Directives**

1. A Catholic institutional health care service is a community that provides health care to those in need of it. This service must be animated by the Gospel of Jesus Christ and guided by the moral tradition of the Church.

2. Catholic health care should be marked by a spirit of mutual respect among caregivers that disposes them to deal with those it serves and their families with the compassion of Christ, sensitive to their vulnerability at a time of special need.

3. In accord with its mission, Catholic health care should distinguish itself by service to and advocacy for those people whose social condition puts them at the margins of our society and makes them particularly vulnerable to discrimination: the poor; the uninsured and the underinsured; children and the unborn; single parents; the elderly; those with incurable diseases and chemical dependencies; racial minorities; immigrants and refugees. In particular, the person

11

with mental or physical disabilities, regardless of the cause or severity, must be treated as a unique person of incomparable worth, with the same right to life and to adequate health care as all other persons.

4. A Catholic health care institution, especially a teaching hospital, will promote medical research consistent with its mission of providing health care and with concern for the responsible stewardship of health care resources. Such medical research must adhere to Catholic moral principles.

5. Catholic health care services must adopt these Directives as policy, require adherence to them within the institution as a condition for medical privileges and employment, and provide appropriate instruction regarding the Directives for administration, medical and nursing staff, and other personnel.

6. A Catholic health care organization should be a responsible steward of the health care resources available to it. Collaboration with other health care providers, in ways that do not compromise Catholic social and moral teaching, can be an effective means of such stewardship.[10]

7. A Catholic health care institution must treat its employees respectfully and justly. This responsibility includes: equal employment opportunities for anyone qualified for the task, irrespective of a person's race, sex, age, national origin, or disability; a workplace that promotes employee participation; a work environment that ensures employee safety and well-being; just compensation and benefits; and recognition of the rights of employees to organize and bargain collectively without prejudice to the common good.

8. Catholic health care institutions have a unique relationship to both the Church and the wider community they serve. Because of the ecclesial nature of this relationship, the relevant

12

requirements of canon law will be observed with regard to the foundation of a new Catholic health care institution; the substantial revision of the mission of an institution; and the sale, sponsorship transfer, or closure of an existing institution.

9. Employees of a Catholic health care institution must respect and uphold the religious mission of the institution and adhere to these Directives. They should maintain professional standards and promote the institution's commitment to human dignity and the common good.

13

PART TWO

## The Pastoral and Spiritual Responsibility of Catholic Health Care

**Introduction**

The dignity of human life flows from creation in the image of God (Gn 1:26), from redemption by Jesus Christ (Eph 1:10; 1 Tm 2:4-6), and from our common destiny to share a life with God beyond all corruption (1 Cor 15:42-57). Catholic health care has the responsibility to treat those in need in a way that respects the human dignity and eternal destiny of all. The words of Christ have provided inspiration for Catholic health care: "I was ill and you cared for me" (Mt 25:36). The care provided assists those in need to experience their own dignity and value, especially when these are obscured by the burdens of illness or the anxiety of imminent death.

Since a Catholic health care institution is a community of healing and compassion, the care offered is not limited to the treatment of a disease or bodily ailment but embraces the physical, psychological, social, and spiritual dimensions of the human person. The medical expertise offered through Catholic health care is combined with other forms of care to promote health and relieve human suffering. For this reason, Catholic health care extends to the spiritual nature of the person. "Without health of the spirit, high technology focused strictly on the body offers limited hope for healing the whole person."[11] Directed to spiritual needs that are often appreciated more deeply during times of illness, pastoral care is an integral part of Catholic health care. Pastoral care encompasses the full range of spiritual services, including a listening presence; help in dealing with powerlessness, pain, and alienation; and assistance in recognizing and responding to God's will with greater joy and peace. It should be acknowledged, of course, that technological advances in medicine have reduced the length of hospital stays dramatically. It

14

follows, therefore, that the pastoral care of patients, especially administration of the sacraments, will be provided more often than not at the parish level, both before and after one's hospitalization. For this reason, it is essential that there be very cordial and cooperative relationships between the personnel of pastoral care departments and the local clergy and ministers of care.

Priests, deacons, religious, and laity exercise diverse but complementary roles in this pastoral care. Since many areas of pastoral care call upon the creative response of these pastoral caregivers to the particular needs of patients or residents, the following directives address only a limited number of specific pastoral activities.

**Directives**

10. A Catholic health care organization should provide pastoral care to minister to the religious and spiritual needs of all those it serves. Pastoral care personnel—clergy, religious, and lay alike—should have appropriate professional preparation, including an understanding of these Directives.

11. Pastoral care personnel should work in close collaboration with local parishes and community clergy. Appropriate pastoral services and/or referrals should be available to all in keeping with their religious beliefs or affiliation.

12. For Catholic patients or residents, provision for the sacraments is an especially important part of Catholic health care ministry. Every effort should be made to have priests assigned to hospitals and health care institutions to celebrate the Eucharist and provide the sacraments to patients and staff.

13. Particular care should be taken to provide and to publicize opportunities for patients or residents to receive the sacrament of Penance.

15

19

14. Properly prepared lay Catholics can be appointed to serve as extraordinary ministers of Holy Communion, in accordance with canon law and the policies of the local diocese. They should assist pastoral care personnel—clergy, religious, and laity—by providing supportive visits, advising patients regarding the availability of priests for the sacrament of Penance, and distributing Holy Communion to the faithful who request it.

15. Responsive to a patient's desires and condition, all involved in pastoral care should facilitate the availability of priests to provide the sacrament of Anointing of the Sick, recognizing that through this sacrament Christ provides grace and support to those who are seriously ill or weakened by advanced age. Normally, the sacrament is celebrated when the sick person is fully conscious. It may be conferred upon the sick who have lost consciousness or the use of reason, if there is reason to believe that they would have asked for the sacrament while in control of their faculties.

16. All Catholics who are capable of receiving Communion should receive Viaticum when they are in danger of death, while still in full possession of their faculties.[12]

17. Except in cases of emergency (i.e., danger of death), any request for Baptism made by adults or for infants should be referred to the chaplain of the institution. Newly born infants in danger of death, including those miscarried, should be baptized if this is possible.[13] In case of emergency, if a priest or a deacon is not available, anyone can validly baptize.[14] In the case of emergency Baptism, the chaplain or the director of pastoral care is to be notified.

18. When a Catholic who has been baptized but not yet confirmed is in danger of death, any priest may confirm the person.[15]

19. A record of the conferral of Baptism or Confirmation should be sent to the parish in which the institution is located and posted in its baptism/confirmation registers.

16

20. Catholic discipline generally reserves the reception of the sacraments to Catholics. In accord with canon 844, §3, Catholic ministers may administer the sacraments of Eucharist, Penance, and Anointing of the Sick to members of the oriental churches that do not have full communion with the Catholic Church, or of other churches that in the judgment of the Holy See are in the same condition as the oriental churches, if such persons ask for the sacraments on their own and are properly disposed.

With regard to other Christians not in full communion with the Catholic Church, when the danger of death or other grave necessity is present, the four conditions of canon 844, §4, also must be present, namely, they cannot approach a minister of their own community; they ask for the sacraments on their own; they manifest Catholic faith in these sacraments; and they are properly disposed. The diocesan bishop has the responsibility to oversee this pastoral practice.

21. The appointment of priests and deacons to the pastoral care staff of a Catholic institution must have the explicit approval or confirmation of the local bishop in collaboration with the administration of the institution. The appointment of the director of the pastoral care staff should be made in consultation with the diocesan bishop.

22. For the sake of appropriate ecumenical and interfaith relations, a diocesan policy should be developed with regard to the appointment of non-Catholic members to the pastoral care staff of a Catholic health care institution. The director of pastoral care at a Catholic institution should be a Catholic; any exception to this norm should be approved by the diocesan bishop.

17

# PART THREE

## The Professional-Patient Relationship

### Introduction

A person in need of health care and the professional health care provider who accepts that person as a patient enter into a relationship that requires, among other things, mutual respect, trust, honesty, and appropriate confidentiality. The resulting free exchange of information must avoid manipulation, intimidation, or condescension. Such a relationship enables the patient to disclose personal information needed for effective care and permits the health care provider to use his or her professional competence most effectively to maintain or restore the patient's health. Neither the health care professional nor the patient acts independently of the other; both participate in the healing process.

Today, a patient often receives health care from a team of providers, especially in the setting of the modern acute-care hospital. But the resulting multiplication of relationships does not alter the personal character of the interaction between health care providers and the patient. The relationship of the person seeking health care and the professionals providing that care is an important part of the foundation on which diagnosis and care are provided. Diagnosis and care, therefore, entail a series of decisions with ethical as well as medical dimensions. The health care professional has the knowledge and experience to pursue the goals of healing, the maintenance of health, and the compassionate care of the dying, taking into account the patient's convictions and spiritual needs, and the moral responsibilities of all concerned. The person in need of health care depends on the skill of the health care provider to assist in preserving life and promoting

18

22

health of body, mind, and spirit. The patient, in turn, has a responsibility to use these physical and mental resources in the service of moral and spiritual goals to the best of his or her ability.

When the health care professional and the patient use institutional Catholic health care, they also accept its public commitment to the Church's understanding of and witness to the dignity of the human person. The Church's moral teaching on health care nurtures a truly interpersonal professional-patient relationship. This professional-patient relationship is never separated, then, from the Catholic identity of the health care institution. The faith that inspires Catholic health care guides medical decisions in ways that fully respect the dignity of the person and the relationship with the health care professional.

**Directives**

23. The inherent dignity of the human person must be respected and protected regardless of the nature of the person's health problem or social status. The respect for human dignity extends to all persons who are served by Catholic health care.

24. In compliance with federal law, a Catholic health care institution will make available to patients information about their rights, under the laws of their state, to make an advance directive for their medical treatment. The institution, however, will not honor an advance directive that is contrary to Catholic teaching. If the advance directive conflicts with Catholic teaching, an explanation should be provided as to why the directive cannot be honored.

25. Each person may identify in advance a representative to make health care decisions as his or her surrogate in the event that the person loses the capacity to make health care decisions. Decisions by the designated surrogate should be faithful to Catholic moral principles and to the person's intentions and values, or if the person's intentions are unknown, to the person's best interests. In the event that an advance directive is not executed, those who are in a position to

19

know best the patient's wishes—usually family members and loved ones—should participate in the treatment decisions for the person who has lost the capacity to make health care decisions.

26. The free and informed consent of the person or the person's surrogate is required for medical treatments and procedures, except in an emergency situation when consent cannot be obtained and there is no indication that the patient would refuse consent to the treatment.

27. Free and informed consent requires that the person or the person's surrogate receive all reasonable information about the essential nature of the proposed treatment and its benefits; its risks, side-effects, consequences, and cost; and any reasonable and morally legitimate alternatives, including no treatment at all.

28. Each person or the person's surrogate should have access to medical and moral information and counseling so as to be able to form his or her conscience. The free and informed health care decision of the person or the person's surrogate is to be followed so long as it does not contradict Catholic principles.

29. All persons served by Catholic health care have the right and duty to protect and preserve their bodily and functional integrity.[16] The functional integrity of the person may be sacrificed to maintain the health or life of the person when no other morally permissible means is available.[17]

30. The transplantation of organs from living donors is morally permissible when such a donation will not sacrifice or seriously impair any essential bodily function and the anticipated benefit to the recipient is proportionate to the harm done to the donor. Furthermore, the freedom of the prospective donor must be respected, and economic advantages should not accrue to the donor.

20

31. No one should be the subject of medical or genetic experimentation, even if it is therapeutic, unless the person or surrogate first has given free and informed consent. In instances of nontherapeutic experimentation, the surrogate can give this consent only if the experiment entails no significant risk to the person's well-being. Moreover, the greater the person's incompetency and vulnerability, the greater the reasons must be to perform any medical experimentation, especially nontherapeutic.

32. While every person is obliged to use ordinary means to preserve his or her health, no person should be obliged to submit to a health care procedure that the person has judged, with a free and informed conscience, not to provide a reasonable hope of benefit without imposing excessive risks and burdens on the patient or excessive expense to family or community.[18]

33. The well-being of the whole person must be taken into account in deciding about any therapeutic intervention or use of technology. Therapeutic procedures that are likely to cause harm or undesirable side-effects can be justified only by a proportionate benefit to the patient.

34. Health care providers are to respect each person's privacy and confidentiality regarding information related to the person's diagnosis, treatment, and care.

35. Health care professionals should be educated to recognize the symptoms of abuse and violence and are obliged to report cases of abuse to the proper authorities in accordance with local statutes.

36. Compassionate and understanding care should be given to a person who is the victim of sexual assault. Health care providers should cooperate with law enforcement officials and offer the person psychological and spiritual support as well as accurate medical information. A female who has been raped should be able to defend herself against a potential conception from the sexual assault. If, after appropriate testing, there is no evidence that conception has occurred

21

25

already, she may be treated with medications that would prevent ovulation, sperm capacitation, or fertilization. It is not permissible, however, to initiate or to recommend treatments that have as their purpose or direct effect the removal, destruction, or interference with the implantation of a fertilized ovum.[19]

37. An ethics committee or some alternate form of ethical consultation should be available to assist by advising on particular ethical situations, by offering educational opportunities, and by reviewing and recommending policies. To these ends, there should be appropriate standards for medical ethical consultation within a particular diocese that will respect the diocesan bishop's pastoral responsibility as well as assist members of ethics committees to be familiar with Catholic medical ethics and, in particular, these Directives.

22

# PART FOUR

## Issues in Care for the Beginning of Life

**Introduction**

The Church's commitment to human dignity inspires an abiding concern for the sanctity of human life from its very beginning, and with the dignity of marriage and of the marriage act by which human life is transmitted. The Church cannot approve medical practices that undermine the biological, psychological, and moral bonds on which the strength of marriage and the family depends.

Catholic health care ministry witnesses to the sanctity of life "from the moment of conception until death."[20] The Church's defense of life encompasses the unborn and the care of women and their children during and after pregnancy. The Church's commitment to life is seen in its willingness to collaborate with others to alleviate the causes of the high infant mortality rate and to provide adequate health care to mothers and their children before and after birth.

The Church has the deepest respect for the family, for the marriage covenant, and for the love that binds a married couple together. This includes respect for the marriage act by which husband and wife express their love and cooperate with God in the creation of a new human being. The Second Vatican Council affirms:

> This love is an eminently human one. . . . It involves the good of the whole
> person. . . . The actions within marriage by which the couple are united intimately
> and chastely are noble and worthy ones. Expressed in a manner which is truly

23

human, these actions signify and promote that mutual self-giving by which spouses enrich each other with a joyful and a thankful will.[21]

Marriage and conjugal love are by their nature ordained toward the begetting and educating of children. Children are really the supreme gift of marriage and contribute very substantially to the welfare of their parents. . . . Parents should regard as their proper mission the task of transmitting human life and educating those to whom it has been transmitted. . . . They are thereby cooperators with the love of God the Creator, and are, so to speak, the interpreters of that love.[22]

For legitimate reasons of responsible parenthood, married couples may limit the number of their children by natural means. The Church cannot approve contraceptive interventions that "either in anticipation of the marital act, or in its accomplishment or in the development of its natural consequences, have the purpose, whether as an end or a means, to render procreation impossible."[23] Such interventions violate "the inseparable connection, willed by God . . . between the two meanings of the conjugal act: the unitive and procreative meaning."[24]

With the advance of the biological and medical sciences, society has at its disposal new technologies for responding to the problem of infertility. While we rejoice in the potential for good inherent in many of these technologies, we cannot assume that what is technically possible is always morally right. Reproductive technologies that substitute for the marriage act are not consistent with human dignity. Just as the marriage act is joined naturally to procreation, so procreation is joined naturally to the marriage act. As Pope John XXIII observed:

The transmission of human life is entrusted by nature to a personal and conscious act and as such is subject to all the holy laws of God: the immutable and

24

28

inviolable laws which must be recognized and observed. For this reason, one

cannot use means and follow methods which could be licit in the transmission of

the life of plants and animals.[25]

Because the moral law is rooted in the whole of human nature, human persons, through

intelligent reflection on their own spiritual destiny, can discover and cooperate in the plan of the

Creator.[26]

**Directives**

38. When the marital act of sexual intercourse is not able to attain its procreative purpose,

assistance that does not separate the unitive and procreative ends of the act, and does not

substitute for the marital act itself, may be used to help married couples conceive.[27]

39. Those techniques of assisted conception that respect the unitive and procreative

meanings of sexual intercourse and do not involve the destruction of human embryos, or their

deliberate generation in such numbers that it is clearly envisaged that all cannot implant and

some are simply being used to maximize the chances of others implanting, may be used as

therapies for infertility.

40. Heterologous fertilization (that is, any technique used to achieve conception by the

use of gametes coming from at least one donor other than the spouses) is prohibited because it is

contrary to the covenant of marriage, the unity of the spouses, and the dignity proper to parents

and the child.[28]

41. Homologous artificial fertilization (that is, any technique used to achieve conception

using the gametes of the two spouses joined in marriage) is prohibited when it separates

procreation from the marital act in its unitive significance (e.g., any technique used to achieve

extracorporeal conception).[29]

25

42. Because of the dignity of the child and of marriage, and because of the uniqueness of the mother-child relationship, participation in contracts or arrangements for surrogate motherhood is not permitted. Moreover, the commercialization of such surrogacy denigrates the dignity of women, especially the poor.[30]

43. A Catholic health care institution that provides treatment for infertility should offer not only technical assistance to infertile couples but also should help couples pursue other solutions (e.g., counseling, adoption).

44. A Catholic health care institution should provide prenatal, obstetric, and postnatal services for mothers and their children in a manner consonant with its mission.

45. Abortion (that is, the directly intended termination of pregnancy before viability or the directly intended destruction of a viable fetus) is never permitted. Every procedure whose sole immediate effect is the termination of pregnancy before viability is an abortion, which, in its moral context, includes the interval between conception and implantation of the embryo. Catholic health care institutions are not to provide abortion services, even based upon the principle of material cooperation. In this context, Catholic health care institutions need to be concerned about the danger of scandal in any association with abortion providers.

46. Catholic health care providers should be ready to offer compassionate physical, psychological, moral, and spiritual care to those persons who have suffered from the trauma of abortion.

47. Operations, treatments, and medications that have as their direct purpose the cure of a proportionately serious pathological condition of a pregnant woman are permitted when they cannot be safely postponed until the unborn child is viable, even if they will result in the death of the unborn child.

26

30

48. In case of extrauterine pregnancy, no intervention is morally licit which constitutes a direct abortion.[31]

49. For a proportionate reason, labor may be induced after the fetus is viable.

50. Prenatal diagnosis is permitted when the procedure does not threaten the life or physical integrity of the unborn child or the mother and does not subject them to disproportionate risks; when the diagnosis can provide information to guide preventative care for the mother or pre- or postnatal care for the child; and when the parents, or at least the mother, give free and informed consent. Prenatal diagnosis is not permitted when undertaken with the intention of aborting an unborn child with a serious defect.[32]

51. Nontherapeutic experiments on a living embryo or fetus are not permitted, even with the consent of the parents. Therapeutic experiments are permitted for a proportionate reason with the free and informed consent of the parents or, if the father cannot be contacted, at least of the mother. Medical research that will not harm the life or physical integrity of an unborn child is permitted with parental consent.[33]

52. Catholic health institutions may not promote or condone contraceptive practices but should provide, for married couples and the medical staff who counsel them, instruction both about the Church's teaching on responsible parenthood and in methods of natural family planning.

53. Direct sterilization of either men or women, whether permanent or temporary, is not permitted in a Catholic health care institution. Procedures that induce sterility are permitted when their direct effect is the cure or alleviation of a present and serious pathology and a simpler treatment is not available.[34]

54. Genetic counseling may be provided in order to promote responsible parenthood and to prepare for the proper treatment and care of children with genetic defects, in accordance with Catholic moral teaching and the intrinsic rights and obligations of married couples regarding the transmission of life.

PART FIVE

## Issues in Care for the Seriously Ill and Dying

### Introduction

Christ's redemption and saving grace embrace the whole person, especially in his or her illness, suffering, and death.[35] The Catholic health care ministry faces the reality of death with the confidence of faith. In the face of death—for many, a time when hope seems lost—the Church witnesses to her belief that God has created each person for eternal life.[36]

Above all, as a witness to its faith, a Catholic health care institution will be a community of respect, love, and support to patients or residents and their families as they face the reality of death. What is hardest to face is the process of dying itself, especially the dependency, the helplessness, and the pain that so often accompany terminal illness. One of the primary purposes of medicine in caring for the dying is the relief of pain and the suffering caused by it. Effective management of pain in all its forms is critical in the appropriate care of the dying.

The truth that life is a precious gift from God has profound implications for the question of stewardship over human life. We are not the owners of our lives and, hence, do not have absolute power over life. We have a duty to preserve our life and to use it for the glory of God, but the duty to preserve life is not absolute, for we may reject life-prolonging procedures that are insufficiently beneficial or excessively burdensome. Suicide and euthanasia are never morally acceptable options.

The task of medicine is to care even when it cannot cure. Physicians and their patients must evaluate the use of the technology at their disposal. Reflection on the innate dignity of human life in all its dimensions and on the purpose of medical care is indispensable for

29

formulating a true moral judgment about the use of technology to maintain life. The use of life-sustaining technology is judged in light of the Christian meaning of life, suffering, and death. In this way two extremes are avoided: on the one hand, an insistence on useless or burdensome technology even when a patient may legitimately wish to forgo it and, on the other hand, the withdrawal of technology with the intention of causing death.[37]

The Church's teaching authority has addressed the moral issues concerning medically assisted nutrition and hydration. We are guided on this issue by Catholic teaching against euthanasia, which is "an action or an omission which of itself or by intention causes death, in order that all suffering may in this way be eliminated."[38] While medically assisted nutrition and hydration are not morally obligatory in certain cases, these forms of basic care should in principle be provided to all patients who need them, including patients diagnosed as being in a "persistent vegetative state" (PVS), because even the most severely debilitated and helpless patient retains the full dignity of a human person and must receive ordinary and proportionate care.

**Directives**

55. Catholic health care institutions offering care to persons in danger of death from illness, accident, advanced age, or similar condition should provide them with appropriate opportunities to prepare for death. Persons in danger of death should be provided with whatever information is necessary to help them understand their condition and have the opportunity to discuss their condition with their family members and care providers. They should also be offered the appropriate medical information that would make it possible to address the morally legitimate choices available to them. They should be provided the spiritual support as well as the opportunity to receive the sacraments in order to prepare well for death.

30

34

56. A person has a moral obligation to use ordinary or proportionate means of preserving his or her life. Proportionate means are those that in the judgment of the patient offer a reasonable hope of benefit and do not entail an excessive burden or impose excessive expense on the family or the community.[39]

57.     A person may forgo extraordinary or disproportionate means of preserving life. Disproportionate means are those that in the patient's judgment do not offer a reasonable hope of benefit or entail an excessive burden, or impose excessive expense on the family or the community.

58.     In principle, there is an obligation to provide patients with food and water, including medically assisted nutrition and hydration for those who cannot take food orally. This obligation extends to patients in chronic and presumably irreversible conditions (e.g., the "persistent vegetative state") who can reasonably be expected to live indefinitely if given such care.[40] Medically assisted nutrition and hydration become morally optional when they cannot reasonably be expected to prolong life or when they would be "excessively burdensome for the patient or [would] cause significant physical discomfort, for example resulting from complications in the use of the means employed."[41] For instance, as a patient draws close to inevitable death from an underlying progressive and fatal condition, certain measures to provide nutrition and hydration may become excessively burdensome and therefore not obligatory in light of their very limited ability to prolong life or provide comfort.

59.     The free and informed judgment made by a competent adult patient concerning the use or withdrawal of life-sustaining procedures should always be respected and normally complied with, unless it is contrary to Catholic moral teaching.

31

35

60.    Euthanasia is an action or omission that of itself or by intention causes death in order to alleviate suffering. Catholic health care institutions may never condone or participate in euthanasia or assisted suicide in any way. Dying patients who request euthanasia should receive loving care, psychological and spiritual support, and appropriate remedies for pain and other symptoms so that they can live with dignity until the time of natural death.[42]

61. Patients should be kept as free of pain as possible so that they may die comfortably and with dignity, and in the place where they wish to die. Since a person has the right to prepare for his or her death while fully conscious, he or she should not be deprived of consciousness without a compelling reason. Medicines capable of alleviating or suppressing pain may be given to a dying person, even if this therapy may indirectly shorten the person's life so long as the intent is not to hasten death. Patients experiencing suffering that cannot be alleviated should be helped to appreciate the Christian understanding of redemptive suffering.

62. The determination of death should be made by the physician or competent medical authority in accordance with responsible and commonly accepted scientific criteria.

63. Catholic health care institutions should encourage and provide the means whereby those who wish to do so may arrange for the donation of their organs and bodily tissue, for ethically legitimate purposes, so that they may be used for donation and research after death.

64. Such organs should not be removed until it has been medically determined that the patient has died. In order to prevent any conflict of interest, the physician who determines death should not be a member of the transplant team.

65. The use of tissue or organs from an infant may be permitted after death has been determined and with the informed consent of the parents or guardians.

32

66. Catholic health care institutions should not make use of human tissue obtained by direct abortions even for research and therapeutic purposes.[43]

## PART SIX

## Forming New Partnerships with Health Care Organizations and Providers

### Introduction

Until recently, most health care providers enjoyed a degree of independence from one another. In ever-increasing ways, Catholic health care providers have become involved with other health care organizations and providers. For instance, many Catholic health care systems and institutions share in the joint purchase of technology and services with other local facilities or physicians' groups. Another phenomenon is the growing number of Catholic health care systems and institutions joining or co-sponsoring integrated delivery networks or managed care organizations in order to contract with insurers and other health care payers. In some instances, Catholic health care systems sponsor a health care plan or health maintenance organization. In many dioceses, new partnerships will result in a decrease in the number of health care providers, at times leaving the Catholic institution as the sole provider of health care services. At whatever level, new partnerships forge a variety of interwoven relationships: between the various institutional partners, between health care providers and the community, between physicians and health care services, and between health care services and payers.

On the one hand, new partnerships can be viewed as opportunities for Catholic health care institutions and services to witness to their religious and ethical commitments and so influence the healing profession. For example, new partnerships can help to implement the Church's social teaching. New partnerships can be opportunities to realign the local delivery system in order to provide a continuum of health care to the community; they can witness to a

34

responsible stewardship of limited health care resources; and they can be opportunities to provide to poor and vulnerable persons a more equitable access to basic care.

On the other hand, new partnerships can pose serious challenges to the viability of the identity of Catholic health care institutions and services, and their ability to implement these Directives in a consistent way, especially when partnerships are formed with those who do not share Catholic moral principles. The risk of scandal cannot be underestimated when partnerships are not built upon common values and moral principles. Partnership opportunities for some Catholic health care providers may even threaten the continued existence of other Catholic institutions and services, particularly when partnerships are driven by financial considerations alone. Because of the potential dangers involved in the new partnerships that are emerging, an increased collaboration among Catholic-sponsored health care institutions is essential and should be sought before other forms of partnerships.

The significant challenges that new partnerships may pose, however, do not necessarily preclude their possibility on moral grounds. The potential dangers require that new partnerships undergo systematic and objective moral analysis, which takes into account the various factors that often pressure institutions and services into new partnerships that can diminish the autonomy and ministry of the Catholic partner. The following directives are offered to assist institutionally based Catholic health care services in this process of analysis. To this end, the United States Conference of Catholic Bishops (formerly the National Conference of Catholic Bishops) has established the Ad Hoc Committee on Health Care Issues and the Church as a resource for bishops and health care leaders.

This new edition of the *Ethical and Religious Directives* omits the appendix concerning cooperation, which was contained in the 1995 edition. Experience has shown that the brief

articulation of the principles of cooperation that was presented there did not sufficiently forestall certain possible misinterpretations and in practice gave rise to problems in concrete applications of the principles. Reliable theological experts should be consulted in interpreting and applying the principles governing cooperation, with the proviso that, as a rule, Catholic partners should avoid entering into partnerships that would involve them in cooperation with the wrongdoing of other providers.

**Directives**

67. Decisions that may lead to serious consequences for the identity or reputation of Catholic health care services, or entail the high risk of scandal, should be made in consultation with the diocesan bishop or his health care liaison.

68. Any partnership that will affect the mission or religious and ethical identity of Catholic health care institutional services must respect church teaching and discipline. Diocesan bishops and other church authorities should be involved as such partnerships are developed, and the diocesan bishop should give the appropriate authorization before they are completed. The diocesan bishop's approval is required for partnerships sponsored by institutions subject to his governing authority; for partnerships sponsored by religious institutes of pontifical right, his *nihil obstat* should be obtained.

69. If a Catholic health care organization is considering entering into an arrangement with another organization that may be involved in activities judged morally wrong by the Church, participation in such activities must be limited to what is in accord with the moral principles governing cooperation.

36

70. Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide, and direct sterilization.[44]

71. The possibility of scandal must be considered when applying the principles governing cooperation.[45] Cooperation, which in all other respects is morally licit, may need to be refused because of the scandal that might be caused. Scandal can sometimes be avoided by an appropriate explanation of what is in fact being done at the health care facility under Catholic auspices. The diocesan bishop has final responsibility for assessing and addressing issues of scandal, considering not only the circumstances in his local diocese but also the regional and national implications of his decision.[46]

72. The Catholic partner in an arrangement has the responsibility periodically to assess whether the binding agreement is being observed and implemented in a way that is consistent with Catholic teaching.

37

## CONCLUSION

Sickness speaks to us of our limitations and human frailty. It can take the form of infirmity resulting from the simple passing of years or injury from the exuberance of youthful energy. It can be temporary or chronic, debilitating, and even terminal. Yet the follower of Jesus faces illness and the consequences of the human condition aware that our Lord always shows compassion toward the infirm.

Jesus not only taught his disciples to be compassionate, but he also told them who should be the special object of their compassion. The parable of the feast with its humble guests was preceded by the instruction: "When you hold a banquet, invite the poor, the crippled, the lame, the blind" (Lk 14:13). These were people whom Jesus healed and loved.

Catholic health care is a response to the challenge of Jesus to go and do likewise. Catholic health care services rejoice in the challenge to be Christ's healing compassion in the world and see their ministry not only as an effort to restore and preserve health but also as a spiritual service and a sign of that final healing that will one day bring about the new creation that is the ultimate fruit of Jesus' ministry and God's love for us.

38

# Notes

1. United States Conference of Catholic Bishops, *Health and Health Care: A Pastoral Letter of the American Catholic Bishops* (Washington, DC: United States Conference of Catholic Bishops, 1981).

2. Health care services under Catholic auspices are carried out in a variety of institutional settings (e.g., hospitals, clinics, outpatient facilities, urgent care centers, hospices, nursing homes, and parishes). Depending on the context, these Directives will employ the terms "institution" and/or "services" in order to encompass the variety of settings in which Catholic health care is provided.

3. *Health and Health Care,* p. 5.

4. Second Vatican Ecumenical Council, *Decree on the Apostolate of the Laity* (*Apostolicam Actuositatem*) (1965), no. 1.

5. Pope John Paul II, Post-Synodal Apostolic Exhortation *On the Vocation and the Mission of the Lay Faithful in the Church and in the World* (*Christifideles Laici*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 29.

6. As examples, see Congregation for the Doctrine of the Faith, *Declaration on Procured Abortion* (1974); Congregation for the Doctrine of the Faith, *Declaration on Euthanasia* (1980); Congregation for the Doctrine of the Faith, *Instruction on Respect for Human Life in Its Origin and on the Dignity of Procreation: Replies to Certain Questions of the Day* (*Donum Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1987).

7. Pope John XXIII, Encyclical Letter *Peace on Earth* (*Pacem in Terris*) (Washington, DC: United States Conference of Catholic Bishops, 1963), no. 11; *Health and Health Care,* pp. 5, 17-18; *Catechism of the Catholic Church,* 2nd ed. (Washington, DC: Libreria Editrice Vaticana– United States Conference of Catholic Bishops, 2000), no. 2211.

8. Pope John Paul II, *On Social Concern, Encyclical Letter on the Occasion of the Twentieth Anniversary of "Populorum Progressio"* (*Sollicitudo Rei Socialis*) (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

9. United States Conference of Catholic Bishops, *Economic Justice for All: Pastoral Letter on Catholic Social Teaching and the U.S. Economy* (Washington, DC: United States Conference of Catholic Bishops, 1986), no. 80.

10. The duty of responsible stewardship demands responsible collaboration. But in collaborative efforts, Catholic institutionally based health care services must be attentive to occasions when the policies and practices of other institutions are not compatible with the Church's authoritative moral teaching. At such times, Catholic health care institutions should determine whether or to what degree collaboration would be morally permissible. To make that judgment, the governing boards of Catholic institutions should adhere to the moral principles on cooperation. See Part Six.

11. *Health and Health Care,* p. 12.

12. Cf. *Code of Canon Law,* cc. 921-923.

13. Cf. ibid., c. 867, § 2, and c. 871.

14. To confer Baptism in an emergency, one must have the proper intention (to do what the Church intends by Baptism) and pour water on the head of the person to be baptized, meanwhile pronouncing the words: "I baptize you in the name of the Father, and of the Son, and of the Holy Spirit."

15. Cf. c. 883, 3°.

16. For example, while the donation of a kidney represents loss of biological integrity, such a donation does not compromise functional integrity since human beings are capable of functioning with only one kidney.

17. Cf. directive 53.

18. *Declaration on Euthanasia,* Part IV; cf. also directives 56-57.

19. It is recommended that a sexually assaulted woman be advised of the ethical restrictions that prevent Catholic hospitals from using abortifacient procedures; cf. Pennsylvania Catholic Conference, "Guidelines for Catholic Hospitals Treating Victims of Sexual Assault," *Origins* 22 (1993): 810.

20. Pope John Paul II, "Address of October 29, 1983, to the 35th General Assembly of the World Medical Association," *Acta Apostolicae Sedis* 76 (1984): 390.

21. Second Vatican Ecumenical Council, *Pastoral Constitution on the Church in the Modern World* (*Gaudium et Spes*) (1965), no. 49.

22. Ibid., no. 50.

23. Pope Paul VI, Encyclical Letter *On the Regulation of Birth* (*Humanae Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1968), no. 14.

24. Ibid., no. 12.

40

25. Pope John XXIII, Encyclical Letter *Mater et Magistra* (1961), no. 193, quoted in Congregation for the Doctrine of the Faith, *Donum Vitae,* no. 4.

26. Pope John Paul II, Encyclical Letter *The Splendor of Truth* (*Veritatis Splendor*) (Washington, DC: United States Conference of Catholic Bishops, 1993), no. 50.

27. "Homologous artificial insemination within marriage cannot be admitted except for those cases in which the technical means is not a substitute for the conjugal act but serves to facilitate and to help so that the act attains its natural purpose" (*Donum Vitae,* Part II, B, no. 6; cf. also Part I, nos. 1, 6).

28. Ibid., Part II, A, no. 2.

29. "Artificial insemination as a substitute for the conjugal act is prohibited by reason of the voluntarily achieved dissociation of the two meanings of the conjugal act. Masturbation, through which the sperm is normally obtained, is another sign of this dissociation: even when it is done for the purpose of procreation, the act remains deprived of its unitive meaning: 'It lacks the sexual relationship called for by the moral order, namely, the relationship which realizes "the full sense of mutual self-giving and human procreation in the context of true love"'" (*Donum Vitae,* Part II, B, no. 6).

30. Ibid., Part II, A, no. 3.

31. Cf. directive 45.

32. *Donum Vitae,* Part I, no. 2.

33. Cf. ibid., no. 4. (Washington, DC: United States Conference of Catholic Bishops, 1988), no. 43.

34. Cf. Congregation for the Doctrine of the Faith, "Responses on Uterine Isolation and Related Matters," July 31, 1993, *Origins* 24 (1994): 211-212.

35. Pope John Paul II, Apostolic Letter *On the Christian Meaning of Human Suffering* (*Salvifici Doloris*) (Washington, DC: United States Conference of Catholic Bishops, 1984), nos. 25-27.

36. United States Conference of Catholic Bishops, *Order of Christian Funerals* (Collegeville, Minn.: The Liturgical Press, 1989), no. 1.

37. See *Declaration on Euthanasia.*

38. Ibid., Part II.

39. Ibid., Part IV; Pope John Paul II, Encyclical Letter *On the Value and Inviolability of Human Life* (*Evangelium Vitae*) (Washington, DC: United States Conference of Catholic Bishops, 1995), no. 65.

40. See Pope John Paul II, Address to the Participants in the International Congress on "Life-Sustaining Treatments and Vegetative State: Scientific Advances and Ethical Dilemmas" (March 20, 2004), no. 4, where he emphasized that "the administration of water and food, even when provided by artificial means, always represents a *natural means* of preserving life, not a *medical act*." See also Congregation for the Doctrine of the Faith, "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration" (August 1, 2007).

41. Congregation for the Doctrine of the Faith, Commentary on "Responses to Certain Questions of the United States Conference of Catholic Bishops Concerning Artificial Nutrition and Hydration."

42. See *Declaration on Euthanasia*, Part IV.

43. *Donum Vitae,* Part I, no. 4.

44. While there are many acts of varying moral gravity that can be identified as intrinsically evil, in the context of contemporary health care the most pressing concerns are currently abortion, euthanasia, assisted suicide, and direct sterilization. See Pope John Paul II's *Ad Limina* Address to the bishops of Texas, Oklahoma, and Arkansas (Region X), in *Origins* 28 (1998): 283. See also "Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" (*Quaecumqu Sterilizatio*), March 13, 1975, *Origins* 6 (1976): 33-35: "Any cooperation institutionally approved or tolerated in actions which are in themselves, that is, by their nature and condition, directed to a contraceptive end . . . is absolutely forbidden. For the official approbation of direct sterilization and, *a fortiori*, its management and execution in accord with hospital regulations, is a matter which, in the objective order, is by its very nature (or intrinsically) evil." This directive supersedes the "Commentary on the Reply of the Sacred Congregation for the Doctrine of the Faith on Sterilization in Catholic Hospitals" published by the National Conference of Catholic Bishops on September 15, 1977, in *Origins* 7 (1977): 399-400.

45. See *Catechism of the Catholic Church*: "Scandal is an attitude or behavior which leads another to do evil" (no. 2284); "Anyone who uses the power at his disposal in such a way that it leads others to do wrong becomes guilty of scandal and responsible for the evil that he has directly or indirectly encouraged" (no. 2287).

46. See "The Pastoral Role of the Diocesan Bishop in Catholic Health Care Ministry," *Origins* 26 (1997): 703.

42

This fifth edition of the *Ethical and Religious Directives for Catholic Health Care Services* was developed by the Committee on Doctrine of the United States Conference of Catholic Bishops (USCCB) and approved as the national code by the full body of the USCCB at its November 2009 General Meeting. This edition of the *Directives*, which replaces all previous editions, is recommended for implementation by the diocesan bishop and is authorized for publication by the undersigned.

*Msgr. David J. Malloy, STD*
*General Secretary, USCCB*

In 2001 the National Conference of Catholic Bishops and United States Catholic Conference became the United States Conference of Catholic Bishops.

Excerpts from *The Documents of Vatican II,* ed. Walter M. Abbott, SJ, copyright © 1966 by America Press are used with permission. All rights reserved.

Scripture texts used in this work are taken from the *New American Bible,* copyright © 1991, 1986, and 1970 by the Confraternity of Christian Doctrine, Washington, D.C., 20017 and are used by permission of the copyright owner. All rights reserved.

Copyright © 2009, United States Conference of Catholic Bishops, Washington, D.C. All rights reserved. No part of this work may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopying, recording, or by any information storage and retrieval system, without permission in writing from the copyright holder.

To obtain a catalog of USCCB titles, visit *www.usccbpublishing.org* or call toll-free 800-235-8722. In the Washington metropolitan area or from outside the United States, call 202-722-8716. Para pedidos en español, llame al 800-235-8722 y presione 4 para hablar con un representante del servicio al cliente en español.

ARTICLES

# Referrals for Services Prohibited In Catholic Health Care Facilities

**CONTEXT:** *Catholic hospitals control a growing share of health care in the United States and prohibit many common reproductive services, including ones related to sterilization, contraception, abortion and fertility. Professional ethics guidelines recommend that clinicians who deny patients reproductive services for moral or religious reasons provide a timely referral to prevent patient harm. Referral practices in Catholic hospitals, however, have not been explored.*

**METHODS:** *Twenty-seven obstetrician-gynecologists who were currently working or had worked in Catholic facilities participated in semistructured interviews in 2011–2012. Interviews explored their experiences with and perspectives on referral practices at Catholic hospitals. The sample was religiously and geographically diverse. Referral-related themes were identified in interview transcripts using qualitative analysis.*

**RESULTS:** *Obstetrician-gynecologists reported a range of practices and attitudes in regard to referrals for prohibited services. In some Catholic hospitals, physicians reported that administrators and ethicists encouraged or tolerated the provision of referrals. In others, hospital authorities actively discouraged referrals, or physicians kept referrals hidden. Patients in need of referrals for abortion were given less support than those seeking referrals for other prohibited services. Physicians received mixed messages when hospital leaders wished to retain services for financial reasons, rather than have staff refer patients elsewhere. Respondents felt referrals were not always sufficient to meet the needs of low-income patients or those with urgent medical conditions.*

**CONCLUSIONS:** *Some Catholic hospitals make it difficult for obstetrician-gynecologists to provide referrals for comprehensive reproductive services.*

*Perspectives on Sexual and Reproductive Health, 2016, 48(3):TK, doi: 10.1363/48e10216*

By Debra B. Stulberg, Rebecca A. Jackson and Lori R. Freedman

*Debra B. Stulberg is assistant professor, Department of Family Medicine, University of Chicago. Rebecca A. Jackson is professor, and Lori R. Freedman is assistant professor, both in the Department of Obstetrics, Gynecology and Reproductive Sciences, Bixby Center for Global Reproductive Health, University of California, San Francisco.*

In the United States, Catholic health care institutions account for 15% of all acute care hospitals, sponsor 17% of hospital beds and, in some regions, are the sole community hospital.[1] (A sole community hospital, as designated by the Centers for Medicare and Medicaid Services, is the only option for patients within at least 35 miles or a 45-minute drive.[2]) Clinicians in Catholic facilities are bound by the *Ethical and Religious Directives for Catholic Health Care Services*, which prohibits common reproductive health care services, such as those pertaining to contraception, sterilization, abortion and assisted reproductive treatments.[3] The directives are enforced by each diocese's bishop, who is charged with ensuring that Catholic hospital ethics committees understand the church's moral teachings and know how to apply them in daily health care practice.[3]

The Committee on Ethics of the American College of Obstetricians and Gynecologists has concluded that a physician who cannot, for reasons of conscience, provide a patient with a requested and medically accepted reproductive health service has a duty to give the patient a timely referral to a provider who can.[4] This committee opinion, first issued in 2007 and reaffirmed in 2013, is concerned primarily with physicians' personal moral objections, but it also speaks to institutional obligations toward patients. It advises health care institutions to ensure that patients have access to safe and legal reproductive care. It emphasizes that patient medical needs—not provider values—should be the leading consideration.

Catholic bioethical writing about referrals is complex and at times conflicted.[5–9] The directives never use the word "referral," and instead repeatedly caution physicians against various forms of "cooperation." For example, directive 70 states, "Catholic health care organizations are not permitted to engage in immediate material cooperation in actions that are intrinsically immoral, such as abortion, euthanasia, assisted suicide and direct sterilization."[3(p. 37)] Unlike the directives, guidelines from the National Catholic Bioethics Center make a direct link between referrals for prohibited services and cooperation, stating:

"Any form of referral constitutes formal cooperation, and would therefore be immoral. A 'referral' in moral terms is when the person who refuses to do the immoral procedure directs the requesting person to another individual or institution because the other individual or institution is known or believed to be willing to provide the immoral procedure in question."[10]

According to the guidelines, providing information on obtaining the procedure in question is the equivalent of giving a referral, even if the objecting physician does not explicitly request that procedure.

In spite of this guidance, some Catholic theologians advocate openly explaining all existing options to patients, even if they do not support helping the patient to obtain prohibited procedures. Guidelines from the National Catholic Bioethics Center also make a distinction between referral and transfer of care, explaining that transferring the patient's care to a provider who offers the prohibited service is acceptable if the patient finds the provider on her own.

It is unknown how obstetrician-gynecologists who work in Catholic hospitals handle referrals for prohibited reproductive health care services. We conducted a qualitative study of obstetrician-gynecologists who have worked in Catholic hospitals to assess their perceptions of whether referrals for services prohibited by church doctrine are routinely offered in Catholic facilities, how these referrals are handled and whether patients' needs are met in the process.

## METHODS

We conducted qualitative interviews with a subset of respondents to a nationally representative survey of 1,154 practicing obstetrician-gynecologists from around the country.[11] Of the original sample, 237 physicians agreed to be contacted for follow-up interviews, including 30 obstetrician-gynecologists whose primary workplaces were Catholic, 10 who practiced at non-Catholic Christian facilities, four who practiced at Jewish facilities, three who practiced at facilities affiliated with other religions, and 190 who practiced at facilities with no or unknown religious affiliation. Workplace affiliation was determined by a survey question that asked respondents if their primary place of practice was religiously affiliated and, if so, to indicate the religion.

We invited 79 physicians from around the country by phone or e-mail to participate in an interview: all 30 obstetrician-gynecologists whose primary place of practice was Catholic; seven who indicated that they experienced conflict over religious policies or treatment restrictions even though their primary place of practice was not religious; and, to seek a balanced understanding of conflicts common in Catholic and other hospitals,[12] 42 working in non-Catholic religious and secular hospitals. We also sought diversity in the religious self-identity of the obstetrician-gynecologists in our sample, to include perspectives from those who might share the Catholic Church's values and from those whose personal beliefs might differ.

Of the 79 survey respondents we invited to participate, 25 completed interviews (of whom 22 had experience working in Catholic hospitals); five of the remaining invitations bounced back, and 49 yielded no response. We also included a snowball sample to help increase the number of interviewees with experience working in religious hospitals. To recruit this sample, we asked interviewees to forward our e-mail to colleagues they felt would be appropriate for the interview and interested in participating. This resulted in interviews with six additional obstetrician-gynecologists, five of whom had experience in Catholic

health care. In total, we interviewed 31 physicians, 27 of whom had experience working in Catholic health care facilities. Those 27 constitute the sample for the analyses presented in this article.

Interviews lasted 45–60 minutes and were conducted by telephone in 2011–2012 by the third author, a qualitatively trained sociologist experienced in physician interviewing. Respondents were asked about their experiences with the health care institutions in which they worked and about how religious hospital policies affected their patient care. Questions were open-ended to allow respondents to partially guide the direction of the interview. Topics included what physicians liked and disliked about their hospitals; how their values meshed with those of their employer and peers; and how they handled clinical services, including abortion, contraception, sterilization and infertility treatment. Respondents were asked about their experiences in their current primary place of practice, as well as in hospitals and clinics in which they had trained or previously worked. Respondents were compensated for participation with a $50 gift card.

Interviews were transcribed verbatim and coded using qualitative data software (ATLAS.ti version 6.2). The first and third authors reviewed early transcripts and identified themes. After a preliminary code list was developed, both authors coded the same three transcripts, discussed the codes, agreed on revisions and repeated this process. The third author then coded the remaining transcripts using the agreed-upon code list. For the current analysis, we reviewed transcripts from respondents who had ever worked in a Catholic facility, and identified content relevant to referrals.

Respondents' demographic and religious characteristics and their values with respect to reproductive health care were drawn from their survey responses. The survey asked if respondents had any ethical or moral objections to various forms of contraception, sterilization, assisted reproductive technology and abortion in specific clinical scenarios (e.g., to terminate a pregnancy caused by failed contraception or resulting from rape). It also asked respondents to identify their religious affiliation and to rate how important their religion was in their own life. Interviewees were less likely than those who did not respond to our invitation for an interview to have reported that religion was very important or the most important thing in their life (36% vs. 62%). For the snowball sample, the interview included discussion of all of these characteristics.

The study was approved by the institutional review boards at authors' home institutions.

## RESULTS
### Sample Characteristics
Of our 27 interviewees, 18 currently and nine previously worked in Catholic hospitals; 26 had also worked or trained in a non-Catholic hospital. Seventeen of the physicians were women, and 23 were between the ages of 36 and 55 (Table 1).

**TABLE 1. Number of obstetrician-gynecologists participating in interviews about referral practices for prohibited reproductive health services at U.S. Catholic health facilities, by selected characteristics, 2011–2012**

| Characteristic | No. |
|---|---|
| **Total** | **27** |
| **Gender** | |
| Male | 10 |
| Female | 17 |
| **Age** | |
| ≤35 | 1 |
| 36–45 | 8 |
| 46–55 | 15 |
| >55 | 3 |
| **Region** | |
| West | 9 |
| Midwest | 8 |
| South | 7 |
| Northeast | 3 |
| **Religious affiliation** | |
| Jewish | 6 |
| Hindu | 3 |
| Roman Catholic | 2 |
| Protestant | 2 |
| Muslim | 1 |
| Other* | 6 |
| None/metaphysical connection | 5 |
| Unknown | 2 |
| **Importance of religion in respondent's life** | |
| Most important | 3 |
| Very important | 5 |
| Fairly important | 9 |
| Not very important | 7 |
| Unknown | 3 |
| **Moral objection to reproductive services** | |
| Contraception | 0 |
| Tubal ligation | 0 |
| Assisted reproductive technology | 0 |
| Abortion in at least some circumstances† | 6 |

*Includes Eastern Orthodox, Unitarian, Latter-Day Saints, Episcopalian and other Christian. †To terminate a pregnancy caused by contraceptive failure or resulting from rape, or for medical reasons.

Respondents resided in 15 states throughout the country. They were diverse in religious affiliation and in their ratings of the importance of religion in their lives. Attitudes on abortion varied, but no physician expressed personal moral objection to contraception, sterilization or assisted reproductive technology. Some respondents had proactively sought to work in a Catholic hospital, while for the majority, the Catholic affiliation of their hospital was incidental (not shown).

## Serving Patients Who Need Prohibited Services

Respondents learned about their hospital's policies and expectations through a variety of means, including formal consultation with the ethics committee on specific cases, instructions or direct feedback from hospital administrators or departmental leaders, and stories or advice from colleagues. For example, one physician recalled being asked to accept a transfer from another hospital of a patient who was having a miscarriage. The physician did not know if the hospital's religious authorities would consider the threat to this patient's health "imminent," which would

have allowed treatment that the physician considered standard but that, in some cases, Catholic hospitals consider abortion. The physician said, "I need to make sure I can manage this lady without anyone tying my hands." Before accepting the transfer, the physician called the chair of the hospital's ethics committee, who then "talked to a few other people within the system" before determining that this case "[passed] the litmus test of imminent threat."

Some physicians had two hospital affiliations—one Catholic and one non-Catholic—so they were able to continue to care for their patients who needed prohibited services in the non-Catholic facility. However, many had only their Catholic hospital affiliation and had to choose whether to provide only services allowed in the Catholic setting; to provide prohibited services at their own offices (overtly or covertly), but not in the hospital itself, where enforcement was stricter; or to refer patients out for prohibited services.

Twenty-four of the physicians in our sample reported that when working in Catholic facilities, they referred patients to non-Catholic providers for services they were not allowed to provide. Referrals for prohibited women's reproductive health care services were handled in a variety of ways. Some physicians reported that they handled abortion referrals differently than they did referrals for other prohibited services. For example, hospital and clinic staff concerns about making referrals for abortions—especially those perceived as elective—arose more often than concerns about making referrals for tubal ligations, contraception or infertility treatment. Respondents mentioned leaving it to patients to seek abortion care on their own more frequently than they mentioned leaving it to them to seek other types of prohibited services. Furthermore, abortion referrals became a source of conflict between providers and their hospitals and, occasionally, office staff.

### Referral Process

Three key features of the referral process emerged in physicians' discussions of their Catholic hospital experiences: hospitals' attitudes toward referrals, referral type (direct vs. indirect) and the role of financial incentives.

•*Hospitals' attitudes toward referrals.* Some obstetrician-gynecologists reported that Catholic hospital ethics authorities encouraged them to make referrals. One respondent explained how a clergyman, who was described as a consultant of the Catholic Church, came from a major metropolitan area to a small Southern town to talk to physicians at the respondent's hospital. The clergyman instructed obstetrician-gynecologists to refer patients out for tubal ligations and other prohibited services, which surprised the respondent:

"He came in and spoke to us about the Catholic ethic.... And one of the things he recommended was that if we have a situation where a patient needs something that can't be provided by the Catholic institution, that we should refer them to...the place where they could get things taken care of...as quickly as possible.... I was really surprised. He

was like...'If...somebody wants a tubal, you know, refer them to a doctor that can do a tubal at another hospital.' I thought that was interesting 'cause usually you would think they would say, 'Well, we don't want them to have a tubal. That's not the right thing to do.'"

Physicians discussed the complexity of referrals when caring for patients who had life-threatening complications during pregnancy. Some felt that in referring these patients out for abortions rather than allowing physicians to administer the prohibited care, the hospital "dumped" or "punted" them. One obstetrician-gynecologist recounted the story of a patient cared for by a colleague at their Catholic hospital. The patient received a diagnosis of brain cancer during her first trimester of pregnancy and needed chemotherapy that would have been harmful to the fetus. According to the respondent, the obstetrician-gynecologist caring for this patient approached the hospital and said, "I've got a woman whose life is threatened by brain cancer. She's pregnant, and I need to do a termination." The respondent then explained:

"And they refused. They said, 'Go take her to another hospital. Take her to another place. Those places are available to you. We don't have to do it here....' And they said, 'If we were the only hospital, maybe we would do it, but we're not. There are other hospitals.'"

Other respondents recounted scenarios in which referrals, especially for services considered less politically contentious than abortion, were not actively encouraged by their Catholic hospital, but were passively tolerated. One explained:

"I don't think we were really allowed to prescribe contraception under hospital auspices, but generally what we would do is just recommend that they go to the local family planning clinic.... And nobody seemed to care about that. I could just tell people whatever I wanted to. It was just you couldn't write a prescription for birth control pills on a [hospital] prescription pad."

Another physician explained that he was unsure if the administration knew about the contraceptive referrals made in his Catholic residency program:

"We would tell [patients] just pretty directly that we could not provide contraception at that facility and usually would refer them to Planned Parenthood or to the health department. I'm not sure [the hospital administration] knew."

In other circumstances, however, physicians were able to provide some contraceptives (e.g., to treat irregular menstrual cycles), and had to refer for others. One obstetrician-gynecologist explained that physicians had to manage contraceptive counseling and charting discreetly:

"We couldn't provide abortion services there, and we also couldn't provide contraception. Although when the door was closed to the exam room, we did talk about contraception.... And I think the nurses knew that this was going on. I mean, it wasn't that they were policing us.... The given was that they wouldn't get us in trouble for talking about it, but the documentation that went in the chart would be

sparse around the contraceptive counseling. You know, there were little euphemisms that went in there about menstrual regulation and things like that."

This physician went on to clarify that pills and IUDs were treated quite differently. While doctors could provide pills "in-house" by fabricating medical justifications, they had to send patients who requested an IUD elsewhere.

Another respondent described working in a Catholic hospital in which providers understood that referring a patient for an abortion would be treated as a violation of professional community norms:

"If you had a patient with a baby...[with] bad chromosomes and the patient elected for a termination, and you were in any way affiliated with the hospital, you were not looked good upon if you...provided [the patient] with the telephone number to someone who does terminations."

•*Referral type.* Multiple interviewees reported that for most referrals, both the physician and the hospital or office staff are involved in facilitating the patient's transition of care. For abortions, some providers were pressured not to directly facilitate the referral, and especially not to ask nurses or staff to do so. For some, only indirect referrals— in which the provider would tell the patient that she could access the services elsewhere but would not help her do so—were tolerated. For example, one respondent explained that for patients needing abortion referrals, "it wasn't like formal referrals. It was more something that I would say to the patient in the exam room."

Another respondent described a case in which the patient's genetic testing showed that her fetus was affected by Down syndrome, and the patient opted to terminate the pregnancy:

"I gave my secretary all the clinical paperwork and test results and whatnot that she needed to forward on to the facility that we were referring the patient to, and had her call and make the appointment, 'cause we make the appointments for everybody that we're referring, not just for terminations. If we're making appointments for mammograms or bone densities or second opinions, whatever—we make all those appointments for the patient in our office."

In this case, however, the secretary objected to facilitating the abortion referral. The respondent continued:

"So she did send them, but then when I got back, we had a discussion over whether that was appropriate or is she breaking the rules, so to speak, by making the appointment for the patient as opposed to just giving the patient the number and saying, 'Here, you call and make the appointment.'"

The respondent recounted that the nurse in this office shared the concerns of the secretary about facilitating the abortion referral, and argued that giving the patient a phone number was sufficient.

In another case, a physician related that an indirect referral handout was seen as too informative. The local bishop learned that tubal ligations and other prohibited services were being provided at the respondent's hospital, and the bishop decided to tighten enforcement on many aspects of reproductive care. As the physician described the situation:

"We used to hand out a form also that did list places in town they could get contraception, through Planned Parenthood or the health department and things like that, and that actually also went away. They didn't want us… even providing information to the patients."

•*The role of financial incentives.* Some interviewees raised the issue of their hospital's financial incentive not to lose patients—especially for lucrative services—when Catholic doctrine prompted them to refer patients elsewhere. When the hospital's business interest and its moral teaching were in conflict, physicians reported that they received mixed messages from hospital authorities. For example, some respondents described infertility treatment as a service that hospitals wanted to hold on to, even if they had to make creative arrangements for the aspects prohibited by Catholic doctrine. Catholicism teaches that procreation should not be separated from intercourse within the context of heterosexual marriage. Thus, procedures to extract eggs or sperm, or to fertilize an egg in vitro, are prohibited in a Catholic facility. But provision of fertility drugs is permitted, as are medical visits that do not involve handling eggs, sperm or embryos. Noting that no one at her Catholic facility was allowed to provide fertility services, one respondent explained:

"Now, they're getting a little crafty with how they get around it, and they go off-campus [to provide such services]. So we actually do now have…an infertility specialist, who is starting up an in vitro fertilization clinic off-campus…. We had somewhere to send them anyway before—it was just out of the system—but now the system wants the business."

Similarly, one perinatologist explained that her Catholic hospital objected when she suggested that she stop accepting obstetric patient transfers during the previable period because she could not provide a full range of care to those patients. This respondent had cared for a pregnant patient whose fetus had a severe heart defect, and the patient's membranes had ruptured at 19 weeks. The respondent had approved an induction of labor, and had then been accused by her Catholic ethics committee of performing an illicit abortion. The respondent recounted her response and subsequent interaction with the ethics committee:

"[I asked the committee,] 'So am I to understand that if I receive a patient in transfer, who's 20 weeks and has a number of other complicating factors, that, you know, I can't offer [labor induction]? Because if that's the case, then I am going to turn away all patients between 18 and 24 weeks, because we can't manage them in what I believe to be, and what I'm quite certain is, standard of care.'"

After the meeting, the respondent noted that once the opposition had left the room, "several people came up to me and said, 'No, no, no, don't stop accepting those patients.' [The] nurse vice president, the chairman of the ethics committee, kind of quietly afterwards…[came] up to me and [said], 'You know, we don't disagree with what you did, and we don't want you to not accept those referrals…because we're a referral hospital, and you start losing referrals for one thing, and you'll lose referrals for all kinds of things.'"

## Addressing Patients' Medical Needs

Given the potential tension that physicians who do not share the Catholic Church's values may feel between providing quality care and following hospital rules, it is not surprising that respondents varied in whether they felt the referral process adequately addressed their patients' medical needs. For the most part, obstetrician-gynecologists expressed acceptance that for outpatient services perceived as nonurgent or elective, their patients could get care at nearby non-Catholic providers. Respondents mentioned being happy that a local Planned Parenthood, women's clinic or public health department could provide services that they wanted their patients to have but that they could not provide. One physician mentioned, "We give them the phone number for Planned Parenthood or one of the women's centers that are local." Another said, "Oftentimes I'll just end up sending them to Planned Parenthood, and they can get [oral contraceptives] really cheap there."

However, respondents described clinical scenarios in which they felt that referring a patient to an outside provider put the patient's health at risk. For example, obstetrician-gynecologists routinely treat acute bleeding with hormonal contraceptives, but physicians noted that not having these medicines in stock delayed or disrupted a patient's urgent medical care. One obstetrician-gynecologist explained:

"Say you have…a 45-year-old who comes in [at three in the morning] with heavy bleeding and irregular periods. The most common approach to stopping her bleeding is to give her high-dose birth control pills for a short period of time. So, that became very difficult…'cause they didn't have them in stock. I won't say it's impossible to get them, because like the head pharmacist knows where there's three secret packs, and if you happen to manage to find the head pharmacist at [that hour], you can. But it's nearly impossible to get birth control pills to treat heavy bleeding."

Respondents also felt frustrated over their inability to perform tubal ligations at the time of a cesarean or immediately after a vaginal birth. They believed that requiring an unnecessary additional hospitalization or procedure for a patient who wanted a postpartum tubal ligation was not in her best interest. One respondent explained that a decent second choice for such patients is long-acting contraceptives, but Catholic hospitals do not allow provision of these, so he gave referrals to other hospitals:

"A lot of these Catholic institutions, they don't even… dispense those things, unfortunately. So finally I had to kind of tell [patients] that, 'Look, I'm going to give you a prescription. Please go to another hospital [that] is nearby, which is non-Catholic, and please take care of it that way.'"

Another frustration physicians mentioned repeatedly was that the shortage of abortion providers in their communities, especially for procedures at later gestations, limited referral options. Although this issue is not unique to Catholic hospitals, physicians in Catholic hospitals do

not have the option of providing abortions for their own patients the way others would. One respondent explained that at one time, patients seeking abortions at Catholic hospitals could be referred to nearby non-Catholic hospitals, but this type of referral had become more challenging with the dwindling numbers of abortion providers. The physician recalled a local provider, now retired, who "would take all comers." With that provider's presence, the respondent related, "We always had avenues where we could send patients. But those avenues are getting harder to find as it's getting harder to find providers."

Finally, financial barriers—especially for patients from lower socioeconomic groups—were reported as a reason that referrals were not always an adequate solution. A physician explained how, at one Catholic hospital with a large indigent population, providers would prescribe birth control under the guise of treating menstrual irregularity because there was no other way the patients could get contraception. Prescribing pills to treat menstrual irregularity, this physician commented, "was just the right thing to do."

## DISCUSSION

Obstetrician-gynecologists working in Catholic facilities commonly reported referring patients to other providers for reproductive services not permitted under Catholic religious directives. While some reported that their employers openly encouraged them to make such referrals, others had to hide these referrals or make them outside of normal institutional channels. Physicians experienced the greatest difficulty offering abortion referrals—these often had to be kept hidden from employers, and so patients received little assistance. Some physicians noted that financial incentives prompted their Catholic hospitals to keep more lucrative procedures, such as infertility treatment, and refer out only for a small portion of the service, to adhere to the letter of Catholic law.

Referrals allowed some of these obstetrician-gynecologists to feel their patients' medical needs were met, with three commonly cited exceptions. First, patients delivering in a Catholic hospital who wanted a tubal ligation postpartum or accompanying a cesarean were not well served by referrals, because this meant an unnecessary additional hospitalization or procedure. Second, patients with limited financial resources faced barriers in accessing referrals. Third, patients who needed emergent treatment were not always able to get necessary services at the hospital to which they presented. These differences in care raise issues about whether Catholic hospitals are providing a different standard of care to women than non-Catholic hospitals. Furthermore, the limited number of abortion providers in some areas made referral an inadequate strategy to meet patients' needs, according to some respondents. Although this problem highlights the shortage of abortion providers that exists in many areas,[13] it may be especially great for Catholic hospital patients because these facilities have a stricter definition of prohibited abortion than others.[14] This problem would likely be further compounded in Catholic facilities that serve as sole

community hospitals, where getting to another hospital for urgent treatment may be especially difficult.

### Strengths and Limitations

One of the strengths of this study was that it included a diverse group of obstetrician-gynecologists who have worked in Catholic hospitals around the United States. Our open-ended interviews allowed themes about referral processes and barriers to emerge naturally in the respondents' own words and from their personal experiences. Most of the physicians we interviewed were drawn from a nationally representative survey sample, but the interview sample itself was not representative, so we cannot generalize respondents' experiences and perspectives to the entire population of U.S. obstetrician-gynecologists.

It is also important to note that the hospital policies described here are filtered through the experiences and perspectives of the physicians interviewed. We did not directly speak to hospital administrators, ethicists or others in position to enforce the Catholic directives. In the survey from which this sample was derived, 48% of obstetrician-gynecologists who described religion as "not very important" in their lives experienced a conflict with their religious hospital, compared with 20% of those for whom religion was "most important."[11] Physicians' own beliefs and attitudes may therefore affect their reporting of hospital referral policies.

### Conclusion

Little research has been done on referrals for reproductive health services. In a nationally representative survey, primary care physicians were asked what doctors should do when they felt a service was clinically indicated but was prohibited by their hospital's religious policies. Some 86% responded that the right course of action was to refer the patient to a different facility.[15] But this belief may not readily translate into patients' getting timely information and referrals, and barriers other than Catholic hospital policy may also play a role. In a 2010–2011 study of reproductive health facilities (not specifically religious ones) that did not provide abortion but were located fairly near an abortion provider, callers posing as patients received a direct abortion referral in only 46% of instances.[16] In a separate study, in Nebraska, only 52% of family medicine providers and obstetrician-gynecologists believed that clinicians have a professional obligation to refer patients for abortion services, and 17% said they would in no way participate in an abortion referral.[17] The nonprofit organization Provide reviewed both published literature and expert guidance on abortion referrals, and found a need for research evaluating the effectiveness of abortion referrals and the role of the referral process in women's access to care.[18]

Prominent bioethicists and obstetrician-gynecologists have debated whether physicians who hold a personal moral objection to abortion should be required to refer patients to a physician who will safely provide it.[19,20] However, they have not addressed the behavior of institutions (or the

physicians within them) when the objection comes from the religious denomination sponsoring the institution, rather than from individual physicians. The wide range of referral patterns in Catholic hospitals described by the obstetrician-gynecologists we interviewed is probably attributable, at least in part, to the lack of clear guidance from professional norms. Furthermore, individuals charged with enforcing doctrine in Catholic hospitals, such as ethics committee members, clergy and hospital administrators, may be responding to conflicting messages and may be passing this confusion on to the physicians in their facilities.

Our study shows how these complex teachings translate into daily practice in Catholic hospitals, and the findings hold important implications for patient care and public policy. Physicians are important points of entry for patients, yet hospitals and health systems inherently enter into the patient-doctor relationship. Given the prevalence of Catholic health care in the United States, it is highly likely that these hospitals serve patients needing comprehensive health care.

For patients to access the full range of legal reproductive health services in a timely fashion, we recommend that obstetrician-gynecologists and the practices and hospitals in which they work put in place referral practices that help patients access services not provided on-site. As recommended by the American College of Obstetricians and Gynecologists,[4] patients' wishes and well-being, not provider moral judgment or institutional religious policy, should be the primary driver of health care decisions. When religious entities participate in health care service provision for the broad public, policymakers should require them to offer such referrals and to ensure that patients are well informed about the limitations to the care available in their facilities. Further research is needed to better understand opportunities for physicians, bioethicists, professional societies and patient advocacy organizations to work together to improve care for women, in light of the boundaries that exist.

## REFERENCES

1. Utley L, Khaikin C and Hasbrouck P, *Growth of Catholic Hospitals and Health Systems: 2016 Update of the Miscarriage of Medicine Report*, New York: MergerWatch, 2016, http://static1.sqspcdn.com/static/f/816571/27061007/1465224862580/MW_Update-2016-MiscarrOfMedicine-report.pdf?token=7BXxQRTEBazfRuaaR2hTUetc E%3D.

2. Department of Health and Human Services, Centers for Medicare and Medicaid Services, *Acute Care Hospital Inpatient Prospective Payment System*, Baltimore: Department of Health and Human Services, 2016, https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-MLN/MLNProducts/Downloads/Acute PaymtSysfctsht.pdf.

3. United States Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services*, fifth ed., Washington, DC: United States Conference of Catholic Bishops, 2009, http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.

4. American College of Obstetricians and Gynecologists, Committee opinion no. 385: the limits of conscientious refusal in reproductive medicine, *Obstetrics & Gynecology*, 2007, 110(5):1203–1208.

5. Beeman PC, Catholicism, cooperation and contraception, *National Catholic Bioethics Quarterly*, 2012, 12(2):283–309.

6. O'Rourke K, Catholic health care and sterilization, *Health Progress*, 2002, 83(6):43–48 & 60.

7. Panicola MR and Hamel RP, Conscience, cooperation and full disclosure, *Health Progress*, 2006, 87(1):52–59.

8. Cataldo PJ and Haas JM, Institutional cooperation: the ERDs, *Health Progress*, 2002, 83(6):49–57 & 60.

9. Keenan JF and Kopfensteiner TR, The principle of cooperation, *Health Progress*, 1995, 76(3):23–27.

10. National Catholic Bioethics Center, Transfer of care vs. referral: a crucial moral distinction, 2015, http://www.ncbcenter.org/resources/news/transfer-care-vs-referral-crucial-moral-distinction/.

11. Stulberg DB et al., Obstetrician-gynecologists, religious institutions and conflicts regarding patient-care policies, *American Journal of Obstetrics & Gynecology*, 2012, 207(1):73.e1–73.e5.

12. Stulberg DB et al., Tubal ligation in Catholic hospitals: a qualitative study of ob-gyns' experiences, *Contraception*, 2014, 90(4):422–428.

13. Jones RK and Kooistra K, Abortion incidence and access to services in the United States, 2008, *Perspectives on Sexual and Reproductive Health*, 2011, 43(1):41–50.

14. Freedman LR and Stulberg DB, Conflicts in care for obstetric complications in Catholic hospitals, *American Journal of Bioethics Primary Research*, 2013, 4(4):1–10.

15. Stulberg DB et al., Religious hospitals and primary care physicians: conflicts over policies for patient care, *Journal of General Internal Medicine*, 2010, 25(7):725–730.

16. Dodge LE, Haider S and Hacker MR, Using a simulated patient to assess referral for abortion services in the USA, *Journal of Family Planning and Reproductive Health Care*, 2012, 38(4):246–251.

17. French V, A sense of obligation: opinions on abortion referral among clinicians in Nebraska, paper presented at the annual meeting of the American Public Health Association, Chicago, Oct. 31–Nov. 5, 2015.

18. Zurek M et al., Referral-making in the current landscape of abortion access, *Contraception*, 2015, 91(1):1–5.

19. Chervenak FA and McCullough LB, The ethics of direct and indirect referral for termination of pregnancy, *American Journal of Obstetrics & Gynecology*, 2008, 199(3):232.e1–232.e3.

20. Kaunitz AM et al., Ethics and referral for abortion, *American Journal of Obstetrics & Gynecology*, 2009, 200(6):e9.

## Acknowledgments

*This study was supported by grants from the Greenwall Foundation, the David and Lucile Packard Foundation, the Mary Wohlford Foundation and an anonymous foundation. The authors thank Irma Hasham Dahlquist, Molly Battistelli and Sara Magnusson for their assistance on this project.*

**Author contact:** *stulberg@uchicago.edu*