## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC.; SPECIALTY PHYSICIANS OF ILLINOIS, LLC,; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; <br><br> - and - <br><br> STATE OF TEXAS; STATE OF WISCONSIN; STATE OF NEBRASKA; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF ARIZONA; and STATE OF MISSISSIPPI, by and through Governor Phil Bryant, <br><br> *Plaintiffs,* <br><br> v. <br><br> SYLVIA BURWELL, Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> *Defendants.* | **BRIEF IN SUPPORT OF STATE PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, A PRELIMINARY INJUNCTION** <br><br><br><br> Civ. Action No. 7:16-cv-00108-O |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS .................................................................................. 2

ARGUMENT .................................................................................................... 2

I.    The Rule Violates the Clear-Statement Doctrine of the Spending Clause. ...... 2

    A.    Article I Gives Congress Broad Spending Power When It Acts Alone... 4

    B.    Article I Limits Congress's Exercise of its Spending Power When Engaged in Cooperative Federalism. ........................................................ 7

        1.    The clear-statement doctrine requires conditions attached to federal funds to be unambiguous. ...................................... 7

        2.    The clear-statement doctrine is stringent. ................................... 10

    C.    The Rule Violates the Clear-Statement Doctrine. ................................. 11

        1.    When Congress enacted Title IX, "sex" meant the biological differences between male and female. ............................ 12

        2.    Since Title IX's enactment, when using "sex" in other statutes, Congress construed the term narrowly to refer to one's biological sex as male or female. ........................................ 16

        3.    No State could clearly understand when it began accepting Medicare and Medicaid funding decades ago that "sex" included "gender identity" and "termination of pregnancy." ...................... 17

II.    The Rule Violates the Administrative Procedure Act. ......................................... 19

III.    Alternatively, the Court Should Issue a Preliminary Injunction. ..................... 24

CONCLUSION ................................................................................................ 25

CERTIFICATE OF SERVICE ........................................................................... 27

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Ison,*
  249 S.W.2d 791 (Ky. 1952) ........................................................................ 22

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  133 S. Ct. 2321 (2013) ............................................................................ 2–3

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006) ......................................................................... passim

*Barsky v. Bd. of Regents of Univ. of N.Y.,*
  347 U.S. 442 (1954) ................................................................................. 20

*Bennett v. New Jersey,*
  470 U.S. 632 (1985) ................................................................................. 12

*Canutillo Indep. Sch. Dist. v. Leija,*
  101 F.3d 393 (5th Cir. 1996) ................................................................... 11

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................................... 2

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
  527 U.S. 666 (1999) ................................................................................. 10

*Davis v. Monroe Cty. Bd. of Educ.,*
  526 U.S. 629 (1999) .............................................................................. 3, 7

*Garcia v. Tex. State Bd. of Med. Exam'rs,*
  384 F. Supp. 434 (W.D. Tex. 1974) .................................................... 20–21

*Gonzales v. Carhart,*
  550 U.S. 124 (2007) ................................................................................. 20

*Hurst v. Texas Dep't of Assistive & Rehabilitative Servs.,*
  482 F.3d 809 (5th Cir. 2007) .............................................................. 10–11

*Jackson v. Birmingham Bd. of Educ.,*
  544 U.S. 167 (2005) ................................................................................... 3

*Jacobs v. Theimer,*
  519 S.W.2d 846 (Tex. 1975) ............................................................... 22–23

*Kansas v. United States*,
  249 F.3d 1213 (10th Cir. 2001) ............................................................ 25

*King v. Smith*,
  392 U.S. 309 (1968) ............................................................................ 7

*Madden v. Rhodes*,
  626 So. 2d 608 (Miss. 1993) ................................................................ 22

*Maryland v. King*,
  133 S. Ct. 1 (2012) ....................................................................... 24–25

*Murk v. Scheele*,
  120 S.W.3d 865 (Tex. 2003) ........................................................ 20–21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  132 S. Ct. 2566 (2012) ............................................................... passim

*Natanson v. Kline*,
  350 P.2d 1093 (Kan. 1960) .................................................................. 22

*New Motor Vehicle Bd. v. Orrin W. Fox Co.*,
  434 U.S. 1345 (1977) ................................................................... 24–25

*New York v. United States*,
  505 U.S. 144 (1992) ............................................................................ 19

*North Dakota v. EPA*,
  127 F. Supp. 3d 1047 (D.N.D. 2015) ................................................... 25

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) ............................................................... 3, 7, 8, 19

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
  734 F.3d 406 (5th Cir. 2013) ........................................................ 24–25

*Pratt v. Harris Cty.*,
  822 F.3d 174 (5th Cir. 2016) ............................................................... 2

*Printz v. United States*,
  521 U.S. 898 (1997) ...................................................................... 19, 20

*Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.*,

584 F.3d 253 (6th Cir. 2009) ............................................................................ 11

*Sossamon v. Texas,*
  563 U.S. 277 (2011) ..................................................................................... 10

*Texas v. United States,*
  -- F. Supp. 3d --, 2016 WL 4426495 (N.D. Tex. Apr. 21, 2016) ........................ 24–25

*Texas v. United States,*
  95 F. Supp. 3d 965 (N.D. Tex. 2015) ............................................................. 24–25

*United States v. Butler,*
  297 U.S. 1 (1936) ...................................................................................... 4, 6

*Walk v. Ring,*
  44 P.3d 990 (Ariz. 2002) ................................................................................ 22

*Washington v. Glucksberg,*
  521 U.S. 702 (1997) ..................................................................................... 20

*Wilson v. Scott,*
  412 S.W.2d 299 (Tex. 1967) ...................................................................... 22–23

## Constitutional Provisions

U.S. CONST. art. I, § 8, cl. 1 ............................................................................ 4–5

## Statutes

18 U.S.C. § 249 ............................................................................................. 18

20 U.S.C. § 1681 ................................................................................... 4, 12, 17

20 U.S.C. § 1688 ................................................................................... 4, 16–17

42 U.S.C. § 2000e ......................................................................................... 17

42 U.S.C. §§ 2000cc ..................................................................................... 10

42 U.S.C. § 6000 ............................................................................................ 7

42 U.S.C. § 13925 ......................................................................................... 18

42 U.S.C. § 18116 ........................................................................................ 1, 12

NEB. REV. STAT. ANN. § 30-3428 ............................................................. 21–22

Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, § (k),
   92 Stat. 2076, 2076 (1978) ................................................................ 16–17

Social Security Amendments Act of 1965, Pub. L. 89-97, 79 Stat. 286 (1965) ........ 3–4

TEX. GOV'T CODE § 531.0055 ........................................................................ 23

TEX. GOV'T CODE § 531.008 .......................................................................... 23

TEX. HEALTH & SAFETY CODE § 12.0115 ...................................................... 23

TEX. HEALTH & SAFETY CODE § 311.083 ...................................................... 21

TEX. OCC. CODE § 162.0021 .......................................................................... 21

TEX. OCC. CODE § 162.0022 .......................................................................... 21

WIS. STAT. ANN. § 448.30 ............................................................................. 21

WIS. STAT. ANN. § 448.08 ............................................................................. 21

**Rules**

Fed. R. Civ. P. 56 ............................................................................................. 2

**Regulations**

22 TEX. ADMIN. CODE § 177.3 ...................................................................... 21

22 TEX. ADMIN. CODE § 177.5 ...................................................................... 21

45 C.F.R. § 92.4 ............................................................................. 1, 12, 17, 18

45 C.F.R. § 92.206 ......................................................................................... 17

45 C.F.R. § 92.207 ................................................................................... 1, 20

81 Fed. Reg. 31384 ...................................................................... 17, 18, 19, 23

81 Fed. Reg. 31387 ........................................................................................ 19

81 Fed. Reg. 31392 ................................................................................ 23

81 Fed. Reg. 31428 ................................................................................ 23

81 Fed. Reg. 31437 ................................................................................ 24

81 Fed. Reg. 31467 ........................................................................... 17–18

81 Fed. Reg. 31471 ................................................................................ 17

La. Admin. Code 46:XLV § 7603 ............................................................. 22


## Other Authorities

2 Joseph Story, *Commentaries on the Constitution of the United States*
  § 926–27 (1833) .................................................................................. 4–5

2 *The Founders' Constitution* (Kurland & Learner eds. 1987) ................................ 5–6

5 Jonathan Elliot, *The Debates in the Several State Conventions on the
  Adoption of the Federal Constitution* 552 (2d ed. 1881) ........................................... 5

9 Oxford English Dictionary 578 (1961) ................................................ 15

American Heritage Dictionary 1187 (1976) ........................................... 15

Brian W. Ward et al, *Sexual Orientation and Health Among U.S. Adults:
  National Health Interview Survey, 2013,*
  77 Nat'l Health Statistics Reports 2 (2014) ...................................... 13

Charles A. Sullivan, et al., *Federal Statutory Law of Employment
  Discrimination* 161 (1980) ............................................................... 12–13

David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social
  Change in Academic Titles*, 1945–2001, Archives of Sexual Behavior 93
  (Apr. 2004) ...................................................................................... 14

Ethel Tobach, *Some Evolutionary Aspects of Human Gender,*
  41 Am. J. of Orthopsychiatry 710 (1971) ........................................ 14

*Federal Financial Participation in State Assistance Expenditures; Federal
  Matching Shares for Medicaid, the Children's Health Insurance Program,
  and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2014 to
  September 30, 2015*, 79 Fed. Reg. 3385 (Jan. 21, 2014) ............................ 4

H.R. 14752, 93rd Cong. (1974) ................................................................. 16

H.R. 1652, 113th Cong. (2013) ................................................................. 16

H.R. 166, 94th Cong. (1975) ..................................................................... 16

H.R. 2015, 110th Cong. (2007) ................................................................. 16

H.R. 2074, 96th Cong. (1979) ................................................................... 16

H.R. 2981, 111th Cong. (2009) ................................................................. 16

H.R. 4636, 103rd Cong. (1994) ................................................................. 16

Joanne Meyerowitz, *A History of "Gender,"*
  113 THE AM. HISTORICAL REVIEW 1346, 1353 (2008) ............................. 14

John Money, et al., *Imprinting and the Establishment of Gender Role,*
  77 A.M.A. ARCHIVES OF NEUROLOGY & PSYCHIATRY 333–36 (1957) ...................... 14

Mack A. Player, *Employment Discrimination Law* 239 (1988).......................... 12–13

Margaret C. Jasper, *Employment Discrimination Law Under Title VII* 45
  (2d ed. 2008) ................................................................................. 12–13

NEW OXFORD AMERICAN DICTIONARY 721–22, 1600 (3d ed. 2010) ...................... 15–16

President James Monroe, Veto Message (May 4, 1822) ............................... 6

Robert J. Stoller, *Sex and Gender: On the Development of Masculinity and*
  *Femininity* 9 (1968) ....................................................................... 14

S. 2081, 96th Cong. (1979) ...................................................................... 16

S. 811, 112th Cong. (2011) ...................................................................... 16

S. 439, 114th Cong. (2015) ...................................................................... 16

Sari L. Reisner, et al., *"Counting" Transgender and Gender-Nonconforming*
  *Adults in Health Research*, 2 TRANSGENDER STUD. Q. 37 (Feb. 2015).................... 15

*The Federal Government on Autopilot: Delegation of Regulatory Authority to an Unaccountable Bureaucracy: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 13 (2016) .................................................................... 13, 14

*The Heritage Guide to the Constitution* 93 (Meese, Spalding & Forte eds., 2005) ........................................................................................................ 6

United States Advisory Commission on Intergovernmental Relations, *Intergovernmental Problems in Medicaid* 91 (Sept. 1968), *available at* http://digital.library.unt.edu/ark:/67531/metadc1397/ ........................................ 4

Virginia Prince, *Change of Sex or Gender*, 10 TRANSVESTIA 53, 60 (1969) ................................................................... 14

W. M. Moldoff, *Annotation, Malpractice: physician's duty to inform patient of nature and hazards of disease or treatment*, 79 A.L.R.2d 1028 (1961) ................................................................. 22–23

WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1331 (5th ed. 2014) .......................... 15

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ............................. 15

# INTRODUCTION

This case concerns a federal agency's attempt to use its rulemaking power to rewrite the meaning of "sex" in statutory law, without any Congressional authority to do so, and invade the States' sovereign power to provide healthcare and regulate healthcare professionals. Earlier this year, the Department of Health and Human Services ("HHS") issued a Rule that dramatically redefines the meaning of "sex" under the Affordable Care Act ("ACA"), 42 U.S.C. § 18116. Like other federal laws, Section 1557 of the ACA prohibits invidious discrimination on the basis of "sex," and it borrows its definition of "sex" from Title IX. Since its enactment, Title IX has always defined "sex" as a biological category regarding the two sexes, but the new Rule redefines "sex" to include "gender identity" and "termination of pregnancy." 45 C.F.R. § 92.4. As such, the Rule violates the Spending Clause's clear-statement doctrine, because Congress never unambiguously conditioned the State Plaintiffs' receipt of Medicare and Medicaid funding on HHS's new definition of "sex."

Because the Rule violates the Spending Clause, and also commandeers healthcare and regulatory powers reserved to the States, it is contrary to law, and in excess of HHS's authority, in violation of the Administrative Procedure Act ("APA"). The Rule forces state-run healthcare facilities, and state-regulated healthcare providers, to participate in "all health services related to gender transition," 45 C.F.R. § 92.207, to cover those procedures in state health insurance plans, and to risk legal liability through litigation by employees and patients. States that fail to comply with the Rule risk losing billions of dollars in federal healthcare funding. Texas alone could lose over $42.4 billion a year, but those who stand to lose the most are the nation's most vulnerable citizens who participate in Medicare and Medicaid programs.

The State Plaintiffs seek partial summary judgment or, in the alternative, a preliminary injunction, on Counts I, II, III, and XVI because the Rule violates the Spending Clause of Article I, Section 8 of the United States Constitution and the APA.

The State Plaintiffs join in the motion for partial summary judgment on Counts I, II, and III filed by Franciscan Alliance, et al. (collectively, "Franciscan"), but file this separate motion to focus on their Spending Clause claim in Count XVI, and to articulate additional, sovereign-specific reasons to hold the Rule invalid under the APA. Thus, the State Plaintiffs respectfully request that the Court enter summary judgment in their favor on Counts I, II, III, and XVI. In the alternative, they request that the Court issue a preliminary injunction no later than December 31, 2016.

## STATEMENT OF FACTS

The State Plaintiffs adopt and incorporate by reference the Statement of Facts filed by Franciscan in its motion for partial summary judgment.

## ARGUMENT

Summary judgment is warranted on Counts I, II, III, and XVI because there are no genuine issues of material fact and State Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (summary judgment is appropriate if "'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## I.   The Rule Violates the Clear-Statement Doctrine of the Spending Clause.

The Rule violates the Spending Clause's clear-statement doctrine because no State could fathom that Title IX, as incorporated by the ACA, would impose on it new "gender identity" and "termination of pregnancy" requirements in contravention of decades of statutory and case law. While the Spending Clause gives Congress broad power when it acts alone, there are limitations on the manner in which Congress may exercise its spending power. *See, e.g., Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 300 (2006) (holding Individuals with Disabilities Education Act failed to provide clear notice to states that as a condition of accepting funds

litigants may recover expert fees); *accord Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321 (2013) (holding congressional act to address HIV/AIDS, which required funding recipients to adopt certain views on the topic, violated the recipients' First Amendment rights).

One of those limitations is the clear-statement doctrine, which provides that the conditions attached to federal funds appropriated to the States must be unambiguous and enable a state official to "clearly understand" from the language of the law itself the conditions to which a State is agreeing. *Arlington Cent.*, 548 U.S. at 296. Spending power "legislation is 'in the nature of a contract: in return for federal funds, the states agree to comply with federally imposed conditions.'" *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181–82 (2005) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981)). Statutory and regulatory clarity is a "concrete safeguard" in our federal system and "guard[s] against excessive federal intrusion into state affairs." *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 655 (1999) (Kennedy, J., dissenting); *Jackson*, 544 U.S. at 182 ("As we have recognized, there can . . . be no knowing acceptance of the terms of the contract if a State is unaware of the conditions imposed by the legislation on its receipt of funds." (internal citations and quotations omitted)). "The legitimacy of Congress's exercise of the spending power 'thus rests on whether the [entity] voluntarily and knowingly accepts the terms of the 'contract.'" *Nat'l Fed'n of Indep. Bus. v. Sebelius ("NFIB")*, 132 S. Ct. 2566, 2602 (2012) (quoting *Pennhurst*, 451 U.S. at 17).

Under Supreme Court and Fifth Circuit precedent, the Rule violates the clear-statement doctrine because Congress did not unambiguously state that "sex" meant "gender identity" and "termination of pregnancy" when the States chose to participate in Medicare and Medicaid funding decades ago.[1] Congress has never expressed its

---

[1] Congress created the Medicaid program in 1965. *See* Social Security Amendments Act of 1965, Pub.

intent to cover "gender identity" or "termination of pregnancy" as protected classes under Title IX—the operative statute providing the definition of "sex" for Section 1557 of the ACA. In Title IX, "sex" retains its original and only meaning—one's immutable, biological sex as male or female, as acknowledged at or before birth. 20 U.S.C. § 1681. Title IX also remains unequivocally neutral on the topic of abortion. *Id.* § 1688. No State could fathom, much less "clearly understand," that the ACA would impose on it the conditions created by HHS's new Rule—namely, a new "gender identity" nondiscrimination requirement, as well as a provision to require coverage, funding, or facilities for abortion. Thus, summary judgment is proper for the State Plaintiffs on Count XVI.

### A. Article I Gives Congress Broad Spending Power When It Acts Alone.

"No one has ever doubted that the Constitution authorizes the Federal Government to spend money." *NFIB*, 132 S. Ct. at 2657. "The power to make any expenditure that furthers 'the general welfare' is obviously very broad." *Id.* at 2658. But "from 'the foundation of the Nation sharp differences of opinion have persisted as to the true interpretation of the phrase' 'the general welfare.'" *Id.* at 2657 (quoting *United States v. Butler*, 297 U.S. 1, 65 (1936)).

Congress's spending authority is not a freestanding power, but a limitation on the taxing power. Unlike the other enumerated powers in Article I, the Framers articulated the spending power as a condition on the Congress's taxing power. Article I establishes that Congress shall have the power to tax "to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S.

---

L. 89-97, 79 Stat. 286 (1965). All 50 States participate in the Medicaid program. *Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2014 to September 30, 2015*, 79 Fed. Reg. 3385 (Jan. 21, 2014). Texas has participated in the Medicaid program since shortly after its creation. United States Advisory Commission on Intergovernmental Relations, *Intergovernmental Problems in Medicaid* 91 (Sept. 1968), *available at* http://digital. library.unt.edu/ark:/67531/metadc1397/.

CONST. art. I, § 8, cl. 1; *see also* 2 Joseph Story, *Commentaries on the Constitution of the United States* § 926–27 (1833) (describing the spending power as "a qualification or limitation" on the taxing power).

The scope of the spending power generated immediate debate. James Madison contended that Congress was authorized to spend only in furtherance of its enumerated powers. In 1800, Madison explained:

> Money cannot be applied to the general welfare, otherwise than by an application of it to some particular measure, conducive to the general welfare. Whenever, therefore, money has been raised by the general authority, and is to be applied to a particular measure, a question arises whether the particular measure be within the enumerated authorities vested in Congress. If it be, the money requisite for it may be applied to it. If it be not, no such application can be made. This fair and obvious interpretation coincides with, and is enforced by, the clause in the Constitution which declares that "no money shall be drawn from the treasury but in consequence of appropriations made by law." An appropriation of money to the general welfare would be deemed rather a mockery than an observance of this constitutional injunction.

5 Jonathan Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 552 (2d ed. 1881); *see also NFIB*, 132 S. Ct. at 2657. Similarly, Thomas Jefferson wrote that to construe the spending power "as giving a distinct and independent power" to Congress "would render all the preceding, and subsequent enumerations of power completely useless." Story, *supra*, § 923 (quoting from Jefferson's 1791 opinion on the Bank of the United States).

Alexander Hamilton took a much broader view of the spending power. *See NFIB*, 132 S. Ct. at 2657–58 (noting Hamilton "maintained the clause confers a power separate and distinct from those later enumerated [and] is not restricted in meaning by the grant of them."). Like Jefferson and Madison, Hamilton interpreted the spending power as a qualification of the taxing power, but he also believed that it is "left to the discretion of the National Legislature, to pronounce, upon the objects, which concern the general Welfare, and for which under that description, an

appropriation of money is requisite and proper." 2 *The Founders' Constitution* (Kurland & Learner eds. 1987), Art. 1, § 8, cl. 1, Doc. 21 (Hamilton's Report on Manufacturers). Under Hamilton's interpretation, the real limit on spending power was not the enumeration of Congress's powers—Madison and Jefferson's view—but the requirement that Congress direct federal appropriations to the "general welfare," and not to matters that were "local" or "confined to a particular spot." *Id*.

The scope of Congress's spending power continued to divide leading political figures throughout the nineteenth century. In vetoing an internal improvement bill, President James Monroe argued that the spending power is "restricted only by the duty to appropriate it to purposes of common defence, and of general, not local, national, not state, benefit." *The Heritage Guide to the Constitution* 93 (Meese, Spalding & Forte eds., 2005) (quoting President James Monroe, Veto Message (May 4, 1822)). President Jackson, on the other hand, dismissed the "fallacy" that the spending clause permitted Congressional measures designed "to conduce to the public good." *Id*. at 95. And President James Buchanan espoused Madison's position that the spending power is "confined to the execution of the enumerated powers delegated to Congress." *Id*.

Finally, in *United States v. Butler*, 297 U.S. 1 (1936), the Supreme Court adopted Hamilton's view on the scope of the spending power. *NFIB*, 132 S. Ct. at 2658. While acknowledging that "sharp differences of opinion have persisted as to the true interpretation" of the spending power, *Butler*, 297 U.S. at 65, the Court concluded that the "confines" of the spending power "are set in the clause which confers it," and not limited by Congress's enumerated powers, *id*. at 66. Importantly, however, *Butler* does not resolve the spending power when the federal government gives the States money to carry out its legislative goals. In that case, as discussed below, the Court places clear limitations on the way in which Congress may spend.

### B.   Article I Limits Congress's Exercise of its Spending Power When Engaged in Cooperative Federalism.

Since the spending power is so broad, the Supreme Court has "long held that the power to attach conditions to grants to the States has limits." *NFIB*, 132 S. Ct. at 2659. "[T]he Spending Clause power, if wielded without concern for the federal balance, has the potential to obliterate distinctions between national and local spheres of interest and power by permitting the Federal Government to set policy in the most sensitive areas of traditional state concern, areas which otherwise would lie outside its reach." *NFIB*, 132 S. Ct. at 2659 (quoting *Davis*, 526 U.S. at 654–55 (Kennedy, J., dissenting)). Determining these principles is increasingly important with the mid-20th century ascent of "cooperative federalism," where various spending programs are "financed largely by the Federal Government" but "administered by the States." *King v. Smith*, 392 U.S. 309, 316 (1968).

Ultimately, the Supreme Court adopted the clear-statement requirement, which requires that the conditions attached to federal funds appropriated to the States must be unambiguous. State participants may not be surprised by post-acceptance or retroactive conditions that are not clearly stated in the text of the law itself—such as HHS's new Rule here. For over three decades, the Supreme Court and lower federal courts have repeatedly affirmed the clear-statement requirement. Because the HHS Rule flouts this well-established doctrine, it must be enjoined.

#### 1.   The clear-statement doctrine requires conditions attached to federal funds to be unambiguous.

The Supreme Court first applied the clear-statement doctrine to the Spending Clause in *Pennhurst State School and Hospital v. Halderman*. The case involved the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. § 6000 *et seq.*, a federal-state program in which the federal government provided aid and, in return, participating states created programs for the developmentally disabled. *Pennhurst*, 451 U.S. at 11. "Like other federal-state cooperative programs," the Court noted, "the

Act is voluntary and the States are given the choice of complying with the conditions set forth in the Act or forgoing the benefits of federal funding." *Id*. The issue was whether the Act's "bill of rights" provisions were mandatory conditions on the participating states.

The Supreme Court established an exacting standard for conditions on the receipt of federal monies to be validly imposed on the States. The Court characterized the exercise of Article I spending power in cooperative federalism programs as a contract between the federal government and the States whereby "in return for federal funds, the States agree to comply with federally imposed conditions." *Id*. at 17. It reasoned that the spending power could only be legitimately exercised where the States "voluntarily and knowingly accept[ ] the terms of the 'contract,'" and not when they are "unaware of the conditions" or "unable to ascertain" their contractual obligations. *Id*. Spending conditions must be stated "unambiguously." *Id*.

The Supreme Court held that the "bill of rights" provision did not satisfy the clear-statement doctrine. Other sections of the statute explicitly imposed conditions on the States. The "bill of rights" provision, however, employed generalized language that provided encouragement for certain kinds of treatment, but did not "express clearly its intent to impose conditions on the grant of federal funds." *Id*. at 24. The lack of express language in the "bill of rights" imposing a condition was significant. As the Court explained, "where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly." *Id*. at 17–18. Since the "bill of rights" provision was not a clear, unambiguous, express requirement in the statute, the Court concluded that the States could not now be made to follow it.

In *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 (2006), the Supreme Court delivered a strong reaffirmation of the clear-statement doctrine as applied to the Spending Clause. At issue was whether the provision in the

Individual with Disabilities Education Act ("IDEA") allowing "reasonable attorneys' fees" authorized prevailing litigants to recover expert consultant fees incurred in the course of the proceeding. The Court conducted the clear-statement doctrine analysis not from Congress's point of view, but from that of a state official:

> [W]e must view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds. We must ask whether such a state official would clearly understand that one of the obligations of the Act is the obligation to compensate prevailing parents for expert fees. In other words, we must ask whether the IDEA furnishes clear notice regarding the liability at issue in this case.

*Id*. at 296.

Using this framework, the Court concluded that the IDEA did not provide a clear-statement that expert fees were permitted, because the statutory text "does not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for services rendered by experts." *Id*. at 297. Although one section of the IDEA provided that "costs" could be reimbursed, other earlier decisions construed that term as excluding expert fees. *Id*. at 300–03. And while there was legislative history showing that members of Congress intended to permit the reimbursement of expert fees, the Court determined that such evidence was insufficient where the unambiguous text and precedent suggested that expert fees may not be recovered. *Id*. at 304. "In a Spending Clause case, the key is not what a majority of the Members of both Houses intend but what the States are clearly told [by Congress] regarding the conditions that go along with the acceptance of those funds." *Id*. Likewise, notwithstanding what Article II agencies think, believe, or portend, the buck stops with the language of Congress and "whether such a state official would clearly understand" their obligations from the text of Congress's Act. *Id*. at 296.

## 2.   The clear-statement doctrine is stringent.

The clear-statement doctrine is so stringent that a sovereign's consent to "appropriate relief" for an aggrieved individual does not actually amount to a waiver of sovereign immunity. *Sossamon v. Texas*, 563 U.S. 277 (2011). *Sossamon* involved an inmate suit against Texas where the state asserted sovereign immunity. The Court addressed whether Texas's receipt of federal monies for the purposes of housing "institutionalized persons" under the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. §§ 2000cc–2000cc-5 ("RLUIPA"), subjected it to lawsuits for damages in federal court. Though Texas consented to provisions granting "appropriate relief," *id*. § 2000cc–2(a), by accepting RLUIPA funds, "that was not the unequivocal expression of state consent that our precedents require," *Sossamon*, 562 U.S. at 285. "'Appropriate relief' does not so clearly and unambiguously waive sovereign immunity to private suits for damages that we can 'be certain that the State in fact consents' to such a suit." *Id*. at 285–86 (quoting *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 680 (1999)). Indeed, "'[a]ppropriate relief' is open-ended and ambiguous about what types of relief it includes . . . ." *Id*. at 286.

The Fifth Circuit also applies the clear-statement doctrine strictly. In *Hurst v. Texas Department of Assistive and Rehabilitative Services*, 482 F.3d 809 (5th Cir. 2007), it refused to recognize a waiver of sovereign immunity under the Rehabilitation Act. The court noted that "[i]n seeking to determine whether the language of a condition is sufficiently clear, courts must view the statute 'from the perspective of a state official who is engaged in the process of deciding whether the state should accept federal funds and the obligations that go with those funds.'" *Id*. at 811 (quoting *Arlington Cent*., 548 U.S. at 296). "In a Spending Clause case, the key is not [the intention of Congress] but what the States are clearly told regarding the conditions that go along with the acceptance of . . . funds." *Id*. (citing *Arlington Cent*.,

548 U.S. at 304). The Fifth Circuit held that although the Rehabilitation Act provided for a right to review agency decisions in federal court, the language was not clear enough to abrogate a state's sovereign immunity under the Eleventh Amendment. *Id.* at 811–12.

Likewise, in *Canutillo Independent School District v. Leija*, 101 F.3d 393, 398–99 (5th Cir. 1996), the Fifth Circuit held that Title IX did not unambiguously place school districts on notice that they will be strictly liable for their teachers' criminal acts. "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." *Id.* at 398. Because the conditions Title IX imposed on recipients were "limited to those anti-discrimination factors found in its sparse wording," and there was "no mention of liability standards," Congress did not provide a clear-statement that schools would be liable for the criminal acts of their employees. *Id.* at 399; *see also Sch. Dist. of City of Pontiac v. Sec'y of U.S. Dep't of Educ.,* 584 F.3d 253, 271 (6th Cir. 2009) (holding that No Child Left Behind ("NCLB") "does not include any specific, unambiguous mandate requiring the expenditure of non-NCLB funds.").

Thus, the clear-statement doctrine is rigid and demanding, leaving little, if any, room for federal agencies to contrive ambiguities in Congressional language. This is especially so where, as here, Defendants and other Article II agencies are concocting new definitions of well-understood terms not only decades after their enactment, but decades after the States agreed to the terms of participation within the Medicaid and Medicare programs.

## C.    The Rule Violates the Clear-Statement Doctrine.

Defendants' *ex-post* Rule violates the clear-statement doctrine because it is not in accord with the understanding of "sex" that existed when the States chose to begin

accepting Medicare and Medicaid as payment for medical services provided,[2] and which still exists today. Section 1557 of the ACA prohibits denial of certain federally-funded health benefits because of the individual's sex, among other things. 42 U.S.C. § 18116. Section 1557 does not independently define "sex," but relies on the definition provided in Title IX, 20 U.S.C. § 1681. Defendants issued the new Rule to "interpret" Section 1557 of the ACA, and redefined Title IX's definition of "sex" to include "gender identity," "sex stereotypes," and "termination of pregnancy." 45 C.F.R. § 92.4.

When Congress enacted Title IX, the common understanding within the scientific, medical, academic, and general communities was that "sex" meant the biological differences between male and female. When enacting other statutes, Congress has always construed "sex" narrowly to refer to the biological differences between men and women. The Rule's redefinition of "sex" to include "gender identity" or "termination of pregnancy" was not clear from the text of Title IX during its enactment, nor in the ensuing years of congressional lawmaking. Thus, the Rule violates the clear-statement doctrine of the Spending Clause.

### 1. When Congress enacted Title IX, "sex" meant the biological differences between male and female.

When Congress enacted Title IX in 1972, the common understanding of "sex" regarded the biological differences between men and women, and not the contemporary concepts of "gender identity" or "termination of pregnancy" that Defendants' embrace in their new Rule. According to standard legal treatises, "gender identity" is not within the ambit of Titles VII or IX. *See, e.g.*, Margaret C. Jasper, *Employment Discrimination Law Under Title VII* 45 (2d ed. 2008) (stating that Title VII makes it unlawful "to discriminate against any employee or applicant for

---

[2] When the States began their involvement with Medicare and Medicaid is the operative timeframe relevant to understanding the meaning of the conditions at issue. *See Bennett v. New Jersey*, 470 U.S. 632, 638 (1985) (providing that a state's obligation under cooperative federalism program "generally should be determined by reference to the law in effect when the grants were made").

employment because of his or her sex"); Mack A. Player, *Employment Discrimination Law* 239 (1988) (providing that the term "sex" for the purposes of Title VII generally refers to the division of organisms into biological sexes); Charles A. Sullivan, et al., *Federal Statutory Law of Employment Discrimination* 161 (1980) (same). Indeed, "gender identity" was a virtually unrecognized construct among legal academics when Title VII and Title IX became law. It was not even mentioned in a law review article on the subject of Title VII or Title IX until the 1980s.

"Gender identity" is a recent addition to the social science lexicon. The 1992 National Health and Social Life Survey did not ask about men or women that identify as the opposite sex, nor did the first four waves of data collection of the National Longitudinal Study of Adolescent Health (begun in 1994 and last fielded in 2008). And the Centers for Disease Control and Prevention ("CDC") has not done so. Brian W. Ward et al, *Sexual Orientation and Health Among U.S. Adults: National Health Interview Survey, 2013*, 77 NAT'L HEALTH STATISTICS REPORTS 2 (2014).

Among the general public, "gender identity" is a familiar concept only as of late. Law professor Gail Heriot, of the United States Commission on Civil Rights, noted recently before Congress that the 1991 Compact Oxford English Dictionary does not define "transgender." *The Federal Government on Autopilot: Delegation of Regulatory Authority to an Unaccountable Bureaucracy: Hearing Before the H. Comm. on the Judiciary*, 114th Cong. 13 (2016) (statement of Gail Heriot, Member, U.S. Comm'n on Civil Rights). Likewise, newspapers such as the *Washington Post* and the *New York Times* did not use the term throughout the 1960s and 1970s. *Id.*

While not a widely used term at the time President Nixon signed Title IX into law, "gender identity" was first used in 1963 at the 23rd International Psycho-Analytical Congress in Stockholm. David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles*, 1945–2001, ARCHIVES OF SEXUAL

BEHAVIOR 93 (Apr. 2004). Notably, early users of "gender" and "gender identity" understood these terms to mean something *different* than "sex."

In the 1950s, John Money, a psychologist at Johns Hopkins University, introduced "gender"—previously a grammatical term only—into scientific discourse. Joanne Meyerowitz, *A History of "Gender,"* 113 THE AM. HISTORICAL REVIEW 1346, 1353 (2008). Money believed that an individual's "gender role" was not determined at birth but was acquired early in a child's development much in the same fashion that a child learns a language. John Money, et al., *Imprinting and the Establishment of Gender Role*, 77 A.M.A. ARCHIVES OF NEUROLOGY & PSYCHIATRY 333–36 (1957). Robert Stoller, the UCLA psychoanalyst who first used the term "gender identity," was another early adopter of the terminology of "gender." He wrote in 1968 that gender had "psychological or cultural rather than biological connotations." Robert J. Stoller, *Sex and Gender: On the Development of Masculinity and Femininity* 9 (1968). To him, "sex was biological but gender was social." Haig, *supra*, at 93.

In 1969, Virginia Prince, who is credited with coining the term "transgender," echoed the view that "sex" and "gender" are distinct: "I, at least, know the difference between sex and gender and have simply elected to change the latter and not the former. . . . I should be termed 'transgenderal.'" *The Federal Government on Autopilot*, 114th Cong. 13 (Heriot statement) (quoting Virginia Prince, *Change of Sex or Gender*, 10 TRANSVESTIA 53, 60 (1969)). And in the 1970s, feminist scholars joined the chorus differentiating "biological sex" from "socially assigned gender." Haig, *supra*, at 93 (quoting Ethel Tobach, *Some Evolutionary Aspects of Human Gender*, 41 AM. J. OF ORTHOPSYCHIATRY 710 (1971)).

Congress clearly intended the term "sex" in Title IX to be defined based on the biological and anatomical differences between males and females, and the meaning of the term "sex" has remained unchanged since that time. To be sure, around the time that Title IX was enacted, nearly every dictionary definition of "sex" referred to

physiological distinctions between females and males, particularly with respect to their reproductive functions. *See*, *e.g.*, AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions"); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ("the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . ."); 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."). Even today, "sex" continues to refer to biological differences between females and males. *See*, *e.g.*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1331 (5th ed. 2014) ("either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); Sari L. Reisner, et al., *"Counting" Transgender and Gender-Nonconforming Adults in Health Research*, 2 TRANSGENDER STUD. Q. 37 (Feb. 2015) ("Sex refers to biological differences among females and males, such as genetics, hormones, secondary sex characteristics, and anatomy.").

The meaning of "gender" has also remained essentially the same since the term was introduced as a means of drawing a distinction between biological "sex" and social "gender." *See*, *e.g.*, Reisner, *supra*, at 37 ("Gender typically refers to cultural meanings ascribed to or associated with patterns of behavior, experience, and personality that are labeled as feminine or masculine."). This usage of "gender" is also more commonplace now. For example, the 2010 New Oxford American Dictionary distinguishes between "sex," defined in biological terms, and "gender," defined in social and cultural terms. NEW OXFORD AMERICAN DICTIONARY 721–22, 1600 (3d ed.

2010). Accordingly, at the time of Title IX's enactment, "sex" referred to the biological differences between male and female, and "gender identity" was a separate concept.

     **2.**     **Since Title IX's enactment, when using "sex" in other statutes, Congress construed the term narrowly to refer to one's biological sex as male or female.**

Congress has consistently and repeatedly followed this understanding, construing its prohibitions against invidious "sex" discrimination narrowly. In 1974, Representatives Bella Abzug and Edward Koch proposed to amend the Civil Rights Act to *add* the *new* category of "sexual orientation." H.R. 14752, 93rd Cong. (1974). Congress considered other similar bills during the 1970s. *See* H.R. 166, 94th Cong. (1975); H.R. 2074, 96th Cong. (1979); S. 2081, 96th Cong. (1979). In 1994, lawmakers introduced the Employment Non-Discrimination Act ("ENDA") which, like Rep. Abzug and Koch's earlier effort, was premised on the understanding that Title VII's protections against invidious "sex" discrimination related only to one's biological sex as male or female. H.R. 4636, 103rd Cong. (1994). In 2007, 2009, and 2011, lawmakers proposed a broader version of EDNA to codify protections for "gender identity" in the employment context. H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011). In addition, in 2013 and 2015, proposals were made to *add* to Title IX the *new* category of "gender identity." H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). Notwithstanding the success or failure of the aforementioned Congressional proposals, they all affirmed Congress's enduring understanding that "sex," as a protected class, refers only to one's biological sex, as male or female, and not the element of "gender identity" promulgated by Defendants.

And when Congress actually did, in one instance, redefine the term "sex" for the purposes of its prohibitions against invidious "sex" discrimination, the new definition did not encompass "gender identity" or "termination of pregnancy." Rather, in 1978, Congress broadened the statutory term "sex" to include discrimination "on the basis of pregnancy, childbirth, or related conditions," *see* Pregnancy

Discrimination Act of 1978, Pub. L. No. 95-555, § (k), 92 Stat. 2076, 2076 (1978) (codified as 42 U.S.C. § 2000e(k)), while maintaining neutrality regarding abortion, *see* 20 U.S.C. § 1688. In amending the law in this way, Congress indicated that invidious "sex" discrimination occurs when females and males are not afforded the same avenues for advancement (*i.e.*, when pregnant women may be legally fired or not hired). Thus, this amendment affirmed Congress's long-held view that "sex" refers to biological sex, and not to an individual's self-perception of his or her "gender identity," and did not alter its enduring neutrality regarding abortion.

3.   **No State could clearly understand when it began accepting Medicare and Medicaid funding decades ago that "sex" included "gender identity" and "termination of pregnancy."**

The text employed by Congress in Title IX does not support the understanding of the term "sex" put forth by Defendants. Title IX defines "sex" in a binary way. *See* 20 U.S.C. § 1681 (referring to "students of one sex," "both sexes," "students of the other sex"). It also maintains neutrality on the topic of abortion. *See id.* § 1688 ("Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion."). Defendants' Rule, however, redefines Title IX's prohibition against invidious "sex" discrimination, providing that:

> a covered entity shall treat individuals consistent with their gender identity, except that a covered entity may not deny or limit health services that are ordinarily or exclusively available to individuals of one sex, to a transgender individual based on the fact that the individual's sex assigned at birth, gender identity, or gender otherwise recorded is different from the one to which such health services are ordinarily or exclusively available.

45 C.F.R. § 92.206 (2016); 81 Fed. Reg. 31471. And in defining "gender identity," Defendants purport that it "means an individual's internal sense of gender, which may be different from an individual's sex assigned at birth." 81 Fed. Reg. 31384. But Defendants go even further. Not only do they redefine "sex" to include "gender identity," they simultaneously unharness the binary understanding of the sexes.

According to HHS, one's "gender identity" means that a person can identify as "male, female, neither, or a combination of male and female." 45 C.F.R. § 92.4; 81 Fed. Reg. 31467. According to Defendants, "[t]he insertion of this clause helps clarify that those individuals with non-binary gender identities are protected under the [regulation]." 81 Fed. Reg. 31384.

As a separate, distinct category from "sex," Congress expressed its intent to cover "gender identity," as a protected class, in *other* pieces of legislation. *See, e.g.*, 18 U.S.C. § 249(a)(2)(A); 42 U.S.C. § 13925(b)(13)(A). Yet, it has *not* done so regarding Title IX. In *other* legislation, Congress included "gender identity," along with "sex," thus evidencing its intent for "sex" to retain its original and only meaning—one's immutable, biological sex as acknowledged at or before birth. The Rule here was promulgated under the authority Congress delegated to HHS in Section 1557 of the ACA. Section 1557 does *not* add a new non-discrimination provision to the federal code, but merely incorporates by reference pre-existing provisions under, *inter alia*, Title IX ("sex"). Section 1557 does not independently define "sex," or seek to redefine its well-understood meaning. At the time that the ACA was passed in 2010, no federal courts or agencies had interpreted "sex" in Title IX to include "gender identity."

The well-grounded and enduring meaning of "sex," along with the absence of Congressional authorization, can mean only that Defendants insert "gender identity" into the law without authorization. Indeed, Defendants' only purported authority for redefining "sex" are the similarly flawed (and recent) proclamations of other executive

agencies engaged in the mischief of Article I lawmaking.[3] Conveniently, Defendants even cite themselves as an authority for their actions.[4]

Therefore, no State could fathom, much less "clearly understand," that Title IX imposes on it the conditions created by HHS's Rule—namely the absence of neutrality on abortion, plus a new "gender identity" requirement that is, interestingly, untethered from the binary reality of the sexes. The sovereign Plaintiffs did not, therefore, by their actions "voluntarily and knowingly" relinquish their rights. *Pennhurst*, 451 U.S. at 17. Accordingly, the new Rule violates the clear-statement principles of the Spending Clause.

## II.     The Rule Violates the Administrative Procedure Act.

The State Plaintiffs adopt and incorporate by reference the APA arguments on Counts I, II, and III made by Franciscan in its motion for partial summary judgment. The State Plaintiffs assert that the Rule violates the APA for an additional and independent reason: Congress may not exercise its Article I power in a way that commandeers state sovereignty in violation of the Tenth Amendment.

Congress exercises its conferred powers in Article I subject to the limitations contained in the Constitution. *New York v. United States*, 505 U.S. 144, 156 (1992). One of those limitations is the Tenth Amendment, which restrains the power of Congress by reserving powers for the States that are not delegated to Congress in Article I. "It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Printz v. United States*, 521 U.S. 898, 928 (1997). Defendants may not compel the State

---

[3] *See* 81 Fed. Reg. 31384 n.42 (citing agency guidance from the U.S. Office of Personnel Management, U.S. Equal Employment Opportunity Commission, U.S. Office of Special Counsel, U.S. Merit Systems Protection Board); 81 Fed. Reg. 31387 n.56 (citing U.S. Office of Personnel Management regulations, U.S. Dep't of Labor, U.S. Dep't of Justice, U.S. Dep't of Educ. statements).

[4] 81 Fed. Reg. 31387 n.57 (citing Letter from Leon Rodriguez, Director, U.S. Dep't of Health & Human Servs., Office for Civil Rights, to Maya Rupert, Federal Policy Director, National Center for Lesbian Rights (Jul. 12, 2012), https://www.nachc.com/client/OCRLetterJuly2012.pdf).

Plaintiffs to implement, by legislation or executive action, federal regulatory programs. *Id.* at 925. Moreover, once federal and state governments engage in cooperative federalism through a federal spending program, Congress may not "effectively engage in [ ] impermissible compulsion" "so that the States' choice whether to enact or administer a federal regulatory program is rendered illusory." *NFIB*, 132 S. Ct. at 2660. "Congress may not simply commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Id.* (internal quotation marks and citation omitted).

The Rule "commandeers [the State Plaintiffs'] legislative or administrative apparatus for federal purposes," *id.* at 2602, by running headlong into their sovereign power, forcing them to accept and apply new and different standards of medical care, state authority over medical facilities, and state employers' decisions not to cover "all health services related to gender transition," 45 C.F.R. § 92.207, and abortion procedures.

First, the State Plaintiffs zealously protect the independent medical judgment of physicians. Each State regulates the standard of care that physicians must provide patients. "[T]he State has a significant role to play in regulating the medical profession," *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), as well as "an interest in protecting the integrity and ethics of the medical profession," *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). This includes "maintaining high standards of professional conduct" in the practice of medicine. *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954).

Texas zealously protects the physician-patient relationship. Numerous Texas laws and regulations ensure that physicians honor their duties to their patients. The statewide standard of medical practice rests on the principle that Texas doctors must exercise "independent medical judgment" when treating patients under their care. *See, e.g., Murk v. Scheele*, 120 S.W.3d 865, 867 (Tex. 2003) (per curiam); *see also*

*Garcia v. Tex. State Bd. of Med. Exam'rs*, 384 F. Supp. 434, 439 (W.D. Tex. 1974) (upholding regulations designed to preserve the "vitally important doctor-patient relationship"). In 2011, the Texas Legislature prohibited medical organizations from interfering with, controlling, or directing "a physician's professional judgment," TEX. OCC. CODE § 162.0021, and it mandated that they permit physicians to exercise "independent medical judgment when providing care to patients," *id*. § 162.0022.

Texas hospitals must appoint a chief medical officer to supervise "all matters relating to the practice of medicine." TEX. HEALTH & SAFETY CODE § 311.083, which includes adopting policies to ensure that physicians have the ability to exercise independent medical judgment, *id*. This officer must report to the Texas Medical Board ("TMB")—the executive agency responsible for regulating the practice of medicine in Texas—any action or event that constitutes a compromise of the independent medical judgment of a physician in caring for a patient. *Id*. TMB regulations provide that doctors retain "independent medical judgment and discretion in providing and supervising care to patients," and may not be disciplined for "reasonably advocating for patient care." 22 TEX. ADMIN. CODE § 177.5. In addition, they reserve important decisions concerning quality assurance, the medical necessity of treatment, credentialing and peer review to the physician-only boards that direct health organizations. *Id*. §§ 177.3, 177.5.

Likewise, the other State Plaintiffs require the same independence for their physicians. Wisconsin protects the physician-patient relationship by requiring physician employment contracts to "[p]ermit the physician to exercise professional judgment without supervision or interference by the hospital or medical education and research organization," and by requiring physicians to inform patients "about the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments." WIS. STAT. ANN. §§ 448.08(5)(a)2, 448.30. Nebraska safeguards the right of health care providers to decline to take part in

activities that are contrary to the provider's religious, ethical, or moral convictions. NEB. REV. STAT. ANN. § 30-3428. Louisiana requires physicians to "exercise independent medical judgment in the sole interest of the patient" and refrain from "allow[ing] a non-physician to impose or substitute his, her, or its judgment for that of the physician." LA. ADMIN. CODE 46:XLV § 7603. Kansas, Arizona, Mississippi, and Kentucky treat physicians as fiduciaries of their patients, obligating physicians to act in the best interests of patients based on the physician's informed, independent judgment. *See Natanson v. Kline*, 350 P.2d 1093, 1105–06 (Kan.), *decision clarified on denial of reh'g*, 354 P.2d 670 (Kan. 1960); *Walk v. Ring*, 44 P.3d 990, 999 (Ariz. 2002); *Madden v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993); *Adams v. Ison*, 249 S.W.2d 791, 793 (Ky. 1952).

The standard of care established in Texas, and around the country, enables patients to obtain quality healthcare as determined by medical professionals, and not those outside the doctor-patient relationship. The Rule, however, commandeers this standard of care. It discards independent medical judgment and a physician's duty to his or her patient's permanent well-being and replaces them with rigid commands. The Rule forces physicians who accept Medicare and Medicaid payments, and who operate, offer, or contract for health programs and activities that receive federal financial assistance, to subject their patients to procedures that permanently alter or remove well-functioning organs, even though the physician's independent medical judgment advises against such a course of action. And beyond compelling physicians to act against their medical judgment, the Rule requires them to express opinions contrary to what they deem to be in the patient's best interest, or to avoid even describing medical transition procedures as risky or experimental. Yet, physicians are "under a duty to make reasonable disclosure of that diagnosis, and risk of the proposed treatment . . ., as would have been made by a reasonable medical practitioner under the circumstances." *Jacobs v. Theimer*, 519 S.W.2d 846, 848 (Tex.

1975) (citing *Wilson v. Scott*, 412 S.W.2d 299 (Tex. 1967); W. M. Moldoff, *Annotation, Malpractice: physician's duty to inform patient of nature and hazards of disease or treatment*, 79 A.L.R.2d 1028 (1961)).

Second, the Rule commandeers the State Plaintiffs' provisions of healthcare services directly to citizens through various mechanisms of government. Texas, for example, provides health services directly to patients through the Health and Human Services Commission ("HHSC"). TEX. GOV'T CODE § 531.0055; TEX. HEALTH & SAFETY CODE § 12.0115. HHSC superintends operations and resource allocation at many healthcare facilities, which are owned by Texas and receive federal funding administered by HHS, TEX. GOV'T CODE §§ 531.008, 531.0055, including the North Texas State Hospital. These entities will have to offer all manner of (and referrals for) medical transition procedures and treatments. As a result of the Rule, Texas and other states must allocate personnel, resources, and facility spaces to offer and accommodate myriad medical transition procedures now required under the new Rule. Healthcare facilities will also be required to open up sex-separated showers, locker rooms, or other intimate facilities based on individual preference.[5] This is true even in controlled medical locations where patient access to intimate facilities is often under the control of healthcare professionals that are supposed to act in the best interests of the patient. Thus, the requirements of the new Rule commandeer the

---

[5] This becomes especially complicated, or perhaps impossible, under the new Rule's non-binary approach to "sex." As stated by HHS, "those individuals with non-binary gender identities are protected under the rule." 81 Fed. Reg. 31384. Indeed, HHS declares that it is an unlawful "sex stereotype" to have the "belief" or "the expectation that individuals consistently identify with only one of two genders (male or female)." 81 Fed. Reg. 31392. According to HHS, "the gender identity spectrum includes an array of possible gender identities beyond male and female." *Id.* Thus, one can only conclude that the Rule is violated when the intimate facilities within a medical building are labeled in a binary sense, or not otherwise designed for the "array of possible gender identities" that may befall that location on any given day. And "[t]he rule makes clear that in order to meet their obligations under § 92.206, covered entities must treat all individuals consistent with their gender identity, including with regard to access to facilities." 81 Fed. Reg. 31428.

control that Texas and other states legitimately exercise over their healthcare facilities.

Third, the Rule commandeers powers reserved to the States by attempting to force states to provide insurance coverage for "gender transition services" and abortion procedures to all state employees. HHS provides that a state's Medicaid program constitutes a covered "health program or activity" under the Rule. Thus, "the State will be governed by Section 1557 in the provision of employee health benefits for its Medicaid employees." 81 Fed. Reg. 31437. The exclusions Texas and other states currently possess in their employee insurance policies related to pregnancy termination and medical transition procedures will now be illegal under the new Rule. As a result, Texas and other states will be required to change their insurance coverage.

For these reasons, and those articulated in the APA section of Franciscan's motion, the new Rule is contrary to law and in excess of statutory authority because it commandeers powers reserved to the States. The Court should declare that the Rule violates the APA and permanently enjoin its enforcement.

## III.  Alternatively, the Court Should Issue a Preliminary Injunction.

The State Plaintiffs adopt and incorporate by reference Franciscan's arguments as to why the Court, in the alternative, should issue a preliminary injunction against the Rule before December 31, 2016. (Franciscan Partial Mot. for Sum. J., Part VIII.) The State Plaintiffs add an additional reason why they will suffer irreparable injury absent a preliminary injunction.

Defendants' Rule threatens the State Plaintiffs' interest in establishing policies and managing their own medical professionals, hospitals, and facilities. It also threatens their interests as employers providing health benefits to the state workforce. Sovereigns suffer an irreparable harm when their duly enacted laws or policies are enjoined. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) (quoting *New Motor*

*Vehicle Bd. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) (Rehnquist, J., in chambers)) ("It also seems to me that any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws"); *Texas v. United States*, -- F. Supp. 3d --, No. 7:16-cv-00054-O, 2016 WL 4426495, at *16 (N.D. Tex. Apr. 21, 2016) (finding the same); *Texas v. United States*, 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015) ("[W]henever an enactment of a state's people is enjoined, the state suffers irreparable injury.").

Here, the new Rule removes from all non-federal officials their own authority to create and enforce their own rules and regulations for state healthcare facilities and professionals. This unlawful interference amounts to irreparable harm to Plaintiffs' sovereign interest. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (holding that erroneous tribal gaming commission decision amounts to an irreparable injury to the state's sovereign interest); *North Dakota v. EPA*, 127 F. Supp. 3d 1047, 1059 (D.N.D. 2015) (states suffer irreparable harm where defective federal regulation would divest them of their sovereignty over intrastate waters); *Texas*, 95 F. Supp. 3d at 981–82 (irreparable injury occurs when invalid federal rules require states to disregard its laws). For these reasons, and those articulated in Franciscan's motion, the Court should, alternatively, issue a preliminary injunction.

## CONCLUSION

Defendants' new Rule violates the Spending Clause of Article I by changing the unambiguous conditions upon which the State Plaintiffs agreed to take Medicare and Medicaid funds. The Rule also violates the APA and other constitutional provisions identified in the summary judgment brief of Franciscan. Thus, for the reasons articulated above and in Franciscan's motion, the State Plaintiffs respectfully

request that the Court declare the Rule unconstitutional and unlawful, and permanently (or preliminarily) enjoin its enforcement.

Respectfully submitted this the 21st day of October, 2016.

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

PRERAK SHAH
Senior Counsel to the Attorney General

ANDREW D. LEONIE
Associate Deputy Attorney General

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS
Associate Deputy Attorney General
Texas Bar No. 24002695
austin.nimocks@oag.texas.gov

MICHAEL C. TOTH
Senior Counsel

JOEL STONEDALE
Counsel

Office of Special Litigation
**ATTORNEY GENERAL OF TEXAS**
P.O. Box 12548, Mail Code 009
Austin, Texas 78711-2548
(512) 936-1414

*ATTORNEYS FOR PLAINTIFFS*
*STATE OF TEXAS; STATE OF*
*WISCONSIN; STATE OF*
*NEBRASKA; COMMONWEALTH*
*OF KENTUCKY, by and through*
*Governor Matthew G. Bevin;*
*STATE OF KANSAS; STATE OF*
*LOUISIANA, STATE OF ARIZONA, and*
*STATE OF MISSISSIPPI, by and through*
*Governor Phil Bryant*

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2016, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties. In addition, I also will personally serve a copy of this document on the United States Attorney for the Northern District of Texas, and send a copy by certified U.S. Mail to the Attorney General of the United States and to the Honorable Sylvia Burwell, Secretary of the United States Department of Health and Human Services.

*/s/ Austin R. Nimocks*
AUSTIN R. NIMOCKS