# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

FRANCISCAN ALLIANCE, INC., *et al.,*

*Plaintiffs,*

v.

SYLVIA BURWELL, *et al.,*

*Defendants.*

No. 7:16-CV-00108-O

**Plaintiffs' Brief in Support of Their Motion for Partial Summary Judgment or, in the Alternative, Preliminary Injunction**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iv

INTRODUCTION ..................................................................................... 1

STATEMENT OF FACTS ........................................................................ 2

    A. Title IX ............................................................................................ 2

    B. Attempts to Add Protections for "Gender Identity" ........................... 2

    C. The Affordable Care Act .................................................................. 3

    D. Executive Branch Changes ............................................................... 3

    E. The Rule ......................................................................................... 5

        1. Medical Procedures .................................................................. 6

        2. Insurance Coverage .................................................................. 7

        3. Enforcement ............................................................................ 8

    F. Plaintiffs ......................................................................................... 8

        1. Franciscan ............................................................................... 8

        2. CMDA .................................................................................... 9

        3. State Plaintiffs ........................................................................ 10

    G. The Effect of the Rule .................................................................... 10

        1. Franciscan ............................................................................. 10

        2. CMDA .................................................................................. 11

        3. State Plaintiffs ........................................................................ 11

ARGUMENT ........................................................................................ 12

    I. The Rule violates the Administrative Procedure Act ....................... 12

        A. HHS's interpretation of "sex" to include
            "gender identity" is contrary to law ..................................... 12

        B. HHS's failure to include religious or abortion-related
            exemptions is contrary to law, arbitrary and
            capricious, and in excess of statutory authority ...................... 19

            1. The Rule is contrary to law, arbitrary and
               capricious, and exceeds statutory authority
               because it fails to include Title IX's exemption
               for religious entities ........................................................ 19

2. The Rule is contrary to law, arbitrary and capricious, and exceeds statutory authority because it ignores Title IX's abortion exemption ................................. 21

C. HHS's failure to allow employers to accommodate employees' religious beliefs is contrary to Title VII ..................... 22

D. HHS's attempt to commandeer the States is contrary to the Tenth Amendment ............................................. 23

II. The Rule violates the Religious Freedom Restoration Act........................................................................... 23

A. Franciscan's and CMDA members sincerely exercise religion by not performing or covering medical transitions or abortions .................................................................. 24

B. The Rule substantially burdens Plaintiffs' religious exercise by imposing massive financial penalties ..................... 25

C. The Rule cannot satisfy strict scrutiny....................................... 26

1. The Rule furthers no compelling interest ............................. 26

2. Defendants have numerous less restrictive means of furthering their interests ........................................ 30

III. The Rule violates the Spending Clause ......................................... 32

IV. The Rule violates the Free Speech Clause ..................................... 32

A. The Rule prevents healthcare providers from speaking against medical transition procedures........................... 33

B. The Rule compels healthcare providers to speak in favor of medical transition procedures and to use transition-affirming language ................................................. 35

C. The Rule cannot satisfy strict scrutiny....................................... 38

V. The Rule is unconstitutionally vague .............................................. 39

A. The Rule fails to give fair notice of what conduct is subject to liability and gives HHS ample room for arbitrary enforcement ............................................................ 39

B. The Rule's vague, overbroad, and content-based restrictions result in a serious chilling effect on protected expressive activity ......................................................... 43

VI. The Rule violates the Due Process Clause ..................................... 44

A. The United States has a deeply rooted tradition of honoring physicians' rights to refrain from taking human life ................................................................... 44

B. The United States has a deeply rooted tradition of honoring physicians' rights to refrain from destroying the potential for new human life through sterilization................................................... 46

C. The Rule cannot satisfy strict scrutiny...................................................... 47

VII. The Court should expedite summary judgment ........................................... 47

VIII. Alternatively, the Court should enter a preliminary injunction ................................................................................. 48

CONCLUSION.......................................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU of Ill. v. Alvarez,*
  679 F.3d 583 (7th Cir. 2012) ................................................................. 48

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*
  133 S. Ct. 2321 (2013) ....................................................................... 37-38

*Ariz. Free Enter. v. Bennett,*
  131 S. Ct 2806 (2011) .......................................................................... 36

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ....................................................................... 43, 44

*Baxter v. State,*
  224 P.3d 1211 (Mont. 2009) ................................................................. 45

*Brown v. Entm't Merchants Ass'n,*
  564 U.S. 786 (2011) ............................................................................ 38

*Burwell v. Hobby Lobby Stores, Inc.,*
  134 S. Ct. 2751 (2014) ................................................................. *passim*

*Byrum v. Landreth,*
  566 F.3d 442 (5th Cir. 2009) ............................................................... 48

*Cal. Democratic Party v. Jones,*
  530 U.S. 567 (2000) ............................................................................ 26

*Cannon v. Univ. of Chicago,*
  441 U.S. 677 (1979) ......................................................................... 2, 16

*Cape May Greene, Inc. v. Warren,*
  698 F.2d 179 (3d Cir. 1983) ................................................................ 23

*Christian Legal Soc'y v. Walker,*
  453 F.3d 853 (7th Cir. 2006) ............................................................... 50

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ....................................................................... 26, 29

*City of Boerne v. Flores,*
  521 U.S. 507 (1997) ............................................................................ 26

*Conant v. Walters,*
  309 F.3d 629 (9th Cir. 2002) ........................................................... 34, 36

*Contender Farms, L.L.P. v. U.S.D.A.,*
  779 F.3d 258 (5th Cir. 2015) .......................................................... 13, 14

iv

*Cramp v. Bd. of Pub. Instruction of Orange Cty., Fla.*,
    368 U.S. 278 (1961) ............................................................ 43

*EEOC v. Abercrombie & Fitch Stores, Inc.*,
    135 S. Ct. 2028 (2015) ........................................................ 22

*Elrod v. Burns*,
    427 U.S. 347 (1976) ............................................................ 49

*Etsitty v. Utah Transit Auth.*,
    502 F.3d 1215 (10th Cir. 2007) ...................................... 14, 18

*F.C.C. v. Fox Television Stations, Inc.*,
    132 S. Ct. 2307 (2012) ................................................ 39-40, 43

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
    546 U.S. 418 (2006) ...................................................... 24, 38

*Grayned v. City of Rockford*,
    408 U.S. 104 (1972) .................................................... 39-40, 43

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*,
    822 F.3d 709 (4th Cir. 2016) ............................................ 15

*Harris v. McRae*,
    448 U.S. 297 (1980) ............................................................ 30

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .............................................................. 39

*Holt v. Hobbs*,
    135 S. Ct. 853 (2015) ........................................................ 31

*I.R.S., Fresno Serv. Ctr. v. FLRA*,
    706 F.2d 1019 (9th Cir. 1983) .......................................... 23

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
    97 F. Supp. 3d 657 (W.D. Pa. 2015) ................................ 14

*Kansas v. United States*,
    249 F.3d 1213 (10th Cir. 2001) ........................................ 49

*Knox v. Serv. Emp. Int'l Union*,
    132 S. Ct. 2277 (2012) ...................................................... 33

*Korte v. Sebelius*,
    735 F.3d 654 (7th Cir. 2013) ............................................ 48

*Martin v. Struthers*,
    319 U.S. 141 (1943) ............................................................ 36

*Merced v. Kasson*,
    577 F.3d 578 (5th Cir. 2009) ...................................... 26, 29

*N. Haven Bd. of Ed. v. Bell,*
  456 U.S. 512 (1982) ................................................................. 2, 16

*NAACP v. Button,*
  371 U.S. 415 (1963) ...................................................................... 44

*New Motor Vehicle Bd. of California v. Orrin W. Fox Co.,*
  434 U.S. 1345 (1977) .................................................................... 49

*Obergefell v. Hodges,*
  135 S. Ct. 2584 (2015) .................................................................. 47

*Oglala Sioux Tribe of Indians v. Andrus,*
  603 F.2d 707 (8th Cir. 1979) ........................................................ 23

*Opulent Life Church v. City of Holly Springs, Miss.,*
  697 F.3d 279 (5th Cir. 2012) ............................................. 48-49, 50

*Pace v. Bogalusa City Sch. Bd.,*
  403 F.3d 272 (5th Cir. 2005) ........................................................ 32

*Pederson v. La. State Univ.,*
  213 F.3d 858 (5th Cir. 2000) .................................................... 2, 16

*R.A.V. v. St. Paul,*
  505 U.S. 377 (1992) ...................................................................... 35

*Reno v. ACLU,*
  521 U.S. 844 (1997) ...................................................................... 43

*Roe v. Wade,*
  410 U.S. 113 (1973) ...................................................................... 45

*Rosenberger v. Rector,*
  515 U.S. 819 (1995) ...................................................................... 35

*RTM Media, L.L.C. v. City of Houston,*
  518 F. Supp. 2d 866 (S.D. Tex. 2007).......................................... 50

*Smith v. Goguen,*
  415 U.S. 566 (1974) ...................................................................... 43

*Sommers v. Budget Mktg., Inc.,*
  667 F.2d 748 (8th Cir. 1982) ........................................................ 14

*Sorrell v. IMS Health Inc.,*
  564 U.S. 552 (2011) ............................................................. 33, 38-39

*South Dakota v. Dole,*
  483 U.S. 203 (1987) ...................................................................... 32

*Sweet v. Mulberry Lutheran Home,*
  No. IP02-0320-C-H/K, 2003 WL 21525058
  (S.D. Ind. June 17, 2003)............................................................. 14

*Tagore v. United States,*
    735 F.3d 324 (5th Cir. 2013) ............................................................. 29

*Tex. Pipeline Ass'n v. F.E.R.C.,*
    661 F.3d 258 (5th Cir. 2011) ......................................................... 12, 19

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015),
    *aff'd by divided court* 136 S. Ct. 2271 (2016),
    *reh'g denied,* 2016 WL 5640497 (Oct. 3, 2016) ................................. 50

*Texas v. United States,*
    95 F. Supp. 3d 965 (N.D. Tex. 2015) ................................................. 49

*Texas v. United States,*
    No. 7:16-CV-00054-O, 2016 WL 4426495
    (N.D. Tex. Aug. 21, 2016) ....................................................... 14, 15, 48

*Thompson v. W. States Med. Ctr.,*
    535 U.S. 357 (2002) ......................................................................... 33

*Turner Broad. Sys., Inc. v. F.C.C.,*
    512 U.S. 622 (1994) ......................................................................... 36

*Ulane v. E. Airlines, Inc.,*
    742 F.2d 1081 (7th Cir. 1984) ..................................................... 14, 18

*United States v. Playboy Entm't Grp., Inc.,*
    529 U.S. 803 (2000) ......................................................................... 31

*United States v. Williams,*
    553 U.S. 285 (2008) ..................................................................... 39, 41

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
    455 U.S. 489 (1982) ......................................................................... 43

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943) ................................................................. 35-36, 38

*Walters v. Metro. Educ. Enters., Inc.,*
    519 U.S. 202 (1997) ......................................................................... 18

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ..................................................................... 44, 46

*Zabel v. Tabb,*
    430 F.2d 199 (5th Cir. 1970) ........................................................... 23

**Statutes**

42 U.S.C. § 2000bb-1 ......................................................................... 23

5 U.S.C. § 706 ................................................................................... 12

18 U.S.C. § 249 ............................................................................................ 3, 17

20 U.S.C. § 1681 ........................................................................................ *passim*

20 U.S.C. § 1688 ............................................................................................... 21

29 U.S.C. § 794 ................................................................................................. 13

42 U.S.C. § 238n .............................................................................................. 29

42 U.S.C. § 300a-7 ............................................................................ 29, 45, 46-47

42 U.S.C. § 1395 ............................................................................................... 29

42 U.S.C. § 2000bb-1 ....................................................................................... 23

42 U.S.C. § 2000d ............................................................................................ 13

42 U.S.C. § 2000e ............................................................................................ 22

42 U.S.C. § 2000e-2 ......................................................................................... 22

42 U.S.C. § 6101 ............................................................................................... 13

42 U.S.C. § 13925 ......................................................................................... 3, 17

42 U.S.C. § 18023 ........................................................................................ 29, 30

42 U.S.C. § 18116 ............................................................................. 2, 3, 19, 22

Cal. Health & Safety Code § 443.14 ................................................................ 45

Mont. Code. Ann. § 50-9-103(5) (2011) .......................................................... 45

Or. Rev. Stat. Ann. § 127.885 .......................................................................... 45

Vt. Stat. Ann. tit. 18, § 5285 ........................................................................... 45

Wash. Rev. Code Ann. §70.245.190 ................................................................ 45

## Regulations

44 Fed. Reg. 71413 (Dec. 11, 1979) ............................................................. 3, 16

77 Fed. Reg. 5662 (Feb. 3, 2012) ...................................................................... 5

81 Fed. Reg. 31376 (May 18, 2016) ........................................................... *passim*

24 C.F.R. Pt. 106 ................................................................................................ 4

29 C.F.R. § 1604.2 .............................................................................................. 4

45 C.F.R. § 92.4 .......................................................................................... *passim*

45 C.F.R. § 92.101 ......................................................................... 2, 6, 12, 20

45 C.F.R. § 92.207 ........................................................................................ 7, 11

45 C.F.R. § 92.301 ........................................................................................ 8, 25

Exec. Order No. 13,672, 79 Fed. Reg. 42,971(July 21, 2014) ........................ 5

## Legislative Materials

118 Cong. Rec. 5808 (1972) ......................................................... 16

Consolidated and Further Continuing Appropriations Act 2015,
Pub. L. 114-53, Div. G, § 507(d)
(Dec. 16, 2015) .......................................................................... 29

Health Care and Education Reconciliation Act,
Pub. L. 111-152 (March 30, 2010).............................................. 3

H.R. 166, 94th Cong. (1975) ......................................................... 17

H.R. 1652, 113th Cong. (2013) ................................................. 3, 17

H.R. 2015, 110th Cong. (2007) ................................................. 3, 17

H.R. 2074, 96th Cong. (1979) ....................................................... 17

H.R. 2981, 111th Cong. (2009) ................................................. 3, 17

H.R. 3185, 114th Cong. (2015) ................................................. 3, 17

H.R. 4636, 103rd Cong. (1994) ..................................................... 17

H.R. 14752, 93rd Cong. (1974) ..................................................... 17

Patient Protection and Affordable Care Act,
Pub. L. 111-148 (March 23, 2010).............................................. 3

S. 439, 114th Cong. (2015) ....................................................... 3, 17

S. 811, 112th Cong. (2011)........................................................ 3, 17

S. 1858, 114th Cong. (2015) ..................................................... 3, 17

S. 2081, 96th Cong. (1979) ........................................................... 17

## Other Authorities

9 Oxford English Dictionary (1961) ............................................. 15

Akhil Amar, *The Unwritten Constitution* (2012)........................... 46

46 Am. Jur. Proof of Facts 2d 373 § 1 (2016)............................... 46

American Heritage Dictionary (1976)...................................... 2, 15

Catherine E. Lhamon, Assistant Sec'y for Civil Rights,
U.S. Dep't of Educ., Office for Civil Rights,
*Questions and Answers on Title IX and Sexual
Violence* (2014).......................................................................... 5

Compl., *Dovel v. Pub. Library of Cincinnati and Hamilton
Cty.*, No. 16-955 (S.D. Ohio Sept. 26, 2016)........................... 25

Compl., *Prescott v. Rady Children's Hosp. - San Diego*,
No. 16-2408 (S.D. Cal. Sept. 26, 2016)................................................... 25

Compl., *Robinson v. Dignity Health*, No. 16-3035
(N.D. Cal. June 6, 2016) ............................................................................ 25

Council for Christian Colleges & Universities, Comment
Letter on Proposed Rule (Nov. 9, 2015)................................................ 20

David Haig, *The Inexorable Rise of Gender and the
Decline of Sex: Social Change in Academic Titles,
1945–2001*, Archives of Sexual Behav., Apr. 2004 .............................. 15

Dear Colleague Letter on Harassment and Bullying from
Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't
of Educ., Office for Civil Rights (Oct. 26, 2010) ....................................... 4

Def.'s Post-Trial Br., *Schroer v. Billington*, 577 F. Supp. 2d
293 (D.D.C. 2008) (No. 05-01090) ............................................................ 4

Guttmacher Institute, *Refusing to Provide Health Services*,
State Laws and Policies (Oct. 1, 2016),
https://www.guttmacher.org/state-policy/explore/
refusing-provide-health-services ........................................... 44, 45, 47

Institute of Medicine of the National Academies, The Health of
Lesbian, Gay, Bisexual and Transgender People:
Building a Foundation for Better Understanding (2011) ..................... 28

J. G. Randall & Richard Nelson Current,
*Lincoln the President* (1999) .................................................................. 45

Jesse Singal, What's Missing From the Conversation About
Transgender Kids, NYMag.com: Science of Us, July 25, 2015 ............. 36

Joanne Meyerowitz, *A History of "Gender,"* 113 Am. Hist. Rev. 1346
(2008) .......................................................................................................... 15

Lena H. Sun & Lenny Bernstein, *U.S. Moves to Protect Women,
Transgender People in Health Care*, Washington Post, Sep. 3, 2015 ...... 18

Letter from Jocelyn Samuels, Dir., Office for Civil Rights,
Dep't of Health & Human Servs., to Catherine W. Short, et al.
(June 21, 2016) .......................................................................................... 22

Louis Fischer, *Congressional Protection of Religious Liberty* (2003).................... 45-46

Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J.
121 (2012) .................................................................................................. 45

Memorandum from the Attorney General on Treatment of Transgender
Employment Discrimination Claims Under Title VII of the Civil
Rights Act of 1964 (Dec. 15, 2014) ........................................................... 5

x

Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409 (1990) .................................... 45

Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672 (2012) .................................. 46

New Oxford American Dictionary (3d ed. 2010) ......................................... 15

Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs, Directive 2014-02, Gender Identity and Sex Discrimination (2014) ............................................................................... 5

Press Release, Shantae Goodloe, U.S. Dep't of Hous. and Urban Dev., HUD No. 10-139, *HUD Issues Guidance on LGBT Housing Discrimination Complaints* (July 1, 2010) ............................................ 4

Sari L. Reisner et al., *"Counting" Transgender and Gender-Nonconforming Adults in Health Research*, Transgender Stud. Q., Feb. 2015 ............................................................................................. 15

*Trans Health Clinics*, Trans-Health.com, http://www.trans-health.com/clinics/ ........................................................................... 31-32

TRICARE Policy Manual 6010.57-M, Chapter 7, Section 1.2 ................................... 30

U.S. Dep't of Justice and U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students, May 13, 2016 ....................................................... 5

United States Conference of Catholic Bishops, et al., Comment Letter on Proposed Rule (Nov. 6, 2015) ................................................... 20, 21

Webster's Third New Int'l Dictionary (1971) ............................................ 15

## INTRODUCTION

This lawsuit challenges a new Rule issued by the Department of Health and Human Services ("HHS") that seeks to override the medical judgment of healthcare professionals across the country. On pain of massive financial liability, the Rule forces doctors and hospitals to perform controversial and potentially harmful medical procedures that purport to permanently alter an individual's sex—even when doing so would violate a doctor's religious beliefs and medical judgment, and even when the government's own programs exclude the procedures as potentially harmful.

HHS attempts to impose this dramatic new mandate on others by redefining a single word in Title IX of the Education Amendments of 1972: "sex." For decades, Congress has consistently used "sex" to refer to an individual's status as male or female, as determined by biological sex at birth. But in the new Rule, HHS redefines "sex" to include an individual's "gender identity," which it defines as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." 45 C.F.R. § 92.4. HHS then claims that it is "discrimination" on the basis of "sex" to decline to perform gender transition procedures. Thus, with a single stroke of the pen, HHS has created massive new liability for thousands of doctors unless they cast aside their convictions and perform procedures that can be deeply harmful to their patients. It has also threatened to deprive the nation's most vulnerable citizens of healthcare by stripping states and hospitals of Medicare and Medicaid funds.

The Rule ought to be short-lived, because it cannot withstand even the slightest judicial scrutiny. HHS's attempt to redefine "sex" violates the Administrative Procedure Act. Its attempt to force doctors to violate their religious beliefs violates the Religious Freedom Restoration Act. Its attempt to control doctors' speech violates the Free Speech Clause. And its attempt to manipulate the States violates the Spending Clause. Accordingly, it must be enjoined.

## STATEMENT OF FACTS

The Rule at issue in this case prohibits discrimination on the basis of "sex" in certain health activities. 45 C.F.R. § 92.101(a)(1). It defines "sex" to include, among other things, "gender identity." *Id.* § 92.4. The purported authority for the Rule is Section 1557 of the Affordable Care Act ("ACA"), which prohibits discrimination in various health activities "on the ground prohibited under . . . title IX of the Education Amendments of 1972." 42 U.S.C. § 18116(a). Title IX, in turn, prohibits discrimination in education on the basis of "sex," 20 U.S.C. § 1681(a), but expressly excludes religious organizations and precludes interpreting "sex" to mean abortion. Because the purported authority for the Rule ultimately comes from Title IX, we begin there.

### A. Title IX

Congress enacted Title IX in 1972, prohibiting discrimination in federally funded education programs on the basis of "sex." 20 U.S.C. § 1681(a). When the law passed, the term "sex" was commonly understood to refer to the physiological differences between men and women, particularly with respect to their reproductive functions. *See, e.g.* American Heritage Dictionary 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."). That understanding is reflected throughout the statute, which requires equal treatment with respect to two different "sexes"—male and female. *See, e.g.*, 20 U.S.C. § 1681(a)(8) (requiring comparable activities between students of "one sex" and "the other sex"); 20 U.S.C. § 1681(a)(2) (same usage regarding admissions). The law has long been interpreted to prohibit federally funded education programs from treating men better than women, or vice versa. *See, e.g.*, *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 530 (1982); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 680 (1979); *Pederson v. La. State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000).

### B. Attempts to Add Protection for "Gender Identity"

Since Title IX was enacted, Congress has considered a variety of proposals to add

new statutory protections based on "gender identity." These include many attempts to amend both Title VII and Title IX to add protections for "gender identity."[1] And they include attempts currently pending in Congress to do precisely what the new Rule purports to do—prohibit discrimination in federally funded programs on the basis of "gender identity." H.R. 3185, 114th Cong. (2015); S. 1858, 114th Cong. (2015). To date, almost all of these proposals have failed. But two have succeeded. First, in 2010, Congress enacted hate crimes legislation providing enhanced penalties for crimes motivated by "gender identity." 18 U.S.C. § 249(a)(2). Second, in 2013, Congress reauthorized the Violence Against Women Act, prohibiting discrimination in certain funding programs on the basis of "sex" and—separately—"gender identity." 42 U.S.C. § 13925(b)(13)(A).

### C. The Affordable Care Act

Against this backdrop, in March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act." As noted above, the key provision at issue in this case, Section 1557, does not use the term "sex" but instead prohibits discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a). Nothing in the nearly 1,000 pages of text of the Affordable Care Act mentions "gender identity."

### D. Executive Branch Changes

Federal agencies have also long considered the meaning of the term "sex." For several decades, across a variety of statutes, federal agencies consistently interpreted "sex" to refer to physiological differences between males and females. *See, e.g.*, A Policy Interpretation: Title IX & Intercollegiate Athletics, 44 Fed. Reg. 71413 (Dec. 11,

---

[1] *See, e.g.*, H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011); H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).

1979) (listing "male and female" 28 times, "men and women" 24 times, and "men's and women's" 21 times); EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.2 ("Label—'Men's jobs' and 'Women's jobs'—tend to deny employment opportunities unnecessarily to one sex or the other."); Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 24 C.F.R. Pt. 106 (addressing expenditures for male and female teams). As late as 2008, the U.S. Department of Justice was still arguing that "the term 'sex' . . . prohibits discrimination based on the biological state of a male or female," and that "a claim based on gender identity or transsexuality fails as outside the scope of [the term 'sex']." Def.'s Post-Trial Br. at 4, *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) (No. 05-01090). No agency, to our knowledge, interpreted "sex" to include "gender identity" before 2010.

But in 2010, several months *after* enactment of the Affordable Care Act, federal agencies issued a rash of letters, memos, executive orders, and regulations interpreting prohibitions on "sex" discrimination to include protections for "gender identity":

- In July 2010, the Department of Housing and Urban Development (HUD) "announced a new policy . . . treat[ing] gender identity discrimination . . . as gender discrimination under the Fair Housing Act."[2]

- In October 2010, the Office for Civil Rights (OCR) for the Department of Education (DOE) issued a "Dear Colleague" letter asserting that, "[w]hen students are subjected to harassment on the basis of their LGBT status, they may also . . . be subjected to forms of sex discrimination prohibited under Title IX."[3]

- In February 2012, HUD issued a regulation forbidding discrimination on the basis

[2] Press Release, Shantae Goodloe, U.S. Dep't of Hous. and Urban Dev., HUD No. 10-139, *HUD Issues Guidance on LGBT Housing Discrimination Complaints* (July 1, 2010), http://portal.hud.gov/hudportal/HUD?src=/press/press_releases_media_advisories/2010/HUDNo.10-139.

[3] Dear Colleague Letter on Harassment and Bullying from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Oct. 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

of "gender identity" in HUD-assisted or insured housing.[4]

- In April 2014, OCR issued "Questions and Answers" stating that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity . . ."[5]

- In July 2014, the President amended a 50-year-old executive order by adding "gender identity" to a list of prohibited bases of discrimination in federal contracting.[6]

- In August 2014, the Department of Labor issued a Directive stating that "discrimination based on gender identity or transgender status . . . is discrimination based on sex."[7]

- In December 2014, the Department of Justice (DOJ) issued a memo concluding that Title VII's reference to "sex" "encompasses discrimination based on gender identity, including transgender status."[8]

- In May 2016, DOJ and DOE issued a "Dear Colleague Letter" stating that Title IX's prohibition on "sex discrimination . . . encompasses discrimination based on a student's gender identity."[9]

None of these agency actions involved a statute that used the term "gender identity."

### E. The Rule

On May 18, 2016, after notice and comment, HHS issued the Rule at issue here—

---

[4] Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity, 77 Fed. Reg. 5662 (Feb. 3, 2012), https://www.regulations.gov/contentStreamer?documentId=HUD-2011-0014-0312&disposition=attachment&contentType=pdf.

[5] Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[6] Exec. Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014), https://www.gpo.gov/fdsys/pkg/FR-2014-07-23/pdf/2014-17522.pdf.

[7] Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs, Directive 2014-02, Gender Identity and Sex Discrimination (2014), www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html.

[8] Mem. from the Attorney General on Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15, 2014) at 2, https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/18/title_vii_memo.pdf.

[9] U.S. Dep't of Justice and U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students, May 13, 2016, http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

six years after Congress passed the Affordable Care Act. The Rule applies to any "entity that operates a health program or activity, any part of which receives Federal financial assistance." 45 C.F.R. § 92.4 (definition of "Covered entity"). "Federal financial assistance" is defined broadly to include "any grant, loan, credit, subsidy, contract . . . or any other arrangement" by which the Federal Government makes available its property or funds. *Id.* Thus, by HHS's own estimate, the Rule applies to almost every health care provider in the country—including over 133,000 health care facilities (such as hospitals and health clinics) and "almost all licensed physicians" totaling "over 900,000"—because they all accept some form of federal funding, whether through Medicare and Medicaid or otherwise. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31445-31446 (May 18, 2016) (codified at 45 C.F.R. pt. 92).

The new Rule prohibits discrimination "on the basis of sex," defines "sex" to include "gender identity," and defines "gender identity" as an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." 45 C.F.R. § 92.101(a)(1), § 92.4. The Rule states that the "gender identity spectrum includes an array of possible gender identities beyond male and female," and "individuals with non-binary gender identities are protected under the rule." 81 Fed. Reg. at 31392, 31384. The Rule also defines "sex" to include discrimination based upon "termination of pregnancy." 45 C.F.R. § 92.4.

### 1. Medical Procedures

The Rule has several important consequences. First, it requires covered entities to perform medical transition procedures or else be liable for "discrimination." The Rule explains: "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31455.

In other words, if a gynecologist performs a hysterectomy for a woman with uterine cancer, she must do the same for a woman who wants to remove a healthy uterus to transition to living as a man. According to the Rule, a hysterectomy for a transgender man is "medically necessary" if "a patient's provider says [it] is medically necessary to treat gender dysphoria." *Id.* at 31429. Thus, declining to remove a healthy organ is "discrimination." HHS explains that this reasoning applies across the full "range of transition-related services." *Id.* at 31435-31436. This "is not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual." *Id.*

In addition, because the new Rule prohibits discrimination on the basis of "termination of pregnancy," it pressures healthcare providers who perform procedures such as a dilation and curettage for a miscarriage to perform the same procedure for an abortion.

### 2. Insurance Coverage

The Rule also requires covered entities to pay for medical transition procedures in their health insurance plans. The Rule states: "A covered entity shall not, in providing or administering health-related insurance . . . [h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition." 45 C.F.R. § 92.207(b)(4). According to HHS, this means that a plan excluding "coverage for all health services related to gender transition is unlawful on its face." 81 Fed. Reg. at 31429. In addition, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer would be required to cover that procedure on the same basis that it would cover a hysterectomy for other conditions (like cancer). *Id.* at 31429. Also, because the new Rule prohibits discrimination on the basis of "termination of pregnancy," it pressures employers who provide insurance coverage for procedures such as a dilation and curettage for a miscarriage to cover the same procedure for an abortion.

7

### 3. Enforcement

If a covered entity violates the Rule, it is subject to the same penalties that accompany a violation of Title IX. 45 C.F.R. § 92.301. These include the loss of federal funding (which, in the case of Medicare and Medicaid, can total many millions of dollars), debarment from doing business with the government, and false claims liability. 81 Fed. Reg. at 31472; 45 C.F.R. § 92.301. Penalties also include enforcement proceedings brought by the Department of Justice, 81 Fed. Reg. at 31440, and private lawsuits for damages and attorneys' fees. *Id.* at 31471; 45 C.F.R. § 92.301.

### F. Plaintiffs

### 1. Franciscan

Franciscan Alliance, Inc ("Franciscan") is a Roman Catholic nonprofit hospital system founded by a Roman Catholic order, the Sisters of St. Francis of Perpetual Adoration. App. 3 (Declaration of Sister Jane Marie Klein ¶ 3). Specialty Physicians is a member managed limited liability company, of which Franciscan is the sole member (collectively, "Franciscan"). App. 4 (Sister Klein Decl. ¶ 6). "All of Franciscan's healthcare services, and all of Franciscan's physicians and employees, follow the values of the Sisters of St. Francis." App. 6 (Sister Klein Decl. ¶ 12). As part of its religious practices, Franciscan provides extensive medical services for the elderly, poor, and disabled. App. 3-4, 14 (Sister Klein Decl. ¶¶ 5-6, 45-46). Many of those patients rely upon Medicare and Medicaid, and "Franciscan provides approximately 900 million dollars in Medicare and Medicaid services annually." App. 14 (Sister Klein Decl. ¶ 45).

Franciscan's religious beliefs require it to treat every person with compassion and respect. App. 6, 8 (Sister Klein Decl. ¶¶ 12, 17). As part of its religious practices, Franciscan provides care consistent with its religious beliefs and follows The Ethical and Religious Directives for Catholic Healthcare Services, issued by the U.S. Conference of Catholic Bishops. App. 7 (Sister Klein Decl. ¶ 14). Franciscan is committed to

care for transgender individuals with compassion and respect, and in accordance with both its medical judgment and religious beliefs, it does not participate in medical transition procedures. App. 6-10 (Sister Klein Decl. ¶¶ 12, 16-17, 23, 27). As a reflection of its medical judgment and religious beliefs, Franciscan developed its Sex Reassignment Interventions Policy, which states: "Sexual reassignment interventions require a complex set of psychological, psychiatric and ancillary care services that are not available at Franciscan facilities. Therefore, it would be medically imprudent to perform or otherwise facilitate any clinical interventions addressing sexual re-assignment needs. To provide or otherwise facilitate these services would also violate our deeply held religious beliefs." App. 16 (Franciscan Policy, Ex. A to Sister Klein Decl.). Also in keeping with its Catholic religious beliefs, Franciscan does not provide abortions or elective sterilizations. App. 8 (Sister Klein Decl. ¶ 19).

### 2. CMDA

Plaintiff the Christian Medical & Dental Society is an Illinois non-profit corporation doing business as the Christian Medical & Dental Associations. CMDA "exists to glorify God by motivating, educating and equipping Christian healthcare professionals and students." App. 19 (Declaration of Dr. David Stevens ¶ 8). CMDA members sign a statement of faith to join CMDA and allow CMDA to serve as a voice for membership values. App. 20 (Dr. Stevens Decl. ¶ 12). One of CMDA's major priorities is the adoption of ethical guidelines reflecting the beliefs of its members. App. 20 (Dr. Stevens Decl. ¶ 13). CMDA's House of Delegates unanimously adopted an ethics statement on gender transitions. As explained in that statement, "CMDA affirms the obligation of Christian healthcare professionals to care for patients struggling with gender identity with sensitivity and compassion. CMDA holds that attempts to alter gender surgically or hormonally for psychological indications . . . are medically inappropriate, as they . . . are unsupported by the witness of Scripture, and are incon-

sistent with Christian thinking on gender in every prior age. Accordingly, CMDA opposes medical assistance with gender transition . . . ." App. 28 (Transgender Identification Ethics Statement, Ex. A to Dr. Stevens Decl.). CMDA members share these beliefs. App. 20 (Dr. Stevens Decl. ¶ 14); App. 463-464 (Declaration of Dr. Robert P. Hoffman ¶ 5).

### 3. State Plaintiffs

The States of Texas, Wisconsin, Nebraska, Kentucky, Kansas, Louisiana, Arizona, and Mississippi have promulgated laws and standards demonstrating their sovereign interest in the practice of medicine within their borders. They also operate their own healthcare programs that receive federal funds and employ thousands of healthcare employees through their constituent agencies.

### G. The Effect of the Rule

The new Rule affects the Plaintiffs in multiple ways.

### 1. Franciscan

Franciscan provides hysterectomies to treat cancer and other diseases but not for gender transition. App. 9-10 (Sister Klein Decl. ¶¶ 23-25). Under the Rule, Franciscan will be required "to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31455. Similarly, Franciscan's hospitals provide services such as a dilation and curettage to women who have suffered a miscarriage. App. 10 (Sister Klein Decl. ¶ 28). Under the Rule, Franciscan and its physicians are pressured to provide the same service to women seeking an abortion. 45 C.F.R. § 92.4 (banning discrimination based upon termination of pregnancy). Franciscan hospitals and physicians also offer endocrinology services, mastectomies, and psychiatric support. App. 9 (Sister Klein Decl. ¶ 24). The Rule would force Franciscan to offer these services as part of a medical transition, which would violate Franciscan's medical judgment and its religious beliefs.

As part of its religious practices, Franciscan also provides its employees with health benefits. App. 11 (Sister Klein Decl. ¶ 31). Like its other operations, Franciscan's health benefits are operated in accordance with its religious beliefs. *Id.* In accordance with those beliefs, Franciscan's benefits plan specifically excludes coverage for any "[t]reatment, drugs, medicines, services, and supplies related to gender transition," as well as sterilizations and abortions. *Id.* Franciscan sincerely believes that providing coverage for these procedures would harm its employees and constitute impermissible material cooperation with evil. App. 11 (Sister Klein Decl. ¶ 32). As of January 1, 2017, however, that plan will be illegal. 81 Fed. Reg. at 31472; 45 C.F.R. § 92.207(b)(4)-(5). Unless Franciscan denies its faith, it faces enforcement actions, private lawsuits, and the loss of hundreds of millions in Medicare and Medicaid payments, which would destroy its ability to carry out its religious mission to serve the poor, disabled, and elderly. App. 13-14 (Sister Klein Decl. ¶ 43-44).

### 2. CMDA

CMDA members are in the same untenable position as Franciscan. Many CMDA members are subject to the Rule because they receive federal funds and provide medical services such as hysterectomies and endocrinology services or provide insurance coverage to their employees. App. 22-23 (Dr. Stevens Decl. ¶ 18). If CMDA members adhere to their religious beliefs, they are subject to crippling financial penalties.

### 3. State Plaintiffs

The new Rule also harms the States. Because the States provide medical care at state-run facilities, they will be required to provide medical transition procedures, even when their doctors believe such procedures are harmful. If their doctors have a religious objection to performing those procedures, the Rule makes it illegal for the States to accommodate those doctors' religious beliefs, even though Title VII would otherwise require them to do so. The Rule also compels the States to provide insur-

ance coverage for medical transition procedures and abortion procedures at significant financial cost. It imposes significant training costs, which HHS estimates will be $17.8 million in the first two years of implementation alone. 81 Fed. Reg. at 31463, 31464. And if the States do not comply, they face massive financial penalties. Texas, for example, faces the loss of over $42.4 billion a year in healthcare funding to serve its most vulnerable citizens. Finally, the Rule would subject Texas and other States to private lawsuits for damages and attorneys' fees, even though these States never waived their sovereign immunity.

## ARGUMENT

### I. The Rule violates the Administrative Procedure Act.

Under the Administrative Procedure Act ("APA"), courts must "hold unlawful and set aside" agency actions that are "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)&(C). When analyzing a regulation under the APA, courts use "the familiar two-step framework articulated in *Chevron*." *Tex. Pipeline Ass'n v. F.E.R.C.*, 661 F.3d 258, 260 (5th Cir. 2011). First, courts use the "traditional tools of statutory construction" to interpret the statute "*de novo.*" *Id.* If "the intent of Congress is clear, then the matter is at an end, and the challenged regulation will stand or fall in accordance with the unambiguous will of Congress." *Id.* Second, if the statute is "genuinely ambiguous," then the court "will defer to the agency's construction of the statute so long as it is a permissible one." *Id.* Here, the Rule conflicts with the unambiguous text of the statute, so the Rule must be set aside at the first step.

### A. HHS's interpretation of "sex" to include "gender identity" is contrary to law.

The new Rule prohibits discrimination "on the basis of sex" in certain health activities, and defines "on the basis of sex" to include, among other things, "gender identity." 45 C.F.R. § 92.101(a)(1), § 92.4. It defines "gender identity" as an individual's

"internal sense of gender, which may be male, female, neither, or a combination of male and female." 45 C.F.R. § 92.4. The "gender identity spectrum includes an array of possible gender identities beyond male and female," and "individuals with non-binary gender identities are protected under the rule." 81 Fed. Reg. at 31392, 31384.

The purported authority for this Rule is Section 1557 of the Affordable Care Act, which forbids federally funded health programs from discriminating "on the ground prohibited under" four other federal statutes:

- Title VI, 42 U.S.C. § 2000d ("race, color, or national origin");
- Title IX, 20 U.S.C. § 1681 ("sex");
- The Age Discrimination Act, 42 U.S.C. § 6101 ("age"); and
- The Rehabilitation Act, 29 U.S.C. § 794 ("disability").

Section 1557 does not itself use the term "sex"; instead, it simply incorporates the prohibition contained in Title IX. Thus, Section 1557's meaning turns on the meaning of Title IX.

Title IX's key operative provision states: "No person in the United States shall, on the basis of *sex*, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681 (emphasis added). Thus, one key question in this case is the meaning of the term "sex" in Title IX—specifically, whether "sex" means the physiological differences between male and female, or whether it also includes the concept of "gender identity."

To answer that question, the Court must use the "traditional tools of statutory construction," including the statute's "text," "history," and "purpose." *Contender Farms, L.L.P. v. U.S.D.A.*, 779 F.3d 258, 269 (5th Cir. 2015). The Court "(1) [must] begin with the statute's language; (2) [must] give undefined words 'their ordinary,

contemporary, common meaning;' (3) [must] read the statute's words in proper con-text and consider them based on the statute as a whole; and (4) [must] consider a statute's terms in the light of the statute's purposes." *Id.* Here, the text, history, and purpose of Title IX all confirm what this Court and many others have already con-cluded: "[T]he plain meaning of the term sex" in Title IX "meant the biological and anatomical differences between male and female students as determined at their birth." *Texas v. United States*, No. 7:16-CV-00054-O, 2016 WL 4426495, at *14 (N.D. Tex. Aug. 21, 2016).[10]

**Text.** Because Title IX does not define the term "sex," this Court must give the term its "ordinary, contemporary, common meaning." *Contender Farms*, 779 F.3d at 269. As this Court has explained, when Title IX passed, virtually every dictionary

---

[10] *See also, e.g.*:

- *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221 (10th Cir. 2007) ("This court agrees with . . . the vast majority of federal courts to have addressed this issue and concludes discrimination against a transsexual based on the person's status as a transsexual is not discrimination because of sex . . . .");

- *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) ("The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men. The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder.");

- *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982) ("[T]he word 'sex' in Title VII is to be given its traditional definition, rather than an expansive interpreta-tion. . . . [D]iscrimination based on one's transsexualism does not fall within the pro-tective purview of the Act.");

- *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 674 (W.D. Pa. 2015), appeal dismissed (Mar. 30, 2016) ("Title IX does not prohibit discrim-ination on the basis of transgender itself because transgender is not a protected char-acteristic under the statute.");

- *Sweet v. Mulberry Lutheran Home*, No. IP02-0320-C-H/K, 2003 WL 21525058, at *2 (S.D. Ind. June 17, 2003) (Hamilton, J.) ("[D]iscrimination on the basis of sex means discrimination on the basis of the plaintiff's biological sex, not sexual orientation or sexual identity, including an intention to change sex.").

definition of "sex" referred to physiological distinctions between females and males, particularly with respect to their reproductive functions. *Texas v. United States*, 2016 WL 4426495, at *14-15 (citing *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 736 (4th Cir. 2016) (Niemeyer, J., dissenting)).[11]

The term "gender identity," by contrast, was rarely used. Until the 1950s, the term "gender" was used primarily by linguists to refer to a form of grammatical classification. Joanne Meyerowitz, *A History of "Gender,"* 113 Am. Hist. Rev. 1346, 1353 (2008). But in the mid-1950s, the psychologist John Money appropriated the term "gender" to refer to culturally determined roles for men and women. *Id.* at 1354. In his view, "gender" was learned in early childhood and was distinct from, and not determined by, "biological sex." *Id.* Other social scientists picked up on this new usage, and in 1963, Robert Stoller, a UCLA psychoanalyst, coined the term "gender identity." David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles, 1945–2001*, Archives of Sexual Behav., Apr. 2004, at 93. He, too, contrasted "sex" with "gender," arguing that "sex was biological but gender was social." *Id.* That usage was further popularized by feminist authors in the 1970s. Meyerowitz, *A History of "Gender,"* at 1353. Thus, to the extent the terms "gender" or "gender identity" were used at the time of Title IX's passage, they were used in *contrast* to "sex": "gender" referred to socially constructed roles, while "sex" referred to biological differences between men and women. That contrast remains common today.[12]

**Purpose.** This understanding of the term "sex" also fits with Title IX's purpose.

---

[11] *See, e.g.*, American Heritage Dictionary 1187 (1976); Webster's Third New Int'l Dictionary 2081 (1971); 9 Oxford English Dictionary 578 (1961).

[12] *See, e.g.*, Sari L. Reisner et al., *"Counting" Transgender and Gender-Nonconforming Adults in Health Research*, Transgender Stud. Q., Feb. 2015, at 37 ("Gender typically refers to cultural meanings ascribed to or associated with patterns of behavior, experience, and personality that are labeled as feminine or masculine"; "[s]ex refers to biological differences among females and males, such as genetics, hormones, secondary sex characteristics, and anatomy."); New Oxford American Dictionary 721–22, 1600 (3d ed. 2010) ("gender" is defined in social and cultural terms and "sex" in biological terms).

Title IX was enacted at a time of pervasive discrimination in education against women. 44 Fed. Reg. at 71423. It grew out of a series of congressional hearings on discrimination against women. *N. Haven Bd. of Ed.*, 456 U.S. at 523 n.13. Its chief sponsor said it was "an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice . . ." 118 Cong. Rec. 5808 (1972). Thus, the purpose of Title IX was to ensure equal opportunities in education for women. There is no hint of any congressional purpose to be legislating in any way on the basis of "gender identity."

**Structure.** This understanding of the term "sex" is also reflected throughout the statute, which requires equal treatment with respect to two different "sexes"—male and female. For example, the main operative section of Title IX states that if certain activities are provided for students of "one sex," comparable activities must be provided for students of "the other sex." 20 U.S.C. § 1681(a)(8). It also provides that schools may transition from admitting students of "only one sex" to admitting students of "both sexes." 20 U.S.C. § 1681(a)(2). If, as HHS claims, the term "sex" includes an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female," 45 C.F.R. § 92.4, it makes no sense to refer to students of either "one sex" or "the other sex," 20 U.S.C. § 1681(a)(8).

**History.** This understanding of "sex" is also consistent with Title IX's history. Of course, the term "gender identity," and even the concept, appears nowhere in the legislative history of Title IX. Rather, "[t]he legislative history of Title IX clearly shows that it was enacted because of discrimination that currently was being practiced against women in educational institutions." 44 Fed. Reg. at 71423. That is also how Title IX has been interpreted by the courts for decades. *N. Haven Bd. of Ed.*, 456 U.S. at 517-20; *Cannon*, 441 U.S. at 680; *Pederson*, 213 F.3d at 880.

More importantly, both when Title IX was enacted, and ever since, Congress has treated "sex" and "gender identity" (along with "sexual orientation") as distinct. In

the 1970s, Congress rejected several proposals to amend the Civil Rights Act to add the category of "sexual orientation."[13] Similarly, in 1994, Congress rejected the Employment Non-Discrimination Act ("ENDA"), which sought to prohibit employment discrimination on the basis of "sexual orientation."[14] In 2007, 2009, and 2011, Congress rejected a broader version of ENDA, which, for the first time, sought to add protections for "gender identity."[15] In 2013 and 2015, Congress rejected proposals to amend Title IX to add protections for "gender identity."[16] And Congress has so far rejected a proposal to do precisely what the new Rule purports to do—prohibit discrimination in federally funded programs on the basis of "gender identity."[17] None of these proposals makes any sense if Title IX and Title VII *already* prohibited such discrimination.

But not every proposal to add protections for "gender identity" failed. In 2010, Congress enacted hate crimes legislation providing enhanced penalties for crimes motivated by "gender identity." 18 U.S.C. § 249(a)(2). And in 2013, Congress reauthorized the Violence Against Women Act, prohibiting discrimination in certain funding programs on the basis of both "sex" and "gender identity." 42 U.S.C. § 13925(b)(13)(A). These Congressional actions—both those rejecting new protections for "gender identity," and those expressly adding new protections for "gender identity" alongside "sex"—show that Congress understands "sex" and "gender identity" to be distinct and is fully capable of including both concepts when it wants to.

---

[13] H.R. 14752, 93rd Cong. (1974); H.R. 166, 94th Cong. (1975); H.R. 2074, 96th Cong. (1979); S. 2081, 96th Cong. (1979).

[14] H.R. 4636, 103rd Cong. (1994).

[15] H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011).

[16] H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).

[17] H.R. 3185, 114th Cong. (2015); S. 1858, 114th Cong. (2015).

The same is true of federal agencies. For the first 38 years after Title IX's enactment, federal agencies issued numerous regulations, memos, and guidance documents interpreting Title IX. Those pronouncements uniformly reflected a definition of "sex" based on the physiological differences between men and women. *See, e.g.*, *supra* Statement of Facts 2. None mentioned "gender identity." This uniform interpretation of "sex" by federal agencies is further evidence of the term's "ordinary, contemporary, common meaning." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997).

It was not until 2010 that federal agencies began issuing a rash of new pronouncements arguing that the term "sex" includes "gender identity." *See supra* Statement of Facts 3-5. Not surprisingly, these pronouncements, including the Rule at issue here, were hailed as "groundbreaking."[18] But they were "groundbreaking" precisely because the ordinary meaning of the term "sex"—and the existing reach of the relevant statutes—does *not* include "gender identity." And "groundbreaking" changes in the law are supposed to be made by the democratically-elected Congress, not unelected agencies. *See Etsitty*, 502 F.3d at 1222 ("If transsexuals are to receive legal protection apart from their status as male or female, however, such protection must come from Congress and not the courts."); *Ulane*, 742 F.2d at 1086 ("If Congress believes that transsexuals should enjoy the protection of Title VII, it may so provide.").

In short, the term "sex" is not ambiguous. It refers to the biological differences between males and females. HHS's attempt to make it mean something different violates the APA.

---

[18] Lena H. Sun & Lenny Bernstein, *U.S. Moves to Protect Women, Transgender People in Health Care*, Washington Post, Sep. 3, 2015 (The new Rule "for the first time includes bans on gender identity discrimination as a form of sexual discrimination, language that advocacy groups have pushed for and immediately hailed as groundbreaking.").

### B. HHS's failure to include religious or abortion-related exemptions is contrary to law, arbitrary and capricious, and in excess of statutory authority.

HHS's Rule is also "contrary to law" and "in excess of statutory authority" because it attempts to regulate conduct in a way that is expressly foreclosed by the controlling statutes. Title IX, as incorporated by Section 1557, includes two exemptions relevant here: one for religious organizations, and one for abortion. Yet despite the fact that Section 1557 incorporated these exemptions, HHS refused to incorporate or obey them in its Rule. Its refusal to do so is contrary to law and in excess of statutory jurisdiction and authority under the APA.

### 1. The Rule is contrary to law, arbitrary and capricious, and exceeds statutory authority because it fails to include Title IX's exemption for religious entities.

The Fifth Circuit has not hesitated to strike down regulations that ignore exemptions in the controlling statute. For example, in *Texas Pipeline Association*, the agency promulgated a rule purporting to regulate the activities of certain *intra*state pipelines, even though the statutory text only authorized the agency to regulate these activities with respect to "*inter*state commerce." 661 F.3d at 259–61. The Fifth Circuit held that the agency had "unambiguously exceed[ed] the authority granted" by the relevant statute by attempting "to regulate entities specifically excluded from" the statute. *Id.* at 262, 264.

Here, HHS has attempted to do the same thing: regulate entities that are "specifically excluded from" the statute. Title IX's prohibition on sex discrimination includes a broad exemption stating that Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681. Thus when *Congress* wrote Section 1557 to incorporate "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)," 42 U.S.C. § 18116(a), it necessarily included the religious exemption in § 1681. Yet despite many requests to

apply this exemption in the Regulation,[19] HHS refused.

Notably, for other prohibited areas of discrimination—including race, color, national origin, age and disability—HHS complied with Congress's incorporation of existing exceptions into its interpretation of Section 1557. 45 C.F.R. § 92.101 ("The exceptions applicable to Title VI apply to discrimination on the basis of race, color, or national origin under this part. The exceptions applicable to Section 504 apply to discrimination on the basis of disability under this part. The exceptions applicable to the Age Act apply to discrimination on the basis of age under this part."); *see also* 81 Fed. Reg. at 31378. But when it came to Title IX's religious exemption, HHS parted ways with Congress. HHS stated that "certain protections already exist in Federal law with respect to religious beliefs," and that "applying the protections in those laws"—rather than using the religious exemption Congress itself had incorporated into 1557—"offers the best and most appropriate approach for resolving any conflicts between religious beliefs and Section 1557 requirements." *Id.* at 31379-80. In other words, rather than adopting Congress's blanket exemption for religious organizations in Title IX, HHS said it would rather make its own "determinations on a case-by-case basis, based on a thorough analysis and relying on the extensive case law interpreting [other legal] standards." *Id.* at 31380.

HHS also declined to follow Title IX's religious exemption because HHS said the exemption is "limited in scope to educational institutions." *Id.* But of course it is. *All of Title IX*—including its ban on sex discrimination—is limited to "educational institution[s]." 20 U.S.C. § 1681. When Congress brought the ban on sex discrimination

---

[19] *See, e.g.*, United States Conference of Catholic Bishops, et al., Comment Letter on Proposed Rule (Nov. 6, 2015), http://www.usccb.org/about/general-counsel/rulemaking/upload/Comments-Proposal-HHS-Reg-Nondiscrimination-Federally-Funded-Health.pdf (writing on behalf of ten religious groups); Council for Christian Colleges & Universities, Comment Letter on Proposed Rule (Nov. 9, 2015), https://www.regulations.gov/document?D=HHS-OCR-2015-0006-1041 (writing on behalf of 143 religious colleges and universities).

into the healthcare context, it also brought the religious exemption. Both provisions are in the same section of the same statute, and both are expressly incorporated by Section 1557. HHS's refusal to incorporate both is arbitrary and capricious.

### 2. The Rule is contrary to law, arbitrary and capricious, and exceeds statutory authority because it ignores Title IX's abortion exemption.

The new Rule is equally dismissive of congressional intent on the issue of abortion. Title IX makes crystal clear that the ban on "sex" discrimination cannot be used as a means of requiring services or insurance coverage relating to abortion: "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

In its Proposed Rule, however, HHS did precisely what Congress forbade: it expanded the definition of sex discrimination to include discrimination on the basis of a "termination of pregnancy." Understandably, several commenters expressed concern that this language "might be read to require the provision of, or coverage or referral for, abortion,"[20] and asked HHS to clarify that it would not.

Again, however, HHS refused to abide by the limitations Congress included in Title IX. Instead, it simply noted the existence of *other* exemptions and conscience protections in federal law. 81 Fed. Reg. at 31380, 31388. HHS's references to these statutory protections is cold comfort, given that HHS recently interpreted some of these protections, including the Weldon Amendment, very narrowly, giving California a green light to force insurance providers to cover elective abortions, even though churches and other religious organizations objected to abortion being included in

---

[20] United States Conference of Catholic Bishops, et al., Comment Letter on Proposed Rule (Nov. 6, 2015), http://www.usccb.org/about/general-counsel/rulemaking/upload/Comments-Proposal-HHS-Reg-Nondiscrimination-Federally-Funded-Health.pdf.

their insurance plans.[21] More importantly, HHS's refusal to follow the plain text of Title IX exceeds its statutory authority. Congress incorporated "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)," 42 U.S.C. § 18116(a)—which includes the abortion exemption—and it is not for the agency to cherry-pick which parts it will follow.

## C. HHS's failure to allow employers to accommodate employees' religious beliefs is contrary to Title VII.

HHS's Rule is also contrary to Title VII, because it makes it illegal for employers to accommodate the religious beliefs of their employees. State Plaintiffs, for example, employ thousands of healthcare workers, some of whom have religious objections to participating in medical transition procedures. Similarly, many members of CMDA work for nonreligious employers. *See, e.g.*, App. 465-66 (Dr. Hoffman Decl. ¶ 12). Under Title VII, these employers are obligated to provide reasonable accommodations for their employees' religious beliefs, as long as doing so does not impose an undue hardship on the employer. 42 U.S.C. §§ 2000e-2, 2000e(j); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015). And providing those accommodations is not difficult, particularly when other doctors are available to perform the requested procedures. *See, e.g.*, App. 465-66 (Dr. Hoffman Decl. ¶ 12).

But the new Rule now makes these accommodations illegal. For example, the Rule says that if a doctor "works as an attending physician at a hospital," then not just the doctor but also "the hospital may be responsible for discrimination by the doctor's practice that occurs at the hospital." 81 Fed. Reg. at 31384 & n.40. The Rule also states that the hospital "will be held accountable for discrimination under Section 1557" where "a doctor is an employee of a hospital." *Id.* at 31384. Thus, the Rule puts

---

[21] Letter from Jocelyn Samuels, Dir., Office for Civil Rights, Dep't of Health & Human Servs., to Catherine W. Short, et al. (June 21, 2016), https://adflegal.blob.core.windows.net/web-content-dev/docs/default-source/documents/resources/media-resources/cdmhc-investigation-closure-letter.pdf?sfvrsn=2.

employers to an impossible choice: They must either force their doctors and nurses to participate in gender transition procedures in violation of Title VII, or they must violate the new Rule. Because the new Rule conflicts with Title VII, it must be set aside under the APA.[22]

### D. HHS's attempt to commandeer the States is contrary to the Tenth Amendment.

Finally, HHS's Rule is contrary to law because it attempts to commandeer the States in violation of the Tenth Amendment, as explained by the States in their summary judgment brief. We adopt and incorporate that argument by reference here.

## II. The Rule violates the Religious Freedom Restoration Act.

The new Rule also violates the Religious Freedom Restoration Act ("RFRA"). RFRA is a federal civil rights law that provides "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). It provides that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

RFRA claims proceed in two steps. First, the court must determine whether the government has imposed a "substantial burden" on the plaintiffs' religious exercise. To do that, it must (a) identify a sincere religious exercise, and (b) determine whether the government has placed substantial pressure on plaintiffs to abstain from that religious exercise. *Hobby Lobby,* 134 S. Ct. at 2775. Second, if a substantial burden

---

[22] *See, e.g., I.R.S., Fresno Serv. Ctr. v. FLRA*, 706 F.2d 1019, 1025 (9th Cir. 1983) (setting aside agency action that was inconsistent with Title VII); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 190 (3d Cir. 1983) (APA may be violated "when agency action, not clearly mandated by the agency's statute, begins to encroach on congressional policies expressed elsewhere"); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) (invalidating a regulation under one statute because it conflicted with another statute); *Zabel v. Tabb*, 430 F.2d 199, 209 (5th Cir. 1970) ("Governmental agencies in executing a particular statutory responsibility ordinarily are required to take heed of, sometimes effectuate and other times not thwart other valid statutory governmental policies.")

exists, the government must satisfy strict scrutiny—that is, it must "'demonstrate[] that application of the burden to the person represents the least restrictive means of advancing a compelling interest." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006). Here, the Rule substantially burdens Plaintiffs' religious exercise by requiring them, on pain of massive financial liability, to perform and pay for controversial medical procedures in violation of their religious beliefs. And the Rule does not even come close to satisfying strict scrutiny.

### A. Franciscan and CMDA members sincerely exercise religion by not performing or covering medical transitions or abortions.

Consistent with its religious beliefs, Franciscan is committed to care for transgender individuals with compassion and respect. That means that it cannot, in accordance with its religious beliefs and medical judgment, participate in medical transition procedures. App. 6-8 (Sister Klein Decl. ¶ 12, 16-18); App. 16 (Franciscan Policy, Ex. A to Sister Klein Decl.). Nor can it provide insurance coverage for those procedures. App. 11 (Sister Klein Decl. ¶ 31-32). To do so would be to harm its employees and to engage in material cooperation with evil. *Id.* The same is true of performing or covering sterilization or abortion. *Id.*

CMDA members are in the same position. CMDA's House of Delegates unanimously adopted an ethics statement forbidding assistance with gender transition. App. 28 (Transgender Identification Ethics Statement, Ex. A to Dr. Stevens Decl.). CMDA members share these beliefs. App. 20 (Dr. Stevens Decl. ¶ 14); App. 463-64 (Dr. Hoffman Decl. ¶ 5). Many also provide health coverage for employees and believe that they cannot "collaborate" with "interventions to alter normal sexual anatomy to conform to transgender desires." App. 24 (Dr. Stevens Decl. ¶ 20); App. 28 (Transgender Identification Ethics Statement, Ex. A to Dr. Stevens Decl.). CMDA is likewise opposed to abortion. App. 22 (Dr. Stevens Decl. ¶ 17).

In short, these Plaintiffs "sincerely believe that providing the [medical procedures

or] insurance coverage demanded by the HHS regulations lies on the forbidden side of the line . . . ." *Hobby Lobby*, 134 S. Ct. at 2779. In that circumstance, the Court's "'narrow function . . . is to determine' whether the line drawn reflects 'an honest conviction.'" *Id*. There is no doubt that Plaintiffs' actions reflect an honest conviction.

### B. The Rule substantially burdens Plaintiffs' religious exercise by imposing massive financial penalties.

Having identified the Plaintiffs' religious exercise, the next step is to determine whether the government-imposed burden on that religious exercise is substantial. Here, the burdens imposed by the Rule are obviously substantial. If Franciscan and CMDA continue to engage in their religious exercise, they will be subject to massive financial penalties, including the following: loss of federal funding, including Medicare and Medicaid funds, which will cost Franciscan up to $900,000,000 per year, 81 Fed. Reg. at 31472; 45 C.F.R. § 92.301; debarment from contracting with the federal government; enforcement proceedings brought by the Department of Justice; liability under the False Claims Act, including treble damages, 81 Fed. Reg. at 31440; and private lawsuits brought by patients or employees for damages and attorneys' fees, *id.* at 31472; 45 C.F.R. § 92.301. Several entities with policies similar to Franciscan and CMDA have already been sued since the new Rule was issued in May. *See, e.g.*, Compl., *Prescott v. Rady Children's Hosp. - San Diego*, No. 16-2408 (S.D. Cal. Sept. 26, 2016); Compl., *Dovel v. Pub. Library of Cincinnati and Hamilton Cty.*, No. 16-955 (S.D. Ohio Sept. 26, 2016); Compl., *Robinson v. Dignity Health*, No. 16-3035 (N.D. Cal. June 6, 2016).

Financial penalties imposed on a religious practice are the quintessential example of a substantial burden. *See, e.g.*, *Hobby Lobby*, 134 S. Ct. at 2775-76 ("We have little trouble concluding that . . . substantial economic consequences" constitute a substantial burden). In *Hobby Lobby*, for example, the Court said that "[b]ecause the [Rule] forces [plaintiffs] to pay an enormous sum of money . . . if they insist on providing

insurance coverage in accordance with their religious beliefs, the [Rule] clearly imposes a substantial burden on those beliefs." *Hobby Lobby*, 134 S. Ct. at 2779. This is an *a fortiori* case. The Rule imposes the same sort of enormous financial penalties, only this time, Plaintiffs are not only being forced to "provid[e] insurance coverage" for procedures that violate their religious beliefs, they are also being forced to perform the procedures themselves.

### C. The Rule cannot satisfy strict scrutiny.

Because the Rule imposes a substantial burden on Plaintiffs' religious exercise, the only remaining question is whether the Rule satisfies strict scrutiny. Strict scrutiny under RFRA is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). Under that test, the government must demonstrate that the Rule furthers an interest "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). It must make this showing not "in the abstract" but "in the circumstances of this case." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000). And it "must show by specific evidence that [Plaintiffs'] religious practices jeopardize its stated interests." *Merced v. Kasson*, 577 F.3d 578, 592 (5th Cir. 2009). It cannot do so here.

### 1. The Rule furthers no compelling interest.

The government claims it has "a compelling interest in ensuring that individuals have nondiscriminatory access to health care and health coverage." 81 Fed. Reg. at 31380. But this supposed interest is stated at such a broad level of generality that it defies meaningful application of strict scrutiny. RFRA requires courts "to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing the [Rule] in [this case]." *Hobby Lobby*, 134 S. Ct. at 2779. The Rule offers no basis for concluding that Plaintiffs are undermining any specific, compelling interest.

The government cannot claim that the Rule protects individuals from sex discrimination, since "sex" was not understood by Congress to include gender identity. *See supra* Statement of Facts 2-3. Even assuming "sex" means "gender identity," the statutes incorporated in Section 1557 carve out broad exemptions for religious organizations and abortion. *See supra* Part II 19. Thus, the supposed interest in universal provision of medical transition services supposedly advanced by the Rule is not even an interest Congress chose to advance in the statute—much less a compelling one.

Nor can HHS have a compelling interest in forcing private doctors to perform procedures that HHS's own experts admit are potentially harmful. As HHS's medical experts wrote earlier this year: "Based on a thorough review of the clinical evidence available at this time, there is not *enough evidence to determine whether gender reassignment surgery improves health outcomes* for Medicare beneficiaries with gender dysphoria." App. 648 (Centers for Medicare & Medicaid Services, *Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (June 2, 2016) https://www.cms.gov/medicare-coverage-database/details/nca-proposed-decision-memo.aspx?NCAId=282 (emphasis added) ("CMS Proposed Decision Memo")). "There were conflicting (inconsistent) study results—of the best designed studies, some reported benefits while *others reported harms.*" *Id.* (emphasis added). For that reason, Medicare and Medicaid do not require coverage for gender reassignment surgery, but allow states and local administrators to make coverage determinations on a case-by-case basis. App. 734 (Centers for Medicare & Medicaid Services, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (Aug. 30, 2016), https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282). Many states forbid coverage entirely—with the full consent of HHS. This creates a bizarre situation—doctors are required under the Rule to perform and provide coverage for medical transition procedures because they accept

Medicare and Medicaid, but Medicare and Medicaid often do not cover those procedures themselves because they are potentially harmful.

There are also sound medical reasons for not covering these procedures, particularly for children. App. 464-65 (Dr. Hoffman Decl. ¶ 9-10); App. 20-22 (Dr. Stevens Decl. ¶¶ 15-16). As guidance documents that HHS relied upon explain: "Gender dysphoria during childhood does not inevitably continue into adulthood. Rather, in follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6–23% of children."[23] The same report noted that "Newer studies, also including girls, showed a 12–27% persistence rate of gender dysphoria into adulthood." *Id.* Given that the overwhelming majority of children will not experience gender dysphoria into adulthood, the government cannot hope to prove that it has a compelling interest in requiring plaintiffs to provide puberty suppression hormones, cross-sex hormones, and other medical transition procedures for children.

Whether for children or adults, medical transition procedures also carry significant risks. The Institute of Medicine noted that transgender individuals "may be at increased risk for breast, ovarian, uterine, or prostate cancer as a result of hormone therapy."[24] The same study found that "[l]onger duration of hormone use . . . may well exacerbate the effects of aging, such as cardiac or pulmonary problems." *Id.* at 265. The WPATH report notes that hormone therapy is associated with increased risk of cardiovascular disease, Type 2 diabetes, gallstones, venous thromboembolic disease,

---

[23] App. 484 (World Prof'l Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People, 11 (7th ed. 2012), http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1351&pk_association_webpage=3926 (footnote omitted) (WPATH Report) (cited in 81 Fed. Reg. at 31435 n.263)).

[24] Institute of Medicine of the National Academies, The Health of Lesbian, Gay, Bisexual and Transgender People: Building a Foundation for Better Understanding, 264 (2011), http://www.becketfund.org/wp-content/uploads/2016/08/The-Health-of-LGBT-People_Book.pdf.

and hypertension. App. 513 (WPATH Report at 40); *see also* App. 464-65 (Dr. Hoffman Decl. ¶ 9-10); App. 20-22 (Dr. Stevens Decl. ¶¶ 15-16). The government cannot prove that it has a compelling interest in requiring doctors to perform procedures with significant long-term health impacts against their medical judgment. This is a matter for careful consideration by medical professionals considering the issues, not across-the-board rules, issued in a for-thee-but-not-for-me fashion, by political appointees in Washington. *Cf.* 42 U.S.C. § 1395 ("Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided.").

With regard to abortions, Congress has long provided exemptions for medical professionals who cannot participate in abortion. The Rule itself notes that "the proposed rule would not displace the protections afforded by provider conscience laws," or "provisions in the ACA related to abortion services." 81 Fed. Reg. at 31379-80 (citing 42 U.S.C. § 300a-7; 42 U.S.C. § 238n; Consolidated and Further Continuing Appropriations Act 2015, Pub. L. 114-53, Div. G, § 507(d) (Dec. 16, 2015); 42 U.S.C. § 18023). Therefore, the government has no compelling interest in forcing Plaintiffs to participate.

The government's attempt to compel insurance coverage for medical transitions and abortion fails for similar reasons. As many courts have recognized, "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547; *Merced v. Kasson*, 577 F.3d 578, 594 (5th Cir. 2009) ("[E]xceptions weaken [the government's] asserted interests."); *Tagore v. United States*, 735 F.3d 324, 330-31 (5th Cir. 2013) (same). Here, the government has exempted *its own insurance programs* from the Rule. As described above, Medicare and Medicaid are exempt. So is TRI-CARE, the military's insurance program, which excludes coverage for "[a]ll services

and supplies directly and or indirectly related to surgical treatment for gender dysphoria . . . .” TRICARE Policy Manual 6010.57-M, Chapter 7, Section 1.2 at 4.1 (updated: Sept. 6, 2016). TRICARE also excludes cross-sex hormones for children under 16, *id.* at 3.2.2.3, and pubertal suppression for prepubertal children. *Id.* at 3.2.3.1. And TRICARE protects the religious beliefs of physicians who object to performing gender transition procedures: “In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs.” App. 884-85 (Mem. from Karen S. Guice, Acting Assistant Sec’y of Def. to Assistant Sec’y of the Army, et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members 2-3 (July 29, 2016), http://www.defense.gov/Portals/1/features/2016/0616_policy/Guidance_for_Treatment_of_Gender_Dysphoria_Memo_FINAL_SIGNED.pdf (TRICARE Memo)). In short, the government seeks to impose on Plaintiffs a rule that has massive exemptions for the government itself.

With regard to pregnancy termination, courts have long held that the right to an abortion does not include the right to an abortion at another’s expense. *See Harris v. McRae*, 448 U.S. 297 (1980) (upholding the Hyde Amendment, which restricts government funding for abortions). Congress ensured that insurers would not be required to cover abortions under the ACA. *See* 42 U.S.C. § 18023. The agency cannot now claim a compelling interest in doing the opposite.

## 2. Defendants have numerous less restrictive means of furthering their interests.

Even assuming the Rule furthered a compelling governmental interest—and it does not—the Rule also fails strict scrutiny because there are numerous less restrictive alternatives. “The least-restrictive-means standard is exceptionally demanding,” and it requires the government to “sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the

objecting part[y]." *Hobby Lobby,* 134 S. Ct. at 2780. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (quoting *United States v. Playboy Entm't Grp., Inc.,* 529 U.S. 803, 815 (2000)). Numerous alternatives are available here.

If the government wishes to increase access to transition services and insurance coverage for those services, "The most straightforward way of doing this would be for the Government to assume the cost of providing the [procedures] at issue to any [individuals] who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Hobby Lobby,* 134 S. Ct. at 2780. There, as here, "HHS has not shown, see § 2000bb−1(b)(2), that this is not a viable alternative." *Id.* In order to meet this burden of proof, the government should produce "statistics regarding the number of [people] who might be affected," "provide[] an[] estimate of the average cost per [person]," and demonstrate that such costs are excessive compared to the other costs of compliance it has accepted with the ACA. *Id.* at 2780-81.

The government could also set up an alternative system for provision of benefits. Indeed, the government has already essentially done so: It requires insurance plans on its own exchanges to offer this coverage. The government need not coerce religious charities when it has created its own marketplaces to offer this type of care to those who wish to obtain it. The government also offers credits to those who need help affording health care on the exchanges; those same credits could be made available to individuals who do not have this coverage through their employers. The government could also set up an alternative coverage mechanism, as it has done with the preventive services mandate. *See Hobby Lobby,* 134 S. Ct. at 2781-82.

The government also has many alternatives available besides coercing the participation of medical professionals. Many doctors and hospitals provide medical transition services; in fact, many hospitals have established centers of excellence offering coordinated care for transgender patients. *See, e.g.*, *Trans Health Clinics*, Trans-

Health.com, http://www.trans-health.com/clinics/ (last updated Aug. 4, 2016) (listing "health clinics that specialize in trans health care"). If the government wants to increase access to gender transition services—and if it wants to get better care for people who want them—the government could partner with willing professionals to increase access to such facilities. It could assist transgender individuals in finding centers of excellence, clinics, or individual doctors who provide medical transition services. It could train health care navigators to assist individuals in finding such services, just as it does with assisting individuals to find plans on the exchanges. Such options would not only increase access to health care for transgender individuals, they would focus upon doctors with special expertise in transgender issues, rather than conscripting unwilling doctors who may not have the necessary expertise.

## III. The Rule violates the Spending Clause.

The Rule also violates the Spending Clause for the reasons set forth by the States in their summary judgment brief, which we adopt and incorporate by reference here. When Congress legislates under the spending power, any "conditions imposed on the recipients must be unambiguous." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 279 (5th Cir. 2005) (citing *South Dakota v. Dole*, 483 U.S. 203, 207-08 (1987)). But here, there is no plausible argument that Congress unambiguously informed the States that their receipt of Medicare and Medicaid funds was conditioned on embracing the agency's newly minted definition of the term "sex." That definition was unheard of when Medicaid and Medicare were adopted in 1965. And that definition is flatly inconsistent with Title IX and the ACA.

## IV.  The Rule violates the Free Speech Clause.

The Rule also violates the Free Speech Clause by prohibiting doctors from expressing some points of view and compelling them to express others. Under the First Amendment, "[t]he government may not prohibit the dissemination of ideas that it

disfavors, nor compel the endorsement of ideas that it approves . . . . The First Amendment protects the decision of both what to say and what not to say." *Knox v. Serv. Emp. Int'l Union*, 132 S. Ct. 2277, 2288 (2012) (citations and quotation omitted).

The Rule tramples on this bedrock constitutional principle. Despite widespread, well-documented debate about the medical risks and ethics associated with various medical transition procedures, including within the transgender community itself, HHS would halt the serious medical and moral debate by dictating how medical professionals speak about these issues, what words they use, and which procedures they call "experimental." Doctors who give patients their honest opinion and medical judgment would thus run afoul of the Rule—and commit illegal discrimination—unless they align with the agency's view of what is orthodox when discussing sex.

## A. The Rule prevents healthcare providers from speaking against medical transition procedures.

The government cannot prohibit health providers from disseminating factual information and medical judgment simply because the government dislikes the content of that speech. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011). In *Sorrell*, the Supreme Court struck down a state regulation prohibiting pharmacies from selling information about prescribing practices to drug manufacturers for marketing purposes. *Id.* at 567. The Court noted that the state had "imposed a restriction on access to information in private hands," and the "law impose[d] a burden based on the content of speech and the identity of the speaker." *Id.* at 567-68. Even under the more relaxed form of scrutiny applicable to "commercial speech," the Court held the state's asserted interests in medical privacy, improved public health, and reduced healthcare costs did not "withstand[] scrutiny." *Id.* at 571-72; *see also Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) (law barring physicians and pharmacists from advertising compounding drugs violated free speech).

Even more relevant here, in *Conant v. Walters*, the court struck down a government policy that sought "to punish physicians on the basis of the content of doctor-patient communications." 309 F.3d 629, 637 (9th Cir. 2002). Specifically, the government sought to punish a "physician's professional 'recommendation' of the use of medical marijuana." *Id.* at 632. The court held that this policy "strike[s] at core First Amendment interests of doctors and patients," because an "integral component of the practice of medicine is the communication between a doctor and a patient. Physicians must be able to speak frankly and openly to patients." *Id.* at 636. Government condemnation of particular views is especially troubling when a doctor's speech would be "chilled by the threat of federal investigation." *Id.* at 638.

Here, the Rule states that categorizing medical transition procedures as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31435; *see also id.* at 31429. It also cites approvingly to a transgender medical guidance document stating that "[m]ental health professionals should not impose a binary view of gender." App. 489 (WPATH Report at 16 (cited in 81 Fed. Reg. at 31435 n.263)). Thus, the Rule warns doctors that they can be held liable for discrimination based on the way they speak about medical transition procedures and gender.

This restriction on speech is even more troubling than in *Sorrell* or *Conant*. First, unlike the speech in *Sorrell*, which included records sold for a profit to marketers, here Plaintiffs are speaking based on their best medical and religious judgment, and they are forgoing profit rather than seeking it. *Cf. Conant*, 309 F.3d at 639-640 (Kozinski, J., concurring). Second, more than just prohibiting Plaintiffs' dissemination of certain information to certain parties, HHS's Rule deems a particular medical viewpoint to be discriminatory—namely, the viewpoint that transition-related treatment is "experimental." 81 Fed. Reg. at 31435; *see also id.* at 31429. HHS rejects this viewpoint as "outdated and not based on current standards of care," and approvingly cites another HHS document stating that "sex reassignment surgery *can no longer be*

34

*considered* an experimental treatment." *Id.* at 31435 & n.263 (citing App. 909-11 (U.S. Dep't of Health & Human Servs., Departmental Appeals Bd., Appellate Division NCD 140.3, Docket No. A-13-87, Decision No. 2576, 22-24 (May 30, 2014), http://www.hhs.gov/dab/decisions/dabdecisions/dab2576.pdf).); *accord* App. 910. Thus, HHS treats the expression of certain medical and religious viewpoints about gender transition procedures as illegal discrimination.

Plaintiffs hold such viewpoints. *See* App. 28 (Transgender Identification Ethics Statement, Ex. A to Dr. Stevens Decl.); App. 464 (Dr. Hoffman Decl. ¶ 9); App. 7 (Sister Klein Decl. ¶ 16); App. 16 (Franciscan Policy, Ex. A to Sister Klein Decl.). Thus, based simply on a viewpoint that Plaintiffs publicly espouse, Plaintiffs are now potentially subject to enforcement proceedings, loss of federal funding, or private lawsuits under the Rule. "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector*, 515 U.S. 819, 829 (1995). Such content-based restrictions on speech are "presumptively invalid." *R.A.V. v. St. Paul*, 505 U.S. 377, 382 (1992).

## B. The Rule compels healthcare providers to speak in favor of medical transition procedures and to use transition-affirming language.

The Rule violates the Free Speech Clause not only by prohibiting doctors from counseling patients against gender transition procedures, but also by compelling them to speak in favor of those procedures. While the government is certainly free to think that gender transition procedures are good medicine—and to provide them in its own programs if it wants to—it is not free to control the speech of doctors who disagree by forcing them to speak affirmingly about such procedures. Rather, "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion *or force citizens to confess by word or act their faith therein*." *W.*

*Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) (emphasis added).

Laws "that compel speakers to utter or distribute speech bearing a particular message are subject to the same rigorous scrutiny" as those "that suppress, disadvantage, or impose differential burdens upon speech because of its content." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994). And a speaker's right to convey a message in the way it chooses, not the government's message in the manner mandated by the government, is enshrined in the First Amendment. *Ariz. Free Enter. v. Bennett*, 131 S. Ct 2806, 2820 (2011). So too are the rights of listeners, who have a right to hear a range of viewpoints—and to make medical decisions based upon honest advice rather than government-prescribed orthodoxy. *See, e.g.*, *Conant*, 309 F.3d at 635 ("To hold that physicians are barred from communicating to patients sincere medical judgments would disable patients from understanding their own situations well enough to participate in the debate . . . .") (internal quotation marks omitted); *Martin v. Struthers*, 319 U.S. 141, 143 (1943) (The First Amendment "embraces the right to distribute literature and necessarily *protects the right to receive it*.") (emphasis added) (citations omitted). The need for patients to receive candid information in the gender transition context is particularly acute where the issues are so complex, the science so new, and the consequences so profound.[25]

Under the Rule, HHS would compel the speech of healthcare professionals in several ways. For example, the Rule mandates revisions to healthcare professionals'

---

[25] *See, e.g.*, Jesse Singal, *What's Missing From the Conversation About Transgender Kids*, NYMag.com: Science of Us, July 25, 2015, http://nymag.com/scienceofus/2016/07/whats-missing-from-the-conversation-about-transgender-kids.html ("[T]here is strong evidence that even many children with rather severe gender dysphoria will, in the long run, shed it and come to feel comfortable with the bodies they were born with. . . . There is something about the complexities of kids' identity formation — both their gender identity and their nascent sexuality — that makes this stuff really, really complicated. . . . [G]iven the scientific uncertainty at the moment, it's vital children be asked thoughtful, respectful questions about why they feel the way they do, that clinicians understand that gender dysphoria can mean any number of different things. 'What's happening is our society is moving faster than the evidence base' . . . and it's a sentiment worth keeping in mind.").

written policies, requiring express affirmance that transition-related procedures will be provided, 81 Fed. Reg. at 31455, even if such revisions do not reflect the medical judgment, values, or beliefs of the individuals or organization. Second, it requires physicians to use gender-transition affirming language. As just one example, the Rule requires that medical providers use "a transgender individual's preferred name and pronoun." 81 Fed. Reg. at 31406. HHS also cites approvingly to a transgender medical guidance document stating that "[m]ental health professionals should not impose a binary view of gender." App. 489 (WPATH Report at 16 (cited in 81 Fed. Reg. at 31435 n.263)). Thus, to avoid facing liability for being discriminatory under the new Rule, healthcare professionals are compelled to speak in revising their policy to endorse transition-related services, to express language that is affirming of gender transition, and to express a view of gender that is not binary. Further, by treating as discriminatory a medical view of "transition-related treatment . . . as experimental," 81 Fed. Reg. at 31435, HHS is coercing medical professionals like Plaintiffs to speak about these procedures the way the government wants them to, even when they disagree and believe they would be disserving their patients by doing so. App. 7-8 (Sister Klein Decl. ¶¶ 16, 18); App. 23-24 (Dr. Stevens Decl. ¶¶ 19, 22).

Forbidding doctors from presenting a binary view of gender or discussing procedures as experimental may result in medical harm for patients, particularly when the speech requires Plaintiffs to revise their organizational policies to affirm and offer medical services in a way that neither reflects their values nor their medical judgment. And requiring transition-affirming language, such as preferred pronouns, is motivated by an ideological and political view of gender, as opposed to any interest in providing medical information to a patient. The First Amendment forbids this kind of government effort to force speakers to espouse the government's own favored viewpoint. *See, e.g., Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 133 S. Ct. 2321,

2330-31 (2013) (rejecting requirement that federal grant recipients adopt policy opposing prostitution); *Barnette*, 319 U.S. at 642.

### C. The Rule cannot satisfy strict scrutiny.

For many of the same reasons the Rule fails strict scrutiny under RFRA, it also fails strict scrutiny under the Speech Clause. *See O Centro*, 546 U.S. at 429-30 (regardless of whether strict scrutiny is triggered by the Free Speech Clause or RFRA, "the consequences are the same"). Under strict scrutiny, the government must "identify an 'actual problem' in need of solving," and show that "the curtailment of free speech [is] actually necessary to the solution." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) (internal citations omitted). Here, that means HHS must show that it has a compelling need to prohibit physicians from speaking against gender transition procedures and to require them to affirm a non-binary view of gender—even when such views are contrary to their medical judgment.

But HHS cannot have a compelling interest in imposing this message when its own experts have said the opposite. As HHS's own medical experts have said: "Based on a thorough review of the clinical evidence available at this time, there is not enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria." App. 648 (CMS Proposed Decision Memo). "There were conflicting (inconsistent) study results—of the best designed studies, some reported benefits while *others reported harms*." *Id.*

Similarly, HHS cannot have a compelling interest in trampling on the religious views and medical judgments of private physicians when it protects those same views and judgments for military physicians under TRICARE. As a recent TRICARE guidance memo states in the context of gender dysphoria: "In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs." App. 884-85 (TRICARE Memo 2-3). Indeed, the need to protect candid and truthful speech "has great

relevance in the fields of medicine and public health, where information can save lives." *Sorrell*, 564 U.S. at 566. Thus, HHS's content-based regulation of medical speech cannot survive heightened scrutiny.

## V.  The Rule is unconstitutionally vague

The Rule also violates the Due Process Clause and First Amendment because it is hopelessly vague. "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012). A law is impermissibly vague where it allows the government to rely on "untethered" and "wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010). A law also cannot be "so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). And when protected expression is being potentially swept into the reach of a law, "rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 132 S. Ct. at 2317.

The Rule fails these constitutional requirements. Under the sweeping new definition of "sex discrimination," health care providers are left to guess at the type of action (or inaction) that might result in crippling liability. Further, in the face of HHS's vague prohibitions on certain types of expression, healthcare professionals face serious pressure to self-censor in order to avoid liability.

### A.  The Rule fails to give fair notice of what conduct is subject to liability and gives HHS ample room for arbitrary enforcement.

"Even when speech is not at issue, the void for vagueness doctrine" requires that "regulated parties should know what is required of them so they may act accordingly," and "precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *Fox*, 132 S. Ct. at 2317 (citing *Grayned v. City*

*of Rockford*, 408 U.S. 104, 108-109 (1972)). Under this rubric, "a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved." *Id.*

Here, HHS has deliberately written its rule in a way that obfuscates "what fact[s] must be proved" for a covered entity to be liable for discrimination. *Id.* Multiple times, HHS specifically rejected commenters' requests for "further information on the application of the rule to specific circumstances." 81 Fed. Reg. at 31377. Instead, HHS stated, "we neither address every scenario that might arise in the application of these standards nor state that certain practices as a matter of law are 'always' or 'never' permissible. The determination of whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." *Id.* HHS in fact touted that it "value[s] the flexibility inherent in the contextualized approach we have chosen to assess compliance." *Id.* at 31419. But HHS has left itself so much flexibility that there is nothing to prevent it from "act[ing] in an arbitrary or discriminatory way" when it enforces the Rule. *Fox*, 132 S. Ct. at 2317.

For example, regarding prohibitions on discriminatory insurance coverage, the Rule "require[s] that a covered entity apply the same neutral, nondiscriminatory criteria that it uses for other conditions when the coverage determination is related to gender transition." 81 Fed. Reg. at 31435. Yet HHS provides conflicting guidance about what such neutral criteria could entail. For instance, HHS pays lip service to the idea that it "will not second-guess a covered entity's neutral nondiscriminatory application of evidence-based criteria used to make medical necessity or coverage determinations." *Id.* at 31436-37. Yet HHS also "decline[s] to limit application of the rule by specifying that coverage for the health services . . . must be provided *only* when the services are *medically necessary or medically appropriate*." 81 Fed. Reg. at 31435 (emphasis added). And HHS further states that covered entities cannot exclude transition-related care "by categorizing all transition-related treatment as cosmetic

or experimental," because "such across-the-board categorization is now recognized as outdated and not based on current standards of care." *Id.* at 31429. Indeed, HHS suggests that a gender transition procedure will become "medically necessary" simply by virtue of "a patient's provider say[ing it] is medically necessary to treat gender dysphoria." *Id.*

By removing the most obvious types of "neutral" criteria on which covered entities have historically relied—limiting coverage to procedures that are medically necessary, medically appropriate, and that are not merely cosmetic or experimental—HHS has left covered entities with no meaningful "neutral, nondiscriminatory" criteria to choose from. And because covered entities lack "fair notice of what is prohibited" under the Rule, Plaintiffs are pressured to provide coverage for any transition-related procedure an employee's provider recommends. *See Williams*, 553 U.S. at 304.

The Rule also bans discriminatory "benefit design" for an insurance plan—without explaining what a "benefit design" even is. Not surprisingly, HHS received many "requests for guidance and clarification regarding potentially discriminatory benefit designs and suggestions for scenarios that constitute per se discrimination." 81 Fed. Reg. at 31433-31434. But HHS refused to provide clarification:

> [W]e decline to define 'benefit design' in the final rule because to do so would be overly prescriptive. We also decline to codify examples of discriminatory benefit designs because determining whether a particular benefit design results in discrimination will be a fact-specific inquiry that OCR will conduct through its enforcement of Section 1557. For the same reason, we avoid characterizing specific benefit design practices as per se discriminatory in the final rule.

*Id.* This is a pathetic lack of guidance. Plaintiffs and other covered entities are designing complex insurance plans that affect tens of thousands of employees, and they depend on clear regulatory guidance. But under this Rule, they can do nothing but guess at what HHS will decide constitutes a discriminatory benefit design. And they must make those guesses on pain of massive financial liability.

Professionals providing healthcare services face the same dearth of guidance. HHS states that "providers of health services may no longer deny or limit services based on an individual's sex, without a legitimate nondiscriminatory reason." 81 Fed. Reg. at 31455. But HHS offers no guidance on what will qualify as "a legitimate non-discriminatory reason." For many years, doctors have deemed medical transition procedures experimental or harmful based on the current status of the medical literature. That concern is obviously reasonable, given HHS's own very recent acknowledgement in the Medicare context that some studies show transition-related surgeries to be harmful. *See* App. 648 (CMS Proposed Decision Memo). But now HHS says that a "categorization of all transition-related treatment . . . as experimental, is outdated and not based on current standards of care." 81 Fed. Reg. at 31435.

At the same time, HHS offers no guidance on what the applicable standards of care actually are. Indeed, HHS "decline[d] to include a definition of 'health services related to gender transition'" but instead stated that HHS "intends to interpret these services broadly and recognizes that health services related to gender transition may change as standards of medical care continue to evolve." *Id*. Nor did HHS provide guidance on whether physicians can rely on their best medical judgment when it conflicts with this Rule. This stands in sharp contrast with the regulations governing the military's TRICARE plan, which provides a clear safe harbor, stating: "In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs." *See* App. 884-85 (TRICARE Memo 2-3).

In short, the new Rule places healthcare professionals, including Plaintiffs, in the unprecedented position of being forced to perform or cover procedures that violate their medical judgment or else face crippling liability—with the agency deliberately choosing to withhold clear guidance about how to walk the tightrope between the two. The result is an unconstitutionally vague rule that "trap[s] the innocent by not

providing fair warning." *Grayned*, 408 U.S. at 108.

## B. The Rule's vague, overbroad, and content-based restrictions result in a serious chilling effect on protected expressive activity.

The vagueness here is all the more troubling because it chills constitutionally protected activity: "The vice of unconstitutional vagueness is further aggravated where, as here, the [rule] in question operates to inhibit the exercise of individual freedoms affirmatively protected by the Constitution." *Cramp v. Bd. of Pub. Instruction of Orange Cty., Fla.*, 368 U.S. 278, 287 (1961). A law or regulation that "threatens to inhibit the exercise of constitutionally protected rights," such as "the right of free speech," is subject to "a more stringent vagueness test." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982); *see also Reno v. ACLU*, 521 U.S. 844, 871-872 (1997) ("The vagueness of [a content-based] regulation [of speech] raises special First Amendment concerns because of its obvious chilling effect."). Indeed, "[w]hen speech is involved, rigorous adherence to" the requirements that a law give fair notice and provide precise guidance regarding enforcement "is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 132 S. Ct. at 2317.

HHS may argue that it does not plan to enforce the Rule to punish protected speech. But there is no question that the Rule's "literal scope, unaided by a narrowing . . . court interpretation, is capable of reaching expression sheltered by the First Amendment." *Smith v. Goguen*, 415 U.S. 566, 573 (1974). The Rule says that medical views opposed to medical transition procedures are "outdated" and discriminatory, and it compels transition-affirming speech such as revised policies and preferred pronouns. 81 Fed. Reg. at 31435, 31429. In such circumstances, those who wish to avoid liability can do so "only by restricting their conduct to that which is unquestionably safe." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964). Plaintiffs and other healthcare professionals face significant pressure to "steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked," notwithstanding that the

Constitution requires that the benefit of the doubt be given to speech, not censorship. *Id.* (internal quotation marks omitted); *see, e.g.,* App. 23-24 (Dr. Stevens Decl. ¶ 19); App. 13 (Sister Klein Decl. ¶¶ 39-40). Thus, HHS's Rule falls far short of the "greater degree of specificity" required when it "abut[s] upon sensitive areas of basic First Amendment freedoms." *Baggett*, 377 U.S. at 372; *see also NAACP v. Button*, 371 U.S. 415, 433 (1963) ("[t]he threat of sanctions may deter the[] exercise [of First Amendment rights] almost as potently as the actual application of sanctions.").

## VI. The Rule violates the Due Process Clause.

HHS's new Rule also violates Plaintiffs' due process right to refrain from performing invasive medical procedures that violate their conscience, particularly with regard to abortion and sterilization. To receive protection under the Due Process Clause, a right must be: (1) "objectively, 'deeply rooted in this Nation's history and tradition' . . . and 'implicit in the concept of ordered liberty' such that 'neither liberty nor justice would exist if [it] were sacrificed,'" and (2) subject to a "'careful description' of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted).

Here, the fundamental liberty interest is the right to refrain from performing non-emergency medical procedures that violate a physician's conscience—particularly abortion and sterilization. Historically, physicians have received robust legal protections for that right.[26] But the Rule violates that right and cannot satisfy strict scrutiny.

### A. The United States has a deeply rooted tradition of honoring physicians' rights to refrain from taking human life.

HHS's requirement that physicians not discriminate on the basis of "termination

---

[26] *See* Guttmacher Institute, *Refusing to Provide Health Services*, State Laws and Policies (Oct. 1, 2016), https://www.guttmacher.org/state-policy/explore/refusing-provide-health-services ("Almost every state has adopted [conscience protection] policies related to abortion, and, in many instances, policies regarding sterilization or other contraceptive services.").

of pregnancy," thus pressuring physicians to perform abortions, violates the right to refrain from taking human life. That right has long been recognized in every context where the taking of human life has been permitted—whether military service, assisted suicide, capital punishment, abortion, or abortifacient drugs. *See generally* Mark L. Rienzi, *The Constitutional Right Not to Kill*, 62 Emory L.J. 121 (2012).

In the context of military service, the right to refrain from taking human life was recognized by the majority of colonies and the Continental Congress before the Revolutionary War,[27] by President Lincoln during the Civil War,[28] and by Congress starting with World War I.[29] In the context of assisted suicide, only four states have legalized the practice by statute; all four include a religious exemption.[30]

The right to refrain from taking human life is also uniformly protected in the context of abortion. Just weeks after *Roe v. Wade*, 410 U.S. 113 (1973), Congress overwhelmingly passed the Church Amendment, which prohibits federally-funded programs from requiring individuals to assist in an abortion. 42 U.S.C. § 300a-7(b)-(c)(1). Many states followed suit by enacting their own protections for physicians. Rienzi, *supra*, at 147-52 (collecting examples). According to the Guttmacher Institute, these conscience protections regarding abortion now exist in forty-five of fifty states.[31] Many of these protections provide full exemptions to any health care practitioner who

---

[27] Michael W. McConnell, *The Origins and Historical Understanding of Free Exercise of Religion*, 103 Harv. L. Rev. 1409, 1468 (1990); Louis Fischer, *Congressional Protection of Religious Liberty* 11-12 (2003).

[28] J. G. Randall & Richard Nelson Current, *Lincoln the President* 172-75 (1999).

[29] Rienzi, *supra*, at 132.

[30] *See* Or. Rev. Stat. Ann. § 127.885; Wash. Rev. Code Ann. §70.245.190; Vt. Stat. Ann. tit. 18, § 5285; Cal. Health & Safety Code § 443.14. Montana legalized assisted suicide via court decision. *See Baxter v. State*, 224 P.3d 1211, 1222 (Mont. 2009). The applicable statute provides that a physician unwilling to withdraw treatment need only refer the patient to another physician. Mont. Code. Ann. § 50-9-103(5) (2011).

[31] Guttmacher Institute, *Refusing to Provide Health Services*, State Laws and Policies (Oct. 1, 2016), https://www.guttmacher.org/state-policy/explore/refusing-provide-health-services.

conscientiously refuses to "participate," "refer," "assist," "arrange for," "accommo-date," or "advise" in an abortion. Rienzi, *supra*, at 152.

Given this uniform protection—across many contexts, in multiple jurisdictions, and over two centuries—the right to refrain from taking human life is far more "ob-jectively, 'deeply rooted in this Nation's history and tradition'" than other due process rights recognized by the Supreme Court. *Glucksberg*, 521 U.S. at 720-21. Although modern substantive due process jurisprudence has been subject to criticism, the "sturdie[st] basis" for invalidating a law under the Due Process Clause is when the law is an outlier among states. Akhil Amar, *The Unwritten Constitution* 118 (2012); *see also* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1796 (2012) (noting that *Griswold* can be defended on this basis). Here, the Rule is the only federal regulation to undercut a physician's right to refrain from taking human life, and is thus a stark outlier.

## B. The United States has a deeply rooted tradition of honoring physi-cians' rights to refrain from destroying the potential for new human life through sterilization.

The new Rule also violates physicians' right to refrain from performing a sterili-zation, such as an elective hysterectomy. Although there are fewer laws that ex-pressly recognize the right to refrain from performing a sterilization, that is simply because, in contrast with abortion, there have been fewer attempts to force physicians to do so. *See* 46 Am. Jur. Proof of Facts 2d 373 § 1 (2016) (discussing the general background norm that no physician is required to perform any particular medical procedure for any reason). Nevertheless, such protections are still commonplace.

Under the federal Church Amendments, for example, federally-funded programs may not require an "individual to perform or assist in the performance of any sterili-zation procedure or abortion if his performance or assistance in the performance of

such procedure or abortion would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(b). Similarly, Congress has mandated that "[n]o individual shall be required to perform or assist in the performance of any part of a health service program or research activity . . . if his performance or assistance in the performance of such part of such program or activity would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d). And according to the Guttmacher Institute, 17 states provide additional protections related to sterilization.[32]

Yet under the Rule, physicians would be forced to perform a number of sterilizing procedures, such as elective hysterectomies. According to *Obergefell v. Hodges*, the Due Process Clause protects choices "central to individual dignity and autonomy" including those central to "personal identity and beliefs." 135 S. Ct. 2584, 2597 (2015). Certainly a physician's choice about whether to sterilize a patient, and thus forever prevent her from conceiving, constitutes a decision central to a physician's autonomy, identity, and beliefs.

### C. The Rule cannot satisfy strict scrutiny.

Because the Rule violates these well-defined and longstanding rights, it is subject to strict scrutiny. And as explained above, the Rule cannot satisfy strict scrutiny.

## VII.   The Court should expedite summary judgment.

Plaintiffs respectfully request that the Court expedite the ruling on this motion for partial summary judgment. Unless Plaintiffs obtain relief in the near future, they will suffer severe financial penalties. The States face the loss of billions of dollars in Medicare and Medicaid funds needed to serve their most vulnerable citizens. Franciscan serves thousands of patients each day, exposing it to massive liability. Members of CMDA face the same risk each day they open their doors. Plaintiffs therefore

---

[32] Guttmacher Institute, *Refusing to Provide Health Services*, State Laws and Policies (Oct. 1, 2016), https://www.guttmacher.org/state-policy/explore/refusing-provide-health-services.

need a ruling from this Court to give them certainty and shield them from government-imposed penalties and other litigation. Given the absence of material disputes of fact, an expedited ruling on the motion for partial summary judgment may be the best way to preserve the Court's and the parties' resources.

## VIII.  Alternatively, the Court should enter a preliminary injunction.

Alternatively, should the Court not be in a position to rule on the motion for partial summary judgment before January 1, 2017—which is when Plaintiffs will be forced to make significant, expensive changes to their insurance plans—the Court should enter a preliminary injunction against the Rule. This Court recently took similar action in response to a similar regulation that would have affected multiple states. *See Texas v. United States*, 2016 WL 4426495.

*Likelihood of Success on the Merits*. As shown above, Plaintiffs are highly likely to succeed on the merits. Indeed, showing a substantial likelihood of success on the merits is by definition a lower standard than the summary judgment standard. *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) ("A plaintiff is not required to prove its entitlement to summary judgment in order to establish 'a substantial likelihood of success on the merits' for preliminary injunction purposes."). And in cases like this one, where First Amendment rights are at stake, "the analysis begins and ends with the likelihood of success on the merits." *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013). This is because "in First Amendment cases, 'the likelihood of success on the merits will often be the determinative factor." *Id.* (quoting *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012)); *Hobby Lobby*, 723 F.3d at 1145 (same). This principle also holds true for RFRA claims, since "RFRA protects First Amendment free-exercise rights." *Korte*, 735 F.3d at 666; *Hobby Lobby*, 723 F.3d at 1146 ("[O]ur case law analogizes RFRA to a constitutional right.").

*Irreparable Harm*. It is settled law that a potential violation of Plaintiffs' rights under the First Amendment and RFRA threatens irreparable harm. "'The loss of First

Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (*quoting Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, coercing Plaintiffs to provide harmful medical procedures or objectionable insurance coverage in direct violation of their faith is the epitome of irreparable injury. Once they have been forced to violate their conscience, future remedies cannot undo the past.

The Rule will also cause irreparable harm to the States. The Rule will upend current laws and policies governing state health care facilities and religious accommodations for state employees. *See supra* Statement of Facts 12. Sovereigns suffer irreparable harm when their laws or policies are enjoined. *New Motor Vehicle Bd. of California v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."); *Texas v. United States*, 95 F. Supp. 3d 965, 981 (N.D. Tex. 2015) ("[W]henever an enactment of a state's people is enjoined, the state suffers irreparable injury."). Here, the Rule strips state officials of their right to enforce their own laws in their healthcare programs and workplaces. This amounts to irreparable harm to Plaintiffs' sovereign interest. *Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001) (erroneous tribal gaming commission decision amounts to irreparable injury to the state's sovereign interest); *Texas*, 95 F. Supp. 3d at 981-82 (irreparable injury occurs when invalid federal rules require states to disregard its laws).

*Balance of Harms.* The harms faced by Plaintiffs are severe, and include loss of funding, liability for lawsuits, and coercion of religious practice. The harms faced by HHS are minimal. HHS has acknowledged that its goals need not be achieved immediately nor uniformly, a fact made plain by its decision to wait *six years* after enactment of the Affordable Care Act to promulgate the Rule—and to exempt its own insurance programs from its effect. HHS claimed that the Rule "would not displace the

protections afforded by provider conscience laws, the Religious Freedom Restoration Act (RFRA), provisions in the ACA related to abortion services, or regulations issued under the ACA related to preventive health services." 81 Fed. Reg. at 31378-79. Those are the very protections invoked here. When the government has "alternative, constitutional ways of regulating . . . to achieve its goals," as it does here, the government cannot show that its interest outweighs constitutional freedoms. *See RTM Media, L.L.C. v. City of Houston*, 518 F. Supp. 2d 866, 875 (S.D. Tex. 2007). The same is true for unlawful government action which places heavy burdens on the sovereign interests of states. *See Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by divided court* 136 S. Ct. 2271 (2016), *reh'g denied,* 2016 WL 5640497 (Mem.) (Oct. 3, 2016).

*Public Interest.* "This factor overlaps considerably with the previous one, and most of the same analysis applies." *Texas*, 809 F.3d at 187. It is simpler for states to maintain the status quo than to create and enforce new policies, but change them later. *See id.* And for the religious plaintiffs, "[I]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298 (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).

## CONCLUSION

The motion should be granted.

Respectfully submitted this the 21st day of October, 2016.


/s/ Luke W. Goodrich
Luke W. Goodrich
Bar No. 977736DC
Eric C. Rassbach (admission pending)
Mark L. Rienzi (admission pending)
Stephanie H. Barclay (admission pending)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090
lgoodrich@becketfund.org

*Counsel for Plaintiffs Christian Medical &
Dental Associations, Franciscan Health,
Inc., Specialty Physicians of Illinois, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2016 the foregoing brief was served on all parties via ECF.

    /s/ Luke W. Goodrich

Luke W. Goodrich