IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

FRANCISCAN ALLIANCE, INC., *et al.*,

     *Plaintiffs*,

    v.

SYLVIA BURWELL, Secretary of the United
States Department of Health and Human
Services, *et al.*,

     *Defendants*.

Civil Action No. 7:16-cv-00108-O

**BRIEF OF *AMICI CURIAE* RIVER CITY GENDER ALLIANCE AND ACLU OF TEXAS
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

i

## TABLE OF CONTENTS

INTERESTS OF AMICI CURIAE ................................................................................. 1

INTRODUCTION ........................................................................................................ 2

FACTUAL AND PROCEDURAL BACKGROUND .................................................. 4

ARGUMENT ............................................................................................................... 9

I.    Plaintiffs' Claimed Right to Discriminate Against Transgender People and Women
      Seeking Reproductive Care Is in Direct Conflict with Constitutional and Statutory
      Protections .......................................................................................................... 9

      A.   Private Plaintiffs' Requested Religious Accommodation Would Violate the
           Establishment Clause. ................................................................................ 9

      B.   The State Plaintiffs' Claimed Right to Discriminate Violates the Equal Protection
           Clause. ....................................................................................................... 11

      C.   Plaintiffs' Claimed Right To Refuse to Provide Emergency Abortions Violates the
           Emergency Medical Treatment and Active Labor Act. ............................. 14

II.   The Final Rule Is Valid Under the Administrative Procedure Act. ..................... 16

      A.   The Final Rule's Interpretation of "Sex" as Including Gender Identity Is
           Reasonable and Consistent with the Statutory Text. ................................. 18

           1.   Discrimination "on the basis of sex" includes discrimination based on
                gender identity, and, at a minimum, does not unambiguously exclude it ........ 18

           2.   This Court's interpretation of "provide separate toilet facilities on the basis
                of sex" in 34 C.F.R. § 106.33 does not resolve the unambiguous meaning of
                discrimination "on the basis of sex" in Title IX. ...................................... 20

           3.   An injunction against enforcement of the rule on its face is inappropriate. ...... 22

      B.   The Final Rule's Omission of Title IX's Religious Exemption and Abortion
           Language Is Reasonable and Consistent with the Statutory Text. ............. 25

      C.   The Final Rule Does Not Conflict with Title VII. .................................... 27

III.  The Final Rule Does Not Violate Plaintiffs' Rights Under the Religious Freedom
      Restoration Act. ................................................................................................. 28

IV.   The Final Rule Does Not Violate the Spending Clause. .................................... 35

ii

V.      Plaintiffs Have Not Identified a Conflict Between the Final Rule and the First
        Amendment. ..................................................................................................................37

VI.     The Final Rule Is Not Unconstitutionally Vague. .........................................................40

VII.    Plaintiffs Have Not Adequately Alleged, Let Alone Established, That the Final Rule
        Violates Their Due Process Rights. ...............................................................................42

VIII.   Plaintiffs Have Not Demonstrated Irreparable Harm. ...................................................44

IX.     The Balance of Equities and the Public Interest Oppose Granting the Injunction. ...........46

CONCLUSION ...............................................................................................................................48

# TABLE OF AUTHORITIES

**Cases**

*Adkins v. City of New York*,
143 F. Supp. 3d 134 (S.D.N.Y. 2015)...................................................................... 13

*Adkins v. Kaspar*,
393 F.3d 559 (5th Cir. 2004) ....................................................................... 28, 29

*Aquifer Guardians in Urban Areas v. Federal Highway Administration*,
779 F. Supp. 2d 542 (W.D. Tex. 2011)..................................................................... 43

*Arlington Center School District Board of Education v. Murphy*,
548 U.S. 291 (2006)....................................................................................... 36

*Associated Builders & Contractors of Texas, Inc. v. National Labor Relations Board*,
826 F.3d 215 (5th Cir. 2016) ........................................................................... 22

*Barber v. Bryant*,
--- F. Supp. 3d ----, No. 3:16-CV-417-CWR-LRA, 2016 WL 3562647 (S.D. Miss. June 30, 2016)
.................................................................................................. 10, 11

*Barnes v. Gorman*,
536 U.S. 181 (2002)....................................................................................... 36

*Bennet v. Kentucky. Department of Education*,
470 U.S. 656 (1985)....................................................................................... 35

*Board of Education of the Highland Local School District v. U.S. Department of Education*,
--- F. Supp. 3d ----, No. 2:16-CV-524, 2016 WL 5372349 (S.D. Ohio Sept. 26, 2016) .............. 12

*Bob Jones University v. United States*,
461 U.S. 574 (1983)................................................................................... 30, 34

*Borzych v. Frank*,
439 F.3d 388 (7th Cir. 2006) ............................................................................. 29

*Bruff v. North Mississippi Health Services, Inc.*,
244 F.3d 495 (5th Cir. 2001) ............................................................................. 27

*Burton v. Wilmington Parking Authority*,
365 U.S. 715 (1961)....................................................................................... 34

*Burwell v. Hobby Lobby Stores, Inc.,*
134 S. Ct. 2783 (2015)..................................................................................................... 33, 34

*Campaign for Southern Equality v. Bryant,*
64 F. Supp. 3d 906 (S.D. Miss. 2014)...................................................................................... 12

*Chevron U.S.A. Inc. v. N.R.D.C.,*
467 U.S. 837 (1984)............................................................................................................. 2

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993)........................................................................................................... 30

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
401 U.S. 402 (1971)........................................................................................................... 17

*City of Richmond v. J.A. Croson Co.,*
488 U.S. 469 (1989)........................................................................................................... 30

*Cleburne v. Cleburne Living Center, Inc.,*
473 U.S. 432 (1985)........................................................................................................... 12

*Connally v. General Construction Co.,*
269 U.S. 385 (1984)........................................................................................................... 40

*Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos,*
483 U.S. 327 (1987)........................................................................................................... 10

*Crawford v. Davis,*
109 F.3d 1281 (8th Cir. 1997) ............................................................................................ 36

*Cruz v. Zucker,*
 No. 14-CV-4456 (JSR), 2016 WL 3660763 (S.D.N.Y. July 5, 2016).......................................... 6

*Cutter v. Wilkinson,*
544 U.S. 709 (2005)............................................................................................................. 9

*Daniel v. Paul,*
395 U.S. 298 (1969)........................................................................................................... 34

*Davis ex relative LaShonda D. v. Monroe County Board of Education.,*
526 U.S. 629 (1999)........................................................................................................... 35

*Dawson v. H&H Electric, Inc.,*
No. 4:14CV00583 SWW, 2015 WL 5437101 (E.D. Ark. Sept. 15, 2015)................................... 20

*Doe v. University of Illinois,*
138 F.3d 653 (7th Cir. 1998) ........................................................................ 36

*Doyle v. Secretary of Health and Human Services,*
848 F.2d 296 (1st Cir. 1988) ........................................................................ 40

*Environmental Defense v.. Duke Energy Corporation,*
549 U.S. 561 (2007) ........................................................................ 21

*E.E.O.C. v. Boh Brothers Construction Co., LLC,*
731 F.3d 444 (5th Cir. 2013) ........................................................................ 13, 19

*E.E.O.C. v. Wyoming,*
460 U.S. 226 (1983) ........................................................................ 37

*Estate of Thornton v. Caldor,*
472 U.S. 703 (1985) ........................................................................ 10

*Etsitty v. Utah Transit Authority,*
502 F.3d 1215 (10th Cir. 2007) ........................................................................ 24

*Eure v. Sage Corporation,*
61 F. Supp. 3d 651 (W.D. Tex. 2014)........................................................................ 22, 23

*Fabian v. Hospital of Central Connecticut,*
172 F. Supp. 3d 509 (D. Conn. 2016)........................................................................ 20

*Finkle v. Howard County, Maryland,*
12 F. Supp. 3d 780 (D. Md. 2014)........................................................................ 20

*Franks v. Kentucky School for the Deaf,*
142 F.3d 360 (6th Cir. 1998) ........................................................................ 36

*Gebser v. Lago Vista Independent School District,*
524 U.S. 274 (1998)........................................................................ 36

*General Electric Co. v. Gilbert,*
 429 U.S. 125 (1976)........................................................................ 13

*Glenn v. Brumby,*
663 F.3d 1312 (11th Cir. 2011) ........................................................................ 13, 20, 23

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
546 U.S. 418 (2006)........................................................................ 28, 31

*Gresham v. Windrush Partners, Ltd.,*
730 F.2d 1417 (11th Cir. 1984) ................................................................. 46

*Jackson v. Birmingham Board of Education.,*
544 U.S. 167 (2005) ................................................................. 22, 35

*Johnston v. University of Pittsburgh of the Commonwealth System of Higher Education,*
97 F. Supp. 3d 657 (W.D. Pa. 2015) ................................................................. 23

*Knight v. Connecticut Department of Public Health,*
275 F.3d 156 (2d Cir. 2001) ................................................................. 27

*Lopez v. River Oaks Imaging & Diagnostic Group, Inc.,*
542 F. Supp. 2d 653 (S.D. Tex. 2008) ................................................................. 13, 23

*Louisiana College v. Sebelius,*
38 F. Supp. 3d 766 (W.D. La. 2014) ................................................................. 29

*McDonnell Douglas Corporation v. Green,*
411 U.S. 792 (1973) ................................................................. 42

*Mead v. Holder,*
766 F. Supp. 2d 16 (D.D.C. 2011) ................................................................. 30

*Merced v. Kasson,*
577 F.3d 578 (5th Cir. 2009) ................................................................. 30

*Meritor Savings Bank v. Vinson,*
477 U.S. 57 (1986) ................................................................. 39

*Mexichem Specialty Resins, Inc. v. Environmental Protection Agency,*
787 F.3d 544 (D.C. Cir. 2015) ................................................................. 44

*Mississippi University for Women v. Hogan,*
458 U.S. 718 (1982) ................................................................. 12

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile Insurance Co.,*
463 U.S. 29 (1983) ................................................................. 17

*Norsworthy v. Beard,*
87 F. Supp. 3d 1104 (N.D. Cal. 2015) ................................................................. 13

*North Haven Board of Education v. Bell,*
456 U.S. 512 (1982) ................................................................. 22

*Pennhurst State School & Hospital v. Halderman,*
451 U.S. 1 (1981) ................................................................................................ 35, 36

*Price Waterhouse v. Hopkins,*
490 U.S. 228 (1989) ................................................................................................ passim

*R.A.V. v. City of St. Paul, Minnesota,*
505 U.S. 377 (1992) .................................................................................................... 39

*Roberts v. Clark County School District.,*
No. 215CV00388-JAD-PAL, 2016 WL 5843046 (D. Nev. Oct. 4, 2016) .................................. 20

*Roberts v. United States Jaycees,*
468 U.S. 609 (1984) ............................................................................................ 30, 34, 40

*Rock of Ages Corporation v. Secretary of Labor,*
170 F.3d 148 (2d Cir. 1999) ........................................................................................ 42

*Rosa v. Park West Bank & Trust Co.,*
214 F.3d 213 (1st Cir. 2000) ....................................................................................... 13

*Rowinsky v. Bryan Independent School District.,*
80 F.3d 1006 (5th Cir. 1996) ....................................................................................... 37

*Rumble v. Fairview Health Services,*
No. 14-CV-2037 SRN/FLN, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) .................. 20, 24, 47

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.,*
547 U.S. 47 (2006) ..................................................................................................... 20

*Schroer v. Billington,*
424 F. Supp. 2d 203 (D.D.C. 2006) ............................................................................. 13

*Schroer v. Billington,*
577 F. Supp. 2d 293 (D.D.C. 2008) ............................................................................. 20

*Schwenk v. Hartford,*
204 F.3d 1187, 1201 (9th Cir. 2000) ........................................................................ 19, 20

*Sherbert v. Verner,*
374 U.S. 398 (1963) ..................................................................................................... 28

*Silver Sage Partners, Ltd. v. City of Desert Hot Springs,*
251 F.3d 814 (9th Cir. 2001) ....................................................................................... 46

*Smiley v. Citibank (South Dakota), National Association*,
517 U.S. 735 (1996) ....................................................................................... 16

*Smith v. City of Salem*,
378 F.3d 566 (6th Cir. 2004) ................................................................. 13, 20, 24

*South Dakota v. Dole*,
483 U.S. 203 (1987) ....................................................................................... 37

*Swanner v. Anchorage Equal Rights Commissionn*,
874 P.2d 274 (Alaska 1994) ........................................................................... 34

*Tagore v. United States*,
735 F.3d 324 (5th Cir. 2013) .......................................................................... 31

*Texas Health & Human Services Commission v. United States*,
166 F. Supp. 3d 706 (N.D. Tex. 2016) ........................................................... 43

*Texas Monthly, Inc. v. Bullock*,
489 U.S. 1 (1989) ........................................................................................... 10

*Texas Oil & Gas Association v. E.P.A.*
161 F.3d 923 (5th Cir. 1998) .......................................................................... 17

*Texas v. United States*,
--- F. Supp. 3d ----, No. 7:16-cv-00054-O, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016) ........ 18

*Texas v. United States*,
95 F. Supp. 3d 965 (N.D. Tex. 2015) ............................................................. 45

*Texas v. United States*, No. 7:16-CV-00054-O, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016). 21

*Trans World Airlines, Inc. v. Hardison*,
432 U.S. 63 (1977) ................................................................................... 26, 27

*Trevino v. Center for Health Care Services*,
No. SA-08-CV-0140 NN, 2009 WL 2406196 (W.D. Tex. Aug. 3, 2009) .................. 23

*Turic v. Holland Hospitality, Inc.*,
85 F.3d 1211 (6th Cir. 1996) .......................................................................... 14

*United States v. Burke*,
504 U.S. 229 (1992) ....................................................................................... 34

*United States v. Central Carolina Bank & Trust Co.*,
431 F.2d 972 (4th Cir. 1970) ................................................................ 46

*United States v. Hayes International Corporation*,
415 F.2d 1038 (5th Cir. 1969) .............................................................. 46

*United States v. Mead Corporation*,
533 U.S. 218 (2001) ............................................................................. 16

*United States v. National Lead Co.*,
438 F.2d 935 (8th Cir. 1971) ................................................................ 46

*United States v. Virginia*,
518 U.S. 515 (1996) ........................................................................ 12, 14

*Wilson v. United States West Communications*,
58 F.3d 1337 (8th Cir. 1995) ............................................................... 28

*Winter v. N.R.D.C.*,
555 U.S. 7 (2008) ................................................................................. 46

*Yates v. United States*,
135 S. Ct. 1074 (2015) ......................................................................... 21

**Statutes**

10 U.S.C. § 1079 ................................................................................... 32

20 U.S.C. § 1681 ............................................................................. 17, 22

20 U.S.C. § 1688 ................................................................................... 26

29 U.S.C. § 623 ..................................................................................... 37

42 U.S.C. § 300a-7 ...................................................................... 15, 16, 33

42 U.S.C. § 1395dd .............................................................................. 14

42 U.S.C. § 1395w-102 ......................................................................... 42

42 U.S.C. § 18023 ................................................................................ 33

42 U.S.C. § 18116 ...................................................................... 4, 17, 25

42 U.S.C. § 2000bb–1 .......................................................................... 28

x

42 U.S.C. § 2000e ................................................................................................ 27

42 U.S.C. § 238n ........................................................................... 15, 16, 33, 43

42 U.S.C. § 300a-7 ............................................................................................ 43

42 U.S.C. § 2000e–2 .......................................................................................... 27

5 U.S.C. § 706 ................................................................................................... 16

Consolidated Appropriations Act,
Pub. L. No. 114-113, Div. H., tit. V § 507(d) (Dec. 18, 2015) ............................ 16, 33

## Regulations

14 C.F.R. § 1253.445 ......................................................................................... 26

15 C.F.R. § 8a.445 ............................................................................................. 26

29 C.F.R. § 36.445 ............................................................................................. 26

34 C.F.R. § 106.21 ............................................................................................. 26

34 C.F.R. § 106.33 ......................................................................................... 20, 21

38 C.F.R. § 23.445 ............................................................................................. 26

45 C.F.R. § 156.125 ........................................................................................... 42

45 C.F.R. § 92.1 ................................................................................................. 45

45 C.F.R. § 92.207 ............................................................................................... 5

45 C.F.R. § 92.4 ....................................................................................... 4, 17, 42

45 C.F.R. § 92.2 ................................................................................................. 31

*Nondiscrimination in Health Programs and Activities* (Final Rule),
81 Fed. Reg. 31,376 (May 18, 2016) ............................................................... passim

*TRICARE; Mental Health and Substance Abuse Disorders,*
81 Fed. Reg. 61,068 (Sept. 2, 2016) .................................................................. 32

## Other Authorities

151 Cong. Rec. H176-02 (daily ed. Jan. 25, 2005) (statement of Rep. Weldon) ......................... 16

American College of Obstetricians and Gynecologists, *Practice Bulletin No. 160, Premature Rupture of Membranes*, 127 Obstetrics & Gynecology (2016) .............................................. 15

American Heritage Dictionary of the English Language, 730 (5th ed. 2011) ............................. 19

American Heritage Dictionary, 548 (3rd ed. 1973) ...................................................................... 18

Centers for Medicare & Medicaid Services, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (Aug. 30, 2016) ................................................................................. 31

Charles Alan Wright, Arthur R. Miller, 11A Federal Practice & Procedure Civil. § 2948.1 (3d ed.) ............................................................................................................................................ 45

Debra B. Stulberg et al., *Referrals for Services Prohibited in Catholic Health Care Facilities*, 48 Perspectives on Sexual & Reproductive Health 111 (2016) ...................................................... 8

Department of Health & Human Services, NCD 140.3, Transsexual Surgery (Docket No. A-13-87), Decision (May 30, 2014) ................................................................................................... 7

Lambda Legal Defense & Education Fund, *Professional Organization Statements Supporting Transgender People in Health Care* (2016) ............................................................................. 6

Mem. from Karen S. Guice, Acting Assistant Sec'y of Def. to Assistant Sec'y of the Army, et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members (July 29, 2016) ........................................................................................... 32

Oxford English Dictionary Online (2016) ................................................................................... 18

Robert K. Creasy et al., Creasy and Resnik's Maternal-Fetal Medicine: Principles and Practice (Saunders, 7th ed. 2013) ......................................................................................................... 15

Steven G. Gabbe et al., Obstetrics: Normal and Problem Pregnancies 822 (Saunders, 6th ed. 2012) ......................................................................................................................................... 15

U.S. Conference of Catholic Bishops, *Ethical and Religious Directives for Catholic Health Care Services* (5th ed. 2009) .............................................................................................................. 7

Webster's Seventh New Collegiate Dictionary (7th ed. 1970) .................................................... 18

## INTERESTS OF *AMICI CURIAE*

Founded in 1986, River City Gender Alliance ("RCGA") is an Omaha-based, nonprofit membership organization that provides peer support for transgender and gender non-conforming people. RCGA currently has more than 150 members, spanning all age ranges. It holds monthly membership meetings, provides information relating to issues affecting transgender people, and offers referrals to support groups, healthcare providers, emergency hotlines, and other resources for the transgender community. RCGA advocates for the equal rights of transgender people and seeks to further social acceptance of transgender people through community outreach and social activities. It has several members who have a medical need for treatment related to gender transition and who anticipate needing treatment over the next year. If Plaintiffs prevail and the Court enjoins the Final Rule, RCGA fears that its members will be subject to discrimination in transition-related services or coverage for transition-related services.

The ACLU of Texas is a nonprofit, nonpartisan organization dedicated to defending the principles embodied in the Constitution and our nation's civil rights laws. It is the Texas affiliate of the American Civil Liberties Union. The ACLU of Texas has more than 10,000 members throughout the state, including in areas of the state with few medical providers. It advocates on behalf of transgender people, people seeking reproductive healthcare, and religious freedom, including by fighting to prevent discrimination in healthcare and to eliminate religious restrictions on access to care. If the Court issues an injunction against the Final Rule, the ACLU of Texas fears that its members will be discriminated against in both coverage and services for transition-related care and reproductive care.

## INTRODUCTION

As part of the Affordable Care Act, Congress passed a landmark anti-discrimination provision ("Section 1557") that prohibits discrimination on the basis of sex in healthcare programs receiving federal funds. After a detailed notice-and-comment process, the U.S. Department of Health & Human Services ("HHS") issued a final rule (the "Final Rule") pursuant to Section 1557, explicitly prohibiting covered entities from discriminating against patients and employees because they are transgender or because they seek reproductive care. Through this lawsuit, Plaintiffs now seek to eliminate those protections root and branch. *Amici* respectfully request that the Court deny Plaintiffs' motions for preliminary injunction.

First, the Court should deny the requested injunction because the broad sweep of Plaintiffs' arguments stands in direct conflict with several constitutional and statutory protections. The Private Plaintiffs' request for a religious accommodation affording them a blanket right to engage in federally funded healthcare discrimination would violate the Establishment Clause. Discrimination against transgender people and women at public hospitals and in public healthcare plans violates the Equal Protection Clause. And Plaintiffs' claimed right to deny stabilizing abortions to patients experiencing emergency medical conditions conflicts with the Emergency Medical Treatment and Active Labor Act ("EMTALA").

Second, Plaintiffs are not likely to succeed on the merits of their claims. Defendants reasonably interpreted discrimination "on the basis of sex" to encompass discrimination based on gender identity and termination of pregnancy, and that reasonable interpretation is entitled to deference under *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 842–45 (1984). The conflicts Plaintiffs identify between the Final Rule and other statutory provisions are based on their own misreadings of the statutory texts. At a minimum, even if the Court accepts Plaintiffs' assertion

2

that discrimination based on gender identity is not *always* discrimination "on the basis of sex," it is well-established that discrimination based on gender identity is *sometimes* discrimination based on sex.

Plaintiffs' other claims are also unlikely to succeed. Plaintiffs' Religious Freedom Restoration Act ("RFRA") claims are meritless, both because Plaintiffs have not articulated the burden on their religious exercise with sufficient specificity, and because the Final Rule is the least restrictive means for furthering the government's compelling interest in preventing taxpayer funded discrimination. The Final Rule does not violate the Spending Clause because the statutory text provides sufficient notice that federal healthcare funds are conditioned on compliance with anti-discrimination requirements, and because the clear-statement doctrine does not apply to claims for injunctive relief or prospective withholding of funds. Plaintiffs' free speech claim is based on imagined conflicts and egregious distortions of the Final Rule. Like other anti-discrimination laws, the Final Rule is sufficiently definite to survive scrutiny under the void-for-vagueness doctrine. And Plaintiffs have not adequately alleged, let alone established, a violation of their due process rights.

Finally, Plaintiffs have failed to establish the remaining preliminary injunction factors. They have not put forth sufficient evidence to demonstrate that compliance with the Final Rule would impose irreparable harm. And the public interest militates heavily against a preliminary injunction—especially one that enjoins the Final Rule, in its entirety, nationwide. If the Final Rule is enjoined, thousands of transgender people and women seeking reproductive care throughout the country will lose critical protections against discrimination in healthcare services, coverage, and facilities. As a result, these people will be put at risk of being denied healthcare

because of who they are. For that reason alone, the Court should deny Plaintiffs' requests for preliminary injunction.

## FACTUAL AND PROCEDURAL BACKGROUND
### Section 1557 and the Final Rule

On March 23, 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148, also known as the Affordable Care Act. Section 1557 of the Affordable Care Act prohibits discrimination in federally financed healthcare programs and activities on the basis of race, sex, color, national origin, age, or disability. 42 U.S.C. § 18116. On May 18, 2016, HHS published the Final Rule, "Nondiscrimination in Health Programs and Activities," implementing Section 1557. 81 Fed. Reg. 31,376. The Final Rule states that Section 1557's prohibition against sex discrimination includes "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." *Id.* at 31,467; 45 C.F.R. § 92.4.

The Final Rule further provides that, under Section 1557's sex discrimination prohibition, entities receiving federal funding "may no longer deny or limit services based on an individual's sex, without a legitimate nondiscriminatory reason." 81 Fed. Reg. at 31,455. This prohibition is not limited to the provision of care related to gender transition. It also applies to the denial of routine medical care for conditions unrelated to gender dysphoria. *Id.* at 31,460. The Final Rule states that "individuals may not be excluded from health programs and activities for which they are otherwise eligible based on their gender identity." *Id.* at 31,409.

For services related to gender transition, the Final Rule does not require a covered entity to "add to or change the types of services offered in the practice." *Id.* at 31,455. If, however, a

4

covered entity provides medically necessary hysterectomies for other conditions, it must provide

the same service when medically necessary to treat gender dysphoria. *Id.*. Similarly, if a covered

entity performs cosmetic surgery such as breast implants for non-transgender women, it must

offer the same cosmetic surgery to transgender women as well. *Id.* The Final Rule applies only to

covered entities; it does not require individual doctors at covered entities to perform any

particular procedure. 81 Fed. Reg. at 31,384

With respect to insurance providers or healthcare entities' employee benefits plans, the

Final Rule prohibits covered entities from categorically refusing to provide insurance coverage

for care related to gender dysphoria without regard to medical necessity. 45 C.F.R. §

92.207(b)(4). The Final Rule does not prohibit providers from determining whether "a particular

health service is medically necessary or otherwise meets applicable coverage requirements in any

individual case." *Id*. § 92.207(d). Rather, it prohibits insurance companies from broadly

prohibiting coverage for all healthcare related to gender dysphoria without analyzing medical

necessity. The Final Rule "specifies that a categorical coverage exclusion or limitation for all

health care services related to gender transition is discriminatory on its face." 81 Fed. Reg. at

31,456.

### Sex Discrimination in Healthcare

Section 1557 and the Final Rule address the very real problem of discrimination in

healthcare, particularly discrimination against transgender people and women seeking

reproductive care. As documented by HHS, transgender people have experienced and continue to

experience multiple forms of discrimination in access to healthcare services, insurance coverage,

and facilities. According to evidence in the administrative record, transgender individuals

experience significant discrimination from entities providing healthcare even when seeking

routine medical care for treatments unrelated to gender dysphoria. "For transgender individuals,

5

a major barrier to receiving care is a concern over being refused medical treatment based on bias against them. In a 2010 report, 26.7% of transgender respondents reported that they were refused needed health care. A 2011 survey revealed that 25% of transgender individuals reported being subject to harassment in medical settings." 81 Fed. Reg. at 31,460.

Moreover, some entities providing insurance or healthcare discriminate against transgender patients by refusing to cover medically necessary treatments for gender dysphoria in accordance with accepted standards of care. Gender dysphoria is a serious medical condition codified in the Diagnostic and Statistical Manual of Mental Disorders (DSM-V) and International Classification of Diseases (ICD-10). The criteria for diagnosing gender dysphoria are set forth in the DSM-V (302.85). The widely accepted standards of care for treating gender dysphoria are published by the World Professional Association for Transgender Health ("WPATH"). The WPATH Standards of Care have been recognized as the authoritative standards of care by the leading medical organizations and federal courts. *See, e.g., Cruz v. Zucker*, No. 14-CV-4456 (JSR), 2016 WL 3660763, at *4 n.4 (S.D.N.Y. July 5, 2016) ("The Court puts significant weight on the WPATH Standards of Care."); Lambda Legal Def. & Educ. Fund, Professional Organization Statements Supporting Transgender People in Health Care (2016).[1] According to every major medical organization and the overwhelming consensus among medical experts, treatments for gender dysphoria, including surgical procedures, are effective, safe, and medically necessary when clinically indicated to alleviate gender dysphoria. *Id.*[2]

---

[1] http://www.lambdalegal.org/sites/default/files/publications/downloads/
ll_trans_professional_statements.rtf_.pdf.

[2] Plaintiffs dispute that surgery for gender dysphoria can ever be medically necessary. But that is a question that must be resolved with the benefit of expert testimony after full discovery and an evidentiary hearing. Plaintiffs cannot obtain a preliminary injunction based on their contested claims about this disputed question of fact.

In the past, public and private insurance companies excluded coverage for transition-related care based on the erroneous assumption that such treatments were cosmetic or experimental. Today, however, the medical consensus recognizes that such discriminatory exclusions of transition-related healthcare have no basis in medical science. Dep't of Health & Human Servs., NCD 140.3, Transsexual Surgery (Docket No. A-13-87), 18 (2014).[3] Under these exclusions, the same types of surgeries, hormones, and preventive screenings that are used to provide medically necessary care to non-transgender individuals are excluded from insurance coverage when used as medically necessary treatment for gender dysphoria. *See* 81 Fed. Reg. at 31,460. As a result of this discrimination in healthcare, transgender people are more likely to lack health insurance and suffer significant health disparities, such as high rates of untreated mental health needs, suicide attempts, violence, and HIV. *Id.*.

Patients seeking access to reproductive care also encounter significant sex discrimination in the healthcare system. For instance, hundreds of Catholic hospitals and hospital systems around the country—nearly all of which receive Medicare and Medicaid funds—prohibit a range of reproductive health services, including sterilization and abortion, even when a person's health or life is at risk. U.S. Conference of Catholic Bishops, Ethical and Religious Directives for Catholic Health Care Services, Directives 45 and 53 (5th ed. 2009).[4] In many instances, these hospitals refuse even to provide information about emergency medical conditions or provide patients with referrals to other healthcare providers. *See id.*, Directive 28; *see also* Debra B. Stulberg et al., *Referrals for Services Prohibited in Catholic Health Care Facilities*, 48

---

[3] http://www.hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2576.pdf.
[4] http://www.usccb.org/issues-and-action/human-life-and-dignity/health-care/upload/Ethical-Religious-Directives-Catholic-Health-Care-Services-fifth-edition-2009.pdf.

Perspectives on Sexual & Reproductive Health (2016).[5] In this case, Plaintiffs seek to refuse abortion services in all circumstances, even when the patient's life is in jeopardy, and might even seek to refuse to provide emergency stabilizing care to patients who are experiencing rare complications from an abortion that has already been performed. *See* First Am. Compl. ¶ 103.

### The Lawsuit

On August 23, 2016, Plaintiffs brought this lawsuit against Secretary Burwell and the U.S. Department of Health and Human Services ("Defendants") challenging the Final Rule on a number of constitutional and statutory grounds. ECF No. 1. Plaintiffs may be divided into two groups. The first group includes: Franciscan Alliance, Inc. ("Franciscan"), a Roman Catholic hospital system; Specialty Physicians of Illinois, LLC ("Specialty Physicians"), a member managed limited liability company of which Franciscan is the sole member; and the Christian Medical & Dental Associations ("CMDA"), an Illinois nonprofit corporation that provides a variety of professional programs and services for its members (collectively, "Private Plaintiffs").[6] The Second group comprises the State of Texas, the State of Wisconsin, the State of Nebraska, Governor Matthew G. Bevin on behalf of the Commonwealth of Kentucky, the State of Kansas, the State of Arizona, the State of Louisiana, and Governor Phil Bryant on behalf of the State of Mississippi (collectively, "State Plaintiffs").[7] Plaintiffs filed the instant motions for preliminary injunction on October 21, 2016. ECF Nos. 22, 24.

---

[5] https://reujq2sar5z38mfxc343rf51-wpengine.netdna-ssl.com/wp-content/uploads/2016/08/Stulberg_et_al-2016-Perspectives_on_Sexual_and_Reproductive_Health.pdf.

[6] CMDA has not provided sufficient evidence to determine whether any of its members is a "covered entity." The Final Rule does not apply to individual healthcare providers employed at covered entities, and it does not apply to medical practices that do not receive federal funding. 81 Fed. Reg. at 31,384.

[7] On October 17, 2016, Plaintiffs filed an Amended Complaint in which they joined the States of Arizona, Louisiana, and Governor Phil Bryant on behalf of the State of Mississippi as additional plaintiffs. ECF No. 21.

Plaintiffs seek a preliminary injunction invalidating the Final Rule in its entirety and have

not asked the Court to determine whether individual provisions of the Final Rule are valid or

whether the Final Rule is invalid as applied to discrete policies and practices. As a result, they

have provided scant evidence to demonstrate how the Rule would actually affect their operations.

For example, CMDA has not identified which of its members have religious objections to the

Final Rule, let alone the grounds for these objections. Similarly, the State Plaintiffs have not

identified which of their individual employees religiously object to providing transition-related

care or reproductive care that may be required under the Final Rule or the types of healthcare to

which these employees object. Nor have State Plaintiffs identified what insurance coverage they

provide their employees or what forms of transition-related healthcare they currently provide.

The thin factual record makes it difficult to properly assess Plaintiffs' claims. Without being able

to assess a particular policy or practice, the Court cannot determine whether the Final Rule

prohibits the relevant conduct or whether the conduct may legally be prohibited.

## ARGUMENT

I.   **Plaintiffs' Claimed Right to Discriminate Against Transgender People and Women Seeking Reproductive Care Is in Direct Conflict with Constitutional and Statutory Protections.**

   A.   **Private Plaintiffs' Requested Religious Accommodation Would Violate the Establishment Clause.**

If Plaintiffs are granted the relief they seek, they would in effect be granted a religious

exemption that crosses the line from permissible religious accommodation to unconstitutional

fostering of religion. As the Supreme Court cautioned in *Cutter v. Wilkinson*, 544 U.S. 709

(2005), the Establishment Clause requires courts analyzing religious exemption requests to "take

adequate account of the burdens a requested accommodation may impose on nonbeneficiaries."

*Id.* at 720. Otherwise, "[a]t some point, accommodation may devolve into 'an unlawful fostering

of religion.'" *Corp. of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334–35 (1987). In *Estate of Thornton v. Caldor*, for instance, the Court held that the Establishment Clause prohibited a Connecticut law that "arm[ed] Sabbath observers with an absolute and unqualified right not to work on whatever day they designate[d] as their Sabbath," because the statute took "no account of the convenience or interests of the employer or those of other employees who do not observe the Sabbath." 472 U.S. 703, 709 (1985). Because the statute forced non-religious employees to "take a back seat to the Sabbath observer," *id.* at 710 n.9, the Court concluded that it had "a primary effect that impermissibly advances a particular religious practice," *id.* at 710. *See also Texas Monthly, Inc. v. Bullock*, 489 U.S. 1, 18 n.8 (1989) (noting that the Supreme Court has upheld "legislative [religious] exemptions that did not, or would not, impose substantial burdens on nonbeneficiaries while allowing others to act according to their religious beliefs").

Applying these precedents, a federal district court recently issued a preliminary injunction against a Mississippi statute providing that the state may not take any action against anyone who acts on the basis of the belief that: "(a) Marriage is or should be recognized as the union of one man and one woman; (b) Sexual relations are properly reserved to such a marriage; (c) Male (man) or female (woman) refer to an individual's biological sex as objectively determined by anatomy and genetics at the time of birth." *Barber v. Bryant*, --- F. Supp. 3d ----, Case No. 3:16-CV-417-CWR-LRA, 2016 WL 3562647, at *6 (S.D. Miss. June 30, 2016) (citation and internal quotation marks omitted), *stay pending appeal denied*, 833 F.3d. 510 (5th Cir. 2016), *appeal pending*. The *Barber* court reasoned that the Mississippi statute impermissibly accorded persons with the protected religious beliefs the "absolute right to refuse service to LGBT citizens without regard for the impact on their employer, coworkers, or those being denied

service." *Id.* at *31. The court concluded that the statute "cannot withstand the *Caldor* line of cases" because it "results in LGBT citizens being personally and immediately confronted with a denial of service." *Id.* at *32.

Plaintiffs' requested religious exemption goes even further. They seek a blanket right to refuse healthcare coverage and services to transgender people and women seeking reproductive care, without any regard for the serious—indeed, potentially "life threatening"—consequences for the people denied medically necessary healthcare. 81 Fed. Reg. at 31,380. Transgender people who are discriminatorily denied healthcare coverage and services related to gender dysphoria are likely to experience serious negative health consequences, high rates of untreated mental health needs, suicide attempts, violence, and HIV. *Id.* at 31,460. Similarly, discriminating against patients who seek access to reproductive care creates the risk that these patients will be denied potentially life-saving services and information during medical emergencies. *See infra* Section I.C. Whatever the outer limits of permissible accommodation, these harms are beyond the pale. The Establishment Clause does not countenance religious exemptions that "come[] at the expense of other citizens," *Barber*, 2016 WL 3562647, at *31, particularly when the potential consequences are so dire.

**B.      The State Plaintiffs' Claimed Right to Discriminate Violates the Equal Protection Clause.**

The State Plaintiffs request an injunction against the Final Rule in its entirety. But instead of articulating how they intend to treat their transgender employees and patients, the State Plaintiffs assert that any restrictions on their ability to discriminate based on gender identity are invalid on their face. Accepting Plaintiffs' argument that the Final Rule is facially invalid would authorize discrimination that is prohibited not only by Section 1557, but also by the Fourteenth Amendment's Equal Protection Clause.

11

Sex and gender based classifications are subject to intermediate scrutiny under the Equal

Protections Clause. *United States v. Virginia*, 518 U.S. 515, 554–55 (1996). This standard

requires the state to demonstrate that its "gender classification . . . is substantially related to a

sufficiently important government interest." *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S.

432, 441 (1985). The state's justification must be "genuine"— in other words, it cannot be

"hypothesized or invented *post hoc* in response to litigation." *Virginia*, 518 U.S. at 533 (holding

that the state's policy of denying women admission to the Virginia Military Institute failed

intermediate scrutiny because the state relied on generalizations about different aptitudes of men

and women to support its policy). "State actors controlling gates of opportunity . . . may not

exclude qualified individuals based on 'fixed notions concerning the roles and abilities of males

and females.'" *Id.* at 541 (quoting *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725

(1982)).

Transgender status qualifies as a quasi-suspect classification meriting heightened scrutiny

under the Equal Protection Clause. Courts consider several factors in determining whether a

group qualifies as a suspect or quasi-suspect class, including *inter alia* whether the group has

suffered a history of discrimination, whether the characteristic at issue bears on a person's ability

to contribute to society, whether the classification applies to a discernible group, and whether the

group is politically marginalized. *Campaign for S. Equal. v. Bryant*, 64 F. Supp. 3d 906, 929–30

(S.D. Miss. 2014) (collecting cases). Applying these criteria, a number of courts have recognized

that transgender status qualifies as a quasi-suspect class. *See, e.g., Bd. of Ed. of the Highland

Local Sch. Dist. v. U.S. Dep't of Ed.*, --- F. Supp. 3d ----, Case No. 2:16-CV-524, 2016 WL

5372349, at *16 (S.D. Ohio Sept. 26, 2016); *Adkins v. City of New York*, 143 F. Supp. 3d 134,

139 (S.D.N.Y. 2015); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104, 1119 (N.D. Cal. 2015). This Court should reach the same conclusion.

Discrimination on the basis of gender identity also qualifies as sex discrimination under the Equal Protection Clause. *See Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011); *Smith v. City of Salem*, 378 F.3d 566 (6th Cir. 2004). As the Supreme Court made clear in *Price Waterhouse v. Hopkins*, discrimination on the basis of gender stereotype is sex-based discrimination. 490 U.S. 228, 250–51 (1989).[8] "A person is defined as transgender precisely because of the perception that his or her behavior transgresses gender stereotypes. . . . There is thus a congruence between discriminating against transgender . . . individuals and discrimination on the basis of gender-based behavioral norms." *Glenn*, 663 F.3d at 1316. A number of courts, including the Fifth Circuit, have applied the same reasoning in the Title VII context. *See EEOC v. Boh Bros. Cons. Co., LLC*, 731 F.3d 444, 454 (5th Cir. 2013) (en banc) ("Numerous courts, including ours, have recognized that a plaintiff can satisfy Title VII's because-of-sex requirement with evidence of a plaintiff's perceived failure to conform to traditional gender stereotypes."); *see also, e.g., Rosa v. Park W. Bank & Trust Co.*, 214 F.3d 213, 215–16 (1st Cir. 2000); *Lopez v. River Oaks Imaging & Diagnostic Grp., Inc.*, 542 F. Supp. 2d 653, 659–61 (S.D. Tex. 2008); *Schroer v. Billington*, 424 F. Supp. 2d 203, 211 (D.D.C. 2006).[9]

---

[8] Although *Price Waterhouse* was a Title VII case, the Supreme Court regularly analogizes between Title VII and the Equal Protection Clause in determining what constitutes discrimination "because of" a protected characteristic. *See, e.g., Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 133 (1976), *superseded by statute on other grounds as recognized in Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991).

[9] An injunction against the Final Rule's provision barring discrimination based on sex would also violate the Equal Protection Clause in the context of women seeking reproductive care. For example, an employer engages in sex discrimination when it fires a woman out of animus for her decision to obtain an abortion. *See Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1214 (6th

The state Plaintiffs advance no important governmental interest capable of satisfying intermediate scrutiny. To the extent they are concerned about individual state employees' religious objections to providing treatment to transgender people or women seeking reproductive care, those concerns may be addressed through reasonable accommodations under Title VII. *See infra* Section II.C. Insofar as the State Plaintiffs claim that ceasing discrimination against transgender people and women seeking reproductive care would require personnel training and other expenses, *see* First Am. Compl. ¶ 68, those expenses are constitutionally required. *See Virginia*, 518 U.S. at 540, 546 (observing that women's admission to the Virginia Military Institute "would require accommodations, primarily in arranging housing assignments and physical training programs for female cadets," while holding that the state had fallen "far short" of establishing the "exceedingly persuasive justification" necessary to satisfy intermediate scrutiny).

### C.     Plaintiffs' Claimed Right To Refuse to Provide Emergency Abortions Violates the Emergency Medical Treatment and Active Labor Act.

To the extent that Plaintiffs seek an injunction against the Final Rule to avoid providing stabilizing abortions to patients experiencing pregnancy-related emergencies, they are requesting the right to violate EMTALA. EMTALA requires hospital emergency departments that accept Medicare funds to stabilize all patients who are experiencing an emergency medical condition, regardless of their condition and regardless of the treatment needed to stabilize the patient. 42 U.S.C. § 1395dd.[10]

---

Cir. 1996) (holding that an employer violated Title VII's prohibition against sex discrimination when it fired an employee for considering having an abortion).

[10] EMTALA defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of

There are a number of conditions that arise during, or that are exacerbated by, pregnancy that necessitate an abortion to stabilize the patient. *See generally* Br. of Amici Curiae Obstetricians-Gynecologists in Supp. of Pl-App and Reversal, *Means v. U.S. Conference of Catholic Bishops*, No. 15-1779 (6th Cir. Jan.15, 2016). For example, when a pregnant woman's water breaks before the fetus is viable, the patient may be at risk for developing life-threatening complications, including chorioamnionitis. *See, e.g.*, American College of Obstetricians and Gynecologists Practice Bulletin No. 160, Premature Rupture of Membranes, 127 Obstetrics & Gynecology e39 (2016). The only treatment to end the infection, and protect the patient's health and life, is immediate delivery of the fetus, i.e., an abortion. *Id.* A woman may also develop a hypertensive disorder called preeclampsia, the leading cause of illness and death of pregnant women worldwide. *See, e.g.*, Steven G. Gabbe et al., Obstetrics: Normal and Problem Pregnancies 822 (Saunders, 6th ed. 2012). In cases where the fetus is not yet viable, an immediate abortion might be needed to stabilize the patient. *See, e.g.,* Robert K. Creasy et al., Creasy and Resnik's Maternal-Fetal Medicine: Principles and Practice 770-71 (Saunders, 7th ed. 2013).

In the context of these preliminary injunction motions, any claimed right to deny all abortion care, and thus emergency abortions to patients experiencing emergency medical conditions, is nothing less than a declaration of intent to violate EMTALA.[11] Plaintiffs provide no justification for such a right. The federal refusal laws—i.e., the Church, Coats, and Weldon Amendments—provide no exception for hospitals in the context of emergency abortions under

---

the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1395dd(e)(1)(A).

[11] Although Plaintiffs baldly assert that their hospital emergency rooms comply with EMTALA, they repeatedly make clear that they do not provide abortion under any circumstances. *See, e.g.,* Declaration of Sister Jane Marie Klein, App. 8 ¶ 19; *id.* at App. 10 ¶ 28-29.

EMTALA. *See* 42 U.S.C. § 300a-7; 42 U.S.C. § 238n; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. H., tit. V § 507(d) (Dec. 18, 2015). The Church Amendment, 42 U.S.C. § 300a-7, prohibits courts from ruling that a hospital is obligated to provide abortions because it receives one of three specific federal funding streams; EMTALA is not predicated on receipt of those funds, but is rather predicated on receipt of Medicare funds. The Coats Amendment does not apply to hospitals. 42 U.S.C. § 238n (c). And Representative Weldon, the sponsor of the Weldon Amendment, explicitly stated that the Weldon Amendment was not intended to reach emergency abortions. *See* 151 Cong. Rec. H176-02 (Jan. 25, 2005).

## II.     The Final Rule Is Valid Under the Administrative Procedure Act.

Plaintiffs argue that the Final Rule violates the APA. The Final Rule is valid under the APA unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A), (C). The Court must defer to an agency's reasonable interpretation of a statute it administers, particularly where, as here, the agency's interpretation is the result of notice-and-comment rulemaking. *United States v. Mead Corp.*, 533 U.S. 218, 226–28 (2001); *Chevron*, 467 U.S. at 842–45. In reviewing Defendants' interpretation of Section 1557, the Court must first decide "whether Congress has directly spoken to the precise question at issue." *Id.* at 842. Where "Congress has explicitly left a gap" to be filled, the agency's regulation is "given controlling weight unless . . . arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843–44. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question . . . is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. The agency need not articulate "the best" interpretation of the statute, only "a reasonable one." *Smiley v. Citibank (South Dakota), N.A.*, 517 U.S. 735, 744–45 (1996).

16

If the agency's interpretation of the statute is reasonable, its actions will be considered arbitrary and capricious only if it has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Tex. Oil & Gas Ass'n v. U.S. E.P.A.*, 161 F.3d 923, 933 (5th Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). This standard "is a narrow one," under which the Court may not "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971).

The Final Rule implements Section 1557, which prohibits discrimination on the grounds prohibited under Title VI, Title IX, the Age Discrimination Act, and the Rehabilitation Act. 42 U.S.C. § 18116. As particularly relevant here, Title IX prohibits discrimination "on the basis of sex." 20 U.S.C. § 1681. The Final Rule construes "on the basis of sex," as incorporated into Section 1557, to include "discrimination on the basis of pregnancy, false pregnancy, termination of pregnancy, or recovery therefrom, childbirth or related medical conditions, sex stereotyping, and gender identity." 45 C.F.R. § 92.4.

Plaintiffs raise three distinct APA challenges to the Final Rule. They argue that: (1) the Final Rule's interpretation of "on the basis of sex" to include discrimination based on gender identity is contrary to Title IX and Section 1557; (2) the Final Rule should have incorporated Title IX's religious exemption and language regarding abortion; and (3) the Final Rule prohibits employers from accommodating their employees' religious beliefs, as required under Title VII. These challenges are all meritless.

17

A.    **The Final Rule's Interpretation of "Sex" as Including Gender Identity Is Reasonable and Consistent with the Statutory Text.**

Defendants acted well within their discretion in concluding that discrimination "on the basis of sex" includes discrimination based on gender identity. First, as numerous courts have concluded, discrimination "on the basis of sex" encompasses discrimination based on gender identity, or at least does not unambiguously exclude it. Second, this Court's decision construing the meaning of "sex" in a Department of Education regulation regarding restrooms and locker rooms at federally funded educational institutions, *Texas v. United States*, --- F. Supp. 3d ----, Civil Action No. 7:16-cv-00054-O, 2016 WL 4426495 (N.D. Tex. Aug. 21, 2016), does not control the meaning of discrimination "on the basis of sex" as used in Title IX itself. Finally, even if Plaintiffs could show that discrimination against transgender people is not *always* discrimination on the basis of sex, it certainly may sometimes qualify as discrimination based on sex stereotypes, making wholesale injunctive relief inappropriate. Plaintiffs have thus failed to demonstrate the APA entitles them to an injunction against enforcement of the Final Rule.

1.    *Discrimination "on the basis of sex" includes discrimination based on gender identity, and, at a minimum, does not unambiguously exclude it.*

Plaintiffs argue that the Final Rule's interpretation of "sex" to include "gender identity" is contrary to law. Plaintiffs' Brief in Support of Their Motion for Partial Summary Judgment or, in the Alternative, Preliminary Injunction at 1, ECF No. 25 ("Private Pls. PI Br.") at 12–18. But the plain meaning of the term "sex," standing alone, is broad enough to encompass the psychological and behavioral aspects of sex that Plaintiffs refer to as "gender." *See* "sex, n., 4a," OED Online, Oxford University Press (2016) (defining sex as "a social or cultural phenomenon, and its manifestations"); Am. Heritage Dictionary 548, 1187 (1973) (defining sex to include "the physiological, functional, and psychological differences that distinguish the male and the

female."); Webster's Seventh New Collegiate Dictionary 347, 795 (1970) (defining sex to include "behavioral peculiarities" that "distinguish males and females."); *see also* American Heritage Dictionary of the English Language 730 (5th ed. 2011) ("[S]ome people maintain that the word gender should be used only to refer to sociocultural roles," but "[t]he distinction can be problematic . . . and it may seem contrived to insist that sex is incorrect in this instance."). Defendants' interpretation of the Final Rule is thus entirely reasonable and consistent with the statutory text.

In both the Title VII and Title IX contexts, the Supreme Court has made clear that discrimination on the basis of sex encompasses more than just discrimination because of anatomical characteristics. Most relevant here, "discrimination because of sex" includes discrimination because of "plaintiff's perceived failure to conform to traditional gender stereotypes." *Boh Bros.*, 731 F.3d at 454. In *Price Waterhouse*,, the Supreme Court held that an employer discriminated against a female employee on the basis of sex when it advised her to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 490 U.S. at 235, 250–51. *Price Waterhouse* thus demonstrated "that Title VII barred not just discrimination based on the fact that [the employee] was a woman, but also discrimination based on the fact that she failed 'to act like a woman.'" *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000); *accord Boh Bros.*, 731 F.3d at 454 (sufficient evidence for a jury to conclude that male employee was discriminated against based on sex because he was harassed for not being "manly" enough and was repeatedly called "sex-based epithets like 'fa—ot,' 'pu—y,' and 'princess.'").

Applying *Price Waterhouse*, appellate and district courts across the country have held that discrimination based on transgender status is discrimination on the basis of sex. The Fifth

Circuit cited approvingly to some of these decisions in *Boh Brothers*. 731 F.3d at 454 n.4.

Because transgender individuals are, by definition, individuals whose gender identity does not

conform to their sex assigned at birth, there is inherently "a congruence between discriminating

against transgender and transsexual individuals and discrimination on the basis of gender-based

behavioral norms." *Glenn*, 663 F.3d at 1316. Thus, "any discrimination against transsexuals (as

transsexuals)—individuals who, by definition, do not conform to gender stereotypes—is . . .

discrimination on the basis of sex as interpreted by *Price Waterhouse*." *Finkle v. Howard Cty.,*

*Md.*, 12 F. Supp. 3d 780, 788 (D. Md. 2014); *accord Schwenk*, 204 F.3d at 1202; *Smith*, 378 F.3d

at 574–75; *Roberts v. Clark Cnty. Sch. Dist.,* No. 215CV00388-JAD-PAL, 2016 WL 5843046, at

*9 (D. Nev. Oct. 4, 2016); *Fabian v. Hosp. of Cent. Conn.*, 172 F. Supp. 3d 509, 527 (D. Conn.

2016); *Dawson v. H&H Elec., Inc.,* No. 4:14CV00583 SWW, 2015 WL 5437101, at *3 (E.D.

Ark. Sept. 15, 2015); *Rumble v. Fairview Health Services,* No. 14-CV-2037 SRN/FLN, 2015

WL 1197415, at *2 (D. Minn. Mar. 16, 2015); *Schroer v. Billington*, 577 F. Supp. 2d 293, 305

(D.D.C. 2008). Defendants thus reasonably interpreted the statutory prohibition against

discrimination "on the basis of sex" to include discrimination based on gender identity, and their

interpretation is accordingly entitled to *Chevron* deference.

> 2.    *This Court's interpretation of "provide separate toilet facilities on the*
>       *basis of sex" in 34 C.F.R. § 106.33 does not resolve the unambiguous*
>       *meaning of discrimination "on the basis of sex" in Title IX.*

In *Texas*, this Court concluded that the term "sex" in a regulation regarding restrooms

and locker rooms referred solely to sex assigned at birth. But the conclusion that the term is

unambiguous in the context of a regulation regarding restrooms and locker rooms does not mean

it is similarly unambiguous in the context at hand. The "natural presumption that identical words

used in different parts of the same act are intended to have the same meaning . . . is not rigid and

readily yields whenever there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent." *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007) (alterations incorporated); *accord Yates v. United States*, 135 S. Ct. 1074, 1082 (2015) (collecting cases).

This Court's analysis in *Texas* addressed permitting schools to create sex-segregated restrooms. The regulation states: "A recipient may provide separate toilet, locker room, and shower facilities on the basis of sex, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex." 34 C.F.R. § 106.33. This Court concluded that "the plain meaning of the term sex *as used in § 106.33 when it was enacted by DOE* following passage of Title IX meant the biological and anatomical differences between male and female students as determined at their birth." *Texas v. United States*, No. 7:16-CV-00054-O, 2016 WL 4426495, at *14 (N.D. Tex. Aug. 21, 2016) (emphasis added). In so holding, this Court emphasized that "the areas identified by the regulations are places where male and female students may have to expose their 'nude or partially nude body, genitalia, and other private parts,' and separation from members of the opposite sex, those whose bodies possessed a different anatomical structure, was needed to ensure personal privacy." *Id.* at *15 (citation omitted). In addition, this Court stated that its interpretation was consistent with the purpose and structure of the regulations because the regulations immediately preceding 34 C.F.R. § 106.33 authorized schools to provide separate housing on the basis of sex and instructions concerning human sexuality. This Court's decision in *Texas* thus stands for the proposition that, in the context of a regulation authorizing sex-segregated restrooms, the term "sex" unambiguously refers to sex assigned at birth.

The question here is very different. In this case, the Court is not interpreting the term

"sex" in the narrow context of a federal regulation pertaining to restrooms and intimate facilities;

rather, it is interpreting the term "sex" in Title IX itself. The contextual meaning of "provide

restrooms on the basis of sex" is very different than the contextual meaning of "discrimination

on the basis of sex." "Title IX is a broadly written general prohibition on discrimination,

followed by specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd.*

*of Educ.*, 544 U.S. 167, 175 (2005). The statute "broadly prohibits a funding recipient from

subjecting any person to 'discrimination' 'on the basis of sex.'" *Id.* at 173 (quoting 20 U.S.C. §

1681). "Discrimination" is a term that covers a wide range of intentional unequal treatment; by

using such a broad term, Congress gave the statute a broad reach. *Id.*; *see N. Haven Bd. of Ed. v.*

*Bell*, 456 U.S. 512, 521 (1982) (Courts "'must accord'" Title IX "'a sweep as broad as its

language'").

       *3.*     *An injunction against enforcement of the rule on its face is inappropriate.*

Plaintiffs' motions seek to enjoin the Final Rule as a whole on APA grounds. In other

words, Plaintiffs argue that the Final Rule can never be applied to prevent discrimination against

transgender people. *Associated Builders & Contractors of Texas, Inc. v. Nat'l Labor Relations*

*Bd.*, 826 F.3d 215, 220 (5th Cir. 2016). But even if discrimination based on a transgender

person's gender identity or transgender status did not *always* constitute discrimination on the

basis of sex, there is no dispute that discrimination against transgender individuals *sometimes*

does constitute sex discrimination under *Price Waterhouse*. "In some cases, the plaintiffs

bringing successful sex stereotyping claims are transgender people, arguing that the

discrimination that they have suffered is because their coworkers perceived their behavior or

appearance as not 'masculine or feminine enough.'" *Eure v. Sage Corp.*, 61 F. Supp. 3d 651, 661

(W.D. Tex. 2014). "Although the *Ulane*, *Sommers*, *Holloway* line of case law was, at one time, a complete bar for transgender plaintiffs to seek recovery on any basis, 'federal courts have recognized with near-total uniformity' that complete bar was eliminated when the Supreme Court upheld gender stereotyping as a valid approach to show discrimination because of sex." *Id.* at 661 n.6 (quoting *Glenn*, 663 F.3d at 1318 n. 5).

In *Trevino v. Center for Health Care Services*, for example, a federal court found that the following evidence was sufficient to survive summary judgment on a transgender employee's Title VII sex discrimination claim:

> Trevino presented summary-judgment evidence showing that she experienced harassment for years. Her evidence indicates that her coworkers and supervisors referred to Trevino as a "he-she," "cross-dresser," "transsexual," and "cross-gender," and made such comments as "you're not a woman," "why are you dressing like a woman," "you look like a man," "you look like a drag queen," "did the doctor cut off your penis," "can you have sex," "you cannot be married," "you're man," and "what parts do you have?" These statements are sufficient to support a claim of severe and pervasive harassment, conveying the message that Trevino is incompetent because of her sex.

No. SA-08-CV-0140 NN, 2009 WL 2406196, at *3 (W.D. Tex. Aug. 3, 2009) (footnotes omitted). Similarly, in *Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, a federal court held that a transgender job applicant had submitted direct evidence to support her Title VII sex discrimination claim, where the defendant employer used the following language in rescinding her job offer: "You presented yourself as a female and we later learned you are a male." 542 F. Supp. 2d 653, 656, 662 (S.D. Tex. 2008).

Even the post-*Price Waterhouse* cases cited by Plaintiffs acknowledge that discrimination against a transgender individual can sometimes constitute discrimination on the basis of sex. In *Johnston v. University of Pittsburgh of the Commonwealth System of Higher Education*, for

23

instance, the court held that a transgender plaintiff had not adequately alleged a claim for sex

discrimination under *Price Waterhouse* because:

> The University permitted him, without harassment or discrimination, to dress like
> a man, act like a man, change his name to reflect his male gender, and enroll in
> classes designated for males. Plaintiff's sole contention of discrimination is that
> UPJ forbade him from using University bathrooms and locker rooms consistent
> with his male gender identity rather than his female birth sex.

97 F. Supp. 3d 657, 681 (W.D. Pa. 2015), *appeal dismissed* (3d Cir. 15-2022) (Mar. 30, 2016);

*see also Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1222 n.2 (10th Cir. 2007) ("Sex

stereotyping based on a person's gender non-conforming behavior is impermissible

discrimination, irrespective of the cause of that behavior; a label, such as 'transsexual,' is not

fatal to a sex discrimination claim where the victim has suffered discrimination because of his or

her gender nonconformity." (some internal quotation marks omitted) (quoting *Smith*, 378 F.3d at

575)).

The same principles apply here. For example, in *Rumble v. Fairview Health Services*, a

federal district court held that an 18-year-old transgender plaintiff—who alleged that he was

subjected to prolonged and extreme abuse at a Minnesota hospital, over a six-day period, after

requesting medical treatment for his debilitating pain and fever—had validly stated a Section

1557 sex discrimination claim. *See* 2015 WL 1197415, at *18 ("Even if Plaintiff was required to

prove that Dr. Steinman intended to harass Rumble because of . . . Rumble's failure to conform

with gender stereotypes, Plaintiff plausibly alleges facts demonstrating Dr. Steinman's requisite

intent."); *see also* 81 Fed. Reg. at 31,460 ("For transgender individuals, a major barrier to

receiving care is a concern over being refused medical treatment based on bias against them. In a

2010 report, 26.7% of transgender respondents reported that they were refused needed health

care. A 2011 survey revealed that 25% of transgender individuals reported being subject to

harassment in medical settings."). Thus, even if the Court concludes that discrimination against

transgender people is not "discrimination because of sex" *per se*, Plaintiffs' challenge still fails

because discrimination against transgender people undoubtedly amounts to sex discrimination in

at least some circumstances.

**B.      The Final Rule's Omission of Title IX's Religious Exemption and Abortion
          Language Is Reasonable and Consistent with the Statutory Text.**

Plaintiffs contend that the Final Rule violates the APA because it does not include Title

IX's religious exemption and abortion language. Private Pls. PI Br. at 19–22. Plaintiffs' premise

is mistaken—Section 1557 was never meant to incorporate every aspect of Title IX. Rather, the

plain language of Section 1557 references Title IX, Title VI, and the other underlying civil rights

statutes only with respect to identifying: 1) who is protected under Section 1557; and 2) the

attendant enforcement mechanisms. The statute states in relevant part: "[A]n individual shall not,

*on the ground prohibited under title VI of the Civil Rights Act of 1964, title IX of the Education*

*Amendments of 1972, the Age Discrimination Act of 1975, or section 504 of the*

*Rehabilitation Act of 1973*, be excluded from participation in, be denied the benefits of, or be

subjected to discrimination under, any health program or activity, any part of which is receiving

Federal financial assistance . . . . *The enforcement mechanisms provided for and available under*

*such title VI, title IX, section 504, or such Age Discrimination Act shall apply* for purposes of

violations of this subsection." 42 U.S.C. § 18116(a) (emphases added). Had Congress intended

Section 1557 to incorporate Title IX wholesale, it would have said so explicitly.

Defendants also had good reason for declining to incorporate Title IX's blanket religious

exemption into Section 1557, namely the different context. As the Final Rule itself points out:

> [S]tudents or parents selecting religious educational institutions typically do so as a
> matter of choice; a student can attend public school (if K-12) or choose a different
> college. In the healthcare context, by contrast, individuals may have limited or no choice

> of providers, particularly in rural areas or where hospitals have merged with or are run by religious institutions. Moreover, the choice of providers may be even further circumscribed in emergency circumstances.

81 Fed. Reg. at 31,380. Additionally, "a blanket religious exemption could result in a denial or delay in the provision of health care to individuals and in discouraging individuals from seeking necessary care, with serious and, in some cases, life threatening results." *Id.*

Plaintiffs are also flatly wrong to argue that Title IX "forbade" Defendants from defining sex discrimination to include discrimination based on the termination of pregnancy. The opposite is true. The Final Rule's prohibition on discriminating against a person because she has terminated a pregnancy tracks Title IX's statutory language, which says that "[n]othing in this section shall be construed to permit a penalty to be imposed on any person or individual because such a person or individual is seeking or has received any benefit or service related to a legal abortion." 20 U.S.C. § 1688. Similarly, Title IX's implementing regulations prohibit discrimination based on "termination of pregnancy." *See, e.g.*, 34 C.F.R. § 106.21(b). [12] It is therefore audacious to claim, as Plaintiffs do, that the Rule is in conflict with Title IX, given that Title IX's own regulation contains precisely the same language prohibiting discrimination based on "termination of pregnancy."

---

[12] In fact, the Code of Federal Regulations is replete with regulations interpreting statutes that bar sex discrimination to reach discrimination against a woman because she terminated a pregnancy. Dep't of Veterans Affairs, Nondiscrimination on the Basis of Sex, Marital or Parental Status, 38 C.F.R. § 23.445(b)(1) (2016) ("A recipient shall not discriminate against any student … on the basis of such student's pregnancy, childbirth, false pregnancy, *termination of pregnancy*, or recovery therefrom") (emphasis added); NASA, Nondiscrimination on the Basis of Sex, Marital or Parental Status, 14 C.F.R. § 1253.445(b)(1) (2016) (same); Dep't of Labor, Nondiscrimination on the Basis of Sex, Marital or Parental Status, 29 C.F.R. § 36.445(b)(1) (2016) (same); Dep't of Commerce, Nondiscrimination on the Basis of Sex, Marital or Parental Status, 15 C.F.R. § 8a.445(b)(1) (2016) (same). As noted by Defendants, the Rule is merely consistent with these countless, decades-old regulations. 81 Fed. Reg. at 31,388 (the Rule's prohibition on discriminating against people who have terminated a pregnancy is "based upon existing regulation and previous Federal agencies' and courts' interpretations that discrimination on the basis of sex including discrimination on the basis of "termination of pregnancy").

C.     **The Final Rule Does Not Conflict with Title VII.**

There is no conflict between the Final Rule and Title VII's religious accommodation

provisions. 42 U.S.C. §§ 2000e–2(a), 2000e(j): Critically, the Final Rule imposes obligations

only on entities receiving federal financial assistance, not their employees. 81 Fed. Reg. at

31,384. Contrary to Plaintiffs' contentions, nothing in the Final Rule would prevent an entity

receiving federal financial assistance—the only persons subject to the rule—from

accommodating an objecting employee, so long as the entity ensures that healthcare services

continue to be provided on a nondiscriminatory basis.[13]

Moreover, whereas the Final Rule does not *prohibit* healthcare entities from

accommodating their employees' religious beliefs, Title VII does not *require* employers to

accommodate employees' religious beliefs when doing so would result in an undue hardship. 42

U.S.C. § 2000e(j); *see also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977)

(defining "undue hardship" to mean more than a de minimis cost). Applying the undue hardship

analysis, the Fifth Circuit held that Title VII did not require a healthcare provider to

accommodate a counselor who refused to perform her job duties because she had a religiously

motivated objection to serving gay people. *See, e.g., Bruff v. N. Miss. Health Servs., Inc.*, 244

F.3d 495, 500–01 (5th Cir. 2001).

Along similar lines, courts have held that Title VII does not require an employer to allow

an employee to impose their religious beliefs on others. *See, e.g., Knight v. Conn. Dep't of Pub.

Health*, 275 F.3d 156, 168 (2d Cir. 2001) (holding that the plaintiffs' proposed accommodation

was not reasonable because "[p]ermitting appellants to evangelize while providing services to

---

[13] Plaintiffs fail to mention whether they have received any requests for religious accommodation
regarding transition-related care or reproductive care, even though the Final Rule has been in
effect with respect to healthcare services since July 18.

clients would jeopardize the state's ability to provide services in a religion-neutral matter");

*Wilson v. U.S. West Commc'ns*, 58 F.3d 1337, 1341 (8th Cir. 1995) ("Although Wilson's

religious beliefs did not create scheduling conflicts or violate dress code or safety rules, Wilson's

[proposed accommodation] would require U.S. West to allow Wilson to impose her beliefs as

she chooses."). There is thus no conflict between Title VII and the Final Rule.

**III.     The Final Rule Does Not Violate Plaintiffs' Rights Under the Religious Freedom Restoration Act.**

Franciscan Alliance and CMDA also argue that the Final Rule violates their rights under

RFRA. Courts have consistently analyzed religious exemption claims on a strictly case-by-case

basis. *See, e.g., Sherbert v. Verner*, 374 U.S. 398, 410 (1963) (upholding a claim to a religious

exemption from a state law denying unemployment benefits to those who would not work on

Saturdays, but explaining that the decision was not announcing a constitutional right to

unemployment benefits for "all persons whose religious convictions are the cause of their

unemployment"). RFRA requires the same approach. The statute provides that the "Government

shall not substantially burden *a person's* exercise of religion," unless it "demonstrates that

*application of the burden to the person*" is "in furtherance of a compelling government interest,"

and is "the least restrictive means of furthering that compelling governmental interest." 42

U.S.C. § 2000bb–1(a), (b) (emphases added).

As the statutory language makes clear, RFRA requires "case-by-case consideration of

religious exemptions to generally applicable rules." *Gonzales v. O Centro Espirita Beneficente*

*Uniao do Vegetal*, 546 U.S. 418, 436 (2006); *see also Adkins*, 393 F.3d at 571 (holding that the

substantial burden analysis under the Religious Land Use and Institutionalized Persons Act

("RLUIPA"), which resembles RFRA analysis in all relevant respects, "requires a case-by-case,

fact-specific inquiry to determine whether the government action or regulation in question

28

imposes a substantial burden on an adherent's religious exercise"). Thus, RFRA does not

"require[] (or permit[]) courts to nullify whole regulations just because they have a potential for

improper application to a particular faith or belief." *Borzych v. Frank*, 439 F.3d 388, 391 (7th

Cir. 2006).

Here, Plaintiffs have not shown with specificity how the Final Rule "truly pressures the

adherent to significantly modify his religious behavior and significantly violate his religious

beliefs." *Louisiana College v. Sebelius*, 38 F. Supp. 3d 766, 779 (W.D. La. 2014) (quoting

*Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)), *appeal pending*. For example, Franciscan

Alliance does not explain which specific medical procedures it objects to performing and under

what circumstances, nor does it identify the specific forms of healthcare coverage that it objects

to providing. *See* Private Pls. PI Br. at 24. CMDA does not even identify which of its members

are covered entities subject to the Final Rule, let alone which of these members object to the

Final Rule and what the specific bases of these objections are. *See id.* These factual lacunae are

important because the RFRA analysis is highly fact-specific and relief is necessarily

individualized. *See Borzych*, 439 F.3d at 391 (analyzing RLUIPA); *Adkins*, 393 F.3d at 571.

Without more evidence, it is simply impossible to determine what the substantial burden is on

Plaintiffs' religious exercise and what forms of individualized relief might be available.[14]

Even assuming, *arguendo*, that Plaintiffs could demonstrate a sufficiently specific

substantial burden on their religious exercise, their RFRA claim would still fall because the Final

Rule is the least restrictive means for furthering the government's compelling interests in

preventing taxpayer-funded discrimination in healthcare. The government has a well-established

---

[14] Indeed, CMDA cannot claim a RFRA exemption on behalf of *all* its members without even identifying who those members are and the grounds for their objections. Nor can CMDA claim a RFRA exemption for itself, as it does not appear to be a covered entity within the meaning of the Final Rule. *See* Private Pls. PI Br. at 9–10.

compelling interest in eradicating all forms of invidious discrimination, including discrimination based on sex. *See, e.g.*, *Roberts v. U.S. Jaycees*, 468 U.S. 609, 628 (1984). But the government also has an independent—and at least equally compelling—interest in making sure that federal funds are not used to subsidize discrimination. *See e.g.*, *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 492 (1989) (plurality opinion). Thus, for example, the Supreme Court held in *Bob Jones University v. United States* that the denial of tax benefits to universities that engage in religiously motivated racial discrimination did not violate the Free Exercise Clause, because the government had a compelling interest in denying such benefits to discriminatory institutions. 461 U.S. 574, 591 (1983). Additionally, the government has a compelling interest in making sure that people are able to access healthcare coverage and services on a nondiscriminatory basis, *see* 81 Fed. Reg. at 31,380, and in "safeguarding the public health," *Mead v. Holder*, 766 F. Supp. 2d 16, 43 (D.D.C. 2011).

Invoking the Supreme Court's decision in *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), Franciscan and CMDA argue that the government's interest in preventing taxpayer funded discrimination cannot be regarded as compelling because other government policies allow "appreciable damage to that supposedly vital interest." Private Pls. PI Br. at 29 (quoting *Lukumi*, 508 U.S. at 547) (internal quotation marks omitted). But *Lukumi* concerned a Free Exercise Clause challenge to laws *intended* to accomplish a "religious gerrymander, an impermissible attempt to target petitioners and their religious practices" while permitting similar religious practices by other religious groups. 508 U.S. at 535 (citation and internal quotation marks omitted); *see also Merced v. Kasson*, 577 F.3d 578, 594 (5th Cir. 2009) (quoting *Lukumi*, 508 U.S. at 546–47). Here, there is absolutely nothing to suggest that Section 1557 and the Final Rule were meant to target the religious exercise of Franciscan Alliance and

30

CMDA for special mistreatment. To be sure, the government may not rely on a categorical

interest in uniform statutory enforcement to oppose a RFRA claim where the statute at issue

includes exemptions for similar religious conduct. *See Tagore v. United States*, 735 F.3d 324,

331 (5th Cir. 2013) (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546

U.S. 418, 430–31 (2006)). But Franciscan Alliance and CMDA do not identify any such

exemptions in Section 1557 or the Final Rule, nor do they argue that Defendants are selectively

restricting their religious exercise while allowing similar groups to continue engaging in taxpayer

funded discrimination in healthcare.

In any event, the so-called exemptions identified by Franciscan Alliance and CMDA are

inapposite. First, they argue that Medicare and Medicaid do not require coverage for gender

confirmation surgery, but rather "allow state and local administrators to make coverage

determinations on a case-by-case basis." Private Pls. PI Br. at 27 (citing Centers for Medicare &

Medicaid Services, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery*

(Aug. 30, 2016)). But the decision by the Centers for Medicare and Medicaid Services to allow

individualized coverage determinations in no way conflicts with the Final Rule, which prohibits

covered entities from categorically excluding all treatments for gender dysphoria from insurance

coverage without engaging in individualized analysis. *See, e.g.*, 81 Fed. Reg. at 31,435 ("[W]e

do not affirmatively require covered entities to cover any particular treatment, as long as the

basis for exclusion is evidence-based and nondiscriminatory."). And, indeed, Medicare and

Medicaid are themselves subject to the Final Rule. *See* 45 C.F.R. 92.2 ("[T]his part applies to . . .

every health program or activity administered by [HHS].").

Second, Franciscan Alliance and CMDA argue that TRICARE, the military's insurance

program, does not cover surgical treatment for gender dysphoria. Private Pls. PI Br. at 29–30

31

(citing TRICARE Policy Manual 6010.57-M, Chapter 7, Sections 1.2 and 4.1 (updated Sept. 6,

2016)). But recent changes to TRICARE support, rather than undermine, the government's

compelling interests. In a final rule issued on September 2, 2016, the Department of Defense

concluded that "[i]t is no longer justifiable to categorically exclude and not cover currently

accepted medically and psychologically necessary treatments for gender dysphoria (such as

psychotherapy, pharmacotherapy, and hormone replacement therapy) that are not otherwise

excluded by statute." 81 Fed. Reg. 61,6008, 61,071 (Sept. 2, 2016; *see also id.* (noting the

"overwhelming support for these proposed changes"). While it is true that TRICARE does not

provide coverage for surgical treatment related to gender dysphoria, this is based on a statutory

prohibition against any surgical treatment that is not "focused on restoring function of the body

part upon which surgery is performed." *Id.* at 61,074 (discussing 10 U.S.C. § 1079(a)(11)).

Plaintiffs also argue that the Military Health Service "protects the religious beliefs of

physicians who object to performing gender transition procedures." Private Pls. PI Br. at 30

(citing Mem. from Karen S. Guice, Acting Assistant Sec'y of Def. to Assistant Sec'y of the

Army, et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve

Component Service Members 2–3 (July 29, 2016) ("Guice Memo")). The cited memorandum

provides that a Military Health Service provider will not "be required to deliver care that he or

she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or

religious beliefs." Guice Memo ¶ 6. The Memo goes on to state that "referral to an appropriate

provider or level of care is required under such circumstances," and "reinforc[es] at all times the

transgender Service member's right to receive all medical care with dignity and respect." *Id.*

Similarly, the Final Rule does not require individual healthcare providers to provide transition-

related care, so long as the healthcare entity receiving federal funds ensures that care is provided on a nondiscriminatory basis.

Finally, Franciscan Alliance and CMDA argue that the government does not have a compelling interest in requiring them to provide healthcare services or coverage for abortion. Private Pls. PI Br. at 29, 30. But, as Plaintiffs themselves acknowledge, the Final Rule does "not displace the protections afforded by provider conscience laws" or the "provisions in the ACA related to abortion services." 81 Fed. Reg. at 31,378; *see also* 42 U.S.C. § 300a-7; 42 U.S.C. § 238n; Consolidated Appropriations Act, 2016, Pub. L. No. 114-113, Div. H., tit. V § 507(d) (Dec. 18, 2015). It is thus unclear what, exactly, Plaintiffs believe the Final Rule requires them to do in violation of their religious beliefs.[15]

The Final Rule is also the least restrictive means of advancing these compelling government interests. Plaintiffs suggest that the government itself may provide the healthcare services and coverage to which they object, or that it may partner with willing healthcare entities to ensure that these services are provided. *See* Private Pls. PI Br. at 31–32. But it is not a less restrictive alternative for the government to create an entirely new government program to directly provide healthcare services and coverage that existing, federally funded healthcare entities refuse to provide. *See Hobby Lobby*, 134 S. Ct. at 2786 (Kennedy, J., concurring) ("[I]t is the Court's understanding that an accommodation may be made to the employers without imposition of a whole new program or burden on the Government."). And, even if the government could directly provide the services and coverage to which Plaintiffs object, it might

---

[15] As noted above, EMTALA requires covered healthcare entities to provide appropriate stabilizing care, including abortion, to people experiencing emergency medical conditions. *Supra* Section I.C. Neither the federal religious refusals laws nor the ACA has displaced that requirement. *Id.; see also* 42 U.S.C. § 18023(d) (stating that nothing in the ACA "shall be construed to relieve any health care provider from providing emergency services as required by State or Federal law, including [EMTALA].").

not be able to provide them to people living in rural areas or who rush to an area hospital while experiencing emergency medical conditions. 81 Fed. Reg. at 31,380.

Moreover, none of Plaintiffs' proposed alternatives addresses the core issue—namely, the government's compelling interest in making sure that federal funds, to which all taxpayers contribute, are not used to subsidize discrimination. As the Supreme Court made clear in *Bob Jones University*, there are no less restrictive means for furthering the government's interest in not funding discrimination than to simply not fund it. 461 U.S. at 604; *cf. Hobby Lobby Stores, Inc.*, 134 S. Ct. at 2783 (stating that prohibitions on racial discrimination in employment "are precisely tailored to achieve [the] critical goal" of eliminating such discrimination). Even if the government funds could be segregated from an organization's discriminatory activities, the very fact of government funding would impermissibly lend the government's "power, property, and prestige" to a discriminatory organization. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961).

Every single instance of discrimination "causes grave harm to its victims." *United States v. Burke*, 504 U.S. 229, 238 (1992); *see also Daniel v. Paul*, 395 U.S. 298, 307–08 (1969) (describing "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public" (internal quotation marks omitted)). Such discrimination also denies society the benefit of their "participation in political, economic, and cultural life." *Roberts*, 468 U.S. at 625. Because of the harms associated with each instance of invidious discrimination, there is simply no "numerical cutoff below which the harm is insignificant." *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 282 (Alaska 1994). That is especially true in the healthcare context, where a discriminatory denial of coverage or

services may discourage, or even prevent, individuals from seeking medically necessary care. *See* 81 Fed. Reg. at 31,380.

## IV.   The Final Rule Does Not Violate the Spending Clause.

Plaintiffs argue that the Final Rule violates the Spending Clause's clear-statement doctrine because Section 1557 does not state explicitly that it prohibits discrimination against transgender people and women seeking reproductive care. *See* Brief in Support of State Plaintiffs' Motion for Partial Summary Judgment or, in the Alternative, A Preliminary Injunction at 1–2, ECF No. 23 ("State Pls. PI Br."). at 12–19 (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1 (1981)). Not so. The Spending Clause requires Congress to "express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds"; it does not require Congress to "specifically identif[y] and proscribe[] in advance" every improper action. Instead, notice is provided "by the statutory provisions, regulations, and other guidelines provided by [the government] at t[he] time" the funds are received. *Bennet v. Ky. Dep't of Educ.*, 470 U.S. 656, 665–66, 670 (1985). Thus, "[t]he Supreme Court has explained that so long as a spending condition has a clear and actionable prohibition of discrimination, it does not matter that the manner of that discrimination can vary widely." *Benning v. Georgia*, 391 F.3d 1299, 1306 (11th Cir. 2004); *see also Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (stating that Title IX's provisions have been "broadly" interpreted "to encompass diverse forms of intentional sex discrimination").

Moreover, even if notice were inadequate, *Pennhurst*'s clear-notice rule does not affect "the scope of the behavior" proscribed by Spending Clause legislation, but only the availability of "money damages." *Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629,

639 (1999); *see id.* at 640 ("Because we have repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause, however, *private damages actions are available* only where recipients of federal funding had adequate notice that they could be liable for the conduct at issue." (citations omitted) (emphasis added)); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("[W]e must ask whether the [Individual with Disabilities Education Act] furnishes clear notice regarding the liability at issue in this case."); *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) ("[W]e have regularly applied the contract-law analogy in cases defining the scope of conduct for which funding recipients may be held liable for money damages."); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) ("When Congress attaches conditions to the award of federal funds under its spending power, as it has in Title IX and Title VI, we examine closely the propriety of private actions *holding the recipient liable in monetary damages* for noncompliance with the condition" (emphasis added)); *see generally Pennhurst*, 451 U.S. at 28–29. Thus, Plaintiffs' clear-statement argument does not implicate the availability of prospective relief under the Final Rule.

Even if the Final Rule did violate the Spending Clause, it would nonetheless be independently justified as an exercise of Congress's authority under Section 5 of the Fourteenth Amendment—which grants Congress broad powers to enforce the Equal Protection Clause. The question whether Congress acted pursuant to its Section 5 authority does not depend on a specific reference in the statutory text itself or even in the legislative history. Rather, the question is whether Congress, "as an objective matter," had the constitutional authority to act pursuant to its power to enforce the Equal Protection Clause. *Crawford v. Davis*, 109 F.3d 1281, 1283 (8th Cir. 1997). Applying these principles, the majority of courts to address the question have had little difficulty concluding that the constitutional roots of Title IX, for example, lie in Section 5

36

of the Fourteenth Amendment as well as the Spending Clause. *See, e.g., Doe v. Univ. of Illinois*, 138 F.3d 653 (7th Cir. 1998); *Crawford*, 109 F.3d at 1283; *Franks v. Kentucky Sch. for the Dead*, 142 F.3d 360 (6th Cir. 1998). *But see Rowinsky v. Bryan Ind. Sch. Dist.*, 80 F.3d 1006, 1012 (5th Cir. 1996) (stating, in dicta, that "precedent strongly suggests that title IX, like its model, title VI, was enacted under" the Spending Clause, rather than Section 5). The same rationale applies to Section 1557, which was modeled on these statutes. As discussed above, *supra* Section I.B, the Equal Protection Clause prohibits both sex discrimination and discrimination against transgender people. Thus, the purposes of Section 1557 and the purposes of the Equal Protection Clause are entirely congruent, at least in cases like this where Section 1557 apples to public officials operating federally funded programs. In such cases, Section 1557 is simply one means of enforcing the equality guarantees of the Fourteenth Amendment.

The State Plaintiffs also argue that the Final Rule violates the APA because it unconstitutionally commandeers their states' legislative and administrative apparatuses, in violation of the Tenth Amendment. State Pls. PI Br. at 19–24. However, valid exercises of Congress's Spending Clause and Section 5 authority do not implicate the Tenth Amendment. *EEOC v. Wyoming*, 460 U.S. 226, 243 n.18 (1983) ("We do reaffirm that when properly exercising its power under § 5, Congress is not limited by the same Tenth Amendment constraints that circumscribe the exercise of its Commerce Clause powers."), *superseded on other grounds by* 29 U.S.C. § 623; *South Dakota v. Dole*, 483 U.S. 203, 210 (1987) ("We have also held that a perceived Tenth Amendment limitation on congressional regulation of state affairs did not concomitantly limit the range of conditions legitimately placed on federal grants.). The State Plaintiffs' Tenth Amendment claim therefore fails.

**V.      Plaintiffs Have Not Identified a Conflict Between the Final Rule and the First Amendment.**

Plaintiffs Franciscan Alliance and CMDA argue that the Final Rule facially "violates the Free Speech Clause by prohibiting doctors from expressing some points of view and compelling them to express others." Private Pls. PI Br. at 32. Plaintiffs' arguments, however, are based on egregious distortions of the Final Rule's text.

First, Franciscan Alliance and CMDA take issue with a statement in the Final Rule's preamble explaining that categorically excluding all coverage for transition-related care as "experimental" is "outdated and not based on current standards of care." 81 Fed. Reg. at 31,429. This statement in the Final Rule does not regulate covered entities in their capacity as healthcare providers. The statement is about a regulation of coverage in insurance policies. The Final Rule merely explains the agency's own rationale for why the Final Rule prohibits insurance companies from categorically excluding insurance coverage for transition-related care. In other words, that portion of the Final Rule regulates what a covered entity must do—provide an insurance policy that does not categorically exclude coverage. It does not require covered entities to voice support for such procedures or to refrain from criticizing such procedures.[16]

Second, Franciscan Alliance and CMDA assert that the Final Rule requires them to speak by publishing written policies expressing affirmance of transition-related procedures. Private Pls. PI Br. at 36–37. The Rule does nothing of the kind. The Rule's reference to "written policies" occurs in a section estimating potential costs that regulated entities might incur to ensure that

---

[16] Franciscan Alliance and CMDA also object to a statement in the WPATH Standards of Care stating that "[m]ental health professionals should not impose a binary view of gender." Private Pls. PI Br. at 37. Other mainstream mental health organizations adhere to a similar code of ethics. The Final Rule never cites to or references the sentence that Plaintiffs find objectionable. Rather, the Rule simply cites to the WPATH Standards in support of Defendants' determination that covered entities may not provide an insurance policy that does not categorically exclude coverage for treating gender dysphoria.

they bring their practices into compliance with Section 1557. *See* 81 Fed. Reg. at 31,455–46 ("We assume that it will take, on average, three to five hours for a provider to develop or modify policies and procedures concerning sex discrimination."). The Final Rule does not require covered healthcare entities to publish such policies or mandate any particular message.

Finally, Franciscan Alliance and CMDA object to a statement in the Final Rule's preamble describing potential types of harassment that could potentially constitute sex discrimination. Private Pls. PI Br. at 37. But the Final Rule does not actually contain any provisions expressly addressing harassment. The statements to which Plaintiffs refer were made in the context of explaining why Defendants chose *not* to include an explicit anti-harassment provision in the Final Rule. As the Final Rule's preamble squarely states:

> OCR recognizes that various forms of harassment can impede an individual's ability to participate in or benefit from a health program or activity and can thus constitute unlawful discrimination under Section 1557 and this part. . . . Because it has been long-established that harassment is a form of prohibited discrimination under each of the laws cited in Section 1557 and this part, OCR does not believe a separate harassment provision is necessary and therefore declines to revise the proposed rule to include one.

*See* 81 Fed. Reg. at 31,405–06. Plaintiffs' speculation that they may be sued for harassment at some point in the future is wholly speculative, but even if Plaintiffs' alleged an immediate and particularized injury in fact, the alleged injury is not traceable to the Final Rule and would not be redressed by an injunction prohibiting the Rule's enforcement.[17]

---

[17] To be sure, Section 1557's prohibition against sex discrimination also prohibits sex-based harassment, as the Final Rule acknowledges. *Id.*; *see also, e.g.*, *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 67 (1986). But Section 1557 would prohibit such harassment even if the Final Rule were enjoined. Moreover, it is well-established that the First Amendment does not protect sex-based harassment. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 389 (1992) ("[S]ince words can in some circumstances violate laws directed not against speech but against conduct . . . a particular content-based subcategory of a proscribable class of speech can be swept up incidentally within the reach of a statute directed at conduct rather than speech. Thus, for example, sexually derogatory 'fighting words,' among other words, may produce a violation of

VI.     **The Final Rule Is Not Unconstitutionally Vague.**

Franciscan Alliance and CMDA also challenge the Final Rule on vagueness grounds.

Private Pls. PI Br. at 39–44. "The void-for-vagueness doctrine reflects the principle that 'a

statute [or regulation] which either forbids or requires the doing of an act in terms so vague that

[persons] of common intelligence must necessarily guess at its meaning and differ as to its

application, violates the due process of law.'" *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984)

(quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1984)). In *Roberts*, the Supreme

Court had "little trouble concluding that these concerns are not seriously implicated" by laws

prohibiting discrimination at places of public accommodation. *Id.* at 629. That is true, despite the

fact that, as the preamble for the Final Rule recognizes, "[t]he determination of whether a certain

practice is discriminatory typically requires a nuanced analysis that is fact-dependent." 81 Fed.

Reg. at 31,377. The statute at issue in *Roberts*, for instance, prohibited places of public

accommodation from denying "any person the full and equal enjoyment of the goods, services,

facilities, privileges, advantages, and accommodations of a place of public accommodation

because of race, color, creed, religion, disability, national origin or sex," and defined "place of

public accommodation" to encompass "a business, accommodation, refreshment, entertainment,

recreation, or transportation facility of any kind, whether licensed or not, whose goods, services,

facilities, privileges, advantages or accommodations are extended, offered, sold, or otherwise

made available to the public." 468 U.S. at 615. Courts have also rejected vagueness challenges to

Medicare regulations because "[t]he definition of adequate medical care cannot be boiled down

---

Title VII's prohibition against sexual discrimination in employment practices."); *see also*
*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006).

to a precise mathematical formula." *Doyle v. Sec'y of Health & Human Servs.*, 848 F.2d 296, 301

(1st Cir. 1988). Thus, both Section 1557 and the Final Rule easily survive vagueness review.

To the extent Plaintiffs challenge specific statements in the Final Rule, those challenges

are based on distortions of the Rule's text. For example, the Final Rule states that covered

entities cannot exclude transition-related care from their coverage "by categorizing all transition-

related treatment as cosmetic or experimental," because "such across-the board categorization is

now recognized as outdated and not based on current standards of care." 81 Fed. Reg. at 31,429.

Plaintiffs argue that, "[b]y removing the most obvious types of 'neutral' criteria on which

covered entities have historically relied—limiting coverage to procedures that are medically

necessary, medically appropriate, and that are not merely cosmetic or experimental—HHS has

left covered entities with no meaningful 'neutral, nondiscriminatory' criteria to choose from."

Private Pls. PI Br. at 41. But the Final Rule does not prohibit federally funded healthcare entities

from denying coverage for particular transition-related procedures as experimental, cosmetic, or

not medically necessary. Rather, it merely prohibits those entities from systematically denying

transition-related care "by categorizing all transition-related treatment as cosmetic or

experimental." 81 Fed. Reg. at 31,429.

Plaintiffs also complain that HHS declined to limit the Final Rule's application "by

specifying that coverage for health services . . . must be provided *only* when the services are

*medically necessary or medically appropriate*." Private Pls. Br. at 40 (quoting 81 Fed Reg. at

31,435). But the Final Rule does not require covered entities to provide procedures that are not

"strictly identified as medically necessary or appropriate." 81 Fed. Reg. at 31,435. Rather, the

Rule states that "if a covered entity covers certain types of elective procedures that are beyond

those strictly identified as medically necessary or appropriate, it must apply the same standards

41

to its coverage of comparable procedures related to gender transition." *Id.* There is nothing vague about this standard.

Finally, although Plaintiffs also challenge a number of terms contained in the Final Rule—such as "benefit design," "legitimate, non-discriminatory reason," and "health services related to gender transition," Private Pls. PI Br. at 41–42—those terms are concepts with which people in the healthcare industry are readily familiar. *See Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999) (stating that regulations need not achieve "meticulous specificity" and holding that due process is satisfied "as long as a reasonably prudent person, familiar with the conditions the regulations are meant to address and the objectives the regulations are meant to achieve, has fair warning of what the regulations require"). Some of these terms are also commonly used in federal law. *See, e.g.*, 42 U.S.C. § 1395w-102 ("benefit design"); 45 C.F.R. § 156.125 ("benefit design"); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) ("legitimate, nondiscriminatory reason"). Plaintiffs may dispute whether and how the terms should be applied, but they cannot argue that the concepts referenced are utterly devoid of meaning. Section 1557 and the Final Rule thus provide more than sufficient notice of the discriminatory conduct they prohibit.

## VII. Plaintiffs Have Not Adequately Alleged, Let Alone Established, That the Final Rule Violates Their Due Process Rights.

Finally, Franciscan Alliance and CMDA argue that the Final Rule violates their substantive due process right to refrain from performing abortion and sterilization procedures. Private Pls. PI Br. at 44–47. Putting aside that Plaintiffs are unable to cite any precedent identifying such a right, they do not explain whether the Final Rule requires any individual

Plaintiff physician to provide some aspect of healthcare to which he or she objects.[18] At most, Plaintiffs can muster only the vague claim that the Rule "pressur[es]" physicians to perform abortion and sterilization. Private Pls. PI Br. at 45. But Plaintiffs fail to state which individual Plaintiff physicians (presumably members of CMDA, but even that is unclear) feel that "pressure"; what specialty those physicians practice (for example, whether any of them are obstetrician-gynecologists); and how the Rule would actually cause those physicians to change their behavior. Simply put, Plaintiffs have not made any allegations, let alone put forth evidence, to support their Due Process Clause claim.

Even if Plaintiffs had provided such evidence, or made such allegations, their argument would fail. To support their asserted substantive due process right, Plaintiffs point to federal laws that they claim allow individual providers to refuse to provide abortion and sterilization. Private Pls. PI Br. at 45–47. For example, the Coats Amendment states that the government may not discriminate against an individual physician if he or she refuses to preform abortion. 42 U.S.C. § 238n. Similarly, the Church Amendment provides that entities receiving certain federal funding streams may not discriminate against a physician if he or she refuses to provide abortion or sterilization. 42 U.S.C. § 300a-7(c)(1). The Plaintiffs also point to Title VII, which requires employers to provide a religious accommodation to employees, as long as that accommodation does not unduly burden the employer. Those laws are explicitly undisturbed by the Final Rule. *See, e.g.*, 81 Fed. Reg. at 31379–80. If those laws protect individual Plaintiffs from providing abortion and sterilization, and the Final Rule does nothing to change those laws, then Plaintiffs' Due Process Clause challenge collapses on itself.

---

[18] As discussed above, *supra* at 5, the Final Rule does not apply to physicians in their individual capacities, but rather applies only to healthcare entities operating a health program or activity that receives HHS funds. 45 C.F.R. § 92.4.

## VIII.   Plaintiffs Have Not Demonstrated Irreparable Harm.

"To establish irreparable injury, [Plaintiffs] must demonstrate that the harm is 'real,

imminent, and significant—not merely speculative or potential—with admissible evidence and a

clear likelihood of success.'" *Tex. Health & Human Servs. Comm'n v. United States*, 166 F.

Supp. 3d 706, 710 (N.D. Tex. 2016) (quoting *Aquifer Guardians in Urban Areas v. Fed.

Highway Admin.*, 779 F. Supp. 2d 542, 574 (W.D. Tex. 2011)). Plaintiffs have failed to carry that

burden here.

First, Franciscan Alliance and CMDA argue that they will suffer irreparable injury to

their religious exercise, free speech, and due process rights if the Final Rule is not immediately

enjoined. Supplemental Br. in Supp. of Pls. Mot. for Preliminary Injunction ("Supplemental PI

Br.") at 1. But, as discussed above, Plaintiffs have not demonstrated that the Final Rule violates

any of these rights.[19]

Second, Plaintiffs argue that the threatened costs of compliance (or noncompliance) with

the Final Rule provides an independent basis for finding irreparable harm. Supplemental PI Br. at

2. Such "[f]inancial injury is only irreparable where no 'adequate compensatory or other

corrective relief will be available at a later date, in the ordinary course of litigation.'" *Mexichem

Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisconsin Gas Co. v.

FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)); *cf. Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016)

(finding irreparable harm because "[n]o mechanism here exists for [plaintiffs] to recover the

compliance costs they will incur if the Final Rule is invalidated on the merits"). Here, Plaintiffs

have asked for actual damages. First Am. Compl. ¶ j. They have not explained why such

---

[19] Plaintiffs argue that "[t]he same principle applies to the harm to Plaintiffs from the government's violations of the Administrative Procedure Act, Due Process Clause, and Spending Clause." *Id.* at 1–2. Plaintiffs cite no authority to support this proposition. In any event, they have also failed to establish a likelihood of success on the merits for these claims.

44

damages would be insufficient to cover the costs of compliance, nor have they put forth a shred

of evidence to estimate the overall magnitude of their compliance costs. In fact, the State

Plaintiffs have not put forth any evidence whatsoever. For example, it is unclear: what insurance

coverage the State Plaintiffs currently provide, what transition-related healthcare their public

hospitals currently provide, how many healthcare providers employed by the state object to

providing care, whether other providers are available to cover for objecting providers, where

their public hospitals are located, and whether they have received requests for religious

accommodations. As a result, it is impossible to assess how much it would actually cost them to

be in compliance with the Final Rule.

Third, the State Plaintiffs argue that the Final Rule interferes with their sovereign

interests. Supplemental PI Br. at 2–3. They cite to this Court's decision in *Texas v. United States*,

95 F. Supp. 3d 965 (N.D. Tex. 2015). But this Court's decision in that case concerned a concrete

conflict between a federal regulation defining "spouse" under the Family and Medical Leave Act

and several contrary provisions in Texas law. *See id.* at 971. Here, by contrast, Plaintiffs have not

identified an actual and direct conflict between the Final Rule and their respective state laws.

Plaintiffs cite several statutes protecting physicians' independent medical judgment. State Pls. PI

Br. at 21–23; Supplemental PI Br. at 2. But the Final Rule does not interfere with physicians'

independent medical judgment any more than Title VI, the Age Discrimination Act, or the

Rehabilitation Act do.

Finally, Plaintiffs' delay in seeking a preliminary injunction undermines their claim of

irreparable harm. *See* Charles A. Wright & Arthur R. Miller, 11A Fed. Prac. & Proc. Civ. §

2948.1 & n.13 (3d ed.). The Final Rule was issued on May 18, 2016. Most of the Rule's

provisions—including provisions prohibiting discrimination in access to healthcare services and

facilities, as well as healthcare plan benefit implementation—went into effect on July 18, 2016.

45 C.F.R. § 92.1. Plaintiffs filed this lawsuit on August 23, more than three months after the

Rule was issued and more than a month after it had already gone into effect. *See* ECF No. 1.

Plaintiffs did not serve the United States Attorney for the Northern District of Texas until

September 26, 2016. *See* ECF No. 28 at 2. And they did not file their motions for partial

summary judgment or preliminary injunction until October 21, more than five months after the

Final Rule was issued. ECF Nos. 23, 25. Plaintiffs' sluggishness belies their asserted need for

immediate relief.

**IX.     The Balance of Equities and the Public Interest Oppose Granting the Injunction.**

A plaintiff seeking a preliminary injunction must also establish "that the balance of

equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555

U.S. 7, 20 (2008). Here, the balance tilts sharply against the grant of an injunction. As numerous

courts, including the Fifth Circuit, have recognized, the violation of federal civil rights laws

imposes irreparable harm as a matter of law. *See United States v. Hayes Int'l Corp.*, 415 F.2d

1038, 1045 (5th Cir. 1969); *see also, e.g.*, *Silver Sage Partners, Ltd. v. City of Desert Hot*

*Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417,

1423 (11th Cir. 1984); *United States v. Nat'l Lead Co.*, 438 F.2d 935, 937–38 (8th Cir. 1971);

*United States v. Cent. Carolina Bank & Trust Co.*, 431 F.2d 972, 975 (4th Cir. 1970). But that is

precisely what will happen if the Final Rule is erroneously enjoined.

The grant of an injunction against the Final Rule's enforcement would impose irreparable

harm on thousands of transgender people and women seeking reproductive care. A preliminary

injunction would deprive these vulnerable populations of critical safeguards against

discrimination in access to healthcare services, coverage, and facilities. These harms are not

46

hypothetical. As the Final Rule found, "[M]any women and transgender individuals continue to experience discrimination in the healthcare context, which can lead to denials of adequate health care and increases in existing health disparities in underserved communities." 81 Fed. Reg. at 31,460. As noted above, *supra* at 24, Jakob Rumble was subject to six days of abuse at a Minnesota hospital, after seeking treatment for a fever and excruciating pain, because of his transgender status. *Rumble*, 2015 WL 1197415, at *2. Joe Robinson, an operating room nurse at a hospital in Arizona, had to pay thousands of dollars out of pocket for his doctor-prescribed treatment because his employer refuses to provide any coverage for transition-related care. Complaint, *Robinson v. Dignity Health*, Case No. 3:16-cv-03035, ECF No. 1. And HHS's Office of Civil Rights has already collected numerous complaints of discrimination against transgender people in healthcare. *See* OCR Enforcement Under Section 1557 of the Affordable Care Act – Sex Discrimination Cases.[20] More than a quarter of transgender survey respondents report that they were denied healthcare or subjected to harassment while seeking it. *See* 81 Fed. Reg. at 31,460. As a result transgender people suffer significant health disparities. *Id.*

Patients seeking reproductive care are also in danger. As discussed above, *supra* at 7, Catholic hospitals and healthcare systems around the country prohibit a range of reproductive health services and information, including services and information related sterilization and abortion, even when a person's health or life is at risk. For example, when Jessica Mann became pregnant with her third child, her doctor recommended that she undergo a tubal ligation at the time of delivery because of a pre-existing brain tumor that could become life-threating when strained by pregnancy; however, her hospital flatly refused to allow her doctor to perform the procedure because it conflicted with the Ethical & Religious Directives for Catholic Health Care

---

[20] http://www.hhs.gov/civil-rights/for-individuals/section-1557/ocr-enforcement-section-1557-aca-sex-discrimination/index.html.

Services. Administrative Complaint, *Mann v. Ascension Health* (HHS Office for Civil Rights Oct. 25, 2016).[21] Similarly, Melanie Jones was turned away by her doctor, who was part of a Catholic healthcare network, when seeking treatment for bleeding and cramping after her intrauterine device (IUD) became dislodged; her doctor said that she was not allowed to remove the IUD because of religious restrictions. Administrative Complaint, *Jones v. Mercy Hosp. & Med. Ctr.* (HHS Office for Civil Rights June 30, 2016).

Any injunction against the Final Rule threatens significantly worse health outcomes for transgender people and women seeking reproductive care. Plaintiffs cannot justify these results any more than they can justify the use of taxpayer funds for discriminatory ends. Their requests for preliminary relief should be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for preliminary injunction.

---

[21] https://www.aclu.org/legal-document/ocr-complaint-behalf-jessica-mann?redirect=legal-document/complaint-behalf-jessica-mann-and-aclu.

Respectfully submitted this 23rd day of November, 2016.

Rebecca L. Robertson                    /s/ Brian Hauss
AMERICAN CIVIL LIBERTIES                Brian Hauss
UNION OF TEXAS                          Joshua Block
P.O. Box 8306                           Brigitte Amiri
Houston, TX 77288                       James D. Esseks
(713) 942-8146                          Louise Melling
                                        AMERICAN CIVIL LIBERTIES
Kali Cohn                               UNION FOUNDATION
AMERICAN CIVIL LIBERTIES                125 Broad Street, 18th Floor
UNION OF TEXAS                          New York, NY 10004
P.O. Box 600169                         (212) 549-2500
Dallas, TX 75360
(214) 346-6577


Daniel Mach*                            Amy Miller*
AMERICAN CIVIL LIBERTIES                AMERICAN CIVIL LIBERTIES
UNION FOUNDATION                        UNION OF NEBRASKA
915 15th Street, N.W.                   134 S. 13th St., #1010
Washington, D.C. 20005                  Lincoln, NE 68508
(202) 548-6604                          (402) 476-8091



Counsel for *Amici Curiae*

*Applications for admission pending.

## CERTIFICATE OF SERVICE

On November 23, 2016, I electronically submitted the foregoing **BRIEF OF *AMICI***
***CURIAE* RIVER CITY GENDER ALLIANCE AND ACLU OF TEXAS IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** to the clerk of the court
for the U.S. District Court, Northern District of Texas, using the electronic case filing system of
the Court.  I hereby certify that I have served counsel of record for all parties through the Court's
ECF system.

/s/ Brian Hauss
Brian Hauss

50