# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

FRANCISCAN ALLIANCE, INC., *et al.*,

   *Plaintiffs,*

  v.

SYLVIA BURWELL, *et al.*,

   *Defendants.*

No. 7:16-cv-00108-O

**Private Plaintiffs' Reply Brief in Support of Their Motion for Preliminary Injunction**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ........................................................................................... 1

ARGUMENT ................................................................................................ 1

    I.    The Rule imposes immediate, irreparable harm ........................................... 1

    II.    HHS's jurisdictional arguments are meritless ........................................... 7

        A.    Plaintiffs' claims are ripe ....................................................... 7

        B.    Plaintiffs have standing ....................................................... 10

        C.    A pre-enforcement challenge is not prohibited.................................. 11

    III.    The Rule violates the Administrative Procedure Act.................................. 13

        A.    HHS's interpretation of "sex" is contrary to law ................................ 13

        B.    HHS's failure to include Title IX's exemptions
            is contrary to law ............................................................. 15

        C.    HHS's Rule is contrary to Title VII.............................................. 16

    IV.    The Rule violates RFRA .............................................................. 16

    V.    The Rule violates the Spending Clause ................................................ 18

    VI.    The Rule violates the Free Speech Clause ............................................ 19

    VII.    The Rule is unconstitutionally vague ................................................ 21

    VIII.  The Rule violates the Due Process Clause ............................................ 23

    IX.    *Amici's* arguments are meritless.................................................... 24

    X.    The balance of harms and public interest favor Plaintiffs........................... 25

CONCLUSION............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Abbott Labs. v. Gardner,*
  387 U.S. 136 (1967) ............................................................................... 9, 10, 11, 12

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
  133 S. Ct. 2321 (2013) ........................................................................................ 20

*Am. Civil Liberties Union v. Trinity Health Corp.,*
  No. 15-cv-12611, 2016 WL 1407844 (E.D. Mich. Apr. 11, 2016) .......................... 24

*Am. Forest & Paper Ass'n v. U.S. E.P.A.,*
  137 F.3d 291 (5th Cir. 1998) ................................................................................. 8

*Artuso v. Hall,*
  74 F.3d 68 (5th Cir. 1996) ................................................................................... 14

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004) .............................................................................................. 4

*Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
  627 F.3d 547 (5th Cir. 2010) ........................................................................... 10-11

*Baggett v. Bullitt,*
  377 U.S. 360 (1964) ............................................................................................ 22

*Burwell v. Hobby Lobby Stores, Inc.,*
  134 S. Ct. 2751 (2014) ............................................................................. 17, 18, 24

*Byers v. Intuit, Inc.,*
  564 F. Supp. 2d 385 (E.D. Pa. 2008)...................................................................... 6

*Cannon v. Univ. of Chi.,*
  441 U.S. 677 (1979) ............................................................................................ 13

*Central & S. W. Servs., Inc. v. E.P.A.,*
  220 F.3d 683 (5th Cir. 2000) ............................................................................. 7, 9

*Cenzon-DeCarlo v. Mount Sinai Hosp.,*
  626 F.3d 695 (2d Cir. 2010)................................................................................... 3

*Chemical Waste Mgmt., Inc. v. E.P.A.,*
  869 F.2d 1526 (D.C. Cir. 1989)............................................................................. 9

*Chevron U.S.A., Inc. v. Traillour Oil Co.,*
  987 F.2d 1138 (5th Cir. 1993) ........................................................................ 7, 18

*Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.,*
  933 F.2d 1285 (5th Cir. 1991) .............................................................................. 16

*City of Lakewood v. Plain Dealer Publ'g Co.,*
  486 U.S. 750 (1988) ............................................................................................ 22

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.,*
  779 F.3d 258 (5th Cir. 2015) .......................................................................... 10, 13

*Cutter v. Wilkinson,*
  544 U.S. 709 (2005) ............................................................................................ 24

*Doe v. Garrett,*
  903 F.2d 1455 (11th Cir. 1990) ............................................................................ 12

*Dortch v. Mem'l Herman Healthcare Sys.-Sw.,*
  525 F. Supp. 2d 849 (S.D. Tex. 2007) .................................................................. 16

*Douglas v. Kimberly-Clark Corp.,*
  No. 91-2599, 1991 WL 236882 (E.D. Pa. Oct. 31, 1991) ........................................ 6

*FCC v. Fox Television Stations, Inc.,*
  132 S. Ct. 2307 (2012) .................................................................................. 21, 23

*Freed v. Consol. Rail Corp.,*
  201 F.3d 188 (3d Cir. 2000) ................................................................................ 12

*Gen. Conference Corp. of Seventh-Day Adventists v. McGill,*
  617 F.3d 402 (6th Cir. 2010) ................................................................................. 6

*Geneva Coll. v. Sebelius,*
  929 F. Supp. 2d 402 (W.D. Pa. 2013) .................................................................... 3

*Gonzales v. O Centro Espirita*
*Beneficente Uniao do Vegetal,*
  546 U.S. 418 (2006) ........................................................................................ 17-18

*Harris v. McRae,*
  448 U.S. 297, 321 (1980) .................................................................................... 10

*Hobby Lobby Stores, Inc. v. Sebelius,*
  723 F.3d 1114 (10th Cir. 2013) .............................................................................. 7

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
    515 U.S. 557 (1995) ........................................................................... 19-20

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.,*
    97 F. Supp. 3d 657 (W.D. Pa. 2015) ...................................................... 14

*Jones v. Brown,*
    41 F.3d 634 (Fed. Cir. 1994) ................................................................... 14

*Kling v. L.A. Cty.,*
    633 F.2d 876 (9th Cir. 1980) .................................................................. 12

*Kolender v. Lawson,*
    461 U.S. 352 (1983) ............................................................................... 22

*Lockhart v. United States,*
    136 S. Ct. 958 (2016) ............................................................................. 14

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ............................................................................... 10

*McAllen Grace Brethren Church v. Salazar,*
    764 F.3d 465 (5th Cir. 2014) ................................................................. 10

*McCutcheon v. FEC,*
    134 S. Ct. 1434 (2014) ........................................................................... 18

*MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.,*
    512 U.S. 218 (1994) ............................................................................... 13

*Means v. U.S. Conference of Catholic Bishops,*
    No. 1:15-CV-353, 2015 WL 3970046 (W.D. Mich. June 30, 2015) ....... 24

*Montgomery Improvement Ass'n, Inc. v.*
    *U.S. Dep't of Hous. & Urban Dev.,*
    645 F.2d 291 (5th Cir. 1981) ................................................................. 12

*Nat'l Socialist Party of Am. v. Vill. of Skokie,*
    432 U.S. 43 (1977) ................................................................................. 19

*Nat. Res. Def. Council v. EPA,*
    559 F.3d 561 (D.C. Cir. 2009) .................................................................. 9

*NFIB v. Sebelius,*
    132 S. Ct. 2566 (2012) ........................................................................... 19

iv

*Ohio Forestry Ass'n Inc. v. Sierra Club,*
   523 U.S. 726, 734 (1998) ................................................................. 8

*Opulent Life Church v. City of Holly Springs, Miss.,*
   697 F.3d 279 (5th Cir. 2012) .......................................................... 1-2

*Pace v. Bogalusa City Sch. Bd.,*
   403 F.3d 272 (5th Cir. 2005) ............................................................ 18

*Price Waterhouse v. Hopkins,*
   490 U.S. 228 (1989) ......................................................................... 14

*Real Alts., Inc. v. Burwell,*
   150 F. Supp. 3d 419 (M.D. Pa. 2015) ................................................ 3

*Reno v. Koray,*
   515 U.S. 50 (1995) ........................................................................... 14

*Roark & Hardee LP v. City of Austin,*
   522 F.3d 533 (5th Cir. 2008) ............................................................ 21

*Ruiz v. Estelle,*
   161 F.3d 814 (5th Cir. 1998) ............................................................ 13

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.,*
   547 U.S. 47 (2006) ........................................................................... 20

*Serafine v. Branaman,*
   810 F.3d 354 (5th Cir. 2016) ............................................................. 5

*Silva-Trevino v. Holder,*
   742 F.3d 197 (5th Cir. 2014) ............................................................ 14

*Smith v. Goguen,*
   415 U.S. 566 (1974) ......................................................................... 21

*Snyder v. Phelps,*
   562 U.S. 443 (2011) ......................................................................... 19

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ..................................................................... 18-19

*S. Fork Band v. U.S. Dep't of Interior,*
   643 F. Supp. 2d 1192 (D. Nev. 2009) ............................................... 11

*Texas v. United States,*
   497 F.3d 491 (5th Cir. 2007) ........................................................... 10

*Texas v. United States*,
    787 F.3d 733 (5th Cir. 2015) ................................................................ 10

*Texas v. United States*,
    No. 7:16-CV-00054-O, 2016 WL 4426495
    (N.D. Tex. Aug. 21, 2016) ........................................................ 1, 7, 12-13

*Thunder Basin Coal Co. v. Reich*,
    510 U.S. 200 (1994) ............................................................................ 12

*Tomic v. Catholic Diocese of Peoria*,
    442 F.3d 1036 (7th Cir. 2006) ............................................................... 6

*United States v. Stevens*,
    559 U.S. 460 (2010) ...................................................................... 4, 23

*United Transp. Union v. Foster*,
    205 F.3d 851 (5th Cir. 2000) ............................................................ 7, 8

*Window Sys., Inc. v. Manchester Mem'l Hosp.*,
    424 F. Supp. 331, 336 (D.Conn.1976) ................................................... 6

## Statutes

20 U.S.C. § 1681 .................................................................................. 15

42 U.S.C. § 2000bb-1 ........................................................................... 17

42 U.S.C. § 18116 ................................................................................ 12

## Other Authorities

45 C.F.R. § 92.2 ................................................................................... 23

45 C.F.R. § 92.4 .............................................................................. 14-15

45 C.F.R. § 92.101 ............................................................................... 15

81 Fed. Reg. 31376 (May 18, 2016) ...................................................*passim*

ACLU, *Do You Believe a Catholic Hospital Provided You or a Loved
    One Inadequate Reproductive Health Care?*, https://ac-
    tion.aclu.org/secure/do-you-believe-catholic-hospital-provided-you-
    or-loved-one-inadequate-reproductive-health-car .................................... 5

Compl. and Jury Demand, *Dovel v. Pub. Library*
   *of Cincinnati & Hamilton Cty.*,
   No. 16-955 (S.D. Ohio Sept. 26, 2016) ...................................................... 5

Compl., *Prescott v. Rady Children's Hosp. - San Diego*,
   No. 16-2408 (S.D. Cal. Sept. 26, 2016)................................................... 5

Compl., *Robinson v. Dignity Health*, No. 16-3035
   (N.D. Cal. June 6, 2016) .......................................................................... 5

Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. and Mem. in
   Supp. Thereof, *Ave Maria School of Law v. Sebelius*, No. 2:13-cv-
   795, 2014 WL 1420311 (M.D. Fla. Mar. 7, 2014) ................................... 3

Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J., *Real Alts.,
   et al. v. Burwell*, 150 F. Supp. 3d 419, No. 1:15-cv-0105, 2015 WL
   12700984 (M.D. Pa. May 28, 2015)......................................................... 3

HHS Admin. Compl., OCR, *Mann v. Ascension Health* (Oct. 25,2 016) ..................... 5

OCR, *Laws and Regulations Enforced by OCR*,
   Laws Regulations Guidance, http://www.hhs.gov/civil-rights/
   for-providers/laws-regulations-guidance/laws/index.html...................................... 4

**INTRODUCTION**

This case would vanish if HHS would do one simple thing: Agree that Plaintiffs are in full compliance with the Rule. HHS repeatedly proclaims that the Rule is not meant to override an "applicable" religious defense or a doctor's "nondiscriminatory" medical judgment. But it carefully avoids saying that Plaintiffs' religious defenses are actually "applicable" here or that their medical judgments are "nondiscriminatory." Instead, HHS would have Plaintiffs play a regulatory game of Russian roulette, where only HHS knows how many chambers of the gun are loaded. Plaintiffs can pull the trigger and hope the Rule won't apply. But if it does, Plaintiffs will suffer massive consequences. HHS lacks any statutory basis for making Plaintiffs play this game. Accordingly, a preliminary injunction is required.

**ARGUMENT**

**I.    The Rule imposes immediate, irreparable harm.**

The irreparable harm in this case is readily apparent. In accordance with their religious beliefs and medical judgment, Plaintiffs have adopted categorical policies against performing gender transition procedures or covering them in their insurance plans. Pls.' Br. in Supp. of their Mot. for Partial Summ. J., or in the Alternative, Prelim. Inj. 8-12 (Br.). But under the new Rule, Plaintiffs "have to revise [their] policy to provide the procedure[s] for transgender individuals," and their insurance plan will be "unlawful on its face" as of January 1. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31455, 31429 (May 18, 2016); *cf.* Def.'s Opp. to Pls.' Mots. for Prelim. Inj. 12 (HHS). Thus, Plaintiffs face "a Hobson's choice between violating federal rules . . . on the one hand, and transgressing [their] longstanding policies and practices, on the other." *Texas v. United States*, No. 7:16-CV-00054-O, 2016 WL 4426495, at *15-16 (N.D. Tex. Aug. 21, 2016). As this Court has already held, this constitutes "irreparable harm." *Id.*; *see Opulent Life Church v. City of Holly Springs,*

1

*Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

In response, HHS claims that there is no irreparable harm because Plaintiffs *might* be able to avoid liability in a future enforcement proceeding. HHS 19-22. But this argument fails for several reasons.

First, HHS's assurances ring hollow. To obviate the need for this motion, both before and after filing it, Plaintiffs asked if HHS would simply agree in writing that Plaintiffs' practices do not violate the Rule. Goodrich Decl. at ¶¶ 3, 6. But HHS refused. *Id.* at ¶¶ 4, 6. Instead, HHS offers only coy generalities. It repeatedly says, for example, that the Rule "does not require any covered entity to perform, or to provide insurance coverage for, any particular medical services"; rather, it simply requires covered entities to refrain from "unlawful discrimination." HHS 1; *see also* HHS 9-10; 11; 14; 26; 41. But this is simply an oblique way of saying that if Plaintiffs' refusal to perform or cover gender transition procedures is deemed to be discriminatory, then they must perform and cover them. And the Rule makes indicates that it will treat Plaintiffs' policies on coverage and medical services as discriminatory. *See* Br. 10-12, 24-26, 35-37, 43.

Similarly, HHS says that it will respect medical judgment if it is "nondiscriminatory" and "legitimate." HHS 1, 10, 11, 12, 14, 21, 25, 41. But it carefully avoids saying whether *Plaintiffs'* medical judgments, as detailed in their written policies and opening brief, are "nondiscriminatory" and "legitimate." To the contrary, it says that it will "carefully scrutinize" any assertions of medical judgment for any hint of "pretext." 81 Fed. Reg. at 31429. And the Rule suggests that it will treat Plaintiffs' medical judgment as discriminatory. *See* Br. 10-11, 36-38, 42.

On the question of religious conscience, HHS offers the truism that its Rule cannot trump federal conscience statutes when those statutes are "applicable." HHS 8, 12. But it studiously avoids saying whether those statutes are "applicable" to Plaintiffs'

conduct here. For example, HHS does not deny that on January 1, 2017, Franciscan's health plan, which categorically excludes coverage for gender transition procedures, will be "unlawful on its face." 81 Fed. Reg. at 31429; *accord* HHS 12. But HHS refuses to say whether Franciscan's plan is protected under RFRA, promising only that the existing Rule "contemplates addressing" such religious objections. HHS 14. HHS also suggests that it will take a dim view of such objections, arguing that its Rule furthers a "compelling interest" under RFRA, 81 Fed. Reg. at 31380, and admitting that it "decided against including a blanket religious exemption in the final rule," *id*. at 31376, precisely so that it could enforce the Rule against at least some religious objectors. HHS 42; 81 Fed. Reg. at 31380.

HHS's assurances based on the Church Amendment are equally hollow. HHS itself says that the Church Amendment is limited to "three specified federal funding streams." HHS 9 n.4. But Plaintiffs provide many health services outside the scope of those three funding streams, and the Rule still applies to them in "all of [their] operations." 81 Fed. Reg. at 31430. Similarly, several courts, often at the behest of HHS, have held that the Church Amendment is enforceable only by HHS, not private parties.[1] And HHS has repeatedly argued that the Church Amendment protects only "individuals" and therefore does not protect entities like Franciscan at all.[2] Indeed,

---

[1] *See, e.g.*, *Cenzon-DeCarlo v. Mount Sinai Hosp.*, 626 F.3d 695, 699 (2d Cir. 2010) (finding no private right of action under Church Amendment); *Real Alts., Inc. v. Burwell*, 150 F. Supp. 3d 419, 446 (M.D. Pa. 2015) (Plaintiff who does not show a "connection between [his or her] actions" and "grant funding for 'voluntary family planning projects' . . . lack[s] standing to advance [his or her] claim that the mandate violates the Church Amendment.") (quoting *Geneva Coll. v. Sebelius*, 929 F. Supp. 2d 402, 449-50 (W.D. Pa. 2013)).

[2] *See, e.g.*, Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. at 33, *Real Alts., et al. v. Burwell*, No. 1:15-cv-0105 (M.D. Pa. May 28, 2015), 2015 WL 12700984 (arguing that an "entity" could not receive protection under the Church Amendment because it is not an "individual"); *accord* Defs.' Mot. to Dismiss or, in the Alternative, for Summ. J. and Mem. in Supp. Thereof at 44, *Ave Maria Sch. of Law v. Sebelius*, No. 2:13-cv-795 (M.D. Fla. Mar. 7, 2014), 2014 WL 1420311 ("Nor is plaintiff an 'individual' under that provision. Plaintiff is therefore not within the Church Amendment's zone of interests either.").

HHS's own website describes the Church and Weldon Amendments as limited only to "recipients of *certain* federal funds," with respect to "*certain* health care providers" who refuse to participate in "*certain* health care services." OCR, *Laws and Regulations Enforced by OCR*, Laws Regulations Guidance, http://www.hhs.gov/civil-rights/for-providers/laws-regulations-guidance/laws/index.html (last visited Dec. 1, 2016) (emphasis added). It is little wonder, then, that HHS never actually says that the Church Amendment protects Plaintiffs here.

Ultimately, HHS has adopted a Rule that, by its plain text, makes Plaintiffs' conduct illegal. It then tries to evade judicial review by claiming that the Rule allows Plaintiffs to raise affirmative defenses. But courts have repeatedly rejected this tactic. In *Ashcroft v. ACLU*, for example, the government opposed an injunction on the ground that "[n]o prosecutions ha[d] yet been undertaken under the law," and anyone who faced prosecution could assert "an affirmative defense" under the First Amendment. 542 U.S. 656, 670-71 (2004). But the Supreme Court rejected that argument, noting that when "only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial"—which is itself an irreparable harm. *Id.*

Similarly, in *United States v. Stevens*, the government argued that a law banning depictions of animal cruelty should be upheld because the law included a broad "exceptions clause" for constitutionally protected speech, and because the government promised to apply it in the future in a way that respected speech. 559 U.S. 460, 480-81 (2010). But the Supreme Court flatly rejected that argument, stating that "[w]e w[ill] not uphold an unconstitutional statute merely because the Government promise[s] to use it responsibly." *Id.* at 480. Instead, "[t]he Government's assurance that it will apply [the law] far more restrictively than its language provides is pertinent only as an implicit acknowledgment of the potential constitutional problems with a more natural reading." *Id.* So too here: HHS tries to assure the Court that it will

apply the Rule in a way that respects religious conscience and medical judgment precisely because the plain language of the Rule is indefensible. *Accord Serafine v. Branaman*, 810 F.3d 354, 368-69 (5th Cir. 2016).

Unwilling to say that Plaintiffs are actually in compliance with the Rule, HHS resorts to arguing that there is no irreparable harm because Plaintiffs are unlikely to face private lawsuits or government enforcement under the Rule, HHS 22, and if they do, they can obtain "judicial review of the very types of arguments that Plaintiffs attempt to raise here." HHS 15 n.8. But that argument is triply flawed.

First, enforcement of the Rule against Plaintiffs is far from "speculative." HHS 22. In just six months since HHS issued the new Rule, activist groups have already filed four complaints against entities like the Plaintiffs—and that is *before* the insurance provisions have even taken effect.[3] Two Catholic hospitals are already facing enforcement proceedings, one of which was sued by the ACLU over an insurance exclusion just like Franciscan's. *See* Compl., *Robinson*, No. 16-3035; Compl., *Prescott*, No. 16-2408. And the ACLU has an active campaign to identify clients who were treated at "Catholic-sponsored hospital[s]" so that it can file lawsuits against them for following their "religiously based Directives."[4] Beyond that, HHS itself has already initiated multiple enforcement actions under the new Rule, and it is now investigating one of the States that is a Plaintiff in this case. Reply Br. in Support of St. Pls.' Mot. for

---

[3] Admin. Compl., *ACLU v. Ascension Health*, U.S. Dept. of Health & Human Servs., Office for Civil Rights (Oct. 25, 2016); Compl. & Jury Demand, *Dovel v. Pub. Library of Cincinnati & Hamilton Cty.*, No. 16-955 (S.D. Ohio Sept. 26, 2016); Compl., *Prescott v. Rady Children's Hosp. - San Diego*, No. 16-2408 (S.D. Cal. Sept. 26, 2016); Compl., *Robinson v. Dignity Health*, No. 16-3035 (N.D. Cal. June 6, 2016).

[4] ACLU, *Do You Believe a Catholic Hospital Provided You or a Loved One Inadequate Reproductive Health Care?*, https://action.aclu.org/secure/do-you-believe-catholic-hospital-provided-you-or-loved-one-inadequate-reproductive-health-car (last visited Dec. 1, 2016).

Prelim. Inj. 10-11, 13-14. That HHS can say enforcement is "speculative" (at 22), *while it is currently investigating one of the Plaintiffs in this case*, is absurd.

Second, Plaintiffs will *not* necessarily be able to obtain review in a later proceeding of "the very types of arguments" they raise here. HHS 15 n.8. As HHS well knows, several circuits have held that RFRA cannot be applied in lawsuits between private parties.[5] Other courts have also held that APA claims cannot be asserted between private parties.[6] Thus, when Plaintiffs are sued by a private party, they may be foreclosed from raising the APA or RFRA as a defense. While HHS likely prefers that Plaintiffs defend themselves with two hands tied behind their back, this Court should reject HHS's transparent attempt to evade judicial review under the APA and RFRA.

Finally, the prospect of possibly obtaining relief in the future does not change the fact that Plaintiffs must decide right *now* whether to take actions that expose them to massive liability. Franciscan, for example, must decide right now whether to keep its policy of declining to perform gender transition procedures—despite the fact that the Rule requires it "to revise its policy to provide the procedure[s] for transgender individuals in the same manner it provides the procedure[s] for other individuals." 81 Fed. Reg. at 31455. Similarly, Franciscan must decide now whether to keep its categorical exclusion of gender transition procedures in its healthcare policy—despite the fact that this becomes a facial violation of the Rule in 30 days. 81 Fed. Reg. at 31429.

Ultimately, Plaintiffs should not be forced to play Russian roulette with the healthcare ministries to which they have devoted their lives. As this Court and many

---

[5] *See, e.g.*, *Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1042 (7th Cir. 2006) ("RFRA is applicable only to suits to which the government is a party."); *Gen. Conference Corp. of Seventh-Day Adventists v. McGill*, 617 F.3d 402, 411-12 (6th Cir. 2010) (same).

[6] *See, e.g.*, *Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385, 413 (E.D. Pa. 2008), *aff'd*, 600 F.3d 286 (3d Cir. 2010) ("[T]he APA is not applicable to suits between private parties.") (quoting *Window Sys., Inc. v. Manchester Mem'l Hosp.*, 424 F. Supp. 331, 336 (D.Conn.1976)); *Douglas v. Kimberly-Clark Corp.*, No. 91-2599, 1991 WL 236882, at *2 (E.D. Pa. Oct. 31, 1991) (government must be a party for plaintiff to assert APA claim).

others have held, forcing them to play that game—to make "a Hobson's choice between violating federal rules . . . on the one hand, and transgressing [their] longstanding policies and practices, on the other"—constitutes "irreparable harm." *Texas v. United States*, 2016 WL 4426495, at *15-16; *see also Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1146 (10th Cir. 2013) (requiring Plaintiffs to choose between violating their faith or violating the law constituted "irreparable harm"), *aff'd sub nom*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014).

## II.   HHS's jurisdictional arguments are meritless.

For similar reasons, HHS's attacks on this Court's jurisdiction also fail.

### A.  Plaintiffs' claims are ripe.

First, HHS argues that "Plaintiffs' claims are not ripe" because Plaintiffs "must 'wait until' the Rule 'has been applied' and a finding of unlawful discrimination has been made." HHS 23-24. But this argument flies in the face of the "purpose of the Declaratory Judgment Act," which "is to settle 'actual controversies' *before* they ripen into violations of law." *Chevron U.S.A., Inc. v. Traillour Oil Co.*, 987 F.2d 1138, 1154 (5th Cir. 1993). That is why "[d]eclaratory judgments are typically sought *before* a completed 'injury-in-fact' has occurred . . . ." *United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) (emphasis added).

Next, HHS quotes *Central & South West Services, Inc. v. E.P.A.*, 220 F.3d 683, 690 (5th Cir. 2000), for the proposition that, in the context of rulemaking, courts typically "wait until a rule has been applied before granting review." HHS 23. Unfortunately, HHS truncates the quotation midsentence. The full sentence reads: "Typically, in the context of rulemaking, we wait until a rule has been applied before granting review, *however, this prudential concern loses force when the question presented is purely legal.*" *Id.* (internal quotation marks and alterations omitted). Accordingly, courts routinely decide pre-enforcement challenges to agency rules when the question presented is purely legal. This is especially true when, as here, the rule pressures a regulated

7

entity "to modify its behavior in order to avoid future adverse consequences." *Ohio Forestry Ass'n Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998) (collecting cases); *see also Am. Forest & Paper Ass'n v. U.S. E.P.A.*, 137 F.3d 291, 296-97 (5th Cir. 1998) (challenge to agency rule was ripe for review because it involved "a pure question of law" and plaintiffs faced an "imminent need to comply").

Plaintiffs easily meet this standard. It is undisputed that they currently have policies forbidding them to perform or cover gender transition procedures. The only questions are purely legal: whether these policies are permitted under the Rule, and whether the Rule is valid. And, as explained above, the Rule places substantial pressure on Plaintiffs "to modify [their] behavior in order to avoid future adverse consequences." *Ohio Forestry Ass'n*, 523 U.S. at 734. Accordingly, their claim is ripe.

We are aware of no case—and HHS has cited none—where a court dismissed a claim as unripe simply because the Plaintiff might be able to prevail in the future on an as-yet-unresolved *legal* defense. Instead, HHS cites a handful of cases where the plaintiff based its claim on a chain of future *factual* events that might never occur. A typical example is *United Transportation Union*, 205 F.3d 851. There, although the Fifth Circuit found one pre-enforcement challenge unripe because it rested on a "mountain of conjuctur[al] and speculat[ive]" factual events, *id.* at 858, it held that two other pre-enforcement claims were ripe—one because it involved a law that "impose[d] immediate obligations on the [plaintiff]," and the other because, even though it "depend[ed] upon a future railroad collision[,] . . . the only questions [the court] need[ed] to decide [were] purely legal." *Id.* at 859.

Next, HHS claims that this case "involves myriad facts that cannot be determined outside the context of a particular enforcement action." HHS 24 n.11. But HHS fails to identify even one such fact. That is because all of the relevant facts are undisputed: Plaintiffs have clearly explained the nature of their policies, their religious beliefs, and their medical judgments. *See* Br. 8-12.

HHS also argues that the Court is not permitted to consider the "examples and guidance provided in the Rule's preamble." HHS 24. But the only case HHS cites for this proposition involved agency statements that were "conditional," "equivocal," "nonbinding," "hypothetical," and "non-specific," and therefore did not even constitute "final agency action." *Id.* (citing *Nat. Res. Def. Council v. EPA*, 559 F.3d 561, 565 (D.C. Cir. 2009)). Here, by contrast, HHS included a number of specific, unequivocal requirements in the preamble, such as the following: "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31455. Thus, this case is even stronger than *Chemical Waste Management, Inc. v. E.P.A.*, where the D.C. Circuit held that an agency's "interpretive principles" were ripe for review, even though they "consisted only of brief references which were 'buried' within lengthy preambles." 869 F.2d 1526, 1530, 1534 (D.C. Cir. 1989). As the Fifth Circuit said: "An [agency] declaration contained in the preamble to a final rule setting forth the Agency's final and binding interpretation of the statute *qualifies as a reviewable regulation* for purposes of judicial review." *Cent. & S. W. Servs., Inc.*, 220 F.3d at 689 n.2 (emphasis added).

Ultimately, the case is ripe for a simple reason: The Rule directly regulates Plaintiffs' day-to-day operations, and they face significant consequences for violating it. Thus, this case is no different from *Abbott Labs. v. Gardner*, 387 U.S. 136, 151 (1967), where the government argued that a pre-enforcement challenge to a rule was not ripe because the government had not yet taken any enforcement action. The Supreme Court rejected this argument, noting that the rule would have "a direct effect on the day-to-day business" of plaintiffs by forcing them to either "comply with the . . . requirement and incur the costs of changing over their [practices] or . . . follow their present course and risk prosecution." *Id.* at 152. The rule thus "put[ ] petitioners in a

dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate."
*Id.* Plaintiffs face precisely the same dilemma, and their claims are ripe for review.

**B. Plaintiffs have standing.**

For many of the same reasons, Plaintiffs also have standing. *See Texas v. United States*, 497 F.3d 491, 496 (5th Cir. 2007) (doctrines of ripeness and standing "often overlap"). As the Supreme Court has explained: "When the suit is one challenging the legality of government action," and "the plaintiff is himself an object of the action," then "there is ordinarily little question" that the plaintiff has standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). Similarly, as the Fifth Circuit put it: "An increased regulatory burden typically satisfies the injury in fact requirement." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015). Based on this principle, the Fifth Circuit has recognized that a plaintiff has standing when, as a result of an agency's action, it faces a "forced choice between incurring costs and changing its" policies or practices. *Texas v. United States*, 787 F.3d 733, 749 (5th Cir. 2015). The same injury is present here.

As for CMDA's associational standing, "[i]t is well settled that once [the court] determine[s] that at least one plaintiff has standing, [it] need not consider whether the remaining plaintiffs have standing." *McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014). Moreover, HHS does not challenge CMDA's associational standing with respect to the APA, Free Speech, Due Process, and vagueness claims. Thus, its objection with respect to the RFRA claim is purely academic.

Even on that point, HHS is mistaken. Unlike the cases HHS cites (at 28), such as *Harris v. McRae*, 448 U.S. 297, 321 (1980), this case involves a government policy that broadly threatens the rights of the association's members, and plaintiffs have not conceded that participation by members is necessary. As the Fifth Circuit explained in a case involving a medical association, associational standing is particularly well suited to "claims of administrative illegality that would be apparent with

minimal factual development." *Ass'n of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010). This is just such a case. Moreover, there is "no indication . . . that the Supreme Court intended to limit representational standing to cases in which it would not be necessary to take any evidence from individual members of an association." *Id.* (internal quotation marks omitted). CMDA has offered evidence about its role representing the shared practices and beliefs of its members; it has offered evidence from a representative member addressing how CMDA represents that member's beliefs; and it is prepared to offer evidence from more members if necessary. App. 19-20 ¶¶ 10-12; 463-64 ¶ 5. Thus, this case is more like *South Fork Band v. United States Department of Interior*, 643 F. Supp. 2d 1192, 1204-05 (D. Nev. 2009), where the court upheld associational standing for a RFRA claim.

### C. A pre-enforcement challenge is not prohibited.

HHS also argues that Plaintiffs' pre-enforcement claims are not justiciable because Section 1557 "prohibit[s] pre-enforcement review." HHS 28. But with respect to pre-enforcement challenges, the Supreme Court has said that when a legal issue is "fit for judicial resolution," and a regulation "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act *must be permitted*, absent a statutory bar or some other unusual circumstance." *Abbott Labs.*, 387 U.S. at 153 (emphasis added). This presumption of judicial review can be rebutted "only upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Id.* at 141. HHS has failed to make that showing here.

HHS relies primarily on the fact that it must conduct agency proceedings before withdrawing federal funds. HHS 28-29. But Plaintiffs are not merely challenging the withdrawal of funds; they are challenging the Rule on its face and the way it exposes

them to private lawsuits, public enforcement proceedings, and False Claims Act lia-bility. Br. 25-26. Unlike the cases HHS cites, where plaintiffs were trying to skirt an administrative process they could already use, *cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994), here there is no administrative process allowing Plaintiffs to pursue their current claims.

Next, HHS claims that Congress must have intended to preclude pre-enforcement review because it incorporated the "enforcement mechanisms provided for and avail-able under . . . [T]itle VI." HHS 30 (quoting 42 U.S.C. § 18116(a)). But the Supreme Court has rejected this argument before, stating that "[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others. The right to review is too important to be excluded on such slender and inde-terminate evidence of legislative intent." *Abbott Labs.*, 387 U.S. at 141. Accordingly, numerous courts have held that Title VI does *not* require exhaustion of administra-tive remedies before judicial review in all contexts,[7] including when the enforcement mechanisms of Title VI have been incorporated into other statutes.[8]

More importantly, Plaintiffs are not challenging the Rule's incorporation of "race" under Title VI; they are challenging its interpretation of "sex" under Title IX. For that, Section 1557 incorporates "[t]he enforcement mechanisms provided . . . [under] *[T]itle IX.*" 42 U.S.C. § 18116(a) (emphasis added). HHS avoids discussing the en-forcement mechanisms under Title IX with good reason: Title IX does not "present[ ] [a] statutory scheme[ ] that would preclude Plaintiffs from bringing these claims in

---

[7] *See, e.g., Montgomery Improvement Ass'n, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 645 F.2d 291, 297 (5th Cir. 1981) ("[W]e hold that plaintiffs have a private cause of action under . . . Title VI . . . ."); *Freed v. Consol. Rail Corp.*, 201 F.3d 188, 191 (3d Cir. 2000) ("Title VI . . . does not require that plaintiffs exhaust the administrative process before bringing suit.").

[8] *See, e.g., Doe v. Garrett*, 903 F.2d 1455, 1460 (11th Cir. 1990) ("Title VI—and by extension section 794—does not incorporate Title VII's requirement of exhaustion of administrative remedies."); *Kling v. L.A. Cty.*, 633 F.2d 876, 879 (9th Cir. 1980) (Since "Section 504 regula-tions . . . adopt the enforcement procedures of Title VI," it does not require exhaustion.).

federal district court." *Texas v. United States*, 2016 WL 4426495, at *10; *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979) (Title IX's enforcement provisions do not provide the exclusive statutory remedy for violations). Thus, Plaintiffs are entitled to judicial review.

## III.  The Rule violates the Administrative Procedure Act.

Once HHS's jurisdictional arguments are swept aside, HHS has little to say on the merits.

### A.  HHS's interpretation of "sex" is contrary to law.

On the APA claim, HHS concedes that "the statutory text should be the Court's starting point." HHS 34. But it offers no serious textual argument at all. First, it concedes that the common meaning of "sex" when Title IX was enacted referred to the physiological differences between males and females. Br. 14-15. It says only that this common meaning "is not particularly relevant." HHS 36 n.18. But that is directly contrary to Fifth Circuit precedent, which requires the Court to give undefined words their "ordinary, contemporary, common meaning" at the time the statute was enacted. *Contender Farms*, 779 F.3d at 269; *see also MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 228 (1994) ("the most relevant time for determining a statutory term's meaning" is "when the [statute] became law").

Second, HHS does not dispute that Congress has enacted *other* statutes protecting both "sex" and "gender identity" separately, but has refused to do the same in Title IX. Br. 16-17. It says only that "there is no evidence" that "the explicit inclusion of 'gender identity' in [these statutes]" means that "discrimination based on gender identity falls outside the meaning of discrimination 'on the basis of sex.'" HHS 36 n.18. But of course there is: It's called the canon against superfluity, and it requires courts to "avoid an interpretation [of a statute] which makes a part redundant or superfluous." *Ruiz v. Estelle*, 161 F.3d 814, 820 (5th Cir. 1998). That canon has "special force" in circumstances like this, *id.*, where Congress has added a *new* protection

for "gender identity" to a statute that *already* protected "sex." *See also Lockhart v. United States*, 136 S. Ct. 958, 965-66 (2016) (applying canon against superfluity).

Third, HHS does not dispute that the structure of Title IX contemplates only two sexes, male and female. Br. 16. And it does not dispute that federal agencies uniformly interpreted "sex" to refer to physiological differences for almost 40 years. Br. 18. All of this confirms that the common meaning of "sex" refers to the differences between male and female.

Lacking any textual argument, HHS claims that the meaning of "sex" "is unsettled," because "courts are split on this issue." HHS 34-35. But it is well-settled that "[a] statute is not ambiguous . . . merely because there is a division of judicial authority over its proper construction." *Reno v. Koray*, 515 U.S. 50, 51 (1995) (internal quotation marks omitted). Otherwise, "[one court] could never reverse a[nother] court on plain-language grounds." *Jones v. Brown*, 41 F.3d 634, 639 (Fed. Cir. 1994). Instead, sometimes one side of a split simply gets a statute wrong. *See, e.g.*, *Silva-Trevino v. Holder*, 742 F.3d 197, 200 (5th Cir. 2014) ("the phrase is not ambiguous" despite a circuit split); *Artuso v. Hall*, 74 F.3d 68, 72 (5th Cir. 1996) (same). That is what has happened here. And, in any event, the weight of circuit authority still confirms the common understanding of "sex." Br. 14 n.10.

HHS also argues (at 35) that "sex" must mean "gender identity" based on *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). But *Price Waterhouse* simply held that "sex" discrimination includes "disparate treatment of men and women resulting from sex stereotypes." *Id.* at 250-51. As many courts have recognized, sex stereotyping claims and gender identity claims are different; sex stereotyping claims involve "behaviors, mannerisms, and appearances" associated with biological sex, while gender identity claims involve transgender "status." *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 680-81 (W.D. Pa. 2015) (collecting cases). Indeed, HHS's own Rule recognizes this distinction: It defines discrimination based

14

on "sex" to include *both* "sex stereotyping, and gender identity." 45 C.F.R. § 92.4. If they were the same thing, prohibiting both would be superfluous.

Next, HHS claims that "sex" should be interpreted in light of the "purpose" of Section 1557. HHS 36. But Section 1557 does not use the term "sex." Instead, it incorporates the statutory prohibition of Title IX. Thus, the relevant "purpose" for determining the meaning of "sex" is the purpose of Title IX. And HHS concedes that the purpose of Title IX was "to ensure equal opportunities in education for women" (HHS 36)—further confirming the ordinary meaning of "sex."

Finally, HHS claims that its interpretation of "sex" is entitled to deference under *Chevron* step two because it is "reasonable." HHS 37-42. But the word "sex" is not ambiguous, so HHS receives no deference.

### B. HHS's failure to include Title IX's exemptions is contrary to law.

The Rule is also contrary to law because it refuses to incorporate Title IX's religious and abortion exemptions—even though it incorporates *other* exemptions from Title VI, the Age Act, and the Rehabilitation Act. Br. 20; 45 C.F.R. § 92.101(c). HHS says this shouldn't matter, because its Rule acknowledges the existence of the "Weldon, Church, and Coats amendments, and RFRA." HHS 42. But that is beside the point: HHS lacks authority to displace those statutes even if it wanted to. And, as noted above, those statutes do not necessarily offer the same protection as Title IX's blanket exemptions.

Next, HHS says that, "while *Title IX* contains a religious exemption, . . . *Section 1557* does not." HHS 42. But Section 1557 does not contain a ban on sex discrimination either. Instead, Section 1557 *incorporates* Title IX—and Title IX includes a religious exemption in the very same sentence that it bans sex discrimination. 20 U.S.C. § 1681(a)(3). HHS has no rational basis for incorporating one part of the sentence but not the other.

Lastly, HHS says that a religious exemption is more appropriate in the education

context than in the healthcare context, because people "typically" have more "choice" in schools than in hospitals. HHS 42. But not always: Many people have extremely limited educational choices. More importantly, that is a policy decision for Congress to make. If Congress wanted to ban sex discrimination without incorporating a religious exemption, it easily could have done so. Instead, it adopted a statute that bans sex discrimination and exempts religious organizations in the same sentence.

### C. HHS's Rule is contrary to Title VII.

Finally, HHS's Rule is contrary to Title VII because it restricts the ability of employers to accommodate religious employees. Br. 22-23. HHS denies this, claiming that employers can accommodate employees by "excusing an objecting provider and allowing a non-objecting provider to perform a particular service." HHS 21-22. But what if there is no "non-objecting provider" available to perform the service? This is common among sole-practitioner clinics and smaller hospitals with a limited number of specialists. Prior to the new Rule, employers could accommodate their employees under Title VII by referring patients elsewhere. But now the employer "will be held accountable for discrimination." 81 Fed. Reg. at 31384. That is contrary to Title VII.

## IV. The Rule violates RFRA.

HHS does not even attempt to address Plaintiffs' RFRA arguments. Br. 23-32. HHS does not dispute the existence of a substantial burden, nor does it offer any evidence or argument that the Rule is the least restrictive means of advancing a compelling governmental interest. By failing to brief the issue, HHS has waived it. *Dortch v. Mem'l Herman Healthcare Sys.-Sw.*, 525 F. Supp. 2d 849, 876 n.69 (S.D. Tex. 2007) ("failure to brief an argument in the district court waives that argument").

The Court cannot consider *amici's* arguments in place of the government's. This is true for the ordinary reason that, "[a]bsent exceptional circumstances, an issue waived by appellant cannot be raised by amicus curiae." *Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991). But it

is also true for a RFRA-specific reason—namely, as a statutory matter, the *government* bears the burden of making its own case, something it has entirely failed to do here. 42 U.S.C. § 2000bb-1(b) ("Government may substantially burden a person's exercise of religion only if *it* demonstrates" that strict scrutiny is satisfied) (emphasis added); *see also Hobby Lobby*, 134 S. Ct. at 2776 (refusing to consider RFRA arguments raised by *amici* because HHS "has never made this argument" and "we do not even know what the Government's position might be").

Nevertheless, a brief review of *amici's* RFRA arguments demonstrates why they weren't worth a try. *Amici* claim (at 29) that Plaintiffs have not identified what "medical procedures" or "healthcare coverage" they object to. But Plaintiffs have explained precisely what procedures and coverage they object to and why. *See, e.g.*, App. 7-11 ¶¶ 16, 18-19, 23-25, 27, 31; App. 16; App. 22-24 ¶¶ 17-20; App. 28-33. Plaintiffs have also presented specific evidence that the Rule burdens their religious practices by requiring them to change their policies with regard to medical services right now, and to change their insurance policies on January 1. *See supra* Part I; App. 13 ¶ 43; App. 25 ¶ 24; App. 465 ¶ 11. This is more than enough detail for a RFRA claim. And notably, neither *amici* nor HHS dispute that the Rule imposes a substantial burden on Plaintiffs' religious exercise. Nor could they in light of *Hobby Lobby*'s holding that forced provision of contraceptive insurance coverage was a substantial burden. 134 S. Ct. at 2779.

As for strict scrutiny, HHS's brief belies any argument that it has a compelling interest in enforcing the Rule against Plaintiffs as to the services at issue. *Amici* try to expand the analysis to suggest that the real compelling interest at issue is to stop government-funded discrimination. But that is precisely the kind of highly generalized interest the Supreme Court has indicated cannot satisfy strict scrutiny. *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 431 (2006) (courts must "look[] beyond broadly formulated interests" and evaluate "the asserted harm

17

of granting specific exemptions to particular religious claimants."); *accord Hobby Lobby*, 134 S. Ct. at 2751. In any case, even at that impermissible level of generality, *amici's* arguments fail. The government still allows gaping holes in coverage of transgender services elsewhere in the law. Br. 27-30. Indeed, under *amici's* theory, the whole of Title IX—which of course includes both the broad religious entity exception and the protection against forced participation in abortions—is a massive act of government-funded discrimination that undermines *amici*'s claimed compelling interest. Moreover, there is nothing to stop the government from using other means, including expending its own funds, to further its interests; that is what strict scrutiny requires. *See, e.g., McCutcheon v. FEC*, 134 S. Ct. 1434, 1458 (2014) ("multiple alternatives available" to government to avoid harming First Amendment rights, including new government programs). Finally, *amici* present no evidence suggesting that Plaintiffs' proposed alternatives would be unworkable.

Thus, in light of governing caselaw, the absence of evidence to disprove Plaintiffs' proposed alternatives, and HHS's decision not to advance a RFRA argument at all, Plaintiffs' success on their RFRA claim is highly likely.

## V.    The Rule violates the Spending Clause.

The Rule also violates the Spending Clause by imposing new conditions on the States that were not unambiguously included in the text of the relevant statute. HHS claims that the Spending Clause claim fails because it is "predicated on the same faulty premises" as the "*Chevron* step one argument." HHS 43-44. But this misunderstands the relationship between *Chevron* and the Spending Clause. Under *Chevron*, an agency receives deference only if the underlying statute is "ambiguous." *Chevron*, 467 U.S. at 842-43. But under the Spending Clause, a condition on federal funding is valid only if the statute imposing it is "unambiguous." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 278 (5th Cir. 2005) (quoting *South Dakota v. Dole*, 483 U.S. 203, 207

(1987)). Thus, HHS's argument is self-contradictory: To get *Chevron* deference, it argues that "sex" is ambiguous (HHS 34-37); but to survive Spending Clause review, "sex" must be unambiguous. Unlike Schrödinger's cat, "sex" cannot be both ambiguous and unambiguous at the same time.

HHS also offers no response on the issue of coercion. Even if funding conditions are unambiguous, they still cannot be unduly coercive. In his controlling opinion for seven Justices in *NFIB v. Sebelius*, 132 S. Ct. 2566 (2012), Chief Justice Roberts held that a threat to eliminate all federal Medicaid funding, which constituted "10 percent of a State's overall budget," was "economic dragooning" and thus unconstitutionally coercive. *Id.* at 2604-05. Here, the States face even more coercion, because they stand to lose not only all of their Medicare funding, but all other HHS funding, and to face private lawsuits for damages and attorneys' fees.

## VI.   The Rule violates the Free Speech Clause.

The Rule violates the Free Speech Clause by proscribing certain medical views and speech while compelling others. HHS does not dispute that the Rule requires Plaintiffs to revise their written policies to affirm the provision of medical transition procedures. HHS 45. Nor does HHS dispute that the Rule will require physicians to use transgender affirming language. *Id.* HHS also continues to cite sources suggesting that Plaintiffs' medical viewpoints are impermissible. HHS 40-41 & n.20; *see also Amici* 6-7 (arguing that Plaintiffs' views "have no basis in medical science"). HHS simply argues that because it purports to "prohibit[] discrimination," it is regulating "conduct," not speech. *Id.* at 46. But the Supreme Court has repeatedly rejected the argument that the government can regulate speech simply by labeling it "discriminatory conduct." *See, e.g., Nat'l Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43 (1977) (unanimously protecting the speech rights of Nazi group); *Snyder v. Phelps*, 562 U.S. 443, 448 (2011) (protecting harassing and discriminatory speech of funeral protesters); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557

(1995) (unanimously protecting a group's exclusion of LGBT messages despite conflicting anti-discrimination laws). Here, Plaintiffs' simple desire to ensure that their speech reflects their medical judgments and religious beliefs is a much simpler case.

In fact, this case is quite like *Agency for International Development v. Alliance for Open Society International, Inc.*, in which HHS required recipients of anti-trafficking grants to amend their policies to express opposition to legalized prostitution. 133 S. Ct. 2321, 2331 (2013). Although HHS claimed that it was merely regulating conduct, the Supreme Court disagreed, concluding that HHS was unconstitutionally trying to "compel[ ] a grant recipient to adopt a particular belief as a condition of funding." *Id.* at 2330. The same is true here. This case also stands in sharp contrast to *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, where the Court observed that the viewpoint-neutral regulation at issue did "not dictate the content of the speech at all," but merely required schools to send scheduling notices for the military similar to those it was already sending for other on-campus recruiters. 547 U.S. 47, 62 (2006).

Finally, HHS tries to gloss over the fact that the Rule deems one particular viewpoint—the viewpoint that "transition-related treatment . . . [i]s experimental"—to be "outdated and not based on current standards of care." 81 Fed. Reg. at 31435. According to HHS, this statement simply deals with insurance coverage, not medical advice. HHS 45. But this statement follows comments regarding access to both "coverage *and* care" and is supported by a citation to WPATH "standards of care" for physicians providing medical services. 81 Fed. Reg. at 31434 & n.263 (emphasis added). It is also unclear why HHS's view of the science in the insurance realm would be any different than in the medical services realm. Indeed, elsewhere in its brief, HHS itself quotes from statements in the preamble that arose in the insurance context to justify how HHS will treat the medical judgment of providers in the context of providing medical services. HHS 11 ("The Department has committed that it '*will not second-guess* a covered-entity's neutral nondiscriminatory application of evidence-based criteria

used to make medical necessity . . . determinations.'" (quoting 81 Fed. Reg. at 31436-37)). Regardless of what HHS subjectively thinks about the language in its Rule, there is no question that the Rule's "literal scope, unaided by a narrowing . . . court interpretation, is capable of reaching expression sheltered by the First Amendment" and capable of chilling the expression of medical professionals who fear their medical or religious views will be labeled as illegal discrimination. *Smith v. Goguen*, 415 U.S. 566, 573 (1974). Thus, the Rule violates Plaintiffs' free speech rights.

## VII. The Rule is unconstitutionally vague.

The Rule also violates the Due Process Clause and First Amendment because it is unconstitutionally vague. Indeed, HHS's main defense to this lawsuit is to claim that nobody can know whether Plaintiffs are in violation of the Rule until after Plaintiffs have been sued and a court has reached a decision. HHS 21. If that is not a failure to "give fair notice of conduct that is forbidden or required," it is hard to imagine what would be. *FCC v. Fox Television Stations, Inc.*, 132 S. Ct. 2307, 2317 (2012).

Citing *Roark & Hardee LP v. City of Austin*, HHS claims that facial vagueness challenges are "often difficult." 522 F.3d 533, 547 (5th Cir. 2008). But the Fifth Circuit said this specifically in the context of a law that "does not threaten to inhibit any constitutionally protected conduct." *Id.* By contrast, *Roark* recognized that "[m]any times void-for-vagueness challenges are successfully made when laws have the capacity 'to chill constitutionally protected conduct, especially conduct protected by the First Amendment,'" and that in that context "a more stringent vagueness test should apply." *Id.* at 546, 552. Here, there is no question that the Rule has the capacity to chill Plaintiffs' free exercise and speech rights. *See* Br. 33-35, 43-44. And unlike the clear standards in *Roark* that provided the parties with a "clear 'how to' guide for avoiding a violation under the" law, 522 F.3d at 553, here HHS has done the opposite. In fact, HHS's response brief only underscores just how standardless the Rule is, and just how unbridled HHS's discretion to enforce it would be.

For example, HHS argues that Plaintiffs are wrong to have relied on the Rule's preamble for guidance, yet HHS itself relies on the preamble when it suits HHS's litigation position. *Compare* HHS 24 ("Plaintiffs' focus on examples and guidance provided in the Rule's preamble . . . is particularly misplaced."), *with id.* 19 (relying on a statement found only in the Preamble to assert that HHS will protect "scientific or medical reasons" for "distinctions based on sex"). HHS states that it will protect medical judgment and physician speech, but only if such medical judgments are not "discriminatory"—without offering any guidance on what a discriminatory medical judgment would be. HHS 45 n.23. HHS also pays lip service to the existence of statutes protecting religious conscience, 81 Fed. Reg. at 31379, but offers no guidance on whether entities like Plaintiffs are protected by their RFRA defense, and even goes so far as to avoid addressing the merits of Plaintiffs' RFRA claim entirely. HHS's silence on this topic is telling, given that the Rule acknowledges that HHS believes RFRA claims will not be successful in certain circumstances—circumstances that may very well apply to Plaintiffs. 81 Fed. Reg. at 31380.

In the end, the Rule attempts to "vest[] virtually complete discretion in the hands of" HHS to determine which religious exercise, medical judgments, and speech are discriminatory, and which are not. *Kolender v. Lawson,* 461 U.S. 352, 358 (1983). The subjective nature of the Rule and lack of clear standards pressure Plaintiffs to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *see also City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770 (1988). But that is precisely what both the vagueness and unbridled discretion doctrines prohibit.

## VIII. The Rule violates the Due Process Clause.

HHS does not deny that there is a substantive due process right not to be forced to provide medical procedures that violate one's conscience. HHS 47-48. Instead, hav-

ing effectively conceded that a substantive due process right exists, HHS's sole argument is that since "the Rule explicitly incorporates" the Church Amendment provisions, this "confirms that Plaintiffs' substantive due process claim is meritless." HHS 48 (citing 45 C.F.R. § 92.2(b)(2)).

As discussed in Part I, however, HHS did not actually incorporate the Church Amendment (or any other conscience protection) into the Rule. It simply stated the truism that its Rule cannot trump federal statutes. 45 C.F.R. § 92.2(b)(2). More importantly, HHS refuses to say whether these conscience provisions are applicable to entities like Franciscan (as opposed to "individuals"), and it refuses to say whether they are actually applicable here. As explained in Part I, HHS has repeatedly argued for a narrow interpretation of the Church Amendment and has deliberately declined to include a religious exemption in the Rule. Thus, there is no reason to believe that the Rule adequately protects Plaintiffs' substantive due process rights.

Ultimately, HHS is trying to avoid substantive due process by promising to use its broadly-worded Rule carefully. But the Supreme Court has made clear that constitutional protections such as due process and the First Amendment "do not leave regulated parties at the mercy of *noblesse oblige.*" *FCC*, 132 S. Ct. at 2318 (alterations in original and citation omitted). The proper response to an illegal Rule is not to order regulated parties to trust the government, but to order the government to follow the law. *Stevens*, 559 U.S. at 480-81.

## IX. *Amici*'s arguments are meritless.

*Amici* claim that enjoining the new Rule would violate the Establishment Clause, Equal Protection Clause, and EMTALA. *Amici* 9-16. But these arguments are baseless. Plaintiffs have been providing medical care in compliance with their beliefs for decades, and no court has ever found this to be unlawful. Enjoining the new Rule would simply return the law to the status quo that has governed for decades.

Not surprisingly, *amici* fail to cite a single case holding that an application of

RFRA violated the Establishment Clause. In fact, *amici*'s Establishment Clause argument has been made and rejected repeatedly, including just two years ago in *Hobby Lobby*. *Compare Hobby Lobby*, 134 S. Ct. at 2805, 2802 n.25 (Ginsburg, J., dissenting) (suggesting that the majority's application of RFRA violated the Establishment Clause), *with id.* at 2781 n.37 (rejecting this argument); *see also Cutter v. Wilkinson*, 544 U.S. 709 (2005) (unanimously holding that RFRA's companion statute does not violate Establishment Clause). Similarly, *amici* fail to cite a single case holding that a government violated the Equal Protection Clause by declining to perform or cover gender transition procedures—even though states and the federal government have been doing this for decades. And *amici* fail to cite a single case holding that a religious hospital violated EMTALA by declining to perform an abortion—even though religious hospitals have been doing this for decades. To the contrary, *amici*'s arguments on this point have repeatedly failed. *See, e.g.*, *Am. Civil Liberties Union v. Trinity Health Corp.*, No. 15-cv-12611, 2016 WL 1407844, at *4 (E.D. Mich. Apr. 11, 2016) (rejecting ACLU's EMTLA argument); *Means v. U.S. Conference of Catholic Bishops*, No. 1:15-CV-353, 2015 WL 3970046, at *12 (W.D. Mich. June 30, 2015) (same). They fail here, too.

## X.   The balance of harms and public interest favor Plaintiffs.

HHS's arguments on the other preliminary injunction factors are also meritless. As explained above, the harm Plaintiffs face currently, and to a further extent on January 1, is real. For the religious plaintiffs, the choice between following their beliefs and following the law poses a much greater harm than any harm to HHS's ability to carry out regulations. HHS 49. HHS cites the public interest in enforcing "civil rights statutes," HHS 48—but RFRA is a civil rights statute, and Plaintiffs' rights to free speech, due process, and the free exercise of religion are no less important. Moreover, HHS concedes that an injunction need only prevent it "from enforcing the two

aspects of the Rule that Plaintiffs challenge"—namely its application to "gender identity" and "termination of pregnancy"—leaving the rest of the Rule in place. HHS 49.

HHS complains that an injunction would be improper because Plaintiffs "delay[ed] in seeking relief." HHS 50. But Plaintiffs filed suit just one month after the Rule took effect. They personally served HHS's authorized representative the following week. ECF No. 6. And they filed a motion for summary judgment soon after HHS told them that it would not agree that they were protected under the Rule. Goodrich Decl. ¶ 5. HHS, by contrast, did not promulgate its new Rule until *six years* after enactment of the ACA. Plaintiffs have moved quickly to protect their rights, and the public interest weighs heavily in favor of maintaining the status quo while this Court considers the serious legal problems created by the new Rule.

## CONCLUSION

The motion should be granted.

Respectfully submitted this 2nd day of December, 2016.

/s/ Luke W. Goodrich
Luke W. Goodrich
Bar No. 977736DC
Eric C. Rassbach (admission pending)
Mark L. Rienzi (admission pending)
Stephanie H. Barclay (admission pending)
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW
Suite 700
Washington, DC 20036
(202) 955-0095
(202) 955-0090
lgoodrich@becketfund.org

*Counsel for Plaintiffs Christian Medical &*
*Dental Associations, Franciscan Health,*
*Inc., Specialty Physicians of Illinois, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2016 the foregoing brief was served on all parties via ECF.

 /s/ Luke W. Goodrich

Luke W. Goodrich