**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**WICHITA FALLS DIVISION**

| | | |
|---|---|---|
| **FRANCISCAN ALLIANCE, INC. et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 7:16-cv-00108-O** |
| | § | |
| **SYLVIA BURWELL, Secretary of the** | § | |
| **United States Department of Health and** | § | |
| **Human Services; and UNITED STATES** | § | |
| **DEPARTMENT OF HEALTH AND** | § | |
| **HUMAN SERVICES,** | § | |
| | § | |
| **Defendants.** | § | |

## ORDER

Before the Court are Plaintiffs' Motions for Preliminary Injunction and Briefs and Appendix in Support (ECF Nos. 22–26), filed October 21, 2016; Defendants' Response (ECF No. 53), filed November 23, 2016; and Plaintiffs' Replies (ECF Nos. 56, 57), filed December 2, 2016. Additionally, the parties appeared at a hearing on the request for a preliminary injunction and presented oral arguments on December 20, 2016. ECF No. 61.

The Plaintiffs challenge a regulation enacted pursuant to the Patient Protection and Affordable Care Act ("ACA") that covers nearly every healthcare provider in the country and reaches into one of the most intimate relationships: that between a physician and her patient. The ACA forbids discriminating on the basis of sex. Pursuant to this statutory provision, Defendants enacted a regulation that forbids discriminating on the basis of "gender identity"[1] and "termination of pregnancy." 42 U.S.C. § 18116(a); 45 C.F.R. § 92.4. Plaintiffs argue the new regulation will

---

[1] The challenged regulation defines "gender identity" as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." 45 C.F.R. § 92.4.

require them to perform and provide insurance coverage for gender transitions and abortions, regardless of their contrary religious beliefs or medical judgment. *See* Am. Compl., ECF No. 21. While this lawsuit involves many issues of great importance—state sovereignty, expanded healthcare coverage, anti-discrimination protections, and medical judgment—ultimately, the question before the Court is whether Defendants exceeded their authority under the ACA in the challenged regulations' interpretation of sex discrimination and whether the regulation violates the Religious Freedom Restoration Act as applied to Private Plaintiffs. Before reaching this question however, the Court is obligated to determine whether it has authority to hear the matter.

For the following reasons, the Court concludes that jurisdiction is proper, the regulation violates the Administrative Procedure Act ("APA") by contradicting existing law and exceeding statutory authority, and the regulation likely violates the Religious Freedom Restoration Act ("RFRA") as applied to Private Plaintiffs. Accordingly, Plaintiffs' Motions for Preliminary Injunction should be and are hereby **GRANTED**.

## I.      BACKGROUND

The following factual recitation is taken from Plaintiffs' First Amended Complaint (ECF No. 21) unless stated otherwise.[2] Plaintiffs are composed of eight states (collectively "State Plaintiffs")[3] and three private healthcare providers, Franciscan Alliance, Inc. ("Franciscan"), its wholly owned entity Specialty Physicians of Illinois, LLC ("Specialty Physicians"), and the Christian Medical & Dental Society ("CMDA"), doing business as the Christian Medical & Dental

---

[2] Page numbers cited throughout the Court's Order refer to the page numbers assigned by the Court's electronic docket.

[3] State Plaintiffs include: (1) the State of Texas; (2) the State of Wisconsin; (3) the State of Nebraska; (4) the State of Kansas; (5) the State of Louisiana; (6) the State of Arizona; (7) the Commonwealth of Kentucky, by and through Governor Matthew G. Bevin; and (8) the State of Mississippi, by and through Governor Phil Bryant. Am. Compl. 4–6, ECF No. 21.

Associations (collectively "Private Plaintiffs").  Am. Compl. 4–8, ECF No. 21.  They have sued

the U.S. Department of Health and Human Services ("HHS"), and HHS Secretary Sylvia Burwell

("Burwell") (collectively "Defendants"), challenging a new rule issued by HHS entitled

Nondiscrimination in Health Programs & Activities (the "Rule").  81 Fed. Reg. 31376–31473,

(May 18, 2016) (codified at 45 C.F.R. § 92).

The Rule implements Section 1557 of the ACA ("Section 1557"), which prohibits

discrimination by any health program or activity receiving federal financial assistance on the

grounds prohibited under four federal nondiscrimination statutes incorporated by Section 1557.

45 C.F.R. § 92.1.  The ground at issue in this case is Section 1557's incorporation of the prohibited

sex discrimination under Title IX of the Education Amendments of 1972 ("Title IX").  Plaintiffs

challenge the Rule's interpretation of discrimination "on the basis of sex" under Title IX as

encompassing "gender identity" and "termination of pregnancy."  45 C.F.R. § 92.4; State Pls.' Br.

10, ECF No. 23.  Plaintiffs argue that because Section 1557 incorporates the statutory prohibition

of sex discrimination in Title IX, its scope should be limited by Title IX's unambiguous definition

of "sex" as the immutable, biological differences between males and females "as acknowledged at

or before birth."  *Id.* at 13, 27.  The Plaintiffs also assert that the Rule's definition of sex does not

apply to them because the text of Section 1557 incorporates the religious and abortion exemptions

of Title IX, and the Rule's failure to incorporate those exemptions renders it contrary to law.  *See*

Priv. Pls.' Br. 31–34, ECF No. 25.

On October 21, 2016, Plaintiffs moved for partial summary judgment, or in the alternative,

a preliminary injunction.  ECF Nos. 22, 24.  To resolve the matter before the Rule's insurance

provision goes into effect on January 1, 2017, at which time Plaintiffs would be forced to "make

significant, expensive changes to their insurance plans," the Court set an expedited briefing

schedule and held a hearing on the preliminary injunction motions on December 20, 2016.   Priv.

Pls.' Mot. 2, ECF No. 24; Nov. 1, 2016 Order 7, ECF No. 32; ECF No. 61.   Plaintiffs' motions for

preliminary injunction are now ripe for review.

### A.      The Rule

The challenged Rule was first proposed on September 8, 2015, pursuant to HHS's authority

to implement Section 1557 of the ACA.   Am. Compl. 10–11, ECF No. 21.   After notice and

comment, the final Rule was published on May 18, 2016.   *Id.*   The Rule took partial effect on July

18, 2016, and the insurance provisions will be effective on January 1, 2017.   81 Fed. Reg. at 31376.

The Rule purports to implement Section 1557 which provides:

> [A]n individual shall not, *on the ground prohibited under* title VI of the Civil Rights
> Act of 1964 (42 U.S.C. 2000d et seq.) ["Title VI"], title IX of the Education
> Amendments of 1972 (20 U.S.C. 1681 et seq.) ["Title IX"], the Age Discrimination
> Act of 1975 (42 U.S.C. 6101 et seq.) ["ADA"], or section 504 of the Rehabilitation
> Act of 1973 (29 U.S.C. 794) ["Section 504"], be excluded from participation in, be
> denied the benefits of, or be subjected to discrimination under, any health program
> or activity, any part of which is receiving Federal financial assistance . . . .

42 U.S.C. § 18116(a) (emphasis added).   Section 1557 does not create new bases of prohibited

discrimination, but rather incorporates the grounds of four longstanding federal nondiscrimination

statutes: Title VI, Title IX, the ADA, and Section 504.   42 U.S.C. § 18116(a).   The implementing

Rule claims to merely "clarif[y] and codif[y] *existing* nondiscrimination requirements,"

incorporated in Section 1557.   81 Fed. Reg. at 31376 (emphasis added).   A substantial portion of

the Rule deals with discrimination on the basis of disability, but Plaintiffs limit their challenge to

the Rule's definition of discrimination on the basis of sex.   Priv. Pls.' Br. 24, ECF No. 25.

When implementing the Title IX portion of Section 1557, HHS defined discrimination "on

the basis of sex" to include "termination of pregnancy" and "gender identity."   45 C.F.R. § 92.4.

The Rule does not define termination of pregnancy but defines gender identity as "an individual's

internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." *Id.* The Rule explains that the "gender identity spectrum includes an array of possible gender identities beyond male and female." 81 Fed. Reg. at 31392.

Plaintiffs claim the Rule's interpretation of sex discrimination pressures doctors to deliver healthcare in a manner that violates their religious freedom and thwarts their independent medical judgment and will require burdensome changes to their health insurance plans on January 1, 2017. Priv. Pls.' Mot. 1–2, ECF No. 24; State Pls.' Br. 31–33, ECF No. 23. Plaintiffs argue that Defendants define prohibited sex discrimination to include: (1) refusing to provide abortion-related services and health insurance coverage of abortion-related services; and (2) refusing to provide transition-related services and health insurance coverage of transition-related services. *See* Am. Compl., ECF No. 21. Defendants claim the Rule does not mandate any particular procedure, rather it requires only that covered entities provide nondiscriminatory health services and health insurance in a nondiscriminatory manner. Defs.' Resp. 35, ECF No. 50; Hr'g Tr. 49:25–50:3, Dec. 20, 2016.

### 1.    Health Coverage

One of the "discriminatory actions prohibited" under the Rule is "hav[ing] or implement[ing] a categorical [insurance] coverage exclusion or limitation for all health services related to gender transition." 45 C.F.R. § 92.207(b). The Rule declares that categorizations of all transition-related treatment as cosmetic or experimental are now "outdated and not based on current standards of care." 81 Fed. Reg. at 31429. The "range of transition-related services"

contemplated by the Rule includes treatment for gender dysphoria[4] and is "not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual." 81 Fed. Reg. at 31435–36.

Because the Rule contains no age limitation, Plaintiffs are concerned it may require health insurance coverage of transitions for children and they note that transition-related procedures are viewed by many in the medical community as harmful, including HHS's own medical experts.[5] Priv. Pls.' Br. 40, ECF No. 25.  They argue the Rule prohibits covered entities from categorically excluding transition-related procedures from insurance coverage plans even though TRICARE, the military's insurance program, categorically excludes all coverage of surgical transition procedures and widespread debate about the medical risks and ethics associated with transition procedures continues within the medical community.  *Id.* at 40–42.

## 2.    Health Services

Plaintiffs also allege the Rule requires doctors or healthcare providers to perform (or refer patients for) transition-related procedures if the entity provides an analogous service in a different context.  Am. Compl. 12–13, ECF No. 21.  For example, the Rule's preamble explains that "[a] provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy [removal of the uterus] for a transgender man would have to revise its

---

[4] Gender dysphoria is defined as "a distressed state arising from conflict between a person's gender identity and the sex the person has or was identified as having at birth."  MERRIAM-WEBSTER MEDICAL DICTIONARY (2016) https://www.merriam-webster.com/medical/gender%20dysphoria.

[5] *See* Priv. Pls.' App. 648, ECF No. 26; Centers for Medicare & Medicaid Services, Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (June 2, 2016) ("Based on a thorough review of the clinical evidence available at this time, there is not enough evidence to determine whether gender reassignment surgery improves health outcomes for Medicare beneficiaries with gender dysphoria. There were conflicting (inconsistent) study results—of the best designed studies, some reported benefits while others reported harms.").

policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31455.

HHS stressed that some procedures "related to gender transition" may be required even if not "strictly identified as medically necessary or appropriate." *Id.* at 31435. Plaintiffs interpret this to mean that if a doctor performs mastectomies as part of a medically necessary treatment for breast cancer, he would be forced to perform the same procedure for a gender transition, even if the doctor believed removing healthy breast tissue was contrary to the patient's medical interest. Am. Compl. 14, ECF No. 21. Private Plaintiffs also perform certain procedures for a miscarriage (such as dilation and curettage) and they fear the Rule will require them to perform those procedures for abortions to avoid discrimination on the basis of "termination of pregnancy." Am. Compl. 33, 38–39, ECF No. 21.

Plaintiffs claim the Rule pressures covered entities to perform and provide insurance coverage for abortion- and transition-related procedures. Priv. Pls.' Br. 18–19, ECF No. 25. But Defendants argue the Rule does not require the performance or insurance coverage of any procedure, but merely prohibits policies from "operating in a discriminatory manner, both in design and implementation." Defs.' Resp. 27, ECF No. 50. Defendants claim that "neutral nondiscriminatory application of evidence-based criteria" can be used to "make medical necessity or coverage determinations" and that "a legitimate nondiscriminatory reason" can justify a limitation of services. Defs.' Resp. 55, 24–25, ECF No. 50. At the hearing on this matter however, Defendants' Counsel argued it would be "very difficult to imag[in]e" *any* medical justification for a categorical exclusion of health services or coverage of *all* transition-related procedures. Hr'g Tr. 75:9–12.

### 3.   Enforcement

Although Title IX provides the grounds of prohibited sex discrimination, covered entities who violate the Rule's prohibition of sex discrimination are subject to the penalties associated with a violation of Title VI of the Civil Rights Act of 1964.  45 C.F.R. § 92.302(a).  Those in violation of the Rule face the loss of federal funding, debarment from doing business with the government, and false claims liability.[6]  45 C.F.R. §§ 92.301, 92.302.  Covered entities are required to record and submit compliance reports upon request to HHS's Office of Civil Rights ("OCR") and post public notices of compliance.  45 C.F.R. § 92.8; 81 Fed. Reg. at 31439.  The Rule also provides for enforcement proceedings by the Department of Justice ("DOJ") and private lawsuits for damages and attorney's fees.  81 Fed. Reg. at 31440–41.

### 4.   Plaintiffs

Franciscan and CMDA's members are covered entities under the Rule because they both receive federal financial assistance and provide employee health insurance.[7]  Franciscan is a Roman Catholic faith-based hospital system founded by a Roman Catholic order, the Sisters of St. Francis of Perpetual Adoration.  Am. Compl. 7, ECF No. 21.  Healthcare and religion have been inextricably intertwined in the delivery of their services since their first hospital building opened, serving as both a convent and a hospital.  *Id.*  Since opening their doors in 1875, they have been focused on serving the most vulnerable of society with the values of the Sisters of St. Francis,

---

[6] Franciscan would risk losing $900 million in federal funds; Texas would risk losing more than $42.4 billion in federal funds; and CMDA members would risk losing a significant amount of federal funds.  Am. Compl. 7–8, ECF No. 21; Am. Compl. 28–29, ECF No. 21; *See* Hr'g Tr. 89:10–20, Dec. 20, 2016.

[7] The Rule applies to "every health program or activity, any part of which receives Federal financial assistance provided or made available by the Department; every health program or activity administered by the Department; and every health program or activity administered by a Title I entity."  45 C.F.R. § 92.2(a).  HHS estimated the Rule would "likely cover almost all licensed physicians because they accept Federal financial assistance . . . ."  81 Fed. Reg. at 31445.

including: respect for life, fidelity to Franciscan's mission, compassionate concern, and Christian stewardship. *Id.* at 7, 35. Franciscan's hospitals provide many resources to accommodate the spiritual needs of their employees, patients, and their families—including daily Mass and 24-hour access to a chapel for individuals of all faith to pray and meditate. *Id.* at 34. Franciscan now provides $900 million in Medicare and Medicaid services annually to the poor, disabled, and elderly; and stands to lose that funding and significantly more if federal funding is withdrawn. *Id.* at 7–8.

Franciscan provides all of its standard medical services to every individual, including those who identify as transgender. Am. Compl. 36, ECF No. 21. But Franciscan's religious beliefs do not allow them to perform or cover transition-related procedures. *Id.* at 3.

> Franciscan holds religious beliefs that sexual identity is an objective fact rooted in nature as male or female persons. Like the Catholic Church it serves, Franciscan believes that a person's sex is ascertained biologically, and not by one's beliefs, desires, or feelings. Franciscan believes that part of the image of God is an organic part of every man and woman, and that women and men reflect God's image in unique, and uniquely dignified, ways.

Am. Compl. 37, ECF No. 21. Indeed, Franciscan tailors care according to the biological differences between men and women and credits this approach as part of the success behind its award-winning heart-health treatment program.[8] *Id.* Franciscan does not believe transition-related procedures are *ever* in the best interests of its patients and providing or covering *any* transition-related service would violate their deeply held religious beliefs. *Id.* at 37–38.

CMDA is the nation's largest faith-based organization of doctors, including nearly 18,000 members who sign a statement of faith to join and rely on CMDA to advocate on behalf of their

---

[8] Franciscan believes that "optimal patient care—including in patient education, diagnosis, and treatment—requires taking account of the biological differences between men and women" and that "optimal prevention of and treatment for heart disease in women requires monitoring for different warning signs, accounting for different risk factors, and providing different counseling than it would for men." Am. Compl. 37, ECF No. 21.

religious beliefs and medical judgments in the public square.  Am. Compl. 29–30, ECF No. 21; App. 17, Dr. Stevens' Decl., ECF No. 26.  Accordingly, CMDA is bringing suit on behalf of its members.  Am. Compl. 6–7, ECF No. 21.[9]  CMDA members hold values similar to Franciscan and CMDA's approved Ethics Statement affirms the "obligation of Christian healthcare professionals to care for patients struggling with gender identity with sensitivity and compassion" but states clear opposition to medical assistance with gender transition and abortion.  *Id.* at 30. CMDA members treat transgender individuals for health issues ranging from the common cold to cancer, and several members have already received requests for transition-related procedures that they cannot provide without violating their religious beliefs.  App. 25, Dr. Stevens' Decl., ECF No. 26.  Like Franciscan, CMDA members tailor care according to biological sex phenotype and believe that "[t]ransgender designations may conceal biological sex differences relevant to medical risk factors, recognition of which is important for effective healthcare and disease prevention." Am. Compl. 31, ECF No. 21.  Private Plaintiffs provide a variety of services specifically and exclusively for women (e.g., obstetrics and gynecology; hysterectomies; hormone treatments; reconstructive surgery) that the Rule requires they "demonstrate an exceedingly persuasive justification" to maintain.  Am. Compl. 36, ECF No. 21; 45 C.F.R. § 92.101(b)(3)(iv).[10]

Private Plaintiffs' religious beliefs also prevent them from being able to participate in, refer for, or cover elective sterilizations or abortion-related procedures.  Am. Compl. 33, 38–39, ECF No. 21.  Because the Rule prohibits discrimination on the basis of "termination of pregnancy" and

---

[9] Although the Amended Complaint stated CMDA was bringing suit on behalf of itself and its members, Private Plaintiffs indicated at the December 20, 2016 hearing that CMDA is not a covered entity and is bringing suit on behalf of its members only.  Am. Compl. 6–7, ECF No. 21; Hr'g Tr. 89:10–20.

[10] "A covered entity may operate a sex-specific health program or activity [] only if the covered entity can demonstrate an exceedingly persuasive justification, that is, that the sex-specific health program or activity is substantially related to the achievement of an important health-related or scientific objective."  45 C.F.R. § 92.101(b)(3)(iv).

fails to incorporate the blanket religious and abortion exemptions of Title IX, Private Plaintiffs are concerned that their blanket exclusion of abortion or elective sterilization services and coverage of such procedures puts them at risk of losing federal funding and facing civil liability. *See* Priv. Pls.' Br. 31, ECF No. 25.[11]

Franciscan and CMDA's members also provide health insurance coverage for their employees in accordance with their religious beliefs. *See* Am. Compl., ECF No. 21. For example, both groups exclude coverage for services related to gender transition, sterilizations, and abortions. *Id.* at 34, 39. Franciscan's employee health benefit plan specifically excludes coverage for any "[t]reatment, drugs, medicines, services, and supplies related to gender transition; sterilizations; abortions." Am. Compl. 39, ECF No. 21; Am. Compl. 34, ECF No. 21 ("CMDA has members who currently provide healthcare coverage for employees, coverage which excludes medical transition procedures."). Private Plaintiffs sincerely believe that participating in, referring for, or providing insurance coverage of gender transitions, sterilizations, or abortions would constitute "impermissible material cooperation with evil." Am. Compl. 39, 33, ECF No. 21.

The State Plaintiffs receive billions in federal financial assistance each year, and are subject to the Rule as providers of both health care and health insurance. *See id.* at 4–6. State Plaintiffs prohibit insurance coverage for abortions and gender transition procedures, but to comply with the Rule, State Plaintiffs must rescind these categorical exclusions. *See* State Pls.' Reply 17, ECF No. 56. Texas, one of the named State Plaintiffs, is already being forced to comply with an investigation by HHS's Office of Civil Rights and stands to lose more than $42.4 billion in federal healthcare funding—jeopardizing the availability of healthcare for the nation's most vulnerable

---

[11] The Rule cites to federal religious protections outside of Title IX and they are discussed at length below. 45 C.F.R. § 92.2(b)(2).

citizens if it does not change its policies.  State Pls.' Reply 16–17, ECF No. 56; Am. Compl. 4, ECF No. 21.  State Plaintiffs claim the Rule "undermines the longstanding sovereign power of the States to regulate healthcare, ensure appropriate standards of medical judgment, and protect its citizens' constitutional and civil rights."  Am. Compl. 3, ECF No. 21.  State Plaintiffs also argue the Rule forces them to incur significant costs to post required notices of compliance, train personnel, adjust insurance coverage, and increase service offerings to include transition-related procedures.  *Id.* at 27–28.  HHS estimates that states will need to contribute $17.8 million to train 7,637,306 state workers under the new Rule.  81 Fed. Reg. at 31465, 31449.

Together, Plaintiffs claim the Rule violates the Administrative Procedure Act ("APA") because its definition of prohibited sex discrimination is contrary to law and arbitrary and capricious.  *See* Am. Compl., ECF No. 21.  Accordingly, the Court begins with the law governing APA claims and the relevant standards in considering a preliminary injunction.

## II.   LEGAL STANDARDS

### A.   The Administrative Procedure Act

"The APA authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702).  "Where no other statute provides a private right of action, the 'agency action' complained of must be *final* agency action."  *Id.* at 61–62 (quoting 5 U.S.C. § 704).  An administrative action is "final agency action" under the APA if: (1) the agency's action is the "consummation of the agency's decision making process"; and (2) "the action [is] one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & Southern Air Lines, Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 113

(1948); and *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).  "In evaluating whether a challenged agency action meets these two conditions, this court is guided by the Supreme Court's interpretation of the APA's finality requirement as 'flexible' and 'pragmatic.'" *Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149–50 (1967)).  When final agency actions are presented for judicial review, the APA provides that reviewing courts should "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with [the] law."  5 U.S.C. § 702(2).

### B.    Preliminary Injunction

The Fifth Circuit set out the requirements for a preliminary injunction in *Canal Authority of State of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).  To prevail on a preliminary injunction, the movant must show: (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not granted; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that granting the injunction is not adverse to the public interest.  *Id.*; *see also Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008).

To qualify for a preliminary injunction, the movant must clearly carry the burden of persuasion with respect to all four requirements.  *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003).  If the movant fails to establish any one of the four prerequisites to injunctive relief, relief will not be granted.  *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 419 n.15 (5th Cir. 2001).  A movant who obtains a preliminary

injunction must post a bond to secure the non-movant against any wrongful damages it suffers as a result of the injunction.  Fed. R. Civ. P. 65(c).

The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court.  *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985) (citing *Canal*, 489 F.2d at 572).  A preliminary injunction "is an extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries the burden of persuasion."  *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989) (quoting *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985)).  Even when a movant satisfies each of the four *Canal* factors, the decision whether to grant or deny a preliminary injunction remains discretionary with the district court.  *Miss. Power & Light*, 760 F.2d at 621.

## III.   ANALYSIS

Plaintiffs argue the Rule should be enjoined because it violates: (1) the Administrative Procedure Act; (2) the Religious Freedom Restoration Act; (3) the First Amendment's Free Speech Clause; and (4) the Spending Clause of Article I.  *See* Priv. Pls.' Mot., ECF No. 25.

Defendants contend that Plaintiffs are not entitled to a preliminary injunction because they are unlikely to succeed, arguing: (1) the Court lacks jurisdiction; (2) the Rule is entitled to *Chevron* deference; (3) the Rule does not compel or curtail speech; (4) Plaintiffs failed to assert a sufficient facial pre-enforcement vagueness challenge; and (5) Plaintiffs failed to assert a sufficient substantive due process claim.  *See* Defs.' Resp., ECF No. 50.  Defendants also argue Plaintiffs are not entitled to a preliminary injunction because (1) Plaintiffs failed to establish irreparable injury and (2) the balance of equities and public interest favor denying injunctive relief.  *Id.*

### A. Jurisdiction

The Court must first assess jurisdiction, for "without proper jurisdiction, a court cannot proceed at all." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 84 (1998).[12] Defendants argue the Court lacks jurisdiction because (1) Plaintiffs lack standing; (2) Plaintiffs' claims are not ripe; and (3) Section 1557 requires Plaintiffs adhere to its specified mechanisms for administrative and judicial review. Defs.' Resp. 36–37, ECF No. 50. The Court addresses each of these arguments in turn.

Article III confines the federal judicial power to actual "cases" and "controversies." U.S. CONST. art. III, § 2. The case-or-controversy requirement plays a critical role in ensuring the federal judiciary respects "the proper—and properly limited—role of the courts in a democratic society." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006) (quoting *Allen v. Wright*, 468 U.S. 737, 750 (1984)). Article III standing enforces the case-or-controversy requirement and must be established by the party invoking federal jurisdiction as to each claim asserted. *DaimlerChrysler*, 547 U.S. at 342 (citing *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11 (2004)).

### 1. Standing

To establish standing Plaintiffs must show: (1) an injury in fact; (2) fairly traceable to Defendants' challenged conduct; and (3) likely to be redressed by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A plaintiff must support each standing element "with the manner and degree of evidence required at the successive stages of the

---

[12] It is undisputed that this case presents a federal question, giving the Court subject matter jurisdiction pursuant to 28 U.S.C. § 1331. It is also undisputed the Court has authority to review administrative actions pursuant to 5 U.S.C. § 702 of the APA and authority to grant injunctive relief pursuant to Federal Rule of Civil Procedure 65.

litigation." *Lujan*, 504 U.S. at 561. But it is not necessary for all Plaintiffs to demonstrate standing; rather, "one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Texas v. United States*, 809 F.3d 134, 151 (quoting *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

To establish injury in fact, a plaintiff must show that he or she suffered "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). For an injury to be particularized it must "affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. In this case, the Rule will affect each of the Plaintiffs in different ways and varying degrees, but each will be required to make changes to their health insurance coverage (to rescind their current categorical exclusion of transitions) or risk the loss of federal funding and face potential civil liability.[13]

Defendants argue Plaintiffs failed to satisfy the first element of standing because their alleged injuries are conjectural and hypothetical. Defs.' Resp. 39–40, ECF No. 50. Defendants also contend CMDA lacks associational standing to sue on behalf of its members because CMDA members would not have standing to sue in their own right and the claims asserted require their individual participation. *Id.* at 40–42.

Here, the injuries alleged by Plaintiffs are particularized because they distinctly affect each Plaintiff. For example, the Rule will affect how CMDA members communicate with patients, what insurance coverage they offer to their employees, and their hiring prospects because the Rule

---

[13] While the Rule cites "[f]ederal statutory protections for religious freedom and conscience" potentially available to Plaintiffs, Defendants refused to agree the protections would apply to Private Plaintiffs or that Private Plaintiffs would be able to maintain their current categorical exclusions. 45 C.F.R. § 92.2(b)(2); *see* Hr'g Tr. 70:10–71:13. Accordingly, Private Plaintiffs must remove their categorical exclusion the Rule declares is "unlawful on its face" or roll the dice and risk the withdrawal of federal funding and civil liability. 81 Fed. Reg. at 31429.

imposes potential liability on hospitals for a doctor's discrimination.  Priv. Pls.' Br. 44–49, 19, ECF No. 25; 81 Fed. Reg. at 31384.  The Rule will affect Franciscan's ability to continue operations because with no assurance that they will be exempt from the Rule's provisions that contradict their religious beliefs, Franciscan must either maintain their current insurance coverage plan that violates the Rule and risk debilitating consequences or violate their religious beliefs.  *See* Priv. Pls.' Br. 22–23, ECF No. 25.  Because State Plaintiffs enforce categorical exclusions of transition-related procedures, and have no religious defense to assert, the Rule mandates revision of their policies and forces State Plaintiffs to conduct individualized inquiries into whether a particular transition procedure is medically necessary.  *See* State Pls.' Reply 17, ECF No. 56.  The Rule also forces State Plaintiffs to cooperate with ongoing investigations, expend millions on training personnel under the Rule, and adjust physical facilities to accommodate what the Rule describes as "an array of possible gender identities."  81 Fed. Reg. at 31392; *see* State Pls.' Reply 20, ECF No. 56.

To satisfy the injury in fact requirement, the injury must also be concrete.  *Spokeo*, 136 S. Ct. at 1548.  The Supreme Court has emphasized that a concrete injury "must actually exist," meaning it is "real" and "not abstract."  *Id.*  When seeking a preliminary injunction, in addition to past injury, a plaintiff must show he or she faces "an imminent threat of future injury."  *See Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 210–11 (1995).  For example, in *Los Angeles v. Lyons*, the Supreme Court held the plaintiff lacked standing to seek an injunction against a police chokehold policy because he faced "no realistic threat" from the policy.  461 U.S. 95 (1983).  The Supreme Court noted that "[t]he reasonableness of [plaintiff's] fear is dependent upon the likelihood of a recurrence of the allegedly unlawful conduct."  *Id.* at 107 n.8.

Here, Plaintiffs' fear of being subjected to penalties under the challenged Rule is reasonable given they are all covered entities whose insurance plans include a categorical exclusion of transition-related procedures that is forbidden by the Rule.[14]  Further, the likelihood that Plaintiffs will suffer further harm from the Rule is strengthened by the current HHS investigation into some of the Plaintiffs' potential noncompliance.[15]  State Pls.' Reply 16–17, ECF No. 56.  Accordingly, Plaintiffs have presented concrete evidence to support their fears that they will be subject to enforcement under the Rule.

The second and third elements of standing, causation and redressability, are easily established here because the Plaintiffs are themselves the subject of the challenged government action.  *Lujan*, 504 U.S. at 561–62 (stating that when a plaintiff challenges the legality of government action or inaction, and is himself an object of the action at issue, "there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it").

Because Plaintiffs bring claims under the APA, in addition to Article III standing requirements, "the interest [they] assert[] must be 'arguably within the zone of interests to be protected or regulated by the statute' that [they] say[] was violated."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).  As covered entities required to make expensive changes to their insurance coverage plans, Plaintiffs' asserted interests fall

---

[14] 45 C.F.R. § 92.207(b)(4).

[15] HHS's Office for Civil Rights ("OCR") contacted Texas's Health and Human Services Commission on September 29, 2016 to investigate a complaint concerning the Texas Medicaid Program and is currently investigating whether Texas covers "sex change therapy," who determines the "medical necessity" for such therapy, and whether there is a different process for determining medical necessity criteria for hormonal fertility treatment and cosmetic surgery.  State Pls.' Reply 16, ECF No. 56 (quoting Decl. of Dana Williamson Ex. 1, Dec. 2, 2016).

squarely within the zone of interests regulated by the Rule.  Accordingly, Private Plaintiffs and State Plaintiffs have standing to pursue this lawsuit.

CMDA also asserts associational standing on behalf of its 18,000 members.  Am. Compl. 6–7, 59, ECF No. 21.  It is well established that an association is permitted to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  An organization lacks standing if it fails to adequately allege that there is a threat of injury to any individual member of the association and thus fails to identify even one individual member with standing.  *Funeral Consumers Alliance, Inc. v. Serv. Corp. Intern.*, 695 F.3d 330, 344 (5th Cir. 2012) (citing *Nat'l Treasury Emps. Union v. U.S. Dep't of Treasury*, 25 F.3d 237, 242 (5th Cir. 1994)).  The Supreme Court has held that standing cannot be established by "accepting the organization's self-description of the activities of its members" and determining that "there is a statistical probability that some of those members are threatened with concrete injury."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 497 (2009).  Plaintiff-organizations must make specific allegations establishing that at least one identified member has suffered or would suffer harm.  *Id.* at 498.

As to the first prong, Defendants argue CMDA lacks associational standing because its members have not established their "religious or conscience-based objections to performing [transition or abortion] services."  Defs.' Resp. 40, ECF No. 50.  But a plaintiff-organization need only establish that one member would suffer harm under the Rule, and CMDA has satisfied that requirement by providing the declaration of Dr. Hoffman.  Priv. Pls.' App. 467–70, Hoffman Decl., ECF No. 26.  Dr. Hoffman declared that "CMDA's ethical statements are consistent with my own

medical and religious beliefs." App. 468, ECF No. 26. Dr. Hoffman currently provides standard medical services to transgender patients and performs a variety of procedures that could be used in connection with a gender transition but that, in light of his medical judgment and religious beliefs, he would not offer for that purpose. *Id.* at 468–69.

Defendants take no issue with the second prong, and the Court finds that the interests CMDA seeks to protect in this suit are germane to its purpose. Am. Compl. 29, ECF No. 21. As to the third prong, Defendants argue CMDA lacks associational standing as to the asserted RFRA claim because it would require the participation of individual members. Defs.' Resp. 41, ECF No. 50. CMDA is not required to detail the specific religious views of each member however, and the record is sufficiently developed from Dr. Hoffman's Declaration, CMDA's Ethics Statement, and Private Plaintiffs' briefing, to consider the RFRA claim at the preliminary injunction stage. Because CMDA alleges there is a real and immediate threat that one of its members will be injured by the Rule, it has established standing on behalf of its members.

### 2.   Ripeness

Defendants also argue this suit is not ripe because Plaintiffs' injuries are speculative, Plaintiffs face no significant hardship in the absence of review, and the issues presented would be significantly aided by further factual development. Defs.' Resp. 37–39, ECF No. 50.

The Court looks primarily at two considerations in determining whether a case is ripe for judicial review: (1) fitness of the issues for judicial decision; and (2) hardship to the parties of withholding court consideration. *Abbott Labs.*, 387 U.S. at 149. In the same vein, a challenge to administrative regulations is fit for review if (1) the questions presented are "purely legal one[s]," (2) the challenged regulations constitute "final agency action," and (3) further factual development would not "significantly advance [the court's] ability to deal with the legal issues presented."

*Texas v. United States*, 497 F.3d 491, 498–99 (5th Cir. 2007) (quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 812 (2003)).

Because the present case involves primarily questions of law, the Court finds that it would not be significantly aided by further factual development.  The parties do not dispute that Plaintiffs are covered entities under the Rule or that they currently exclude all insurance coverage of transition-related procedures.  However, the parties disagree as to the Rule's exact application and effect on Plaintiffs.  Defendants refuse to indicate whether any of the religious defenses cited by the Rule would allow Private Plaintiffs to maintain their categorical exclusions, and insist more facts are needed to determine whether Private Plaintiffs' insurance policies violate the Rule.  Hr'g Tr. 51:20–24, 61:1–62:25.  Absent an applicable religious defense, the Rule clearly forbids categorical exclusions of health insurance coverage for transition-related procedures.  45 C.F.R. § 92.207(b)(4); Defs.' Resp. 26, ECF No. 50.  As the Rule clearly prohibits categorical exclusions of transition coverage and Private Plaintiffs have articulated their religious beliefs forbidding coverage of transitions in *any* case, it is not clear what additional facts would aid resolution of the suit, and Defendants' counsel struggled to articulate any at the hearing.  45 C.F.R. § 92.207(b)(4); *see* Hr'g Tr. 61:1–62:25, 93:14–95:16.

But even assuming that Private Plaintiffs would eventually find safe harbor under one of the federal religious protections cited by the Rule, Defendants do not dispute that Private Plaintiffs are covered by the Rule or that it directly affects their conduct.  Therefore on January 1, 2017, Private Plaintiffs will be forced to either violate their religious beliefs or maintain their current policies which seem to be in direct conflict with the Rule and risk the severe consequences of enforcement.

Further, even if Defendants eventually agree Private Plaintiffs are covered by one of the referenced religious protections, State Plaintiffs would have no such defense available. The Rule requires State Plaintiffs to rescind their categorical exclusions of transition procedures and evaluate requests for insurance coverage of transitions on a case-by-case basis. *See* 45 C.F.R. § 92.207(b)(4). The parties do not dispute that State Plaintiffs' categorical exclusions of transition-related insurance coverage will be in violation of the Rule on January 1, 2017. *See* Hr'g Tr. 92:4–8. Therefore, the Court finds no further factual development would aid resolution of the case and what little value a more developed factual record would provide is strongly outweighed by the significant hardship Plaintiffs face in the absence of immediate judicial review.

Substantial hardship is typically satisfied when a party is forced to choose between refraining from allegedly lawful activity or engaging in the allegedly lawful activity and risking significant sanctions. *Abbott Labs.*, 387 U.S. at 136 (finding the suit ripe because denying review would force plaintiffs to undergo significant hardship in an effort to comply with the challenged FDA regulation or risk serious civil and criminal penalties); *Steffel v. Thompson*, 415 U.S. 452 (1974) (finding the suit ripe because denying review would force plaintiff to choose between forgoing possibly protected speech (distributing anti-Vietnam War literature) and risking criminal punishment). Plaintiffs should not be forced to choose between forgoing conduct they believe is protected or risking substantial sanctions and liability. *Steffel*, 415 U.S. at 462.

Courts have departed from this general principle—that this impossible choice imposes a substantial hardship worthy of pre-enforcement review—only when the alleged injury is hypothetical or speculative. *See, e.g.*, *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967); *United Public Workers v. Mitchell*, 330 U.S. 75 (1947); *Renee v. Geary*, 501 U.S. 312 (1991). In *Toilet Goods*, the choice faced by cosmetic manufacturers challenging an FDA regulation was complying

and allowing FDA employees to inspect their facilities or refusing to comply and risking a reviewable suspension of certification services. *Toilet Goods*, 387 U.S. at 165. The Supreme Court concluded the case was not ripe for review because the challenged regulation did not immediately impact plaintiffs in "conducting their day-to-day affairs" and complying required "no advance action." *Id.* at 164. The Court also declined to find ripeness because "no irremediabl[y] adverse consequences flow[ed] from requiring a later challenge." *Id.* In this case however, the challenged Rule affects Plaintiffs' day-to-day affairs—the provision of healthcare services for their patients and healthcare coverage for their employees. The Rule requires Plaintiffs to incur significant expense in complying with the Rule and assessing their potential noncompliance. Further, because Private Plaintiffs claim the Rule substantially burdens their exercise of religion in violation of RFRA, the Court finds that irremediable adverse consequences would result from a delay of review.

Claims are often ripe when denying review would place "the hapless plaintiff between the Scylla of intentionally flouting state law and the Charybdis of forgoing what he believes to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding." *Steffel*, 415 U.S. at 462. Plaintiffs in the present case face a similar impossible choice: between the Scylla of intentionally defying federal law and the Charybdis of forgoing specific conduct they believe is constitutionally protected to avoid serious financial and civil penalties. The Court finds the impossible choice faced by Plaintiffs constitutes substantial hardship and with the issues fit for review, the case is accordingly ripe.

Defendants also claim Plaintiffs' alleged injuries are too speculative to warrant injunctive relief because the Rule incorporates "applicable Federal statutory protections for religious freedom

and conscience." Defs.' Resp. 22–23, ECF No. 50.[16] For example, RFRA forbids the government from "substantially burden[ing] a person's exercise of religion" unless doing so "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b). The Weldon Amendment forbids discriminating against "any institutional or individual health care entity . . . on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Pub. L. No. 114–113, Div. H, § 507(d), 129 Stat. 2242, 2649 (2015) ("Weldon Amendment"). The Coats Amendment forbids discriminating against an entity that refuses to undergo training in performance or referrals for abortions. 42 U.S.C. § 238n(a) ("Coats Amendment"). The Church Amendment forbids requiring any individual "to perform or assist in the performance of any part of a health service program . . . if his performance or assistance in the performance of such part of such program . . . would be contrary to his religious beliefs or moral convictions." 42 U.S.C. § 300a-7(d) ("Church Amendment").

The Court addresses Plaintiffs' RFRA argument below, but the remaining federal protections are insufficient to assure Plaintiffs of either their compliance with the Rule or safety from enforcement proceedings. The Weldon and Coats Amendments deal exclusively with abortions and do not reach religious objections to providing or covering transition-related procedures. The Church Amendment is limited to specific federal funding streams, providing no assurance that the Rule's enforcement mechanisms will not be employed to give "maximum effect to the provision[s] permitted by law." 45 C.F.R. § 92.2(b)(c); *see* Hr'g Tr., 19:1–20.

---

[16] The Rule provides that "applicable Federal statutory protections for religious freedom and conscience" are available, which Defendants identify as RFRA, the Weldon Amendment, the Coats Amendment, and the Church Amendment. Defs.' Resp. 22–23, ECF No. 50 (quoting 45 C.F.R. § 92.2(b)(2)).

### 3.    Administrative Exhaustion

Defendants also allege that Congress intended to forbid pre-enforcement review of the Rule, as evidenced by the statutory enforcement scheme enacted by Section 1557.  Defs.' Resp. 42–46, ECF No. 50.  "The APA authorizes suit by '[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute.'"  *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 61 (2004) (quoting 5 U.S.C. § 702).  This right of judicial review extends to agency actions "except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law."  *Heckler v. Chaney*, 470 U.S. 821, 828 (1985) (quoting 5 U.S.C. § 701(a)).  The "strong presumption" favoring judicial review of administrative action "fails when a statute's language or structure demonstrates that Congress wanted an agency to police its own conduct."  *Mach Mining, LLC v. E.E.O.C.*, 135 S. Ct. 1645, 1651 (2015).  Defendants bear a "heavy burden" to establish the Rule's unreviewability, and "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling."  *Texas v. United States*, 809 F.3d 134, 164 (5th Cir. 2015) (quoting *Block v. Cmty. Nutrition Inst.*, 467, U.S. 340, 351 (1984)).

Defendants argue that Section 1557's "comprehensive scheme of administrative and judicial review" indicates Congress intended to preclude initial judicial review.  Defs.' Resp. 44, ECF No. 50.  Section 1557 incorporates Title VI's enforcement mechanisms for allegations of sex discrimination under the Rule, so Title VI is the relevant statute to evaluate and determine if Congress intended to divest the Court of original federal question jurisdiction over Plaintiffs' claims.[17]   Defendants are unable to offer any binding authority that Title VI's enforcement

---

[17] Plaintiffs discuss Title IX as the applicable enforcement statute.  Priv. Pls.' Reply 20, ECF No. 57.  But the Rule provides: "The procedural provisions applicable to *Title VI* apply with respect to administrative

mechanisms (incorporated by Section 1557) indicate Congress intended to forbid judicial review of agency actions under Section 1557.[18]  In fact, as Plaintiffs point out, several courts have held that Title VI does not always require exhaustion of administrative remedies before judicial review.[19]  Because Plaintiffs have presented ripe claims and Section 1557 contains no explicit or implicit bar to judicial review, the APA's basic presumption of reviewability applies.   The Supreme Court has held that when a legal issue is "fit for judicial resolution" and a regulation "requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, access to the courts under the Administrative Procedure Act and the Declaratory Judgment Act must be permitted, absent a statutory bar or some other unusual circumstance."  *Abbott Labs.*, 387 U.S. at 153.  "Judicial review of a final agency action by an aggrieved person will not be cut off unless there is persuasive reason to believe that such was the purpose of Congress."  *Id.* at 140.  Absent an explicit or implicit statutory bar to judicial review, the APA's presumption of reviewability applies to Plaintiffs' ripe claims.

Further, while Section 1557 establishes a thorough enforcement process for the individuals it seeks to protect, it provides no similar avenue of relief for Plaintiffs' current claims.  Priv. Pls.' Reply 12, ECF No. 57.  Plaintiffs must either change course to bring their insurance and physician policies in accordance with the Rule, bearing compliance costs and violating their religious views

---

enforcement actions concerning discrimination on the basis of race, color, national origin, *sex*, and disability discrimination under Section 1557 or this part." 45 C.F.R. § 92.302(a) (emphasis added).

[18] Defendants rely on authority from the Fourth and Ninth Circuits (*Taylor v. Cohen*, 405 F.2d 277, 279 (4th Cir. 1968); *Bakersfield City Sch. Dist. of Kern Cty. v. Boyer*, 610 F.2d 621, 624 (9th Cir. 1979)) for the contention that Title VI's comprehensive plan of enforcement divests district courts of jurisdiction over pre-enforcement challenges.  Defs.' Resp. 44–46, ECF No. 50. The remaining authorities cited by Defendants deal with statutory schemes outside of Title VI (such as Title VII and Title IX).  *Id.*

[19] *See, e.g.*, *Montgomery Improvement Ass'n, Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 645 F.2d 291, 297 (5th Cir. 1981) ("[W]e hold that plaintiffs have a private cause of action under . . . Title VI . . . ."); *Freed v. Consol. Rail Corp.*, 201 F.3d 188, 191 (3d Cir. 2000) ("Title VI . . . does not require that plaintiffs exhaust the administrative process before bringing suit.").

and medical judgment; or roll the dice and risk the loss of federal funding or massive liability to private parties.  The Court finds nothing in the Affordable Care Act—including Section 1557—precludes this action.

Because Plaintiffs have standing and allege ripe claims properly subject to judicial review, the Court next evaluates whether a preliminary injunction is appropriate.

### B.      Preliminary Injunction

#### 1.      Likelihood of Success on the Merits

The first consideration in determining whether to grant Plaintiffs' motions for preliminary injunction is whether Plaintiffs have shown a likelihood of success on the merits for their claims. This requires Plaintiffs to present a prima facie case.  *Daniels Health Scis., LLC v. Vascular Health Scis.*, 710 F.3d 579, 582 (5th Cir. 2013) (citing *Janvey v. Alguire*, 647 F.3d 585, 595–96 (5th Cir. 2011)).  A prima facie case does not mean Plaintiffs must prove they are entitled to summary judgment.  *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009).  A party "is not required to prove his case in full at a preliminary injunction hearing."  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

#### a.      *Administrative Procedure Act*

Plaintiffs claim the Rule violates the APA because it is contrary to law and exceeds statutory authority by (1) interpreting Title IX's prohibition of sex discrimination to include gender identity; (2) failing to include the religious and abortion exemptions of Title IX; (3) contradicting the commands of Title VII; and (4) attempting to commandeer the states in violation of the Tenth Amendment.  Priv. Pls.' Br., ECF No. 25.  In response, Defendants argue the Rule is lawful and

argue the Rule's interpretation of sex discrimination is entitled to *Chevron* deference.[20]  *See* Defs.'
Resp., ECF No. 50.

In evaluating agency action under the APA, courts must "hold unlawful and set aside"
agency actions that are "not in accordance with the law" or "in excess of statutory jurisdiction,
authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2).  For "the authority of
administrative agencies is constrained by the language of the statute they administer."  *Texas v.
United States*, 497 F.3d 491, 500–01 (5th Cir. 2007) (citing *Massachusetts v. EPA*, 549 U.S. 497
(2007)).  "No matter how it is framed, the question a court faces when confronted with an agency's
interpretation of a statute it administers is always, simply, *whether the agency has stayed within
the bounds of its statutory authority*."  *City of Arlington, Tex. v. F.C.C.*, 133 S. Ct. 1863, 1868
(2013) (emphasis in original).

The Court begins analysis of Plaintiffs' likelihood of success by considering Defendants'
first and primary defense: whether HHS's interpretation of sex discrimination is entitled to
deference under *Chevron*.

### i.        *Chevron Deference*

In reviewing an agency's construction of a statute it administers, courts follow the familiar
two-step framework articulated in *Chevron* and ask first whether Congress has directly spoken to
the precise question at issue.  *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837,
842 (1984).  If so, this is the end of the matter as the court and agency must give effect to
Congress's unambiguously expressed intent.  *Food and Drug Admin. v. Brown & Williamson
Tobacco Corp.*, 529 U.S. 120, 121 (2000); *City of Arlington, Tex. v. FCC*, 133 S. Ct. 1863, 1874

---

[20] Defendants also argue Plaintiffs are unlikely to succeed on their First or Fifth Amendment claims, but
because the Court is working on an expedited briefing schedule it does not reach Plaintiffs' constitutional
arguments or Defendants' constitutional defenses.

(2013) (quoting *Chevron*, 467 U.S. at 842–43).  If not, the court must defer to the agency's construction of the statute so long as it is permissible.  *Brown & Williamson*, 529 U.S. at 121.

Step one of *Chevron* analysis includes both whether the statute confers the agency jurisdiction over an issue, as well as challenges to an agency's interpretation of a statute.  *Texas v. United States*, 497 F.3d at 500–01.[21]  For *Chevron* deference to apply, an agency must have received congressional authority to determine the particular matter at issue in the particular manner adopted.  *City of Arlington*, 133 S. Ct. at 1874 (citing *United States v. Mead Corp.*, 533 U.S. 218 (2001)).  When a statute is silent or ambiguous with respect to a specific issue, courts assume the implementing agency has been granted an implicit delegation from Congress to fill in the statutory gaps, and proceed to ask whether the agency's construction is permissible.  *Brown & Williamson*, 529 U.S. at 123 (citing *Chevron*, 467 U.S. at 844).  "Ambiguity is a creature not of definitional possibilities but of statutory context."  *Brown v. Gardner*, 513 U.S. 115, 118 (1994).  When considering whether a statute is ambiguous under *Chevron*, a court must: (1) begin with the statute's language; (2) give undefined words their ordinary, contemporary, common meaning; (3) read the statute's words in proper context and consider them based on the statute as a whole; and (4) consider a statute's terms in light of the statute's purposes.  *Contender Farms, L.L.P. v. U.S. Dep't. of Agric.*, 779 F.3d 258, 269 (5th Cir. 2015).

Courts use traditional means of statutory interpretation to determine if a statute is ambiguous: the text, its history, and its purpose.  *Calix v. Lynch*, 784 F.3d 1000, 1005 (5th Cir. 2015) (quoting *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 739 (5th Cir. 2005)).  When the words are unambiguous, the "judicial inquiry is complete."  *Desert Palace, Inc. v. Costa*, 539 U.S.

---

[21] State Plaintiffs refer to the agency's purported jurisdiction over the issue as "*Chevron* Step Zero" but the Court evaluates both agency jurisdiction and challenges to the agency's interpretation in *Chevron* step one. State Pls.' Reply 8, ECF No. 56.

90, 98 (2003) (quoting *Rubin v. United States*, 449 U.S. 424, 430 (1981)).   Legislation is ambiguous if it is susceptible to more than one accepted meaning.  *Calix*, 784 F.3d at 1005.  But multiple accepted meanings do not exist merely because a statute's "authors did not have the forethought expressly to contradict any creative contortion that may later be constructed to expand or prune its scope."  *Id.* (citing *Moore v. Hannon Food Servs., Inc.*, 317 F.3d 489, 497 (5th Cir. 2003)).

Because the authority to issue the Rule was given in Section 1557 of the ACA, the Court begins with the language of Section 1557.[22]   Section 1557 clearly incorporates Title IX's prohibition of sex discrimination.[23]   Therefore, with no ambiguity in the statute as to what is prohibited sex discrimination, the Court next analyzes the incorporated text to determine whether HHS's interpretation of the incorporated statute was in line with the text of Title IX.  42 U.S.C. § 18116 (a), (c).  Title IX provides that "[n]o person in the United States shall, *on the basis of sex,* be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."  20 U.S.C. § 1681(a) (emphasis added).

Plaintiffs assert that the plain language of Title IX (incorporated by Section 1557) is clear and unambiguously prohibits biological sex discrimination.  State Pls.' Br. 10, ECF No. 23.  They argue Congress spoke directly to the contested issue—the meaning and scope of prohibited sex discrimination—and urge the Court to decide this issue at the first step of the *Chevron* analysis.  State Pls.' Reply 12–14, ECF No. 56.  Defendants assert that Section 1557's definition of sex

---

[22] "The [HHS] Secretary may promulgate regulations to implement this section."  42 U.S.C. § 18116(c).

[23] "[A]n individual shall not, on the ground prohibited under . . . [T]itle IX of the Education Amendments of 1972 . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ."  42 U.S.C. § 18116(a).

discrimination is ambiguous because it fails to explicitly address transgender individuals and the Rule simply fills the statutory gap, implementing Section 1557.  Hr'g Tr. 56:5–10.

The precise question at issue in this case is: What constitutes Title IX sex discrimination? The text of Section 1557 is neither silent nor ambiguous as to its interpretation of sex discrimination.  Section 1557 clearly adopted Title IX's existing legal structure for prohibited sex discrimination.  42 U.S.C. § 18116(a).  For the reasons set out more fully below, this Court has previously concluded: the meaning of sex in Title IX unambiguously refers to "the biological and anatomical differences between male and female students as determined at their birth."  *Texas v. United States*, No. 7:16-cv-00054, 2016 WL 4426495, at \*14 (N.D. Tex. Aug. 21, 2016); *see Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 674 (W.D. Pa. 2015), *appeal dismissed* (Mar. 30, 2016) ("Title IX does not prohibit discrimination on the basis of transgender itself because transgender is not a protected characteristic under the statute."); *see infra* III.B.1.a.ii.  In promulgating the Rule, HHS revised the core of Title IX sex discrimination under the guise of simply incorporating it.

In addition to the statutory text, the Supreme Court has emphasized a common-sense approach when determining whether Congress was likely to delegate a "policy decision of such economic and political magnitude to an administrative agency."  *Brown & Williamson*, 529 U.S. at 133.  The challenged Rule undoubtedly implicates significant policy questions—namely, the scope and meaning of sex discrimination prohibited by Title IX and incorporated by Section 1557. If Congress wished to assign that decision to HHS, it surely would have done so expressly.  *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citing *Util. Air Regulatory Group v. EPA*, 134 S. Ct. 2427, 2444 (2014)).

The Court does not discount Defendants' stated goal, question the seriousness of the problem the Rule seeks to address, or weigh into the merits of the issue. But no matter how "important, conspicuous, and controversial the issue . . . an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Brown & Williamson*, 529 U.S. at 161. Because Congress clearly addressed the question at issue by incorporating Title IX's existing legal structure, and HHS had no authority to interpret such a significant policy decision—the scope of sex discrimination under Title IX— *Chevron* deference does not apply and the Court need not reach step two of the analysis. *See Brown & Williamson*, 529 U.S. at 160, 121.

### ii.      Title IX Sex Discrimination

Because HHS is not entitled to *Chevron* deference, the Court now considers whether Plaintiffs have demonstrated a likelihood of success on their claim that the Rule violates the APA. Plaintiffs claim the Rule is contrary to law under the APA because its definition of prohibited sex discrimination conflicts with that incorporated by Section 1557. Priv. Pls.' Br., ECF No. 25. Congress's intent in enacting Section 1557 is clear because the statute explicitly incorporates Title IX's prohibition of sex discrimination. *See* 42 U.S.C. § 18116(a). It is also clear from Title IX's text, structure, and purpose that Congress intended to prohibit sex discrimination on the basis of the biological differences between males and females. *See* 20 U.S.C. § 1681.

The text of Title IX indicates Congress's binary definition of "sex." *See* 20 U.S.C. § 1681 (referring to "students of one sex," "both sexes," "students of the other sex"). When interpreting a statute, courts look to its ordinary meaning at the time it was enacted. *See, e.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 388 (2009) ("We begin with the ordinary meaning of the word 'now,' as understood when the [statute] was enacted."); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512

U.S. 218, 228 (1994) (finding the relevant time for determining a statutory term's meaning is when the statute became law); *Baker Botts L.L.P. v. ASARCO L.L.C.*, 135 S. Ct. 2158, 2165 n.2 (2015) (interpreting "services" at the time the word was first used in the statute). When Title IX was enacted in 1972, the term "sex" was commonly understood to refer to the biological differences between males and females.[24] Even the early users of the term "gender identity" recognized the distinction between "sex" and "gender identity."[25] If Congress had intended to enact a new, different, or expansive definition of prohibited sex discrimination in Section 1557, it knew how to do so and would not have chosen to explicitly incorporate its meaning from Title IX. The structure of 20 U.S.C. § 1681 et seq. (Title IX) supports this conclusion. For example, in § 1686 Congress authorized covered institutions to provide different arrangements for each of the sexes. 20 U.S.C. § 1686. These authorized distinctions based on sex can only reasonably be interpreted to be necessary for the protection of personal privacy, and confirm Congress's biological view of the term "sex." *See G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 723, 734 (4th Cir. 2016), *recalling mandate & issuing stay*, 136 S. Ct. 2442 (2016). Accordingly, the text, structure, and purpose reveal that the definition of sex in Title IX's prohibition of sex discrimination

---

[24] *See, e.g.*, AMERICAN HERITAGE DICTIONARY 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2081 (1971) ("The sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction with its concomitant genetic segregation and recombination which underlie most evolutionary change . . ."); 9 OXFORD ENGLISH DICTIONARY 578 (1961) ("The sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these.").

[25] *See, e.g.*, Robert Stroller (UCLA psychoanalyst who coined the term "gender identity") believed "sex was biological but gender was social" David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles*, 1945–2001, ARCHIVES OF SEXUAL BEHAVIOR 93 (Apr. 2004); Virginia Prince (Transgender activist who coined the term "transgender") stated that "I, at least, know the difference between sex and gender" Virginia Prince, *Change of Sex or Gender*, 10 TRANSVESTIA 53, 60 (1969).

unambiguously prevented discrimination on the basis of the biological differences between males and females.

But even if, as Defendants argue, the definition of sex discrimination was determined in 2010 when the ACA incorporated Title IX's prohibition of sex discrimination, the Court is not persuaded it was passed with the Rule's expansive scope in mind because: (1) Congress knew how but did not use language indicating as much, and (2) in 2010 no federal court or agency had interpreted Title IX sex discrimination to include gender identity.[26]  That Congress did not understand "sex" to include "gender identity" when it passed the ACA is evidenced by the employment of the phrase "gender identity" by the same Congress to include protections against crimes motivated by gender identity.  *See* 18 U.S.C. § 249(a)(2)(A) (hate crimes legislation passed by Congress in 2010 protecting "gender identity" and "sexual orientation");[27] *see also Brown & Williamson*, 529 U.S. at 143 (subsequent analogous statutes more specifically addressing a topic in an earlier statute shape the focus of the earlier statute's meaning).  In addition, the 2013 amendments to the Violence Against Women Act, legislation designed to protect women, added protections for "gender identity" and simultaneously reinforced the longstanding, binary definition of "sex" by employing both terms as separate and distinct bases of discrimination prohibited by the statute.  *See* 42 U.S.C. § 13925(b)(13)(A) (specifically addressing *both* sex and gender identity,

---

[26] Defendants argued at the hearing that Section 1557's definition of prohibited sex discrimination determined in 2010 when the ACA was passed.  Hr'g Tr. 79:4–7.

But even if the definition of sex discrimination was determined in 2010, promulgation of the proposed Rule five years later included a new and expanded definition, as evidenced by commentators' depictions of the Rule as "groundbreaking."  Lena H. Sun & Lenny Bernstein, *U.S. Moves to Protect Women, Transgender People in Health Care*, Washington Post, Sept. 3, 2015 (The new Rule "for the first time includes bans on gender identity discrimination as a form of sexual discrimination, language that advocacy groups have pushed for and immediately hailed as groundbreaking.").

[27] The 2010 legislation defines "gender identity" as "actual or perceived gender-related characteristics."  18 U.S.C. § 249(c)(4).

declaring: "No person . . . shall, on the basis of . . . race, color, religion, national origin, sex, gender identity. . . be subjected to discrimination . . . ."). These subsequent enactments confirm that Title IX and Congress's incorporation of it in the ACA unambiguously adopted the binary definition of sex. *See Brown & Williamson*, 529 U.S. at 143.

Finally, the government's usage of the term sex in the years since Title IX's enactment bolsters the conclusion that its common meaning in 1972 and 2010 referred to the binary, biological differences between males and females. Prior to the passage of the ACA in 2010 and for more than forty years after the passage of Title IX in 1972, no federal court or agency had concluded sex should be defined to include gender identity.[28] Accordingly, HHS's expanded definition of sex discrimination exceeds the grounds incorporated by Section 1557.

### iii.      Title IX Unincorporated Religious Exemptions

Plaintiffs also claim the Rule's failure to incorporate Title IX's religious exemptions renders the Rule arbitrary, capricious, and contrary to law under the APA. Priv. Pls.' Br. 31, 33, ECF No. 25. Title IX does not apply to covered entities controlled by a religious organization if its application would be inconsistent with the religious tenets of such organization. 20 U.S.C. § 1681(a)(3) (the "religious exemption"). Title IX also states that it cannot be "construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service,

---

[28] Defendants' briefing and the Rule's preamble relied on *Price Waterhouse* to show that "sex" discrimination encompasses "gender identity." *See* 81 Fed. Reg. at 31387–90; Defs.' Resp. 16, 49, ECF No. 50; *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) (holding that Title VII's prohibition of sex discrimination included discrimination based on stereotypical notions of appropriate behavior, appearance, or mannerisms for males and females). But *Price Waterhouse* dealt with the definition of "sex" in the Title VII context, not the incorporated statute at issue here: Title IX. *Price Waterhouse* was decided in 1989, twenty years before the ACA was enacted. If Congress intended to prohibit the newly-expanded version of sex discrimination that Defendants claim includes "gender identity" it could have incorporated Title VII's prohibition of sex discrimination instead of Title IX. But even in *Price Waterhouse*, the Supreme Court seems to acknowledge the binary nature of sex and focuses mainly on sex stereotypes. 490 U.S. at 251 ("[i]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes").

including the use of facilities, related to an abortion."   20 U.S.C. § 1688 (the "abortion exemption").  The Rule did not incorporate Title IX's religious or abortion exemption even though it incorporated the exemptions of the other three federal nondiscrimination statutes.[29]

Defendants argue the Title IX religious and abortion exemptions were not incorporated because Section 1557 was doing a "new work," i.e., applying the education statute to the healthcare context, and the other three incorporated statutes had already been applied to the healthcare context.  Hr'g Tr. 84:18–21.  Defendants argue not incorporating the Title IX exemptions is of no moment because the other religious and abortion exemptions cited by the Rule are available. Defs.' Resp. 56–57, ECF No. 50.

As outlined above, the Court declines to give HHS *Chevron* deference, and when determining whether the failure to incorporate the exemptions is contrary to law, the Court must examine the text of Section 1557.  This examination requires the Court to again apply well settled rules of construction which include giving the statutory text its plain and ordinary meaning, construing the statute as a whole, and giving effect to every word of the statute.  *Taniguchi v. Kan Pac. Saipan*, Ltd., 132 S. Ct. 1997, 2002 (2012); *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988); *Corley v. United States*, 556 U.S. 303, 314 (2009).  The canon disfavoring surplusage is "one of the most basic interpretive canons."  *Corley*, 556 U.S. at 314.  In construing a statute, courts are obligated to give effect to all its provisions "so that no part will be inoperative or superfluous, void or insignificant."  *Id.* at 315 (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

---

[29] "The exceptions applicable to Title VI apply to discrimination on the basis of race, color, or national origin under this part.  The exceptions applicable to Section 504 apply to discrimination on the basis of disability under this part.  The exceptions applicable to the Age Act apply to discrimination on the basis of age under this part."  45 C.F.R. § 92.101(c).

The text of Section 1557 prohibits discrimination "on the ground prohibited under . . . [T]itle IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.) . . . ." 42 U.S.C. § 18116(a). Congress specifically included in the text of Section 1557 "20 U.S.C. 1681 et seq." That Congress included the signal "et seq.," which means "and the following," after the citation to Title IX can only mean Congress intended to incorporate the entire statutory structure, including the abortion and religious exemptions.[30] Title IX prohibits discrimination on the basis of sex, but exempts from this prohibition entities controlled by a religious organization when the proscription would be inconsistent with its religious tenets. 20 U.S.C. § 1681(a)(3). Title IX also categorically exempts any application that would require a covered entity to provide abortion or abortion-related services. 20 U.S.C. § 1688. Therefore, a religious organization refusing to act inconsistent with its religious tenets on the basis of sex does not discriminate on the ground prohibited by Title IX.[31] Failure to incorporate Title IX's religious and abortion exemptions nullifies Congress's specific direction to prohibit only the ground proscribed by Title IX. That is not permitted. *Corley*, 556 U.S. at 314. By not including these exemptions, HHS expanded the "ground prohibited under" Title IX that Section 1557 explicitly incorporated. *See id.* The Rule's failure to include Title IX's religious exemptions renders the Rule contrary to law.

Defendants' argument that Section 1557 was "new work" does not save this failure. Hr'g Tr. 56:11–57:18. Congress dictated that an entity would be liable under Section 1557 on the ground prohibited by Title IX. 42 U.S.C. § 18116(a). A religious organization that meets the specification of § 1681(a)(3) or any entity seeking the protection of § 1688 would not be liable for discriminating on the basis of sex under Title IX. HHS could not add additional prohibitions

---

[30] BLACK'S LAW DICTIONARY (10th ed. 2014).

[31] The same reasoning also exempts any covered entity from having to provide abortion or abortion-related services.

simply because it was engaged in "new work." Further, HHS knew how to adapt Title IX from the education realm to the healthcare context because it provides that when cross-referencing the provisions of Title IX's use of "student," the term "individual" should be used in the healthcare context. *See* 45 C.F.R. 92.101(b)(3)(i). Accordingly, the Court finds the Rule's conflict with its incorporated statute—Title IX—renders it contrary to law under the APA.[32]

### b. Religious Freedom Restoration Act

The Court next evaluates in the alternative whether Plaintiffs have established a substantial likelihood of success on their RFRA claim. Private Plaintiffs allege the Rule violates RFRA because it substantially burdens their exercise of religion. Priv. Pls.' Br. 23–32, ECF No. 25. Defendants did not address Plaintiffs' RFRA claim in their briefing but asserted at the hearing that more factual development was necessary to evaluate the claim. Hr'g Tr. 61:1–62:25. The Court addressed the argument that more facts are needed above and finds the record is sufficiently developed to consider Private Plaintiffs' RFRA claim. *See supra*, III.A.2.

RFRA provides that the "[g]overnment may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . is the least restrictive means of furthering [a] compelling government interest." 42 U.S.C. § 2000bb-1(b). RFRA was passed by a broad coalition of legislators in direct response to a Supreme Court decision that Congress viewed as curbing longstanding constitutional protections for religious liberty and was enacted to work a "substantive change in constitutional protections." *Tennessee v. Lane*, 541 U.S. 509, 520 (2004) (quoting *City of Boerne v. Flores*, 521 U.S. 507, 532 (1997)); *see also* Douglas Laycock & Oliver S. Thomas, *Interpreting the Religious Freedom Restoration Act*, 73 Tex. L.

---

[32] Both parties agree that if the Court resolves the APA or RFRA claim, there is no need to reach the remaining constitutional issues. Hr'g Tr. 57:22–25, 30:1–3.

Rev. 209, 210, 244 (1994). Courts evaluating a claim under RFRA must first determine if the challenged rule imposes a "substantial burden" on plaintiffs' religious exercise and if so, then whether the rule satisfies strict scrutiny.

As to the first prong, the Court must (a) identify a sincere religious exercise, and (b) determine whether the government has placed substantial pressure on Plaintiffs to abstain from that religious exercise. *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Defendants do not question or contest the sincerity of Private Plaintiffs' religious beliefs or exercise, and the Court is careful not to weigh or evaluate the relevant doctrines of faith.[33] As discussed above, the Court finds that Private Plaintiffs' refusal to perform, refer for, or cover transitions or abortions is a sincere religious exercise. Private Plaintiffs have demonstrated they sincerely believe such procedures would harm their patients and force their employees to "engage in material cooperation with evil." Priv. Pls.' Br. 24, ECF No. 25. The Supreme Court has explained that the exercise of religion includes "business practices that are compelled or limited by the tenets of a religious doctrine." *Hobby Lobby*, 134 S. Ct. at 2770.

In regards to whether the Rule places substantial pressure on Plaintiffs to abstain from religious exercise, the Court finds—and the parties agree—that the Rule's prohibition of categorical exclusions of transitions and abortions forces Plaintiffs to make an individualized assessment of every request for performance of such procedures or coverage of the same. The Rule therefore places substantial pressure on Plaintiffs to perform and cover transition and abortion procedures. The Rule's prohibition of categorical exclusions also forces Plaintiffs to provide the

---

[33] *See Hernandez v. Comm'r*, 490 U.S. 680, 699 (1989) ("It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds."); *see also* Stephanie N. Phillips, *A Text-Based Interpretation of Title VII's Religious Employer Exemption*, TEXAS REVIEW OF LAW & POLITICS (2016) (stressing the importance that courts avoid unconstitutional entanglement with religion when asked to weigh different doctrines of faith).

federal government a nondiscriminatory and "exceedingly persuasive justification" for their refusal to perform or cover such procedures.  45 C.F.R. § 92.101.  Private Plaintiffs' long-held view that such procedures are immoral and inappropriate in every circumstance is now at odds with the Rule's interpretation of sex discrimination because it requires them to remove the categorical exclusion of transitions and abortions (a condition they assert is a reflection of their religious beliefs and an exercise of their religion) and conduct an individualized assessment of every request for those procedures.  "A law that 'operates so as to make the practice of . . . religious beliefs more expensive' in the context of business activities imposes a burden on the exercise of religion."  *Hobby Lobby*, 134 S. Ct. at 2770 (quoting *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961)).  Accordingly, the Rule imposes a substantial burden on Private Plaintiffs' religious exercise.

As to the second prong, the government bears the burden to show the Rule satisfies strict scrutiny—i.e., "demonstrate[] that the application of the burden to the person represents the least restrictive means of advancing a compelling interest." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006).  The Fifth Circuit has held that to satisfy strict scrutiny under RFRA, the government "must show by specific evidence that [Private Plaintiffs'] religious practices jeopardize its stated interests." *Merced v. Kasson*, 577 F.3d 578, 592 (5th Cir. 2009).  Defendants do not provide a compelling interest in their briefing and Private Plaintiffs dispute that one exists.  Priv. Pls.' Br. 38–42, ECF No. 25.  Although the preamble to the Rule claims broadly that the government has "a compelling interest in ensuring that individuals have nondiscriminatory access to health care and health coverage," Defendants have failed to brief the basis of its compelling interest, leaving the Court unable to determine whether Private Plaintiffs' religious practices jeopardize its purpose. *See* 81 Fed. Reg. at 31380.  A compelling interest is one

the government would be willing to pursue itself.  Yet, the government's own health insurance programs, Medicare and Medicaid, do not mandate coverage for transition surgeries; the military's health insurance program, TRICARE, specifically excludes coverage for transition surgeries; and the government's own medical experts reported "conflicting" study results of transition procedures—"some reported benefits while others reported harms."  Centers for Medicare & Medicaid Services, *Proposed Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (June 2, 2016); *see* Pls.' App. 648, ECF No. 26; *see Hobby Lobby*, 134 S. Ct. at 2780 (significant carve outs and exceptions may indicate the government lacks a compelling interest). Therefore, it appears the government has failed to adequately carry its burden and show the Rule advances a compelling interest.[34]

Nevertheless, the Court assumes the Rule pursues a compelling interest, because even if it does, the government has failed to prove the Rule employs the least restrictive means.  The least-restrictive-means standard requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Hobby Lobby*, 134 S. Ct. at 2780.  If the government wishes to expand access to transition and abortion procedures, "[t]he most straightforward way of doing this would be for the government to assume the cost of providing the [procedures] at issue to any [individuals] who are unable to obtain them under their health-insurance policies due to their employers' religious objections." *Id.*  The government could also assist transgender individuals in finding and paying for transition procedures available from the growing number of healthcare providers who offer and

---

[34] While Putative Intervenors proposed several compelling interests in their briefing (including "eradicating all forms of invidious discrimination," "making sure that federal funds are not used to subsidize discrimination," "making sure people are able to access healthcare coverage and services on a nondiscriminatory basis," and "safeguarding the public health") it is the government's view that controls. *Hobby Lobby*, 134 S. Ct. at 2776; Putative Intervenors' Resp. 42, ECF No. 53.

specialize in those services.  The government has failed to demonstrate how exempting Private Plaintiffs pursuant to their religious beliefs would frustrate the goal of ensuring "nondiscriminatory access to health care and health coverage," and the government has numerous less restrictive means available to provide access and coverage for transition and abortion procedures.  *See* 81 Fed. Reg. at 31380.  Accordingly, Private Plaintiffs have demonstrated a substantial likelihood of success on their claim that the challenged Rule violates RFRA.

### 2.    Threat of Irreparable Harm

Next, Plaintiffs must demonstrate they are "likely to suffer irreparable harm in the absence of preliminary relief."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  "[H]arm is irreparable where there is no adequate remedy at law, such as monetary damages."  *Janvey v. Alguire*, 647 F.3d at 600 (5th Cir. 2009).  An injunction is appropriate only if the anticipated injury is imminent and not speculative.  *Winter*, 555 U.S. at 22.

Defendants argue Plaintiffs' asserted injuries are speculative because Plaintiffs misunderstand the scope and effect of the Rule and its incorporated religious protections.  *See* Defs.' Resp. 33–36, ECF No. 50.  The State Plaintiffs claim they are currently suffering injury under the ongoing HHS investigation into their insurance plans and all Plaintiffs will suffer irreparable harm on January 1, 2017, when they are forced to alter their insurance coverage plans. State Pls.' Reply 16–17, ECF No. 56.  Plaintiffs also point out several entities with similar insurance policies that have already been sued under the Rule since it was issued on May 18, 2016.[35]  State Plaintiffs allege the Rule is in direct conflict with state law that mandates a

---

[35] Priv. Pls.' Br. 37, ECF No. 25 (citing Compl., *Prescott v. Rady Children's Hosp. – San Diego*, No. 16-2408 (S.D. Cal. Sept. 26, 2016); Compl., *Dovel v. Pub. Library of Cincinnati and Hamilton Cty.*, No. 16-955 (S.D. Ohio Sept. 26, 2016); Compl., *Robinson v. Dignity Health*, No. 16-3035 (N.D. Cal. June 6, 2016)).

physician's independent medical judgment be given paramount consideration when providing treatment because the Rule makes a physician's independent medical judgment one of many factors in evaluating compliance.  State Pls.' Reply 18–19, ECF No. 56.  *See* TEX. OCC. CODE §§ 162.0021–0022 (mandating deference to the "independent medical judgment" of physicians).

A state suffers irreparable harm anytime it is prevented from enforcing a statute enacted by representatives of its people.  *Planned Parenthood of Greater Texas Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."); *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (citing *New Motor Vehicle Bd. of Cal. v. Orrin W. Fox Co.*, 434 U.S. 1345, 1351 (1977) ("[A]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.")).

Because the Rule is in conflict with state law, one of the State Plaintiffs is already undergoing investigation by the HHS's OCR, and entities similarly situated to Private Plaintiffs have already been sued under the Rule since it took partial effect on May 18, 2016, the Court finds Plaintiffs have demonstrated that they face a substantial threat of irreparable harm in the absence of an injunction.

### 3.   Balance of Hardships and Public Interest

The Court next considers whether the threatened injury to Plaintiffs outweighs any damage the proposed injunction may cause Defendants and its impact on the public interest.[36]  The threatened injury to Plaintiffs outweighs any potential harm to Defendants.  Without an injunction,

---

[36] The Court considers the balance of hardships and public interest factors together as they overlap considerably.  *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015), *aff'd*, 136 S. Ct. 2271 (2016).

Plaintiffs will be threatened with substantial harm, including the risk of federal funding withdrawal and civil liability.

On the other hand, HHS will suffer no harm from delaying implementation of the challenged portion of the Rule.  The agency's six-year delay in issuing the Rule strengthens the Court's conclusion that the delay imposed by the injunction would work no significant harm on Defendants.  The injunction would merely maintain the status quo—allowing HHS to prohibit sex discrimination in healthcare services as defined by Title IX and incorporated by Section 1557.  If the Rule is invalid, it will be set aside in its entirety and the public interest will be served by the injunction.  But even if the Rule is valid, the injunction will merely delay its implementation, pending final review on the merits.

Defendants allege that Plaintiffs delay in seeking relief should weigh in favor of denying the injunction.  Defs.' Resp. 64, ECF No. 50.  But the Court finds that filing suit one month after the first parts of the Rule became effective constitutes prompt action, notwithstanding the inadvertent mistake that led to a delay in serving the U.S. Attorney for the Northern District of Texas.  *See* Defs.' Resp. 64, ECF No. 50.  Further, Defendants' six-year delay in promulgating the Rule since the ACA's enactment demonstrates that Defendants and the public interest would suffer no irreparable injury in the face of an injunction to maintain the status quo.

For the foregoing reasons, the Court finds that Plaintiffs have satisfied all prerequisites for a preliminary injunction.

### C.        Scope of Injunction

Finally, the Court must determine the scope of the injunction.  Plaintiffs seek a nationwide injunction as to the challenged portions of the Rule—prohibiting discrimination on the basis of "gender identity" and "termination of pregnancy."   Priv. Pls.' Reply 24–25, ECF No. 57.  Defendants argue the injunction should be limited to Plaintiffs.  Defs.' Resp. 49–50, ECF No. 50.

"[D]istrict courts enjoy broad discretion in awarding injunctive relief."  *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998).  "[T]he Constitution vests the District Court with 'the judicial power of the United States.'  That power is not limited to the district wherein the court sits but extends across the country.  It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction."  *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (quoting U.S. CONST. art. III, §1).  "[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  A nationwide injunction is appropriate when a party brings a facial challenge to agency action under the APA.  *See, e.g.*, *Nat'l Mining*, 145 F.3d at 1407–08 (invalidating an agency rule and affirming the nationwide injunction); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) ("When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated— not that their application to the individual petitioners is proscribed.").

CMDA's membership extends across the country and the Rule applies broadly to "almost all licensed physicians."[37]   81 Fed. Reg. at 31445.   Accordingly, the Rule's harm is felt by healthcare providers and states across the country, including all of CMDA's members, and the Court finds a nationwide injunction appropriate.   Because the Rule includes a severability

---

[37] CMDA has members "in all [the] states."  Hr'g Tr. 93:5.

provision, none of the unchallenged provisions are enjoined.  45 C.F.R. § 92.2(c).  Only the Rule's command this Court finds is contrary to law and exceeds statutory authority—the prohibition of discrimination on the basis of "gender identity" and "termination of pregnancy"—is hereby enjoined.

### D.      Bond

Rule 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any part found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The amount of security required "is a matter for the discretion of the trial court," and the Fifth Circuit has held district courts have discretion to "require no security at all."  *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citing *Corrigan Dispatch Company v. Casa Guzman*, 569 F.2d 300, 303 (5th Cir. 1978)).  The Court finds no evidence that Defendants will suffer any financial loss requiring Plaintiffs to post security.  Accordingly, the Court grants Plaintiffs' request to waive the bond requirement.  State Pls.' Mot. 3, ECF No. 22; Priv. Pls.' Mot. 2, ECF No. 24.

## IV.      CONCLUSION

For the foregoing reasons, the Court finds that Plaintiffs' motions for preliminary injunction (ECF Nos. 22, 24) should be and are hereby **GRANTED**.  *See* Fed. R. Civ. P. 65. Defendants are hereby **ENJOINED** from enforcing the Rule's prohibition against discrimination on the basis of gender identity or termination of pregnancy.

**SO ORDERED** on this **31st day** of **December, 2016**.

_____
Reed O'Connor
**UNITED STATES DISTRICT JUDGE**