## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## WICHITA FALLS DIVISION

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC.; SPECIALTY PHYSICIANS OF ILLINOIS, LLC,; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS;<br><br>- and -<br><br>STATE OF TEXAS; STATE OF WISCONSIN; STATE OF NEBRASKA; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF ARIZONA; and STATE OF MISSISSIPPI, by and through Governor Phil Bryant,<br><br>     *Plaintiffs*,<br><br>v.<br><br>ALEX M. AZAR, II, Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>     *Defendants*. | Civ. Action No. 7:16-cv-00108-O<br><br><br>**BRIEF IN SUPPORT OF STATE PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... iv

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS .......................................................................................... 2

    A.    Title IX ..................................................................................................... 2

    B.    The Affordable Care Act ............................................................................ 3

    C.    The executive branch changes the definition of sex ................................... 4

    D.    The Rule ................................................................................................... 6

    E.    The effect of the Rule on State Plaintiffs .................................................. 7

PROCEDURAL HISTORY .......................................................................................... 9

ARGUMENT ............................................................................................................ 10

I.    The Rule Violates the Administrative Procedure Act. ........................................ 10

    A.    The Rule is contrary to the ACA and Title IX ........................................... 11

        1.    Text ............................................................................................ 13

        2.    Purpose ....................................................................................... 14

        3.    Structure .................................................................................... 14

        4.    History ....................................................................................... 15

    B.    The Rule is contrary to law Title IX's religion and abortion-related exemptions. .......................................................................................... 17

        1.    The Rule lacks an exemption for religious entities. ..................... 17

        2.    The Rule lacks an abortion exemption. ....................................... 19

    C.    The Rule is contrary to Title VII. ........................................................... 20

    D.    The Rule is contrary to the Spending Clause of Article I. ...................... 21

        1.    Under the Spending Clause, defendants may not withhold State funding on the basis of ambiguous conditions. ................. 21

        2.    Section 1557 does not provide clear notice that sex includes gender identity and termination of pregnancy. ......................... 23

        3.    *Pennhurst* and *Arlington Central* preclude the application of *Chevron.* ............................................................................... 28

    E.    The Rule is contrary to the Tenth Amendment. ..................................... 30

        1.    The Rule commandeers State laws protecting the independent medical judgment of physicians. ........................... 31

2.      The Rule commandeers the States provision of healthcare
        to residents.................................................................... 33

3.      The Rule commandeers the States' provision of insurance
        coverage for state employees........................................ 34

F.   The Rule is contrary to the Eleventh Amendment. .............................. 35

II.    The Rule Violates the Constitution. ................................................... 36

III.   The Court Should Declare the Rule Invalid and Set it Aside. ........................ 37

IV.    The Court Should Issue a Permanent Injunction Against Enforcement
       of the Rule. ........................................................................ 37

A.   State Plaintiffs succeed on the merits. ................................................ 37

B.   State Plaintiffs will suffer irreparable injury. ...................................... 37

C.   The balance of hardships tips in favor of a permanent injunction. ...... 39

D.   The public interest favors a permanent injunction. ............................ 40

CONCLUSION.............................................................................................. 42

CERTIFICATE OF SERVICE ...................................................................... 43

# TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Adams v. Ison,*
    249 S.W.2d 791 (Ky. 1952) ................................................................... 33

*Alden v. Maine,*
    527 U.S. 706 (1999) ......................................................................... 35

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
    548 U.S. 291 (2006) ........................................................ 11, 22, 23, 28, 29

*Bailey v. Shell W. E&P, Inc.,*
    609 F.3d 710 (5th Cir. 2010) ................................................................ 10

*Barsky v. Bd. of Regents of Univ. of N.Y.,*
    347 U.S. 442 (1954) ......................................................................... 31

*Meyers ex rel. Benzing v. Texas,*
    410 F.3d 236 (5th Cir. 2005) ................................................................ 35

*Canal Auth. of State of Fla. v. Callaway,*
    489 F.2d 567 (5th Cir. 1974) ................................................................ 39

*Cannon v. Univ. of Chicago,*
    441 U.S. 677 (1979) ...................................................................... 3, 15

*Cape May Greene, Inc. v. Warren,*
    698 F.2d 179 (3d Cir. 1983) ................................................................ 21

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ......................................................................... 10

*Chevron, U.S.A., Inc. v. Nat. Res. Defense Council,*
    467 U.S. 837 (1984) ...................................................................... 29, 30

*Christian Legal Soc'y v. Walker,*
    453 F.3d 853 (7th Cir. 2006) ................................................................ 41

*Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.,*
    527 U.S. 666 (1999) ......................................................................... 35

*Commw. of Va. Dep't of Educ. v. Riley,*
    106 F.3d 559 (4th Cir. 1997) (en banc) (per curiam) ................................ 28, 29, 30

*Contender Farms, L.L.P. v. USDA,*
   779 F.3d 258 (5th Cir. 2015) ......................................................... 12, 13

*Dellmuth v. Muth,*
   491 U.S. 223 (1989) ............................................................................ 35

*Doe v. Bd. of Educ.,*
   115 F.3d 1273 (7th Cir. 1997) .......................................................... 30

*eBay Inc. v. MercExchange, L.L.C.,*
   547 U.S. 388 (2006) ............................................................................ 37

*Edelman v. Jordan,*
   415 U.S. 651 (1974) ............................................................................ 35

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
   135 S. Ct. 2028 (2015) ........................................................................ 20

*Etsitty v. Utah Transit Auth.,*
   502 F.3d 1215 (10th Cir. 2007) ......................................................... 17

*Franciscan All., Inc. v. Burwell,*
   227 F. Supp. 3d 660 (N.D. Tex. 2016) ............................................. 1, 9

*Fullilove v. Klutznick,*
   448 U.S. 448 (1980) ............................................................................ 22

*Garcia v. Tex. State Bd. of Med. Exam'rs,*
   384 F. Supp. 434 (W.D. Tex. 1974) .............................................. 31, 38

*Gonzales v. Carhart,*
   550 U.S. 124 (2007) ............................................................................ 31

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.,*
   822 F.3d 709 (4th Cir. 2016) (Niemeyer, J., dissenting) .................... 13

*Hurst v. Tex. Dep't of Assistive & Rehab. Servs.,*
   482 F.3d 809 (5th Cir. 2007) ........................................................ 23, 25

*IRS, Fresno Serv. Ctr. v. Fed. Lab. Relations Auth.,*
   706 F.2d 1019 (9th Cir. 1983) ........................................................... 21

*Jacobs v. Theimer,*
   519 S.W.2d 846 (Tex. 1975) ............................................................... 33

*Madden v. Rhodes,*
   626 So. 2d 608 (Miss. 1993) .............................................................. 33

*Murk v. Scheele,*
120 S.W.3d 865 (Tex. 2003) (per curiam) ...................................................... 31, 38

*N. Haven Bd. of Ed. v. Bell,*
456 U.S. 512 (1982) .............................................................................. 3, 14, 15

*Nat'l Fed. Indep. Bus. v. Sebelius,*
567 U.S. 519 (2012) .................................................................................. 30, 31

*Natanson v. Kline,*
350 P.2d 1093 (Kan.), *decision clarified on denial of reh'g,* 354 P.2d 670
(Kan. 1960) ...................................................................................................... 33

*Nevada Dep't of Human Res. v. Hibbs,*
538 U.S. 721 (2003) ............................................................................................ 35

*New York v. United States,*
505 U.S. 144 (1992) ........................................................................................... 30

*Oglala Sioux Tribe of Indians v. Andrus,*
603 F.2d 707 (8th Cir. 1979) ........................................................................... 21

*Opulent Life Church v. City of Holly Springs, Miss.,*
697 F.3d 279 (5th Cir. 2012) ........................................................................... 39

*Pace v. Bogalusa City Sch. Bd.,*
403 F.3d 272 (5th Cir. 2005) ........................................................................... 23

*Pederson v. La. State Univ.,*
213 F.3d 858 (5th Cir. 2000) ...................................................................... 3, 15

*Pennhurst State Sch. & Hosp. v. Halderman,*
451 U.S. 1 (1981) ........................................................................................ 22, 23

*Pratt v. Harris Cty.,*
822 F.3d 174 (5th Cir. 2016) ........................................................................... 10

*Printz v. United States,*
521 U.S. 898 (1997) ........................................................................................... 30

*Schroer v. Billington,*
No. 05-1090, 577 F. Supp. 2d 293 (D.D.C. 2008)........................................... 4

*Sossamon v. Lone Star State of Tex.,*
560 F.3d 316 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas,* 563
U.S. 277 (2011) ................................................................................................. 23

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ...................................................................................... 22, 23

*Tex. Pipeline Ass'n v. F.E.R.C.,*
    661 F.3d 258 (5th Cir. 2011) .......................................................... 11, 17

*Texans for Free Enter. v. Tex. Ethics Comm'n,*
    732 F.3d 535 (5th Cir. 2013) .................................................................. 41

*Texas v. United States,*
    201 F. Supp. 3d 810 (N.D. Tex. 2016), *clarified by Texas v. United
    States*, No. 16-cv-00054-O, 2016 WL 7852331 (N.D. Tex. Oct. 18, 2016)....... 13, 38

*Texas v. United States,*
    340 F. Supp. 3d 579 (N.D. Tex. 2018).................................................................. 2

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S.
    Ct. 2271 (2016)................................................................................... 11, 41

*Texas v. United States,*
    No. 18-cv-00167-O, 2018 WL 6844173 (N.D. Tex. Dec. 30, 2018) ......................... 2

*Texas v. United States,*
    No. 19-1001 (5th Cir.)................................................................................ 2

*Ulane v. E. Airlines, Inc.,*
    742 F.2d 1081 (7th Cir. 1984) ........................................................... 17

*United States v. St. Bernard Par.,*
    756 F.2d 1116 (5th Cir. 1985) ........................................................... 23

*VRC LLC v. City of Dall.,*
    460 F.3d 607 (5th Cir. 2006) ............................................................. 38

*Walk v. Ring,*
    44 P.3d 990 (Ariz. 2002) ..................................................................... 33

*Walters v. Metro. Educ. Enters., Inc.,*
    519 U.S. 202 (1997) ............................................................................. 16

*Washington v. Glucksberg,*
    521 U.S. 702 (1997) ............................................................................. 31

*Wilderness Soc'y v. U.S. Fish & Wildlife Serv.,*
    353 F.3d 1051 (9th Cir. 2003) ........................................................... 12

*Wilson v. Scott*,
  412 S.W.2d 299 (Tex. 1967) ................................................................ 33

*Zabel v. Tabb*,
  430 F.2d 199 (5th Cir. 1970) ............................................................. 21

**Constitutional Provisions**

U.S. Const. amend. XI ....................................................................... 35

U.S. Const. art. I, § 8, cl. 1 ............................................................... 22

**Statutes**

5 U.S.C. § 706 ............................................................................. 11, 37

18 U.S.C. § 249 ........................................................................... 3, 16, 25

20 U.S.C. § 1681 .............................................................................. *passim*

20 U.S.C. § 1686 .................................................................................. 25

20 U.S.C. § 1688 .............................................................................. *passim*

29 U.S.C. § 794 ................................................................................... 12

42 U.S.C. § 2000d ............................................................................ 12, 18

42 U.S.C. § 2000e ................................................................................. 20

42 U.S.C. § 2000e-2 .............................................................................. 20

42 U.S.C. § 6101 .................................................................................. 12

42 U.S.C. § 13925 .......................................................................... 3, 16, 25

42 U.S.C. § 18116 ............................................................................. *passim*

Neb. Rev. Stat. Ann. § 30-3428 ............................................................. 32

Tex. Gov't Code § 531.008 ................................................................... 33

Tex. Gov't Code § 531.0055 .................................................................. 33

Tex. Health & Safety Code § 12.0115 ...................................................... 34

Tex. Health & Safety Code § 311.083 ...................................................... 32

Tex. Occ. Code § 162.0021 ........................................................................ 31

Tex. Occ. Code § 162.0022 .................................................................... 31, 38

Wis. Stat. Ann. § 448.08 .......................................................................... 32

Wis. Stat. Ann. § 448.30 .......................................................................... 32

**Regulations**

29 C.F.R. § 1604.2 ..................................................................................... 4

34 C.F.R. pt. 106 ........................................................................................ 4

45 C.F.R. § 92.4 ................................................................................*passim*

45 C.F.R. § 92.101 ..................................................................... 2, 7, 11, 18

45 C.F.R. § 92.206 .................................................................................... 34

45 C.F.R. § 92.207 ......................................................................... 8, 26, 30

45 C.F.R. § 92.301 ............................................................................... 9, 36

22 Tex. Admin. Code §177.3 .................................................................... 32

22 Tex. Admin. Code § 177.5 ................................................................... 32

La. Admin. Code 46:XLV § 7603 ............................................................. 32

**Rules**

Fed. R. Civ. P. 41 ..................................................................................... 10

Fed. R. Civ. P. 56 ..................................................................................... 10

**Other Authorities**

118 Cong. Rec. 5808 (1972) ..................................................................... 14

44 Fed. Reg. 71,413 (Dec. 11, 1979) ............................................. 4, 14, 15

77 Fed. Reg. 5662 (Feb. 3, 2012) ............................................................... 5

80 Fed. Reg. 54,172 .................................................................................. 19

81 Fed. Reg. 31,376 (May 18, 2016) (codified at 45 C.F.R. pt. 92)....................*passim*

9 Oxford English Dictionary 578 (1961) ...................................................... 13

Am. Heritage Dictionary 1187 (1976) ............................................... 2–3, 13

Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ.,
    Office for Civil Rights, Questions and Answers on Title IX and Sexual
    Violence (2014) ...................................................................................... 5

Council for Christian Coll. & Univ., Comment Letter on Proposed Rule
    (Nov. 9, 2015) ....................................................................................... 18

David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social
    Change in Academic Titles, 1945–2001,* Archives of Sexual Behav., Apr.
    2004 ................................................................................................ 13, 14

Dear Colleague Letter on Harassment and Bullying from Russlynn Ali,
    Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil
    Rights (Oct. 26, 2010) ........................................................................... 5

Dear Colleague Letter on Withdrawal of Statements of Policy and
    Guidance from Candice Jackson, Acting Assistant Sec'y for Civil Rights,
    U.S. Dep't of Educ., Office for Civil Rights (Sept. 27, 2017) ................... 5

Exec. Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014) ...................... 5

H.R. 166, 94th Cong. (1975) ....................................................................... 15

H.R. 1652, 113th Cong. (2013) ............................................................... 3, 15

H.R. 2015, 110th Cong. (2007) ............................................................... 3, 15

H.R. 2074, 96th Cong. (1979) ..................................................................... 15

H.R. 2981, 111th Cong. (2009) ............................................................... 3, 15

H.R. 3185, 114th Cong. (2015) ................................................................... 15

H.R. 4636, 103rd Cong. (1994) ................................................................... 15

H.R. 14752, 93rd Cong. (1974) ................................................................... 15

Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30,
    2010) ...................................................................................................... 3

Joanne Meyerowitz, *A History of "Gender,"* 113 Am. Hist. Rev. 1346, 1353
    (2008) .................................................................................................. 14

Lena H. Sun & Lenny Bernstein, *U.S. Moves to Protect Women, Transgender People in Health Care*, Wash. Post, Sep. 3, 2015 ........................... 16

Letter from Jocelyn Samuels, Dir., Office for Civil Rights, Dep't of Health & Human Servs., to Catherine W. Short, et al. (June 21, 2016) ........................ 20

Mem. from the Attorney General on Revised Treatment of Transgender Employment Discrimination Claims under Title VII of the Civil Rights Act of 1964 (Oct. 4, 2017) ........................................................................... 6

Mem. from the Attorney General on Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15, 2014) ......................................................................... 6

New Oxford Am. Dictionary (3d ed. 2010) ................................................. 14

Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010) ............................................................................................................ 3

Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs, Directive 2014-02, Gender Identity and Sex Discrimination (2014) ..................................................................................... 5

Press Release, Shantae Goodloe, U.S. Dep't of Hous. & Urban Dev., HUD No. 10-139, HUD Issues Guidance on LGBT Housing Discrimination Complaints (July 1, 2010) ............................................................................... 5

S. 439, 114th Cong. (2015) .................................................................... 3, 15

S. 811, 112th Cong. (2011) .................................................................... 3, 15

S. 1858, 114th Cong. (2015) ...................................................................... 15

S. 2081, 96th Cong. (1979) ........................................................................ 15

Sarah Kilpatrick & Etoi Garrison, "Normal Labor and Delivery" in Steven G. Gabbe, et al., Obstetrics: Normal and Problem Pregnancies (7th ed. 2017) ......................................................................................................... 27

Sari L. Reisner et al*., "Counting" Transgender and Gender-Nonconforming Adults in Health Research,* Transgender Stud. Q., Feb. 2015 ............................ 14

U.S. Conf. of Catholic Bishops, et al., Comment Letter on Proposed Rule (Nov. 6, 2015) ................................................................................... 18, 20

U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid
Servs., Oct. 2018 Medicaid & CHIP Enrollment Data Highlights (Oct.
2018)........................................................................................................... 41

U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid
Servs., Office of Enter. Data & Analytics (December 2018) ................................. 41

U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter on
Transgender Students (May 13, 2016) ..................................................... 6

U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter
regarding Rescission of Prior Letters (Feb. 22, 2017)............................. 6

W. M. Moldoff, *Annotation, Malpractice: physician's duty to inform patient
of nature and hazards of disease or treatment,* 79 A.L.R.2d 1028 (1961) ........... 33

Webster's 3d New Int'l Dictionary (1971) ................................................. 13

# INTRODUCTION[1]

This case concerns a federal agency's attempt to rewrite the meaning of "sex" discrimination in statutory law without any congressional authority to do so, and to invade the States' sovereign powers to provide healthcare and regulate healthcare professionals. In 2016, the United States Department of Health and Human Services ("HHS") issued a rule that dramatically redefined the meaning of sex discrimination under section 1557 of the Affordable Care Act ("ACA"), 42 U.S.C. § 18116. Section 1557 prohibits invidious discrimination "on the basis of sex," and borrows its definition of "sex" from Title IX. Since its enactment, Title IX has always defined sex as a fixed biological category of the two sexes, male and female. But HHS's rule redefines sex to include "gender identity" and "termination of pregnancy." 45 C.F.R. § 92.4 (hereinafter, the "Rule").

Over two years ago, the Court issued a nationwide preliminary injunction against enforcement of the Rule. *Franciscan All., Inc. v. Burwell*, 227 F. Supp. 3d 660, 695–96 (N.D. Tex. 2016). Although, Plaintiffs attempted to wrap up the litigation at that time by moving for summary judgment, Defendants protested and asked for time to consider whether the new presidential administration would amend or repeal the Rule. Two years and nine status reports by the federal government later, there has been no progress. Thus, it is time for the Rule to be set aside and wiped permanently from the Code of Federal Regulations.

The Rule violates the Administrative Procedure Act ("APA") and the Constitution multiple respects. First, the Rule is contrary to the text, purpose, structure, and history of the ACA and Title IX. Second, the Rule fails to include religious or abortion-related exemptions, which are required by Title IX. Third, the Rule fails to allow employers to accommodate their employees' religious beliefs,

---

[1] Wisconsin joins the brief only as to Argument section I.D., and to requests for remedy corresponding to that argument.

rendering it contrary to Title VII. Fourth, the Rule violates the Spending Clause's clear-statement doctrine because Congress never unambiguously conditioned State Plaintiffs' receipt of Medicare and Medicaid funding on HHS's new definition of sex. Fifth, the Rule commandeers healthcare and regulatory powers reserved to States. Sixth, the Rule is contrary to the Eleventh Amendment because it abrogates sovereign immunity. Thus, State Plaintiffs ask the Court to grant summary judgment in their favor, declare the Rule invalid, set it aside, and issue a permanent injunction against its enforcement.

## STATEMENT OF FACTS

The Rule prohibits sex discrimination in certain healthcare activities. 45 C.F.R. § 92.101(a)(1). It defines "sex" to include, among other things, "gender identity" and "termination of pregnancy." *Id*. § 92.4. HHS asserts that the Rule is authorized by section 1557 of the Affordable Care Act ("ACA"), which prohibits discrimination in various health activities "on the ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a).[2]

### A.    Title IX

In 1972, Congress enacted Title IX, which prohibits sex discrimination in federally funded education programs, 20 U.S.C. § 1681(a), but expressly excludes religious organizations, *id*. § 1681(a)(3), and precludes interpreting sex to mean abortion, *id*. § 1688. At the time of enactment, society commonly understood the term "sex" to refer to the physiological differences between men and women, particularly with respect to their reproductive functions. *See, e.g.*, Am. Heritage Dictionary 1187

---

[2] On December 14, 2018, this Court declared the entire Affordable Care Act unconstitutional. *Texas v. United States*, 340 F. Supp. 3d 579 (N.D. Tex. 2018). The Court stayed that ruling, pending appeal. *Texas v. United States*, No. 18-cv-00167-O, 2018 WL 6844173, at *15 (N.D. Tex. Dec. 30, 2018). The defendants subsequently filed an appeal to the Fifth Circuit where the case remains pending. *Texas v. United States*, No. 19-1001 (5th Cir.).

(1976) ("The property or quality by which organisms are classified according to their reproductive functions."). That understanding is reflected throughout Title IX, which requires equal treatment with respect to two different sexes—male and female. *See, e.g.*, 20 U.S.C. § 1681(a)(8) (requiring comparable activities between students of "one sex" and "the other sex"); *id*. § 1681(a)(2) (same usage regarding admissions). Courts have long interpreted the statute to prohibit federally funded education programs from treating men better than women, or vice versa. *See, e.g.*, *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 530 (1982); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 680 (1979); *Pederson v. La. State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000).

Since the enactment of Title IX, Congress has considered a variety of proposals, including attempts to amend both Title VII and Title IX, to add new statutory protections based on gender identity. *See, e.g.*, H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011); H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). To date, however, all but two of these proposals have failed. In 2010, Congress enacted hate crimes legislation providing enhanced penalties for crimes motivated by gender identity. 18 U.S.C. § 249(a)(2). And, in 2013, Congress reauthorized the Violence Against Women Act, prohibiting sex discrimination, and separately gender identity discrimination, in certain funding programs. 42 U.S.C. § 13925(b)(13)(A). However, neither of those specific references to gender identity were added to the definition of "sex" as used in Title IX and incorporated into the ACA.

## B.     The Affordable Care Act

In 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act, Pub. L. 111-152 (March 30, 2010). Section 1557 of the ACA—the key provision at issue in this case—does not use the term sex, but instead prohibits discrimination "on the ground prohibited under . . . title IX of the Education Amendments of 1972

(20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a). Nowhere in the ACA is "gender identity" mentioned.

## C.   The executive branch changes the definition of sex

The meaning of the term sex also has a long history of careful consideration within federal agencies. For decades they have consistently interpreted sex to refer to physiological differences between males and females. *See, e.g.*, A Policy Interpretation: Title IX & Intercollegiate Athletics, 44 Fed. Reg. 71,413 (Dec. 11, 1979) (listing "male and female" 28 times, "men and women" 24 times, and "men's and women's" 21 times); EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.2 ("Label—'Men's jobs' and 'Women's jobs'—tend to deny employment opportunities unnecessarily to one sex or the other."); Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 34 C.F.R. pt. 106 (addressing expenditures for male and female teams). In fact, in 2008, the U.S. Department of Justice argued that "the term 'sex' . . . prohibits discrimination based on the biological state of a male or female," and that "a claim based on gender identity or transsexuality fails as outside the scope of [the term 'sex']." Def.'s Post-Trial Br. 4, *Schroer v. Billington*, No. 05-1090, 577 F. Supp. 2d 293 (D.D.C. 2008).

In 2010, all of this changed. Several months after enactment of the ACA, federal agencies and the President began issuing letters, memos, executive orders, and regulations interpreting prohibitions on sex discrimination to include protections for gender identity. Demonstrating the lack of authorization for these changes, President Trump's administration has since rescinded some of these document, but not all:

- In July 2010, the Department of Housing and Urban Development ("HUD") "announced a new policy . . . treat[ing] gender identity

discrimination . . . as gender discrimination under the Fair Housing Act."[3]

- o HUD has since removed the July 2010 guidance document from its website.

- In October 2010, the Office for Civil Rights ("OCR") for the Department of Education ("DOE") issued a "Dear Colleague" letter asserting that, "[w]hen students are subjected to harassment on the basis of their LGBT status, they may also . . . be subjected to forms of sex discrimination prohibited under Title IX."[4]

- In February 2012, HUD issued a regulation forbidding discrimination on the basis of "gender identity" in HUD-assisted or insured housing.[5]

- In April 2014, the Department of Education OCR issued "Questions and Answers" stating that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity . . ."[6]

- o DOE has since rescinded this document.[7]

- In July 2014, the President amended a 50-year-old executive order by adding "gender identity" to a list of prohibited bases of discrimination in federal contracting.[8]

- In August 2014, the Department of Labor issued a Directive stating that "discrimination based on gender identity or transgender status . . . is discrimination based on sex."[9]

---

[3] Press Release, Shantae Goodloe, U.S. Dep't of Hous. & Urban Dev., HUD No. 10-139, HUD Issues Guidance on LGBT Housing Discrimination Complaints (July 1, 2010), https://archives.hud.gov/news/2010/pr10-139.cfm.

[4] Dear Colleague Letter on Harassment and Bullying from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Oct. 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[5] Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity, 77 Fed. Reg. 5662 (Feb. 3, 2012), https://www.regulations.gov/contentStreamer?documentId=HUD-2011-0014-0312&disposition=attachment&contentType=pdf.

[6] Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, Questions and Answers on Title IX and Sexual Violence (2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[7] Dear Colleague Letter on Withdrawal of Statements of Policy and Guidance from Candice Jackson, Acting Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Sept. 27, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

[8] Exec. Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014), https://www.gpo.gov/fdsys/pkg/FR-2014-07-23/pdf/2014-17522.pdf.

[9] Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs, Directive 2014-02, Gender Identity and Sex Discrimination (2014), www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html.

- In December 2014, the Department of Justice ("DOJ") issued a memorandum concluding that Title VII's reference to sex "encompasses discrimination based on gender identity, including transgender status."[10]

  o DOJ has since rescinded the memorandum.[11]

- In May 2016, DOJ and DOE issued a "Dear Colleague Letter" stating that Title IX's prohibition on "sex discrimination . . . encompasses discrimination based on a student's gender identity."[12]

  o DOJ and DOE eventually rescinded this letter.[13]

Even though several agencies rescinded these guidance documents, at the time the agencies promulgated the original documents, and still to this day, none of the underlying statutory authority used the term "gender identity."

### D.    The Rule

On May 18, 2016, six years after Congress passed the ACA, HHS issued the Rule. The Rule applies broadly to any "entity that operates a health program or activity, any part of which receives Federal financial assistance." 45 C.F.R. § 92.4 (definition of "Covered entity"). "Federal financial assistance" is defined broadly to include "any grant, loan, credit, subsidy, contract . . . or any other arrangement" by which the Federal Government makes available its property or funds. *Id.* Thus, according to HHS, the Rule applies to almost every health care provider in the country—including over 133,000 health care facilities (such as hospitals and health clinics) and "almost all licensed physicians" totaling "over 900,000"—because they all accept some form of federal funding, whether through Medicare and Medicaid or

---

[10] Mem. from the Attorney General on Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 at 2 (Dec. 15, 2014), https://www.justice.gov/sites/default/files/opa/press-releases/attachments/2014/12/18/title_vii_memo.pdf.

[11] Mem. from the Attorney General on Revised Treatment of Transgender Employment Discrimination Claims under Title VII of the Civil Rights Act of 1964 at 2 (Oct. 4, 2017), https://www.justice.gov/ag/page/file/1006981/download.

[12] U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students (May 13, 2016), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[13] U.S. Dep't of Justice & U.S. Dep't of Educ., Dear Colleague Letter regarding Rescission of Prior Letters (Feb. 22, 2017), https://www.justice.gov/opa/press-release/file/941551/download.

otherwise. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31,376, 31,445–31,446 (May 18, 2016) (codified at 45 C.F.R. pt. 92).

The Rule prohibits discrimination "on the basis of sex," defines "sex" to include "gender identity," and defines "gender identity" as an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." 45 C.F.R. §§ 92.101(a)(1), 92.4. HHS further states that the "gender identity spectrum includes an array of possible gender identities beyond male and female," and "individuals with non-binary gender identities are protected under the rule." 81 Fed. Reg. at 31,392, 31,384. And the Rule defines sex to include discrimination based upon "termination of pregnancy." 45 C.F.R. § 92.4.

### E.   The effect of the Rule on State Plaintiffs

The Rule has several important consequences for State Plaintiffs. The States of Texas, Wisconsin, Nebraska, Kentucky, Kansas, Louisiana, Arizona, and Mississippi have promulgated laws and standards demonstrating their sovereign interest in the practice of medicine within their borders. Am. Compl. ¶¶ 51–70, ECF No. 21. They also operate their own healthcare programs that receive federal funds and employ thousands of healthcare employees through their constituent agencies. *Id.* ¶¶ 59–60, 64–66.

According to HHS, the Rule requires covered entities, like the States, to perform medical transition procedures or else be liable for discrimination. *See* 81 Fed. Reg. at 31,455 ("A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals."). Thus, if a gynecologist performs a hysterectomy for a woman with uterine cancer, she must do the same for a woman who wants to remove a healthy uterus to transition to living as a man. According to HHS, a hysterectomy for a transgender man is "medically necessary" if

"a patient's provider says [it] is medically necessary to treat gender dysphoria." *Id.* at 31,429. Declining to remove a healthy organ is discrimination. HHS explains that this reasoning applies across the full "range of transition-related services." *Id.* at 31,435–31,436. This "is not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual." *Id.* In addition, because the Rule prohibits discrimination on the basis of "termination of pregnancy," it pressures healthcare providers who perform procedures such as a dilation and curettage for a miscarriage to perform the same procedure for an abortion. Because the States provide medical care at state-run facilities, they will be required to provide medical transition and other procedures, even when their doctors believe such procedures are harmful. Am. Compl. ¶ 60, ECF No. 21. Moreover, if their doctors have a religious objection to performing those procedures, the Rule makes it illegal for the States to accommodate those doctors' religious beliefs, even though Title VII requires them to do so. *Id.* ¶¶ 61–62.

The Rule also requires covered entities to pay for medical transition procedures in their health insurance plans. The Rule states: "A covered entity shall not, in providing or administering health-related insurance . . . [h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition." 45 C.F.R. § 92.207(b)(4). Thus, a plan excluding "coverage for all health services related to gender transition is unlawful on its face." 81 Fed. Reg. at 31,429. In addition, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer would be required to cover that procedure on the same basis that it would cover a hysterectomy for other conditions (like cancer). *Id.* Also, because the Rule prohibits discrimination on the basis of "termination of pregnancy," it pressures employers who provide insurance coverage for procedures such as a dilation and curettage for a miscarriage to cover the same

procedure for an abortion. Thus, the Rule compels the States to provide insurance coverage for medical transition and abortion procedures at significant financial cost. Am. Compl. ¶¶ 64–65. And it imposes significant training costs, which HHS estimates will be $17.8 million in the first two years of implementation alone. 81 Fed. Reg. at 31,463, 31,464; Am. Compl. ¶ 68.

A covered entity that violates the Rule is subject to the same penalties that accompany a violation of Title IX, 45 C.F.R. § 92.301, which includes the loss of federal funding (in the case of Medicare and Medicaid to the States, this alone can total many millions of dollars), debarment from doing business with the government, and false claims liability, 81 Fed. Reg. at 31,472; 45 C.F.R. § 92.301. Penalties also include enforcement proceedings brought by the Department of Justice, 81 Fed. Reg. at 31,440, and private lawsuits for damages and attorneys' fees, *id.* at 31,471; 45 C.F.R. § 92.301. Thus, if States do not comply, they face massive financial penalties. Am. Compl. ¶ 69. Texas, for example, faces the loss of over $42.4 billion a year in healthcare funding to serve its most vulnerable citizens. *Id.* And, the Rule would subject State Plaintiffs to private lawsuits for damages and attorneys' fees, even though these States never waived their sovereign immunity. *Id.* ¶ 70.

## PROCEDURAL HISTORY

Plaintiffs commenced this action on August 23, 2016 and moved for summary judgment or, in the alternative, a preliminary injunction. Am. Compl., ECF No. 1. On December 31, 2016, the Court issued a nationwide preliminary injunction against the Rule's prohibition against discrimination on the basis of gender identity or termination of pregnancy. Prelim. Inj. Order, ECF No. 62; *Franciscan All.*, 227 F. Supp. 3d at 695–96. Soon thereafter, Plaintiffs jointly moved for partial summary

judgment.[14] Pls.' Mot. Sum. J., ECF No. 82. In response, Defendants moved to voluntarily remand the case to HHS and stay proceedings in this Court. Dfs.' Mot. Vol. Remand & Stay, ECF No. 92. On July 10, 2017, the Court granted in part and denied in part Defendants' motion, stayed the case, ordered Defendants to provide periodic status updates to the Court, retained jurisdiction over the case, and clarified that the preliminary injunction order remained in place. Order 10, ECF No. 105.

Since July 2017, Defendants have filed *nine* status reports, each indicating scant progress on revising or repealing the Rule. Having waited two years, on December 13, 2018, Plaintiffs moved the Court to hold a status conference, Pls.' Mot. for Status Conf., ECF No. 121, and the parties later filed a joint motion to lift the stay, vacate the status conference, and set a briefing schedule for dispositive motions, Jt. Mot. to Lift Stay, ECF No. 125. The Court granted the joint motion on December 17, 2018. Order 1, ECF No. 126. This motion follows.

## ARGUMENT

The Court should grant summary judgment in favor of State Plaintiffs because there are no genuine issues of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *see Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (summary judgment is appropriate if "'there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## I.    The Rule Violates the Administrative Procedure Act.

The APA requires courts to "hold unlawful and set aside" agency actions that are "not in accordance with law" or "in excess of statutory jurisdiction, authority, or

---

[14] Prior to moving for partial summary judgment in March 2017, Plaintiffs purported to voluntarily dismiss Counts III–X and XIII–XX under Rule 41(a)(1)(A)(i). ECF No. 81. That "dismissal," however, was ineffective because Rule 41(a) dismissals apply only to the dismissal of an entire action, not particular claims. *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 720 (5th Cir. 2010). Thus, these counts remain live in the operative complaint.

limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)&(C); *see Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015), *aff'd by an equally divided Court*, 136 S. Ct. 2271 (2016). When analyzing a regulation under the APA, courts use "the familiar two-step framework articulated in *Chevron*." *Tex. Pipeline Ass'n v. F.E.R.C.*, 661 F.3d 258, 260 (5th Cir. 2011). First, courts use the "traditional tools of statutory construction" to interpret the statute "de novo." *Id*. If "the intent of Congress is clear, then the matter is at an end, and the challenged regulation will stand or fall in accordance with the unambiguous will of Congress." *Id*. Second, if the statute is "genuinely ambiguous," then the court "will defer to the agency's construction of the statute so long as it is a permissible one." *Id*. But in a case involving a conditional spending statute, before courts even reach the *Chevron* analysis, they must ask if the spending conditions provide sufficiently clear notice to satisfy the principles of the Spending Clause. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 300 (2006).

Here, the Rule is contrary to law and in excess of statutory authority because (1) the Rule conflicts with the unambiguous text of the ACA, Title IX, and Title VII, (2) Title IX fails to provide the requisite clear notice under the Spending Clause, (3) the Rule commandeers State power in violation of the Tenth Amendment, and (4) the Rule abrogates sovereign immunity in violation of the Eleventh Amendment.

## A.     The Rule is contrary to the ACA and Title IX.

Neither section 1557 nor Title IX authorizes the Rule's new definition of sex discrimination. As stated above, the Rule prohibits discrimination "on the basis of sex" in certain health activities, and defines "on the basis of sex" to include, among other things, "gender identity." 45 C.F.R. §§ 92.101(a)(1), 92.4. It defines "gender identity" as an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." *Id*. § 92.4. The "gender identity spectrum includes an array of possible gender identities beyond male and female,"

and "individuals with non-binary gender identities are protected under the rule." 81 Fed. Reg. at 31,392, 31384.

The purported authority for this Rule is section 1557 of the ACA, which forbids federally funded health programs from discriminating "on the ground prohibited under" four other federal statutes: Title VI, 42 U.S.C. § 2000d ("race, color, or national origin"); Title IX, 20 U.S.C. § 1681 ("sex"); the Age Discrimination Act, 42 U.S.C. § 6101 ("age"); and the Rehabilitation Act, 29 U.S.C. § 794 ("disability"). Section 1557 does not itself use the term sex; instead, it simply incorporates the prohibition contained in Title IX. Thus, section 1557's meaning turns on the meaning of Title IX.

Title IX's operative provision states:

> No person in the United States shall, on the basis of *sex*, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization.

20 U.S.C. § 1681 (emphasis added). Thus, one key question in this case is the meaning of the term sex in Title IX—specifically, whether sex means the physiological differences between male and female, or whether it also includes the concept of gender identity.

To answer that question, the Court must use the "traditional tools of statutory construction," including the statute's "text," "history," and "purpose." *Contender Farms, L.L.P. v. USDA*, 779 F.3d 258, 269 (5th Cir. 2015). The Court "(1) [must] begin with the statute's language; (2) [must] give undefined words 'their ordinary, contemporary, common meaning;' (3) [must] read the statute's words in proper con-text and consider them based on the statute as a whole; and (4) [must] consider a statute's terms in the light of the statute's purposes." *Id.* (quoting *Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1060 (9th Cir. 2003)). Here, the text, history, and purpose of Title IX all confirm what this Court and many others have

already concluded: "the meaning of sex in Title IX unambiguously refers to 'the biological and anatomical differences between male and female students as determined at their birth.'" Prelim. Inj. Order 31 (quoting *Texas v. United States*, 201 F. Supp. 3d 810, 832 (N.D. Tex. 2016), *clarified by Texas v. United States*, No. 16-cv-00054-O, 2016 WL 7852331, at *1 (N.D. Tex. Oct. 18, 2016)).

### 1.   Text

Because Title IX does not define the term "sex," this Court must give the term its "ordinary, contemporary, common meaning." *Contender Farms*, 779 F.3d at 269. As this Court explained in the preliminary injunction order, when Title IX passed, virtually every dictionary definition of sex referred to physiological distinctions between females and males, particularly with respect to their reproductive functions. *See* Prelim. Inj. Order 33; *Texas*, 201 F. Supp. 3d at 833 (citing *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 736 (4th Cir. 2016) (Niemeyer, J., dissenting)).[15]

The term gender identity, by contrast, was rarely used. Until the 1950s, the term gender was used primarily by linguists to refer to a form of grammatical classification. Joanne Meyerowitz, *A History of "Gender,"* 113 Am. Hist. Rev. 1346, 1353 (2008). But in the mid-1950s, the psychologist John Money appropriated the term gender to refer to culturally determined roles for men and women. *Id.* at 1354. In his view, gender was learned in early childhood and was distinct from, and not determined by, biological sex. *Id.* Other social scientists picked up on this new usage, and in 1963, Robert Stoller, a UCLA psychoanalyst, coined the term gender identity. David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles, 1945–2001*, Archives of Sexual Behav., Apr. 2004, at 93. He, too, contrasted sex with gender, arguing that "sex was biological but gender was social."

---

[15] *See, e.g.*, Am. Heritage Dictionary 1187 (1976); Webster's 3d New Int'l Dictionary 2081 (1971); 9 Oxford English Dictionary 578 (1961).

*Id.* That usage was further popularized by feminist authors in the 1970s. Meyerowitz, *A History of "Gender,"* at 1353. Thus, to the extent the terms gender or gender identity were used at the time of Title IX's passage, they were used in contrast to sex: gender referred to socially constructed roles, while sex referred to biological differences between men and women. That contrast remains common today.[16]

## 2.    Purpose

This understanding of the term "sex" also fits with Title IX's purpose. Title IX was enacted at a time of pervasive discrimination in education against women. 44 Fed. Reg. at 71,423. It grew out of a series of congressional hearings on discrimination against women. *N. Haven Bd. of Ed.*, 456 U.S. at 523 n.13. Its chief sponsor said it was "an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice . . ." 118 Cong. Rec. 5808 (1972). Thus, the purpose of Title IX was to ensure equal opportunities in education for women. There is no hint of any congressional purpose to be legislating in any way on the basis of gender identity.

## 3.    Structure

This understanding of the term sex is also reflected throughout the statute, which requires equal treatment with respect to two different sexes—male and female. For example, the main operative section of Title IX states that if certain activities are provided for students of "one sex," comparable activities must be provided for students of "the other sex." 20 U.S.C. § 1681(a)(8). It also provides that schools may transition from admitting students of "only one sex" to admitting students of "both sexes." 20 U.S.C. § 1681(a)(2). If, as HHS claims, the term "sex" includes an

---

[16] *See, e.g.*, Sari L. Reisner et al*., "Counting" Transgender and Gender-Nonconforming Adults in Health Research*, Transgender Stud. Q., Feb. 2015, at 37 ("Gender typically refers to cultural meanings ascribed to or associated with patterns of behavior, experience, and personality that are labeled as feminine or masculine"; "[s]ex refers to biological differences among females and males, such as genetics, hormones, secondary sex characteristics, and anatomy."); New Oxford Am. Dictionary 721–22, 1600 (3d ed. 2010) ("gender" is defined in social and cultural terms and "sex" in biological terms).

individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female," 45 C.F.R. § 92.4, it makes no sense to refer to students of either "one sex" or "the other sex," 20 U.S.C. § 1681(a)(8).

### 4.   History

This understanding of sex is also consistent with Title IX's history. Of course, the term gender identity, and even the concept, appears nowhere in the legislative history of Title IX. Rather, "[t]he legislative history of Title IX clearly shows that it was enacted because of discrimination that currently was being practiced against women in educational institutions." 44 Fed. Reg. at 71,423. That is also how Title IX has been interpreted by the courts for decades. *See, e.g.*, *N. Haven Bd. of Ed.*, 456 U.S. at 517–20; *Cannon*, 441 U.S. at 680; *Pederson*, 213 F.3d at 880.

Moreover, when Title IX was enacted, and ever since, Congress has treated sex and gender identity (along with sexual orientation) as distinct. In the 1970s, Congress rejected several proposals to amend the Civil Rights Act to add the category of "sexual orientation." *See* H.R. 14752, 93rd Cong. (1974); H.R. 166, 94th Cong. (1975); H.R. 2074, 96th Cong. (1979); S. 2081, 96th Cong. (1979). Similarly, in 1994, Congress rejected the Employment Non-Discrimination Act ("ENDA"), which sought to prohibit employment discrimination on the basis of "sexual orientation." *See* H.R. 4636, 103rd Cong. (1994). In 2007, 2009, and 2011, Congress rejected a broader version of ENDA, which, for the first time, sought to add protections for gender identity. *See* H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011). In 2013 and 2015, Congress rejected proposals to amend Title IX to add protections for gender identity. *See* H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015). And Congress also rejected a proposal to do precisely what the Rule purports to do— prohibit discrimination in federally funded programs on the basis of "gender identity." *See* H.R. 3185, 114th Cong. (2015); S. 1858, 114th Cong. (2015). None of these

proposals makes any sense if Title IX and Title VII already prohibited such discrimination.

Importantly, not every proposal to add protections for gender identity failed. In 2010, Congress enacted hate crimes legislation providing enhanced penalties for crimes motivated by "gender identity." 18 U.S.C. § 249(a)(2). And in 2013, Congress reauthorized the Violence Against Women Act, prohibiting discrimination in certain funding programs on the basis of both "sex" and "gender identity." 42 U.S.C. § 13925(b)(13)(A). These congressional actions—both those rejecting new protections for gender identity, and those expressly adding new protections for gender identity alongside sex—show that Congress understands sex and gender identity to be distinct and is fully capable of including both concepts when it wants to. The same is true of federal agencies. For the first 38 years after Title IX's enactment, federal agencies issued numerous regulations, memos, and guidance documents interpreting Title IX. Those pronouncements uniformly reflect a definition of sex based on the physiological differences between men and women. *See supra* Stmt. of Facts 2–3 & 4. None mention gender identity. This uniform interpretation of sex by federal agencies is further evidence of the term's "ordinary, con-temporary, common meaning." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997).

It was not until 2010 that federal agencies began issuing a rash of new pronouncements arguing that the term "sex" includes "gender identity." *See supra* Stmt. of Facts 4–6. Not surprisingly, these pronouncements, including the Rule at issue here, were hailed as "groundbreaking."[17] But they were "groundbreaking" because the ordinary meaning of the term sex—and the existing reach of the relevant statutes—does not include gender identity. And "groundbreaking" changes in the law

---

[17] Lena H. Sun & Lenny Bernstein, *U.S. Moves to Protect Women, Transgender People in Health Care*, Wash. Post, Sep. 3, 2015 (The new Rule "for the first time includes bans on gender identity discrimination as a form of sexual discrimination, language that advocacy groups have pushed for and immediately hailed as groundbreaking.").

are supposed to be made by the democratically-elected Congress, not unelected agencies. *See Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1222 (10th Cir. 2007) ("If transsexuals are to receive legal protection apart from their status as male or female, however, such protection must come from Congress and not the courts."); *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1086 (7th Cir. 1984) ("If Congress believes that transsexuals should enjoy the protection of Title VII, it may so provide.").

In short, the term "sex" is not ambiguous. It refers to the biological differences between males and females. HHS's attempt to make it mean something different violates the APA.

### B. The Rule is contrary to law Title IX's religion and abortion-related exemptions.

HHS's Rule is also "contrary to law" and "in excess of statutory authority" because it attempts to regulate conduct in a way that is expressly foreclosed by the controlling statutes. Title IX, as incorporated by section 1557, includes two exemptions relevant here: one for religious organizations, and one for abortion. Yet despite the fact that section 1557 incorporated these exemptions, HHS refused to incorporate or obey them in the Rule. Its refusal to do so is contrary to law and in excess of statutory jurisdiction and authority under the APA.

### 1. The Rule lacks an exemption for religious entities.

The Fifth Circuit has struck down regulations that ignore exemptions in the controlling statute. For example, in *Texas Pipeline Association*, the agency promulgated a rule purporting to regulate the activities of certain intrastate pipelines, even though the statutory text only authorized the agency to regulate these activities with respect to "interstate commerce." 661 F.3d at 259–61. The Fifth Circuit held that the agency had "unambiguously exceed[ed] the authority granted" by the relevant statute by attempting "to regulate entities specifically excluded from" the statute. *Id*. at 262 & 264.

Here, HHS has attempted to do the same thing: regulate entities that are "specifically excluded from" the statute. Title IX's prohibition on sex discrimination includes a broad exemption stating that Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681. Thus when Congress wrote section 1557 to incorporate "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)," 42 U.S.C. § 18116(a), it necessarily included the religious exemption in section 1681 of Title IX. Yet despite many requests to apply this exemption in the Regulation,[18] HHS refused.

Notably, for other prohibited areas of discrimination—including race, color, national origin, age and disability—HHS complied with Congress's incorporation of existing exceptions into its interpretation of section 1557. *See* 45 C.F.R. § 92.101 ("The exceptions applicable to Title VI apply to discrimination on the basis of race, color, or national origin under this part. The exceptions applicable to Section 504 apply to discrimination on the basis of disability under this part. The exceptions applicable to the Age Act apply to discrimination on the basis of age under this part."); *see also* 81 Fed. Reg. at 31,378. But when it came to Title IX's religious exemption, HHS parted ways with Congress. HHS stated that "certain protections already exist in Federal law with respect to religious beliefs," and that "applying the protections in those laws"—rather than using the religious exemption Congress itself had incorporated into section 1557—"offers the best and most appropriate approach for resolving any conflicts between religious beliefs and Section 1557 requirements." 81 Fed. Reg. at 31,379–80. In other words, rather than adopting Congress's blanket

---

[18] *See, e.g.*, U.S. Conf. of Catholic Bishops, et al., Comment Letter on Proposed Rule (Nov. 6, 2015), http://www.usccb.org/about/general-counsel/rulemaking/upload/Comments-Proposal-HHS-Reg-Nondiscrimination-Federally-Funded-Health.pdf (writing on behalf of ten religious groups); Council for Christian Coll. & Univ., Comment Letter on Proposed Rule (Nov. 9, 2015), https://www.regulations.gov/document?D=HHS-OCR-2015-0006-1041 (writing on behalf of 143 religious colleges and universities).

exemption for religious organizations in Title IX, HHS said it would rather make its own "determinations on a case-by-case basis, based on a thorough analysis and relying on the extensive case law interpreting [other legal] standards." *Id*. at 31,380.

HHS also declined to follow Title IX's religious exemption because HHS said the exemption is "limited in scope to educational institutions." *Id*. Of course it is. All of Title IX—including its ban on sex discrimination—is limited to "educational institution[s]." 20 U.S.C. § 1681. When Congress brought the ban on sex discrimination into the healthcare context through the ACA, it also brought the religious exemption. Both provisions are in the same section of the same statute, and both are expressly incorporated by section 1557. HHS's refusal to incorporate both exceeds statutory authority and is contrary to law.

### 2.   The Rule lacks an abortion exemption.

The Rule is equally dismissive of congressional intent on the issue of abortion. Title IX makes crystal clear that the ban on sex discrimination cannot be used as a means of requiring services or insurance coverage relating to abortion: "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

In its proposed rule, however, HHS did precisely what Congress forbade: it expanded the definition of sex discrimination to include discrimination on the basis of a "termination of pregnancy." Nondiscrimination in Health Programs & Activities, 80 Fed. Reg. 54,172, 54,216 (proposed Sept. 8, 2015). Understandably, several commenters expressed concern that this language "might be read to require the provision of, or coverage or referral for, abortion,"[19] and asked HHS to clarify that it would not.

---

[19] U.S. Conf. of Catholic Bishops, *supra* note 18.

Again, however, HHS refused to abide by the limitations Congress included in Title IX. Instead, it simply noted the existence of other exemptions and conscience protections in federal law. 81 Fed. Reg. at 31,380, 31,388. HHS's references to these statutory protections is cold comfort, given that HHS interpreted some of these protections, including the Weldon Amendment, very narrowly, giving California a green light to force insurance providers to cover elective abortions, even though churches and other religious organizations objected to abortion being included in their insurance plans.[20] More importantly, HHS's refusal to follow the plain text of Title IX exceeds its statutory authority. Congress incorporated "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)," 42 U.S.C. § 18116(a)—which includes the abortion exemption—and it is not for the agency to cherry-pick which parts it will follow.

## C.   The Rule is contrary to Title VII.

The Rule is contrary to Title VII, because it makes it illegal for employers to accommodate the religious beliefs of their employees. State Plaintiffs, for example, employ thousands of healthcare workers, some of whom have religious objections to participating in medical transition procedures. Under Title VII, the States must provide reasonable accommodations for their employees' religious beliefs, as long as doing so does not impose an undue hardship on them as employers. 42 U.S.C. §§ 2000e-2, 2000e(j); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015). And providing those accommodations is not difficult, particularly when other doctors are available to perform the requested procedures.

The Rule makes these accommodations illegal. For example, HHS says that if a doctor "works as an attending physician at a hospital," then not just the doctor but

---

[20] Letter from Jocelyn Samuels, Dir., Office for Civil Rights, Dep't of Health & Human Servs., to Catherine W. Short, et al. (June 21, 2016), http://www.adfmedia.org/files/CDMHCInvestigationClosureLetter.pdf.

also "the hospital may be responsible for discrimination by the doctor's practice that occurs at the hospital." 81 Fed. Reg. at 31,384 & n.40. The agency also states that the hospital "will be held accountable for discrimination under Section 1557" where "a doctor is an employee of a hospital." *Id.* at 31,384. Thus, the Rule puts the States, as employers, to an impossible choice: They must either force their doctors and nurses to participate in gender transition procedures in violation of Title VII, or they must violate the Rule. Because the Rule conflicts with Title VII, it must be set aside under the APA. *See, e.g., IRS, Fresno Serv. Ctr. v. Fed. Lab. Relations Auth.*, 706 F.2d 1019, 1025 (9th Cir. 1983) (setting aside agency action that was inconsistent with Title VII); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 190 (3d Cir. 1983) (APA may be violated "when agency action, not clearly man-dated by the agency's statute, begins to encroach on congressional policies expressed elsewhere"); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) (invalidating a regulation under one statute because it conflicted with another statute); *Zabel v. Tabb*, 430 F.2d 199, 209 (5th Cir. 1970) ("Governmental agencies in executing a particular statutory responsibility ordinarily are required to take heed of, sometimes effectuate and other times not thwart other valid statutory governmental policies.")

### D.    The Rule is contrary to the Spending Clause of Article I.

In addition to being contrary to law and in excess of statutory authority under the APA, the Rule is contrary to several provisions of the Constitution, and can be invalidated under the APA on these bases as well. First, we examine the Spending Clause of Article I.

### 1.    Under the Spending Clause, defendants may not withhold State funding on the basis of ambiguous conditions.

The Constitution provides that "Congress shall have Power to lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. Const. art. I, § 8, cl. 1. This

clause—generally called the "Spending Clause"—permits Congress to "further broad policy objectives by conditioning the receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (quoting *Fullilove v. Klutznick*, 448 U.S. 448, 474 (1980)).

Congress's spending power is "not unlimited" and is "subject to several general restrictions." *Id.* at 207. For example, while "Congress may fix the terms on which it shall disburse federal money to the States," it must prescribe those terms "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In *Pennhurst*, the Court first explained that legislation enacted under the Spending Clause "is much in the nature of a contract." *Id.* That is, "in return for federal funds, the States agree to comply with federally imposed conditions." *Id.* Congress's authority "thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.' " *Id.* It is impossible for a State to "voluntarily and knowingly" accept any limitations "if a State is unaware of the conditions or is unable to ascertain what is expected of it." *Id.* Therefore, if Congress intends to impose a condition on the receipt of federal funding, it must "speak with a clear voice." *Id.*

In *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 (2006), the Supreme Court applied these principles in the context of a provision in the Individual with Disabilities Education Act ("IDEA") allowing prevailing litigants to recover attorneys' fees. At issue was whether the cost of experts' services was covered by that fee-shifting provision. *See id.* Relying on what it called a "clear notice" rule, the Court held that expert fees were not recovered under IDEA.

In reaching that conclusion, the Court maintained that the clear notice analysis must be done not from Congress's point of view, but "from the perspective of a state official who is engaged in the process of deciding whether the State should accept" the conditioned funds. *Id.* at 296. The question for a court is "whether such a state official would clearly understand" IDEA's conditions. *Id.* The Court summed up:

"we must ask whether the IDEA furnishes clear notice regarding the liability at issue in this case." *Id.* Under that test, because IDEA's text did not clearly notify States that they would face liability for expert fees, the Spending Clause did not permit prevailing parents to recover such fees. *Id.* at 296–98.

The Fifth Circuit routinely applies clear-notice principles and has often recognized that "conditions imposed on the recipients [of federal grants] must be unambiguous." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 278 (5th Cir. 2005) (citing *South Dakota*, 483 U.S. at 207-08). *Pennhurst*'s "clear-statement rule," the Circuit has held, is "stringent." *Id.* at 279. And applying that "stringent" rule, the Circuit has declared, for example, that a State's acceptance of funds under section 102 the Rehabilitation Act did not waive sovereign immunity. *See Hurst v. Tex. Dep't of Assistive & Rehab. Servs.*, 482 F.3d 809, 814 (5th Cir. 2007). The same is true for a State's acceptance of funds under the Religious Land Use and Institutionalized Persons Act, *see Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 331 (5th Cir. 2009), *aff'd sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011), and the National Flood Insurance Program, *see United States v. St. Bernard Par.*, 756 F.2d 1116, 1121 (5th Cir. 1985).

### 2. Section 1557 does not provide clear notice that sex includes gender identity and termination of pregnancy.

*Pennhurst* forbids the use of ambiguous conditions on funding. 451 U.S. at 17. *Arlington Central* requires every condition to carry a "clear notice." 548 U.S. at 296. The Rule's prohibitions against discrimination on the basis of "gender identity" and "termination of pregnancy" are not unambiguously stated in section 1557. Because no State could fathom that Title IX, as incorporated by the ACA, would impose on it these new requirements, the Rule must be set aside.

*a. Gender identity.* Section 1557 does not provide clear notice that the health care providers must not discriminate on the basis of gender identity. The Rule,

however, interprets the statute's prohibition on discrimination "on the basis of sex" to include gender identity. 45 C.F.R. § 92.4. But, as stated above, section 1557 does not add a new non-discrimination provision. Rather, as relevant here, it prevents discrimination on the grounds already prohibited under Title IX. 20 U.S.C. § 1681(a). Thus, the clear-notice question is whether the language of Title IX (as incorporated by section 1557) unambiguously prohibits discrimination on the basis of gender identity. It does not.

In ruling on Plaintiffs' motion for preliminary injunction, the Court already found that gender identity is not within the meaning of the term "sex" in Title IX. The Court based this conclusion on the text, structure, and purpose of Title IX. In construing the statutory text, the Court adhered to well-established precedent and looked first for the ordinary meaning of the operative language at the time the law was enacted. Prelim. Inj. Order 32. When Title IX was passed in 1972, the Court correctly pointed out, "sex" meant biological sex. *Id.* at 33 n.24 (collecting dictionaries). The text of Title IX demonstrates that Congress intended "sex" to carry the common meaning that this term had at the time. For example, Title IX refers to "students of one sex," "both sexes," and "students of the other sex." *See* 20 U.S.C. § 1681. Thus, Congress used "sex" in the same way that American speakers of the English language commonly used the term at the time—that is, to refer to biological and anatomical differences between males and females.

The structure and purpose of Title IX reinforce the conclusion that the term "sex" means biological sex. As an example, Congress authorized education institutions subject to Title IX to maintain "separate living facilities for the different sexes." 20 U.S.C. § 1686. These authorized distinctions between "the different sexes" in Title IX served to protect personal privacy and presuppose a biological understanding of the term "sex." Prelim. Inj. Order 33. As the Court correctly concluded, the "text, structure, and purpose reveal that the definition of sex in Title

IX's prohibition of sex discrimination unambiguously prevented the discrimination on the basis of the biological differences between males and females." *Id.* at 33–34.

Finally, it bears noting that when Congress incorporated Title IX's prohibition of sex discrimination into the ACA, it did not somehow redefine the term "sex." At the time, no federal courts or agencies had interpreted "sex" in Title IX to include "gender identity" at the time of the ACA. Further, the same Congress that enacted the ACA also passed legislation that recognized "gender identity" as a category distinct from "gender." *See* 18 U.S.C. § 249(a)(2)(A) (punishing crimes committed because of the victim's "gender, sexual orientation, [or] gender identity"). And, in other conditional spending legislation enacted only three years after the ACA, Congress protected "gender identity" as a category distinct from "sex" or "sexual orientation." *See* 42 U.S.C. § 13925(b)(13)(A) (preventing activities or programs funded under the Violence Against Women Act from discriminating on the basis of "sex [or] gender identity"). Thus, as this Court correctly found, section 1557 "unambiguously adopted the binary definition of sex." Prelim. Inj. Order 35.

"In a Spending Clause case," the Fifth Circuit has explained, " the key is not [the intention of Congress] but what the States are clearly told regarding the conditions that go along with the acceptance of . . . funds." *Hurst*, 482 F.3d at 814. For the reasons already discussed, section 1557 carries clear notice of a prohibition on the basis of biological sex. The Rule redefines Title IX's prohibition against "sex" discrimination to include discrimination on the basis of "gender identity," defined as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female." 45 C.F.R. § 92.4. The Rule goes so far as to recognize that sex and gender identity are distinct concepts. *See id.* (asserting that "gender identity" could be "different from an individual's sex assigned at birth"). But rather than stay within the prohibitions against sex discrimination clearly stated in section

1557, the Rule adds a series conditions unrelated to discrimination on the basis of biological sex.

The Rule prohibits, for example, "hav[ing] or implement[ing] a categorical [insurance] coverage exclusion or limitation for all health services related to gender transition." 45 C.F.R. § 92.207(b). The "range of transition-related services" covered under the Rule includes a broad range of therapies and treatments, including surgical treatments, hormone therapy, and psychotherapy, all of which may be required "over the lifetime of the individual." 81 Fed. Reg. at 31,435–36. The Rule's requirements related to "gender identity" presuppose that gender identity is within the meaning of sex discrimination. *See* 81 Fed. Reg. at 31,435 (explaining that the Rule requires covered entities "to apply the same neutral, nondiscriminatory criteria that it uses for other conditions when the coverage determination is related to gender transition"). But, as the Court already found, section 1557 defines "sex" more narrowly. Accordingly, it provides no "clear notice" sufficient to withhold funding for failing to comply with any of the Rule's requirements related to "gender identity."

**b. *Termination of pregnancy.*** Likewise, the Rule's prohibition against discrimination based on the "termination of pregnancy" also violates the clear-notice rule. Title IX expressly states that the law cannot be "construed to require or prohibit and person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688. The Rule did not incorporate Title IX's clear statement of neutrality on the issue of abortion. Instead, the Rule redefines sex discrimination, contrary to the terms of section 1688, to include a prohibition against discrimination on the basis of "termination of pregnancy," a euphemism for abortion.[21] 45 C.F.R. § 92.4.

---

[21] Medical literature (and common sense) underscore the basic point that childbirth also brings pregnancy to a close, but Plaintiffs understand the Rule's prescriptions related to the "termination of pregnancy" to refer only to termination of pregnancy by abortion. *See, e.g.*, Sarah Kilpatrick & Etoi

Under the Rule's pro-abortion revision of the term "sex," insurance plans that exclude abortion would be illegal. *See* 81 Fed. Reg. at 31,471–72 (prohibiting "discriminatory actions" such as denying or limiting insurance coverage based on "sex" discrimination). The Rule overrides the choice by Texas and other States to exclude coverage for abortion in the health insurance plans offered to state employees. *See, e.g.*, App.123–24 (excluding coverage for elective abortion and abortion-related procedures for State of Texas employees). The Rule cannot rewrite the insurance coverage and medical treatment decisions of covered entities without a "clear statement" from Congress. Because the Rule has no such authorization, the abortion requirements must be set aside.

The Rule's failure to adopt a neutral posture toward abortion conflicts with section 1557, which forbids discrimination "on the ground prohibited under . . . [T]itle IX of the Education of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a)). As the Court pointed out: "Congress specifically included in the text of Section 1557 '20 U.S.C. 1681 et seq.'" Prelim. Inj. Order 37. The signal "et seq.," which means "and the following," indicates that Congress "intended to incorporate the entire statutory structure." *Id*. This includes the protection from liability that Title IX affords covered entities that do not provide abortion or abortion-related services. 20 U.S.C. § 1688.

Section 1557 provides clear notice that sex discrimination would be prohibited "on the ground" prohibited by Title IX. Unlike the Rule, the ground prohibited under Title IX does not include discrimination based on the "termination of pregnancy." A covered entity's decision not to provide abortions or abortion-related services is not a ground for discrimination under Title IX. 20 U.S.C. § 1688. But the Rule does not

---

Garrison, "Normal Labor and Delivery" in Steven G. Gabbe, et al., Obstetrics: Normal and Problem Pregnancies, 246 (7th ed. 2017) (ebook) ("Labor is defined as the process by which the fetus is expelled from the uterus."). Thus, covered entities, including the Plaintiff States, who insure childbirth but not abortion would still be within the Rule's anti-discrimination provisions because they would be discriminating against the kind of "termination of pregnancy" that matters to the Rule—that is, abortion and not childbirth.

include the abortion exemption. Rather, as the Court correctly found, it expands the scope of liability for sex discrimination beyond the unambiguous terms of Section 1557. Prelim. Inj. Order 37. Thus, the Rule's conditions based on the "termination of pregnancy" are unsupported by a "clear statement" in the statutory text.

### 3. *Pennhurst* and *Arlington Central* preclude the application of *Chevron*.

Defendants and putative Intervenors have argued that HHS is entitled to *Chevron* deference. ECF No. 50 at 51; ECF No. 53 at 20. But Chevron has no place in the analysis of conditional spending regulations. *Pennhurst* and *Arlington Central's* clear notice rule—and not *Chevron's* familiar two-step test—is the proper standard for determining whether a spending condition provided in a rule is valid. As the en banc Fourth Circuit has held, relying on *Chevron* amounts to an implicit "concession," that the statute is "silent or ambiguous," and therefore that the contested conditions must fail *Pennhurst's* and *Arlington Central's* requirement of statutory unambiguity. *Commw. of Va. Dep't of Educ. v. Riley*, 106 F.3d 559, 567 (4th Cir. 1997) (en banc) (per curiam).

As set out above, *Pennhurst* and *Arlington Central* require a clear-notice rule. *See Arlington Cent.*, 548 U.S. at 300; *see supra* Part I.D.1. That is, the Spending Clause does not permit the federal government to withhold funding from States due to the State's noncompliance with a condition unless that condition is clear and unambiguous. *See Arlington Cent.*, 548 U.S. at 300. If a federal condition does not enable a state official to "clearly understand" from the language of the law itself the conditions to which a State agrees when a State accepts federal funds, then the condition violates the Spending Clause. *See id.* at 296.

By contrast, *Chevron* applies only to "ambiguous" federal statutes. *Chevron, U.S.A., Inc. v. Nat. Res. Defense Council*, 467 U.S. 837, 843–44 (1984). In *Chevron*, the Supreme Court announced a "principle of deference to administrative

interpretations." *Id.* at 844. The Court explained that a federal court must defer to an agency's "permissible construction of the statute" only when "the statute is silent or ambiguous with respect to the specific issue." *Id.* at 843. Absent such "ambigu[ity]," the "principle of deference to administrative interpretations" does not apply. *Id.* at 843–44.

Thus, as the en banc Fourth Circuit has recognized, *Pennhurst* precludes the application of *Chevron* deference. *See Riley*, 106 F.3d at 567. The reason is that *Chevron* cannot apply unless the statute is ambiguous, but if the statute is ambiguous, then it fails the *Pennhurst/Arlington Central* clear-notice rule. *See id.* at 566. The Fourth Circuit further held that the IDEA condition at issue was ambiguous. *See id.* at 561. As a result, a straightforward application of *Pennhurst* precluded the enforcement of the ambiguous conditions the department had imposed. *See id.* The court expressly faulted the department for arguing for *Chevron* deference, describing that argument as a "concession" of ambiguity. *Id.* at 567. As the court explained: "It is axiomatic that statutory ambiguity defeats altogether a claim by the Federal Government that Congress has unambiguously conditioned the States' receipt of federal monies in the manner asserted."[22] *Id.*  In other words, if *Chevron* applies, then the department has failed to follow *Pennhurst*'s clear-notice rule. *See id.* That "rationale and result" has been adopted by at least one other circuit. *See Doe v. Bd. of Educ.*, 115 F.3d 1273, 1278–79 (7th Cir. 1997).

The same logic applies here. By asking for *Chevron* deference, Defendants and the putative Intervenors the offered an implicit "concession," *Riley*, 106 F.3d at 567, that section 1557 is "silent or ambiguous," *Chevron*, 467 U.S. at 843, on the statutory question underlying this case: what constitutes sex discrimination within the

---

[22] The language quoted here initially appeared in Judge Luttig's panel dissent. On en banc review, however, the Fourth Circuit majority "adopt[ed] as their own the dissenting panel opinion of Judge Luttig" and "attached" it in its entirety as binding Fourth Circuit law. *Id.* at 560–61.

meaning of operative statutory text? And that concession confirms that the Rule violates the clear-notice rule of *Pennhurst* and *Arlington Central*. *See supra* Part I.D.2.

### E.     The Rule is contrary to the Tenth Amendment.

The Rule also is contrary to law because it attempts to commandeer the States in violation of the Tenth Amendment. Congress exercises its conferred powers in Article I subject to the limitations contained in the Constitution. *New York v. United States*, 505 U.S. 144, 156 (1992). One of those limitations is the Tenth Amendment, which restrains the power of Congress by reserving powers for the States that are not delegated to Congress in Article I. "It is an essential attribute of the States' retained sovereignty that they remain independent and autonomous within their proper sphere of authority." *Printz v. United States*, 521 U.S. 898, 928 (1997). Defendants may not compel State Plaintiffs to implement, by legislation or executive action, federal regulatory programs. *Id.* at 925. Moreover, once federal and state governments engage in cooperative federalism through a federal spending program, Congress may not engage in "impermissible compulsion" "so that the States' choice whether to enact or administer a federal regulatory program is rendered illusory." *Nat'l Fed. Indep. Bus. v. Sebelius*, 567 U.S. 519, 677 (2012). "Congress may not simply commandeer the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program." *Id.* (internal quotation marks and citation omitted).

The Rule "commandeers [the State Plaintiffs'] legislative or administrative apparatus for federal purposes," *id.* at 577, by running headlong into their sovereign power, forcing them to apply new standards of medical care, state authority over medical facilities, and state employers' decisions not to cover "all health services related to gender transition," 45 C.F.R. § 92.207, and abortion procedures.

### 1. The Rule commandeers State laws protecting the independent medical judgment of physicians.

State Plaintiffs zealously protect the independent medical judgment of physicians. Each State regulates the standard of care that physicians must provide patients. "[T]he State has a significant role to play in regulating the medical profession," *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), as well as "an interest in protecting the integrity and ethics of the medical profession," *Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). This includes "maintaining high standards of professional conduct" in the practice of medicine. *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954).

Texas zealously protects the physician-patient relationship. Numerous Texas laws and regulations ensure that physicians honor their duties to their patients. The statewide standard of medical practice rests on the principle that Texas doctors must exercise "independent medical judgment" when treating patients under their care. *See, e.g.*, *Murk v. Scheele*, 120 S.W.3d 865, 867 (Tex. 2003) (per curiam); *see also Garcia v. Tex. State Bd. of Med. Exam'rs*, 384 F. Supp. 434, 439 (W.D. Tex. 1974) (upholding regulations designed to preserve the "vitally important doctor-patient relationship"). In 2011, the Texas Legislature prohibited medical organizations from interfering with, controlling, or directing "a physician's professional judgment," Tex. Occ. Code § 162.0021, and it mandated that they permit physicians to exercise "independent medical judgment when providing care to patients," *id.* § 162.0022.

Texas hospitals must appoint a chief medical officer to supervise "all matters relating to the practice of medicine." Tex. Health & Safety Code § 311.083, which includes adopting policies to ensure that physicians have the ability to exercise independent medical judgment, *id*. This officer must report to the Texas Medical Board ("TMB")—the executive agency responsible for regulating the practice of medicine in Texas—any action or event that constitutes a compromise of the independent medical judgment of a physician in caring for a patient. *Id*. TMB

regulations provide that doctors retain "independent medical judgment and discretion in providing and supervising care to patients," and may not be disciplined for "reasonably advocating for patient care." 22 Tex. Admin. Code § 177.5. In addition, they reserve important decisions concerning quality assurance, the medical necessity of treatment, credentialing and peer review to the physician-only boards that direct health organizations. *Id.* §§ 177.3, 177.5.

Likewise, the other State Plaintiffs require the same independence for their physicians. Wisconsin protects the physician-patient relationship by requiring physician employment contracts to "[p]ermit the physician to exercise professional judgment without supervision or interference by the hospital or medical education and research organization," Wis. Stat. Ann. § 448.08(5)(a)2, and by requiring physicians to inform patients "about the availability of reasonable alternate medical modes of treatment and about the benefits and risks of these treatments," *id.* § 448.30. Nebraska safeguards the right of health care providers to decline to take part in activities that are contrary to the provider's religious, ethical, or moral convictions. Neb. Rev. Stat. Ann. § 30-3428. Louisiana requires physicians to "exercise independent medical judgment in the sole interest of the patient" and refrain from "allow[ing] a non-physician to impose or substitute his, her, or its judgment for that of the physician." La. Admin. Code 46:XLV § 7603. Kansas, Arizona, Mississippi, and Kentucky treat physicians as fiduciaries of their patients, obligating physicians to act in the best interests of patients based on the physician's informed, independent judgment. *See Natanson v. Kline*, 350 P.2d 1093, 1105–06 (Kan.), *decision clarified on denial of reh'g*, 354 P.2d 670 (Kan. 1960); *Walk v. Ring*, 44 P.3d 990, 999 (Ariz. 2002); *Madden v. Rhodes*, 626 So. 2d 608, 618 (Miss. 1993); *Adams v. Ison*, 249 S.W.2d 791, 793 (Ky. 1952).

The standard of care established in Texas, and around the country, enables patients to obtain quality healthcare as determined by medical professionals, and not

those outside the doctor-patient relationship. The Rule, however, commandeers this standard of care. It discards independent medical judgment and a physician's duty to his or her patient's permanent well-being and replaces them with rigid commands. The Rule forces physicians who accept Medicare and Medicaid payments, and who operate, offer, or contract for health programs and activities that receive federal financial assistance, to subject their patients to procedures that permanently alter or remove well-functioning organs, even though the physician's independent medical judgment advises against such a course of action. And beyond compelling physicians to act against their medical judgment, the Rule requires them to express opinions contrary to what they deem to be in the patient's best interest, or to avoid even describing medical transition procedures as risky or experimental. Yet, physicians are "under a duty to make reasonable disclosure of that diagnosis, and risk of the proposed treatment . . ., as would have been made by a reasonable medical practitioner under the circumstances." *Jacobs v. Theimer*, 519 S.W.2d 846, 848 (Tex. 1975) (citing *Wilson v. Scott*, 412 S.W.2d 299 (Tex. 1967); W. M. Moldoff, *Annotation, Malpractice: physician's duty to inform patient of nature and hazards of disease or treatment*, 79 A.L.R.2d 1028 (1961)).

### 2.   The Rule commandeers the States provision of healthcare to residents.

The Rule also commandeers State Plaintiffs' provisions of healthcare services directly to residents through various mechanisms of government. Texas, for example, provides health services directly to patients through the Health and Human Services Commission ("HHSC"). Tex. Gov't Code § 531.0055; Tex. Health & Safety Code § 12.0115. HHSC superintends operations and resource allocation at many healthcare facilities, which are owned by Texas and receive federal funding administered by HHS, Tex. Gov't Code §§ 531.008, 531.0055, including the North Texas State Hospital. These entities will have to offer all manner of (and referrals

for) medical transition procedures and treatments. As a result of the Rule, Texas and other states must allocate personnel, resources, and facility spaces to offer and accommodate myriad medical transition procedures now required under the Rule. Healthcare facilities will also be required to open up sex-separated showers, locker rooms, or other intimate facilities based on individual preference.[23] This is true even in controlled medical locations where patient access to intimate facilities is often under the control of healthcare professionals that are supposed to act in the best interests of the patient. Thus, the requirements of the Rule commandeer the control that Texas and other states legitimately exercise over their healthcare facilities.

### 3. The Rule commandeers the States' provision of insurance coverage for state employees.

The Rule also commandeers powers reserved to the States by attempting to force States to provide insurance coverage for "gender transition services" and abortion procedures to all state employees. HHS provides that a state's Medicaid program constitutes a covered "health program or activity" under the Rule. 45 C.F.R. § 92.4. Thus, "the State will be governed by section 1557 in the provision of employee health benefits for its Medicaid employees." 81 Fed. Reg. 31,437. The exclusions Texas and other states currently possess in their employee insurance policies related to pregnancy termination and medical transition procedures will now be illegal under the Rule. As a result, Texas and other states will be required to change their

---

[23] This becomes especially complicated, or perhaps impossible, under the Rule's non-binary approach to "sex." As stated by HHS, "those individuals with non-binary gender identities are protected under the rule." 81 Fed. Reg. 31,384. Indeed, HHS declares that it is an unlawful "sex stereotype" to have the "belief" or "the expectation that individuals consistently identify with only one of two genders (male or female)." *Id.* at 31,392. According to HHS, "the gender identity spectrum includes an array of possible gender identities beyond male and female." *Id.* Thus, one can only conclude that the Rule is violated when the intimate facilities within a medical building are labeled in a binary sense, or not otherwise designed for the "array of possible gender identities" that may befall that location on any given day. And "[t]he rule makes clear that in order to meet their obligations under § 92.206, covered entities must treat all individuals consistent with their gender identity, including with regard to access to facilities." *Id.* at 31,428.

insurance coverage. And for these reasons, the Rule violates the anti-commandeering doctrine of the Tenth Amendment.

### F.    The Rule is contrary to the Eleventh Amendment.

The Eleventh Amendment provides that the "Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. A State's Eleventh Amendment immunity, outside of waiver, is not easily abrogated as "a specific legislative enactment is required to waive Eleventh Amendment immunity." *Alden v. Maine*, 527 U.S. 706, 710 (1999). There are two circumstances in which an individual may sue a state: (1) when Congress has expressly abrogated a state's Eleventh Amendment immunity through legislation and (2) when a state waives its own Eleventh Amendment immunity. *Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 240 (5th Cir. 2005) (citing *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999)). Congress may not abrogate a State's sovereign immunity unless it makes that intention to abrogate unmistakably clear in the language of the statute and acts pursuant to a valid exercise of its power under section 5 of the Fourteenth Amendment. *See, e.g., Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726–27 (2003) ("Congress may, however, abrogate such immunity in federal court if it makes its intention to abrogate unmistakably clear in the language of the statute . . ."); *Dellmuth v. Muth*, 491 U.S. 223, 230 (1989) ("Lest *Atascadero* be thought to contain any ambiguity, we reaffirm today that in this area of the law, evidence of congressional intent must be both unequivocal and textual."). Thus, "an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

Section 1557 of the ACA does not unmistakably abrogate sovereign immunity, and Defendants did not act pursuant to a valid exercise of federal power under section 5 of the Fourteenth Amendment. In enacting section 1557 of the ACA, Congress did not make findings regarding gender identity, but merely incorporated existing law under Title IX, which does not extend to gender identity. Congress has in fact declined to pass specific gender identity legislation on numerous occasions.

The Rule abrogates State Plaintiffs' sovereign immunity by subjecting them to lawsuits from their employees, non-employees, including spouses and dependents of its employees, students at health-related schools run by the States, patients at state-run hospitals and medical facilities, and the Department of Justice. 81 Fed. Reg. at 31,440, 31,471; 45 C.F.R. § 92.301. If a covered entity violates the Rule, it is subject to the same penalties that accompany a violation of Title IX, 45 C.F.R. § 92.301, which include the loss of federal funding (which, in the case of Medicare and Medicaid to the States, can total many millions of dollars), debarment from doing business with the government, and false claims liability, 81 Fed. Reg. at 31472; 45 C.F.R. § 92.301. The Rule does these things without clear authorization from Congress, and its expansion of the definition of sex to include gender identity is not supported by congressional findings.

For all the reasons explained above, the Rule violates the APA as contrary to law and in excess of statutory authority.

## II.    The Rule Violates the Constitution.

The Rule also independently violates the Spending Clause of Article I of the Constitution, as well as the Tenth and Eleventh Amendments. Of course, the Court does not need to reach these constitutional claims if it declares the Rule invalid and sets it aside under the APA. But if the Court chooses to review the Rule under the Constitution, then the analysis of State Plaintiffs' claims under the Spending Clause,

Tenth Amendment, and Eleventh Amendments would be the same as what they articulate in Parts I.D, I.E., and I.F above.

## III.   The Court Should Declare the Rule Invalid and Set it Aside.

The Court should declare the Rule unlawful and set it aside. The APA provides that a federal court "shall" "hold unlawful and set aside agency action . . . found to be—(A) . . . not in accordance with law" or "(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706. Because the Rule violates the APA for all the reasons specified above, the Court must declare it unlawful and set it aside.

## IV.   The Court Should Issue a Permanent Injunction Against Enforcement of the Rule.

The Court should also exercise its equitable power to issue an order converting its preliminary injunction into a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006) ("the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts"). Before a court may issue a permanent injunction, a plaintiff "must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *VRC LLC v. City of Dall.*, 460 F.3d 607, 611 (5th Cir. 2006). State Plaintiffs satisfy each of these factors.

### A.   State Plaintiffs succeed on the merits.

As established above in Parts I and II, State Plaintiffs prevail on the merits of their claims.

### B.   State Plaintiffs will suffer irreparable injury.

State Plaintiffs will suffer irreparable harm absent a permanent injunction, because the Rule will prevent them from enforcing their own laws and policies. "A

state suffers irreparable harm anytime it is prevented from enforcing a statute enacted by representatives of its people." Prelim. Inj. Order 43; *Texas*, 201 F. Supp. 3d at 834 (citation omitted). The Rule causes irreparable injury to State Plaintiffs by disabling them from following their own healthcare laws and policies; imposing new compliance costs; and forcing them into a Hobson's choice of either accommodating their employees' religious liberty under state and federal employment laws and violating the Rule, or denying employees those protections and following the Rule. In analogous litigation, this Court ruled that a similar conflict between federal guidelines and sovereign plaintiffs' policies and practices constituted irreparable injury. *Texas*, 201 F. Supp. 3d at 834.

Texas law, for example, zealously protects the physician-patient relationship and the "independent medical judgment" of doctors. *See* Tex. Occ. Code § 162.0022 (mandating that medical organizations permit physicians to exercise "independent medical judgment when providing care to patients"); *Murk*, 120 S.W.3d at 867 (recognizing faculty member's role as a treating physician at state-run science center entitled him to independent medical judgment); *Garcia*, 384 F. Supp. at 439 (upholding regulations designed to preserve the "vitally important doctor-patient relationship"). The Rule, however, supplants a physician's independent medical judgment with that of federal rule-makers who deem a physician's decision to advise against abortion or gender transition procedures as a newly conceived form of discrimination. Thus, the Rule forces physicians who accept federal funds to ignore their state legal obligations to exercise independent and proper medical judgment when treating patients.

The Rule also requires state healthcare facilities to offer transition and abortion procedures, post patient notices concerning what Defendants now declare discrimination, and train employees on their obligations under the Rule. The States will be forced to allocate personnel, resources, facilities, and finances to accommodate

the transition and abortion services, and open sex-separated showers, locker rooms, and other facilities. The States did not accede to these extra costs when they chose to participate in Medicare and Medicaid decades ago.

The States fare no better under the Rule as employers. As described above, federal statutes, like Title VII, prohibit employment discrimination based on religion. Employers must reasonably accommodate employees' religious beliefs, observances, or practices. If those beliefs mean abstaining from participation in transition and abortion procedures, then the sovereigns as employers must (and can) reasonably accommodate the employees that possess a conflict. But under the Rule, the sovereign medical providers must provide or refer for transition and abortion procedures even when doing so would violate their employees' religious beliefs.

State Plaintiffs, acting as employers, also offer covered health benefits to thousands of employees. The Rule pressures them to change their health benefits by providing coverage for transition and abortion procedures. *Cf.* App.123–24. Thus, State Plaintiffs will suffer irreparable injuries absent a permanent injunction.

## C. The balance of hardships tips in favor of a permanent injunction.

When balancing the hardships between the parties, the scale clearly tips in Plaintiffs' favor. "Although a showing that plaintiff will be more severely prejudiced by a denial of the injunction than defendant would be by its grant does not remove the need to show some probability of winning on the merits, it does lower the standard that must be met." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). Since Plaintiffs are likely to succeed on the merits of the case, Defendants must "present powerful evidence of harms to [their] interests" to prevent Plaintiffs from meeting the balancing requirement. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 297 (5th Cir. 2012). Defendants cannot meet this high standard.

State Plaintiffs face the loss of critical Medicare and Medicaid funding if they fail to comply with the Rule. This could force some private and state healthcare providers either out of business or to discontinue social services all together. The Rule requires State Plaintiffs to alter their health benefits in contravention of internal or state policy. The States also face intrusion into their regulation of the practice of medicine and their provision of medical care to citizens and employees. State Plaintiffs also face legal liability if the Rule is not enjoined. They face lawsuits from individuals seeking required procedures and from employees seeking required insurance coverage. They face employment discrimination lawsuits from employees seeking religious accommodations from participating in transition and abortion procedures. And if State Plaintiffs provide care that conflicts with their professional medical judgment, then they expose themselves to malpractice lawsuits.

By contrast, an injunction inflicts no meaningful injury on Defendants. Defendants waited over six years to propose and promulgate the Rule. And the Rule has been preliminarily enjoined for over two years, with no adverse effect on the defendants. Moreover, Defendants do not even require their own health insurance programs—programs that cover millions of poor, disabled, and elderly Americans— to comply with the Rule. Private Pls.' Br. in Supp. Sum. J. 29–30, ECF No. 25. The federal government should not be permitted to claim harm from the delayed enforcement upon others of what it will not enforce upon itself. Thus, the balance of harms clearly tips in favor of granting injunctive relief.

### D.    The public interest favors a permanent injunction.

The public interest "factor overlaps considerably with the previous one [balancing the harms], and most of the same analysis applies." *Texas*, 809 F.3d at 187. Just as the balance of harms favors State Plaintiffs, the public interest is safeguarded by protecting State Plaintiffs from the unlawful Rule. This is particularly true since State Plaintiffs' claims involve the deprivation of Tenth

Amendment rights. "[I]njunctions protecting [constitutional] freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013) (quoting *Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006)).

Plus, disqualifying State Plaintiffs as Medicare and Medicaid recipients not only hurts them and their ability to fulfil their responsibilities to their residents, but hurts the public even more. Many individuals rely primarily, and exclusively in many instances, on the viability of Medicare and Medicaid to pay for crucial health services.[24] Without a permanent injunction against the Rule recipients of Medicare and Medicaid are placed into the crosshairs of harm. That should weigh heavily in favor of enjoining the Rule.

Given the gravity of the changes proposed in the Rule, the medical debate on the propriety of these procedures, the widespread impact on private and public entities, the harm posed to individuals that rely upon Medicare and Medicaid for medical treatment, and the intrusion into sovereignty, the public interest favors a permanent injunction.

---

[24] More than 60 million people are enrolled in Medicare. *See* U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., Office of Enter. Data & Analytics (December 2018), https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/ Dashboard/Medicare-Enrollment/Enrollment%20Dashboard.html. More than 72 million people are enrolled in Medicaid. *See* U.S. Dep't of Health & Human Servs., Ctrs. for Medicare & Medicaid Servs., Oct. 2018 Medicaid & CHIP Enrollment Data Highlights (Oct. 2018), https://www.medicaid.gov/ medicaid/program-information/medicaid-and-chip-enrollment-data/report-highlights/index.html.

## CONCLUSION

State Plaintiffs respectfully request that the Court declare the Rule unlawful, set it aside, and permanently enjoin its enforcement.

Respectfully submitted this the 4th day of February, 2019.

DOUG PETERSON
Attorney General of Nebraska

DEREK SCHMIDT
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

MARK BRNOVICH
Attorney General of Arizona

MATT BEVIN
Governor of Kentucky

PHIL BRYANT
Governor of Mississippi

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

BRANTLEY D. STARR
Deputy First Assistant Attorney General

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

*/s/ David J. Hacker*
DAVID J. HACKER
Special Counsel for Civil Litigation
Texas Bar No. 24103323
david.hacker@oag.texas.gov

MICHAEL C. TOTH
Special Counsel for Civil Litigation

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Mail Code 001
Austin, Texas 78711
(512) 936-1414

*ATTORNEYS FOR PLAINTIFFS*
*STATE OF TEXAS; STATE OF*
*WISCONSIN; STATE OF*
*NEBRASKA; COMMONWEALTH*
*OF KENTUCKY, by and through*
*Governor Matthew G. Bevin;*
*STATE OF KANSAS; STATE OF*
*LOUISIANA; STATE OF ARIZONA; and*
*STATE OF MISSISSIPPI, by and through*
*Governor Phil Bryant*

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2019, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ David J. Hacker*
DAVID J. HACKER