**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC., *et al.*, | No. 7:16-CV-00108-O |
| *Plaintiffs*, | |
| v. | **Private Plaintiffs' Brief in Support of Their Renewed Motion for Partial Summary Judgment** |
| ALEX M. AZAR, II, *et al.*, | |
| *Defendants*. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iv

INTRODUCTION ............................................................................................ 1

STATEMENT OF FACTS ............................................................................... 2

    A.    Title IX ................................................................................................ 2

    B.    Attempts to Add Protection for "Gender Identity" ................................. 3

    C.    The Affordable Care Act ..................................................................... 3

    D.    Executive Branch Changes .................................................................. 4

    E.    The Rule ............................................................................................ 6

        1.    Medical Procedures .................................................................... 7

        2.    Insurance Coverage .................................................................... 8

        3.    Enforcement .............................................................................. 9

        4.    No Exemptions for Conscience or Medical Judgment .................. 9

    F.    Plaintiffs ........................................................................................... 10

        1.    Franciscan ................................................................................ 10

        2.    CMDA ...................................................................................... 11

        3.    State Plaintiffs .......................................................................... 11

    G.    The Effect of the Rule ......................................................................... 11

        1.    Franciscan ................................................................................ 11

        2.    CMDA ...................................................................................... 12

        3.    State Plaintiffs .......................................................................... 13

    H.    Procedural History ............................................................................. 13

ARGUMENT .................................................................................................. 15

    I.    The Rule violates the Administrative Procedure Act ............................ 14

        A.    HHS's interpretation of "sex" to include "gender identify" is contrary to law. ................................................................. 14

            1.    Section 1157's plain text, purpose, structure, and history foreclose the HHS Rule ........................................ 15

            2.    Recent court decisions reinterpreting the word "sex" are mistaken ............................................................. 23

B. HHS's failure to include religious or abortion-related exemptions is contrary to law and in excess of statutory authority ........................................................................................ 28

    1. The Rule violates the APA because it fails to include Title IX's religious exemption................................ 29

    2. The Rule violates the APA because it ignores Title IX's abortion exemption..................................... 31

    3. HHS's failure to allow employers to accommodate employees' religious beliefs is contrary to Title VII. ....... 32

C. Even if "sex" were ambiguous, *Chevron* does not apply. ........... 33

D. The Rule is contrary to the Spending Clause and the Tenth and Eleventh Amendments................................ 34

II. The Rule violates the Religious Freedom Restoration Act.................. 34

A. Franciscan and CMDA members sincerely exercise religion by not performing or covering medical transitions or abortions. ...................................................................... 35

B. The Rule substantially burdens Plaintiffs' religious exercise by imposing massive financial and other penalties. ........... 36

C. The Rule cannot satisfy strict scrutiny ...................................... 37

    1. The Rule furthers no compelling interest........................ 38

    2. Defendants have numerous less restrictive means of furthering their interests ............................................ 42

III. The Rule violates the Free Exercise Clause. ...................................... 43

A. The Rule is not neutral and generally applicable. .................... 44

B. The Rule cannot satisfy strict scrutiny ...................................... 48

IV. The Court should vacate the unlawful portions of the Rule and enter a permanent injunction.................................................... 48

CONCLUSION ........................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bailey v. Shell W. E&P, Inc.,*
609 F.3d 710 (5th Cir. 2010) ........................................................................ 44

*Blackhawk v. Pennsylvania,*
381 F.3d 202 (3d Cir. 2004) (Alito, J.) ..................................................... 46, 47

*Blum v. Gulf Oil Corp.,*
597 F.2d 936 (5th Cir. 1979) ........................................................................ 23

*Burwell v. Hobby Lobby Stores, Inc.,*
134 S. Ct. 2751 (2014) ......................................................................... *passim*

*Cal. Democratic Party v. Jones,*
530 U.S. 567 (2000) ..................................................................................... 37

*Cannon v. Univ. of Chi.,*
441 U.S. 677 (1979) ......................................................................... 3, 20, 24

*Cape May Greene, Inc. v. Warren,*
698 F.2d 179 (3d Cir. 1983) ......................................................................... 33

*Chamber of Commerce of United States of Am. v. U.S.*
*Dep't of Labor*, 885 F.3d 360 (5th Cir. 2018) ........................................... 49

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ............................................................................ *passim*

*City of Arlington v. F.C.C.,*
569 U.S. 290 (2013) ..................................................................................... 15

*City of Boerne v. Flores,*
521 U.S. 507 (1997) ................................................................................ 37, 48

*Contender Farms, L.L.P. v. U.S.D.A.,*
779 F.3d 258 (5th Cir. 2015) .................................................................. 16, 17

*Corley v. United States,*
556 U.S. 303 (2009) ..................................................................................... 29

*Dresser-Rand Co. v. Virtual Automation Inc.,*
361 F.3d 831 (5th Cir. 2004) ........................................................................ 49

iv

*EEOC v. Abercrombie & Fitch Stores, Inc.,*
    135 S. Ct. 2028 (2015) ....................................................................................32

*EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.,*
    884 F.3d 560 (6th Cir. 2018) .......................................................................*passim*

*Elrod v. Burns,*
    427 U.S. 347 (1976) .......................................................................................50

*Emp't Div. v. Smith,*
    494 U.S. 872 (1990) ...................................................................33, 44, 46, 48

*Etsitty v. Utah Transit Auth.,*
    502 F.3d 1215 (10th Cir. 2007) ................................................................17, 22

*Evans v. Ga. Regional Hosp.,*
    850 F.3d 1248 (11th Cir. 2017) .....................................................................26

*FDA v. Brown & Williamson,*
    529 U.S. 120 (2000) ..................................................................................33, 34

*Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,*
    170 F.3d 359 (3d Cir. 1999)...........................................................................45

*Gonzales v. O Centro Espirita Beneficente Uniao,*
    546 U.S. 418 (2006) ..................................................................................35, 44

*G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.,*
    822 F.3d 709 (4th Cir. 2016) .........................................................................17

*Harmon v. Thornburgh,*
    878 F.2d 484 (D.C. Cir. 1989).......................................................................49

*Harris v. McRae,*
    448 U.S. 297 (1980) .......................................................................................43

*Hively v. Ivy Tech Cmty. Coll.,*
    853 F.3d 339 (7th Cir. 2017) (en banc) .....................................................*passim*

*Hobby Lobby Inc., v. Sebelius,*
    723 F.3d 1114 (10th Cir. 2013) .....................................................................50

*Holt v. Hobbs,*
    135 S. Ct. 853 (2015) ....................................................................................42

*I.R.S., Fresno Serv. Ctr. v. FLRA,*
    706 F.2d 1019 (9th Cir. 1983) .......................................................................33

*Johnston v. Univ. of Pittsburgh of Com. Sys.*
  *of Higher Educ.*, 97 F. Supp. 3d 657 (W.D. Pa. 2015) ................................. 17, 22, 26

*Kennedy v. Bremerton Sch. Dist.,*
  No. 18-12, 2019 WL 272131 (U.S. Jan. 22, 2019) ......................................... 44, 48

*King v. Burwell,*
  135 S. Ct. 2480 (2015) ................................................................................. 33, 34

*Korte v. Sebelius,*
  735 F.3d 654 (7th Cir. 2013) ............................................................................... 49

*Merced v. Kasson,*
  577 F.3d 578 (5th Cir. 2009) ........................................................................ 38, 41

*N. Haven Bd. of Educ. v. Bell,*
  456 U.S. 512 (1982) ................................................................................... 3, 19, 20

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers,*
  145 F.3d 1399 (D.C. Cir. 1998) ........................................................................... 49

*New Prime Inc. v. Oliveira,*
  139 S. Ct. 532 (2019) ............................................................................... 16, 24, 28

*Oglala Sioux Tribe of Indians v. Andrus,*
  603 F.2d 707 (8th Cir. 1979) ............................................................................... 33

*Opulent Life Church v. City of Holly Springs, Miss.,*
  697 F.3d 279 (5th Cir. 2012) ............................................................................... 50

*Pederson v. La. State Univ.,*
  213 F.3d 858 (5th Cir. 2000) ......................................................................... 3, 20

*Pennhurst State Sch. & Hosp. v. Halderman,*
  451 U.S. 1 (1981) ................................................................................................. 34

*Perrin v. United States,*
  444 U.S. 37 (1979) ............................................................................................... 16

*Price Waterhouse v. Hopkins,*
  490 U.S. 228 (1989) ............................................................................... 24, 25, 26, 27

*R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*
  (U.S. Oct. 24, 2018) ..................................................................................... *passim*

*RTM Media, L.L.C. v. City of Houston,*
  518 F. Supp. 2d 866 (S.D. Tex. 2007) ................................................................. 50

*Sherbert v. Verner,*
   374 U.S. 398 (1963) ............................................................................................ 46

*Sommers v. Budget Mktg., Inc.,*
   667 F.2d 748 (8th Cir. 1982) ............................................................................ 17

*South Dakota v. Dole,*
   483 U.S. 203 (1987) ............................................................................................ 34

*Sweet v. Mulberry Lutheran Home,*
   No. IP02-0320-C-H/K, 2003 WL 21525058
   (S.D. Ind. June 17, 2003) .................................................................................. 17

*Tagore v. United States,*
   735 F.3d 324 (5th Cir. 2013) ............................................................................ 41

*Texas Pipeline Association v. FERC,*
   661 F.3d 258 (5th Cir. 2011) ............................................................................ 29

*Texas v. United States,*
   201 F. Supp. 3d 810 (N.D. Tex. Aug. 21, 2016) ....................................... 6, 17

*Ulane v. E. Airlines, Inc.,*
   742 F.2d 1081 (7th Cir. 1984) .......................................................................... 17

*United States v. Virginia,*
   518 U.S. 515 (1996) ............................................................................................ 20

*Util. Air Regulatory Grp. v. EPA,*
   573 U.S. 302 (2014) ............................................................................................ 34

*VRC LLC v. City of Dallas,*
   460 F.3d 607 (5th Cir. 2006) ............................................................................ 49

*Walters v. Metro. Educ. Enters., Inc.,*
   519 U.S. 202 (1997) ............................................................................................ 22

*Whitaker by Whitaker v. Kenosha Unified Sch. Dist.*
   No. 1 Bd. of Educ.,* 858 F.3d 1034 (7th Cir. 2017) ........................... 23, 24, 26, 27

*Wisconsin Cent. Ltd. v. United States,*
   138 S. Ct. 2067 (2018) ....................................................... 16, 23, 24, 28

*Zabel v. Tabb,*
   430 F.2d 199 (5th Cir. 1970) ............................................................................ 33

*Zarda v. Altitude Express, Inc.,*
   883 F.3d 100 (2d Cir. 2018) ...................................................................... 23, 27

**Statutes**

5 U.S.C. § 706 ................................................................................................15, 49

18 U.S.C. § 249 .................................................................................................3, 21

20 U.S.C. § 1681 ............................................................................................ *passim*

20 U.S.C. § 1686 ...................................................................................................20

20 U.S.C. § 1688 ...............................................................................................9, 31

29 U.S.C. § 794 ..................................................................................................15b

34 U.S.C. § 12291 .............................................................................................3, 21

42 U.S.C. § 238n ..................................................................................................40

42 U.S.C. § 300a-7 ...............................................................................................40

42 U.S.C. § 1395 ..................................................................................................40

42 U.S.C. § 2000bb ..................................................................................35, 42, 48

42 U.S.C. § 2000d ................................................................................................15

42 U.S.C. § 2000e ................................................................................................32

42 U.S.C. § 6101 ..................................................................................................15

42 U.S.C. § 18023 ................................................................................................42

42 U.S.C. § 18116 .......................................................................................... *passim*

**Regulations**

24 C.F.R. Pt. 106.....................................................................................................4

29 C.F.R. § 1604.2..................................................................................................4

38 C.F.R. § 17.38..................................................................................................41

45 C.F.R. § 92.4.............................................................................................. *passim*

45 C.F.R. § 92.101.......................................................................................... *passim*

45 C.F.R. § 92.207............................................................................................8, 12

45 C.F.R. § 92.301....................................................................................9, 36, 37

118 Cong. Rec. 5808 (1972) ............................................................... 19

44 Fed. Reg. 71413 (Dec. 11, 1979) ......................................... 4, 19, 20

77 Fed. Reg. 5662 (Feb. 3, 2012) ....................................................... 5

79 Fed. Reg. 42971 (July 21, 2014) .................................................... 5

81 Fed. Reg. 31376 (May 18, 2016) ............................................. *passim*

**Legislative Materials**

Consolidated and Further Continuing Appropriations
   Act 2015, Pub. L. 114-53, Div. G, § 507(d) (Dec. 16, 2015) .................... 40

Health Care and Education Reconciliation Act of 2010,
   Pub. L. No. 111-152 (March 30, 2010) ...................................... 3

H.R. XXIII(9), 116th Cong. (2019) ................................................. 21

H.R. 166, 94th Cong. (1975) ........................................................ 21

H.R. 1652, 113th Cong. (2013) .................................................. 3, 21

H.R. 2015, 110th Cong. (2007) .................................................. 3, 21

H.R. 2074, 96th Cong. (1979) ...................................................... 21

H.R. 2282, 115th Cong. (2017) ..................................................... 21

H.R. 2981, 111th Cong. (2009) .................................................. 3, 21

H.R. 3185, 114th Cong. (2015) .................................................. 3, 21

H.R. 4636, 103rd Cong. (1994) ..................................................... 21

H.R. 14752, 93rd Cong. (1974) ..................................................... 21

Patient Protection and Affordable Care Act,
   Pub. L. No. 111-148 (March 23, 2010) ...................................... 3

S. 439, 114th Cong. (2015) ..................................................... 3, 21

S. 811, 112th Cong. (2011). .................................................... 3, 21

S. 1006, 115th Cong. (2017) ....................................................... 21

S. 1858, 114th Cong. (2015) .................................................... 2, 21

S. 2081, 96th Cong. (1979). ....................................................... 21

ix

**Other Authorities:**

9 Oxford English Dictionary 578 (1961) ........................................................................17

9 Wright & Miller, *Federal Practice & Procedure*
  § 2362 (3d ed. 2018 update) .................................................................................44

American Heritage Dictionary 1187 (1976) ...........................................................2, 17

Civil Rights, *Questions and Answers on Title IX and
  Sexual Violence* (2014),........................................................................................5

Complaint, *Dovel v. Pub. Library of Cincinnati and
  Hamilton Cty.*, No. 16-955 (S.D. Ohio Sept. 26, 2016)........................................37

Complaint, *Prescott v. Rady Children's Hosp. - San Diego*,
  No. 16-2408 (S.D. Cal. Sept. 26, 2016) ...............................................................37

Complaint, *Robinson v. Dignity Health*, No. 16-3035
  N.D. Cal. June 6, 2016), ..........................................................................................

Council for Christian Colleges & Universities, Comment Letter
  on Proposed Rule (Nov. 9, 2015) .........................................................................29

Dear Colleague Letter on Harassment and Bullying from
  Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't
  of Educ., Office for Civil Rights (Oct. 26, 2010) ...................................................5

Def.'s Post-Trial Br., *Schroer v. Billington*, 577 F. Supp. 2d 293
  (D.D.C. 2008) .........................................................................................................4

Dep't of Veterans Affairs, VHA Directive 1341, Providing Health Care for
  Transgender and Intersex Veterans 1 (May 23, 2018) .....................................41-42

Richard Elkins & Dave King, *The Transgender
  Phenomenon* 82 (2006)..........................................................................................19

David Haig, *The Inexorable Rise of Gender and the Decline
  of Sex: Social Change in Academic Titles, 1945–2001*,
  Archives of Sexual Behav. (Apr. 2004) ................................................................18

Health.mil, *Beneficiary Population Statistics*, https://www.health.mil/I-Am-
  A/Media/Media-Center/Patient-Population-Statistics...........................................45

Human Rights, *Legal Enforcement Guidance on Discrimination
  on the Basis of Gender Identity or Expression* 2 (Dec. 2018) .............................19

Institute of Medicine of the National Academies, The Health of
    Lesbian, Gay, Bisexual and Transgender People: Building a
    Foundation for Better Understanding, 264 (2011) ............................... 40

Catherine E. Lhamon, Assistant Sec'y for Civil Rights,
    U.S. Dep't of Educ., Office for Civil Rights, *Questions
    and Answers on Title IX and Sexual Violence* (2014) ........................... 5

Letter from Jocelyn Samuels, Dir., Office for
    Civil Rights, Dep't of Health & Human Servs.,
    to Catherine W. Short, et al. (June 21, 2016) ...................................... 31

Michael W. McConnell, *Free Exercise Revisionism and
    the Smith Decision*, 57 U. Chi. L. Rev. 1109, 1111 (1990).................... 48

Medicare & Medicaid Services, *Decision Memo for Gender
    Dysphoria and Gender Reassignment Surgery* (Aug. 30, 2016) ........... 39

Medicare & Medicaid Services, *Proposed Decision Memo
    for Gender Dysphoria and Gender Reassignment Surgery*
    (June 2, 2016) ..................................................................................... 38

Mem. from the Attorney General on Revised Treatment
    of Transgender Employment Discrimination Claims Under
    Title VII of the Civil Rights Act of 1964 (Oct. 4, 2017)......................... 6

Mem. from the Attorney General on Treatment of
    Transgender Employment Discrimination Claims
    Under Title VII of the Civil Rights Act of 1964 (Dec. 15, 2014)............. 5

Mem. from James Mattis, Sec'y of Def., on Military
    Service by Transgender Individuals (Feb. 22, 2018) ............................. 39

Mem. from Karen S. Guice, Acting Assistant Sec'y
    of Def. to Assistant Sec'y of the Army, et al., Subject:
    Guidance for Treatment of Gender Dysphoria for Active
    and Reserve Component Service Members 2-3 (July 29, 2016)............... 41

Merriam-Webster's Collegiate Dictionary (11th ed. 2014)........................... 19

Joanne Meyerowitz, *A History of "Gender,"* 113 .......................................... 18

New Oxford American Dictionary 721-22, 1600 (3d ed. 2010)...................... 18

NYC Comm'n on Human Rights, *Legal Enforcement
    Guidance on Discrimination on the Basis of Gender
    Identity or Expression* 2 (Dec. 2018) .................................................. 19

Press Release, Shantae Goodloe, U.S. Dep't of Hous. and
    Urban Dev., HUD No. 10-139, *HUD Issues Guidance on
    LGBT Housing Discrimination Complaints* (July 1, 2010) .................................................... 4

Virginia Prince, *Change of Sex or Gender*, 10 Transvestia 53 (1969) ........................................ 19

Sari L. Reisner et al., *"Counting" Transgender and
    Gender-Nonconforming Adults in Health Research
    in* Transgender Stud. Q (Feb. 2015) ...................................................................................... 18

Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of
    Fed. Contract Compliance Pro- grams, Directive 2014-02,
    Gender Identity and Sex Discrimination (2014) .................................................................... 5

Lena H. Sun & Lenny Bernstein, U.S. Moves to Protect Women,
    Transgender People in Health Care, Washington Post, Sept. 3, 2015 ................................ 22

*Trans Health Clinics*, TransHealth.com,
    http://www.trans-health.com/clinics/ .................................................................................. 43

"Transgender," Google Books Ngram Viewer, goo.gl/ELud7A .................................................... 18

TRICARE Policy Manual 6010.57-M ......................................................................................... 41

U.S. Dep't of Educ., Dear Colleague Letter Withdrawing
    Title IX Guidance on Transgender Students, February 22, 2017 .......................................... 6

U.S. Dep't of Justice and U.S. Dep't of Educ.,
    Dear Colleague Letter on Transgender Students,
    May 13, 2016 .......................................................................................................................... 6

United States Conference of Catholic Bishops, et al.,
    Comment Letter on Proposed Rule (Nov. 6, 2015) ......................................................... 29, 31

Webster's Third New Int'l Dictionary 2081 (1971) ..................................................................... 17

## INTRODUCTION

This lawsuit challenges a Rule issued by the Department of Health and Human Services ("HHS") that seeks to override the medical judgment of healthcare professionals across the country. On pain of massive financial liability, the Rule forces doctors and hospitals to perform controversial and potentially harmful medical procedures that purport to permanently alter an individual's sex—even when doing so would violate a doctor's religious beliefs and medical judgment, and even when the government's own programs exclude the procedures as potentially harmful.

HHS attempts to impose this dramatic mandate by redefining a single word in Title IX of the Education Amendments of 1972: "sex." For decades, Congress has consistently used "sex" to refer to an individual's status as male or female, as determined by biological sex at birth. But in the Rule, HHS redefines "sex" to include an individual's "gender identity," which it defines as "an individual's internal sense of gender, which may be male, female, neither, or a combination of male and female, and which may be different from an individual's sex assigned at birth." 45 C.F.R. § 92.4. HHS then claims that it is "discrimination" on the basis of "sex" to decline to perform gender transition procedures. Thus, with a single stroke of the pen, HHS has created massive new liability for thousands of doctors unless they cast aside their medical judgment and perform procedures that can be harmful to their patients.

The Rule ought to be short-lived, because it cannot withstand even the slightest judicial scrutiny. As this Court already concluded at the preliminary-injunction stage, HHS's attempt to redefine "sex" and force doctors and hospitals to disregard their religious beliefs violates both the Administrative Procedure Act and the Religious Freedom Restoration Act. ECF No. 62 at 2. As explained below, it also violates the Free Exercise Clause. HHS's case hasn't gotten any stronger since this Court issued a preliminary injunction. To the contrary, the government has *embraced* this

Court's view: it is now the position of "the United States" that "the ordinary mean-ing of 'sex'" in federal nondiscrimination law "does not refer to gender identity." Br. in Opp'n, *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC,* at 16-18, 21 (U.S. Oct. 24, 2018) (No. 18-107). The government's new position—which was its longstanding position before issuing the Rule—is the right one. The Court should grant partial summary judgment and make its preliminary injunction permanent.

## STATEMENT OF FACTS

The Rule at issue in this case prohibits discrimination on the basis of "sex" in certain health activities. 45 C.F.R. § 92.101(a)(1). It defines "sex" to include, among other things, "gender identity." *Id.* § 92.4. The purported authority for the Rule is Section 1557 of the Affordable Care Act ("ACA"), which prohibits discrimination in various health activities "on the ground prohibited under . . . ***title IX*** of the Educa-tion Amendments of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a) (emphasis added). Title IX, in turn, prohibits discrimination in education on the basis of "sex." 20 U.S.C. § 1681(a). Because the purported authority for the Rule ultimately de-rives from the use of the word "sex" in Title IX, we begin there.

### A. Title IX

Congress enacted Title IX in 1972, prohibiting discrimination in federally funded education programs on the basis of "sex." 20 U.S.C. § 1681(a). When the law passed, the term "sex" was commonly understood to refer to the physiological differences be-tween men and women, particularly with respect to their reproductive functions. *See, e.g.*, American Heritage Dictionary 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions."). That under-standing is reflected throughout the statute, which requires equal treatment with respect to two different "sexes"—male and female. *See, e.g.*, 20 U.S.C. § 1681(a)(8) (requiring comparable activities between students of "one sex" and "the other sex");

20 U.S.C. § 1681(a)(2) (same usage regarding admissions). The law has long been interpreted to prohibit federally funded education programs from treating men better than women, or vice versa. *See, e.g.*, *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 530 (1982); *Cannon v. Univ. of Chi.*, 441 U.S. 677, 680 (1979); *Pederson v. La. State Univ.*, 213 F.3d 858, 880 (5th Cir. 2000).

## B. Attempts to Add Protection for "Gender Identity"

Since 1972, Congress has considered a variety of proposals to add new statutory protections based on "gender identity." These include many attempts to amend both Title VII and Title IX to add protections for "gender identity."[1] And they include attempts that were pending in Congress at the time the Rule was promulgated that would have done precisely what the Rule purports to do—prohibit discrimination in federally funded programs on the basis of "gender identity." H.R. 3185, 114th Cong. (2015); S. 1858, 114th Cong. (2015). To date, almost all of these proposals have failed. But two have succeeded. First, in 2010, Congress enacted hate crimes legislation providing enhanced penalties for crimes motivated by "gender identity." 18 U.S.C. § 249(a)(2). Second, in 2013, Congress reauthorized the Violence Against Women Act, prohibiting discrimination in certain funding programs on the basis of "sex" and—separately—"gender identity." 34 U.S.C. § 12291(b)(13)(A).

## C. The Affordable Care Act

Against this backdrop, in March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148 (March 23, 2010), and the Health Care and Education Reconciliation Act of 2010, Pub. L. No. 111-152 (March 30, 2010), collectively known as the "Affordable Care Act." The key provision at issue in this case, Section 1557, does not use the term "sex"; instead, it prohibits discrimination "on the

---

[1] *See, e.g.*, H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011); H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).

ground prohibited under . . . title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a). Nothing in the nearly 1,000 pages of text of the Affordable Care Act mentions "gender identity."

### D. Executive Branch Changes

Federal agencies have also long considered the meaning of the term "sex." For several decades, across many statutes, agencies consistently interpreted "sex" to refer to physiological differences between males and females.[2] As late as 2008, the U.S. Department of Justice was still arguing that "the term 'sex' . . . prohibits discrimination based on the biological state of a male or female," and that "a claim based on gender identity or transsexuality fails as outside the scope of [the term 'sex']." Def.'s Post-Trial Br. at 4, *Schroer v. Billington*, 577 F. Supp. 2d 293 (D.D.C. 2008) (No. 05-01090). No agency, to our knowledge, interpreted "sex" to include "gender identity" before 2010.

But in 2010, several months *after* enactment of the Affordable Care Act, federal agencies issued a rash of letters, memos, executive orders, and regulations interpreting prohibitions on "sex" discrimination to include protections for "gender identity":

- In July 2010, the Department of Housing and Urban Development ("HUD") announced what it called "a new policy" of "treat[ing] gender identity discrimination . . . as gender discrimination under the Fair Housing Act."[3]

- In October 2010, the Office for Civil Rights ("OCR") for the Department of Education ("DOE") issued a "Dear Colleague" letter asserting that, "[w]hen students

---

[2] *See, e.g.*, A Policy Interpretation: Title IX & Intercollegiate Athletics, 44 Fed. Reg. 71413 (Dec. 11, 1979) (listing "male and female" 28 times, "men and women" 24 times, and "men's and women's" 21 times); EEOC Guidelines on Discrimination Because of Sex, 29 C.F.R. § 1604.2 ("Label—'Men's jobs' and 'Women's jobs'—tend to deny employment opportunities unnecessarily to one sex or the other."); Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 24 C.F.R. Pt. 106 (addressing expenditures for male and female teams).

[3] Press Release, Shantae Goodloe, U.S. Dep't of Hous. and Urban Dev., HUD No. 10-139, *HUD Issues Guidance on LGBT Housing Discrimination Complaints* (July 1, 2010), https://archives.hud.gov/news/2010/pr10-139.cfm.

are subjected to harassment on the basis of their LGBT status, they may also . . . be subjected to forms of sex discrimination prohibited under Title IX."[4]

- In February 2012, HUD issued a regulation forbidding discrimination on the basis of "gender identity" in HUD-assisted or insured housing.[5]

- In April 2014, OCR issued "Questions and Answers" stating that "Title IX's sex discrimination prohibition extends to claims of discrimination based on gender identity."[6]

- In July 2014, President Obama amended a 50-year-old executive order by adding "gender identity" to a list of prohibited bases of discrimination in federal contracting.[7]

- In August 2014, the Department of Labor issued a Directive stating that "discrimination based on gender identity or transgender status . . . is discrimination based on sex."[8]

- In December 2014, the Department of Justice ("DOJ") issued a memo concluding that Title VII's reference to "sex" "encompasses discrimination based on gender identity, including transgender status."[9]

- In May 2016, DOJ and DOE issued a "Dear Colleague Letter" stating that Title IX's prohibition on "sex discrimination . . . encompasses discrimination based on

---

[4] Dear Colleague Letter on Harassment and Bullying from Russlynn Ali, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights (Oct. 26, 2010), http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.

[5] Equal Access to Housing in HUD Programs Regardless of Sexual Orientation or Gender Identity, 77 Fed. Reg. 5662 (Feb. 3, 2012), https://www.federalregister.gov/documents/2012/02/03/2012-2343/equal-access-to-housing-in-hud-programs-regardless-of-sexual-orientation-or-gender-identity.

[6] Catherine E. Lhamon, Assistant Sec'y for Civil Rights, U.S. Dep't of Educ., Office for Civil Rights, *Questions and Answers on Title IX and Sexual Violence* (2014), http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

[7] Exec. Order No. 13,672, 79 Fed. Reg. 42,971 (July 21, 2014), https://www.gpo.gov/fdsys/pkg/FR-2014-07-23/pdf/2014-17522.pdf.

[8] Patricia A. Shiu, Director, U.S. Dep't of Labor, Office of Fed. Contract Compliance Programs, Directive 2014-02, Gender Identity and Sex Discrimination (2014), www.dol.gov/ofccp/regs/compliance/directives/dir2014_02.html.

[9] Mem. from the Attorney General on Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Dec. 15, 2014) at 2, https://www.justice.gov/file/188671/download.

a student's gender identity."[10] None of these agency actions involved a statute that used the term "gender identity."

Federal agencies' change in position on this question, however, has proven to be fleeting. In February 2017, DOJ and DOE withdrew the May 2016 "Dear Colleague Letter," explaining that the letter does not "explain how [its] position is consistent with the express language of Title IX" and citing this Court's holding in *Texas v. United States*, 201 F. Supp. 3d 810 (N.D. Tex. Aug. 21, 2016), that "the term 'sex' unambiguously refers to biological sex."[11] In October 2017, the Attorney General issued a memorandum stating that "Title VII's prohibition on sex discrimination . . . does not encompass discrimination based on gender identity *per se*."[12] And in litigation now before the Supreme Court, DOJ and EEOC have explained that in the view of "the United States," "the ordinary meaning of 'sex' does not refer to gender identity." Br. in Opp'n, *R.G. & G.R. Harris Funeral Homes, Inc. v. EEOC*, at 16-18, 21 (U.S. Oct. 24, 2018) (No. 18-107).

### E.  The Rule

On May 18, 2016, HHS issued the final Rule at issue here. The Rule applies to any "entity that operates a health program or activity, any part of which receives Federal financial assistance." 45 C.F.R. § 92.4 (definition of "Covered entity"). "Federal financial assistance" is defined broadly to include "any grant, loan, credit, sub-

---

[10] U.S. Dep't of Justice and U.S. Dep't of Educ., Dear Colleague Letter on Transgender Students, May 13, 2016, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf.

[11] U.S. Dep't of Justice and U.S. Dep't of Educ., Dear Colleague Letter Withdrawing Title IX Guidance on Transgender Students, February 22, 2017, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

[12] Mem. from the Attorney General on Revised Treatment of Transgender Employment Discrimination Claims Under Title VII of the Civil Rights Act of 1964 (Oct. 4, 2017) at 1, https://www.justice.gov/ag/page/file/1006981/download.

sidy, contract . . . or any other arrangement" by which the Federal Government makes available its property or funds. *Id.* Thus, by HHS's own estimate, the Rule applies to almost every health care provider in the country—including over 133,000 health care facilities (such as hospitals and health clinics) and "almost all licensed physicians" totaling "over 900,000"—because they all accept some form of federal funding, whether through Medicare and Medicaid or otherwise. Nondiscrimination in Health Programs and Activities, 81 Fed. Reg. 31376, 31445-31446 (May 18, 2016) (codified at 45 C.F.R. Pt. 92).

The Rule prohibits discrimination "on the basis of sex," defining "sex" to include "gender identity," and defining "gender identity" as an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." 45 C.F.R. § 92.101(a)(1), § 92.4. The Rule states that the "gender identity spectrum includes an array of possible gender identities beyond male and female," and "individuals with non-binary gender identities are protected under the rule." 81 Fed. Reg. at 31392, 31384. The Rule also defines "sex" to include discrimination based upon "termination of pregnancy." 45 C.F.R. § 92.4.

### 1. Medical Procedures

The Rule has several important consequences. First, it requires covered entities to perform medical transition procedures or else be liable for "discrimination." The Rule explains: "A provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31455.

In other words, if a gynecologist performs a hysterectomy for a woman with uterine cancer, she must do the same for a woman who wants to remove a healthy uterus to transition to living as a man. According to the Rule, a hysterectomy for a transgender man is "medically necessary" if "a patient's provider says [it] is medi-

cally necessary to treat gender dysphoria." *Id.* at 31429. Thus, declining to remove a healthy organ becomes "discrimination." HHS explains that this reasoning applies across the full "range of transition-related services." *Id.* at 31435-31436. This "is not limited to surgical treatments and may include, but is not limited to, services such as hormone therapy and psychotherapy, which may occur over the lifetime of the individual." *Id.*

In addition, because the Rule prohibits discrimination based on "termination of pregnancy," it pressures healthcare providers who perform procedures such as a dilation and curettage for a miscarriage to perform the same procedure for an abortion. *See* 81 Fed. Reg. at 31455; *see also* App. 10.

### 2. Insurance Coverage

The Rule also requires covered entities to pay for medical transition procedures in their health insurance plans. The Rule states: "A covered entity shall not, in providing or administering health-related insurance . . . [h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition." 45 C.F.R. § 92.207(b)(4). According to HHS, categorizations of all transition-related treatment as cosmetic or experimental are now "outdated and not based on current standards of care." 81 Fed. Reg. at 31429. Thus, a plan excluding "coverage for all health services related to gender transition is unlawful on its face." 81 Fed. Reg. at 31429. In addition, if a doctor concludes that a hysterectomy "is medically necessary to treat gender dysphoria," the patient's employer would be required to cover that procedure on the same basis that it would cover a hysterectomy for other conditions (like cancer). *Id.* at 31429. Also, because the new Rule prohibits discrimination based on "termination of pregnancy," it pressures employers who provide insurance coverage for procedures such as a dilation and curettage for a miscarriage to cover the same procedure for an abortion. *See* 81 Fed. Reg. at 31429.

### 3. Enforcement

If a covered entity violates the Rule, it is subject to the same penalties that accompany a violation of Title IX. 45 C.F.R. § 92.301. These include the loss of federal funding (which, in the case of Medicare and Medicaid, can total many millions of dollars), debarment from doing business with the government, and false claims liability. 81 Fed. Reg. at 31472; 45 C.F.R. § 92.301. Penalties also include enforcement proceedings brought by the Department of Justice, 81 Fed. Reg. at 31440, and private lawsuits for damages and attorneys' fees. *Id.* at 31471; 45 C.F.R. § 92.301.

### 4. No Exemptions for Conscience or Medical Judgment

The Rule includes no religious exemptions or exemptions related to abortion—even though Title IX includes both. Title IX's prohibition on sex discrimination includes a broad exemption stating that Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681. Likewise, Title IX provides that its prohibition on sex discrimination shall not be "construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688. Section 1557 refers to the whole of Title IX, incorporating "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)." 42 U.S.C. § 18116(a). Yet in interpreting the prohibition on "sex" discrimination in the Rule, HHS declined to incorporate these exemptions.

Nor does the Rule include an exemption protecting a doctor's medical judgment about gender transition services. To the contrary, the Rule states that if a healthcare professional holds the medical view that "transition-related treatment" is "experimental," under the Rule such a view is "now recognized as outdated and not based on current standards of care." 81 Fed. Reg. at 31429.

9

### F. Plaintiffs

#### 1. Franciscan

Franciscan Alliance, Inc., is a Roman Catholic nonprofit hospital system founded by a Catholic order, the Sisters of St. Francis of Perpetual Adoration. App. 3. Specialty Physicians is a member-managed limited liability company, of which Franciscan is the sole member (collectively, "Franciscan"). App. 4. "All of Franciscan's healthcare services, and all of Franciscan's physicians and employees, follow the values of the Sisters of St. Francis." App. 6. As part of its religious practices, Franciscan provides extensive medical services for the elderly, poor, and disabled. App. 3-4, 14. Many of those patients rely upon Medicare and Medicaid, and "Franciscan provides approximately 900 million dollars in Medicare and Medicaid services annually." App. 14.

Franciscan's religious beliefs require it to treat every person with compassion and respect. App. 6, 8. Franciscan also follows The Ethical and Religious Directives for Catholic Healthcare Services, issued by the U.S. Conference of Catholic Bishops. App. 7. As part of its religious practices, Franciscan is committed to caring for transgender individuals with compassion and respect, and in accordance with both its medical judgment and religious beliefs, it does not participate in medical transition procedures. App. 6-10. As a reflection of its medical judgment and religious beliefs, Franciscan developed its Sex Reassignment Interventions Policy, which states: "Sexual reassignment interventions require a complex set of psychological, psychiatric and ancillary care services that are not available at Franciscan Alliance facilities. Therefore, it would be medically imprudent to perform or otherwise facilitate any clinical interventions addressing sexual re-assignment needs. To provide or otherwise facilitate these services would also violate our deeply held religious beliefs." App. 16. Also in keeping with its Catholic religious beliefs, Franciscan does not provide abortions or elective sterilizations. App. 8.

### 2. CMDA

Plaintiff the Christian Medical & Dental Society is an Illinois non-profit corporation doing business as the Christian Medical & Dental Associations. CMDA "exists to glorify God by motivating, educating and equipping Christian healthcare professionals and students." App. 19. CMDA members sign a statement of faith to join CMDA and allow CMDA to serve as a voice for membership values. App. 20. One of CMDA's major priorities is the adoption of ethical guidelines reflecting the beliefs of its members. App. 20. CMDA's House of Delegates unanimously adopted an ethics statement on gender transitions. As explained in that statement, "CMDA affirms the obligation of Christian healthcare professionals to care for patients struggling with gender identity with sensitivity and compassion. CMDA holds that attempts to alter gender surgically or hormonally for psychological indications . . . are medically inappropriate, as they . . . are unsupported by the witness of Scripture, and are inconsistent with Christian thinking on gender in every prior age. Accordingly, CMDA opposes medical assistance with gender transition." App. 28. CMDA members share these beliefs. App. 20, 463-64.

### 3. State Plaintiffs

The States of Texas, Wisconsin, Nebraska, Kentucky, Kansas, Louisiana, Arizona, and Mississippi have promulgated laws and standards demonstrating their sovereign interest in the practice of medicine within their borders. They also operate their own healthcare programs that receive federal funds and employ thousands of healthcare employees through their constituent agencies.

### G. The Effect of the Rule

The new Rule affects the Plaintiffs in multiple ways.

### 1. Franciscan

Franciscan provides hysterectomies to treat cancer and other diseases but not for gender transition. App. 9-10. Under the Rule, Franciscan will be required "to revise

its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31455. Similarly, Franciscan's hospitals provide services such as a dilation and curettage to women who have suffered a miscarriage. App. 10. Under the Rule, Franciscan and its physicians are pressured to provide the same service to women seeking an abortion. 45 C.F.R. § 92.4 (banning discrimination based on termination of pregnancy). Franciscan hospitals and physicians also offer endocrinology services, mastectomies, and psychiatric support. App. 9. The Rule would force Franciscan to offer these services as part of a medical transition, which would violate Franciscan's medical judgment and its religious beliefs.

As part of its religious practices, Franciscan also provides its employees with health benefits. App. 11. Like its other operations, Franciscan's health benefits are operated in accordance with its religious beliefs. *Id.* In accordance with those beliefs, Franciscan's benefits plan specifically excludes coverage for any "[t]reatment, drugs, medicines, services, and supplies related to gender transition," as well as sterilizations and abortions. *Id.* Franciscan sincerely believes that providing coverage for these procedures would harm its employees and violate its religious beliefs. App. 11. Under the Rule, however, that plan is illegal. 81 Fed. Reg. at 31472; 45 C.F.R. § 92.207(b)(4)-(5). Unless Franciscan denies its faith, it faces enforcement actions, private lawsuits, and the loss of hundreds of millions in Medicare and Medicaid payments, which would destroy its ability to carry out its religious mission to serve the poor, disabled, and elderly. App. 13-14.

## 2. CMDA

CMDA members are in the same untenable position as Franciscan. Many CMDA members are subject to the Rule because they receive federal funds and provide medical services such as hysterectomies and endocrinology services or provide insurance coverage to their employees. App. 22-23. If CMDA members such as Dr. Hoffman

adhere to their religious beliefs or follow their best medical judgment, they are subject to crippling financial penalties. App. 463-66.

### 3. State Plaintiffs

The new Rule also harms the States. Because the States provide medical care at state-run facilities, they will be required to provide medical transition procedures, even when their doctors believe such procedures are harmful. If their doctors have a religious objection to performing those procedures, the Rule makes it illegal for the States to accommodate those doctors' religious beliefs, even though Title VII would otherwise require them to do so. ECF Nos. 23 at 2, 25 at 11-12. The Rule also compels the States to provide insurance coverage for medical transition procedures and abortion procedures at significant financial cost. ECF No. 56 at 12-13. It imposes significant training costs, which HHS estimates will be $17.8 million in the first two years of implementation alone. 81 Fed. Reg. at 31463, 31464. And if the States do not comply, they face massive financial penalties. Texas, for example, faces the loss of over $42.4 billion a year in healthcare funding to serve its most vulnerable citizens. Finally, the Rule would subject Texas and other States to private lawsuits for damages and attorneys' fees, even though these States never waived their sovereign immunity.

### H. Procedural History

Plaintiffs filed this lawsuit in August 2016. ECF No. 1. In October 2016, Plaintiffs moved for summary judgment, or, in the alternative, for a preliminary injunction. ECF Nos. 22, 24. On December 31, 2016, this Court preliminarily enjoined the Rule. ECF No. 62. The Court concluded that because the meaning of the word "sex" in Title IX—and thus, in Section 1557—"unambiguously refers to the biological and anatomical differences between male and female [persons] as determined at their birth," HHS likely violated the Administrative Procedure Act ("APA") by interpret-

ing it to include "gender identity." *Id.* at 28-34 (internal quotation marks omitted). The Court also concluded that the Rule likely violated the Religious Freedom Restoration Act ("RFRA") by "plac[ing] substantial pressure on [Franciscan and CMDA] to perform and cover transition and abortion procedures" without being narrowly tailored to a compelling government interest. *Id.* at 38-42. The Court did not reach Plaintiffs' requests for summary judgment, "giv[ing] priority" to the motions for preliminary injunction because of the Rule's fast-approaching effective date. ECF No. 21 at 4; *see also* ECF No. 62 at 3-4.

As this Court anticipated in its preliminary-injunction order, no factual disputes developed on the claims on which the Court based its injunction. *See* ECF No. 62 at 21-22 (this case "involves primarily questions of law"; "no further factual development would aid resolution of the case"). So in March 2017, Plaintiffs again moved for summary judgment on their APA and RFRA claims. ECF No. 82. In response, HHS did not attempt to defend the Rule on the merits. Instead, it moved for a "stay" of the litigation and a "voluntary remand" to "reconsider" "the reasonableness, necessity, and efficacy of the two aspects of the regulation that are challenged in this case." ECF No. 92.

Over Plaintiffs' opposition, this Court granted that request in July 2017. ECF No. 105. In the ensuing 17 months, however, HHS's only action with respect to this case was to file seven nearly identical status reports, all requesting "an opportunity to continue reconsidering the Rule." ECF No. 121 at 3. Thus, in December 2018, Plaintiffs moved to lift the stay and proceed with the litigation, ECF No. 121, which this Court granted. ECF No. 126.

## ARGUMENT

### I.   The Rule violates the Administrative Procedure Act.

Under the APA, courts must "hold unlawful and set aside" agency actions that are "not in accordance with law" or "in excess of statutory jurisdiction, authority,

or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A)&(C). In evaluating an APA challenge to "an agency's interpretation of a statute it administers," the question "is always, simply, *whether the agency has stayed within the bounds of its statutory authority.*" *City of Arlington v. FCC*, 569 U.S. 290, 290-91, 297 (2013). HHS has not done so here. The Rule exceeds HHS's authority because it reinterprets "sex" to mean "gender identity" in violation of the statutory text, refuses to incorporate the statute's religious and abortion exceptions, and prohibits employers from accommodating employees' religious beliefs as required under Title VII.

**A.   HHS's interpretation of "sex" to include "gender identity" is contrary to law.**

**1.   Section 1557's plain text, purpose, structure, and history foreclose the HHS Rule.**

The Rule prohibits discrimination "on the basis of sex" in certain health activities, and defines "on the basis of sex" to include, among other things, "gender identity." 45 C.F.R. § 92.101(a)(1), § 92.4. It defines "gender identity" as an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female." 45 C.F.R. § 92.4. The "gender identity spectrum includes an array of possible gender identities beyond male and female," and "individuals with non-binary gender identities are protected under the rule." 81 Fed. Reg. at 31392, 31384.

The purported authority for this Rule is Section 1557 of the Affordable Care Act, which forbids federally funded health programs from discriminating "on the ground prohibited under" four other federal statutes:

- Title VI, 42 U.S.C. § 2000d ("race, color, or national origin");
- Title IX, 20 U.S.C. § 1681 ("sex");
- The Age Discrimination Act, 42 U.S.C. § 6101 ("age"); and
- The Rehabilitation Act, 29 U.S.C. § 794 ("disability").

Section 1557 does not itself use the term "sex"; instead, it simply incorporates the prohibition contained in Title IX. Thus, Section 1557's meaning turns on the meaning of the "incorporated text"—Title IX. ECF No. 62 at 30.

15

Title IX's key operative provision states: "No person in the United States shall, on the basis of *sex*, . . . be subjected to discrimination under any education program or activity receiving Federal financial assistance, except that . . . this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681 (emphasis added). Thus, "[t]he precise question at issue in this case is" the meaning of the term "sex" in Title IX, ECF No. 62 at 31—specifically, whether "sex" means the physiological differences between male and female, or whether it also includes the concept of "gender identity."

To answer that question, the Court must use the "traditional tools of statutory construction," including the statute's "text," "history," and "purpose." *Contender Farms, L.L.P. v. U.S.D.A.*, 779 F.3d 258, 269 (5th Cir. 2015). In doing so, the goal is to determine the term's "ordinary meaning . . . at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018) (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). It is irrelevant that a term might strike "lawyerly ears" differently today than at the time of enactment, *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019), or that some might think the statute should be "revise[d] or update[d]" to reflect modern views. *Wisconsin Cent.*, 138 S. Ct. at 2074. "Congress alone has the institutional competence, democratic legitimacy, and (most importantly) constitutional authority to revise statutes in light of new social problems and preferences." *Id.* The question for the Court is simply how "most people [at the time of enactment] would have understood" the law. *New Prime*, 139 S. Ct. at 539.

Applying that analysis here, the text, history, and purpose of Title IX all confirm what this Court and many others have already concluded: "the term 'sex'" in Title

IX unambiguously "refer[s] to the biological differences between males and females." ECF No. 62 at 33; *see also Texas*, 201 F. Supp. 3d at 832.[13]

**Text.** Because Title IX does not define the term "sex," this Court must give the term its "ordinary, contemporary, common meaning." *Contender Farms*, 779 F.3d at 269. As this Court has twice explained, when Title IX passed, virtually every dictionary definition of "sex" referred to physiological distinctions between females and males, particularly with respect to their reproductive functions. ECF No. 62 at 33 n.24; *Texas*, 201 F. Supp. 3d at 822-33 (citing *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 736 (4th Cir. 2016) (Niemeyer, J., dissenting), *vacated*, 137 S. Ct. 1239 (2017)).[14]

---

[13] *See also, e.g.*:

- *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1221 (10th Cir. 2007) ("This court agrees with . . . the vast majority of federal courts to have addressed this issue and concludes discrimination against a transsexual based on the person's status as a transsexual is not discrimination because of sex. ");

- *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085 (7th Cir. 1984) ("The phrase in Title VII prohibiting discrimination based on sex, in its plain meaning, implies that it is unlawful to discriminate against women because they are women and against men because they are men. The words of Title VII do not outlaw discrimination against a person who has a sexual identity disorder.");

- *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 750 (8th Cir. 1982) ("[T]he word 'sex' in Title VII is to be given its traditional definition, rather than an expansive interpretation. [D]iscrimination based on one's transsexualism does not fall within the protective purview of the Act.");

- *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 674 (W.D. Pa. 2015), appeal dismissed (Mar. 30, 2016) ("Title IX does not prohibit discrimination on the basis of transgender itself because transgender is not a protected characteristic under the statute.");

- *Sweet v. Mulberry Lutheran Home*, No. IP02-0320-C-H/K, 2003 WL 21525058, at *2 (S.D. Ind. June 17, 2003) (Hamilton, J.) ("[D]iscrimination on the basis of sex means discrimination on the basis of the plaintiff's biological sex, not sexual orientation or sexual identity, including an intention to change sex.").

[14] *See, e.g.*, American Heritage Dictionary 1187 (1976); Webster's Third New Int'l Dictionary 2081 (1971); 9 Oxford English Dictionary 578 (1961).

The term "gender identity," by contrast, was rarely used. Until the 1950s, the term "gender" was used primarily by linguists to refer to a form of grammatical classification. Joanne Meyerowitz, *A History of "Gender,"* 113 Am. Hist. Rev. 1346, 1353 (2008). But in the mid-1950s, the psychologist John Money appropriated the term "gender" to refer to culturally determined roles for men and women. *Id.* at 1354. In his view, "gender" was learned in early childhood and was distinct from, and not determined by, "biological sex." *Id.* Other social scientists picked up on this new usage, and in 1963, Robert Stoller, a UCLA psychoanalyst, coined the term "gender identity." David Haig, *The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles, 1945-2001, in* Archives of Sexual Behav. 87, 93 (Apr. 2004). He, too, contrasted "sex" with "gender," arguing that "sex was biological but gender was social." *Id.* That usage was further popularized by feminist authors in the 1970s. Meyerowitz, *A History of "Gender,"* at 1353. Thus, to the extent the terms "gender" or "gender identity" were used at the time of Title IX's passage, they were used in *contrast* to "sex": "gender" referred to socially constructed roles, while "sex" referred to biological differences between men and women. That contrast remains common today.[15]

The word "transgender"—used, in the Rule, to describe the status of a person likely to be discriminated against on the basis of "gender identity," *e.g.*, 81 Fed. Reg. at 31405-06—likewise would not have been commonly understood in 1972. *See* "Transgender," Google Books Ngram Viewer, goo.gl/ELud7A (showing no significant

---

[15] *See, e.g.*, Sari L. Reisner et al., *"Counting" Transgender and Gender-Nonconforming Adults in Health Research in* Transgender Stud. Q. 34, 37 (Feb. 2015) ("Gender typically refers to cultural meanings ascribed to or associated with patterns of behavior, experience, and personality that are labeled as feminine or masculine"; "[s]ex refers to biological differences among females and males, such as genetics, hormones, secondary sex characteristics, and anatomy."); New Oxford American Dictionary 721-22, 1600 (3d ed. 2010) (defining "gender" in social and cultural terms and "sex" in biological terms).

use until late 1980s). The term evidently was coined in an obscure magazine in 1969. *See* Richard Elkins & Dave King, *The Transgender Phenomenon* 82 (2006) (citing Virginia Prince, *Change of Sex or Gender*, 10 Transvestia 53, 65 (1969)). But even its earliest user "recognized the distinction between 'sex' and 'gender identity.'" ECF 62 at 33 & n.25 (quoting Prince, *Change of Sex or Gender*, for the statement: "I, at least, know the difference between sex and gender."). And today, a "transgender" person is defined precisely as someone whose "gender identity differs from" the person's birth "sex." Merriam-Webster's Collegiate Dictionary (11th ed. 2014), goo.gl/hfe5fp. Moreover, it would have been impossible for Congress in 1972 to have known or anticipated the many different genders that would be identified in the new century.[16]

**Purpose.** This understanding of the term "sex"—as reflecting the physiological distinction between males and females—also fits with Title IX's purpose. Title IX was enacted at a time of pervasive discrimination in education against women. 44 Fed. Reg. at 71423. It grew out of a series of congressional hearings on discrimination against women. *N. Haven Bd. of Ed.*, 456 U.S. at 523 n.13. Its chief sponsor said it was "an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice." 118 Cong. Rec. 5808 (1972). Thus, the purpose of Title IX was to ensure equal opportunities in education for women. There is no hint of any congressional purpose to address matters of "gender identity."

**Structure.** This understanding of the term "sex" is also reflected throughout the statute, which requires equal treatment with respect to two different "sexes"—male

---

[16] Genders unknown in 1972 include "genderqueer," "non-binary," "gender fluid," "man of trans experience," and "pangender," among others. *See, e.g.*, NYC Comm'n on Human Rights, *Legal Enforcement Guidance on Discrimination on the Basis of Gender Identity or Expression* 2 (Dec. 2018), goo.gl/cmFJwz.

and female. For example, the main operative section of Title IX states that if certain activities are provided for students of "one sex," comparable activities must be provided for students of "the other sex." 20 U.S.C. § 1681(a)(8). It also provides that schools may transition from admitting students of "only one sex" to admitting students of "both sexes." *Id.* § 1681(a)(2). If, as HHS claims, the term "sex" includes an individual's "internal sense of gender, which may be male, female, neither, or a combination of male and female," 45 C.F.R. § 92.4, it makes no sense to refer to students of either "one sex" or "the other sex," 20 U.S.C. § 1681(a)(8).

Likewise, another section of Title IX authorizes covered institutions to provide "separate living facilities for the different sexes." 20 U.S.C. § 1686. This "can only reasonably be interpreted to be necessary for the protection of personal privacy, and confirm Congress's biological view of the term 'sex.'" ECF No. 62 at 33; *see also United States v. Virginia*, 518 U.S. 515, 533, 550 n.19 (1996) (recognizing need "to afford members of each sex privacy from the other sex in living arrangements" arising from "[p]hysical differences").

***History.*** This understanding of "sex" is also consistent with Title IX's history. Of course, neither the term nor the concept of "gender identity" appears anywhere in the legislative history. Rather, "[t]he legislative history of Title IX clearly shows that it was enacted because of discrimination that currently was being practiced against women in educational institutions." 44 Fed. Reg. at 71423. That is also how Title IX has been interpreted by courts for decades. *N. Haven Bd. of Ed.*, 456 U.S. at 517-20; *Cannon*, 441 U.S. at 680; *Pederson*, 213 F.3d at 880.

More importantly, both when Title IX was enacted, and ever since, Congress has treated "sex" and "gender identity" (along with "sexual orientation") as distinct. In the 1970s, Congress rejected several proposals to amend the Civil Rights Act to add

the category of "sexual orientation."[17] Similarly, in 1994, Congress rejected the Employment Non-Discrimination Act ("ENDA"), which sought to prohibit employment discrimination based on "sexual orientation."[18] In 2007, 2009, and 2011, Congress rejected a broader version of ENDA, which, for the first time, sought to add protections for "gender identity."[19] In 2013 and 2015, Congress rejected proposals to amend Title IX to add protections for "gender identity."[20] And in 2015 and 2017, Congress rejected proposals to do precisely what HHS's Rule purports to do— prohibit discrimination in federally funded programs on the basis of "gender identity."[21] None of these proposals makes any sense if Title IX and Title VII *already* prohibit such discrimination.

But not every proposal to add protections for "gender identity" failed. In 2010, Congress enacted hate crimes legislation providing enhanced penalties for crimes motivated by "gender identity." 18 U.S.C. § 249(a)(2). In 2013, Congress reauthorized the Violence Against Women Act, prohibiting discrimination in certain funding programs on the basis of both "sex" and "gender identity." 34 U.S.C. § 12291(b)(13)(A). And just weeks ago, the House of Representatives revised its internal rules to prohibit discrimination based on "gender identity" (and "sexual orientation") alongside the House's preexisting prohibition of discrimination based on "sex."[22] These Congressional actions—both those rejecting new protections for "gender identity," and

---

[17] H.R. 14752, 93rd Cong. (1974); H.R. 166, 94th Cong. (1975); H.R. 2074, 96th Cong. (1979); S. 2081, 96th Cong. (1979).

[18] H.R. 4636, 103rd Cong. (1994).

[19] H.R. 2015, 110th Cong. (2007); H.R. 2981, 111th Cong. (2009); S. 811, 112th Cong. (2011).

[20] H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).

[21] H.R. 3185, 114th Cong. (2015); S. 1858, 114th Cong. (2015); H.R. 2282, 115th Cong. (2017); S. 1006, 115th Cong. (2017).

[22] H.R. XXIII(9), 116th Cong. (2019).

those expressly adding new protections for "gender identity" alongside "sex"—show that Congress understands "sex" and "gender identity" to be distinct and is fully capable of including both concepts when it wants to.

The same is true of federal agencies. For the first 38 years after Title IX's enactment, federal agencies issued numerous regulations, memos, and guidance documents interpreting Title IX. Those pronouncements uniformly reflected a definition of "sex" based on the physiological differences between men and women. *See, e.g.*, *supra* Statement of Facts 2. None mentioned "gender identity." This uniform interpretation of "sex" by federal agencies is further evidence of the term's "ordinary, contemporary, common meaning." *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997).

It was not until 2010 that federal agencies began issuing a rash of new pronouncements arguing that the term "sex" includes "gender identity." *See supra* Statement of Facts 4-6. Not surprisingly, these pronouncements—many of which those same agencies have now abandoned as contrary to law, *see id.* 5-6—were hailed as "groundbreaking."[23] But they were "groundbreaking" precisely because the ordinary meaning of the term "sex"—and the existing reach of the relevant statutes—does *not* include "gender identity." And "groundbreaking" changes in the law are supposed to be made by the democratically-elected Congress, not unelected agencies. *See Etsitty*, 502 F.3d at 1222 ("If transsexuals are to receive legal protection apart from their status as male or female, however, such protection must come from Congress and not the courts."); *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 680-81 (W.D. Pa. 2015) ("The exclusion of gender

---

[23] Lena H. Sun & Lenny Bernstein, U.S. Moves to Protect Women, Transgender People in Health Care, Washington Post, Sept. 3, 2015 (The new Rule "for the first time includes bans on gender identity discrimination as a form of sexual discrimination, language that advocacy groups have pushed for and immediately hailed as groundbreaking.").

identity from the language of Title IX is not an issue for this Court to remedy. It is within the province of Congress—and not this Court—to identify those classifications which are statutorily prohibited."). In short, the text, purpose, structure, and history of Title IX all point to the same conclusion: "the term 'sex'" in Title IX unambiguously "refer[s] to the biological differences between males and females." ECF No. 62 at 33.

### 2. Recent court decisions reinterpreting the word "sex" are mistaken.

Since this Court preliminarily enjoined the Rule, two circuits have interpreted a ban on "sex" discrimination to prohibit discrimination based on "gender identity" or "transgender status."[24] Two other courts, employing similar reasoning, have similarly concluded that "sex" discrimination also includes discrimination based on "sexual orientation."[25] But these decisions are contrary to Fifth Circuit precedent, *Blum v. Gulf Oil Corp.*, 597 F.2d 936, 938 (5th Cir. 1979) (addressing "sexual orientation"), contrary to the weight of authority in other circuits, *supra* n.13, and wrongly decided. Simply put, these cases are mistaken because (1) they ignore the plain meaning of the word "sex" at the time the relevant laws were enacted, and (2) the "two [non-textual] reasons" they offer for their interpretation, *see Harris Funeral Homes*, 884 F.3d at 574-75, are meritless.

First, the recent decisions holding that "sex" discrimination includes "gender identity" give short shrift to the most important consideration in any statutory-interpretation case: "the original meaning of the written law." *Wisconsin Cent.*, 138

---

[24] *Whitaker by Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1049-50 (7th Cir. 2017) (Title IX); *EEOC v. R.G. & G.R. Harris Funeral Homes, Inc.*, 884 F.3d 560, 574-75 (6th Cir. 2018), *petition for cert. pending* ("*Harris Funeral Homes*") (Title VII).

[25] *Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 112-115, 124-131 (2d Cir. 2018) (en banc), *petition for cert. pending*; *Hively v. Ivy Tech Cmty. Coll.*, 853 F.3d 339, 343-52 (7th Cir. 2017) (en banc).

S. Ct. at 2074. In *G.G.*, for instance, the Fourth Circuit did not seriously grapple with the meaning of "sex" when Title IX was passed; instead, it "relie[d] entirely on" now-repudiated agency guidance. 822 F.3d at 730 (Niemeyer, J., dissenting). And in *Whitaker*, the Seventh Circuit offered only a single sentence of textual analysis, stating that "[n]either the statute nor the regulations define the term 'sex.'" 858 F.3d at 1047.

But Title IX "expressly identifies" the protected classification—"sex." *Cannon*, 441 U.S. at 690, 694. So the key question is one of statutory interpretation: whether "a fluent speaker of the English language" would understand "gender identity" to be synonymous with, or "fairly include[d]" in, "sex." *Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 363 (2017) (Sykes, J., dissenting). That "sex" is undefined doesn't render it ambiguous; rather, it simply means that courts must look to the contemporary ordinary meaning of the term. *New Prime*, 139 S. Ct. at 539-40. And as this Court has already recognized, the ordinary meaning of "sex" in 1972 was clear—it "referred to the binary, biological differences between males and females." ECF No. 62 at 35. "Gender identity"—a person's "internal sense of gender"—is a different concept, both to the few who had heard of it in 1972 and today.

Rather than following the statutory text, courts that have reinterpreted "sex" to include "gender identity" have relied primarily on two other approaches: first, the "comparative method," by courts sometimes use to discern whether sex discrimination has occurred as a factual matter by comparing the plaintiff's treatment to a similarly situated person of the opposite sex, *Harris Funeral Homes*, 884 F.3d at 575; and second, an analogy of "gender identity" claims to "sex stereotyping" claims under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), *see Whitaker*, 858 F.3d at 1048-50; *Harris Funeral Homes*, 884 F.3d at 576-77; *see also* 81 Fed. Reg. at 31387-90 (Rule's preamble relying on *Price Waterhouse*). Neither approach has merit.

As for the "comparative method," the Sixth Circuit in *Harris Funeral Homes*

concluded that "it is analytically impossible" to discriminate based on transgender status without "being motivated, at least in part, by" a person's "sex." 884 F.3d at 575. To reach that conclusion, the court considered a hypothetical: it asked whether the plaintiff there (a biological man who had allegedly been fired for "presenting" as a woman at work) would have been fired for "presenting" as a woman if he had been a biological woman instead. *Id.* Finding the answer to be "obviously . . . no," the court thought this "confirm[ed]" that gender identity discrimination is "sex" discrimination. *Id.*

But even assuming this kind of "thought experiment" is a permissible way to interpret the meaning of "sex" discrimination, *but see Hively*, 853 F.3d at 362, 365-66 (Sykes, J., dissenting), the *Harris Funeral Homes* court misapplied it. The point of the comparison was to "isolat[e] the significance of the plaintiff's sex" to the adverse decision, *Harris Funeral Homes*, 884 F.3d at 575; if the decision depended on the plaintiff's sex, it would constitute sex discrimination. But to "isolate" sex as a motivating factor, "we must hold everything constant *except* the plaintiff's sex." *Hively*, 853 F.3d at 366 (Sykes, J., dissenting). Thus, if the decisionmaker's purported reason for adverse action is that a plaintiff of Sex A was presenting *as a person of the opposite sex*, the only potentially useful comparison would ask whether the same adverse action would have been taken against a plaintiff of Sex B who *also presented as a person of the opposite sex*. By changing both the sex *and* the presentation of its hypothetical comparator, the *Harris Funeral Homes* court "load[ed] the dice." *Id.*

Alternatively, courts have tried to expand "sex" discrimination to cover "gender identity" by categorizing gender identity claims as a form of "sex stereotyping" under *Price Waterhouse*. But these cases "read [*Price Waterhouse*] for more than it's worth." *Id.* at 371. *Price Waterhouse* simply held that "sex" discrimination includes "disparate treatment of men and women resulting from sex stereotypes." 490 U.S. at 250-51. As many courts have recognized, sex stereotyping claims and gender

identity claims are different; sex stereotyping claims involve "behaviors, manner-isms, and appearances" associated with biological sex, while gender identity claims involve transgender "status." *Johnston*, 97 F. Supp. 3d at 680-81 (collecting cases); *see also Evans v. Ga. Regional Hosp.*, 850 F.3d 1248, 1260 (11th Cir. 2017) (William Pryor, J., concurring) ("The doctrine of gender nonconformity is, and always has been, behavior based. Status-based protections must stem from a separate doctrine or directly from the text of Title VII."). And indeed, HHS's own Rule recognizes this distinction: It defines discrimination based on "sex" to include *both* "sex stereotyp-ing, and gender identity." 45 C.F.R. § 92.4. If they were the same thing, prohibiting both would be superfluous.

Nor is it the case that, "gender identity" claims are "by definition" a subset of sex-stereotyping claims. *Whitaker*, 858 F.3d at 1048; *see also Harris Funeral Homes*, 884 F.3d at 576-77. That view stretches the concept of a "sex stereotype" beyond recognition. A sex stereotype is a belief about how members of a particular sex should act that operates to the disadvantage of members of that sex, relative to the other. *See Price Waterhouse*, 490 U.S. at 251 ("Congress intended to strike at the en-tire spectrum of *disparate treatment of men and women* resulting from sex stereo-types." (emphasis added)); *see also* ECF No. 62 at 35 (*Price Waterhouse* "acknowledge[s] the binary nature of sex"). In *Price Waterhouse*, for instance, the "sex stereotype" was the employer's "belief" that women "must not be" "aggressive" in the workplace—a belief that "place[d] women in an . . . impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not." 490 U.S. at 251. The beliefs at issue here, by contrast, are not this kind of "sex stereotype"; in-deed, they're not sex-specific at all. A doctor who believes that sex reassignment surgeries are harmful does not "assume or insist" that male or female patients match a stereotype specific to their sex. She instead does not perform sex reassign-ment surgeries for any patient, *regardless of his or her sex*. This belief "does not

spring from a sex-specific bias at all," and so cannot constitute discrimination on the basis of a "sex stereotype" under *Price Waterhouse*. *Hively*, 853 F.3d at 370 (Sykes, J., dissenting).[26] Indeed, it is particularly implausible that the *Price Waterhouse* Court could have had a world of *many* genders in mind—*i.e.*, what gender identity connotes today—since at the time it was decided, most if not all non-binary genders had never even been identified, much less brought up in litigation.

Finally, the *Whitaker* and *Harris Funeral Homes* courts found it irrelevant that Congress has repeatedly declined to "explicitly add[] transgender status as a protected characteristic to either Title VII or Title IX," viewing it as "equally tenable" to conclude from Congress's inaction that Congress thought that Title VII and Title IX "already incorporated" this prohibition. *Whitaker*, 858 F.3d at 1049 (internal quotation marks omitted); *Harris Funeral Homes*, 884 F.3d at 578-79. But this reasoning fails to account for the fact that while Congress *declined* to add "gender identity" to Title IX, it *added* "gender identity" to other statutes that, like Title IX, also prohibited "sex" discrimination. *See supra* Statement of Facts 2-3. It makes no sense to say that Congress sometimes thinks "sex" so clearly includes gender identity that there's no need to make that explicit, while other times both prohibitions must be spelled out. Instead, the only reading that accounts for all the data is the more straightforward one already adopted by this Court: that when Congress means to prohibit both "sex" and "gender identity" discrimination, it says so; when it doesn't, it doesn't. *See* ECF No. 62 at 34-35; *cf. Zarda*, 883 F.3d 100 at 154-55 (Lynch, J.,

---

[26] In any event, even if *Price Waterhouse* could be read to sweep "gender identity" claims into "sex" discrimination under the statute at issue there—Title VII—there's little reason to think Congress would have understood that implication to be incorporated into the one at issue here—Section 1557. As this Court has explained, "*Price Waterhouse* was decided in 1989, twenty years before the ACA was enacted. If Congress intended to prohibit the newly-expanded version of sex discrimination that Defendants claim includes 'gender identity' it could have incorporated Title VII's prohibition of sex discrimination instead of Title IX." ECF No. 62 at 35 n.28.

dissenting) ("It is hardly reasonable, in light of the EEOC and judicial consensus that sex discrimination did not encompass sexual orientation discrimination, to conclude that Congress rejected the proposed amendments because senators and representatives believed that Title VII already incorporated the offered change").

Ultimately, Judge Posner candidly admitted what courts are doing when they reinterpret "sex" to include "sexual orientation" or "gender identity": They are adopting "an interpretation [of the statute] that will update it to the present" to reflect changing "attitudes toward sex." *Hively*, 853 F.3d at 353-55 (Posner, J., concurring). But that is not a form of statutory interpretation permitted by the Constitution or approved by the Supreme Court. *See New Prime*, 139 S. Ct. at 537 ("After all, if judges could freely invest old statutory terms with new meanings, we would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands" (internal quotation marks omitted)); *Wisconsin Cent.*, 138 S. Ct. at 2074 (until Congress "revise[s a] statute[]," "the people may rely on the original meaning of the written law"). The term "sex" was not ambiguous in 1972 and is not ambiguous now. It refers to the biological differences between males and females. HHS's attempt to make it mean something different violates the APA.

### B. HHS's failure to include religious or abortion-related exemptions is contrary to law and in excess of statutory authority.

HHS's Rule is also "contrary to law" and "in excess of statutory authority" because it attempts to regulate conduct in a way that is expressly foreclosed by the controlling statutes. Title IX, as incorporated by Section 1557, includes two exemptions relevant here: one for religious organizations, and one for abortion. Yet despite the fact that Section 1557 incorporated these exemptions, HHS refused to include them in its Rule. That violates the APA.

### 1. The Rule violates the APA because it fails to include Title IX's religious exemption.

The Fifth Circuit has not hesitated to strike down regulations that ignore exemptions in the controlling statute. In *Texas Pipeline Association v. FERC*, the agency promulgated a rule purporting to regulate the activities of certain *intra*state pipelines, even though the statutory text only authorized the agency to regulate these activities with respect to "*inter*state commerce." 661 F.3d 258, 259-61 (5th Cir. 2011) (emphasis added). The Fifth Circuit held that the agency had "unambiguously exceed[ed] the authority granted" by the relevant statute by attempting "to regulate entities specifically excluded from" the statute. *Id.* at 262, 264.

Here, HHS has attempted to do the same thing: regulate entities that are "specifically excluded from" the statute. Title IX's prohibition on sex discrimination includes a broad exemption stating that Title IX "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. § 1681. And the text of Section 1557 incorporates "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.)," 42 U.S.C. § 18116(a). "That Congress included the signal 'et seq.[]' . . . after the citation to Title IX can only mean Congress intended to incorporate the entire statutory structure, including" the religious exemption in § 1681. ECF No. 62 at 37; *see also, e.g., Corley v. United States*, 556 U.S. 303, 314-15 (2009) (stating the canon against superfluity). Yet despite many requests to apply this exemption in the Regulation,[27] HHS refused.

Notably, for other prohibited areas of discrimination—including race, color, national origin, age and disability—HHS incorporated all relevant exceptions into its

---

[27] *See, e.g.*, United States Conference of Catholic Bishops, et al., Comment Letter on Proposed Rule (Nov. 6, 2015), https://bit.ly/2iARdTf (writing on behalf of ten religious groups); Council for Christian Colleges & Universities, Comment Letter on Proposed Rule (Nov. 9, 2015), https://bit.ly/2jqDazK (writing on behalf of 143 religious colleges and universities).

interpretation of Section 1557. 45 C.F.R. § 92.101 ("The exceptions applicable to Title VI apply to discrimination on the basis of race, color, or national origin under this part. The exceptions applicable to Section 504 apply to discrimination on the basis of disability under this part. The exceptions applicable to the Age Act apply to discrimination on the basis of age under this part."); *see also* 81 Fed. Reg. at 31378. But when it came to Title IX's religious exemption, HHS parted ways with Congress. HHS stated that "certain protections already exist in Federal law with respect to religious beliefs," and that "applying the protections in the laws"—rather than using the religious exemption Congress itself had incorporated into 1557— "offers the best and most appropriate approach for resolving any conflicts between religious beliefs and Section 1557 requirements." *Id.* at 31379-80. In other words, rather than adopting Congress's blanket exemption for religious organizations in Title IX, HHS said it would rather make its own "determinations on a case-by-case basis, based on a thorough analysis and relying on the extensive case law interpreting [other legal] standards." *Id.* at 31380.

HHS also declined to follow Title IX's religious exemption because HHS said the exemption is "limited in scope to educational institutions." *Id.* But of course it is. *All of Title IX*—including its ban on sex discrimination—is limited to "educational institution[s]." 20 U.S.C. § 1681. Further, as this Court explained, "HHS knew how to adapt Title IX from the education realm to the healthcare context because it provides that when cross-referencing the provisions of Title IX's use of 'student,' the term 'individual' should be used in the healthcare context." ECF No. 62 at 38 (citing 45 C.F.R. § 92.101(b)(3)(i)). When Congress brought the ban on sex discrimination into the healthcare context, it also brought the religious exemption. Both provisions are in the same section of the same statute, and both are expressly incorporated by Section 1557. HHS's refusal to incorporate both is contrary to law.

### 2. The Rule violates the APA because it ignores Title IX's abortion exemption.

The Rule is equally dismissive of congressional intent on the issue of abortion. Title IX makes clear that the ban on "sex" discrimination cannot be used to require services or insurance coverage relating to abortion: "Nothing in this chapter shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." 20 U.S.C. § 1688.

In its Proposed Rule, however, HHS did precisely what Congress forbade: it expanded the definition of sex discrimination to include discrimination based on "termination of pregnancy." Understandably, several commenters expressed concern that this language "might be read to require the provision of, or coverage or referral for, abortion,"[28] and asked HHS to clarify that it would not.

Again, however, HHS refused to abide by the limitations Congress included in Title IX. Instead, it simply noted the existence of *other* exemptions and conscience protections in federal law. 81 Fed. Reg. at 31380, 31388. HHS's reference to these statutory protections is cold comfort, given that HHS in 2016 interpreted some of these protections, including the Weldon Amendment, very narrowly, authorizing California to force insurance providers to cover elective abortions, even though churches and other religious organizations objected to abortion being included in their insurance plans.[29] More importantly, as this Court has recognized, HHS's refusal to follow the plain text of Title IX exceeds its statutory authority. Congress incorporated "title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.),"

---

[28] United States Conference of Catholic Bishops, et al., Comment Letter on Proposed Rule (Nov. 6, 2015), https://bit.ly/2iARdTf.

[29] Letter from Jocelyn Samuels, Dir., Office for Civil Rights, Dep't of Health & Human Servs., to Catherine W. Short, et al. (June 21, 2016), https://bit.ly/2SsdZBX.

42 U.S.C. § 18116(a)—which includes the abortion exemption—and it is not for the agency to cherry-pick which parts it will follow. *See* ECF No. 62 at 37 (Section 1557 "can only mean Congress intended to incorporate" both "the abortion and religious exemptions").

### 3. HHS's failure to allow employers to accommodate employees' religious beliefs is contrary to Title VII.

HHS's Rule is also contrary to Title VII, because it makes it illegal for employers to accommodate the religious beliefs of their employees. State Plaintiffs, for example, employ thousands of healthcare workers, some of whom have religious objections to participating in medical transition procedures. Similarly, many members of CMDA work for nonreligious employers. *See, e.g.*, App. 465-66. Under Title VII, these employers are obligated to provide reasonable accommodations for their employees' religious beliefs, as long as doing so does not impose an undue hardship on the employer. 42 U.S.C. §§ 2000e-2, 2000e(j); *EEOC v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 (2015). And providing those accommodations is not difficult, particularly when other doctors are available to perform the requested procedures. *See, e.g.*, App. 465-66.

But the Rule now makes these accommodations illegal. For example, the Rule says that if a doctor "works as an attending physician at a hospital," then not just the doctor but also "the hospital may be responsible for discrimination by the doctor's practice that occurs at the hospital." 81 Fed. Reg. at 31384 & n.40. The Rule also states that the hospital "will be held accountable for discrimination under Section 1557" where "a doctor is an employee of a hospital." *Id.* at 31384. Thus, the Rule puts employers to an impossible choice: They must either force their doctors and nurses to participate in gender transition procedures in violation of Title VII, or they must violate the Rule. Because the Rule conflicts with Title VII, it must be set aside under

the APA.[30]

## C.  Even if "sex" were ambiguous, *Chevron* does not apply.

Even assuming the term "sex" were ambiguous, the Rule is not entitled to *Chevron* deference, for three reasons. *First*, as this Court has already recognized, it is implausible that Congress delegated to an administrative agency the power to decide that "sex" discrimination includes the refusal to provide abortion and gender transition services. ECF No. 62 at 31; *see also FDA v. Brown & Williamson*, 529 U.S. 120, 159 (2000) (inquiry whether *Chevron* applies is "shaped, at least in some measure, by the nature of the question presented"). Millions of Americans share religious beliefs about sex and the human person like those of Private Plaintiffs here, so any interpretation of "sex" discrimination to include "gender identity" was certain to result in a new and significant conflict between nondiscrimination law and religious liberty. But as "a society that believes in the negative protection accorded to religious belief" we should "expect[ Congress] to be solicitous of that value in its legislation," *Emp't Div. v. Smith*, 494 U.S. 872, 890 (1990)—not to leave it up to agencies to decide whether to protect it or not. *Chevron*'s default rule about Congress's intent should not apply when the stakes for religious exercise are as high as they are here. *Cf. King v. Burwell*, 135 S. Ct. 2480, 2488-89 (2015) (*Chevron* does not apply "'in extraordinary cases'" "of deep 'economic and political significance'" (quoting *Brown & Williamson*, 529 U.S. at 159).

---

[30] *See, e.g., I.R.S., Fresno Serv. Ctr. v. FLRA*, 706 F.2d 1019, 1025 (9th Cir. 1983) (setting aside agency action that was inconsistent with Title VII); *Cape May Greene, Inc. v. Warren*, 698 F.2d 179, 190 (3d Cir. 1983) (APA may be violated "when agency action, not clearly mandated by the agency's statute, begins to encroach on congressional policies expressed elsewhere"); *Oglala Sioux Tribe of Indians v. Andrus*, 603 F.2d 707, 717 (8th Cir. 1979) (invalidating a regulation under one statute because it conflicted with another statute); *Zabel v. Tabb*, 430 F.2d 199, 209 (5th Cir. 1970) ("Governmental agencies in executing a particular statutory responsibility ordinarily are required to take heed of, sometimes effectuate and other times not thwart other valid statutory governmental policies.")

*Second*, even aside from its religious-liberty implications, the Rule here governs nearly every doctor and healthcare provider in the country, affects billions of dollars in federal funding, and mandates sweeping changes on deeply controversial social issues over which HHS has no expertise. That is precisely the kind of "transformative expansion" of regulatory authority that the Supreme Court has repeatedly held to require a clear statement from Congress. *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see King*, 135 S. Ct. at 2489; *Brown & Williamson*, 529 U.S. at 159.

*Third*, *Chevron* deference is also displaced here by the clear-statement rule for Spending Clause legislation like Section 1557. *Chevron*'s premise is that a "statute's ambiguity constitutes an implicit delegation from Congress to the agency to fill in the statutory gaps." *Brown & Williamson*, 529 U.S. at 159. But Congress cannot delegate to HHS power to interpret ambiguous conditions on federal money because Congress cannot impose ambiguous spending conditions in the first place. *See South Dakota v. Dole*, 483 U.S. 203, 207 (1987); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 & n.13 (1981).

### D. The Rule is contrary to the Spending Clause and the Tenth and Eleventh Amendments.

As explained by the States in their renewed summary judgment brief, HHS's Rule is also contrary to law because it imposes new conditions on the States that were not unambiguously included in the text of Section 1557, violating the Spending Clause; it attempts to commandeer the States, violating the Tenth Amendment; and it abrogates the States' sovereign immunity without clear authorization from Congress, violating the Eleventh Amendment. We adopt and incorporate those arguments by reference.

### II.   The Rule violates the Religious Freedom Restoration Act.

The Rule also violates the Religious Freedom Restoration Act ("RFRA"). "RFRA

was passed by a broad coalition of legislators in direct response to a Supreme Court decision that Congress viewed as curbing longstanding constitutional protections for religious liberty." ECF No. 62 at 38. RFRA provides "very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2760 (2014). Under RFRA, "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

RFRA claims proceed in two steps. First, the court must determine whether the government has imposed a "substantial burden" on the plaintiffs' religious exercise. To do that, it "must (a) identify a sincere religious exercise, and (b) determine whether the government has placed substantial pressure on plaintiffs to abstain from that religious exercise." ECF No. 62 at 39 (citing *Hobby Lobby,* 134 S. Ct. at 2760). Second, if a substantial burden exists, the government must satisfy strict scrutiny— that is, it must "demonstrate[] that application of the burden to the person represents the least restrictive means of advancing a compelling interest." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 423 (2006) (internal quotation marks omitted). Here, the Rule substantially burdens Plaintiffs' religious exercise by requiring them, on pain of massive financial liability, to perform and pay for controversial medical procedures in violation of their religious beliefs. And the Rule does not even come close to satisfying strict scrutiny.

## A  Franciscan and CMDA members sincerely exercise religion by not performing or covering medical transitions or abortions.

There is no dispute about the nature of Plaintiffs' religious exercise. Consistent with its beliefs, Franciscan is committed to care for transgender individuals with compassion and respect. That means it cannot, in accordance with its religious beliefs and medical judgment, participate in medical transition procedures. App. 6-8,

16. Nor can it provide insurance coverage for those procedures. App. 11. To do so would be to harm its employees and to violate its religious beliefs. *Id.* The same is true of performing or covering sterilization or abortion. *Id.*

CMDA members are in the same position. CMDA's House of Delegates unanimously adopted an ethics statement forbidding participation in gender transition. App. 28-33. CMDA members share these beliefs. App. 20, 463-64. Many also provide health coverage for employees and believe that they cannot "collaborate" with "interventions to alter normal sexual anatomy to conform to transgender desires." App. 24, 28-33. CMDA is likewise opposed to abortion. App. 22.

In short, these Plaintiffs "sincerely believe that providing the [medical procedures or] insurance coverage demanded by the HHS regulations lies on the forbidden side of the line." *Hobby Lobby*, 134 S. Ct. at 2779. Defendants have never "question[ed] or contest[ed] the sincerity of . . . Plaintiffs' religious beliefs or exercise," and this Court has already concluded that Plaintiffs have demonstrated sincerity. ECF No. 62 at 39.

## B. The Rule substantially burdens Plaintiffs' religious exercise by imposing massive financial and other penalties.

Having identified Plaintiffs' religious exercise, the next step is to determine whether the government-imposed burden on that religious exercise is substantial. As this Court has recognized, the burdens imposed by the Rule obviously qualify. Plaintiffs' religious beliefs require them to not perform or cover transition or abortion procedures, but the Rule prohibits them from categorically excluding these procedures, calling that "unlawful on its face," 81 Fed. Reg. at 31429. If they nonetheless persist in their religious exercise, they will be subject to massive financial penalties, including loss of Medicare and Medicaid funds, which will cost Franciscan up to $900,000,000 per year, 81 Fed. Reg. at 31472; 45 C.F.R. § 92.301; debarment from contracting with the federal government; enforcement proceedings brought by the

36

Department of Justice; liability under the False Claims Act, including treble dam-
ages, 81 Fed. Reg. at 31440-41; and private lawsuits brought by patients or employ-
ees for damages and attorneys' fees, *id.* at 31440-41, 31472; 45 C.F.R. § 92.301. Sev-
eral entities with policies similar to Plaintiffs' have already been sued since the new
Rule was issued in 2016.[31]

Financial penalties imposed on a religious practice are the quintessential example
of a substantial burden. In *Hobby Lobby*, for example, the Court said that "[b]ecause
the [Rule] forces [plaintiffs] to pay an enormous sum of money . . . if they insist
on providing insurance coverage in accordance with their religious beliefs, the
[Rule] clearly imposes a substantial burden on those beliefs." 134 S. Ct. at 2779.
This is an *a fortiori* case. The Rule imposes the same sort of enormous financial
penalties, only this time, Plaintiffs are not only being forced to "provid[e] insurance
coverage" for procedures that violate their religious beliefs, they are also being pres-
sured to perform the procedures themselves.

### C. The Rule cannot satisfy strict scrutiny.

Because the Rule imposes a substantial burden on Plaintiffs' religious exercise,
the only remaining question is whether the Rule satisfies strict scrutiny. Strict scru-
tiny under RFRA is "the most demanding test known to constitutional law." *City of
Boerne v. Flores*, 521 U.S. 507, 534 (1997). Under that test, the government must
demonstrate that the Rule furthers an interest "of the highest order." *Church of the
Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993). It must make
this showing not "in the abstract" but *"in the circumstances of this case." Cal. Demo-
cratic Party v. Jones*, 530 U.S. 567, 584 (2000). And it "must show by specific evidence

---

[31] *See, e.g.*, Compl., *Prescott v. Rady Children's Hosp. - San Diego*, No. 16-2408 (S.D. Cal.
Sept. 26, 2016), ECF No. 1; Compl., *Dovel v. Pub. Library of Cincinnati and Hamilton Cty.*,
No. 16-955 (S.D. Ohio Sept. 26, 2016); Compl., *Robinson v. Dignity Health*, No. 16-3035
(N.D. Cal. June 6, 2016), ECF No. 1.

that [Plaintiffs'] religious practices jeopardize its stated interests." *Merced v. Kasson*, 577 F.3d 578, 592 (5th Cir. 2009). It cannot do so here.

### 1. The Rule furthers no compelling interest.

The government claims it has "a compelling interest in ensuring that individuals have nondiscriminatory access to health care and health coverage." 81 Fed. Reg. at 31380. But this supposed interest is stated at such a broad level of generality that it defies meaningful application of strict scrutiny. RFRA requires courts "to 'loo[k] beyond broadly formulated interests' and to 'scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants'—in other words, to look to the marginal interest in enforcing the [Rule] in [this case]." *Hobby Lobby*, 134 S. Ct. at 2779 (citation omitted). The Rule offers no basis for concluding that Plaintiffs are undermining any specific, compelling interest. Nor has HHS, as it failed even to brief its compelling interest at the preliminary-injunction stage.

HHS cannot claim that the Rule protects individuals from sex discrimination, since "sex" was not understood by Congress to include gender identity. *See supra* Statement of Facts 2-3. Even assuming "sex" means "gender identity," the statutes incorporated in Section 1557 carve out broad exemptions for religious organizations and abortion. *See id.* 9. Thus, the supposed interest in universal provision of medical transition services supposedly advanced by the Rule is not even an interest Congress chose to advance in the statute—much less a compelling one.

Nor can HHS have a compelling interest in forcing private doctors to perform procedures that go against the doctors' best medical judgment and that HHS's own experts admit are potentially harmful. As HHS's medical experts wrote in 2016: "Based on a thorough review of the clinical evidence available at this time, there is not *enough evidence to determine whether gender reassignment surgery improves health outcomes* for Medicare beneficiaries with gender dysphoria." App. 648 (Centers for Medicare & Medicaid Services, *Proposed Decision Memo for Gender Dyspho-*

*ria and Gender Reassignment Surgery* (June 2, 2016), goo.gl/Z61Cx1 (emphasis added) ("CMS Proposed Decision Memo")). "There were conflicting (inconsistent) study results—of the best designed studies, some reported benefits while *others reported harms.*" *Id.* (emphasis added).[32] For that reason, Medicare and Medicaid do not require coverage for gender reassignment surgery, but allow states and local administrators to make coverage determinations on a case-by-case basis. App. 734 (Centers for Medicare & Medicaid Services, *Decision Memo for Gender Dysphoria and Gender Reassignment Surgery* (Aug. 30, 2016), goo.gl/BjPDhg).

There are also sound medical reasons for not covering these procedures, particularly for children. App. 20-22, 464-65. As guidance documents that HHS relied upon explain: "Gender dysphoria during childhood does not inevitably continue into adulthood. Rather, in follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6–23% of children."[33] The same report noted that "Newer studies, also including girls, showed a 12-27% persistence rate of gender dysphoria into adulthood." *Id.* Given that the overwhelming majority of children will not experience gender dysphoria into adulthood, the government cannot hope to prove that it has a compelling interest in requiring Plaintiffs to provide puberty suppression hormones, cross-sex hormones, and other medical transition procedures for children.

Whether for children or adults, medical transition procedures also carry signifi-

---

[32] *See also* Mem. from James Mattis, Sec'y of Def., on Military Service by Transgender Individuals 22-27 (Feb. 22, 2018), https://bit.ly/2GuHQny (reviewing the CMS data and concluding that there is "scientific uncertainty surrounding the efficacy of transition-related treatments for gender dysphoria").

[33] App. 484 (World Prof'l Ass'n for Transgender Health, Standards of Care for the Health of Transsexual, Transgender, and   Gender-Nonconforming People, 11 (7th ed. 2012), goo.gl/1jTcLT (footnote omitted) (WPATH Report) (cited in 81 Fed. Reg. at 31435 n.263)).

cant risks. The Institute of Medicine noted that transgender individuals "may be at increased risk for breast, ovarian, uterine, or prostate cancer as a result of hormone therapy."[34] The same study found that "longer duration of hormone use . . . may well exacerbate the effects of aging, such as cardiac or pulmonary problems." *Id.* at 265. The WPATH report notes that hormone therapy is associated with increased risk of cardiovascular disease, Type 2 diabetes, gallstones, venous thromboembolic disease, and hypertension. App. 513; *see also* App. 20-22, 464-65. The government cannot prove that it has a compelling interest in requiring doctors to perform procedures with significant long-term health impacts against their medical judgment. This is a matter for careful consideration by individual medical professionals, not across-the-board rules issued by political appointees in Washington. *Cf.* 42 U.S.C. § 1395 ("Nothing in this subchapter shall be construed to authorize any Federal officer or employee to exercise any supervision or control over the practice of medicine or the manner in which medical services are provided.").

With regard to abortion, Congress has long provided exemptions for medical professionals who cannot participate. The Rule itself notes that "the proposed rule would not displace the protections afforded by provider conscience laws," or "provisions in the ACA related to abortion services." 81 Fed. Reg. at 31379-80 (citing 42 U.S.C. § 300a-7; 42 U.S.C. § 238n; Consolidated and Further Continuing Appropriations Act 2015, Pub. L. 114-53, Div. G, § 507(d) (Dec. 16, 2015); 42 U.S.C. § 18023). So the government has no compelling interest in forcing Plaintiffs to participate.

The government's attempt to compel insurance coverage for medical transitions and abortion fares no better. As many courts have recognized, "a law cannot be re-

---

[34] Institute of Medicine of the National Academies, The Health of Lesbian, Gay, Bisexual and Transgender People: Building a Foundation for Better Understanding, 264 (2011), https://www.ncbi.nlm.nih.gov/books/NBK64806/pdf/Bookshelf_NBK64806.pdf.

garded as protecting an interest 'of the highest order' . . . when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi*, 508 U.S. at 547 (citation omitted); *Merced*, 577 F.3d at 594 ("[E]xceptions weaken [the government's] asserted interests."); *Tagore v. United States*, 735 F.3d 324, 330-31 (5th Cir. 2013) (same). An obvious corollary to this proposition is that to be "compelling" an interest must be one "the government would be willing to pursue itself." ECF No. 62 at 40-41.

Yet here, the government has exempted some of *its own healthcare programs* from the Rule. Thus, TRICARE—the military's insurance program—is exempt. TRICARE excludes coverage for "[a]ll services and supplies directly and or indirectly related to surgical treatment for gender dysphoria." TRICARE Policy Manual 6010.57-M, Chapter 7, Section 1.2 at 4.1 (updated: Jan. 24, 2019). TRICARE also excludes cross-sex hormones for children under 16, *id.* at 3.2.2.3, and pubertal suppression for prepubertal children. *Id.* at 3.2.3.1. And TRICARE protects the religious beliefs of physicians who object to performing gender transition procedures: "In no circumstance will a provider be required to deliver care that he or she feels unprepared to provide either by lack of clinical skill or due to ethical, moral, or religious beliefs." App. 884-85 (Mem. from Karen S. Guice, Acting Assistant Sec'y of Def. to Assistant Sec'y of the Army, et al., Subject: Guidance for Treatment of Gender Dysphoria for Active and Reserve Component Service Members 2-3 (July 29, 2016), goo.gl/4KffYv (TRICARE Memo)). Likewise exempt from the Rule is the Veterans Health Administration ("VA"), whose medical benefits package specifically excludes "gender alterations." 38 C.F.R. § 17.38(c); *see also* Dep't of Veterans Affairs, VHA Directive 1341, Providing Health Care for Transgender and Intersex Veterans 1 (May 23, 2018), https://bit.ly/2Gm5hih ("VA does not provide gender confirming/affirming surgeries[.]"). In short, the government seeks to impose on Plaintiffs a rule that has massive exemptions for the government itself.

41

With regard to pregnancy termination, courts have long held that the right to an abortion does not include the right to an abortion at another's expense. *See Harris v. McRae*, 448 U.S. 297 (1980) (upholding the Hyde Amendment, which restricts government funding for abortions). Congress ensured that insurers would not be required to cover abortions under the ACA. *See* 42 U.S.C. § 18023. The agency cannot now claim a compelling interest in doing the opposite.

### 2. Defendants have numerous less restrictive means of furthering their interests.

Even "assum[ing] the Rule pursues a compelling interest"—and it does not—the government cannot "prove the Rule employs the least restrictive means" because there are numerous less restrictive alternatives. ECF No. 62 at 41. "The least-restrictive-means standard is exceptionally demanding," and it requires the government to "sho[w] that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting part[y]." *Hobby Lobby,* 134 S. Ct. at 2780. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (citation omitted). Numerous alternatives are available here.

"If the government wishes to expand access to transition and abortion procedures, '[t]he most straightforward way of doing this would be for the government to assume the cost of providing the [procedures] at issue to any [individuals] who are unable to obtain them under their health-insurance policies due to their employers' religious objections.'" ECF No. 62 at 41 (quoting *Hobby Lobby,* 134 S. Ct. at 2780). In *Hobby Lobby*, as here, "HHS has not shown, see § 2000bb–1(b)(2), that this is not a viable alternative." *Hobby Lobby,* 134 S. Ct. at 2780. In order to meet this burden of proof, the government should produce "statistics regarding the number of [people] who might be affected," "provide[] an[] estimate of the average cost per [person]," and demonstrate that such costs are excessive compared to the other costs of com-

pliance it has accepted with the ACA. *Id.* at 2780-81.

The government could also set up an alternative system for provision of benefits. For instance, the government could (by act of Congress or by a regulation with proper statutory authority) require non-religiously-objecting insurance providers to offer plans with gender-transition coverage on an exchange. HHS could also negotiate with healthcare providers to ensure that some or all plans on federally-facilitated exchanges offer coverage for gender-transition and abortion services. The government also offers credits to those who need help affording health care on the exchanges; those same credits could be made available to individuals who do not have this coverage through their employers. The government could also set up an alternative coverage mechanism, as it has done with the preventive services mandate. *See Hobby Lobby,* 134 S. Ct. at 2781-82.

"The government could also assist transgender individuals in finding and paying for transition procedures available from the growing number of healthcare providers who offer and specialize in those services." ECF No. 62 at 41-42. Many doctors and hospitals provide medical transition services; in fact, many hospitals have established centers of excellence offering coordinated care for transgender patients. *See, e.g.*, *Trans Health Clinics*, TransHealth.com, https://bit.ly/2UKlnq1 (last updated Feb. 14, 2018) (listing "health clinics that specialize in trans health care"). If the government wants to increase access to gender transition services—and if it wants to get better care for people who want them—the government could partner with willing providers to increase access to such facilities. It could also train health care navigators to assist individuals in finding such services, just as it does with assisting individuals to find plans on the exchanges. Such options would not only increase access to health care for transgender individuals, they would focus upon doctors with expertise in transgender issues, rather than conscripting unwilling doctors who may not have the necessary expertise.

43

## III.   The Rule violates the Free Exercise Clause.

### A.   The Rule is not neutral and generally applicable.

The Rule also violates the Free Exercise Clause by pressuring Franciscan and CMDA to perform and provide insurance coverage for gender transition and abortion services in violation of their religious beliefs.[35]

Before the Supreme Court's decision in *Emp't Division v. Smith*, 494 U.S. 872 (1990), Free Exercise claims were evaluated much like RFRA claims today—if a law substantially burdened religious exercise, it was subject to strict scrutiny. *See O Centro*, 546 U.S. at 424. In *Smith*, however, the Court held that even if a law substantially burdens religious exercise, it need not satisfy strict scrutiny if it is "neutral" and "generally applicable." 494 U.S. at 880-90. *Smith* therefore "drastically cut back on the protection provided by the Free Exercise Clause." *Kennedy v. Bremerton Sch. Dist.*, No. 18-12, 2019 WL 272131, at *3 (U.S. Jan. 22, 2019) (Alito, J., joined by Thomas, Gorsuch, and Kavanaugh, JJ., concurring in denial of certiorari).

Even under *Smith*, however, "a law burdening religious practice that is *not* neutral or of general application must undergo the most rigorous of scrutiny." *Lukumi*, 508 U.S. at 546 (emphasis added). And "[t]here are . . . many ways" of demonstrating that a law is not neutral or generally applicable. *Id.* at 533. Here, the Rule is not neutral and generally applicable for three reasons: (1) it *categorically exempts* secu-

---

[35] In March 2017, Plaintiffs filed a notice of voluntary dismissal under Rule 41(a)(1)(A)(i), purporting to dismiss all the claims of their Amended Complaint that this Court did not consider in its preliminary-injunction ruling, including their Free Exercise claim. ECF No. 81. "Rule 41(a) dismissal," however, "only applies to the dismissal of an entire action—not particular claims." *Bailey v. Shell W. E&P, Inc.*, 609 F.3d 710, 720 (5th Cir. 2010). Plaintiffs' notice was therefore ineffective, and the claims they purported to dismiss remain live. *Id.* (reviewing summary judgment involving claims plaintiff attempted to dismiss under Rule 41(a)(1)(A)(i)); *see also* 9 Wright & Miller, *Federal Practice & Procedure* § 2362 (3d ed. 2018 update) ("Rule 41(a) is applicable only to the voluntary dismissal of all the claims in an action. A plaintiff who wishes to drop some claims but not others should do so by amending his complaint pursuant to Rule 15.").

lar conduct that undermines HHS's alleged interests far more than Plaintiffs' religious objections do; (2) it lets HHS make *individualized exemptions* to its requirements on a case-by-case basis; and (3) it is *targeted* at religious conduct.

*Categorical exemptions.* One way to prove that a law is not generally applicable is to show that it categorically permits nonreligious conduct that threatens the government's "interests in a similar or greater degree than" does the plaintiff's religious conduct. *Lukumi*, 508 U.S. at 543. In *Lukumi*, for instance, a Santeria priest who sought to perform religious animal sacrifice challenged municipal ordinances restricting the killing of animals. The government claimed the ordinances furthered two interests: protecting public health and preventing animal cruelty. 508 U.S. at 543. But the ordinances didn't apply to many types of animal killing, like hunting, fishing, and euthanasia of stray animals, that "endanger[ed] these interests in a similar or greater degree than Santeria sacrifice d[id]." *Id.* at 543-44. The Court therefore held that the ordinances weren't generally applicable, and strict scrutiny applied. *Id.* at 543-46; *see also Fraternal Order of Police Newark Lodge No. 12 v. City of Newark*, 170 F.3d 359 (3d Cir. 1999) (Alito, J.) (law that allowed police officers to grow beards for medical reasons, but not religious reasons, was not neutral and generally applicable).

Like the laws in *Lukumi* and *Fraternal Order of Police*, the Rule is not generally applicable because it fails to prohibit conduct—vast swaths of it—that undermines HHS's alleged interests at least as much as a religious exemption would. The Rule attempts to compel insurance coverage for medical transitions and abortion, religious objections notwithstanding. But TRICARE is exempt—even though it serves "approximately 9.4 million beneficiaries around the world"[36] and flatly excludes sex re-

---

[36]    Health.mil,    *Beneficiary    Population    Statistics*,    https://www.health.mil/I-Am-A/Media/Media-Center/Patient-Population-Statistics.

assignment surgery and many other gender transition services. VA is likewise exempt, even though it, too, excludes sex reassignment surgery. The broad exclusions in these other government programs undermine the government's interest in increasing access to these services far more than Franciscan's and CMDA's religious objections do, rendering the Rule not generally applicable.

*Individualized exemptions.* A law is also not generally applicable if it makes available "individualized exemptions from a general requirement." *Lukumi*, 508 U.S. at 537 (citing *Smith*, 494 U.S. at 884). In that situation, the Free Exercise Clause requires the government to exempt religious objectors, unless its failure to do so satisfies strict scrutiny. *Id.* The rationale for this rule is straightforward. When the government applies an "across-the-board" prohibition, there's less risk that it is discriminating against religious conduct. 494 U.S. at 884. But when an open-ended law lets government officials exempt conduct on a case-by-case basis, there's significant risk that the law will be "applied in practice in a way that discriminates against religiously motivated conduct." *Blackhawk v. Pennsylvania*, 381 F.3d 202, 209 (3d Cir. 2004) (Alito, J.). That risk—that in exercising individualized discretion, the government will "devalue[] religious reasons for [acting] by judging them to be of lesser import than nonreligious reasons"—justifies strict scrutiny. *Lukumi*, 508 U.S. at 537-38; *see also Smith*, 494 U.S. at 884 (law in *Sherbert v. Verner*, 374 U.S. 398 (1963), triggered strict scrutiny because its exception for "good cause" let the government make "individualized governmental assessment[s] of the reasons for the relevant conduct"); *Blackhawk*, 381 F.3d at 205, 209-14 (law letting the government waive permitting requirements in "extraordinary circumstances" triggered strict scrutiny because it was "sufficiently open-ended to bring the regulation within the individualized exemption rule").

Here, the Rule triggers strict scrutiny under the "individualized exemptions" rule. The Rule's prohibition on "sex" discrimination includes a general prohibition

on covered entities' "operat[ing] a sex-specific health program or activity (a health program or activity that is restricted to members of one sex)." 45 C.F.R. § 92.101(b)(3)(iv). But the Rule makes an exception "if the covered entity can demonstrate an exceedingly persuasive justification." *Id.* This is a textbook individualized-exemption regime. The Rule allows HHS to exempt sex-specific activities on a case-by-case basis whenever it is sufficiently "persua[ded]" to do so—giving it free rein to discriminate against religiously-motivated healthcare and insurance providers by denying them exemptions it would grant others whose motivations were wholly secular.

Nor does the qualifier—that the justification for the program or activity should be "substantially related to the achievement of an important health-related or scientific objective," 45 C.F.R. § 92.101(b)(3)(iv)—save the Rule from strict scrutiny. This language is "hardly . . . self-defining," and like the government in *Blackhawk*, HHS has steadfastly refused to clarify the Rule's contours. 381 F.3d at 210-11. To the contrary, HHS has declined to "address every scenario that might arise in the application of these standards nor state that certain practices as a matter of law are 'always' or 'never' permissible," instead touting the "flexibility inherent in the contextualized approach we have chosen to assess compliance." 81 Fed. Reg. at 31377, 31419. This "flexibility"—and the concomitant opportunity it gives HHS to devalue religious beliefs—is precisely what triggers strict scrutiny.

*Targeting*. Third, a law is not neutral and generally applicable if it improperly targets religious conduct. In *Lukumi*, the Supreme Court found "significant evidence of the ordinances' improper targeting of Santeria sacrifice in the fact that they proscribe more religious conduct than is necessary to achieve their stated ends." 508 U.S. at 538. When a law "visits 'gratuitous restrictions' on religious conduct," courts can infer that it "seeks not to effectuate the stated governmental interests, but to suppress the conduct because of its religious motivation." *Id.* (citation

omitted).

Here, when interpreting Section 1557, HHS's Rule incorporated statutory exceptions for discrimination based on race, color, national origin, age, and disability. 45 C.F.R. § 92.101; 81 Fed. Reg. at 31378. But when it came to discrimination based on sex, HHS expressly refused to incorporate Title IX's religious exemption—and it offered no reasoned basis for doing so. The effect of this decision was to "proscribe more religious conduct than is necessary to achieve [HHS's] stated ends"—thus triggering strict scrutiny. *Lukumi*, 508 U.S. at 538.

*Revisiting* Smith. Finally, even assuming the Rule were neutral and generally applicable, this Court should reconsider the applicability of the controversial *Smith* decision. Four Justices recently signaled willingness "to revisit th[at] decision[]." *Kennedy*, 2019 WL 272131, at *3. At least one other current Justice has argued that "*Smith* was wrongly decided." *City of Boerne v. Flores*, 521 U.S. 507, 544-45 (1997) (O'Connor, J., joined by Breyer, J., dissenting); *see also* Michael W. McConnell, *Free Exercise Revisionism and the Smith Decision*, 57 U. Chi. L. Rev. 1109, 1111 (1990) ("*Smith* is contrary to the deep logic of the First Amendment."). Thus, if this Court determines that the Rule is neutral and generally applicable, it should reconsider whether *Smith* is in fact controlling,

**B.  The Rule cannot satisfy strict scrutiny.**

Under the Free Exercise Clause, "a law restrictive of religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Lukumi*, 508 U.S. at 546 (internal quotation marks and citation omitted). This is substantially the same as "the compelling interest test" adopted in RFRA. *See* 42 U.S.C. § 2000bb(b)(1). So for the same reasons the Rule fails strict scrutiny under RFRA, it fails under the Free Exercise Clause.

48

## IV. The Court should vacate the unlawful portions of the Rule and enter a permanent injunction.

Because HHS's reinterpretation of the term "sex" is inconsistent with the plain meaning of Section 1557, this Court should vacate the unlawful portions of the Rule and make its preliminary injunction permanent. The APA directs that a "reviewing court *shall* . . . hold unlawful and set aside" agency rules "in excess of statutory authority." 5 U.S.C. § 706 (emphasis added); *see, e.g.*, *Chamber of Commerce of United States of Am. v. U.S. Dep't of Labor*, 885 F.3d 360, 369, 388 (5th Cir. 2018) (vacating "*in toto*" a Labor Department rule reinterpreting a statutory term in "vast and novel ways"). As the D.C. Circuit has "made clear," the required remedy "'[w]hen a reviewing court determines that agency regulations are unlawful' . . . is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)). The unlawful portions of the Rule should therefore be vacated.

Further, as this Court has already held, a permanent injunction is supported by the general injunction standard. "[T]he standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits." *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847-48 (5th Cir. 2004). Thus, the party seeking a permanent injunction "must establish (1) success on the merits; (2) that a failure to grant the injunction will result in irreparable injury; (3) that said injury outweighs any damage that the injunction will cause the opposing party; and (4) that the injunction will not disserve the public interest." *VRC LLC v. City of Dallas*, 460 F.3d 607, 611 (5th Cir. 2006). In cases like this one, however, where First Amendment rights are at stake, "success on the merits will often be the determinative factor." *Korte v. Sebelius*, 735 F.3d 654, 666 (7th Cir. 2013) (citation omitted); *Hobby Lobby Inc., v.*

*Sebelius,* 723 F.3d 1114, 1145 (10th Cir. 2013) (same). This principle also holds true for RFRA claims, since "RFRA protects First Amendment free-exercise rights." *Korte*, 735 F.3d at 666; *Hobby Lobby*, 723 F.3d at 1146 ("[O]ur case law analogizes RFRA to a constitutional right.").

*Success on the Merits.* As shown above, Plaintiffs' claims succeed on the merits.

*Irreparable Harm.* It is settled law that a violation of Plaintiffs' rights under the First Amendment and RFRA constitutes irreparable harm. "'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). Here, coercing Plaintiffs to provide harmful medical procedures or objectionable insurance coverage in direct violation of their faith is the epitome of irreparable injury. Once they have been forced to violate their conscience, future remedies cannot undo the past.

*Balance of Harms and Public Interest.* These factors "overlap." ECF No. 62 at 43. And they both point in Plaintiffs' favor here. The harms faced by Plaintiffs are severe, and include loss of funding, liability for lawsuits, and coercion of religious practice. ECF No. 62 at 43-44. Meanwhile, when the government has "alternative, constitutional ways of regulating . . . to achieve its goals," as it does here, the government cannot show that its interests outweigh constitutional freedoms. *See RTM Media, L.L.C. v. City of Houston*, 518 F. Supp. 2d 866, 875 (S.D. Tex. 2007). Finally, "[i]njunctions protecting First Amendment freedoms are always in the public interest." *Opulent Life Church*, 697 F.3d at 298 (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully urge the Court to grant this motion for partial summary judgment, vacate the unlawful portions of the Rule, and convert the Court's preliminary injunction into a final injunction.

Respectfully submitted this the 4th day of February, 2019.

/s/ Luke W. Goodrich
Luke W. Goodrich
Bar No. 977736DC
Eric C. Rassbach
Mark L. Rienzi
Stephanie H. Barclay
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Plaintiffs Christian Medical &*
*Dental Associations, Franciscan Health, Inc.,*
*Specialty Physicians of Illinois, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on February 4, 2019 the foregoing brief was served on all parties via ECF.

/s/ Luke W. Goodrich
Luke W. Goodrich