**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC.; SPECIALITY PHYSICIANS OF ILLINOIS, LLC; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS,<br><br>- and -<br><br>STATE OF TEXAS; STATE OF NEBRASKA; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF ARIZONA; and STATE OF MISSISSIPPI, by and through Governor Phil Bryant,<br><br>*Plaintiffs*,<br><br>v.<br><br>ALEX M. AZAR II, Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>*Defendants*. | Civ. Action No. 7:16-cv-00108-O |

**PROPOSED INTERVENORS' OPPOSITION TO
STATE AND PRIVATE PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT**

Proposed Intervenors, River City Gender Alliance and the American Civil Liberties

Union of Texas, hereby oppose State and Private Plaintiffs' motions for summary judgment. A

memorandum of law is attached.

Respectfully submitted this 5th day of April, 2019.

/s/ Joshua Block
Joshua Block
(NY Bar No. 4370573)
Lindsey Kaley
Brigitte Amiri
James D. Esseks
Louise Melling
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Daniel Mach
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street, N.W.
Washington, D.C. 20005
(202) 548-6604

Kali Cohn
AMERICAN CIVIL LIBERTIES UNION OF TEXAS
P.O. Box 600169
Dallas, TX 75360
(214) 346-6577

Amy Miller
AMERICAN CIVIL LIBERTIES UNION OF NEBRASKA
134 S. 13th St., #1010
Lincoln, NE 68508
(402) 476-8091

*Counsel for Proposed Intervenors*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

|  |  |
|---|---|
| FRANCISCAN ALLIANCE, INC.;<br>SPECIALITY PHYSICIANS OF<br>ILLINOIS, LLC;<br>CHRISTIAN MEDICAL & DENTAL<br>ASSOCIATIONS,<br><br>- and -<br><br>STATE OF TEXAS;<br>STATE OF NEBRASKA;<br>COMMONWEALTH OF KENTUCKY, by<br>and through Governor Matthew G. Bevin;<br>STATE OF KANSAS;<br>STATE OF LOUISIANA;<br>STATE OF ARIZONA; and<br>STATE OF MISSISSIPPI, by and through<br>Governor Phil Bryant,<br><br>*Plaintiffs*,<br>v.<br><br>ALEX M. AZAR II, Secretary of the United<br>States Department of Health and Human<br>Services; and UNITED STATES<br>DEPARTMENT OF HEALTH AND<br>HUMAN SERVICES,<br><br>*Defendants*. | Civ. Action No. 7:16-cv-00108-O |

**<u>PROPOSED INTERVENORS' MEMORANDUM OF LAW IN OPPOSITION TO
STATE AND PRIVATE PLAINTIFFS' MOTIONS FOR SUMMARY JUDGMENT</u>**

## TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................i

TABLE OF AUTHORITIES ...................................................................................................i

INTRODUCTION ..................................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

    Prohibiting discrimination based on termination of pregnancy ......................................5

    Prohibiting discrimination against transgender people in providing routine medical care ......................5

    Prohibiting discrimination in insurance coverage for transition-related care ...........................................6

    Prohibiting discrimination in the provision of transition-related care ...................................................7

ARGUMENT...........................................................................................................................8

    I.    Plaintiffs Have Failed to Establish Standing to Challenge the Definitional Provisions of the Rule. 8

        A.    Plaintiffs Must Support Their Motion for Summary Judgment with Admissible Evidence—Not Merely Allegations From Their Complaint ........................................................................................9

        B.    Plaintiffs Lack Standing to Challenge the Rule's Definitional Provision Regarding Termination of Pregnancy. .......................................................................................................................10

        C.    Plaintiffs Do Not Have Standing to Challenge the Rule's Definitional Provision Regarding Gender Identity Because Their Alleged Injuries Are Limited to Providing and Paying for Transition-Related Care........................................................................................................................................12

        D.    The Christian Medical Dental Association Has Not Proven an Article III Injury. .....................14

        E.    The State Plaintiffs Have Not Proven an Article III Injury......................................................16

    II.    Plaintiffs Are Not Entitled to Summary Judgment on Any Claims Regarding Discrimination Based on "Termination of Pregnancy." ..................................................................................................18

    III. Plaintiffs Are Not Entitled to Summary Judgment on Their APA Claims Regarding Discrimination on the Basis of Gender Identity..............................................................................................19

        A.    Under *Price Waterhouse* Discrimination on the Basis of Gender Identity Necessarily Entails Discrimination on the Basis of Sex.............................................................................................20

        B.    *Price Waterhouse* Applies to Title IX and Section 1557..........................................................23

        C.    The Rule Does Not Conflict with Title VII's Religious Accommodation Provisions................25

D.   The Rule Properly Recognizes that Section 1557 Does Not Incorporate Title IX's Exemption for Religiously Affiliated Schools. .................................................................................... 26

IV.   The Rule Does Not Violate State Sovereignty........................................................................ 27

A.   The Rule Does Not Violate *Pennhurst*. ......................................................................... 27

B.   The Rule Is Not Unconstitutionally Coercive Under the Tenth Amendment. ............................ 29

C.   The Rule Does Not "Commandeer" States. ..................................................................... 30

D.   The Rule Does Not Violate Sovereign Immunity. ................................................................ 31

V.   The Private Plaintiffs Are Not Entitled to Summary Judgment on Their Claims that the Rule Violates Protections for Religious Freedom. ............................................................................... 32

A.   There Is Not Sufficient Evidence in the Record to Evaluate Whether Applying the Rule to Private Plaintiffs Violates RFRA. ................................................................................................ 32

B.   The Rule Does Not Violate the Free Exercise Clause. ........................................................ 35

VI.   Any Injunction Must Be Limited to Remedying Plaintiffs' Article III Injuries. ........................ 37

A.   Plaintiffs' Article III Injuries Can Be Addressed Without Facially Invalidating All Protections from Discrimination Based on Gender Identity. ............................................................................... 38

B.   The Preliminary Injunction Does Not Provide the Clarity Required by Rule 65........................ 39

C.   A Nationwide Injunction Is Unnecessary and Overbroad.................................................... 41

CONCLUSION.............................................................................................................................. 43

# TABLE OF AUTHORITIES

## Cases

*ACLU of Texas v. Franciscan Alliance,*
  No. 17-10135, ECF No. 00514055754 (5th Cir. June 30, 2017) ........................................ 1, 3

*ACORN v. Fowler*, 178 F.3d 350
  (5th Cir. 1999) ........................................................................................................................ 14

*Agostini v. Felton,*
  521 U.S. 203 (1997) ................................................................................................................ 37

*Alison O. v. Anthem Blue Cross Life & Health Ins. Co.,*
  No. 13-CV-4787, 2013 WL 5979515 (N.D. Cal. Nov. 8, 2013) ............................................ 33

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy,*
  548 U.S. 291 (2006) ................................................................................................................ 28

*Bd. of Pub. Instruction of Taylor Cty., Fla. v. Finch,*
  414 F.2d 1068 (5th Cir. 1969) ................................................................................................ 29

*Bob Jones University v. United States,*
  461 U.S. 574 (1983) ................................................................................................................ 34

*Brown v. City of Hous.,*
  337 F.3d 539 (5th Cir. 2003) .................................................................................................. 10

*Bruff v. N. Miss. Health Servs., Inc.,*
  244 F.3d 495 (5th Cir. 2001) .................................................................................................. 26

*Burton v. Wilmington Parking Auth.,*
  365 U.S. 715 (1961) ................................................................................................................ 34

*Burwell v. Hobby Lobby Stores, Inc.,*
  573 U.S. 682 (2014) ................................................................................................................ 34

*Califano v. Sanders,*
  430 U.S. 99 (1977) .................................................................................................................... 4

*Camp v. Pitts,*
  411 U.S. 138 (1973) .................................................................................................................. 4

*Carmichael v. Galbraith,*
  574 F. App'x 286 (5th Cir. 2014) ........................................................................................... 23

*Cent. & S. W. Servs., Inc. v. U.S. E.P.A.,*
  220 F.3d 683 (5th Cir. 2000) .................................................................................................. 12

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
   508 U.S. 520 (1993) ............................................................................................................ 35, 37

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
   401 U.S. 402 (1971) ................................................................................................. 4, 21, 33, 34

*City of Dallas v. Hall*,
   No. 3:07-CV-0060, 2007 WL 3257188 (N.D. Tex. Oct. 29, 2007) ....................................... 33

*City of L.A., Dep't of Water & Power v. Manhart*,
   435 U.S. 702 (1978) ............................................................................................................... 23

*Cruz v. Abbott*,
   849 F.3d 594 (5th Cir. 2017) .................................................................................................. 11

*DaimlerChrysler Corp. v. Cuno*,
   547 U.S. 332 (2006) ......................................................................................................... 14, 38

*Daniel v. Paul*,
   395 U.S. 298 (1969) ............................................................................................................... 34

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
   710 F.3d 579 (5th Cir. 2013) .................................................................................................. 37

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
   |526 U.S. 629 (1999) .............................................................................................................. 28

*Delta Commercial Fisheries Ass'n v. Gulf of Mex. Fishery Mgmt. Council*,
   364 F.3d 269 (5th Cir. 2004) .................................................................................................. 12

*EEOC v. Boh Bros. Const. Co.*,
   731 F.3d 444 (5th Cir. 2013) ............................................................................................ 21, 22

*Emp't Div., Dep't of Human Res. of Or. v. Smith*,
   494 U.S. 872 (1990) ......................................................................................................... 35, 37

*Exxon Corp. v. Dep't of Energy*,
   91 F.R.D. 26 (N.D. Tex. 1981). .............................................................................................. 34

*Firestone Synthetic Rubber & Latex Co. v. Marshall*,
   507 F. Supp. 1330 (E.D. Tex. 1981) ...................................................................................... 33

*Flack v. Wis. Dep't of Health Servs.*,
   328 F. Supp. 3d 931 (W.D. Wis. 2018) ............................................................................ 20, 42

*Franciscan All., Inc. v. Burwell*,
   227 F. Supp. 3d 660 (N.D. Tex. 2016) ................................................................ 21, 24, 26, 42

*Franciscan All., Inc. v. Burwell*,
  No. 16-CV-00108, 2017 WL 2964088 (N.D. Tex. Jan. 24, 2017)................................................ 24

*Franklin v. Gwinnett Cty. Pub. Sch.*,
  503 U.S. 60 (1992)................................................................................................................ 24, 28

*Gebser v. Lago Vista Indep. Sch. Dist.*,
  524 U.S. 274 (1998).............................................................................................................. 27, 28

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018).................................................................................................................. 41

*Glenn v. Brumby*,
  663 F.3d 1312 (11th Cir. 2011)...................................................................................................... 22

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,
  546 U.S. 418 (2006)...................................................................................................................... 36

*Guardians Ass'n v. Civil Serv. Comm'n of City of N.Y.*,
  463 U.S. 582 (1983)...................................................................................................................... 28

*Holt v. Hobbs*,
  135 S. Ct. 853 (2015).................................................................................................................... 33

*Hunt v. Wash. State Apple Advert. Comm'n*,
  432 U.S. 333 (1977)...................................................................................................................... 15

*Hyman v. City of Louisville*,
  53 F. App'x 740 (6th Cir. 2002) .................................................................................................... 15

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005)...................................................................................................................... 28

*John Doe # 1 v. Veneman*,
  380 F.3d 807 (5th Cir. 2004) ........................................................................................................ 37

*Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*,
  97 F. Supp. 3d 657 (W.D. Pa. 2015), *appeal dismissed*, No. 15-2022 (3d Cir. Mar. 30, 2016) ............ 23

*Joint Heirs Fellowship Church v. Akin*,
  629 F. App'x 627 (5th Cir. 2015) .................................................................................................. 11

*King v. Dogan*,
  31 F.3d 344 (5th Cir. 1994) ...................................................................................................... 9, 16

*L.A. Haven Hospice, Inc. v. Sebelius*,
  638 F.3d 644 (9th Cir. 2011) ........................................................................................................ 42

iii

*La. Envtl. Soc'y, Inc. v. Dole*,
    707 F.2d 116 (5th Cir. 1983) ..................................................................................... 4

*Lewis v. Casey*,
    518 U.S. 343 (1996) ....................................................................................... 14, 38

*Lewis v. Heartland Inns of Am.*,
    591 F.3d 1033 (8th Cir. 2010) ................................................................................ 21

*Littell v. Houston Indep. Sch. Dist.*,
    894 F.3d 616 (5th Cir. 2018) ................................................................................. 39

*Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*,
    542 F. Supp. 2d 653 (S.D. Tex. 2008) ..................................................................... 40

*Los Angeles v. Lyons*,
    461 U.S. 95 (1983) ............................................................................................ 12

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ....................................................................................... 9, 18

*Malacara v. Garber*,
    353 F.3d 393 (5th Cir. 2003) ................................................................................. 17

*Merced v. Kasson*,
    577 F.3d 578 (5th Cir. 2009) ................................................................................. 35

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) ............................................................................................ 24

*Miss. State Democratic Party v. Barbour*,
    529 F.3d 538 (5th Cir. 2008) ................................................................................. 12

*Miss. Univ. for Women v. Hogan*,
    458 U.S. 718 (1982) .......................................................................................... 36

*National Federation of Independent Businesses v. Sebelius ("NFIB")*,
    567 U.S. 519, 579 (2012) ................................................................................ 29, 30

*ODonnell v. Harris Cty.*,
    892 F.3d 147 (5th Cir. 2018) ................................................................................. 37

*Pederson v. Louisiana State University*,
    213 F.3d 858 (5th Cir. 2000) ................................................................................. 32

*Pennhurst State School & Hospital v. Halderman*,
    451 U.S. 1 (1981) ............................................................................................. 27

*Pennsylvania v. Trump*,
    351 F. Supp. 3d 791 (E.D. Pa. 2019) ...................................................................................... 42

*Prescott v. Rady Children's Hosp.-San Diego*,
    265 F. Supp. 3d 1090 (S.D. Cal. 2017) ........................................................................ 20, 43

*Price Waterhouse v. Hopkins*,
    490 U.S. 228 (1989) ............................................................................................... 19, 21, 25

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ....................................................................................................... 34

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.*,
    490 U.S. 477 (1989) ....................................................................................................... 37

*Rumble v. Fairview Health Servs.*,
    No. 14-CV-2037, 2015 WL 1197415 (D. Minn. Mar. 16, 2015) .................................. 14, 38

*Schreane v. Beemon*,
    575 F. App'x 486 (5th Cir. 2014) .................................................................................. 9, 16

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) ........................................................................................ 21

*Sierra Club, Lone Star Chapter v. F.D.I.C.*,
    992 F.2d 545 (5th Cir. 1993) ........................................................................................ 10

*Singh v. RadioShack Corp.*,
    882 F.3d 137 (5th Cir. 2018) ........................................................................................ 14

*Smith v. City of Salem*,
    378 F.3d 566 (6th Cir. 2004) ................................................................................... 21, 22

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ....................................................................................................... 29

*Summers v. Earth Island Inst.*,
    555 U.S. 488 (2009) ....................................................................................................... 15

*Swanner v. Anchorage Equal Rights Comm'n*,
    874 P.2d 274 (Alaska 1994) ........................................................................................... 34

*Tagore* v. *United States*,
    735 F.3d 324 (5th Cir. 2013) ........................................................................................ 35

*Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*,
    207 F.3d 789 (5th Cir. 2000) ........................................................................................ 14

*Texas v. United States,*
    No. 16-CV-00054, 2016 WL 7852331(N.D. Tex. Oct. 18, 2016) ....................................... 23

*Texas v. United States,*
    340 F. Supp. 3d 579 (N.D. Tex. 2018) ............................................................................. 14

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ........................................................................................... 41

*Tovar v. Essentia Health,*
    342 F. Supp. 3d 947 (D. Minn. 2018) ......................................................................... 20, 42

*Town of Chester v. Laroe Estates, Inc.,*
    137 S. Ct. 1645 (2017) ................................................................................................... 9, 41

*Trans World Airlines, Inc. v. Hardison,*
    432 U.S. 63 (1977) ........................................................................................................... 25

*Trevino v. Center for Health Care Services,*
    No. 08-CV-0140, 2009 WL 2406196 (W.D. Tex. Aug. 3, 2009) ....................................... 40

*Trump v. Int'l Refugee Assistance Project,*
    137 S. Ct. 2080 (2017) ..................................................................................................... 39

*Turic v. Holland Hosp., Inc.,*
    85 F.3d 1211 (6th Cir. 1996) ........................................................................................... 18

*United States v. Burke,*
    504 U.S. 229 (1992) ......................................................................................................... 34

*United States v. Lee,*
    455 U.S. 252 (1982) ......................................................................................................... 35

*United States v. Virginia,*
    518 U.S. 515 (1996) ......................................................................................................... 36

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State,*
    454 U.S. 464 (1982) ......................................................................................................... 12

*Virginia Department of Education v. Riley,*
    106 F.3d 559 (4th Cir. 1997) ...................................................................................... 28, 29

*Washington v. Trump,*
    847 F.3d 1151 (9th Cir. 2017) ......................................................................................... 41

*Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    858 F.3d 1034 (7th Cir. 2017) ......................................................................................... 22

*Wittmer v. Phillips 66 Co.*,
  915 F.3d 328 (5th Cir. 2019) ............................................................... 23

**Statutes**

20 U.S.C. § 1681 ........................................................................... 26, 27

20 U.S.C. § 1682 ............................................................................... 29

20 U.S.C. § 1688 ............................................................................... 19

29 U.S.C. § 794 ................................................................................ 26

42 U.S.C. § 18023 ............................................................................. 19

42 U.S.C. § 18116 ........................................................................... 4, 26

42 U.S.C. § 2000bb-1. ......................................................................... 32

42 U.S.C. § 2000d .............................................................................. 26

42 U.S.C. § 2000d-7 ........................................................................... 32

42 U.S.C. § 2000e .............................................................................. 25

42 U.S.C. § 2000e-2 ........................................................................... 25

42 U.S.C. § 6101 ............................................................................... 26

5 U.S.C. § 706 ............................................................................... 4, 33

**Regulations**

45 C.F.R. § 86.40 (2005) ....................................................................... 5

45 C.F.R. § 92.101 (2016). .................................................................... 15

45 C.F.R. § 92.207 (2016) .................................................................... 6, 7

45 C.F.R. § 92.4 (2016) .................................................................... 4, 12

Nondiscrimination in Health Programs and Activities and its accompanying preamble.
  81 Fed. Reg. 31,376 (May 18, 2016) ............................................. 4, 5, 6, 7

Patient Protection and Affordable Care Act,
  Pub. L. 111-148 ............................................................................... 4

TRICARE; Mental Health and Substance Use Disorder Treatment,
    81 Fed. Reg. at 61,068 ................................................................................................. 36

**Rules**

Fed. R. Civ. P. 56 ....................................................................................................... 10, 16

Fed. R. Civ. P. 65 ........................................................................................................... 37

Fed. R. Evid. 201 ............................................................................................................ 21

N.D. Texas Local Rule 7.1(i)(1) .................................................................................... 17

**Other Authorities**

11A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure
    § 2947 (3d ed. 2013) .................................................................................................. 46

Dep't of Justice, Title IX Legal Manual
    § VII.C.2 (2005) ......................................................................................................... 35

Garner's Modern English Usage (4th ed. 2016) ........................................................... 31

*Litigation Guidelines for Cases Presenting the Possibility of Nationwide Injunctions*
    (Sept. 13, 2018) ......................................................................................................... 50

OED Online, Oxford University Press .......................................................................... 23

Webster's Third New International Dictionary (1961) .................................................. 23

## INTRODUCTION

"The true measure of our adversarial system of justice is not the results of cases, but whether the parties affected by those results had a full and fair opportunity to make their case to an impartial court." *ACLU of Texas v. Franciscan Alliance*, No. 17-10135, ECF No. 00514055754, at 4 (5th Cir. June 30, 2017) (Costa, J., concurring). This Court has already concluded that the Plaintiffs are likely to succeed on the merits of their claims, but that likelihood of success does not excuse a plaintiff from actually proving their case.

By filing a motion for summary judgment before a responsive pleading, with a notable absence of admissible evidence, and before the official administrative record has even been compiled, Plaintiffs seek to bypass the ordinary rules of litigation that exist to provide fairness to all parties—and the appearance of fairness to the public at large. Even worse, Plaintiffs' preemptive motions for summary judgment fail to meet the most rudimentary evidentiary standards. The State Plaintiffs, for example, rely almost entirely on the allegations in their Amended Complaint, in disregard for both the Federal Rules of Civil Procedure and this Court's local rules governing summary judgment.

There is only one plaintiff, Franciscan Alliance, that has cited to admissible evidence that it has Article III standing to challenge the regulations at issue in this case. Even then, Franciscan Alliance only objects to the regulations to the extent it is required to provide medical care and insurance coverage for gender transition-related treatment. None of the Plaintiffs represents that they intend to discriminate against individuals who have previously had abortions. And none of the Plaintiffs represents that they intend to deny routine care and health care coverage to transgender individuals. At this stage of litigation, where admissible evidence is needed to support Plaintiffs' standing, the only case and controversy before the Court is Franciscan

Alliance's specific objections to providing or paying for transition-related care.

On the merits of Plaintiffs' claims, this Court's legal conclusions at the preliminary injunction stage are not considered law of the case and must be revisited. As a general matter, the regulations prohibit discrimination against individuals who have terminated pregnancies, which does not require covered entities to perform or provide coverage for abortions, as Plaintiffs contend. Plaintiffs then argue that the agency that promulgated the regulations should not have treated discrimination based on gender identity as a form of discrimination based on sex. But over the past two years, every district court to consider the matter has determined that discrimination against transgender individuals is prohibited by the text of the non-discrimination statute itself. Plaintiffs contend that the regulations' inclusion of gender identity conflicts with statutes, but the text of the regulations explicitly provides that they do not conflict with Title VII's religious accommodation provisions, or incorporate Title IX's exemption for religiously affiliated schools.

Putting aside that the State Plaintiffs have submitted no admissible evidence as to how much funding is at risk by the regulations, the regulations do not violate their state sovereignty, as the regulations are consistent with federal authority to condition receipt of federal funds to ensure that the funds are spent in support of the general welfare. The regulations also do not overrule the States' standards of care, as they do not impose obligations inconsistent with doctors' own medical judgment.

Further, now that the case is at summary judgment stage, the Court cannot rule on Private Plaintiffs' arguments that the regulations violate the Religious Freedom Restoration Act ("RFRA") without reviewing the administrative record before the agency that promulgated the regulations. That record is necessary for the Court to determine whether the regulations serve a

compelling government interest and are narrowly tailored. The administrative record has not been produced, and accordingly, this Court cannot rule on the merits of Private Plaintiffs' claim. Even without the record, the regulations are neutral with regard to religion, and Private Plaintiffs have failed to identify any relevant exemptions to challenge that neutrality under the Free Exercise Clause.

It is not just the rules of litigation that raise questions of fairness in this case—the regulations that Plaintiffs seek to strike down are fundamentally about fairness as well. The regulations at issue are crucial to the fair treatment of many patients who simply want to access health care without facing the refusals of care and dignitary harms of discrimination—which can be life-threatening for transgender patients in particular. Yet if this Court nonetheless determines that Plaintiffs are entitled to summary judgment, it must at least limit any permanent injunction to the injuries that Plaintiffs have supported with admissible evidence. For example, there is no basis to invalidate the definitional provisions of the regulations in their entirety, particularly because then the government would be enjoined from taking action against *any* discrimination on the basis of gender identity. Nor have Plaintiffs demonstrated the necessity of nationwide relief.

Before demanding a final injunction, Plaintiffs should submit admissible evidence proving an actual injury in fact. Proposed Intervenors should have a chance to determine whether the evidence actually supports Plaintiffs' assertions. And the administrative record should be filed so that Proposed Intervenors can adequately defend the regulations. In a case "of great public interest with strong passions on both sides," *ACLU of Texas*, No. 17-10135, ECF No. 00514055754, at 5 (Costa, J., concurring), the Plaintiffs' confidence in their likelihood of success does not excuse them from following the same orderly rules that apply to every other litigant.

3

## STATEMENT OF FACTS

In order to review agency action, a "court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. When reviewing an "administrative determination, 'the focal point for judicial review should be the administrative record already in existence [on the basis of which the administrator's determination was made], not some new record made initially in the reviewing court.'" *La. Envtl. Soc'y, Inc. v. Dole*, 707 F.2d 116, 119 (5th Cir. 1983) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (alteration in original)). Where the administrative record is not before the court, it is unable to properly review the agency action on summary judgment. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).

Defendants have not provided this Court with the administrative record, which is necessary for judicial review of agency action. Accordingly, the following statement of facts is based solely on the text of the final agency regulation promulgated by the Department of Health and Human Services ("HHS"), "Nondiscrimination in Health Programs and Activities" and its accompanying preamble. 81 Fed. Reg. 31,376 (May 18, 2016 ("the Rule").

On March 23, 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. 111-148, also known as the Affordable Care Act. Section 1557 of the Affordable Care Act prohibits discrimination in federally financed health care programs and activities on the basis of race, sex, color, national origin, age, or disability. 42 U.S.C. § 18116. On May 18, 2016, HHS published the "Nondiscrimination in Health Programs and Activities" final rule, implementing Section 1557. 81 Fed. Reg. at 31,376. The Rule states that Section 1557's prohibition against sex discrimination includes "discrimination on the basis of . . . termination of pregnancy, or recovery therefrom . . . and gender identity." *Id.* at 31,467; 45 C.F.R. § 92.4 (2016).

**Prohibiting discrimination based on termination of pregnancy**

In the preamble to the Rule, HHS explains that the inclusion of "termination of pregnancy" in the definition of discrimination on the basis of sex was "based upon existing regulation and previous Federal agencies' and courts' interpretations." 81 Fed. Reg. at 31,388. In particular, as Section 1557 was intended to "extend[] the grounds for discrimination found in the nondiscrimination laws cited in the statute . . . to certain health programs and activities," the Rule "mirror[s]" the HHS Title IX nondiscrimination regulation, which explicitly includes discrimination on the basis of "'termination of pregnancy,'" as well as other pregnancy-based grounds. 81 Fed. Reg. at 31,387 (quoting 45 C.F.R. § 86.40(b) (2005)). The preamble highlights that individuals "have experienced considerable discrimination in accessing certain health care services such as mental health care and drug treatment services," due to pregnancy and related forms of discrimination. 81 Fed. Reg. at 31,428.

**Prohibiting discrimination against transgender people in providing routine medical care**

As documented by HHS, transgender people have experienced and continue to experience multiple forms of discrimination in access to health care services, insurance coverage, and facilities. According to preamble to the Rule, transgender individuals experience significant discrimination from entities providing health care even when seeking routine medical care for treatments unrelated to gender dysphoria. "For transgender individuals, a major barrier to receiving care is a concern over being refused medical treatment based on bias against them. In a 2010 report, 26.7% of transgender respondents reported that they were refused needed health care. A 2011 survey revealed that 25% of transgender individuals reported being subject to harassment in medical settings." 81 Fed. Reg. at 31,460. "Ultimately, transgender individuals who have experienced discrimination in the health care context often postpone or do not seek

needed health care, which may lead to negative health consequences." *Id* According to one survey, "one-quarter of the more than 6,400 transgender and gender-nonconforming respondents reported . . . being denied needed treatment[,] . . . being harassed in health care settings[,] . . . [and] postponing medical care because of discrimination by providers." *Id.* HHS "received several comments echoing these statements, both from individuals citing personal experiences and from entities citing data." *Id.*

The regulations provide critical protections to transgender individuals by ensuring that they are not denied routine medical care solely based on the fact that they are transgender. "For example, a provider could not refuse to treat a patient for a cold or a broken arm based on the patient's gender identity. Similarly, if the provider is accepting new patients, it must accept a new patient request from a transgender individual and cannot decline to accept a transgender individual in favor of a person who is not transgender." 81 Fed. Reg. at 31,455.

**Prohibiting discrimination in insurance coverage for transition-related care**

The regulation's only specific references to transition-related health care are in 45 C.F.R. § 92.207(b) (2016), which provides that a covered entity providing health insurance may not "[h]ave or implement a categorical coverage exclusion or limitation for all health services related to gender transition," *id.* § 92.207(b)(4), or "[o]therwise deny or limit coverage, deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition if such denial, limitation, or restriction results in discrimination against a transgender individual," *id.* § 92.207(b)(5).

In the preamble to the regulations, HHS explains that "covered entities have justified these blanket exclusions by categorizing all transition-related treatment as cosmetic or experimental. However, such across-the-board categorization is now recognized as outdated and

6

not based on current standards of care." 81 Fed. Reg. at 31,429. Critically, the preamble's references to exclusions as "outdated and not based on current standards of care" refer to insurance exclusions that categorically deny coverage for care "that a patient's provider says is medically necessary to treat gender dysphoria." 81 Fed. Reg. at 31,429, 31,435. The patient's provider makes an independent decision about whether the care is medically necessary, and nothing in the regulation restricts that provider's independent medical judgment.

Moreover, although 45 C.F.R. § 92.207 prohibits covered entities from categorically excluding transition-related care from their insurance policies, the regulation does not "determine, or restrict a covered entity from determining, whether a particular health service is medically necessary or otherwise meets applicable coverage requirements in any individual case." *Id.* § 92.207(d). The preamble to the regulation explains that HHS specifically rejected commenters' requests for the regulations to mandate particular treatment guidelines or particular forms of care. In response to those requests, HHS states that it "will not second-guess a covered entity's neutral nondiscriminatory application of evidence-based criteria used to make medical necessity or coverage determinations. Therefore, we refrain from adding any regulatory text that establishes or limits the criteria that covered entities may utilize when determining whether a health service is medically necessary or otherwise meets applicable coverage requirements." 81 Fed. Reg. at 31,436–37.

**Prohibiting discrimination in the provision of transition-related care**

The regulations also prohibit covered entities from refusing to provide "existing services in a nondiscriminatory manner" solely based on the fact that the services are for the purpose of gender transition. 81 Fed. Reg. at 31,455. Thus, "[a] provider specializing in gynecological services that previously declined to provide a medically necessary hysterectomy for a

transgender man would have to revise its policy to provide the procedure for transgender individuals in the same manner it provides the procedure for other individuals." *Id.* But this obligation applies only to "existing services." *Id.* The rules do not require a provider "to fundamentally change the nature of their operations to comply with the regulation. For example, the rule would not require a provider that operates a gynecological practice to add to or change the types of services offered in the practice." *Id.*

Critically, the regulations apply only to a covered entity—not to the individual doctors and health care workers employed at the covered entity. The regulations do not require hospitals to provide treatment "when their doctors believe such procedures are harmful" and do not prohibit hospitals from accommodating doctors' "religious objection to performing those procedures" consistent with the law. State Pls. Br. 8.

**ARGUMENT**

## I.   Plaintiffs Have Failed to Establish Standing to Challenge the Definitional Provisions of the Rule.

With one exception, none of the Plaintiffs has proffered admissible evidence establishing Article III standing. *See generally* Proposed Intervenors' App. 1–7.

None of the Plaintiffs has standing to challenge the "termination of pregnancy" provision of the Rule, because the "termination of pregnancy" provision does not require Plaintiffs to provide or pay for abortions. It simply prohibits discrimination based on the fact that a person has had an abortion. None of the Plaintiffs seeks to engage in such discrimination.

Plaintiffs also lack standing to challenge the "gender identity" provision of the Rule in its entirety. Only Franciscan Alliance has provided admissible evidence that it has standing to challenge the gender identity provision of the Rule, and then, only with respect to its objections to providing transition-related health care and insurance coverage. Franciscan Alliance does not

8

represent that it intends to discriminate against people based on their gender identity in other respects by, for example, refusing to provide routine medical care to transgender patients. Franciscan Alliance, therefore, lacks standing to challenge the definitional provision beyond the specific context of providing and paying for transition-related care. Accordingly, Plaintiffs are not entitled to summary judgment striking the regulations in their entirety, as they have failed to proffer evidence of Article III injuries supporting such relief.

### A. Plaintiffs Must Support Their Motion for Summary Judgment with Admissible Evidence—Not Merely Allegations From Their Complaint.

To establish standing on a motion for summary judgment, the Plaintiffs cannot rest on allegations from their unverified compliant, which "does not constitute competent summary judgment evidence." *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994); *see also Schreane v. Beemon*, 575 F. App'x 486, 489 n.1 (5th Cir. 2014). "Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Moreover, the Plaintiffs must "demonstrate standing for each claim [it] seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (internal quotation marks omitted).

Plaintiffs also cannot rely this Court's earlier standing determination in connection with their motion for a preliminary injunction because "at the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence" which does not meet the evidentiary standard at the summary judgment stage. *Sierra Club, Lone Star Chapter v. F.D.I.C.*, 992 F.2d

545, 551 (5th Cir. 1993). Instead, Plaintiffs must prove standing by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(a). Moreover, "an affidavit or declaration used to support . . . a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Unsubstantiated assertions, improbable inferences, and unsupported speculation" are not competent summary judgment evidence. *Brown v. City of Hous.*, 337 F.3d 539, 541 (5th Cir. 2003).

### B. Plaintiffs Lack Standing to Challenge the Rule's Definitional Provision Regarding Termination of Pregnancy.

Plaintiffs assert that they have standing to challenge the prohibition on discrimination based on "termination of pregnancy" because they claim it "pressures" them to provide abortions[1] or insurance coverage for abortions. Private Pls.' Br. 8; State Pls.' Br. at 8–9, 27, 39. But, as discussed below, the Rule's prohibition on discrimination based on "termination of pregnancy" simply prohibits covered entities from discriminating against a person who has terminated a pregnancy. It does not require covered entities to provide abortions or insurance coverage for abortions. *See infra* Part II. None of the Plaintiffs has represented that it intends to discriminate against individuals who have terminated pregnancies through the denial of health care or health insurance, nor have Plaintiffs cited admissible evidence to that effect. Indeed,

---

[1] Franciscan Alliance states that it would not provide an abortion under any circumstances. Yet Franciscan Alliance also claims to comply with EMTALA, Private Pls.' App. 8, 10, and such compliance would at times require performing an abortion to stabilize a patient. RCGA & ACLU Tex. Br., Nov. 13, 2016, ECF No. 53 at 15–16. Franciscan Alliance cannot categorically refuse to perform abortions in any and all situations and claim that it complies with EMTALA.

Franciscan Alliance states that it "would provide compassionate, high-quality care to a woman who, for example, needed emergency care for a complication that developed subsequent to an elective abortion," Private Pls.' App. 10–11, affirming that they *do not* discriminate against patients who have had abortions.

Under Fifth Circuit precedent, when there is a dispute over whether a statute actually prohibits plaintiffs from engaging in a particular course of conduct, "standing is reduced to a question of statutory interpretation." *Cruz v. Abbott*, 849 F.3d 594, 599 (5th Cir. 2017). In *Cruz*, plaintiffs who sheltered undocumented immigrants attempted to challenge a Texas statute making it illegal to encourage a person to remain in the country in violation of federal law by "harboring, or shielding that person from detection." *Id.* Texas argued that the plaintiffs lacked standing to challenge the statute because "the statute applies to persons or entities that hide illegal aliens from authorities, not to those who merely shelter them." *Id.* The Fifth Circuit agreed with Texas, holding that because the statute does not prohibit sheltering undocumented immigrants, the plaintiffs lacked standing to challenge it. *Id.* at 602; *see also Joint Heirs Fellowship Church v. Akin*, 629 F. App'x 627, 632 (5th Cir. 2015) (holding plaintiffs "cannot show a credible threat of enforcement" based on statutory interpretation contrary to the enforcement authority's interpretation).

The same principle applies here. Because Plaintiffs object to the Rule in relevant part on the ground they will not provide abortions or insurance coverage for abortions, and because the prohibition on discrimination based on "termination of pregnancy" does not itself require covered entities to provide or pay for abortions, Plaintiffs lack standing to challenge that provision. "'[I]t is the reality of the threat of [impending] injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions.'" *Cent. & S. W. Servs., Inc. v. U.S. E.P.A.*,

220 F.3d 683, 700 (5th Cir. 2000) (quoting *Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983)).

   **C.   Plaintiffs Do Not Have Standing to Challenge the Rule's Definitional Provision
         Regarding Gender Identity Because Their Alleged Injuries Are Limited to
         Providing and Paying for Transition-Related Care.**

   Plaintiffs are seeking a permanent injunction prohibiting HHS from enforcing a

definitional provision in the Rule that defines discrimination on the basis of sex to include

discrimination on the basis of gender identity. 45 C.F.R. § 92.4. But the Plaintiffs have not

offered evidence that they have standing to challenge this definitional provision of the Rule in its

entirety, or in all applications. Plaintiffs' general disagreement with whether discrimination

based on gender identity is properly construed as a form of sex discrimination does not, on its

own, establish a concrete injury. *See Delta Commercial Fisheries Ass'n v. Gulf of Mex. Fishery

Mgmt. Council*, 364 F.3d 269, 273 (5th Cir. 2004) (noting a "generalized interest in proper

application of the law . . . is not by itself an injury in fact for purposes of standing."); *Miss. State

Democratic Party v. Barbour*, 529 F.3d 538, 546 (5th Cir. 2008) ("'[T]he requirements of Article

III are not satisfied merely because a party requests a court of the United States to declare its

legal rights.'" (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church &

State*, 454 U.S. 464, 471 (1982)). Plaintiffs' challenge must be limited to addressing their

concrete injury in fact.

   Plaintiffs' alleged injuries rest on their objections to providing or paying for transition-

related care. *See, e.g.*, Pls.' Opp. Defs.' Mot., Apr. 4, 2019, ECF No. 152 at 2 (seeking assurance

as to "whether Plaintiffs can be forced to either perform or provide insurance coverage for

gender 'transition and abortion procedures'"). But by asking the Court to enjoin the Rule's

definitional provision, Plaintiffs seek to invalidate critical protections the regulations provide to

transgender people across an array of contexts beyond the specific issue of transition-related

care. For example, the Rule prohibits a provider from "refus[ing] to treat a patient for a cold or a broken arm based on the patient's gender identity." 81 Fed. Reg. at 31,455. Similarly, "a covered entity may not deny, based on an individual's identification as a transgender male, treatment for ovarian cancer where the treatment is medically indicated." *Id.* at 31,428.

None of the Plaintiffs provides admissible evidence that it intends to discriminate against individuals based on their gender identity except in the context of providing or paying for transition-related care. Indeed, Franciscan Alliance repeatedly states that it does *not* discriminate against transgender individuals in the provision of medical care generally. *See* Private Pls.' Br. 10, 35. In support, it asserts that:

> Franciscan provides all of its standard medical services to every individual who needs and qualifies for its care, including to individuals who identify as transgender. Thus, for instance, if a transgender individual required cardiac care, Franciscan would provide the same full spectrum of compassionate care for that individual as it provides for every other cardiac patient.

Private Pls.' App. 8. The Christian Medical Dental Association ("CMDA") similarly states that its members "treated and do treat individuals who identify as transgender, for health issues ranging from common colds to cancer." *Id.* at 25; *see also id.* at 464 ("I believe all patients should be treated with dignity and compassion, and I currently treat transgender patients who have type 1 diabetes. I give my transgender patients the same loving and compassionate medical care I give all my patients."). State Plaintiffs also do not allege or provide evidence that they intend to discriminate against individuals based on their gender identity outside the context of transition-related care.

Plaintiffs thus have no standing to invalidate the definitional provision of the Rule in its entirety. Even if Plaintiffs ultimately succeed in establishing that discrimination based on gender identity is not a form of discrimination based on sex under Section 1557, Plaintiffs' standing

13

would be limited to challenging the Rule in the specific context of providing and paying for transition-related care. "'[T]he actual-injury requirement would hardly serve the purpose of preventing courts from undertaking tasks assigned to the political branches, if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration.'" *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (alterations incorporated) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)).

Moreover, to the extent that *other* health care providers may wish to discriminate against transgender people by refusing to treat their broken bones or harassing them for failing to conform to sex stereotypes about their dress, mannerisms, and appearance, *cf. Rumble v. Fairview Health Servs.*, No. 14-CV-2037, 2015 WL 1197415, at *18 (D. Minn. Mar. 16, 2015), Plaintiffs lack prudential standing to "rais[e] another person's legal rights." *Singh v. RadioShack Corp.*, 882 F.3d 137, 151 (5th Cir. 2018). Plaintiffs are not the "'proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial power'" as to the definitional provision of the Rule. *Texas v. United States*, 340 F. Supp. 3d 579, 593 (N.D. Tex. 2018) (quoting *ACORN v. Fowler*, 178 F.3d 350, 362 (5th Cir. 1999)).

### D.  The Christian Medical Dental Association Has Not Proven an Article III Injury.

As an association, CMDA's standing is limited by that of its members: "An association has standing to bring a suit on behalf of its members when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members." *Texans United for a Safe Econ. Educ. Fund v. Crown Cent. Petroleum Corp.*, 207 F.3d 789, 792 (5th Cir. 2000) (citing *Hunt v. Wash. State Apple*

*Advert. Comm'n*, 432 U.S. 333, 343 (1977)). At summary judgment, CMDA is required to "establish[] that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009).

CMDA's standing fails at the first prong. In support of its standing, CMDA relies on the declaration of only one member, Dr. Robert Hoffman. The only alleged injury that Dr. Hoffman asserts is that he contends the Rule requires him to provide transition-related endocrine treatment to children. Private Pls.' App. 465. CMDA has not proffered admissible evidence of any other injury to Dr. Hoffman under the Rule, or any other injured member. Accordingly, CMDA does not have any arguable standing to challenge the Rule's termination of pregnancy provision, its standards for insurance coverage, or its prohibition against discrimination based on gender identity in accessing care and coverage generally.

Thus, at most, Dr. Hoffman could have a claim that the Rule requires him to provide transition-related hormone therapy to children. But this argument too fails. Most fundamentally, the Rule prohibits covered *entities*—not their employees—from discriminating in the provision of health care and coverage. 45 C.F.R. § 92.101(b) (2016). The Rule thus does not regulate Dr. Hoffman, as an employee of a covered entity, or his actions.

Moreover, Dr. Hoffman fails to offer any evidence that he has any likelihood of encountering a patient seeking transition-related hormone therapy. Even where a plaintiff is "strongly opposed" to regulations and "fully intended to violate them," a court "must assess the facts as they stood when the complaint was filed" to determine if there was "any real expectation" that the law would be violated. *Hyman v. City of Louisville*, 53 F. App'x 740, 744 (6th Cir. 2002) (holding physician lacked standing to challenge an employment nondiscrimination ordinance because he had not shown a need to hire new employees, or past job

15

applicants who he would have declined to hire based on their sexual orientation). Here, Dr. Hoffman states that if he were asked to offer puberty blocking medication to a child referred to him for gender dysphoria, he would refuse to do so. But he does not offer admissible evidence that such a scenario has occurred in the past, or is likely to occur in the future. Private Pls.' App. 464. He does not provide evidence that he will be referred a patient for gender dysphoria treatment, or that he will be asked to offer puberty-blocking medication for such a patient. Far from demonstrating that he will be placed in the position of violating the Rule, Dr. Hoffman states that he works at a hospital that has always accommodated his beliefs, and "accommodation is quite easy." *Id.* at 465.

Without evidentiary support, Hoffman's alleged injuries are neither concrete nor imminent. Therefore, on the present record, CMDA has failed to provide admissible evidence establishing even one member with an Article III injury in fact.

### E.  The State Plaintiffs Have Not Proven an Article III Injury.

At the preliminary injunction stage, this Court found that the State Plaintiffs had adequately alleged standing. But the State Plaintiffs have failed to proffer any admissible evidence proving their standing for purposes of summary judgment. In describing the impact of the Rule's prohibition of discrimination against transgender individuals, State Plaintiffs cite exclusively to the Amended Complaint, but "because it is unverified, it does not constitute competent summary judgment evidence." *King*, 31 F.3d at 346; *see also Schreane*, 575 F. App'x at 489 n.1. For that reason alone, the motion should be denied as to all State Plaintiffs.

The State Plaintiffs bear the burden of "citing to particular parts of materials in the record" to support their position that there's no genuine factual dispute as to its standing. Fed. R. Civ. P. 56(c)(1)(A). Even if "evidence exists in the summary judgment record," where, as here,

16

the party "fails even to refer to it . . ., that evidence is not properly before the district court." *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). Further, the local rules require parties to "include the materials in an appendix" that they intend to rely on in support of their motions. N.D. Texas Local Rule 7.1(i)(1).[2]

Even were this Court to review the record, the materials there relate only to Texas, and no other State Plaintiff has provided any admissible evidence of its standing in this suit. Further, Texas's arguments and admissible evidence support only a challenge to one narrow channel of potential harm and avenue for relief: the Rule's requirement that transition-related care be covered by its employee insurance plan. State Pls.' Br. 34 (citing no admissible evidence).

For example, Texas makes no allegations and presents no evidence with respect to its Medicaid program. At the preliminary injunction stage, Texas alleged that its Medicaid program was being investigated by HHS, but Texas has waived that argument by not including it in the motion for summary judgment. There is also not sufficient evidence in the record establishing that an investigation ever existed in the first place. An email from HHS's Office of Civil Rights poses questions about the Medicaid program, but is explicit that "[t]he investigation is not against the administration of the Texas Medicaid Program." States Pls.' App. 12.

Texas also fails to provide any admissible evidence in support its allegations that it is harmed by the Rule's prohibition on discrimination regarding the provision of transition-related medical care. State Pls.' Br. 8–9. Texas asserts the Rule requires the provision of such care, "even when their doctors believe such procedures are harmful," State Pls.' Br. 8, and prohibits Texas from accommodating physicians' religious objections. As discussed below, *see infra*

---

[2] State Plaintiffs' only two cites to the record evidence are to the exclusion of coverage for particular abortions, State Pls.' Br. 27, 39, which, as discussed above, is not addressed by the Rule. *See supra* Section I.B. Accordingly, they have not offered evidence that they will be injured by the inclusion of "termination of pregnancy" in the definition of sex discrimination.

Sections III.C., IV.C., both of those assertions are legally incorrect. But they are also completely hypothetical. Texas has provided no admissible information regarding whether transition-related care is currently offered at its hospitals or whether any providers object to providing transition-related care. Indeed, for all the record shows, Texas public hospitals may *already* be providing transition-related hysterectomies and mastectomies on a regular basis. To establish standing and win summary judgment, Texas must submit evidence proving that there is an "actual" conflict between the Rule and the treatment recommendations of doctors at its hospitals, not merely a "conjectural" or "hypothetical" one. *Lujan*, 504 U.S. at 560.

## II.     Plaintiffs Are Not Entitled to Summary Judgment on Any Claims Regarding Discrimination Based on "Termination of Pregnancy."

The Rule's prohibition on discrimination based on termination of pregnancy prohibits health care entities receiving federal funds from discriminating against someone because she has had an abortion, which has long been recognized as sex discrimination. *See Turic v. Holland Hosp., Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996) (holding an employer who discriminates against an employee who has exercised right to access abortion violates Title VII prohibition on sex discrimination). Indeed, this Court has acknowledged that "th[o]se sorts of practices are plainly *sex* discriminatory." Order, Jan. 24, 2017, ECF No. 69 at 9.

Plaintiffs nevertheless convinced this Court to issue a facial, nationwide injunction prohibiting the government from enforcing that antidiscrimination provision based on their bare assertion that the prohibition on discrimination based on termination of pregnancy "pressures" them to perform and provide insurance coverage for abortions. That is just not true. Prohibiting discrimination based on termination of pregnancy is not the same thing as requiring an entity to perform abortions or provide insurance coverage for them. Indeed, Title IX's provision regarding "neutrality with respect abortion"—the same provision that Plaintiffs argue should be

18

incorporated by reference as part of Section 1557—states that "[n]othing in this section shall be construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion." 20 U.S.C. § 1688. That (and only that) is what the challenged "termination of pregnancy" portion of the Rule prohibits.

The proper remedy to address Plaintiffs' claims is a declaratory judgment that the "termination of pregnancy" provision does not require them to perform or provide insurance coverage for abortions. Instead, the preliminary injunction Plaintiffs obtained—and the permanent injunction they seek—provide no additional protection to Plaintiffs who do not wish to "provide, pay for, provide coverage of, or refer for abortions." *See also* 42 U.S.C. § 18023. The one and only effect of the Court's injunction is to prevent the government from protecting Proposed Intervenors' members and other patients from being discriminated against based on the fact that they have terminated a pregnancy.

## III. Plaintiffs Are Not Entitled to Summary Judgment on Their APA Claims Regarding Discrimination on the Basis of Gender Identity.

In its preliminary injunction decision, this Court concluded that plaintiffs were likely to prevail in showing that the discrimination based on gender identity is not encompassed as a form of discrimination based on sex under Section 1557. That decision rested on the fundamentally flawed premise that the prohibitions on sex discrimination in Title IX and Section 1557 do not encompass discrimination based on sex stereotypes in accordance with *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Over the past two years, every other district court to consider the issue has disagreed with this Court's analysis. According to all of these courts, *Price Waterhouse* applies to Section 1557, and discrimination against transgender individuals is prohibited by the text of Section 1557 itself. *See Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 953 (D. Minn.

2018); *Flack v. Wis. Dep't of Health Servs.*, 328 F. Supp. 3d 931, 949–50 (W.D. Wis. 2018);

*Prescott v. Rady Children's Hosp.-San Diego*, 265 F. Supp. 3d 1090, 1098–1100 (S.D. Cal.

2017).

At the preliminary injunction stage, the Court found Plaintiffs likely to prevail on their

position that discrimination based on sex does not encompass discrimination based on gender

identity. The question now is whether the Plaintiffs prevail as a matter of final judgment. For the

reasons set forth below, this Court should recognize—in accordance with every other court to

consider the question—that Section 1557 prohibits discrimination based on failure to conform to

sex stereotypes. Accordingly, Plaintiffs' motion for summary judgment should be denied.

### A.  Under *Price Waterhouse* Discrimination on the Basis of Gender Identity Necessarily Entails Discrimination on the Basis of Sex.

In determining the meaning of discrimination on the basis of "sex," this Court drew a

sharp distinction between the term "sex" and the term "gender" with the term "sex" referring to

physical characteristics and "gender" referring to behavioral characteristics. But those terms of

art do not reflect the ordinary meaning of sex in 1964 or today. The term "sex" typically refers to

men and women in general, including both physical attributes and cultural and behavioral ones.

See "sex, n., 4a," OED Online, Oxford University Press (defining sex as "a social or cultural

phenomenon, and its manifestations" and collecting definitions dating back to 1651); Webster's

Third New International Dictionary 2081 (1961) (defining sex as the sum of the morphological,

physiological, and behavioral peculiarities of living beings that subserves biparental reproduction

. . . and that is typically manifested as maleness and femaleness.").

In reaching a contrary conclusion, this Court relied on a variety of secondary sources

cited by Plaintiffs regarding linguistics and the writings of John Money, Robert Stoller, and

Virginia Prince from *Transvestia* and other publications. *Franciscan All., Inc. v. Burwell*, 227 F.

Supp. 3d 660, 672 n.5 (N.D. Tex. 2016). None of these sources has been introduced through expert testimony, and the relevant content in these sources is not subject to judicial notice as facts that are "generally known" or "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201. Nor were they part of an agency administrative record before the Court. *See Overton Park*, 401 U.S. at 419–20 (limiting review of agency action to the administrative record). On a motion for preliminary injunction, the Plaintiffs were not restricted by the Federal Rules of Evidence, but to prevail on summary judgment Plaintiffs must now support their assertions with admissible evidence to have them considered as part of the summary judgment record.

Moreover, even if sex were defined exclusively as "biological differences between males and females," discrimination against an individual because their gender identity differs from their sex assigned at birth would still be discrimination "on the basis of sex" as a form of sex stereotyping under *Price Waterhouse*, 490 U.S. at 242, and *EEOC v. Boh Bros. Const. Co.*, 731 F.3d 444, 457 (5th Cir. 2013) (en banc). In *Price Waterhouse*, the Supreme Court held that an employer discriminated against a female employee on the basis of sex when it advised her to "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." 490 U.S. at 235, 250–51. *Price Waterhouse* thus demonstrated "that Title VII barred not just discrimination based on the fact that [the employee] was a woman, but also discrimination based on the fact that she failed 'to act like a woman.'" *Schwenk v. Hartford*, 204 F.3d 1187, 1201 (9th Cir. 2000). That is because when an employee is discriminated against for failing to conform to sex stereotypes, "*the discrimination would not occur but for the victim's sex.*" *Lewis v. Heartland Inns of Am.*, 591 F.3d 1033, 1040 (8th Cir. 2010) (quoting *Smith v. City of Salem*, 378 F.3d 566, 574 (6th Cir. 2004) (emphasis in original)).

21

Applying *Price Waterhouse* appellate and district courts across the country have held that discrimination based on transgender status is discrimination on the basis of sex. The Fifth Circuit cited approvingly to some of these decisions in *Boh Brothers*. 731 F.3d at 454 n.4. As these cases explain, "discrimination against a plaintiff who is a transsexual—and therefore fails to act and/or identify with his or her gender—is no different from the discrimination directed against Ann Hopkins in *Price Waterhouse*, who, in sex-stereotypical terms, did not act like a woman." *Smith*, 378 F.3d at 575. Because transgender individuals are, by definition, individuals whose gender identity does not conform to their sex assigned at birth, there is inherently "a congruence between discriminating against transgender and transsexual individuals and discrimination on the basis of gender-based behavioral norms." *Glenn v. Brumby*, 663 F.3d 1312, 1316 (11th Cir. 2011). "By definition, a transgender individual does not conform to the sex-based stereotypes of the sex that he or she was assigned at birth." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017).

The Fifth Circuit's en banc decision in *Boh Brothers* also forecloses the position that discrimination based on an individual's failure to conform to sex stereotypes violates Title VII only when it advantages men as a group over women as a group. In *Boh Brothers*, the Fifth Circuit sustained a jury verdict that an employer violated Title VII when the male superintendent on an iron worker crew degraded another male employee because, in the eyes of the harasser, the employee "fell outside of [a] manly-man stereotype." *Boh Bros.*, 731 F.3d at 459. There was no allegation that the harassing superintendent favored women as crew workers instead of men. And the fact that the crew superintendent also expressed degrading views about women, including the employee's daughter, *see id.* at 450 n.1, did not change the fact that the harassment against the employee was because of his sex. *See City of L.A., Dep't of Water & Power v. Manhart*, 435

U.S. 702, 709 (1978) ("[T]he statute requires that we focus on fairness to individuals rather than fairness to classes.").[3]

Under *Price Waterhouse* and *Boh Brothers*, discriminating against a transgender individual for being perceived an insufficiently masculine man or an insufficiently feminine woman is discrimination on the basis of sex.

## B. *Price Waterhouse* Applies to Title IX and Section 1557.

In its preliminary injunction decision, this Court held that *Price Waterhouse*'s recognition that sex stereotyping is a form of sex discrimination does not apply to Title IX and Section 1557. But just a few months earlier, this Court acknowledged in *Texas v. United States*, No. 16-CV-00054, 2016 WL 7852331, at *3 (N.D. Tex. Oct. 18, 2016), that Title IX *does* protect students from discrimination based on gender nonconformity. In that case, the Court enjoined the Department of Education from enforcing guidance regarding access to restrooms and locker rooms, but clarified that its injunction "does not affect a school's obligation [under Title IX] to investigate and remedy student complaints of . . . sex stereotyping." *Id.* Indeed, Courts have uniformly held that Title IX—like Title VII—protects individuals from discrimination based on gender nonconformity. *See Carmichael v. Galbraith*, 574 F. App'x 286, 292–93 (5th Cir. 2014) (Dennis, J., concurring) (collecting cases); *Johnston v. Univ. of Pittsburgh of Com. Sys. of Higher Educ.*, 97 F. Supp. 3d 657, 680 (W.D. Pa. 2015), *appeal dismissed*, No. 15-2022 (3d Cir. Mar. 30, 2016) (applying sex stereotyping precedent from Title VII to claims of transgender

---

[3] In *Wittmer v. Phillips 66 Co.*, 915 F.3d 328 (5th Cir. 2019), Judge Ho wrote a concurring opinion—which was not joined by any other judge on the panel—expressing his view that Title VII does not prohibit discrimination against transgender individuals because "sex stereotyping is actionable only to the extent it provides evidence of favoritism of one sex over the other." *Id.* at 339 (Ho, J., concurring). That argument directly conflicts with the en banc decision in *Boh Brothers*, which remains binding precedent in the Fifth Circuit. Unless and until Judge Ho's reasoning is adopted by a majority of the Fifth Circuit sitting en banc, this Court must continue to apply *Boh Brothers*.

individual under Title IX). Plaintiffs have failed to cite *any* case to the contrary.

The Supreme Court has also consistently applied the same definition of sex discrimination in both Title VII and Title IX. For example, in *Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 75 (1992), the Supreme Court specifically held that because sexual harassment is discrimination on the basis of sex under Title VII under *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986), it is also discrimination on the basis of sex under Title IX: "Title IX placed on the Gwinnett County Public Schools the duty not to discriminate on the basis of sex, and 'when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex.' We believe the same rule should apply when a teacher sexually harasses and abuses a student." *Franklin*, 503 U.S. at 75 (quoting *Meritor*, 477 U.S. at 64).[4]

In excluding sex stereotyping from the scope of Section 1557, this Court reasoned that if Congress wanted to incorporate sex stereotyping as a form of discrimination on the basis of sex "it could have incorporated Title VII's prohibition of sex discrimination instead of Title IX." *Franciscan All.*, 227 F. Supp. 3d at 689 n.28. To the contrary, Congress incorporated Title IX along with other statutes concerning federal funding because it also sought to incorporate the "enforcement mechanisms" regarding withholding of funds. Congress could not have referenced Title VII because Title VII is not a statute about federal funding and does not include withholding of funds as an enforcement mechanism. It is not plausible that by referencing Title IX along with other federal funding statutes, Congress signaled that health care providers should

---

[4] In denying Proposed Intervenors' motion for a stay pending appeal, this Court stated that the portion of *Franklin* cited by Proposed Intervenors "makes no mention of Title VII." *Franciscan All., Inc. v. Burwell*, No. 16-CV-00108, 2017 WL 2964088, at *6 n.7 (N.D. Tex. Jan. 24, 2017). Although the opinion does not explicitly reference "Title VII," it incorporates *Meritor*'s holding that sexual harassment against employees is sex discrimination and states that the same rule should apply to sexual harassment of students.

be free to discriminate against a female patient who does not "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Price Waterhouse*, 490 U.S. at 235. But that is the necessary consequence of the Court's prior holding.

### C. The Rule Does Not Conflict with Title VII's Religious Accommodation Provisions.

Plaintiffs assert that the challenged regulations conflict with Title VII's religious accommodation provisions. 42 U.S.C. §§ 2000e-2(a), 2000e(j). But the Rule specifically states that "[n]othing in this part shall be construed to invalidate or limit the rights, remedies, procedures, or legal standards available to individuals under . . . Title VII of the Civil Rights Act of 1964." 81 Fed. Reg. at 31,466. If any conflict exists, the Rule already provides that Title VII controls.

More fundamentally, the Rule imposes obligations only on entities receiving federal financial assistance, not their employees. *Id.* at 31,384. Contrary to Plaintiffs' contentions, nothing in the Rule would prevent an entity receiving federal financial assistance—the only persons subject to the Rule—from accommodating an objecting employee, so long as the entity ensures that health care services continue to be provided on a nondiscriminatory basis.

Plaintiffs have failed to provide any evidence indicating that they would be unable to provide accommodations for individual employees while still providing health care services to patients. But in the unlikely event that hypothetical situation occurs, Title VII does not require employers to accommodate employees' religious beliefs when doing so would result in an undue hardship. 42 U.S.C. § 2000e(j); *see also Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 84 (1977) (defining "undue hardship" to mean more than a de minimis cost). Applying the undue hardship analysis, the Fifth Circuit held that Title VII did not require a health care provider to

accommodate a counselor who refused to perform her job duties because she had a religiously motivated objection to serving gay people. *See, e.g.*, *Bruff v. N. Miss. Health Servs., Inc.*, 244 F.3d 495, 500–01 (5th Cir. 2001). In light of the Fifth Circuit's binding precedent in *Bruff*, Plaintiffs cannot show that the simple existence of an antidiscrimination regulation creates an irreconcilable conflict with Title VII's protections for religious accommodation.

### D.  The Rule Properly Recognizes that Section 1557 Does Not Incorporate Title IX's Exemption for Religiously Affiliated Schools.

In its preliminary injunction decision, this Court accepted the Private Plaintiffs' Argument that Section 1557 incorporates "the entire statutory structure" of Title IX, including its exemption for religiously affiliated schools. *Franciscan All.*, 227 F. Supp. 3d at 690. That argument conflicts with Section 1557's plain text, which provides that:

> [A]n individual shall not, *on the ground prohibited under* title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance[.]

42 U.S.C. § 18116(a) (emphasis added). The plain text of Section 1557 does not incorporate each and every subsection of Title VI, Title IX, the ADEA, and the Rehabilitation Act; it prohibits health programs from discriminating "on the ground prohibited by" those statutes, *i.e.* because of race, ethnicity, national origin, sex, age, and disability. *Id.*; *see* Garner's Modern English Usage 100, 442 (4th ed. 2016) (phrase "on the grounds" is synonym for "because").

The plain text of the statute is reinforced by common sense. The numerous exemptions in Title IX are tailored to educational institutions and make no sense when applied to hospitals and insurance policies. Title IX provides exceptions to its rule barring sex discrimination in education programs or activities receiving Federal financial assistance for vocational schools,

schools transitioning from single-sex to coeducational institutions, educational institutions controlled by a religious organization, military academies, single-sex colleges, fraternities and sororities, boys and girls conferences, father-son or mother-daughter activities, and beauty pageants. 20 U.S.C. § 1681(a). Congress plainly did not intend to incorporate all of these various exemptions into Section 1557's prohibition on discrimination by health care entities.

Plaintiffs argue that HHS acted inconsistently by incorporating statutory exemptions for Title VI and the Rehabilitation Act while at the same time declining to incorporate statutory exemptions to Title IX. But HHS explained the reason for that distinction: "[U]nlike the Age Act, Section 504, and Title VI, which apply to all programs and activities that receive Federal financial assistance (including health programs and activities), Title IX applies only in the context of education programs and not to the majority of the health programs and activities subject to the proposed rule. In addition, we noted that many of Title IX's limitations and exceptions do not readily apply in a context that is grounded in health care, rather than education." 81 Fed. Reg. at 31,376.

## IV.  The Rule Does Not Violate State Sovereignty.

### A.  The Rule Does Not Violate *Pennhurst.*

The State Plaintiffs argue that, as legislation passed pursuant to the Spending Clause, Section 1557 is subject to the "clear statement" rule required by *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1 (1981). But *Pennhurst* just applies to claims for damages, not prospective injunctive relief. In applying *Pennhurst*, the "central concern . . . is with ensuring that the receiving entity of federal funds has notice that it will be liable for a monetary award." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998) (internal quotation marks and brackets omitted). *Pennhurst* thus affects only the available remedy for violations, not the scope

of the behavior the law proscribes. *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 639 (1999); *see Gebser*, 524 U.S. at 284 (distinguishing between "the scope of the implied right" and "the scope of the available remedies"). Thus—as long as the recipient is not being held liable for damages for past conduct—"a court may identify the violation and enjoin its continuance or order recipients of federal funds prospectively to perform their duties incident to the receipt of federal money," and then "the recipient has the option of withdrawing and hence terminating the prospective force of the injunction." *Guardians Ass'n v. Civil Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 596 (1983) (White, J.); *see Gebser*, 524 U.S. at 287 (applying Justice White's *Guardians* opinion to Title IX).

Even with respect to damages, in an unbroken line of cases, the Supreme Court has applied *Pennhurst* to Title IX by restricting liability for damages to acts of intentional discrimination, as opposed to negligence or vicarious liability. It has never applied *Pennhurst* to Title IX by restricting the broad scope of the statutory text. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 182–83 (2005); *Davis*, 526 U.S. at 639; *Gebser*, 524 U.S. at 287; *Franklin*, 503 U.S. at 74–75; *see generally Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291 (2006) (applying *Pennhurst* in determining recipients' financial liability for costs under the Individuals with Disabilities in Education Act). That is because, as the Court has reaffirmed multiple times, "[t]he *Pennhurst* notice problem does not arise in a case . . . in which intentional discrimination is alleged." *Jackson*, 544 U.S. at 182–83 (alterations incorporated and internal quotation marks omitted).[5]

---

[5] Instead of relying on decisions interpreting Title IX, the State Plaintiffs rely on the Fourth Circuit's decision interpreting the Individuals with Disabilities Education Act in *Virginia Department of Education v. Riley*, 106 F.3d 559, 563 (4th Cir. 1997 (en banc), *superseded by* IDEA Amendments for 1997, Pub. L. No. 105–17, § 612. The question in *Riley* was whether the obligation to provide students with disabilities "a free appropriate public education" implicitly

**B. The Rule Is Not Unconstitutionally Coercive Under the Tenth Amendment.**

The State Plaintiffs also allege that the challenged regulations are unconstitutionally coercive under *National Federation of Independent Businesses v. Sebelius ("NFIB")*, 567 U.S. 519, 579 (2012). To the contrary, as *NFIB* itself explained, "We have upheld Congress's authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *Id.* at 580.

In addition to being legally flawed, the State Plaintiffs' coercion argument misstates the relevant facts about the amount of federal funds actually at issue. A critical part of the Court's decision in *NFIB* was based on the fact that "a State that opts out of the Affordable Care Act's expansion in health care coverage thus stands to lose not merely 'a relatively small percentage' of its existing Medicaid funding, but *all* of it." *NFIB*, 567 U.S. at 581 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)). The State Plaintiffs base their argument on the mistaken premise that they, too, risk losing all of their Medicaid and Medicare funding if they do not comply with Section 1557. To the contrary, Title IX's "pinpoint" provision limits termination of funding "to the particular program, or part thereof" where "noncompliance [is] . . . found." 20 U.S.C. § 1682; *see* Dep't of Justice, Title IX Legal Manual § VII.C.2 (2005), https://goo.gl/2TkL1t; *Bd. of Pub. Instruction of Taylor Cty., Fla. v. Finch*, 414 F.2d 1068, 1078 (5th Cir. 1969).

The State Plaintiffs here have provided no admissible evidence demonstrating which

---

required Virginia to provide private tutors to students who are expelled for serious misconduct *unrelated* to their disability. *See* 106 F.3d at 560 The dispute was not about the meaning of particular statutory terms, such as "handicap" or "free appropriate public education." It was about whether an entirely new condition completely unrelated to a student's disability could be implied. Even without resorting to *Pennhurst*, the Fourth Circuit held that such a requirement had no basis in the statutory text. *See id*. at 563.

specific programs they believe will be violating the Rule, how much funding those specific programs actually receive, or how much funding they would actually risk losing. Without that information, it is impossible for the State Plaintiffs to prove—or for the Proposed Intervenors to rebut—the assertion that the amount of funding at stake rises to the level of unconstitutional coercion under *NFIB*.

### C.  The Rule Does Not "Commandeer" States.

Section 1557 was passed pursuant to Congress's spending powers and does not directly command or commandeer State officials to do anything. The Supreme Court reaffirmed in *NFIB* that "Congress may use this power to grant federal funds to the States, and may condition such a grant upon the States taking certain actions that Congress could not require them to take. Such measures encourage a State to regulate in a particular way, and influence a State's policy choices." *NFIB*, 567 U.S. at 576 (internal citations and quotation marks omitted).

Moreover, the specific allegations made by the State Plaintiffs in support of their commandeering argument are simply false. The Rule does not "commandeer" State "standards of care." State Pls.' Br. 33. It does not impose any obligations on individual doctors. It does not require doctors to take any actions that are inconsistent with their own medical judgment, and it does not restrict the medical advice that doctors provide to patients. *See* 81 Fed. Reg. at 31,405 ("Scientific or medical reasons can justify distinctions based on the grounds enumerated in Section 1557.").

The Rule also does not require States to "allocate personnel, resources, and facility spaces to offer and accommodate myriad medical transition procedures." State Pls.' Br. 34. The Rule merely prohibits States from excluding transgender individuals from accessing the same services that the State already makes available. The preamble to the regulations specifically

states that providers do not "have to fundamentally change the nature of their operations to comply with the regulation. For example, the rule would not require a provider that operates a gynecological practice to add to or change the types of services offered in the practice." 81 Fed. Reg. at 31,455. The preamble also explicitly states that, under the Rule, "the infrastructure and protocols for providing services or treatment are already in place; providers would simply have to start providing those existing services in a nondiscriminatory manner to individuals regardless of sex." *Id.* Thus, if a State hospital performs hysterectomies for non-transgender women, it cannot prevent physicians from performing hysterectomies for transgender men. But if a State hospital does not already perform complex vaginoplasty and phalloplasty reconstructive surgeries for non-transgender patients, the Rule does not require them to create new practices or allocate new resources to provide those surgeries to transgender individuals.

In addition, State Plaintiffs' commandeering claims are not supported by evidence. There is no evidence in the record about the care offered at North Texas Hospital or any other State hospital in this case. There is no evidence about how those hospitals currently treat transgender patients, and whether the hospitals discriminate against them by refusing to provide transition-related care. Without any evidence to the contrary, it is entirely plausible that State hospitals are *already* providing basic transition-related care such as hysterectomies or mastectomies, in which case there would be no conflict between the care the State hospitals are currently providing and what the Rule requires them to provide. The State Plaintiffs offer only bare assertions and hypothetical speculations without any factual record. To win summary judgment, they must present actual evidence to back up those assertions.

### D.  The Rule Does Not Violate Sovereign Immunity.

The Rule also does not violate States' sovereign immunity because States waive their

sovereign immunity to claims under Section 1557 as a condition of accepting federal funds. By statute, Congress has specifically provided that:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7. In *Pederson v. Louisiana State University*, 213 F.3d 858, 876 (5th Cir. 2000), the Fifth Circuit held that "in 42 U.S.C. § 2000d-7(a)(a) Congress has successfully codified a statute which clearly, unambiguously, and unequivocally conditions receipt of federal funds under Title IX on the State's waiver of Eleventh Amendment Immunity."

Section 1557 specifically incorporates the remedies available under all of the statutes enumerated in 42 U.S.C. § 2000d-7, including private suits for damages. And, even without that explicit incorporation, Section 1557 would independently qualify as a "Federal statute prohibiting discrimination by recipients of Federal financial assistance" for purposes of waiving sovereign immunity. 42 U.S.C. § 2000d-7.

## V.  The Private Plaintiffs Are Not Entitled to Summary Judgment on Their Claims that the Rule Violates Protections for Religious Freedom.

### A.  There Is Not Sufficient Evidence in the Record to Evaluate Whether Applying the Rule to Private Plaintiffs Violates RFRA.

Pursuant to RFRA, the "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b). Here, the Private Plaintiffs maintain that the Rule burdens their religious exercise by requiring them to perform and pay for medical care that violates their religious beliefs. Private Pls.' Br. 35. Once a plaintiff shows that

a law substantially burdens religious exercise, "the burden shift[s] to the Department to show that" the law is "the least restrictive means of furthering [a] compelling government interest." *Holt v. Hobbs*, 135 S. Ct. 853, 863 (2015). Private Plaintiffs further argue that the Rule furthers no compelling government interest, while there are less restrictive options for fulfilling the government's interest in expanding access to health care for transgender individuals. Private Pls. Br. 38–43.

Without having reviewed the administrative record, this Court cannot conclude that there is no genuine issue of material fact as to whether the government's interest in expanding access to nondiscriminatory health care is compelling, or that the Rule was the least restrictive means to do so. As part of its review of agency action, the reviewing "court shall review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. "That review is to be based on the full administrative record that was before the Secretary at the time he made his decision." *Overton Park*, 401 U.S. at 420. Thus, "[i]n order for a court to resolve whether an agency's decision is violative of the APA, the agency must prepare a reviewable administrative record for the court." *City of Dallas v. Hall*, No. 3:07-CV-0060, 2007 WL 3257188, at *4 (N.D. Tex. Oct. 29, 2007).[6]

"That administrative record is not, however, before us." *Overton Park*, 401 U.S. at 419. The administrative record is particularly necessary to review whether the Rule violates RFRA. Proposed Intervenors' App. 3–4. From the preamble to the Rule, it is clear that HHS considered this question and made the determination that "the government has a compelling interest in ensuring that individuals have nondiscriminatory access to health care and health coverage." 81

---

[6] A court may grant emergency relief such as a temporary restraining order without the agency producing the full administrative record, but it cannot grant requests that would, in effect, give plaintiffs the ultimate relief they seek in a case "without a full and fair review of the administrative record." *Alison O. v. Anthem Blue Cross Life & Health Ins. Co.*, No. 13-CV-4787, 2013 WL 5979515, at *6 (N.D. Cal. Nov. 8, 2013); *see also, e.g.*, *Firestone Synthetic Rubber & Latex Co. v. Marshall*, 507 F. Supp. 1330, 1331 (E.D. Tex. 1981).

Fed. Reg. at 31,380. And review of the record would aid this Court in determining whether HHS

properly determined that the Rule was the least restrictive means of accomplishing its goals, such

as by reviewing and rejecting some of the alternatives proposed by Private Plaintiffs. Private

Pls.' Br. 42–43.[7] Accordingly, before response is required to Private Plaintiffs' motion of

summary judgment on their RFRA claim, the parties must be able to discover what materials the

agency considered when making its determination that the Rule is consistent with RFRA. *See*

*Overton Park*, 401 U.S. at 419–21 (remanding case to the district court for plenary review of

agency's decision because administrative record was not before the court); *Exxon Corp. v. Dep't*

*of Energy*, 91 F.R.D. 26, 39 (N.D. Tex. 1981).

---

[7] None of the alternatives Private Plaintiffs propose, such as the government itself providing funding for certain medical care or directing individuals to health care providers who do not discriminate in their practices, addresses the government's compelling interest in making sure that federal funds are not used to subsidize discrimination. The Supreme Court made clear in *Bob Jones University v. United States*, 461 U.S. 574 (1983), that there are no less restrictive means for furthering the government's interest in not funding discrimination than to simply not fund it. *Id.* at 604; *cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 733 (2014) (stating that prohibitions on racial discrimination in employment "are precisely tailored to achieve [the] critical goal" of eliminating such discrimination). Even if the government funds could be segregated from an organization's discriminatory activities, the very fact of government funding would impermissibly lend the government's "power, property, and prestige" to a discriminatory organization. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 725 (1961). Every single instance of discrimination "causes grave harm to its victims." *United States v. Burke*, 504 U.S. 229, 238 (1992); *see also Daniel v. Paul*, 395 U.S. 298, 307–08 (1969) (describing "the daily affront and humiliation involved in discriminatory denials of access to facilities ostensibly open to the general public" (internal quotation marks omitted)). Such discrimination also denies society the benefit of their "participation in political, economic, and cultural life." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 625 (1984). Because of the harms associated with each instance of invidious discrimination, there is simply no "numerical cutoff below which the harm is insignificant." *Swanner v. Anchorage Equal Rights Comm'n*, 874 P.2d 274, 282 (Alaska 1994). That is especially true in the health care context, where a discriminatory denial of coverage or services may discourage, or even prevent, individuals from seeking medically necessary care. *See* 81 Fed. Reg. at 31,380.

**B.  The Rule Does Not Violate the Free Exercise Clause.**

The Private Plaintiffs' challenge under the Free Exercise Clause should also be rejected.

"[T]he right of free exercise does not relieve an individual of the obligation to comply with a

'valid and neutral law of general applicability on the ground that the law proscribes (or

prescribes) conduct that his religion prescribes (or proscribes).'" *Emp't Div., Dep't of Human

Res. of Or. v. Smith*, 494 U.S. 872, 879 (1990) (quoting *United States v. Lee,* 455 U.S. 252, 263,

n.3 (1982)). The Rule is neutral with regard to religion, and generally applicable to the covered

health care entities, which all must "perform and provide insurance coverage for gender

transition." Private Pls.' Br. 44. And, contrary to Private Plaintiffs' suggestion, there is

absolutely nothing to suggest that the Rule was meant to target their religious exercise for special

mistreatment.

Private Plaintiffs' invocation of *Church of the Lukumi Babalu Aye, Inc. v. City of

Hialeah*, 508 U.S. 520 (1993), is inapplicable to this Rule. *Lukumi* concerned a Free Exercise

Clause challenge to laws that accomplish a "religious gerrymander, an impermissible attempt to

target petitioners and their religious practices" while permitting similar religious practices by

other religious groups. *Id.* at 535 (citation and internal quotation marks omitted); *see also

Merced v. Kasson*, 577 F.3d 578, 594 (5th Cir. 2009) (quoting *Lukumi*, 508 U.S. at 546–47).

Here, there is absolutely nothing to suggest that Section 1557 and the Rule were meant to target

the religious exercise of Franciscan Alliance and CMDA for special mistreatment. Private

Plaintiffs do not identify any exemptions for similar religious conduct in the Rule, nor do they

argue that Defendants are selectively restricting their religious exercise while allowing similar

groups to continue engaging in taxpayer-funded discrimination in health care. *See Tagore* v.

*United States*, 735 F.3d 324, 331 (5th Cir. 2013) (citing *Gonzales v. O Centro Espirita

*Beneficente Uniao do Vegetal*, 546 U.S. 418, 430–31 (2006)).

The Private Plaintiffs have not identified any "exemptions" in support of a free exercise claim. First, despite Plaintiffs' assertions to the contrary, HHS does not "exempt" its own Medicare program from following the same standards as the Section 1557 regulations. Under Medicare, the necessity of care must be determined on a case-by-case basis, which is precisely the same requirement set forth in Section 1557 regulations. HHS has no control over the Department of Defense or the Veterans' Administration, but TRICARE and the Veterans' Administration also both cover transition-related psychotherapy, pharmacotherapy, and hormone replacement therapy. TRICARE; Mental Health and Substance Use Disorder Treatment, 81 Fed. Reg. at 61,068, 61,071.

Second, the Rule's allowance for case-by-case factual determinations is not an example of "individualized exemptions," but a fundamental part of addressing allegations of discrimination. Indeed, the Rule states that its basis for the standard is drawn directly from Supreme Court precedent, 81 Fed. Reg. at 31,409 & n.146, which likewise requires that "[p]arties who seek to defend gender-based government action must demonstrate an 'exceedingly persuasive justification' for that action." *United States v. Virginia*, 518 U.S. 515, 531 (1996) (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982)). Drawing conclusions as to "whether a certain practice is discriminatory typically requires a nuanced analysis that is fact-dependent." 81 Fed. Reg. at 31,377. These individualized determinations are not intended to *waive* the requirement that entities not discriminate on the basis of sex, but to determine whether discrimination occurred at all.

Third, as discussed above, *see supra* Section III.D., the Rule does not incorporate Title IX's religious exemption, not as a means to target religious conduct, but because the plain text of

36

Section 1557 does not incorporate each and every subsection of the underlying statutes. The Title IX exemptions are tailored to educational institutions and make no sense when applied to hospitals and insurance policies. This Court cannot infer "gratuitous restrictions on religious conduct" where the Rule does not import exemptions inapplicable to the matter before the agency. *Lukumi*, 508 U.S. at 538 (internal quotation marks omitted).

Finally, as a last resort, Private Plaintiffs ask this court to "revisit" *Employment Division v. Smith*, 494 U.S. 872 (1990), but this Court is not free to do so. The Supreme Court has repeatedly instructed "'[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [district court and] Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.'" *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)).

## VI.   Any Injunction Must Be Limited to Remedying Plaintiffs' Article III Injuries.

If the Court grants summary judgment, any permanent injunction should be far more narrow and specific than this Court's sweeping, nationwide preliminary injunction. When granting an injunction, the district court must "state its terms specifically" and "describe in reasonable detail" the conduct restrained or required. Fed. R. Civ. P. 65(d). "Furthermore, the court 'must narrowly tailor an injunction to remedy the specific action which gives rise to the order.'" *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 586 (5th Cir. 2013) (*John Doe # 1 v. Veneman,* 380 F.3d 807, 818 (5th Cir. 2004)). "[A]n injunction must be vacated if it fails to meet these standards and is overbroad." *ODonnell v. Harris Cty.*, 892 F.3d 147, 163 (5th Cir. 2018) (internal quotation marks omitted). This Court's preliminary injunction order ran afoul of those requirements in several different respects.

37

**A.  Plaintiffs' Article III Injuries Can Be Addressed Without Facially Invalidating All Protections from Discrimination Based on Gender Identity.**

The only Article III injuries claimed by Plaintiffs relate to the coverage or provision of transition-related health care. *See* First Am. Compl., Oct. 17, 2016, ECF No. 21 ¶¶ 58, 60, 62, 64, 78, 98, 101, 107. Plaintiffs specifically state that they do not otherwise discriminate against transgender individuals and that they have no objection to providing them with medical care and insurance coverage for non-transition-related treatment. An injunction targeted at those specific requirements would provide Plaintiffs complete relief to address all their demonstrated Article III injuries. "'The actual-injury requirement would hardly serve the purpose of preventing courts from undertaking tasks assigned to the political branches, if once a plaintiff demonstrated harm from one particular inadequacy in government administration, the court were authorized to remedy *all* inadequacies in that administration.'" *DaimlerChrysler Corp.*, 547 U.S. at 353 (quoting *Lewis*, 518 U.S. at 357 (alterations incorporated)).

Instead of enjoining HHS from taking specific enforcement actions, the injunction was targeted in the abstract at the *definitional* provisions in the Rule, not the specific portions of the regulations concerning transition-related care, and extends to all forms of discrimination on the basis of "gender identity." As a result, Defendants are enjoined from taking *any* action to enforce Section 1557 against any covered health care entity in the country that refuses to provide routine medical care to a transgender person. As documented by HHS:

> For transgender individuals, a major barrier to receiving care is a concern over being refused medical treatment based on bias against them. In a 2010 report, 26.7% of transgender respondents reported that they were refused needed health care. A 2011 survey revealed that 25% of transgender individuals reported being subject to harassment in medical settings.

81 Fed. Reg. at 31,460. For example, in *Rumble v. Fairview Health Services*, a federal district court held that an 18-year-old transgender plaintiff—who alleged that he was subjected to

prolonged and extreme abuse at a Minnesota hospital, over a six-day period, after requesting medical treatment for his debilitating pain and fever—had validly stated a Section 1557 sex discrimination claim. *See* 2015 WL 1197415, at *18.

When it issued its nationwide injunction, the Court considered the harms that an injunction would impose on the government, but it failed to sufficiently consider the significant harms that the injunction imposes on third parties who rely on the government for protection. The proper scope of an injunction is "dependent as much on the equities of a given case as the substance of the legal issues it presents," and courts must tailor the scope "'to meet the exigencies of the particular case.'" *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (quoting 11A C. Wright, A. Miller & M. Kane, Federal Practice & Procedure § 2947 (3d ed. 2013)). A nationwide injunction facially invalidating the definitional provisions of the Rule fails to properly balance the equities in a case that affects the health of women and transgender people across the country and across a wide range of contexts that have nothing to do with abortion or transition-related care.

### B.  The Preliminary Injunction Does Not Provide the Clarity Required by Rule 65.

"Under Rule 65(d), a general injunction which in essence orders a defendant to obey the law is not permitted." *Littell v. Houston Indep. Sch. Dist.*, 894 F.3d 616, 631 (5th Cir. 2018) (internal alterations and quotation marks omitted). By simply enjoining the definitional provisions of the Rule, this Court's injunction merely tells HHS to "follow the law" without any of the specificity Rule 65 requires.

In denying Proposed Intervenors' first request to stay the preliminary injunction pending appeal, this Court stated that "[d]iscrimination on the basis of sex is still clearly prohibited and unaffected by the Court's Order, which enjoined only the new and unauthorized portion of the

Rule, which defined prohibited sex discrimination to include: 'gender identity' and 'termination of pregnancy.'" Order, ECF No. 69 at 9. But the premise of the Rule is that discrimination against someone for being transgender inherently involves discrimination based on sex. Even if this Court disagrees with that premise, there would still be instances in which an adverse action constitutes both discrimination based on gender identity and sex discrimination. This Court's preliminary injunction provides no guidance on whether HHS is prohibited from protecting transgender people from discrimination in any particular pattern.

For example, the district court in *Trevino v. Center for Health Care Services*, No. 08-CV-0140, 2009 WL 2406196 (W.D. Tex. Aug. 3, 2009), found that the following evidence was sufficient to survive summary judgment on a claim by a transgender employee that she was discriminated against because of sex under Title VII:

> Trevino presented summary-judgment evidence showing that she experienced harassment for years. Her evidence indicates that her coworkers and supervisors referred to Trevino as a "he-she," "cross-dresser," "transsexual," and "cross-gender," and made such comments as "you're not a woman," "why are you dressing like a woman," "you look like a man," "you look like a drag queen," "did the doctor cut off your penis," "can you have sex," "you cannot be married," "you're man," and "what parts do you have?" These statements are sufficient to support a claim of severe and pervasive harassment, conveying the message that Trevino is incompetent because of her sex.

*Id.* at *3 (footnotes omitted). Similarly, in *Lopez v. River Oaks Imaging & Diagnostic Group, Inc.*, 542 F. Supp. 2d 653 (S.D. Tex. 2008), the court found that a transgender job applicant presented direct evidence of sex discrimination under Title VII when a company rescinded its job offer to her because: "You presented yourself as a female and we later learned you are a male." *Id.* at 646, 656, 662. This Court's preliminary injunction provides no guidance on whether HHS remains able to investigate and remedy discrimination based on either of those fact patterns. It is not enough for the injunction to say HHS can remedy discrimination based on sex, but not

40

discrimination based on gender identity, because it is difficult—if not impossible—to distinguish between those concepts in any particular case.

None of these problems would exist if the inunction were limited to remedying Plaintiffs' specific Article III injuries instead of targeting the Rule's definitional provisions in the abstract.

### C.  A Nationwide Injunction Is Unnecessary and Overbroad.

The nationwide scope of this Court's preliminary injunction not only violates Rule 65, but also raises concerns under Article III. As the Supreme Court emphasized, "standing is not dispensed in gross," and "a plaintiff must demonstrate standing for each claim [it] seeks to press *and for each form of relief that is sought*." *Town of Chester*, 137 S. Ct. at 1650 (emphasis added) (internal quotation marks omitted); *accord Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). This is not a case where nationwide relief is necessary in order to give the Plaintiffs complete relief. *Cf. Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) ("[T]here is a substantial likelihood that a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states.")*, as revised* (Nov. 25, 2015). Nor is it a case where the nature of the claim makes it impossible for the court to issue a narrower injunction. *Cf. Washington v. Trump*, 847 F.3d 1151, 1167 (9th Cir. 2017) ("[T]he Government has not proposed a workable alternative form of the TRO . . . that would protect the proprietary interests of the States at issue here while nevertheless applying only within the States' borders."). Nor is it a case involving immigration law or foreign affairs where there is an overriding interest in nationwide uniformity. *Cf. Texas*, 809 F.3d at 188 (immigration). In these circumstances, the States' request for a nationwide injunction simply reflects a desire to control conduct occurring outside its borders in States that have made a deliberate decision not to join this lawsuit.

Moreover, although nationwide injunctions are more common in challenges under the

APA, "[t]he concerns about overbroad injunctions carry into APA cases." *Pennsylvania v. Trump*, 351 F. Supp. 3d 791, 832 (E.D. Pa. 2019). "[W]hile an APA violation may 'ordinar[ily]' result in a nation-wide remedy, the potential dangers of an overbroad injunction must still be weighed when crafting a remedy for an APA violation." *Id.*; *see, e.g.*, *L.A. Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 665 (9th Cir. 2011) (vacating nationwide injunction of facially invalid regulation because "[a]n order declaring the hospice cap regulation invalid, enjoining further enforcement against Haven Hospice, and requiring the Secretary to recalculate its liability in conformity with the hospice cap statute, would have afforded the plaintiff complete relief"); Attorney General Sessions, *Litigation Guidelines for Cases Presenting the Possibility of Nationwide Injunctions* at 7 (Sept. 13, 2018), https://www.justice.gov/opa/press-release/file/1093881/download ("[E]ven where the rule itself is the subject of legal challenge, the text of section 706 does not specify whether the rule, if found invalid, should be set aside *on its face* or *as applied to the challenger*.").

In its preliminary injunction decision, this Court noted that "CMDA's membership extends across the country." *Franciscan All.*, 227 F. Supp. 3d at 695. But CMDA has failed to present admissible evidence establishing that one of its members is a "covered entity" subject to the Rule or faces a concrete and imminent Article III injury. Moreover, even if an injunction were necessary to protect CMDA's members nationwide, the injunction should still be limited to CMDA's members. There is no reason to enjoin the Rule nationwide as applied to third parties.

A nationwide injunction is particularly inappropriate here because courts in other jurisdictions have concluded that, regardless of what happens to the Rule, the text of Section 1557 itself prohibits discrimination against transgender individuals as a form of discrimination on the basis of sex. *See Tovar*, 342 F. Supp. 3d at 953; *Flack*, 328 F. Supp. 3d at 940–50;

*Prescott*, 265 F. Supp. 3d at 1098–1100. This Court has no control over how other district courts in other jurisdictions interpret Section 1557 in accordance with their own controlling circuit precedent. A nationwide injunction prohibiting enforcement of the Rule will not—and cannot—provide a nationwide resolution of whether prohibiting discrimination against transgender individuals violates Section 1557.

## CONCLUSION

Both State Plaintiffs' and Private Plaintiffs' motions for summary judgment should be denied.

Respectfully submitted this the 5th day of April, 2019.

/s/ *Joshua Block*
Joshua Block
(NY Bar No. 4370573)
Lindsey Kaley
Brigitte Amiri
James D. Esseks
Louise Melling
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500

Daniel Mach
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street, N.W.
Washington, D.C. 20005
(202) 548-6604

Kali Cohn
AMERICAN CIVIL LIBERTIES UNION OF TEXAS
P.O. Box 600169
Dallas, TX 75360
(214) 346-6577

43

Amy Miller
AMERICAN CIVIL LIBERTIES UNION OF NEBRASKA
134 S. 13th St., #1010
Lincoln, NE 68508
(402) 476-8091


*Counsel for Proposed Intervenors*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 5th day of April, 2019, I electronically filed the foregoing with the clerk of the court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court.


By:     /s/ *Joshua Block*
          JOSHUA BLOCK

45