**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION**

| | |
|---|---|
| FRANCISCAN ALLIANCE, INC.; SPECIALTY PHYSICIANS OF ILLINOIS, LLC,; CHRISTIAN MEDICAL & DENTAL ASSOCIATIONS; <br><br> - and - <br><br> STATE OF TEXAS; STATE OF NEBRASKA; COMMONWEALTH OF KENTUCKY, by and through Governor Matthew G. Bevin; STATE OF KANSAS; STATE OF LOUISIANA; STATE OF ARIZONA; and STATE OF MISSISSIPPI, by and through Governor Phil Bryant, <br><br> *Plaintiffs,* <br><br> v. <br><br> ALEX M. AZAR, II, Secretary of the United States Department of Health and Human Services; and UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> *Defendants.* | Civ. Action No. 7:16-cv-00108-O <br><br><br> **REPLY BRIEF IN SUPPORT OF STATE PLAINTIFFS' RENEWED MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ iii

REPLY TO THE FEDERAL GOVERNMENT ......................................................1

    INTRODUCTION ....................................................................................1

    ARGUMENT ..........................................................................................1

    I.    The Court Should Address All of the Plaintiffs' Claims. ......................1

    II.    The Plaintiffs Need Complete Relief Now. ............................................3

    III.    A Nationwide Permanent Injunction Will Provide Uniform Application of Federal Healthcare Laws and Regulations. .................5

REPLY TO THE PUTATIVE INTERVENORS .........................................................7

    INTRODUCTION ....................................................................................7

    ARGUMENT ..........................................................................................7

    I.    The Court Can Decide the Case on the Record Submitted ..................7

    II.    State Plaintiffs Have Standing to Challenge the Rule. ......................10

        A.    State Plaintiffs are "objects of the regulation" at issue. .........11

        B.    The Rule inflicts economic injuries on State Plaintiffs. ...........16

    III.    The Rule Violates the APA. ...............................................................18

        A.    Discrimination on the basis of "sex" does not include discrimination on the basis of "termination of pregnancy." ...............................................................................18

        B.    Discrimination on the basis of "sex" does not include discrimination on the basis of "gender identity." ....................19

    IV.    The Rule Violates the Spending Clause of Article I and the Anti-Commandeering Doctrine of the Tenth Amendment. ................22

        A.    The Rule violates the clear notice doctrine. ............................23

        B.    The Rule commandeers States. ................................................24

    V.    The Rule Unlawfully Invades States' Sovereign Immunity. ..............24

CONCLUSION ............................................................................................25

CERTIFICATE OF SERVICE ..........................................................................27

# TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Alaska v. U.S. Dep't of Transp.*,
  868 F.2d 441 (D.C. Cir. 1989) ............................................................................. 13

*Altitude Express, Inc. v. Zarda*,
  No. 17-1623, 2019 WL 1756678 (U.S. Apr. 22, 2019)...................................... 4, 22

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001)................................................................................ 8

*Am. Family Life Assurance Co. of Columbus v. Biles*,
  714 F.3d 887 (5th Cir. 2013) ................................................................................... 9

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*,
  548 U.S. 291 (2006) ............................................................................................... 23

*Ass'n of Am. Railroads v. Dep't of Transp.*,
  38 F.3d 582 (D.C. Cir. 1994) ........................................................................... 11, 12

*Barsky v. Bd. of Regents of Univ. of N.Y.*,
  347 U.S. 442 (1954) ............................................................................................... 14

*Bernard v. Gulf Oil Co.*,
  619 F.2d 459 (5th Cir. 1980) (en banc) ................................................................... 2

*Blum v. Gulf Oil Corp.*,
  597 F.2d 936 (5th Cir. 1979) ............................................................................. 4, 22

*Bostock v. Clayton Cty.*,
  No. 17-1618, 2019 WL 1756677 (U.S. Apr. 22, 2019)...................................... 4, 22

*Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*,
  750 F.3d 184 (2d Cir. 2014)..................................................................................... 3

*Camp v. Pitts*,
  411 U.S. 138 (1973) ................................................................................................. 8

*Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) ................................................................................................. 8

*Contender Farms, LLP v. USDA*,
  779 F.3d 258 (5th Cir. 2015) ................................................................................. 11

*Cooper v. Tex. Alcoholic Beverage Comm'n,*
   820 F.3d 730 (5th Cir. 2016) ................................................................ 16

*Wyoming ex rel. Crank v. United States,*
   539 F.3d 1236 (10th Cir. 2008) ............................................................ 13

*Davis v. Monroe Cty. Bd. of Educ.,*
   526 U.S. 629 (1999) ................................................................... 18, 23

*EEOC v. Big Lots Stores, Inc.,*
   No. 9:08–CV–177, 2009 WL 10677352 (E.D. Tex. Oct. 6, 2009) ............ 19

*EEOC v. Boh Brothers Construction Co., LLC,*
   731 F.3d 444 (5th Cir. 2013) (en banc) ................................................. 21

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ............................................................................ 2

*Gonzales v. Carhart,*
   550 U.S. 124 (2007) .......................................................................... 13

*Louisiana ex rel. Guste v. Verity,*
   853 F.2d 322 (5th Cir. 1988) ................................................................. 8

*Harris v. United States,*
   19 F.3d 1090 (5th Cir. 1994) ................................................................. 8

*Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cty.,*
   455 F.2d 818 (5th Cir. 1972) ................................................................. 5

*Ill. Dep't of Transp. v. Hinson,*
   122 F.3d 370 (7th Cir. 1997) ............................................................... 13

*INS v. Cardoza-Fonseca,*
   480 U.S. 421 (1987) ............................................................................ 8

*Int'l Shortstop, Inc. v. Rally's, Inc.,*
   939 F.2d 1257 (5th Cir. 1991) ............................................................... 9

*Jacobs v. Theimer,*
   519 S.W.2d 846 (Tex. 1975) ................................................................ 15

*Loa-Herrera v. Trominski,*
   231 F.3d 984 (5th Cir. 2000) ............................................................... 11

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................... 10, 11, 15

*Lujan v. Nat. Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................................... 6

*Maryland v. King*,
  567 U.S. 1301 (2012) ....................................................................... 13

*Massachusetts v. EPA*,
  549 U.S. 497 (2007) ......................................................................... 10

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986) ........................................................................... 8

*McAllen Grace Brethren Church v. Salazar*,
  764 F.3d 465 (5th Cir. 2014) ........................................................... 10

*Mitchell v. Pidcock*,
  299 F.2d 281 (5th Cir. 1962) ............................................................. 5

*Murk v. Scheele*,
  120 S.W.3d 865 (Tex. 2003) (per curiam) ....................................... 14

*Nat'l Fed'n of Indep. Bus. v. Perez*,
  No. 5:16-cv-00066-C, 2016 WL 3766121 (N.D. Tex. June 27, 2016) ...................... 6

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
  567 U.S. 519 (2012) ................................................................... 16, 24

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*,
  145 F.3d 1399 (D.C. Cir. 1998)...................................................... 5, 6

*Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*,
  700 F.3d 185 (5th Cir. 2012) ........................................................... 10

*Nevada Dep't of Human Res. v. Hibbs*,
  538 U.S. 721 (2003) ......................................................................... 24

*Nevada v. U.S. Dep't of Labor*,
  218 F. Supp. 3d 520 (E.D. Tex. 2016) ............................................... 6

*New York v. United States*,
  505 U.S. 144 (1992) ......................................................................... 24

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
  557 U.S. 193 (2009) ........................................................................... 2

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
  523 U.S. 726 (1998) ........................................................................... 4

*Pace v. Bogalusa City Sch. Bd.*,
   403 F.3d 272 (5th Cir. 2005) ............................................................................... 25

*Pederson v. La. State Univ.*,
   213 F.3d 858 (5th Cir. 2000) ............................................................................... 11

*Pennhurst State Sch. & Hosp. v. Halderman*,
   451 U.S. 1 (1981) ................................................................................................ 23

*Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*,
   734 F.3d 406 (5th Cir. 2013) ............................................................................... 13

*Price Waterhouse v. Hopkins*,
   490 U.S. 228 (1989) ......................................................................... 19, 20, 21, 22

*Printz v. United States*,
   521 U.S. 898 (1997) ........................................................................................... 24

*R.G. & G.R. Harris Funeral Homes v. EEOC*,
   No. 18-107, 2019 WL 1756679 (U.S. Apr. 22, 2019) ...................................... 4, 22

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
   547 U.S. 47 (2006) ............................................................................................ 9, 10

*Sierra Club v. U.S. Fish & Wildlife Serv.*,
   245 F.3d 434 (5th Cir. 2001) ................................................................................. 8

*Spokeo, Inc. v. Robins*,
   136 S. Ct. 1540 (2016) ........................................................................................ 11

*Susan B. Anthony List v. Driehaus*,
   134 S. Ct. 2334 (2014) ........................................................................................ 11

*Tex. Democratic Party v. Benkiser*,
   459 F.3d 582 (5th Cir. 2006) ............................................................................... 16

*Texas v. United States*,
   201 F. Supp. 3d 810 (N.D. Tex. 2016) .................................................................. 6

*Texas v. United States*,
   300 F. Supp. 3d 810 (N.D. Tex. 2018) .................................................................. 3

*Texas v. United States*,
   497 F.3d 491 (5th Cir. 2007) ............................................................................... 15

*Texas v. United States,*
   809 F.3d 134 (5th Cir. 2015), *aff'd by an equally divided court*, 136
   S. Ct. 2271 (2016) ................................................................ 5, 6, 10, 11, 13

*Time Warner Cable, Inc. v. Hudson,*
   667 F.3d 630 (5th Cir. 2012) .................................................................. 15

*Turic v. Holland Hospitality, Inc.,*
   85 F.3d 1211 (6th Cir. 1996) .................................................................. 18

*Washington v. Glucksberg,*
   521 U.S. 702 (1997) .............................................................................. 14

*Wilson v. Scott,*
   412 S.W.2d 299 (Tex. 1967) .................................................................. 15

*Wittmer v. Phillips 66 Co.,*
   915 F.3d 328 (5th Cir. 2019) ...................................................... 4, 20, 22

*Zarda v. Altitude Exp., Inc.,*
   883 F.3d 100 (2d Cir. 2018) (Lynch, J., dissenting), *cert. granted* No.
   17-1623, 2019 WL 1756678 (U.S. Apr. 22, 2019) .................................. 20

**Statutes**

5 U.S.C. § 553 .......................................................................................... 5

5 U.S.C. § 706 ................................................................................. 2, 5–6

20 U.S.C. § 1682 ...................................................................................... 18

20 U.S.C. § 1686 ...................................................................................... 21

42 U.S.C. § 1396c .................................................................................... 16

42 U.S.C. § 2000d-7 ................................................................................ 25

42. U.S.C. § 18116 ........................................................................... 23, 25

Tex. Gov't Code § 531.0055 .................................................................... 16

Tex. Health & Safety Code § 12.0115 ..................................................... 16

Tex. Health & Safety Code § 311.083 ..................................................... 14

Tex. Occ. Code § 162.0021 ...................................................................... 14

Tex. Occ. Code § 162.0022 ...................................................................... 14

## Other Authorities

34 C.F.R. § 106.33 ........................................................................................... 21

45 C.F.R. § 92.4 .............................................................................................. 12

45 C.F.R. § 92.5 .............................................................................................. 12

45 C.F.R. § 92.7 ......................................................................................... 12, 16

45 C.F.R. § 92.8 .............................................................................................. 17

45 C.F.R. § 92.206 ........................................................................................... 12

45 C.F.R. § 92.301 ........................................................................................... 18

80 Fed. Reg. 54,172 (Sept. 8, 2015) ................................................................ 5, 12

81 Fed. Reg. 31,375 (May 18, 2016) .......................................................... 5, 12, 13, 17

22 Tex. Admin. Code § 177.3 ............................................................................. 14

22 Tex. Admin. Code § 177.5 ............................................................................. 14

Fed. R. Civ. P. 56(a) ..................................................................................... 7–8

Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment ........................... 8

Jesse Singal, *When Children Say They're Trans*, THE ATLANTIC,
    July/Aug., 2018 ............................................................................................ 21

Katherine Cave, *The Medical Scandal that the Mainstream Media
    Ignores*, PUBLIC DISCOURSE, Apr. 8, 2019 ........................................................ 21

W. M. Moldoff, Annotation, *Malpractice: physician's duty to inform
    patient of nature and hazards of disease or treatment*, 79 A.L.R.2d
    1028 (1961) ................................................................................................. 15

## REPLY TO THE FEDERAL GOVERNMENT

### INTRODUCTION

The federal government agrees with Plaintiffs that the Rule is unlawful under the Administrative Procedure Act ("APA") because it redefines sex discrimination under section 1557 of the Affordable Care Act ("ACA") to include gender identity and termination of pregnancy discrimination. Defs.' Br. 1, ECF No. 154. For this reason alone, the Court should declare the Rule invalid and set it aside.

Disagreement between the federal government and Plaintiffs arises over whether the Court should address any claims other than those arising under the APA, whether the Court should delay ruling on the pending motions, and whether the Court should issue a nationwide injunction.

The Court should resolve all of the parties' claims rather than leaving further litigation for another day, because this case is likely to end up in the Fifth Circuit. In addition, the federal government's repeatedly unfulfilled promises to issue a new rule should not delay the Court any longer in ruling on Plaintiffs' motions for summary judgment. And to ensure uniform application of the nation's healthcare laws and regulations, the Court should, once again, issue a nationwide permanent injunction against Defendants' enforcement of the Rule.

### ARGUMENT

### I.   The Court Should Address All of the Plaintiffs' Claims.

Defendants contend that the Court need only consider whether the Rule is contrary to section 1557, and can avoid the constitutional claims. Defs.' Br. 11, ECF No. 154. State Plaintiffs agree the Rule is invalid under section 1557, but the Court should resolve all of Plaintiffs' claims and avoid leaving the case in a partially unresolved posture.

The ordinary rule is that federal courts avoid deciding claims raised under the Constitution when a dispositive non-constitutional claim is available. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 205 (2009) (citation omitted). But courts do not adhere to this rule with rigidity. *See id.* at 212 (Thomas, J., concurring in the judgment in part and dissenting in part) (urging the Court to decide the constitutional questions)); *see also Bernard v. Gulf Oil Co.*, 619 F.2d 459, 463 (5th Cir. 1980) (en banc) (deciding constitutional questions even though statutory grounds were available).

Here, the Court should decide all the claims because the constitutional questions are intertwined with the statutory analysis of whether the Rule is contrary to law under the APA. State Plaintiffs bring their constitutional claims both independently and under the APA. *See* Am. Compl. Counts I–III, ¶¶ 116–210 (APA claims), Counts XVI–XX, ¶¶ 336–83 (independent constitutional claims), Counts I–III, ¶¶ 136, 142–46, 170, 176–79, 198, 204–07 (same constitutional claims brought under the APA), ECF No. 21. After all, an agency rule can violate the APA if it is unconstitutional. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009) ("[T]he Administrative Procedure Act separately provides for setting aside agency action that is 'unlawful,' 5 U.S.C. § 706(2)(A), which of course includes unconstitutional action"). Thus, the Rule is not only contrary to statutory authority in section 1557, but also contrary to and in excess of authority under the Constitution.

At oral argument on Plaintiffs' motion for preliminary injunction, counsel agreed that if the Court decided the APA claim, it need not decide the other claims. Order 38 n.32, ECF No. 62. State Plaintiffs stand by that concession, but the case was in a different posture at that time. Plaintiffs were urging the Court to issue a preliminary injunction by December 31, 2016, and the hearing occurred on December 20, 2016—just eleven days, including Christmas, before the Rule would have taken effect. Now, with the preliminary injunction in place, the Court is not as pressed for

time, and rendering a complete and final ruling on all claims, as it has done in other cases, will allow the appellate courts to resolve the case more quickly. *See Texas v. United States*, 300 F. Supp. 3d 810 (N.D. Tex. 2018) (deciding an HHS rule violated the Article I prohibition on non-delegation of legislative powers, and then analyzing the same rule under the APA).

Another reason to issue a ruling on all pending claims is because there is a tendency for hotly contested cases to take on a life of their own when some claims are left unresolved in the district court. One example is *Bronx Household of Faith v. Board of Education of City of New York*, 750 F.3d 184 (2d Cir. 2014). In that case, a church sued the New York City public school system for its decision to prohibit community groups using the schools after hours from engaging in any form of Christian worship. The district court and the Second Circuit repeatedly ruled on only the freedom of speech claims, despite there being other valid free exercise and Establishment Clause claims, and, as a result, the case continued on for 18 years. *See id.* at 188 (discussing the procedural history and citing to four prior appellate court decisions in the same case). Thus, the prudent course is to decide all the claims and provide the Fifth Circuit with a final judgment that resolves all claims.

## II.      The Plaintiffs Need Complete Relief Now.

After Plaintiffs filed their first motion for summary judgment, the Court allowed the federal government to stay this case pending the issuance of a new rule. Order 10, ECF No. 105. That was nearly two years ago. There is no new rule.

Now Defendants ask the Court to abate these proceedings yet again, based on the empty promise that a new rule is forthcoming. But Plaintiffs' challenge to the Rule is ripe. Since the Court preliminarily enjoined the Rule on December 31, 2016, the federal government has had over two years to issue a rule that complies with the law and Constitution. But despite repeated promises, Defendants have not issued a

notice of proposed rulemaking ("NPRM"). They have mentioned the *possibility* of rulemaking in status reports but have yet to actually issue an NPRM.

The ripeness of this APA challenge is not in question. There is no requirement that HHS change the rule, other than the fact that it is unlawful under the APA. *Cf. Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 735 (1998) ("[H]ere, the possibility that further consideration will actually occur before the Plan is implemented is not theoretical, but real" because the agency, under the plan, must issue an NPRM to take implementing steps).

The Court should not require Plaintiffs to wait longer for the clarity that a final judgment provides. Vacatur of the Rule and a permanent injunction against its enforcement will provide the finality that States need for their healthcare systems. State Plaintiffs are not asking the Court to step out on a policy limb that the Fifth Circuit will cut off. All they ask is that the Court affirm that "sex," as defined by Title IX for decades, means biological sex, not gender identity and termination of pregnancy as the invalid Rule declares.[1] *See Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 330 (5th Cir. 2019) (reaffirming the longstanding holding in *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979), that Title VII's prohibition on "sex" discrimination does not prohibit discrimination on the basis of sexual orientation).

Even if HHS issues an NPRM (or the prequel to that, an advanced notice of proposed rulemaking) before the Court decides the motions for summary judgment, and even if there is an arguable basis to claim that the new proposed rule might moot the case in the future, the case would not become moot anytime soon. In most circumstances, HHS must allow the public to comment on the proposed rule and wait

---

[1] Recently, the Supreme Court granted review in three cases on the question of whether sex discrimination under Title VII includes discrimination based on sexual orientation or transgender status. *See Altitude Express, Inc. v. Zarda*, No. 17-1623, 2019 WL 1756678, at *1 (U.S. Apr. 22, 2019); *Bostock v. Clayton Cty.*, No. 17-1618, 2019 WL 1756677, at *1 (U.S. Apr. 22, 2019); *R.G. & G.R. Harris Funeral Homes v. EEOC*, No. 18-107, 2019 WL 1756679, at *1 (U.S. Apr. 22, 2019). The Court has not set these cases for oral argument yet and will not hear or decide them until next term.

at least 30 days before allowing it to take effect. 5 U.S.C. § 553(c), (d). Often, the comment period is longer. For example, HHS waited over eight months from the publication of the NPRM for the Rule at issue in this case to the time it issued the final Rule. *See* 80 Fed. Reg. 54,172 (Sept. 8, 2015); 81 Fed. Reg. 31,375 (May 18, 2016). Thus, the process of issuing a new final rule will take months—time the Court should spend making the preliminary injunction permanent and issuing a final judgment vacating and setting aside the Rule. When a case is ripe for final judgment, the Court should decide the case, not wait for some hypothetical future event to occur.

## III. A Nationwide Permanent Injunction Will Provide Uniform Application of Federal Healthcare Laws and Regulations.

As State Plaintiffs argued during the briefing on the motion for preliminary injunction, "district courts enjoy broad discretion in awarding injunctive relief." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1408 (D.C. Cir. 1998) (citation omitted). This includes the issuance of nationwide injunctions, because the judicial power "is not limited to the district wherein the court sits but extends across the country. It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015) (collecting cases), *aff'd by an equally divided court*, 136 S. Ct. 2271 (2016). Indeed, "courts should not be loathe to issue injunctions of general applicability," *Hodgson v. First Fed. Sav. & Loan Ass'n of Broward Cty.*, 455 F.2d 818, 826 (5th Cir. 1972) (citation omitted), as "[t]he injunctive processes are a means of effecting general compliance with national policy as expressed by Congress, a public policy judges too must carry out—actuated by the spirit of the law and not begrudgingly as if it were a newly imposed fiat of a presidium," *Mitchell v. Pidcock*, 299 F.2d 281, 287 (5th Cir. 1962).

The APA authorizes district courts to enjoin unlawful agency action on a nationwide basis. *See* 5 U.S.C. § 706 ("The reviewing court shall . . . hold unlawful

and set aside agency action . . . ."). When a district court vacates an invalid agency rule, the effect is felt nationwide. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n*, 145 F.3d at 1409 (quotation marks and citation omitted). The Supreme Court has indirectly affirmed the concept of nationwide relief. In *Lujan v. National Wildlife Federation*, Justice Blackmun noted this in dissent, but apparently consistently with the views of the other eight justices:

> The Administrative Procedure Act permits suit to be brought by any person "adversely affected or aggrieved by agency action." In some cases the "agency action" will consist of a rule of broad applicability; and if the plaintiff prevails, the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual. Under these circumstances a single plaintiff, so long as he is injured by the rule, may obtain "programmatic" relief that affects the rights of parties not before the court.

497 U.S. 871, 913 (1990) (Blackmun, J., dissenting) (citation omitted); *cf. id.* at 890 n.2 (majority opinion) (noting under the APA, a successful challenge by an aggrieved individual can affect the entire agency program).

A nationwide injunction here is appropriate. The Rule applies to all fifty states, affects millions of Americans who the federal government forces to participate in the healthcare market, and affects the Plaintiffs, a coalition of private parties and State-sovereigns not limited to this jurisdiction. The scope of the injury extends to medical practitioners, providers, and regulators in all corners of the country. Thus, Defendants should be enjoined from enforcing the Rule nationwide, as this Court has already done with the preliminary injunction and other courts have done in similar contexts. *See Texas*, 809 F.3d at 187–88; *Nevada v. U.S. Dep't of Labor*, 218 F. Supp. 3d 520, 533–34 (E.D. Tex. 2016); *Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016); *Nat'l Fed'n of Indep. Bus. v. Perez*, No. 5:16-cv-00066-C, 2016 WL 3766121, *46 (N.D. Tex. June 27, 2016).

## REPLY TO THE PUTATIVE INTERVENORS

### INTRODUCTION

As Plaintiffs already argued, the putative intervenors failed to show the elements and evidence necessary for intervention as of right. Pls.' Br. Opp. Mot. to Int., ECF No. 140. And if the Court allows them to intervene permissively, it should place strict limitations on their participation as requested by Plaintiffs. *Id.* at 11–12. Thus, State Plaintiffs provide this reply to the putative intervenors' summary judgment arguments in case the Court grants their permissive intervention.

Plaintiffs and Defendants agree that the Rule is unlawful under the APA. Although Defendants have not filed the administrative record, doing so is not necessary and would not change the legal analysis. But the putative intervenors want to blow open this administrative law case and subject Plaintiffs to intrusive and unnecessary discovery. The Court can decide this case on the record submitted by the parties, which conclusively establishes that State Plaintiffs have standing to challenge a rule that imposes regulatory and economic harms on them. The Court should also reject the putative intervenors' creative, but non-binding, interpretations of the Rule and its impact on Plaintiffs. State Plaintiffs adopt by reference the arguments of the Individual Plaintiffs, except those arising under the Religious Freedom Restoration Act and the First Amendment. The Rule clearly conflicts with section 1557 and Title IX, as well as the Spending Clause, the anti-commandeering doctrine, and sovereign immunity. Thus, the Court should grant summary judgment to the Plaintiffs.

### ARGUMENT

**I.    The Court Can Decide the Case on the Record Submitted.**

Ordinarily, summary judgment is appropriate if there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law. Fed.

R. Civ. P. 56(a). The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment).

But "when a party seeks review of agency action under the APA, the district judge sits as an appellate tribunal." *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

Throughout this litigation, putative intervenors have tried to make this case into something that it is not. This case concerns a federal regulation and whether it violates the APA, federal law, and the Constitution. While the federal government has yet to file the administrative record, resolution of the APA claims does not hinge on the agency's fact-finding.[2] Moreover, the Court can decide the case without the administrative record. *Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 440 n.37 (5th Cir. 2001) (citation omitted). Sex discrimination in section 1557 either includes gender identity and termination of pregnancy as a matter of law, or it does not. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 447 (1987) ("'The judiciary is the final authority on issues of statutory construction . . . .'" (quoting *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984))).

The facts the putative intervenors seek to gather in their Rule 56(d) declaration would upend the longstanding rule that the court "may not consider evidence outside the administrative record when determining whether to uphold agency action." *Harris v. United States*, 19 F.3d 1090, 1096 n.7 (5th Cir. 1994) (citing *Louisiana ex rel. Guste v. Verity*, 853 F.2d 322, 327 n.8 (5th Cir. 1988)). Moreover, the

---

[2] If the Court believes it cannot proceed without the administrative record, it should order the federal government to file it within 30 days.

putative intervenors "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts," but instead must show with specificity how the discovery will "create a genuine dispute as to a material fact," *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) (quotation and citation omitted), and how it "will influence the outcome of the summary judgment motion," *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 895 (5th Cir. 2013). Putative intervenors make little effort to sustain that burden, especially in light of the fact that the Court need not even consider the administrative record to render a decision.

Nor is any of the discovery sought by the putative intervenors necessary to establish any of the Plaintiffs' standing. *See infra* Part II. State Plaintiffs are subject to the requirements of the Rule and will suffer economic injury if it goes into effect. The declarations and exhibit provided by Texas are more than sufficient to establish that the States are injured by the Rule. And it is not necessary for other State Plaintiffs to produce similar evidence because Article III is satisfied by just "one party with standing" per claim, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006).

Instead, the putative intervenors, as they have done since they first tried to enter this case, seek to delay and engage in vexatious litigation for the sole purpose of distracting the Court from the real task at hand—deciding the legality of the Rule. For these reasons, Plaintiffs oppose their intervention as of right, and consent to permissive intervention only if the Court limits their participation in specific ways—including a prohibition on the putative intervenors delaying the case or seeking discovery. *See* Pls.' Br. Opp. Mot. to Int. 5–8, 11–12. The Court can decide the case, including the Plaintiffs' standing, on the record currently before it.

## II.    State Plaintiffs Have Standing to Challenge the Rule.

It is well established that plaintiffs have Article III standing where (1) they "have suffered an injury in fact," (2) that injury is "fairly trace[able] to the challenged action of the defendant," and (3) it is "likely" that "the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (quotation marks and citations omitted). It is equally well settled that "the presence of once party with standing is sufficient to satisfy Article III's case-or-controversy requirement" when the parties are alleging the same basis for standing, as the State Plaintiffs and the Individual Plaintiffs are doing here. *Rumsfeld*, 547 U.S. at 52 n.2; *see McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit." (citing *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 192 (5th Cir. 2012))). Thus, the putative intervenors' concession that Franciscan Alliance has standing to challenge the Rule renders the consideration of State Plaintiffs' standing largely academic.[3] Put. Int. Br. 8, ECF No. 155. This is especially true because Texas has proven standing to challenge the Rule. But putting that aside, State Plaintiffs clearly have standing to challenge the Rule.

State Plaintiffs bring this action in their capacities as sovereigns being pressured to relinquish control over powers reserved to them by the Constitution, to reevaluate their own laws, and to incur substantial costs in the process. Federal courts owe States "special solicitude" in the standing analysis. *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). This is because States are not ordinary litigants. They "have a sovereign interest in the power to create and enforce a legal code." *Texas*, 809 F.3d

---

[3] It is not correct that Franciscan Alliance, or the other Individual Plaintiffs, must prove standing to challenge every interpretation of the Rule offered by putative intervenors. The putative intervenors' various interpretations are non-binding on Defendants and irrelevant to this proceeding.

at 153 (quotation marks and citation omitted). Thus, States have standing to challenge federal action when it pressures them to "change state law." *Id.*

As the Court already held, there is no question here that the Rule causes "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Order 16, ECF No. 62 (quoting *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016)). A "particularized" injury is one that "'affect[s] the plaintiff in a personal and individual way,'" *id.* (quoting *Spokeo*, 136, S. Ct. at 1548), such as when the party establishes a "personal stake in the outcome of the controversy," *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (citation omitted). This includes when it is "an object of the action (or forgone action) at issue." *Lujan*, 504 U.S. at 561. Of course, when "identifying an injury that confers standing, courts look exclusively to the time of filing." *Loa-Herrera v. Trominski*, 231 F.3d 984, 987 (5th Cir. 2000) (citing *Pederson v. La. State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000)). State Plaintiffs are suffering an injury in fact because they are objects of the Rule and face increased regulatory and economic burdens.[4]

### A.     State Plaintiffs are "objects of the regulation" at issue.

Plaintiffs presumptively have standing to challenge regulations that govern them personally. *See Contender Farms, LLP v. USDA*, 779 F.3d 258, 264 (5th Cir. 2015) ("If a plaintiff is an object of the regulation 'there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it.'" (quoting *Lujan*, 504 U.S. at 561–62)); *id.* at 266 ("An increased regulatory burden typically satisfies the injury in fact requirement." (citation omitted)).

The question "[w]hether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Id.* at 265. For example, in *Association of American*

---

[4] The putative intervenors focus solely on arguing about State Plaintiffs' injury in fact, and appear to concede causation and redressability.

*Railroads v. Department of Transportation*, 38 F.3d 582 (D.C. Cir. 1994), challengers to a regulation argued that a new rule required them to comply with two sets of regulations enforced by two agencies instead of one. *Id.* at 585. The court concluded that standing was satisfied because "the railroads allege that they are materially harmed by the additional regulatory burden imposed upon them as the result of a federal agency's unlawful adoption of a rule." *Id.* at 586.

Here, the Rule clearly regulates State Plaintiffs. It is undisputed that the Rule applies to States that operate, offer, or contract for health programs and activities that receive federal funding. 45 C.F.R. § 92.4. States must, "as a condition" of applying for federal financial assistance, "submit an assurance" that their "health programs and activities will be operated in compliance with Section 1557 and [the Rule]." *Id.* § 92.5. States must also designate at least one person in each affected state agency to "carry out [the] responsibilities under Section 1557," including "investigati[ng]" allegations of "noncompliance." *Id.* § 92.7. The Rule requires equal access to health programs or activities based on gender identity and transgendered status. *Id.* § 92.206. By HHS's own admission, the Rule impacts *all* licensed physicians who accept payments from Medicare and Medicaid—this includes doctors working for a state. 80 Fed. Reg. 54,172, 54,195 (Sept. 8, 2015); 81 Fed. Reg. 31,379, 31,445 (May 18, 2016).

Because the Rule prohibits discrimination based on "termination of pregnancy," it pressures employers, including state employers, who provide insurance coverage for procedures such as a dilation and curettage for a miscarriage to cover the same procedure for an abortion. 81 Fed. Reg. at 31,429. Texas, as an employer of 556,500 people, excludes coverage for abortion in its group health insurance. State Pls.' Mot. Summ. J. ("MSJ") App.014, 124, ECF No. 134.

Because the Rule prohibits discrimination based on "gender identity," it pressures employers, including state employers, and state-employed OB/GYNs who provide hysterectomy services to also now offer those same services to transgender

men. 81 Fed. Reg. at 31455; *see also id.* at 31,429 ("If, for example, an issuer or State Medicaid agency denies a claim for coverage for a hysterectomy that a patient's provider says is medically necessary to treat gender dysphoria, OCR will evaluate the extent of the covered entity's coverage policy for hysterectomies under other circumstances. We noted that OCR will also carefully scrutinize whether the covered entity's explanation for the denial or limitation of coverage for transition-related care is legitimate and not a pretext for discrimination.").

The Rule also interferes with State Plaintiffs' "sovereign interest in the power to create and enforce a legal code." *Texas*, 809 F.3d at 153 (quotation marks and citation omitted). Whenever "a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) (citation omitted); *see also Planned Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 419 (5th Cir. 2013) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws.").

That irreparable injury is no less real when a federal law—not a federal court—prevents a State from administering its own law and policy preferences. *See Ill. Dep't of Transp. v. Hinson*, 122 F.3d 370, 372 (7th Cir. 1997) (holding that a State has standing where it "complains that a federal regulation will preempt one of the state's laws" (citing *Alaska v. U.S. Dep't of Transp.*, 868 F.2d 441, 443 (D.C. Cir. 1989))); *see also Wyoming ex rel. Crank v. United States*, 539 F.3d 1236, 1242 (10th Cir. 2008) (holding that a State has standing to defend the efficacy of its expungement statute from threatened federal preemption).

The Rule's requirements do just that. "[T]he State has a significant role to play in regulating the medical profession," *Gonzales v. Carhart*, 550 U.S. 124, 157 (2007), as well as "an interest in protecting the integrity and ethics of the medical profession,"

*Washington v. Glucksberg*, 521 U.S. 702, 731 (1997). This includes "maintaining high standards of professional conduct" in the practice of medicine. *Barsky v. Bd. of Regents of Univ. of N.Y.*, 347 U.S. 442, 451 (1954).

Texas, for example, zealously protects the physician-patient relationship. The statewide standard of medical care rests on the principle that Texas doctors must exercise "independent medical judgment" when treating patients under their care. *Murk v. Scheele*, 120 S.W.3d 865, 867 (Tex. 2003) (per curiam). Amid increasing consolidation in the healthcare industry caused by the ACA, in 2011, the Texas Legislature redoubled its longstanding commitment to physician-patient autonomy by prohibiting medical organizations from interfering with, controlling, or directing "a physician's professional judgment," Tex. Occ. Code § 162.0021, and mandating that they permit physicians to exercise "independent medical judgment when providing care to patients," *id*. § 162.0022.

In furtherance of these objectives, Texas hospitals must appoint a chief medical officer who is responsible for adopting policies to ensure that physicians have the ability to exercise independent medical judgment. Tex. Health & Safety Code § 311.083(d). Texas law requires the chief medical officer to report to the Texas Medical Board any action or event that constitutes a compromise of the independent medical judgment of a physician in caring for a patient. *Id*.; 22 Tex. Admin. Code § 177.3, .5

The Rule usurps this standard of care. It discards independent medical judgment and a physician's duty to his or her patient's permanent well-being and replaces them with rigid commands. The Rule forces physicians who accept Medicare and Medicaid payments and who operate, offer, or contract for health programs and activities that receive Federal financial assistance to subject their patients to procedures that permanently alter or remove well-functioning organs, even though the physicians' independent medical judgment advises against such a course of

action. The Rule also requires physicians to express opinions contrary to what they deem to be in the patient's best interest or to avoid even describing medical transition procedures as risky or experimental. Yet, physicians are "under a duty to make reasonable disclosure of that diagnosis, and risk of the proposed treatment . . ., as would have been made by a reasonable medical practitioner under the circumstances." *Jacobs v. Theimer*, 519 S.W.2d 846, 848 (Tex. 1975) (citing *Wilson v. Scott*, 412 S.W.2d 299 (Tex. 1967); W. M. Moldoff, Annotation, *Malpractice: physician's duty to inform patient of nature and hazards of disease or treatment*, 79 A.L.R.2d 1028 (1961)).

The putative intervenors repeatedly argue that State Plaintiffs did not provide admissible evidence to demonstrate standing. But "[i]n their haste to insist on additional evidence," they "completely ignore" that "'the nature and extent of facts that must be averred (at the summary judgment stage) . . . in order to establish standing depends considerably upon whether the plaintiff is himself an object of the action (or forgone action) at issue.'" *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012) (quoting *Lujan*, 504 U.S. at 561). Thus, in *Time Warner Cable*, the Fifth Circuit held industry plaintiffs had standing to challenge a state law simply because it subjected them to different treatment on its face. *Id.* at 637.

On its face, the Rule clearly and unequivocally regulates the conduct of States and usurps state power over the healthcare industry. It would be a waste of judicial resources to withhold summary judgment and require the States to provide additional declarations repeating the exact mandates of the Rule. There is no serious argument that the States are not objects of the Rule. *See Texas v. United States*, 497 F.3d 491, 496-97 (5th Cir. 2007) ("Texas has suffered the injury of being compelled to participate in an invalid administrative process, and we agree that standing exists on this basis."). State Plaintiffs have standing on this basis alone, but they have also proven an economic injury.

**B.** **The Rule inflicts economic injuries on State Plaintiffs.**

Although the conclusion that State Plaintiffs are objects of the Rule is sufficient to confer standing, State Plaintiffs also suffer economic injuries from the Rule. Increased state outlays "is an injury in fact for standing purposes." *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 586 (5th Cir. 2006); *see also Cooper v. Tex. Alcoholic Beverage Comm'n*, 820 F.3d 730, 738 (5th Cir. 2016) (finding "actual economic injury" supports standing). If States do not comply with the dictates of the Rule, and its application to Medicaid funding, then they risk losing their federal funding. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) (declaring that the Secretary of HHS may withhold all 'further [Medicaid] payments . . . to the State' if [he] determines that the State is out of compliance with any Medicaid requirement" (quoting 42 U.S.C. § 1396c)). Moreover, the Rule requires States to hire or train employees to carry out its mandates, alter the healthcare facilities and services they offer, publish certain notices, provide additional health insurance coverages to employees, and face legal liability and the loss of federal funding if they fail to comply.

The Rule requires States to designate "at least one" employee in each affected state agency to "carry out [the] responsibilities under Section 1557," including "investigati[ng]" allegations of "noncompliance." 45 C.F.R. § 92.7.  In other words, States must hire or train people to enforce the Rule within state workplaces and state-run healthcare programs.

The Rule impacts the ability of States to provide healthcare services directly to the public. *See* Tex. Gov't Code § 531.0055 (discussing the Texas Health and Human Services Commission's responsibility to provide healthcare directly to the public); Tex. Health & Safety Code § 12.0115 (same). Texas and other States will be forced to allocate personnel, resources, and facilities to offer and accommodate the myriad medical transition procedures now required to be performed under the Rule.

State healthcare facilities will also be required to open up sex-separated showers, locker rooms, or other facilities based on individual preference. This is true even in controlled medical locations where patient access to intimate facilities is often under the control of healthcare professionals that are supposed to act in the best interests of the patient. The requirements of the Rule substantially interfere with the control that Texas and other States legitimately exercise over their healthcare facilities.

The Rule also requires States to publish notices of the nondiscrimination provisions of the Rule in communications to beneficiaries, enrollees, applicants, members of the public, and its own employees. 45 C.F.R. § 92.8. They must also post the information on state agency websites. *Id*. And they must advise these people how to file discrimination complaints with the HHS Office for Civil Rights. *Id*.

The Rule requires States to increase health insurance benefits for state employees, including the abortion and hysterectomy examples explained above. *See* 81 Fed. Reg. at 31,437 ("[T]he State will be governed by Section 1557 in the provision of employee health benefits for its Medicaid employees . . . ."). Texas, like the other State Plaintiffs, will spend more money on state employee benefits to comply with the Rule's requirements. Robert Kukla's declaration explains that approximately 556,500 employees of the State of Texas participated in group health insurance governed by the Rule. State Pls.' MSJ App.013. In 2016, Texas paid approximately $2.8 billion in medical and pharmacy claims. *Id*. at 014. But Texas excluded from coverage gender reassignment surgery-related services and non-medically necessary abortion (except in cases of criminal activity). *Id*. Thus, the application of the Rule to Texas's group employee health insurance alone would cause the state economic harm. *Id*. Since Texas continues to exclude these services from its employee group benefits, *id*. at 122, 124, it continues to have standing to challenge the Rule.

Finally, the Rule exposes States to legal liability for discriminating based on gender identity and termination of pregnancy, and exposes them to the loss of federal

healthcare funding. The Rule provides for "compensatory damages" for violations of section 1557 in an "appropriate administrative and judicial action[]." 45 C.F.R. § 92.301(b). The Rule also provides that the enforcement mechanisms provided under the civil rights laws cited by section 1557 are available to enforce the Rule's requirements. Under Title IX, for example, the federal government may terminate or refuse to grant funds to any activity found in violation. 20 U.S.C. § 1682. And like other civil rights statutes, a State may be held liable in a private damages action for violating Title IX. *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 633 (1999).

In questioning State Plaintiffs' standing, putative intervenors hint that they believe State Plaintiffs need not comply with it. While the States question whether that concession by the putative intervenors would bind Defendants, who are responsible for enforcing the Rule, it is doubtful that putative intervenors really mean the Rule does not apply to the States, since if that were true, putative intervenors' interest in this case is nullified. Thus, their arguments against State Plaintiffs' standing ring hollow. State Plaintiffs have standing to challenge the Rule.

## III.    The Rule Violates the APA.

### A.    Discrimination on the basis of "sex" does not include discrimination on the basis of "termination of pregnancy."

By its plain terms, discrimination on the basis of sex, as prohibited by section 1557, Title IX, and other federal civil rights laws, does not include discrimination on the basis of "termination of pregnancy." But the Rule says that it does.

The putative intervenors boldly assert that discrimination on the basis of termination of pregnancy "has long been recognized as sex discrimination." Put. Int. Br. 18. In support of this proposition, they cite the Sixth Circuit's decision in *Turic v. Holland Hospitality, Inc.*, 85 F.3d 1211, 1214 (6th Cir. 1996). But *Turic*'s holding has not taken root in the Fifth Circuit. A broad search of Fifth Circuit case law reveals no

similar holdings. *See, e.g.*, *EEOC v. Big Lots Stores, Inc.*, No. 9:08–CV–177, 2009 WL 10677352, at *5 n.3 (E.D. Tex. Oct. 6, 2009).

Putative intervenors also erroneously claim that the Rule could never be interpreted as requiring States to provide abortions. While State Plaintiffs appreciate this concession, it comes with cold comfort because the putative intervenors have no ability to bind the federal defendants with that concession, and putative intervenors, by their own admissions, are engaged in aggressive litigation and lobbying against State Plaintiffs to attack state and federal laws protecting preborn children. Put. Int. Mot. to Int. App. 3, ECF No. 131. The Rule provides no textual assurance that State Plaintiffs will not be forced by Defendants or private litigants to provide abortions as a condition of receiving federal healthcare dollars.[5] State Pls.' MSJ Br. 19–20.

## B.   Discrimination on the basis of "sex" does not include discrimination on the basis of "gender identity."

The putative intervenors make little attempt to rebut the statutory analysis showing the Rule is not authorized by Title IX. *See* State Pls.' MSJ Br. 11–21. Instead, they hang their hat on the notion that the plurality opinion in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), equates "sex stereotyping" with gender identity discrimination. Put. Int. Br. 19–25. But the Rule's prohibition on gender identity discrimination is not the same as sex stereotyping. The holding in *Price Waterhouse* deals with the burden of proof each party bears in Title VII mixed-motive case. 490 U.S. at 232, 258. Dicta in the plurality's opinion discusses whether employment decisions based on sex stereotypes can provide sufficient evidence of Title VII sex discrimination by showing favoritism of one sex over another. Stereotypes based on sex involve beliefs about how men or women *are* or *should be*. For example, a common old fashioned stereotype was that only men made good leaders.

---

[5] If Defendants will concede that "termination of pregnancy" does not require State Plaintiffs to provide any new access to abortion, then the Court could issue a declaratory judgment to that effect in lieu of a permanent injunction against that provision of the Rule.

*Price Waterhouse*'s prohibition against sex stereotyping does not help putative intervenors for two reasons. First, the stereotype must be based on sex. Second, sex stereotyping is not per se unlawful. The stereotype must systemically favor one sex over the other. Discrimination on the basis of gender identity fails on both counts. It is not discrimination on the basis of sex, and does not favor one sex over the other.

Sex stereotyping is not an independent category of discrimination apart from sex. An impermissible sex stereotype must be based on sex. "In forbidding employers to discriminate against individuals because of their sex," *Price Waterhouse* explained, "Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes." *Id.* at 251 (quotation marks and citation omitted). A sex stereotype claim is viable, therefore, "only to the extent it provides evidence of favoritism of one sex over the other." *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 339 (5th Cir. 2019) (Ho, J., concurring). Put simply, "sexual stereotyping is sex discrimination." *Zarda v. Altitude Exp., Inc.*, 883 F.3d 100, 158 (2d Cir. 2018) (Lynch, J., dissenting), *cert. granted* No. 17-1623, 2019 WL 1756678 (U.S. Apr. 22, 2019). It is one's status as male or female— not one's gender identity—that leads to the forbidden sex stereotyping prohibited by *Price Waterhouse*. Thus, *Price Waterhouse* does not bar gender identity discrimination.

Moreover, sex stereotyping is not per se unlawful under Title VII. *Wittmer*, 915 F.3d at 339 (Ho, J., concurring). To be actionable, one sex must be "systemically disadvantaged" as a result of the stereotype. *Zarda*, 883 F.3d at 158 (Lynch, J., dissenting). Courts have upheld policies setting different hair-length and physical-fitness requirements for men and women so long as they do not categorically favor one sex over the other. *Id.* at 150–51 (collecting cases). The debate over access to restrooms further demonstrates that gender identity discrimination does not "systematically" disadvantage individuals on the basis of sex. Title IX expressly protects the well-established and widespread practice of differentiating living

facilities and restrooms on the basis of sex for privacy reasons. 20 U.S.C. § 1686; 34 C.F.R. § 106.33. Sex-designated living facilities and bathrooms may systemically favor cisgender over transgender individuals. But they do not systemically favor women vis-à-vis men, or men vis-à-vis women. For that reason, they are not a sex stereotype actionable under *Price Waterhouse.*

The bathroom example highlights the fundamental point that putative intervenors miss. The basis of sex discrimination law, as it currently exists, is biological sex. By contrast, there is no broad consensus—much less federal law—on the proper approach to treating individuals with gender dysphoria, the clinical term for the feeling of disconnect between one's gender identity and sex at birth. *See, e.g.*, Jesse Singal, *When Children Say They're Trans*, THE ATLANTIC, July/Aug., 2018 (describing the "growing number of people" who regret transitioning to a different sex and later detransition); Katherine Cave, *The Medical Scandal that the Mainstream Media Ignores*, PUBLIC DISCOURSE, Apr. 8, 2019 ("I am liberally-minded in my political beliefs. [When my daughter announced she was transgender], I was pressured to consent to puberty-blocking drugs, with assurances that they were safe and well-studied. My research later confirmed that this was not true."). The role of federal agencies is to implement and execute the law—not to conduct social experiments without Congressional authorization. The Rule cannot redefine sex discrimination.

The putative intervenors also grossly exaggerate the holding of *EEOC v. Boh Brothers Construction Co., LLC*, 731 F.3d 444 (5th Cir. 2013) (en banc). There, a divided Fifth Circuit sitting en banc held that a plaintiff may prove sex discrimination by members of the same sex by providing evidence of sex stereotyping. *Id.* at 456. In other words, in an all-male work environment, like Boh Brothers Construction Company, a male employee may establish a sexual harassment claim under Title VII with evidence that his coworkers or supervisors thought he was not tough enough—

not male enough. The court's holding does not speak to whether gender identity can be included as sex discrimination under Title VII; it only confirms that sex stereotyping, as conceived in *Price Waterhouse*, must be based on one's biological sex.

Importantly, however, the Fifth Circuit recently reiterated that it has long "held that Title VII does not prohibit discrimination on the basis of sexual orientation." *Wittmer*, 915 F.3d at 330 (citing *Blum*, 597 F.2d 936). The putative intervenors try to distinguish Judge Ho's concurring opinion in the case, Put. Int. Br. 23 n.3, but overlook the majority's statement that Title VII's prohibition on sex discrimination includes neither sexual orientation nor transgender status. *Wittmer*, 915 F.3d at 330. Of course, it is worth noting that Judge Ho's concurring opinion supports the position of the Plaintiffs in this litigation. *See id*. at 333 ("For four decades, it has been the uniform law of the land, affirmed in eleven circuits, that Title VII of the 1964 Civil Rights Act prohibits sex discrimination—not sexual orientation or transgender discrimination."). And, as explained above, there is no reason to delay resolution of this case based on the recent cert grants in *Altitude Express*, *Bostock,* and *Harris Funeral Homes* because the Supreme Court will not hear or decide those cases until next term. *See supra* note 1. Thus, the Court should vacate the Rule as unlawful under the APA.

## IV.   The Rule Violates the Spending Clause of Article I and the Anti-Commandeering Doctrine of the Tenth Amendment.

The putative intervenors launch two salvos against State Plaintiffs' Spending Clause and anti-commandeering claims. First, they argue the clear notice requirement for Congress's spending powers does not apply to section 1557. Second, they argue that because HHS promulgated the Rule pursuant to a Spending Clause statute, its requirements cannot commandeer States. Both attacks miss their mark.

### A.    The Rule violates the clear notice doctrine.

The putative intervenors fail to distinguish *Arlington Central*'s clear notice doctrine or provide any explanation as to how the Rule's addition of a categorical prohibition on gender identity and termination of pregnancy discrimination has ever been, or ever could be, protected under Title IX. They also fail to distinguish the Fifth Circuit cases that apply the clear notice doctrine "stringent[ly]." *See* State Pls.' MSJ Br. 23 (citing cases). Instead, putative intervenors discuss when federal funding recipients may be liable for damages under Title IX. Put. Int. Br. 27–28.

State Plaintiffs do not dispute that one may maintain a private damages action against a federal funding recipient for intentional conduct that violates the terms of Title IX. *Davis*, 526 U.S. at 642. Section 1557 points to that framework, but it and the Rule fail to provide States with clear notice that sex discrimination now includes gender identity and termination of pregnancy discrimination. Congress may offer States money to carry out a federal program, but neither it nor HHS may change the terms of that contractual relationship without providing "clear notice" to the States in the text of legislation.

Section 1557 applies to "any health program or activity" that receives "Federal financial assistance." 42 U.S.C. § 18116. But the operative protected classes in the anti-discrimination laws that section 1557 relies on, particularly Title IX, do not "unambiguously" include gender identity and termination of pregnancy. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Put another way, when States decided to accept federal funding, they did not have "clear notice" that they would be forced to prohibit discrimination on those grounds. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). The addition of prohibitions on gender identity and termination of pregnancy discrimination were never "voluntarily and knowingly" accepted by States as limitations on federal healthcare funding. *Id*. Thus, the Rule violates the Spending Clause.

**B.      The Rule commandeers States.**

Putative intervenors also claim that Spending Clause legislation may never coerce or commandeer States. Put. Int. Br. 29–30. In support, they cite *NFIB* for the proposition that "Congress may use [the Spending Clause] to grant federal funds to States, and may condition such a grant upon the States taking certain actions that Congress could not require them to take." 567 U.S. at 576 (quotation marks and citation omitted). The Court goes on to say—and putative intervenors fail to quote—that there are "recognized limits on Congress's power under the Spending Clause," which includes the requirement that States "voluntarily and knowingly accept[] the terms of the contract." *Id.* at 576–77 (internal quotation marks and citations omitted). When "the State has no choice" the federal government commandeers state power in violation of the Constitution. *Id.* at 578 (citing *Printz v. United States*, 521 U.S. 898 (1997); *New York v. United States*, 505 U.S. 144 (1992)). As in *NFIB*, the Rule's inclusion of gender identity and termination of pregnancy discrimination applies to all federal healthcare funding received by the States, including current Medicare payments. The putative intervenors claim there is insufficient evidence showing how much money is at stake, but such numbers are readily available in admissible public records and in the evidence proffered by State Plaintiffs in support of their motion. *See* State Pls.' MSJ App.014 (describing the impact of the Rule only as to state employees in Texas). Thus, as stated in State Plaintiffs' prior briefing, the Rule commandeers state power. State Pls.' MSJ Br. 30–35.

**V.      The Rule Unlawfully Invades States' Sovereign Immunity.**

The putative intervenors argue that section 1557 waives state sovereign immunity. Put. Int. Br. 31–32. Abrogation of Eleventh Amendment immunity must be "unmistakably clear *in the language of the statute.*" *Nevada Dep't of Human Res. v. Hibbs*, 538 U.S. 721, 726 (2003) (emphasis added). Congress must also act pursuant to a valid exercise of its power under section 5 of the Fourteenth Amendment. *Id.* To

determine if Congress acted validly, the Fifth Circuit applies the following test: "(1) The statute must contain an unequivocal statement of congressional intent to abrogate; (2) Congress must have identified a history and pattern of unconstitutional action by the states; and (3) the rights and remedies created by the statute must be congruent and proportional to the constitutional violation(s) Congress sought to remedy or prevent." *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 277 (5th Cir. 2005). Putative intervenors claim 42 U.S.C. § 2000d-7, which abrogates state sovereign immunity under various civil rights statutes, abrogates sovereign immunity under section 1557. But section 1557 makes no such declaration. Instead, section 1557 says that enforcement mechanisms available under Title IX are permissible under the ACA. 42. U.S.C. § 18116. Section 1557 contains no language concerning abrogation, identifies no history of unconstitutional action by the States, and there are no constitutional violations to remedy that would be proportional to the massive invasion of state sovereignty caused by the section. Thus, the Rule violates the Eleventh Amendment.

## CONCLUSION

State Plaintiffs respectfully request that the Court declare the Rule unlawful, set it aside, and permanently enjoin its enforcement.

Respectfully submitted this the 3rd day of May, 2019.

DOUG PETERSON
Attorney General of Nebraska

DEREK SCHMIDT
Attorney General of Kansas

JEFF LANDRY
Attorney General of Louisiana

MARK BRNOVICH
Attorney General of Arizona

KEN PAXTON
Attorney General of Texas

JEFFREY C. MATEER
First Assistant Attorney General

RYAN L. BANGERT
Deputy Attorney General for Legal Counsel

*/s/ David J. Hacker*
DAVID J. HACKER
Special Counsel for Civil Litigation
Texas Bar No. 24103323
david.hacker@oag.texas.gov

MICHAEL C. TOTH
Special Counsel for Civil Litigation

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548, Mail Code 001
Austin, Texas 78711
(512) 936-1414

*ATTORNEYS FOR PLAINTIFFS
STATE OF TEXAS; STATE OF
NEBRASKA; COMMONWEALTH
OF KENTUCKY, by and through
Governor Matthew G. Bevin;
STATE OF KANSAS; STATE OF
LOUISIANA; STATE OF ARIZONA; and
STATE OF MISSISSIPPI, by and through
Governor Phil Bryant*

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2019, I electronically filed the foregoing document through the Court's ECF system, which automatically serves notification of the filing on counsel for all parties.

*/s/ David J. Hacker*
DAVID J. HACKER