# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### WICHITA FALLS DIVISION

FRANCISCAN ALLIANCE, INC., *et al.*,

      *Plaintiffs*,

v.

ALEX M. AZAR, II, *et al.*,

      *Defendants*.

No. 7:16-CV-00108-O

**Private Plaintiffs' Reply in Support of Their Renewed Motion for Partial Summary Judgment**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION ..................................................................................................... 1

ARGUMENT ............................................................................................................ 2

   I.  The Rule violates the Administrative Procedure Act. .................................. 2

      A.  The Rule improperly attempts to define "sex" to include "gender identity." ........................................................................................... 2

      B.  The Rule improperly omits Title IX's religious and abortion exemptions. ...................................................................................... 6

      C.  The Rule conflicts with Title VII. ..................................................... 8

      D.  Even if "sex" were ambiguous, *Chevron* does not apply. ............... 8

      E.  The Rule is contrary to the Spending Clause and the Tenth and Eleventh Amendments. .................................................................. 9

   II.  The Rule violates the Religious Freedom Restoration Act. ....................... 9

      A.  The Rule imposes a "substantial burden" on Private Plaintiffs' religious exercise. .......................................................................... 9

      B.  HHS has failed to carry its burden on strict scrutiny. .................. 10

   III. The Rule violates the Free Exercise Clause. ........................................... 12

   IV. The Rule must be set aside and enjoined. ................................................ 13

      A.  There is no reason to "postpone" a final ruling. ........................... 13

      B.  The unlawful parts of the Rule must be set aside. ........................ 16

   V.  Intervenors' procedural objections are meritless. ................................... 20

      A.  Plaintiffs have standing. ............................................................... 20

      B.  The record is adequate. ................................................................. 24

CONCLUSION ...................................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for Good Gov't v. Coal. for Better Gov't,*
   901 F.3d 498 (5th Cir. 2018)................................................................9

*Altitude Express, Inc. v. Zarda,*
   No. 17-1623, 2019 WL 1756678 (U.S. Apr. 22, 2019)..........................14

*Am. Bankers Ass'n v. Nat'l Credit Union Admin.,*
   271 F.3d 262 (D.C. Cir. 2001)............................................................24

*Am. Family Life Assurance Co. of Columbus v. Biles,*
   714 F.3d 887 (5th Cir. 2013)..............................................................25

*Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.,*
   627 F.3d 547 (5th Cir. 2010)..............................................................22

*Bauer v. Texas,*
   341 F.3d 352 (5th Cir. 2003)..............................................................22

*Bd. of Miss. Levee Comm'rs v. U.S. E.P.A.,*
   674 F.3d 409 (5th Cir. 2012)..............................................................22

*Blum v. Gulf Oil Corp.,*
   597 F.2d 936 (5th Cir. 1979)................................................................5

*Bostock v. Clayton County,*
   No. 17-1618, 2019 WL 1756677 (U.S. Apr. 22, 2019)..........................14

*Boy Scouts of Am. v. Dale,*
   530 U.S. 640 (2000)..........................................................................11

*Bruff v. North Mississippi Health Services, Inc.,*
   244 F.3d 495 (5th Cir. 2001)................................................................8

*Burwell v. Hobby Lobby Stores, Inc.,*
   573 U.S. 682 (2014)..........................................................9, 10, 11, 15

*California v. U.S. Dep't of Health & Human Servs.,*
   No. 19-15072 (9th Cir.) ....................................................................15

*Cent. & Sw. Servs., Inc. v. E.P.A.,*
   220 F.3d 683 (5th Cir. 2000)..............................................................18

*Chamber of Commerce v. U.S. Dep't of Labor,*
   885 F.3d 360 (5th Cir. 2018)..............................................................17

*Checkosky v. S.E.C.*,
    23 F.3d 452 (D.C. Cir. 1994) ................................................................................. 16

*Children's Hosp. Ass'n of Tex. v. Azar*,
    300 F. Supp. 3d 190 (D.D.C. 2018) ...................................................................... 18

*Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.*,
    933 F.2d 1285 (5th Cir. 1991) .............................................................................. 10

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993) .............................................................................................. 12

*Citizens to Preserve Overton Park v. Volpe*,
    401 U.S. 402 (1971) .............................................................................................. 25

*City of Boerne v. Flores*,
    521 U.S. 507 (1997) .............................................................................................. 13

*City of Mesquite v. Aladdin's Castle, Inc.*,
    455 U.S. 283 (1982) .............................................................................................. 14

*Conforti v. St. Joseph's Healthcare System*,
    No. 2:17-cv-00050 (D.N.J. filed Jan. 5, 2017) .................................................... 15

*Contender Farms, L.L.P. v. U.S. Dep't of Agric.*,
    779 F.3d 258 (5th Cir. 2015) .............................................................................. 23

*Cruz v. Abbott*,
    849 F.3d 594 (5th Cir. 2017) .............................................................................. 22

*Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*,
    438 U.S. 59 (1978) ................................................................................................ 21

*East Bay Sanctuary Covenant v. Trump*,
    349 F. Supp. 3d 838 (N.D. Cal. 2018) ................................................................ 19

*El Paso Elec. Co. v. F.E.R.C.*,
    667 F.2d 462 (5th Cir. 1982) .............................................................................. 14

*Energy Future Coal. v. E.P.A.*,
    793 F.3d 141 (D.C. Cir. 2015) ............................................................................ 21

*Enstad v. PeaceHealth*,
    No. 2:17-cv-01496 (W.D. Wash filed Oct. 5, 2017) ........................................... 15

*Evans v. Ga. Reg'l Hosp.*,
    850 F.3d 1248 (11th Cir. 2017) .......................................................................... 19

*F.D.A. v. Brown & Williamson*,
    529 U.S. 120 (2000) .............................................................................................. 8

iv

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ..................................................................................16

*Gonzales v. O Centro Espirita Beneficente Uniao*
    *do Vegetal*, 546 U.S. 418 (2006) ................................................................11

*Gorman v. Sharp,*
    892 F.3d 172 (5th Cir. 2018) .......................................................................13

*Grace v. Whitaker,*
    344 F. Supp. 3d 96 (D.D.C. 2018) ...............................................................19

*Heartland Reg'l Med. Ctr. v. Sebelius,*
    566 F.3d 193 (D.C. Cir. 2009) .....................................................................18

*Hively v. Ivy Tech. Cmty. Coll.,*
    853 F.3d 339 (7th Cir. 2017) .....................................................................4, 5

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
    515 U.S. 557 (1995) .....................................................................................11

*Int'l Refugee Assistance Project v. Trump,*
    241 F. Supp. 3d 539 (D. Md. 2017) ..............................................................20

*Joseph G. Moretti, Inc. v. Hoffman,*
    526 F.2d 1311 (5th Cir. 1976) .....................................................................25

*Kennedy v. Bremerton Sch. Dist.,*
    139 S. Ct. 634 (2019) ...................................................................................13

*King v. Burwell,*
    135 S. Ct. 2480 (2015) ...................................................................................8

*Long Island Care at Home, Ltd. v. Coke,*
    551 U.S. 158 (2007) .....................................................................................14

*Mack Trucks, Inc. v. E.P.A.,*
    682 F.3d 87 (D.C. Cir. 2012) .......................................................................20

*McCutcheon v. F.E.C.,*
    572 U.S. 185 (2014) .....................................................................................12

*Minton v. Dignity Health,*
    No. 17-558259 (Calif. Super. Ct. Apr. 19, 2017) ........................................15

*Nat. Res. Def. Council v. E.P.A.,*
    489 F.3d 1364 (D.C. Cir. 2007) ...................................................................21

*Nat'l Ass'n of Mfrs. v. Dep't of Def.,*
    138 S. Ct. 617 (2018) ...............................................................................1, 13

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
   145 F.3d 1399 (D.C. Cir. 1998) ..................................................................................16

*Nat'l Pork Producers Council v. E.P.A.,*
   635 F.3d 738 (5th Cir. 2011) .....................................................................................17

*N.Y. State Rifle & Pistol Ass'n v. New York,*
   587 U.S. ____, No. 18-280 (Apr. 29, 2019) ...............................................................1

*Nieves-Villanueva v. Soto-Rivera,*
   133 F.3d 92 (1st Cir. 1997) ........................................................................................3

*N. Arapaho Tribe v. Ashe,*
   925 F. Supp. 2d 1206 (D. Wyo. 2012) ...............................................................10, 11

*O Centro Espirita Beneficente Uniao Do Vegetal v. Duke,*
   286 F. Supp. 3d 1239 (D.N.M. 2017) .................................................................10, 11

*Pennsylvania v. Trump,*
   No. 19-1189 (3d Cir.)................................................................................................15

*Price Waterhouse v. Hopkins,*
   490 U.S. 228 (1989)................................................................................................3-4

*R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.,*
   No. 18-107, 2019 WL 1756679 ................................................................................14

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.,*
   908 F.3d 476 (9th Cir. 2018)....................................................................................16

*Shays v. F.E.C.,*
   414 F.3d 76 (D.C. Cir. 2005) ...................................................................................20

*Sierra Club v. U.S. Fish & Wildlife Serv.,*
   245 F.3d 434 (5th Cir. 2001) ..............................................................................24, 25

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior,*
   No. 3:08-CV-00616-LRH-RAM, 2009 WL 73257 (D. Nev. Jan. 7, 2009)................10

*Stone v. Trump,*
   280 F. Supp. 3d 747 (D. Md. 2017) .........................................................................20

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014)..................................................................................................21

*Sw. Elec. Power Co. v. E.P.A.,*
   920 F.3d 999 (5th Cir. 2019) .................................................................16, 17, 18, 20

*Texas Pipeline Ass'n v. F.E.R.C.,*
   661 F.3d 258 (5th Cir. 2011) ....................................................................................24

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ................................................................16, 20, 21

*Tovar v. Essentia Health,*
    342 F. Supp. 3d 947 (D. Minn. 2018) ..............................................................15

*United States v. Lopez-Velasquez,*
    526 F.3d 804 (5th Cir. 2008) ......................................................................1, 14

*Util. Air Regulatory Grp. v. E.P.A.,*
    573 U.S. 302 (2014) .........................................................................................9

*Washington v. Azar,*
    No. 1:19-cv-03040-SAB, 2019 WL 1868362 (E.D. Wash. Apr. 25, 2019) ............19

*WildEarth Guardians v. Jewell,*
    738 F.3d 298 (D.C. Cir. 2013) .......................................................................21

*Wisconsin Cent. Ltd. v. United States,*
    138 S. Ct. 2067 (2018) ......................................................................................2

*Wittmer v. Phillips 66 Co.,*
    915 F.3d 328 (5th Cir. 2019) ....................................................................4, 5, 9

*Woods v. Fed. Home Loan Bank Bd.,*
    826 F.2d 1400 (5th Cir. 1987) .......................................................................25

*Zadeh v. Robinson,*
    902 F.3d 483 (5th Cir. 2018) .........................................................................13

*Zubik v. Burwell,*
    136 S. Ct. 1557 (2016) ...................................................................................15

**Statutes**

5 U.S.C. § 551 ...................................................................................................17

5 U.S.C. § 702 ...................................................................................................17

5 U.S.C. § 706 ................................................................................17, 18-19, 21

20 U.S.C. § 1681 .................................................................................................6

20 U.S.C. § 1688 .................................................................................................7

42 U.S.C. § 2000bb-1 ........................................................................................10

**Regulations**

45 C.F.R. § 92.4 ...........................................................................................4, 19

45 C.F.R. § 92.101................................................................................................6, 12

81 Fed. Reg. 31376 (May 18, 2016) .................................................................*passim*

**Other Authorities**

Anne Joseph O'Connell, *Agency Rulemaking and Political Transitions*,
   105 Nw. U. L. Rev. 471 (2011)...............................................................................14

Oxford English Dictionary Online (Oxford University Press)......................................3

United States Conference of Catholic Bishops, et al., Comment Letter on
   Proposed Rule (Nov. 6, 2015), https://bit.ly/2iARdTf.............................................7

Webster's Third New International Dictionary (3d 1961).............................................3

Wright & Miller, *Fed. Practice & Proc. Civ.* (3d ed.) .......................................13-14, 17

# INTRODUCTION

The Rule in this case threatens Plaintiffs with massive liability unless they perform and cover gender transition procedures and abortions in violation of their religious beliefs and medical judgment. This Court has already said that the Rule is likely unlawful. HHS now concedes that the Court is correct, and Intervenors hardly dispute it. Instead, they spend most of their time trying to delay, avoid, or narrow any final ruling by this Court, presumably to forestall an appeal.

But HHS and Intervenors have been stalling ever since this case was filed, and it is long past time for a final ruling. The mere fact that HHS may propose a new rule, or that the Supreme Court may rule on the meaning of "sex" in Title VII next Term, is no grounds for delay. Courts have repeatedly held that the existence of a proposed rule doesn't moot a challenge to a final rule, *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 627 n.5 (2018), and that the mere grant of "certiorari on a similar question" doesn't relieve courts of the duty of resolving a live case, *United States v. Lopez-Velasquez*, 526 F.3d 804, 808 n.1 (5th Cir. 2008). *Cf. N.Y. State Rifle & Pistol Ass'n v. New York*, 587 U.S. ____, No. 18-280 (Apr. 29, 2019) (denying abeyance sought due to proposed rule change). Delay is particularly inappropriate here, where the case presents purely legal issues and Plaintiffs face continuing harm. In fact, while this case has been stayed, multiple lawsuits have been filed in other jurisdictions seeking to evade the effects of this Court's preliminary injunction and threatening to subject Plaintiffs to inconsistent legal obligations. Intervenors have also made clear that they will challenge the proposed rule if it is ever finalized—meaning the legal questions at the core of this case will remain in dispute indefinitely.

In short, Plaintiffs have operated under a cloud of uncertainty ever since the Rule was finalized. The Rule has not changed, and Plaintiffs' legal position remains uncertain. Given the live controversy, the ongoing harm to Plaintiffs, and the absence of disputed facts, they are entitled to summary judgment now.

**ARGUMENT**

## I.  The Rule violates the Administrative Procedure Act.

The Rule violates the APA in three respects: (a) it attempts to redefine "sex" to include "gender identity"; (b) it fails to include Title IX's religious and abortion exemptions; and (c) it conflicts with Title VII. Defendants now concede that the Rule violates the APA. Intervenors cannot salvage it.

### A.  The Rule improperly attempts to define "sex" to include "gender identity."

The most glaring problem with the Rule is that it attempts to define "sex" to include "gender identity," contrary to the text, purpose, structure, and history of Title IX. As this Court has explained, the ordinary meaning of "sex" in 1972 referred to the biological categories of male or female. ECF No. 62 at 33. That meaning is confirmed by the purpose of Title IX, which was to eliminate discrimination in education against women. ECF No. 136 at 19. It is reflected throughout the structure of Title IX, which has multiple provisions assuming the existence of two "sexes" that must be treated equally. *Id.* at 19-20. It is consistent with Title IX's history, which shows that it was enacted because of discrimination "against women," and nowhere mentions "gender identity." *Id.* at 20. It is reflected in 38 years of uniform agency interpretation. *Id.* at 21-22. And it is confirmed by subsequent acts of Congress, which have consistently treated "gender identity" as a category distinct from "sex." *Id.* at 20-21.

Defendants don't dispute any of this, and Intervenors offer little response. Indeed, they offer *no* response on the purpose, structure, or history of Title IX; no response on 38 years of uniform agency interpretation of Title IX; and no response on other acts of Congress that treat "gender identity" distinct from "sex." When analyzing Title IX's text, Intervenors don't dispute that the Court must determine the "ordinary meaning…at the time Congress enacted the statute." *Wisconsin Cent. Ltd. v. United States*, 138 S. Ct. 2067, 2070 (2018). And they *admit* that "sex," both now and at the

time of Title IX's enactment, "typically refers to men and women in general" (ECF No. 155 at 20)—not, to "gender identity" or to "an array of possible gender identities beyond male and female" (81 Fed. Reg. 31376, 31392, 31384 (May 18, 2016)).

The only textual argument they offer is to cite two dictionaries for the notion that "sex" can *also* include "cultural and behavioral" attributes. ECF No. 155 at 20. But that is beside the point. Of course, the biological categories of "male" or "female" can also be associated with "cultural and behavioral" attributes. But that's not the same as saying "sex" *means* "gender identity." To defend the Rule, Intervenors must show that the ordinary meaning of "sex" in 1972 included the concept of "gender identity"— or was at least ambiguous in that respect. But their brief never even suggests that "sex" is ambiguous, much less that it unambiguously means "gender identity."[1]

Lacking any argument based on the text, purpose, structure, or history of Title IX, Intervenors put all their eggs in the *Price Waterhouse* basket. Specifically, they say that *Price Waterhouse* recognized "sex stereotyping" as a form of "sex" discrimination; that discrimination based on "gender identity" is "inherently" a form of "sex stereotyping" (because transgender individuals don't conform to gender norms); and that therefore discrimination based on "gender identity" is a form of "sex" discrimination.

---

[1] Intervenors also misuse their dictionaries. They cherry-pick the second and fourth definitions from Webster's and the OED, respectively—omitting the first definitions in each, which define "sex" to mean the "two main categories" (or "two divisions") of human beings as "male" or "female." OED Online (Oxford University Press); Webster's Third New International Dictionary (3d 1961). They also selectively quote their cherry-picked definitions, using ellipses to omit the part of the definition saying that sex "in its typical dichotomous occurrence is usu. genetically controlled and associated with special sex chromosomes." Webster's at 2018. Finally, they complain that the Court cited secondary sources on the meaning of "sex" and "gender" without inviting "expert testimony." ECF No. 155 at 21. But the meaning of "sex" is a legal issue for the court to decide. Because statutory interpretation "is exclusively the domain of the judge," "expert testimony on such purely legal issues is rarely admissible," *Nieves-Villanueva v. Soto-Rivera*, 133 F.3d 92, 99-100 (1st Cir. 1997) (collecting cases), and is unnecessary here.

ECF No. 155 at 20-23.

But this syllogism falters at every step. First, it overreads *Price Waterhouse*. "*Price Waterhouse* doesn't make sex stereotyping *per se* unlawful under Title VII." *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 339 (5th Cir. 2019) (Ho, J., concurring). Rather, it makes sex stereotyping actionable "only to the extent it provides evidence of *favoritism of one sex over the other*." *Id.* (emphasis added); *see also Hively v. Ivy Tech. Cmty. Coll.*, 853 F.3d 339, 369 (7th Cir. 2017) (Sykes, J., dissenting). In *Price Waterhouse* itself, the stereotype at issue—that women shouldn't behave aggressively—*disfavored* women by "plac[ing] women in an intolerable and impermissible catch 22: out of a job if they behave aggressively and out of a job if they do not." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51 (1989) (emphasis added). Here, by contrast, when Plaintiffs decline to perform or cover gender transition procedures for both men and women, there is no "favoritism of one sex over the other," and thus no sex stereotyping.

Second, Intervenors overlook the fact that the Rule defines "sex" discrimination to include *separate* prohibitions on both "sex stereotyping" and "gender identity" discrimination. 45 C.F.R. § 92.4. If, as Intervenors claim (at 22), "gender identity" discrimination is "inherently" a form of "sex stereotyping," then a separate prohibition on "gender identity" discrimination is superfluous. Indeed, by their own logic, Intervenors have no reason to intervene in this lawsuit, because Plaintiffs haven't challenged the Rule's ban on "sex stereotyping," and that ban fully covers the issue of "gender identity" discrimination. But, of course, Intervenors don't believe their own logic, because they know "sex stereotyping" and "gender identity" are different.

For example, Plaintiffs do not perform or cover gender transition procedures regardless of whether a woman seeks to live as a man or vice versa. This decision is not based on an employee's sex; it applies to both male and female patients and employees equally. Nor is it based on "sex stereotyping," such as how an employee should walk,

talk, or dress. "It does not spring from any sex-specific bias at all." *Hively*, 853 F.3d at 370 (Sykes, J., dissenting). Thus, the only way to make it unlawful is to define it as *another* form of discrimination—one based on "gender identity." That is why Intervenors are so keen on keeping an independent prohibition on "gender identity" discrimination. But that also confirms that "gender identity" and "sex" are not synonymous.

Third, Intervenors' argument leads to absurd results. By their logic, it is "sex stereotyping" to say that only women (not men) may identify as women, and only men (not women) may identify as men. But as Judge Ho has pointed out, if that is sex stereotyping, so are many other common practices—such as saying that only women (not men) may use women's bathrooms and changing rooms. *Wittmer*, 915 F.3d at 334 (concurring). Thus, Intervenors' sex stereotyping theory would forbid covered entities "from maintaining separate bathrooms and changing rooms for men and women—even though the purpose of separate bathrooms and changing rooms is not favoritism toward either sex, but respect for the privacy of…both sexes." *Id.* at 337.

Finally, Intervenors say that three district courts have "disagreed with this Court's analysis" and held that "discrimination against transgender individuals" is a form of "sex" discrimination. ECF No. 155 at 19-20. But these decisions didn't consider the Rule at issue here and, in any event, were wrong. They failed to grapple with the text, structure, purpose, or history of Title IX, and they are contrary to "four decades of case law," during which "every federal circuit to address the issue—including the First through Eleventh Circuits—rejected attempts to construe Title VII to prohibit discrimination on the basis of either sexual orientation or transgender status." *Wittmer*, 915 F.3d at 335 (Ho, J., concurring). They are also contrary to Fifth Circuit precedent, which holds that a ban on "sex" discrimination is different from a ban on sexual orientation discrimination (and, by extension, gender identity discrimination). *Blum v. Gulf Oil Corp.*, 597 F.2d 936 (5th Cir. 1979). Intervenors do not even

attempt to address this authority. In short, this Court's prior ruling was correct: "sex" in Title IX does not mean "gender identity."

## B. The Rule improperly omits Title IX's religious and abortion exemptions.

HHS's Rule also violates the APA by failing to include Title IX's religious and abortion exemptions. Many commenters asked HHS to incorporate these exemptions in the Rule. ECF No. 136 at 29 n.27, 31 n.28. But HHS refused—even though it incorporated parallel exemptions from statutes prohibiting discrimination based on race, color, national origin, age, and disability. 45 C.F.R. § 92.101. As this Court has held, the "[f]ailure to incorporate Title IX's religious and abortion exemptions....renders the Rule contrary to law." ECF No. 62 at 37. HHS now concedes that this ruling was correct. ECF No. 154 at 10.

In response, Intervenors say that the "numerous exemptions in Title IX are tailored to educational institutions and make no sense when applied to hospitals and insurance policies." ECF No. 155 at 26. But Title IX's prohibition on sex discrimination is *also* "tailored to educational institutions"—and that didn't stop Congress from applying it to hospitals and insurance policies. Moreover, as this Court has noted, if Congress wanted to incorporate only part of Title IX in Section 1557, it could have specified the part it wanted to incorporate. But it didn't. Instead, "Congress included the signal 'et seq.,' which means 'and the following,'"—which "can only mean Congress intended to incorporate the entire statutory structure, including the abortion and religious exemptions." ECF No. 62 at 37. Intervenors offer no response to this point. Intervenors also ignore the fact that Title IX's religious exemption is part of the same subsection of the statute—and even the same sentence—as the prohibition on sex discrimination explicitly referred to in Section 1557. 20 U.S.C. § 1681(a), (a)(3). Intervenors offer no reason why Congress would incorporate one part of the sentence but not the other—much less why it would "make no sense" to incorporate the whole

sentence expressly referenced by Congress.

Turning to the abortion exemption, Intervenors say that "[p]rohibiting discrimination based on termination of pregnancy is not the same thing as requiring an entity to perform abortions or provide insurance coverage for them"—so it is "just not true" that the Rule pressures Plaintiffs to provide abortions. ECF No. 155 at 18-19. But there are several problems with this argument. First, during the rulemaking process, several commenters asked HHS to affirm this understanding of the Rule—that it wouldn't require entities to perform or cover abortions—and HHS refused. *Compare* United States Conference of Catholic Bishops, et al., Comment Letter on Proposed Rule (Nov. 6, 2015), https://bit.ly/2iARdTf *with* 81 Fed. Reg. at 31380, 31388. Indeed, HHS expressly refused to incorporate the exemption that would have done just that.

Second, Intervenors' argument on abortion is inconsistent with their argument on gender identity. Intervenors say Plaintiffs are discriminating based on "gender identity" if they perform a hysterectomy for a woman experiencing uterine cancer, but not for a woman who wants to live as a man. But by that logic, Plaintiffs must also be discriminating based on "termination of pregnancy" if they perform a dilation and curettage for a woman who has miscarried, but not for a woman who wants an abortion. Intervenors can't define "discrimination" to mean two different things in the same Rule.

Finally, and most ironically, Intervenors argue that the Rule must be interpreted in light of *part* of Title IX's abortion exemption—the part that says Title IX cannot be construed "to permit a penalty to be imposed on any person [seeking] a legal abortion." ECF No. 155 at 19 (quoting 20 U.S.C. § 1688). But Intervenors can't say the Rule *necessarily* incorporates part of Title IX's abortion exemption while simultaneously arguing it "makes no sense" to incorporate the rest of that exemption.

## C. The Rule conflicts with Title VII.

The Rule also contradicts Title VII by making it unlawful for employers to accommodate the religious beliefs of their employees. Absent the Rule, covered entities would often be required to accommodate employees who have religious objections to performing abortions or gender transition procedures. Under the Rule, however, hospitals "will be held accountable for discrimination" if they accommodate their doctors by declining to perform those procedures. 81 Fed. Reg at 31384; ECF No. 136 at 32.

In response, Intervenors claim that "Title VII does not require employers to accommodate employees' religious beliefs when doing so would result in an undue hardship"—and that the penalties imposed by the Rule would be an undue hardship. ECF No. 155 at 25. But this argument is circular. Absent the Rule, there would be no penalties and therefore no hardship. Intervenors can't rely on the hardship created by the Rule to justify the Rule. Intervenors' argument also overlooks the scenario where an employer *wants* to accommodate a doctor, and doesn't believe accommodation is an undue hardship, but the Rule nevertheless makes it illegal to do so. In that scenario, the Rule makes it illegal to provide an accommodation that Title VII would require. Thus, the Rule conflicts with Title VII.[2]

## D. Even if "sex" were ambiguous, *Chevron* does not apply.

Even assuming the term "sex" were somehow ambiguous, the Rule is not entitled to *Chevron* deference for three reasons: (1) *Chevron* does not apply "'in extraordinary cases'" "of deep 'economic and political significance'" like this one, *King v. Burwell*, 135 S. Ct. 2480, 2488-89 (2015) (quoting *F.D.A. v. Brown & Williamson*, 529 U.S. 120, 159-60 (2000)); (2) a "transformative expansion" of regulatory authority like this one

---

[2] For the same reasons, Intervenors' reliance on *Bruff v. North Mississippi Health Services, Inc.*, 244 F.3d 495, 496 (5th Cir. 2001), is misplaced. In *Bruff*, there was no law making an accommodation unlawful, and the employer opposed an accommodation on grounds that it imposed an undue hardship.

requires a clear statement from Congress, *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 324 (2014); and (3) *Chevron* is displaced by the clear-statement rule for Spending Clause legislation like Section 1557. ECF No. 136 at 33-34. Neither HHS nor Intervenors dispute any of these points; accordingly, they are conceded. *Cf. Wittmer*, 915 F.3d at 338 (Ho, J., concurring) ("Under the elephants canon, significant policy issues" such as the definition of "sex" in Title VII or Title IX "must be decided by the people, through their elected representatives in Congress, using clearly understood text").

### E. The Rule is contrary to the Spending Clause and the Tenth and Eleventh Amendments.

As explained by the State Plaintiffs, the Rule is also contrary to law because it violates the Spending Clause and Tenth and Eleventh Amendments. We adopt and incorporate those arguments by reference.

## II. The Rule violates the Religious Freedom Restoration Act.

The Rule also violates the Religious Freedom Restoration Act ("RFRA") because it substantially burdens Plaintiffs' religious exercise and cannot satisfy strict scrutiny.

### A. The Rule imposes a "substantial burden" on Private Plaintiffs' religious exercise.

Intervenors and HHS do not dispute that the Rule imposes a substantial burden on Private Plaintiffs' religious exercise. By failing to contest this issue, they have conceded it. *Alliance for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 505 (5th Cir. 2018). In any event, as we have explained (ECF No. 136 at 36-37) and as this Court has recognized (ECF No. 62 at 39-40), the Rule plainly imposes a substantial burden by threatening Private Plaintiffs with massive financial and other penalties if they persist in their religious exercise of declining to perform or cover gender transitions or abortions. *See Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014)

("Because the [rule] forces [plaintiffs] to pay an enormous sum of money…if they insist on providing insurance coverage in accordance with their religious beliefs, [it] clearly imposes a substantial burden on those beliefs.").

### B. HHS has failed to carry its burden on strict scrutiny.

Because the Rule imposes a substantial burden on Private Plaintiffs' religious exercise, the only remaining question is whether it satisfies strict scrutiny. RFRA makes clear that *HHS* bears the burden of proof on this issue—stating that the "Government" may substantially burden religious exercise "only if *it* demonstrates" that its action satisfies strict scrutiny. 42 U.S.C. § 2000bb-1 (emphasis added). Consistent with the statutory text, the Supreme Court in *Hobby Lobby* refused to consider RFRA arguments raised by parties other than the Government, reasoning that HHS "has never made this argument" and "we do not even know what the Government's position might be." *Hobby Lobby*, 573 U.S. at 721; *cf. Christopher M. by Laveta McA. v. Corpus Christi Indep. Sch. Dist.*, 933 F.2d 1285, 1293 (5th Cir. 1991) ("Absent exceptional circumstances, an issue waived by appellant cannot be raised by amicus curiae."). Here, HHS has not even tried to meet its burden under strict scrutiny. Rather, it has acknowledged that its Rule is indefensible. Intervenors cannot carry a burden that RFRA places on the "Government" alone.

Alternatively, Intervenors claim that Plaintiffs cannot raise a successful RFRA claim without the availability of the full administrative record. ECF 155 at 33. But Intervenors are wrong: "[T]he record rule does not apply to RFRA claims," as every court to have considered the question has recognized. *N. Arapaho Tribe v. Ashe*, 925 F. Supp. 2d 1206, 1211 (D. Wyo. 2012); *see O Centro Espirita Beneficiente Uniao Do Vegetal v. Duke*, 286 F. Supp. 3d 1239, 1260-61 (D.N.M. 2017); *S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*, No. 3:08-CV-00616-LRH-RAM, 2009 WL 73257, at *1-3 (D. Nev. Jan. 7, 2009). As Intervenors note, the record rule derives

from § 706 of the APA. ECF No. 155 at 4. But "RFRA provides Plaintiffs with a cause of action that is separate from the APA." *N. Arapaho Tribe*, 925 F. Supp. 2d at 1211. So "the APA's procedural requirements, including the record rule, do not apply to this motion." *O Centro*, 286 F. Supp. 3d at 1260-61.

Finally, even if Intervenors could step into HHS's shoes and try to carry its "exceptionally demanding" burden, *Hobby Lobby*, 573 U.S. at 728, their single footnote of argument fails to do so here. ECF 155 at 34 n.7. As we've noted, HHS cannot have a compelling interest in forcing doctors to perform gender transition services against their religious beliefs and medical judgment when—as HHS's own experts recognize—there is no medical consensus on whether these services are helpful or harmful. ECF 136 at 38-40. This argument has only gotten stronger: In March the Fifth Circuit upheld Texas's "categorical policy judgment not to" provide sex reassignment surgery to prisoners because it is "hotly disputed within the medical community" whether that procedure "is a necessary or even effective treatment for gender dysphoria." *Gibson v. Collier*, 920 F.3d 212, 220-24, 226 (5th Cir. 2019).

Intervenors thus try to raise the level of generality, characterizing the relevant compelling interest (at 34 n.7) as avoiding "subsidize[d] discrimination." But in applying strict scrutiny, courts "look[] beyond broadly formulated interests" and evaluate "the asserted harm of granting specific exemptions to particular religious claimants." *Hobby Lobby*, 573 U.S. at 726-27 (quoting *Gonzales v. O Centro Espirita Beneficiente Uniao do Vegetal*, 546 U.S. 418, 431 (2006)). Even in the antidiscrimination context, the government fails to satisfy strict scrutiny when it makes no particularized showing of the need to eliminate the specific type of discrimination at issue. *See, e.g.*, *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 658-61 (2000); *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 575-81 (1995); *cf. Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018).

And even at Intervenors' impermissible level of generality, their arguments fail.

The Government allows gaping holes in coverage of gender transition procedures elsewhere in the law. ECF No. 136 at 41. Indeed, under Intervenors' theory, the whole of Title IX—which of course includes both the broad religious-entity exception and the protection against forced participation in abortions—is a grand act of "subsidized discrimination" that undermines Intervenors' claimed compelling interest. Moreover, there is nothing to stop the Government from using other means, including expending its own funds, to further its interests; that is what strict scrutiny requires. *See, e.g., McCutcheon v. F.E.C.*, 572 U.S. 185, 221 (2014). Finally, Intervenors offer no evidence—indeed nothing beyond a few conclusory assertions—suggesting that Private Plaintiffs' proposed alternatives would be unworkable.

## III.  The Rule violates the Free Exercise Clause.

For similar reasons, the Rule also violates the Free Exercise Clause. The Rule is not neutral or generally applicable because it allows broad exemptions for the Government's own healthcare programs—TRICARE and the Veterans Administration. It gives HHS authority to make case-by-case exemptions when it finds the justification sufficiently "persuasive." 45 C.F.R. §92.101(b)(3)(iv). And it restricts religious practices gratuitously. ECF No. 136 at 45-48.

In response, Intervenors say that "HHS has no control over…TRICARE and the Veterans' Administration." ECF No. 155 at 36. But the Supreme Court in *Lukumi* didn't divide up the requirement of neutrality agency by agency; it examined the legal framework as a whole, concluding that the *city*'s law was not neutral based in part on the interpretation of a state law by "the Florida attorney general." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 537 (1993). Likewise, here, the fact that the Government exempts massive federal programs from requirements imposed on religious Plaintiffs renders the Rule not neutral.

Intervenors also claim that "individualized determinations" are "a fundamental part of addressing allegations of discrimination." ECF No. 155 at 36. But there is a

difference between determining whether "discrimination" occurred, and banning all "sex-specific health programs" while making case-by-case exemptions for "exceedingly persuasive justifications." The latter—which is what the Rule does—gives HHS complete discretion to find that secular justifications are sufficiently persuasive, but religious justifications are not. That discretion triggers strict scrutiny.

Lastly, on HHS's gratuitous refusal to incorporate Title IX's religious exemption, Intervenors merely repeat their argument that it would "make no sense" to apply a religious exemption to "hospitals and insurance policies." ECF No. 155 at 36-37. But as explained above, incorporating Title IX's religious exemption not only makes sense but is required. HHS's failure to do so renders the Rule non-neutral.[3]

## IV.  The Rule must be set aside and enjoined.

Because the Rule violates the APA and RFRA, this Court should vacate the unlawful portions of the Rule and make its preliminary injunction permanent. HHS's arguments for delaying or narrowing this Court's ruling are unavailing.

### A.  There is no reason to "postpone" a final ruling.

HHS first asks the Court to "postpone" summary judgment because a new proposed rule "may" moot this case.  ECF No. 154 at 11. But courts have repeatedly held that the issuance of a proposed rule does not moot a challenge to a final rule. *Nat'l Ass'n of Mfrs.*, 138 S. Ct. at 627 n.5; *see also* Wright & Miller, 13C *Fed. Practice &*

---

[3] Even assuming the Rule were neutral, the Court should consider whether *Employment Division v. Smith* applies. As several Justices have noted, *Smith* "drastically cut back on the protection provided by the Free Exercise Clause," *Kennedy v. Bremerton Sch. Dist.*, 139 S. Ct. 634, 637 (2019) (Alito, J., concurring in the denial of certiorari), contrary to the text and "original understanding" of that provision. *City of Boerne v. Flores*, 521 U.S. 507, 548-65 (1997) (O'Connor, J., dissenting). So *Smith* is not "immune from thoughtful reappraisal" in the lower courts. *Zadeh v. Robinson*, 902 F.3d 483, 498 (5th Cir. 2018) (Willett, J., concurring *dubitante*); *cf. Gorman v. Sharp*, 892 F.3d 172, 173 (5th Cir. 2018) ("Nor have the parties given any indication that the Supreme Court should revisit its precedent in light of the text or original understanding of the Fourth Amendment").

*Proc. Civ.* § 3533.6 (3d ed.). Courts still have a "duty of deciding" a challenge to a final rule. *El Paso Elec. Co. v. F.E.R.C.*, 667 F.2d 462, 467 (5th Cir. 1982). The reason is clear: a "proposed rule [is] simply a proposal," *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007); it offers "no assurance" that the challengers concerns will ever be addressed, much less "in the near future." *El Paso*, 667 F.2d at 467.

HHS might also request a delay based on the recent grant of certiorari in three cases involving the meaning of "sex" in Title VII. *Altitude Express, Inc. v. Zarda*, No. 17-1623, 2019 WL 1756678, at *1 (U.S. Apr. 22, 2019); *Bostock v. Clayton County*, No. 17-1618, 2019 WL 1756677, at *1 (U.S. Apr. 22, 2019); *R.G. & G.R. Harris Funeral Homes, Inc. v. E.E.O.C.*, No. 18-107, 2019 WL 1756679, at *1 (U.S. Apr. 22, 2019). But the mere grant of "certiorari on a similar question" doesn't relieve courts of the duty of resolving a live case. *Lopez-Velasquez*, 526 F.3d at 808 n.1. The Court "remain[s] bound to follow" the Fifth Circuit's binding precedent in the interim. *Id.*

Delay is particularly inappropriate here for several reasons. *First*, this case involves purely legal questions under the APA and RFRA, and there are no contested factual issues. Plaintiffs first sought summary judgment two-and-a-half years ago, and they still haven't received a final ruling. *Second*, it typically takes over a year before a proposed rule is finalized—often longer in election years. Anne Joseph O'Connell, *Agency Rulemaking and Political Transitions*, 105 Nw. U. L. Rev. 471, 513 (2011) (average of "462.79 days, or nearly 1.3 years"). Given the 2020 election, there is no guarantee that a proposed rule would *ever* be finalized. *Third*, even if a proposed rule were finalized, that would not moot this case. It would simply be an example of voluntary cessation, where the "repeal of the objectionable language" leaves the government free to "reenact[] precisely the same provision" later. *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). *Fourth*, despite the nationwide injunction, Intervenors and other organizations have filed multiple lawsuits against entities like Plaintiffs in other jurisdictions, seeking rulings that the term "sex" in Section 1557

14

(or the Equal Protection Clause itself) requires them to perform gender transition procedures in violation of their religious beliefs and medical judgment.[4] These lawsuits have not been stayed, and if they are resolved contrary to this Court's preliminary-injunction ruling, Plaintiffs face the risk of conflicting legal requirements. *Fifth*, it would help net judicial economy to *speed up* this case, not delay it further, since it presents to the Supreme Court one of the major problems with reinterpreting "sex" by regulation rather than statute. Better to address it now than in some future round of litigation. *Finally*, Intervenors have made clear that they will challenge the proposed rule if it is ever finalized. So the legal question at the core of this case will remain in dispute indefinitely.

For illustration, the Court need look no further than the protracted litigation over another HHS regulation—the contraceptive mandate. Over seven years ago, HHS attempted to force religious objectors to provide health plans that include contraceptive coverage. *See Hobby Lobby*, 573 U.S. at 697-98. After years of litigation and multiple trips to the Supreme Court (*e.g.*, *Hobby Lobby*; *Zubik v. Burwell*, 136 S. Ct. 1557 (2016)), HHS was finally forced to concede that it could not do so consistent with RFRA. When HHS changed its rules to exempt religious objectors, however, it faced another round of lawsuits—still ongoing—asserting that the Constitution in fact *requires* that religious objectors be forced to provide health plans that include contraceptives. *Pennsylvania v. Trump*, No. 19-1189 (3d Cir.), oral argument scheduled May 21, 2019; *California v. U.S. Dep't of Health & Human Servs.*, No. 19-15072 (9th Cir.), oral argument scheduled June 6, 2019. Intervenors have already indicated that the Court can expect the same Sisyphean cycle here.

---

[4] *See, e.g.*, *Tovar v. Essentia Health*, 342 F. Supp. 3d 947, 952-53 (D. Minn. 2018); *Minton v. Dignity Health*, No. 17-558259 (Calif. Super. Ct. Apr. 19, 2017) (appeal filed); *Enstad v. PeaceHealth*, No. 2:17-cv-01496 (W.D. Wash filed Oct. 5, 2017); *Conforti v. St. Joseph's Healthcare System*, No. 2:17-cv-00050 (D.N.J. filed Jan. 5, 2017).

In short, Plaintiffs have operated under a cloud of uncertainty ever since the Rule was finalized. The Rule has not changed, and Plaintiffs' legal position remains uncertain. Given the live controversy, the ongoing harm to Plaintiffs, and the absence of disputed facts, they are entitled to a final ruling now.

### B. The unlawful parts of the Rule must be set aside.

Because the challenged portions of the Rule are unlawful, the proper remedy is clear: the Court should "set aside th[ose] part[s] of the final rule and remand to the agency for reconsideration." *Sw. Elec. Power Co. v. E.P.A.*, 920 F.3d 999, 1022 (5th Cir. 2019) (citing 5 U.S.C. § 706(2)(A)). Under the APA, a reviewing court faced with an unlawful agency action "'shall'—not may—'hold unlawful and set aside' [the] agency action." *Id.* (quoting *Checkosky v. S.E.C.*, 23 F.3d 452, 491 (D.C. Cir. 1994)). Thus, the "ordinary" remedy for unlawful agency rules "is that the rules are vacated— not that their application to the individual petitioners is proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998).

Neither HHS nor Intervenors "provide compelling reasons to deviate from the normal rule in APA cases." *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 512 (9th Cir. 2018). For its part, HHS proposes no specific narrower relief of its own, instead offering a sweeping argument that "nationwide injunctions" are categorically "inappropriate under both Article III and equitable principles." ECF No. 154 at 12. But that argument is squarely foreclosed by Fifth Circuit precedent: "It is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction." *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015). The only case HHS cites in its support says merely that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018). But the remedy Plaintiffs seek *is* tailored to their injury: their injury is that

16

the Rule unlawfully requires them to cover and provide objectionable medical services; they seek to vacate *only* the portions of the Rule imposing that requirement. That this remedy will *also* "benefit not only [Plaintiffs] but all other persons subject to the…rule under attack" is not an Article III problem but a routine side-effect of "most civil-rights" litigation. Wright & Miller, 7A *Fed. Practice & Proc. Civ.* § 1771 (3d ed.).

Intervenors complain that Plaintiffs' proposed relief is "targeted in the abstract at the *definitional* provisions in the Rule," saying the Court should instead merely enjoin HHS from invoking the Rule to require Plaintiffs to cover or provide transition-related services. ECF No. 155 at 38. But Plaintiffs challenge the Rule's definitional provisions, not just specific applications of the Rule to them, because this is a *facial* challenge to an *ultra vires* regulation—and the remedy for a facial challenge is facial invalidation. Indeed, the APA itself contemplates just this sort of challenge. It gives "aggrieved" plaintiffs a cause of action to challenge "agency action," 5 U.S.C. § 702, which it defines to include "the whole or a part of an agency rule." *Id.* § 551(13). It then directs courts that find a rule unlawful to "set [it] aside." *Id.* § 706(2). Accordingly, the Fifth Circuit has routinely vacated agency rules immediately after determining that they violate the APA, without further analysis as to the scope of the remedy.[5] Attempting to evade the APA's language, HHS claims that, in light of "established principles regarding equitable discretion," the APA's command that courts "shall…set aside" unlawful agency action is not clear enough to "mandate" that unlawful agency action in fact be set aside. ECF No. 154 at 12. But again, just weeks

---

[5] *E.g., Southwestern Electric*, 920 F.3d at 1021-22; *Chamber of Commerce v. U.S. Dep't of Labor*, 885 F.3d 360, 369, 388 (5th Cir. 2018) (vacating "*in toto*" a Labor Department rule after determining that it reinterpreted a long-established statutory term in "vast and novel ways"); *Nat'l Pork Producers Council v. E.P.A.*, 635 F.3d 738, 750-53, 756 (5th Cir. 2011) ("vacat[ing] those provisions of [an EPA] Rule" found to have been "*ultra vires*" under the plain language of the relevant statute).

ago, the Fifth Circuit underscored § 706's mandatory language, quoting the D.C. Circuit for the proposition that reviewing courts "shall—not may—…set aside" unlawful agency action. *Southwestern Electric*, 920 F.3d at 1022.

In any event, despite claiming the Court has "discretion" to depart from the text of § 706, ECF No. 154 at 12, HHS makes no serious effort to explain *why* the Court should exercise that discretion here. In some cases, courts have declined "to vacate a flawed agency action" after considering "two principal factors: (1) the seriousness of the deficiencies of the action, that is, how likely it is the agency will be able to justify its decision on remand; and (2) the disruptive consequences of vacatur." *Heartland Reg'l Med. Ctr. v. Sebelius*, 566 F.3d 193, 197 (D.C. Cir. 2009) (cleaned up); *accord Cent. & Sw. Servs., Inc. v. E.P.A.*, 220 F.3d 683, 692 (5th Cir. 2000). But here, both factors point toward vacatur: (1) HHS couldn't possibly "justify its decision on remand" because the Rule isn't just procedurally flawed but "w[as] not statutorily authorized" in the first place. *Children's Hosp. Ass'n of Tex. v. Azar*, 300 F. Supp. 3d 190, 211 (D.D.C. 2018) (internal quotation marks omitted). And (2) vacatur would have no disruptive consequences because the Rule has never gone into effect. Meanwhile, considerations supporting nationwide relief are at their strongest here, where "CMDA's membership extends across the country and the Rule applies broadly to 'almost all licensed physicians.'" ECF No. 62 at 45 (quoting 81 Fed. Reg. at 31445).

Intervenors also say the Court's preliminary relief failed to weigh the harm of a nationwide injunction on third parties, given the possibility of discrimination against women or transgender people in "contexts that have nothing to do with abortion or transition-related care." ECF No. 155 at 38-39. But that harm isn't one Congress chose to address in Section 1557, and when a regulation conflicts with the relevant statute, the APA itself strikes the balance: the regulation is to be "set aside." 5 U.S.C. § 706(2)(A). In any event, this Court *did* appropriately tailor its relief to the specific

18

"command[s]" of the Rule that are "contrary to law," because "none of the unchallenged provisions [were] enjoined." ECF No. 62 at 45-46. Thus if a transgender person has a valid claim of sex stereotyping, rightly understood, *see supra* pp. 3-5, nothing in the Court's order would prevent that person from bringing a claim under the Rule. *See* 45 C.F.R. § 92.4 ("On the basis of sex includes…sex stereotyping"). What plaintiffs cannot do, however, is claim discrimination based solely on transgender *status* when that "status-based class[]" was not "enumerated" by Congress. *Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1260 (11th Cir. 2017) (William Pryor, J., concurring).

For similar reasons, Intervenors' Rule 65 argument misses the mark. They claim that vacating the ban on "gender identity" discrimination while leaving the ban on "sex" discrimination in place is vague, because "it is difficult—if not impossible—to distinguish between those concepts in any particular case." ECF No. 155 at 40-41. But that goes to the merits, not Rule 65. The point of the Court's preliminary-injunction order is that there is a distinction between "sex" discrimination and "gender identity" discrimination, and Section 1557 prohibits only the former. Intervenors' argument falls especially flat in light of *HHS's own* recognition that there is a difference between "gender identity" and "sex" discrimination. ECF No. 154 at 6-9. There is little reason to worry that HHS is unable to distinguish between the two types of claims for purposes of complying with this Court's injunction when HHS has just filed a brief explaining that it can and does do so.

Finally, Intervenors echo HHS's argument against the nationwide scope of relief. But this is hypocrisy; Intervenor ACLU has frequently litigated cases seeking nationwide injunctions, including one issued just last week.[6]

---

[6] *E.g.*, *Washington v. Azar*, No. 1:19-cv-03040-SAB, 2019 WL 1868362 (E.D. Wash. Apr. 25, 2019) (nationwide injunction against HHS rule); *Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018) (Attorney General's policy); *East Bay Sanctuary Covenant v. Trump*, 349 F. Supp. 3d 838 (N.D. Cal. 2018) (Department of Homeland Security

## V. Intervenors' procedural objections are meritless.

Lacking persuasive arguments on the merits or scope of relief, Intervenors turn to procedure, arguing that (1) Plaintiffs lack standing to facially challenge the "gender identity" and "termination of pregnancy" provisions; and (2) the Court should delay ruling on Plaintiffs' motions pending production of the administrative record and further discovery. Both arguments fail.

### A. Plaintiffs have standing.

The standing argument fails because Intervenors have conceded—as they must—that Franciscan has suffered an injury-in-fact, because the Rule forces it to either change its categorical policies against performing or covering gender-transition services or forgo millions of dollars in federal funding. ECF No. 155 at 21-22; *see also* 81 Fed. Reg. at 31429, 31455 (Rule makes categorical policies against performing or covering gender-transition procedures "unlawful on [their] face"); App. 7-9, 11-12, 14 (Franciscan's categorical policies and funding). Only one plaintiff with standing is required to satisfy Article III. *Texas*, 809 F.3d at 151. And when a plaintiff's injury is caused by an invalid rule, the plaintiff has standing to seek the APA's default remedy—"vacating the challenged rule." *Shays v. F.E.C.*, 414 F.3d 76, 95 (D.C. Cir. 2005); *see also, e.g., Southwestern Electric*, 920 F.3d at 1014 n.18, 1033; *Mack Trucks, Inc. v. E.P.A.*, 682 F.3d 87, 91 (D.C. Cir. 2012) ("Petitioners' injury is…clearly traceable to the IFR…and is redressable by a vacatur of the IFR." (cleaned up)). Thus, Intervenors have conceded everything necessary for standing in this case.

Undaunted, Intervenors offer several arguments, all meritless.

*First*, they claim that although Franciscan *is* injured by the "gender identity" provision, it has standing to challenge only the provision's application "in the specific

---

rule); *Int'l Refugee Assistance Project v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017) (President's "travel ban"); *Stone v. Trump*, 280 F. Supp. 3d 747 (D. Md. 2017) (Administration's policy on transgender military service).

context of providing and paying for transition-related care" rather than the provision itself. ECF No. 155 at 12-14. But this argument "slice[s] the salami too thin." *WildEarth Guardians v. Jewell*, 738 F.3d 298, 306-08 (D.C. Cir. 2013). It is undisputed that Franciscan is injured by the "gender identity" provision, and Franciscan's argument in seeking redress for that injury is that the provision is facially unlawful as inconsistent with the text of the relevant statute—an argument that, if successful, would require the provision to be "set aside." 5 U.S.C. § 706(2)(A). Nothing more is required for Plaintiffs to have standing to seek vacatur of the challenged provision.[7]

*Second*, Intervenors (at 18-19) say that even if Plaintiffs can challenge the Rule's "gender identity" provision, they lack standing to challenge the "termination of pregnancy" provision because that provision doesn't require them to provide or pay for abortions—it merely prohibits them from "refus[ing] routine healthcare to a wom[a]n because she previously had an abortion." ECF No. 69 at 9. But to establish standing, all Plaintiffs need to show is that their "intended future conduct" is "arguably…proscribed by the [regulation] they wish to challenge." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014) (cleaned up). As noted above (at p. 7), Plaintiffs have easily shown that here. According to the Rule, a provider commits "gender identity" discrimination if it refuses to provide a "hysterectomy for a transgender man…in

---

[7] *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 72-79 (1978) ("reject[ing]…the[] argument[]" that a plaintiff's standing injury must be "directly related to" his legal theory); *see also, e.g., Texas*, 809 F.3d at 155-161, 182 (Texas had standing to "strike down DAPA" as a whole although its only standing injury was "it would incur significant costs in issuing driver's licenses to DAPA beneficiaries"); *Energy Future Coal. v. E.P.A.*, 793 F.3d 141, 144-45 (D.C. Cir. 2015) (Kavanaugh, J.) (plaintiff who wanted a *particular* non-"commercially available" fuel to be eligible for use in emissions testing had standing to seek to "[i]nvalidat[e] the 'commercially available' requirement" itself); *Nat. Res. Def. Council v. E.P.A.*, 489 F.3d 1364, 1370-71, 1374-75 (D.C. Cir. 2007) (plaintiff whose members lived near *certain* facilities exempt from emissions rules as "low-risk" had standing to seek "vacatur" of the regulation creating the "low-risk" category itself).

the same manner it provides the procedure for other individuals." 81 Fed. Reg. at 31455. By the same token, a provider commits "termination of pregnancy" discrimination if it refuses to provide a procedure like dilation and curettage for an abortion "in the same manner it provides the procedure" after a miscarriage. That is just what Franciscan does here. App. 10 (¶ 28). Indeed, Intervenors themselves recognize Plaintiffs' conduct is at least arguably proscribed by the "termination of pregnancy" provision when they later *concede* that Plaintiffs could seek a declaratory judgment on the "termination of pregnancy" provision's meaning, ECF No. 155 at 19—a damning concession, given that the "case or controversy" required under the Declaratory Judgment Act "is identical to the meaning of 'case or controversy' for the purposes of Article III." *Bauer v. Texas*, 341 F.3d 352, 358 (5th Cir. 2003).[8]

*Finally*, Intervenors argue that CMDA lacks associational standing because it hasn't shown that any of its individual members have suffered an Article III injury. ECF No. 155 at 14-16.[9] Given that Intervenors have conceded Franciscan's standing, ECF No. 155 at 21-22, this is a purely academic objection. But it is also mistaken.

---

[8] *Cruz v. Abbott* (*see* ECF No. 155 at 11) does not undermine this analysis. The plaintiff's conduct there was not arguably proscribed by the challenged statute because (1) the government itself maintained that it wasn't; (2) "the plain meaning of the statutory text" indicated that it wasn't; and (3) the Fifth Circuit had previously rejected the plaintiff's interpretation of identical statutory language in another case. 849 F.3d 594, 599-602 (5th Cir. 2017). None of those circumstances applies here.

[9] Intervenors don't dispute the other two elements of associational standing—namely, that CMDA seeks to protect interests "germane to [its] purpose," and that neither the claim nor the relief "requires the participation of individual members." *Assoc. of Am. Physicians & Surgeons, Inc. v. Tex. Med. Bd.*, 627 F.3d 547, 550 (5th Cir. 2010) (internal quotation marks omitted). Both requirements are thus conceded. They are also amply satisfied here. *See* ECF No. 62 at 20; App. 19 (Dr. Stevens Decl. ¶¶ 9-10) (CMDA's primary purposes include "helping Christian healthcare professionals integrate their faith into their practice" and serving as their "voice…in the public square."). And any argument about the participation of individual members is waived, as that requirement is "solely prudential," *Assoc. of Am. Physicians & Surgeons*, 627 F.3d at 550, and "prudential standing arguments may be waived." *Bd. of Miss. Levee Comm'rs v. U.S. E.P.A.*, 674 F.3d 409, 417-18 (5th Cir. 2012).

This Court already recognized that CMDA "satisfied" associational standing "by providing the declaration of Dr. Hoffman," ECF No. 62 at 19—and rightly so. First, "[w]hether someone is in fact an object of a regulation is a flexible inquiry rooted in common sense." *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 265 (5th Cir. 2015). Here, even if the Rule "applies by its terms only to" Dr. Hoffman's hospital, its "practical impact" falls on doctors, *id.*, who must provide the objectionable services required by the Rule and whose employers are made "accountable" for their actions. 81 Fed. Reg. at 31384 & n.40; *see Contender Farms*, 779 F.3d at 265 (because regulation required private organizations to enforce certain requirements on their participants, the participants were "as much objects of the Regulation as the [organizations] themselves"). So Dr. Hoffman is an "object" of the Rule, and the "ordinary rule" is that he (and thus CMDA) may challenge it. *Id.* at 266.

Moreover, Dr. Hoffman's injury satisfies Article III. "As part of [his] normal medical practice," Dr. Hoffman prescribes puberty blocking medication and hormones—but because of his medical judgment and religious beliefs, he cannot prescribe them for gender transitions. App. 463-65 (Hoffman Decl. ¶¶ 4, 7-11). Under the Rule, this policy against providing for gender transitions services provided in other contexts is illegal, 81 Fed. Reg. at 31429, 31455; and Dr. Hoffman's hospital is "accountable" for his violations, *id.* at 31384 & n.40—forcing him to choose between his medical judgment and religious beliefs, on the one hand, and exposing his hospital to the loss of federal funding, on the other. That his hospital has previously accommodated his beliefs is irrelevant (*cf.* ECF No. 155 at 16), because the accommodation would become illegal under the Rule. *Supra* Part I.C. And while Intervenors say there is no "real expectation" he will be forced to choose between his beliefs and compliance with the Rule in the future, ECF No. 155 at 15 (internal quotation marks omitted), the Rule's effect would be *immediate*: Dr. Hoffman would have to "revise [his] policy to provide the procedure[s] for" gender transitions as of its effective date. 81 Fed. Reg. at 31455.

23

In any event, Intervenors ignore Dr. Stevens's declaration, which demonstrates that other CMDA members likewise receive federal funding, yet, in accordance with CMDA policies, refuse to perform or cover gender-transition and abortion services. App. 20, 21-24 (Stevens Decl. ¶¶ 14-18, 20-21). That establishes standing.

**B. The record is adequate.**

Finally, Intervenors argue that the Court is "unable to properly review" the Rule's legality "[w]here the administrative record is not before" it. ECF No. 155 at 4. We've already explained why this argument fails with respect to Plaintiffs' RFRA claim (*supra* Part II.B). *See id.* at 45-47. This argument is equally foreclosed by controlling precedent with respect to Plaintiffs' APA claim.

Plaintiffs' APA claim presents a purely legal question of statutory interpretation—whether the Rule's "gender identity" and "termination of pregnancy" provisions conflict with Title IX. And the Fifth Circuit has squarely rejected the argument that the administrative record is necessary to review such a claim:

> Although the administrative record for the regulation is not before this Court, that is of no moment. Our review is limited to interpreting the extent to which the regulation is consistent with the statute—a task which we are competent to perform without the administrative record.

*Sierra Club v. U.S. Fish & Wildlife Serv.*, 245 F.3d 434, 440 n.37 (5th Cir. 2001); *see also Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 266-67 (D.C. Cir. 2001) ("argument that the challenged provisions violate the [relevant statute] can be resolved with nothing more than the statute and its legislative history").

Instead, when determining whether a regulation is consistent with the statutory text, courts use "the traditional tools of statutory construction," like text, history, and purpose, *Texas Pipeline Ass'n v. F.E.R.C.*, 661 F.3d 258, 260 (5th Cir. 2011)—not the administrative record. And if, as here, those "traditional tools" reveal that "the intent of Congress is clear, then the matter is at an end," *id.*—with no role for the adminis-

24

trative record to play. None of Intervenors' cases is to the contrary, because each involved challenges to "the reasonableness of the agency's decision-making *process*," not just the consistency of a regulation with the statute. *Sierra Club*, 245 F.3d at 440 n.37 (emphasis added); *see, e.g., Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 414-17 (1971) (challenge to "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment").

Intervenors' request for discovery (ECF No. 156) is likewise unavailing. For one thing, this request is inconsistent with Intervenors' record-rule argument; the point of the record rule is that the "only" permissible evidence is the administrative record and discovery generally isn't allowed. *See Joseph G. Moretti, Inc. v. Hoffman*, 526 F.2d 1311, 1312 (5th Cir. 1976). More importantly, "Rule 56 does not permit a party to avoid confronting his opponent's summary judgment proof by seeking discovery on factual matters that would not affect the legal basis for summary judgment." *Woods v. Fed. Home Loan Bank Bd.*, 826 F.2d 1400, 1414-15 (5th Cir. 1987). Here, the facts establishing Plaintiffs' standing are conceded; the Rule's inconsistency with Title IX is a purely legal question of statutory interpretation; and HHS has made no effort to carry its burden under RFRA. Thus, there is nothing Intervenors could discover that would "influence the outcome of" Plaintiffs' motion. *Am. Family Life Assurance Co. of Columbus v. Biles*, 714 F.3d 887, 894 (5th Cir. 2013). The only rational purpose for their request is either further delay or harassment of the Plaintiffs.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully urge the Court to grant this motion for partial summary judgment, vacate the unlawful portions of the Rule, and convert the Court's preliminary injunction into a final injunction.


Respectfully submitted this the 3rd day of May, 2019.

/s/ Luke W. Goodrich
Luke W. Goodrich
Bar No. 977736DC
Eric C. Rassbach
Mark L. Rienzi
Stephanie H. Barclay
The Becket Fund for Religious Liberty
1200 New Hampshire Ave. NW, Suite 700
Washington, DC 20036
(202) 955-0095
lgoodrich@becketlaw.org

*Counsel for Plaintiffs Christian Medical &*
*Dental Associations, Franciscan Health, Inc.,*
*Specialty Physicians of Illinois, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on May 3, 2019, the foregoing brief was served on all parties via ECF.

/s/ Luke W. Goodrich
Luke W. Goodrich