```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
 2                     WICHITA FALLS DIVISION

 3   FRANCISCAN ALLIANCE, INC.;    )   7:16-CV-108
     SPECIALTY PHYSICIANS OF       )
 4   ILLINOIS, LLC,;               )   Preliminary Injunction
     CHRISTIAN MEDICAL &           )
 5   DENTAL ASSOCIATIONS;          )   December 20, 2016
     - and -                       )
 6   STATE OF TEXAS;               )
     STATE OF WISCONSIN;           )
 7   STATE OF NEBRASKA;            )
     COMMONWEALTH OF               )
 8   KENTUCKY, by and through      )
     Governor Matthew G. Bevin;    )
 9   STATE OF KANSAS; STATE OF     )
     LOUISIANA; STATE OF           )
10   ARIZONA; and STATE OF         )
     MISSISSIPPI, by and through   )
11   Governor Phil Bryant,         )
     Plaintiffs,                   )
12   V.                            )
     SYLVIA BURWELL, Secretary     )
13   Of the United States Department)
     Of Health and Human Services; )
14   And UNITED STATES DEPARTMENT OF)
     HEALTH AND HUMAN SERVICES,    )
15   Defendants,                   )

16

17

18

19              BEFORE THE HONORABLE REED C. O'CONNOR
                    United States District Judge
20                   In Wichita Falls, Texas

21

22

23

24

25
```

```
 1   FOR THE PLAINTIFF:          MR. MARK RIENZI
     Franciscan Alliance        The Becket Fund for Religious
 2                                  Liberty
     Christian Medical and      1200 New Hampshire Ave NW
 3   Dental Society             Suite 700
                                Washington, DC 20036
 4                              202-349-7208
                                Fax: 202-955-0090
 5                              rienzi@law.edu

 6   FOR THE PLAINTIFF:          MR. AUSTIN R. NIMOCKS
     States                     Office of the Texas Attorney
 7                                  General
                                General Litigation Division
 8                              PO Box 12548
                                Austin, TX 78711
 9                              512-936-1400
                                Fax: 512-370-9337
10
     FOR THE DEFENDANT:          MR. ADAM ANDERSON GROGG
11                              U.S. Department of Justice
                                Civil Division, Federal
12                                  Programs Branch
                                20 Massachusetts Ave. NW
13                              Washington, DC 20001
                                202-514-2395
14                              Fax: 202-616-8470
                                adam.a.grogg@usdoj.gov
15
                                MR. BAILEY WILSON HEAPS
16                              United States Department of
                                    Justice
17                              Civil Division
                                Federal Programs Branch
18                              20 Massachusetts Ave NW
                                Washington, DC 20001
19                              202-514-1280
                                Fax: 202-616-8470
20                              bailey.w.heaps@usdoj.gov

21                              MS. EMILY BROOKE NESTLER
                                United States Department of
22                                  Justice
                                20 Massachusetts Avenue NW
23                              Washington, DC 20530
                                202-616-8489
24                              emily.b.nestler@usdoj.gov

25
```

```
 1   COURT REPORTER:              MR. DENVER B. RODEN, RMR
                                 United States Court Reporter
 2                               1050 Lake Carolyn Pkwy #2338
                                 Irving, Texas  75039
 3                               drodenrmr@sbcglobal.net
                                 Phone:  (214) 753-2298
 4

 5
         The above styled and numbered cause was reported by
 6   computerized stenography and produced by computer.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1      (December 20, 2016.)

2          THE COURT:  All right.  Is everyone here or are we

3   still waiting?

4          MS. NESTLER:  Your Honor, Adam Grogg who is arguing

5   for the defendant.  He went to the restroom.

6          THE COURT:  Okay.  Very good.  How about you guys?

7          MR. NIMOCKS:  Good morning, Judge.  Austin Nimocks

8   for Texas.  All the Plaintiffs are here.

9          THE COURT:  All the Plaintiffs are here.  So you are

10  here for the states.

11         MR. RIENZI:  And Mark Rienzi from the Beckham Fund

12  for the private Plaintiffs, Your Honor.

13         THE COURT:  Okay.  Very good.  And then we will

14  wait -- Tell me your name, ma'am.

15         MS. NESTLER:  Emily Nestler.

16         MR. HEAPS:  And Bailey Heaps.

17         THE COURT:  Okay.  Thank you, Mr. Heaps.

18         MR. GROGG:  I apologize, Your Honor.

19         THE COURT:  No apology needed.  Mr. Grogg?

20         MR. GROGG:  Yes.  Thank you.

21         THE COURT:  Okay.  Very good.  Are you all ready to

22  begin?

23         MR. GROGG:  Yes, sir.

24         THE COURT:  Okay.  And who is going to start, since

25  it's the Plaintiff's motion.

1          **MR. RIENZI:**  I will, Your Honor.

2          **THE COURT:**  Very good.

3          **MR. RIENZI:**  Good morning and may it please the

4     Court.  Mark Rienzi for the private plaintiffs.

5          What I would like to do this morning, Your Honor, is

6     tell you briefly about plaintiffs and how they practice

7     medicine, tell you about the rule in this case, and then talk

8     about the reason that Plaintiffs need a preliminary injunction

9     and the various ways in which the rule is illegal and should

10    be subject to that preliminary injunction.

11         I would like to start off by telling you a little bit

12    about Franciscan Alliance.  So Franciscan Alliance is a

13    Catholic hospital group founded by the Sisters of St. Francis

14    of Perpetual Adoration.  They came to the United States in the

15    1870s, fleeing religious persecution in Germany when the

16    government tried to control their order.  They began taking

17    care of patients in 1875 and they've done that continually

18    from 1875 to the present.  They do that now through a network

19    of 13 hospitals which perform more than 4 million procedures a

20    year.

21         In the course of that they give more -- they give

22    almost a billion dollars a year in care to the poor and the

23    elderly through Medicare and Medicaid and that's part of what

24    has them subject to this rule that's in front of the Court

25    that they give that care.  They also give about half a billion

1    dollars of totally uncompensated care to the poor and disabled

2    and elderly.

3            They do all of this because of their religious values

4    and their religious approach to healthcare.  As

5    Sister Jane Marie says in her declaration they understand what

6    they doing to be continuing the ministry of Jesus Christ

7    through healthcare.  That's the understanding of their

8    enterprise.  And because of that, that comes with certain

9    requirements about how they take care of people and how they

10   practice medicine.  That certainly drives their commitment to

11   take care of the poor and the disabled and the elderly.  It

12   also controls how they deal with patients on a day-to-day

13   basis, and so the sisters believe that every patient should be

14   treated with love and respect and dignity, that they should be

15   welcomed, and they should consciously be aware of being loved

16   by the sisters in saint -- and Franciscan Alliance system.

17           That commitment also includes some things that the

18   sisters believe are not appropriate parts of healthcare and

19   are not good and loving and kind and dignified to do to

20   people.  One of those is that they cannot provide abortions in

21   their hospitals.  They don't believe that that is consistent

22   with continuing the ministry of Jesus Christ.  They don't

23   believe that that is the way to treat every human being with

24   love and dignity and respect.

25           They have the same beliefs about trying to surgically

1    or chemically alter somebody's sex.  So sister Jane Marie

2    explains in I think paragraph 27 of her declaration that their

3    view is that every person, regardless of their sexual

4    orientation, regardless of their sexual identity, ought to be

5    treated with love and kindness and dignity and respect.

6         The sisters do not believe, however, that it is

7    consistent with treating people with love, kindness, dignity

8    and respect to try to physically alter their body or

9    chemically alter their body to change their biological sex.  I

10   understand on abortion and gender transition the sisters' view

11   isn't necessarily the view shared by everybody.  Other people

12   have different views; and that is fine, but that is the view

13   of the sisters and the healthcare system that they operate.

14   That's how they practice medicine.

15        Let me briefly just mention the other two private

16   plaintiffs just so you have it in the record.  Specialty

17   Physicians is a physician group that is solely owned and

18   controlled by Franciscan.  In other words, it's essentially

19   part of Franciscan Alliance.  It's a different corporation,

20   but it is completely owned and controlled by Franciscan

21   Alliance.

22        Christian Medical and Dental Association, CMDA, is an

23   association of Christian Health Care Providers, it has about

24   18,000 members, and the group exists for, among other things,

25   to come out with joint ethics statements and joint value

1    statements about the way these people choose to practice

2    medicine and every member of the CMDA signs a statement of

3    faith to be part of the organization and allows the

4    organization to speak for it.

5         Let me briefly introduce the rule.  The rule comes

6    from or is purportedly based on the Affordable Care Act which

7    was enacted in 2010 and in particular the rule purports to --

8    the rule purports to be in I think Section 1557 of the

9    Affordable Care Act.

10        Section 1557 though doesn't say anything about the

11   word "sex."  It doesn't say anything about gender identity.

12   It doesn't say anything about abortion or termination of

13   pregnancy.  Instead, what 1557 does and what Congress did when

14   it passed the statute is 1557 incorporates several other

15   federal civil right statutes and says that those shall apply

16   to healthcare, too.  And in particular what's relevant here is

17   that the statute says Title IX of the education amendments of

18   1977, (20 U.S.C. 1681 et seq).  All right.  And that's what

19   the rule is purporting to interpret, is Congress reference to

20   Title IX in Section 1557.  The rule is, according to the

21   government, an effort to interpret and apply that rule by

22   Congress to use that statute.

23        I want to pause for a moment on the fact that

24   Congress did choose to incorporate and refer to another

25   statute as opposed to doing what would have been much simpler,

1   simply saying there shall be no discrimination on the basis of

2   sex.  All right?  That language, "on the basis of sex,"

3   appears in lots of statutes, Title IX, but others, and it

4   would have been very easy, in fact easier and simpler, for

5   Congress simply to say "no discrimination on the basis of

6   sex."  They didn't do that.  Instead they refer to and

7   incorporated an existing legal structure and that existing

8   legal structure is Title IX.  The agency I think wants to

9   approach it as if Congress just said "on the basis of sex" and

10  give a blank check to figure out whatever that means now.  I

11  don't think they'd be right even if that were the case, but

12  Congress made a deliberate choice not simply to say "on the

13  basis of sex" but instead to specifically refer to and

14  incorporate an existing legal structure that had been in

15  existence for four decades or so.

16          I think there are three aspects of Title IX's legal

17  structure that merits some attention when thinking about

18  whether this rule is authorized by law.

19          First, of course, is just the meaning of "sex."

20  Title IX actually does say "sex," of course.  Title IX says:

21  No discrimination and education on the base is sex -- I'm

22  paraphrasing -- but Title IX does say "sex" and as this Court

23  is aware, and I know you've dealt with it in a prior case,

24  there are arguments to be made, which I can get to in a few

25  minutes, about what Congress meant in Title IX when it said

1    "on the basis of sex."  So one is just -- That terms comes

2    from Title IX.  The only hook here for the Government to get

3    to anything about sex discrimination is Title IX.  That's the

4    only place it's referenced.

5         Secondly, when Congress wrote Title IX it was quite

6    clear that the grounds prohibited for discrimination in Title

7    IX did not include anything that would force a religious

8    institution to violate its beliefs.

9         So here's the exact language from Title IX:

10        "This section shall not apply to an educational

11   institution which is controlled by a religious organization if

12   the application of this subsection would not be consistent

13   with the religious tenants of such organization."  And that's

14   in 20 U.S.C. 1681.

15        So the grounds prohibited, the grounds for

16   discrimination prohibited under Title IX, whatever they

17   included, did not and do not include anything that would force

18   a religious organization to violate its religious beliefs.

19        The third aspect of Title IX that I'd like to flag

20   for the Court is that Title IX was also very clear and

21   Congress was also very clear in Title IX about the

22   relationship between a ban on sex discrimination and abortion.

23   Congress was exceedingly clear on that front and it said --

24   and this is 20 U.S.C. 1688 -- Congress said, quote:  "Nothing

25   in this chapter shall be construed to require or prohibit any

1    person or public or private entity to provide or pay for any

2    benefit or service including the use of facilities related to

3    an abortion."

4            So again Congress, when it bans sex discrimination

5    and education in Title IX was quite clear about the fact the

6    ground prohibited there could never include forcing anybody,

7    public, private, individual, entity, anybody, religious,

8    non-religious; right?  It's not limited to religious

9    objectors.  Congress was clear that the grounds prohibited

10   could not include forcing anybody to provide or pay for an

11   abortion.

12           Based on Congress's reference to Title IX in Section

13   1557 of the Affordable Care Act, the agency issued the new

14   rule at issue in this case.  The Affordable Care Act was

15   enacted in 2010.  The agency didn't issue this rule until

16   2016.

17           Let me flag a few things that this rule does.  First

18   and foremost and the big question in front of the Court, this

19   rule redefines -- defines or purports to interpret the word

20   "sex."  So the agency says that "sex" includes not just

21   biological sex, not just male and female and their physical

22   attributes, but also, quote, "gender identity," which the

23   agency says is, quote, "an individual's internal sense of

24   gender which may be male, female, neither, or a combination of

25   male and female and which may be different from an

1    individual's sex assigned at birth."  Close quote.

2            In the course of adopting that definition, the

3    Government obviously generated a large filing in the *Federal*

4    *Register*.  When it originally came out it was almost 350 pages

5    of double spaced typed.  It's been condensed into the three

6    column format.  It's now a mere 99 pages.  But in course of

7    that the agency gave a lot of guidance about what it meant by

8    the definition of "sex," what it meant by discrimination, and

9    whether it would include the blanket religious exemption from

10   Title IX and the blanket abortion exemption from Title IX.

11   And the agency was quite clear that it would not accept the

12   blanket exceptions from Title IX.  I use the word "blanket."

13   That's the word that the agency uses in the regulation.  They

14   don't want a, quote, "blanket" exemption like Title IX has and

15   instead they say we will deal with this on a case-by-case

16   basis, look to other statutes and other provisions, and those

17   things will be where we'll look.  And they say the reason they

18   want to reject a blanket exemption is precisely that something

19   they think a blanket exemption, sometimes they think

20   protecting religious liberty wouldn't be a good idea, and so

21   they say for example they think they do have a compelling

22   interest in making sure everybody provides coverage for sex

23   change operations.

24           So the Government rejected -- If, at the end of the

25   day, the agency was willing to say there's a complete blanket

1   religious exemption just like in Title IX and just like in

2   Title IX nothing here can force anybody to provide or pay for

3   an abortion, the private Plaintiffs would not have anything to

4   complain about.  It is the fact that they considered and in

5   the text of the rule and the regulation reject the idea of

6   carrying over those religious exemptions and abortion

7   exemptions from Title IX that creates all the trouble and that

8   I would suggest to you also makes the rule violate the

9   Administrative Procedures Act.

10          The rule provides a lot of guidance about what it

11   means to discriminatory based on gender identity.  For

12   example, and this is at page 31455 of the regulation, the

13   agency explains, quote:

14          "A provider specializing in gynecological services

15   that previously declined to provide a medically necessary

16   hysterectomy for a transgender man would have to revise its

17   policy to provide the procedure for transgender individuals in

18   the same manner it provides the procedure for other

19   individuals."  Close quote.

20          So the agency is telling my clients, who do provide

21   medically necessary hysterectomies, for example, if a woman

22   has uterine cancer, my clients generally don't do elective

23   sterilizations, it's part of their Catholic beliefs is that

24   they shouldn't sterilize people, but if someone has uterine

25   cancer, for example, and needs to have a uterus removed, my

1    clients will perform that.

2         And what the agency is saying, if you would perform

3    it for a medical reason, if you would take out a uterus that

4    has cancer, a diseased uterus, you also must be willing to

5    take out a healthy uterus from somebody who wants the uterus

6    removed as a treatment for their transgender dysphoria.

7         The agency likewise explains at page 31435 the way

8    they are going to understand "discrimination."  Quote:

9         "Thus, if a covered entity covers certain types of

10   elective procedures that are beyond those strictly identified

11   as medically necessary or appropriate, it must apply the same

12   standards to its coverage of comparable procedures for gender

13   transition."

14        Again, the agency's way of understanding

15   "discrimination" here is that if you provide, say,

16   reconstructive surgery after a mastectomy for a woman who has

17   breast cancer, you also have to be willing to provide surgery

18   for somebody who wants a transition from being a man to a

19   woman.  Their view of "discrimination" is that if you don't do

20   it equally for both you are violating this regulation.

21        The rule also says that having a health plan; right?

22   The rule is not only about the medical services my clients

23   provide, it's also about the health plans that they provide to

24   their employees, and the agency says under the heading of

25   Discriminatory Actions Prohibited -- and this is in section

92.207 of the rule on page 31472 -- under the heading of
Discriminatory Actions Prohibited it says that:

"A covered entity shall not have or implement a
categorical exclusion or limitation for all health services
related to gender transition."

So the agency in the rule is quite clear about what
they understand "discrimination" to mean and the problem for
my clients, Your Honor, is that my clients do the things that
the rule suggests are discriminatory.  My clients do provide
hysterectomies for women with cancer but they don't provide
them to try to surgically change somebody from a woman to a
man.  My clients do provide those types of health services but
they have a religious -- and they also have a medical
objection to providing them for gender transition; right?
They also believe that these types of procedures are often
experimental, that very often it's not good to give these
procedures to children because children who have gender
dysphoria often by the time they finish going through puberty
don't have gender dysphoria.  But the rule says that they
would need to change those policies.

And the agency was quite clear in the rule that it
understood it was going to be making a lot of people change
their policies.  And so this is on page 31455.  Quote:

"We anticipate that a large number of providers may
need to develop or revise policies or procedures to

1    incorporate this prohibition."

2          So the agency was very much aware that it was forcing

3    changes in behavior.

4          All of this is wrapped up in a rule which the agency

5    says it expects to have the maximum effect permissible by law.

6    That's on 31377 and several other places in their regulation.

7    They want it to be interpreted to have the maximum possible

8    effect under the law.  They say that its rule is supposed to

9    be a set of standards to tell covered entities like Franciscan

10   how they are supposed to behave and how they are supposed to

11   comply.  And they acknowledge and they say that providers are

12   going to have to change their policies.

13         There are a lot of consequences for the Plaintiffs

14   here if they don't do what the Government says which is why

15   we're in court asking for a preliminary injunction.  Among

16   others, there's the possibility of losing federal funding that

17   is a core part for Franciscan Alliance, specifically, core

18   part of their ability to serve the poor and the disabled and

19   the elderly.  That is a lot of what they do and they do it for

20   religious reasons and they do it very well and they do a lot

21   of it.  They would risk losing that.  They could risk having

22   to repay that if they are found to have made a false statement

23   in one of the assurances that the rule says the Government

24   will require from people going forward.  All right?  So the

25   rule says you have to make assurance to us, not simply

1   generally that you don't discriminate based on sex, which is

2   the kind of assurance that Franciscan Alliance has made, you

3   know, or would make all the time.  They don't discriminate

4   based on sex.  But specifically that you don't violate this

5   rule that lays out this new way thinking about what the word

6   "sex" means and this new way of thinking about what

7   "discrimination" means.

8          Plaintiffs are also subject to other types of HHS or

9   DOJ enforcement.  It's worded very broadly that:  "The agency

10  may take such remedial action as the director may require."

11  I'm not exactly sure what that means, but sounds very broad.

12  Sounds like it could at least include trying to recoup money

13  that has been paid, and frankly, spent taking care of the poor

14  and elderly.

15         The places were also subject to private lawsuits and

16  that's not a small consideration.  The agency was quite clear

17  repeatedly in the regulation that it meant to be creating a

18  private right of action.  It meant to be creating rights for

19  private people to go sue health care providers who didn't

20  provide these types of services.  And there have already been

21  some suits like that.  There have been suits like that against

22  Catholic hospitals for precisely the kind of behavior

23  Franciscan engages in here, not including sex change

24  operations in health insurance or refusing to sterilize

25  somebody who wants to be sterilized.  That's Franciscan's

1   behavior.  Those lawsuits have already started coming.  So
2   basically every day that the doors are open at Franciscan they
3   are possibly creating claims for new people that could cost
4   tens or hundreds of thousands of dollars both on the claim and
5   the attorney fees which are including in those claims and they
6   are also jeopardizing all of the federal funding that they
7   have received and they are also risking false claims liability
8   for the assurances they will the be forced to give.  That's
9   already happening.  Again, the private lawsuits are already
10  happening.  It already happening in the sense that HHS is
11  already investigating the State of Texas, one of the
12  Plaintiffs in this case, for -- which obviously Mr. Nimocks
13  can talk about more than I can -- but they are already doing
14  investigations of the State of Texas over this rule, so it's
15  not some speculative hypothetical.  We engage in behavior that
16  the rule says you can't engage in.

17          We think we are well within our medical judgment
18  rights and religious judgment rights to do that.  We think
19  that the rule is invalid.  We don't think that the agency had
20  a right to say that "sex" includes gender identity and
21  specifically sex change operations and abortions, so we think
22  it's an illegal rule.  But right now we are engaged in
23  behavior that the rule gives us every reason to think
24  jeopardizes the continued existence and certainly continued
25  good functioning of the hospital and its care for the elderly

1   and the poor.

2        Let me say this and then I'm happy to -- I defer the

3   Court as to how you want to do it.  I'm happy to jump in and

4   start going claim by claim.  I wanted to give you the basic

5   set up.  I could go by claim by claim or I could pause here

6   and let other people talk.  I certainly don't mean to

7   filibuster and monopolize the time.

8        **THE COURT:**  I just want you to be able to present

9   whatever you want to present and then I will have some

10  follow-up questions at the end and I will do the same for the

11  state Plaintiffs and then the same for the federal government.

12       **MR. RIENZI:**  Okay.  I certainly won't repeat.  I'm

13  going to assume that you've got the briefs and you don't need

14  me to repeat what we've said there, so briefly let me just

15  walk through the claims.

16       Under the Administrative Procedure Act, the agency

17  violated that act because Congress has not authorized this

18  action.  What they have done is actually contrary to law, it's

19  arbitrary, and capricious.  The word "sex" in Title IX simply

20  does not have the definition that the agency is giving it.

21  That's something I know this Court has already addressed in

22  the schools context.  The analysis there also applies just as

23  well here.  Title IX by its terms, by its nature, was designed

24  to -- really took a binary view of "sex," frankly, Title IX.

25  It said that we are concerned that women aren't getting the

1    same treatment as men and it said that we want to make sure

2    that women have equal educational opportunity to men.  There

3    is no basis whatsoever to think that when Congress did that it

4    had the 2016 versions of gender identity and things that are

5    in this rule in mind.  Congress simply didn't.  That's not

6    what the word meant when Congress enacted it.  It's not what

7    it meant in 2010, frankly, when Congress incorporated Title IX

8    into the Affordable Care Act.  So, "sex" doesn't include

9    gender identity under Title IX.

10         It's not that Congress couldn't include gender

11    identity.  I want to be clear about that.  Congress could

12    include gender identity; in fact, in other statues has done

13    precisely that.  The Violence Against Women Act, for example,

14    Congress does that.  So there have been efforts in the 40

15    something years from Title IX to today, there have been

16    efforts to expand federal civil right laws like Title VII and

17    Title IX to include gender identity.  Congress has considered

18    and rejected those efforts.

19         In some context Congress has decided that they should

20    protect gender identity and they have done it and they have

21    done it by including the words "gender identity."  The agency

22    is trying to take a big step that Congress has chosen not to

23    take.  Congress could have taken that step in the ACA but they

24    didn't.  They specifically referred to an existing legal

25    structure.

1           It also violates the APA not just for getting the
2    definition wrong but for getting the exemptions wrong.  The
3    agency knows it was supposed to include those exemptions which
4    is why for every other statute that Congress incorporated in
5    1557 the agency not only took the prohibition but also took
6    the exemptions.  But they said they think about religious
7    exemptions differently and they would rather sort out the
8    religious exemptions under some other statute but they would
9    rather not include a blanket exemption here.
10          As a threshold matter, I would just point out the
11   mere fact that they refused to include the blanket exemption
12   here is great evidence that they do not really think all
13   religious objectors get protected here.  They are very careful
14   and very coy in their brief not to actually say that.  What
15   they say is that their rule contemplates addressing religious
16   liberty objections.  It contemplates addressing them and I say
17   frank say it contemplates address them later.  All right?
18          We have to act now and we want to know what our
19   rights are and what our obligations are now when we have to
20   act with grave consequences hanging over our head.  The agency
21   says, No.  No.  No.  Wait until something happens to you, wait
22   until somebody sues you, wait until we come for your funding
23   and then we will figure out if what you did was legal or not.
24   I don't think that's the way the law works or should work, but
25   that's their treatment of religious exemptions.

1          They also -- They have this litany that they like to

2     repeat of the Religious Freedom Restoration Act, the Church

3     Amendment, the Weldon Amendment, and the Coats Amendment.

4          One, again, note what they do not say.  They do not

5     say that those four things equal blanket exemption; right?

6     They could say that.  If they had said that I would have been

7     happier when I read their brief and my clients would have been

8     happier, but they don't say that at all.  In fact, they make

9     clear that those things are limited and the Government,

10    frankly, likes keeping those limits in its back pocket; right?

11    So the Church Amendment, for example, applies to three

12    specific federal funding streams.  It does not, it does not

13    apply to everybody.  It's not a nationwide conscience right.

14    I wish it were, but it's not, and the Government has argued

15    that it's not.  The Government has argued in other cases

16    recently that the Church Amendment doesn't protect

17    institutions; it only protects individuals, people, persons.

18    That's good for members of the CMDA so far as it reaches,

19    which is not every place it needs to reach.  It's not good for

20    Franciscan Alliance.

21          The Weldon Amendment is one that the agency just

22    recently had the opportunity in California where California

23    was forcing all healthcare insurance policies to include

24    abortion.  The agency had the opportunity to say we understand

25    that the Weldon Amendment forbids the Government from doing

```
1    this.  Instead, they didn't.  They said, No, this is okay.

2    That's different.  The Weldon Amendment is only about

3    providing care, not about providing insurance, so tough luck;

4    the Weldon Amendment doesn't protect you.

5         The Coats Amendment is another one.  It's limited to

6    abortion.  By its terms the Coats Amendment talks about

7    protecting an entity from discrimination by the federal

8    government over abortion.  The definition of "entity" though

9    says that "entity" includes individuals in training programs.

10   I don't know if it's the Government's view that "entity"

11   includes a hospital like Franciscan Alliance, but it's

12   certainly not clear from the text that the Government's

13   view -- it's not clear from their brief -- that Franciscan has

14   an absolute protection against being forced to provide

15   abortions.

16        I would point out that the private Plaintiffs' view

17   of this law is frankly, in many ways, similar to what you read

18   in the amicus brief by the ACLU.  The ACLU understands full

19   well that this law is designed to force religious objectors,

20   like Franciscan Alliance, to perform sex change operations and

21   in certain circumstances to provide abortions.  The Government

22   has resisted carrying over what is in Title IX because they

23   want to sort that out later.  They think they've got arguments

24   about it later.  Our view is, one, it violates the APA not to

25   carry that stuff over; but, two, if we are going to sort out
```

1    sometime whether we have a religious liberty right not to

2    provide abortions and not to provide gender transition

3    operations, we think we have the right to get that established

4    now when we have to act when the law is telling us that what

5    we are doing is illegal and when the law also tells us we have

6    a religious liberty rights.  That conflict is real right now,

7    it's live right now, and the idea that the Government gets to

8    sort of shoot first and figure out the legality later doesn't

9    make sense and is inconsistent with our civil rights laws.

10            Now, let me briefly touch on -- So the RFRA argument.

11   The Government seems to acknowledge I think that their actions

12   are subject to RFRA.  That's good.  At times they act like

13   they've made some big concession to say that RFRA and these

14   other federal statutes and apply.  Of course, that's no

15   concession at all.  Whether they said that or not, federal

16   statutes apply and the agency can't undo those federal

17   statutes.  But it's good they say RFRA applies.

18            In their brief they do not provide any substantive

19   defense to the RFRA claim.  They say, Judge, kick it down the

20   line.  Do it later.  But they don't provide a defense of the

21   RFRA claim.  That's the end of the RFRA claim at the

22   preliminary injunction stage.  There is a substantial burden

23   on plaintiff's religion.  They've got a Government telling

24   them that they have to do things that under their religion

25   they simply cannot do.  The Government fails the strict

1    scrutiny test.  It doesn't have a compelling interest in doing

2    this.  It doesn't need to do this.  The idea that the best way

3    to make sex change operations available is to force unwilling

4    people to do them is a pretty bizarre idea.  I frankly doubt

5    that people who want to have sex change operations really want

6    to get them for people who think it's a bad thing to do.  I

7    suspect that they don't.  I suspect that they would rather get

8    them from people who think this is a great thing to do for

9    people and I'm helping.  The same with abortions.

10          The key point though is the Government offers you

11   know defense; right?  They wrote a 50 page brief.  They wrote

12   nothing to explain how they satisfy RFRA's compelling interest

13   test.  That should be the end of it for the RFRA matter.

14          On the free speech question.  The regulation says

15   that referring to somebody by their biological gender can be

16   considered creating a hostile environment for them.  It cites

17   documents that say healthcare professionals should not impose

18   a binary view of gender while the fact of the matter is the

19   Plaintiffs here have a binary view of gender.  Their view of

20   sexuality is that it is not something that is determined by

21   the feelings or beliefs of an individual but it is something

22   that is a matter of biology and it is something that relates

23   to their God-given nature.  Again, that doesn't have to be the

24   belief shared by everybody, but that is the belief shared by

25   the private Plaintiffs.  The Government cites documents saying

1    that that is outdated and that that should not be imposed on

2    patients.  Well, if by imposing it on patients they mean

3    Franciscan Alliance won't do sex change operations and will

4    tell people, Hey, we don't think it's actually good to go

5    cutting up your body and doing this, we think you should get

6    some other kind of help, that's the kind of medical advice

7    that the Plaintiffs in this case give and have given and wish

8    to continue to give.  The rule suggests that's no longer

9    permissible, that that is hostile environment, that that is

10   discrimination under the rule and that is harmful, frankly,

11   not only for the Plaintiffs but also for their patients.  The

12   patients have the right to get the honest medical advice from

13   the people they are talking to.  The Government may not like

14   the honest medical advice from, for example, Dr. Hoffman, the

15   CMDA doctor who has got a declaration in the record that his

16   advice is that trying to chemically alter a child to hold off

17   puberty is not good thing for the child.  Patients are

18   entitled to that advice.  They don't have to heed it.  They

19   can go find another doctor if they want.  But the Government

20   shouldn't be regulating what doctors say to their patients and

21   shouldn't be forcing doctors to engage in these services that

22   are against their beliefs.

23           On the void for vagueness claim, I would simply say

24   the Government wrote a -- well, it was originally a 350 page

25   rule, it's been condensed into the 99 page version, and then a

1    50 page brief.  The 50 page brief maybe makes the vagueness

2    claim better than the rule did; right?  They essentially are

3    saying to the Plaintiffs here you have to violate the rule if

4    you want to find out what's in it; right?  We are not going to

5    tell you clearly whether you are allowed to turn down sex

6    change operations now.  We are going to wait and see later.

7    Go ahead and do it, do it at risk of great peril, great

8    financial peril, great peril to your religious ministry.  Go

9    ahead and do that and we're going to tell you later.  We are

10   going to figure it out later whether that's okay.  Well, we

11   would suggest there's no reason to have figure it out later.

12   Either the rule makes our conduct illegal or it doesn't;

13   right?

14        And I would just -- if I could put three examples on

15   the table that I would love to get clear answers and know the

16   answer to.  Hysterectomy; right?  Is it discrimination under

17   this rule if you provide a hysterectomy for someone with

18   cancer but you won't for gender transition?  On the issue of

19   abortion, you know, my clients perform a dilation and

20   evacuation or a dilation and curettage on a woman who's had a

21   miscarriage.  In other words, the baby has died and they are

22   clearing out body of the baby.  They do those things for

23   miscarriages.  They would not do them for abortions.  Is that

24   discrimination based on termination of pregnancy?  I think it

25   is based on what I read.  If they want to say it's not, then

1   my clients would be thrilled to hear that.

2         And, lastly, to go back to Dr. Hoffman, in his

3   declaration he says he gives puberty blocking medication to

4   children as young as three or four who have a condition known

5   precocious puberty.  All right?  Essentially, their body kicks

6   into puberty when they're much too young for their body to

7   actually handle that and so he will give hormones or puberty

8   blocking hormones to hold off puberty in those children until

9   they get to an age where they are physically developed enough

10  that their body can go through those changes, but he says he

11  wouldn't do or try to hold off puberty at, you know, a normal

12  age of ten or twelve years old or whenever the child would

13  normally start going puberty at that age for sex change

14  reasons is not a good thing to go.

15        Again, we think by the rule that that's

16  discrimination.  I think the Government's brief is designed in

17  part to say we don't quite know in it's discrimination, but if

18  that's the case then we've got a serious vagueness problem;

19  right?  We don't know whether our actions, which we've put out

20  clearly in the documents and the affidavits, our actions are

21  what they are, our beliefs are what they are, and we've tried

22  to be very clear about that, we've put it on the table, and we

23  need to know are we legally allowed to keep doing that or are

24  we violating the law when we do that.  The Government ought to

25  just be able answer those simple questions.

1            And, lastly, I will briefly touch on the substantive

2    due process claim at the end.  It's a short claim.  The gist

3    of it, Your Honor, though is the idea of the Government

4    forcing doctors to provide abortions and sterilizations which,

5    I should have said this earlier, but obviously a lot of sex

6    change operations are sterilizations, whether it's a

7    hysterectomy, whether it's cutting out other organs, those

8    are -- or even chemicals like hormones can often lead to

9    sterilization.  So our substantive due process argument is

10   simply that the idea of the Government having the ability to

11   force doctors and force religious healthcare providers to

12   provide these types of services against their will is a --

13   it's been long been established that they can't do that and

14   the Government doesn't really contest that.  The Government

15   says, Well, you've got the Church Amendment, so you are fine.

16   The Church Amendment, as I said before, doesn't actually cover

17   everything under this rule.  Church Amendment is limited to

18   funding streams.  This rule by its terms is not just limiting

19   funding streams, it's all activities by the healthcare

20   providers.  So from a substantive due process point of view,

21   if there a fundamental mystery of the universe and meaning of

22   life, right though choose, for example, to terminate a

23   pregnancy and have an abortion, surely there is the same kind

24   of commitment right for a healthcare provider who says, Well,

25   my mystery of the universe is that I can't kill that baby or

1   mystery of the universe is that I can't go sterilizing people.

2   They can't claim down.  There's certainly no need to reach it,

3   but I just wanted to flag what it is.

4         So, in sum, again I would just end with from our

5   point of view the rule is illegal in a lot of different ways.

6   We face a lot of very serious consequences if we don't get

7   protection.  You know, the easiest and sort of most

8   overarching way to deal with that is the Administer Procedures

9   Act which is simply they don't have the authority to do what

10  they're doing, they certainly don't have the authorize to do

11  what they're doing without giving us the exemptions that are

12  in Title IX, and ultimately the Government shouldn't be able

13  to put us in that position and given that they have put us in

14  that position that's why we need relief from the Court.

15        Thank you, Your Honor.

16        **MR. Nimocks:**  Good morning, Judge.  And may it please

17  the Court.  Austin Nimocks on behalf of Texas and the other

18  sovereign Plaintiffs.

19        I will do my best to avoid repeating arguments that

20  Professor Rienzi articulated, but I want to go -- start with

21  the statute I think that is really at the center of this case,

22  and that's Title IX, and go into what is it and what does it

23  mean.

24        As the Court is well aware, the Supreme Court of the

25  United States has made clear that we interpret the language

1    employed by Congress at the time of the enactment.  Here we

2    are talking about the educational amendments of 1972.  The

3    question of what does the word "sex" mean is significant here

4    and particularly because Congress did not delegate in 1972 to

5    the agency HHS, at the time HEW, authority over the term.  It

6    didn't give it an expressed grant to define terms and so we

7    look to the plain meaning of the term at the time that

8    Congress employs it, so the absence of delegation by Congress

9    puts us in this circumstance.

10         Now, we go through extensively in our brief, and I'm

11   referring to ECF document 23 at pages 12 through 16, the

12   history of the term "sex" in particular what it was and what

13   it meant at the time it was enacted by Congress in 1972.  And

14   I would note to this point that our esteemed opponents have

15   not sought to fight us on that particular history in terms of

16   what does the term mean.

17         The Defendant's approach is the term means what they

18   want it to mean in the current light as opposed to looking at

19   what the term meant at the time Congress enacted it.  This is

20   important as it impacts the rule because the word "sex" at the

21   time Congress enacted it in 1972 had two critical components:

22         Number one, it was abundantly clear that the word

23   "sex" was biological in nature, that it had biological

24   moorings to the sense of being male and female.

25         And, secondly, it was binary in nature, meaning that

the word "sex" meant you were male or female, the options or

categories, so to speak, of "sex" were male and female.  That

is extolled in looking at dictionary definitions that we

provide ad nauseam, looking at scholarly writing, and even

amongst scholars who were familiar with and/or embedded in

what I will call the transgender movement at the time

understood the words gender -- read in the concept of gender

identity which emerged only shortly thereafter had a

completely different idea and meaning than the term "sex" that

Congress used.

Now, in Title IX, which is what we're talking about,

Congress gave us some indications additionally -- in addition

to using the term "sex" and bringing its plain meaning along

with it as to what it meant when it used the term "sex."  In

Section 1686 of 20 U.S.C., that's a provision that the Court

may be familiar with where Congress authorized the separate

living facilities that were permitted to fund recipients on

the basis of sex and then the agency at the time responsible

for implementing Title IX, the Department of Health,

Education, and Welfare, I believe in 1974 or '75, promulgated

34 CFR Sections 106.32 and .33 both which provide that

providing separate intimate facilities on the base of sex was

permitted, so we have an indication as to again the

implementation of the federal government of the plain meaning

of "sex" putting into action Congress's clear intent when it

1    used the word "sex."

2          But now we turn to the rule at issue, Your Honor.

3    And Professor Rienzi has touched on this and I want to expound

4    a little bit on it.  And I'm going to from this point forward

5    make reference to page numbers and I'm referring to the rule,

6    Your Honor, as published in the *Federal Register*.  Volume 81

7    of the *Federal Register*.  I'm looking at page 31392 where

8    Health & Human Services now say that gender identity, which is

9    encompassed they say within the term "sex" includes an array

10   of possible gender identities beyond male and female.  So not

11   only does the agency, Your Honor, go beyond the biological

12   moorings of sex and permit within their new construction of

13   gender identity the right to select that which you are, but no

14   longer is it more to the categories of male and female.  And

15   when the agency uses the word of array of possible gender

16   identities but doesn't tell us what the ends of the spectrum

17   are at all, I think on its face that's an indication of a rule

18   that's arbitrary and capricious.  We have no idea what the

19   array is.  They don't point us to the boundaries of the array,

20   how big or small is it or where we can even find answers to

21   that particular question.  They dig their heels in on this

22   concept.

23         Now, I'm looking at page 31428 to tell us that:

24         "Individuals," and I'm quoting here, "with non-binary

25   gender identities may face difficulty in accessing certain

1    gender specific programs.  However, covered entities must

2    treat all individuals consistent with their gender identity

3    including with regard to access to facilities."

4         Your Honor, this language is undoubtedly a reference

5    to sex-designated facilities including intimate facilities

6    which are designated in a binary fashion.  Yet the agency

7    demands that there is no binary nature to this definition,

8    that there is no array of possibilities, and that anybody who

9    falls within the rubric of this rule must accommodate that

10   array especially with regard to facilities.

11        How can a hospital that designates restrooms or

12   intimate facilities like Franciscan Alliance accommodate from

13   a facility basis an array that is completely undefined?  It

14   makes it impossible to comply, it is a vague, and I would say

15   void on that basis and thus arbitrary and capricious.

16        But shortly before this reference on page 31428 that

17   I just mentioned, curiously the agency adopts *United States*

18   *against Virginia* on pages 31408 and 09.  This is a case, Your

19   Honor, that where the Virginia Military Institute went all the

20   way to the United States Supreme Court and Justice Ginsburg

21   required that male and female have equal access to the

22   educational opportunities at that institution.

23        And there are two things about that opinion that I

24   will note:

25        Number one, if you take a close look at it, it is

1    very binary in nature.  The language employed by Justice

2    Ginsburg extolls the differences between men and women and

3    talks about it in that context.

4            Number two, she drops a footnote acknowledging that

5    when it comes to intimate facilities separate facilities must

6    be provided by men and women.

7            So the agency here in this case adopts a judicial

8    case and framework over the course of two pages of its rule

9    that is a binary case that acknowledges the differences

10   between men and women and requires that separate intimate

11   facilities be provided.  The agency is just very inconsistent

12   and imprecise within its own rule.

13           With that, Your Honor, I would like to turn to

14   addressing the legal basis that HHS articulates for the rule

15   as to why they believe they are allowed to do this or why what

16   they are doing is perfectly permissible or consistent with

17   federal law.  On page 31384 they say the following, quote:

18           "In the proposed rule we noted that the approach

19   taken in the proposed definition," this is referring to sex,

20   "is consistent with the approach taken by the federal

21   government in similar matters," unquote.

22           And there they drop a footnote, footnote 42, where

23   the agency cites the U.S. Office of Personnel Management,

24   which is a convenient citation because OPM can do anything and

25   it hardly ever gets challenged because it's just the federal

1    government self-regulating and a couple of other internal

2    federal agencies and then on page 31387 they talk again about

3    the basis for the rule and they say this:

4         "We noted that like other federal agencies," and they

5    drop footnote 56 and I'll come pack to that, "HHS has

6    previously interpreted sex discrimination to include

7    discrimination on the basis of gender identity," where they

8    then drop footnote 57.

9         Well, if you look closely at footnotes 56 and 57,

10   this is again on page 31387 of the rule, Your Honor, this is a

11   clear example of a federal self-fulfilling prophecy.  The

12   basis for their interpretation is so weak I almost feel like

13   I'm giving it too much attention to mention it, but I'll go

14   through the footnotes since they brought them up.  They cite

15   again OPM; a directive by the Department of Labor with regard

16   to contracting; statements of interest filed by the Department

17   of Justice -- as the Court is aware, those are things that the

18   Department of Justice can file in virtually any case, if not

19   any case; a memorandum produced by Attorney General Holder;

20   and then a guideline produced by the Department of Education.

21        Now, what's curious about this guideline they cite

22   about the Department of Education, this happens to be one of

23   the guidelines that is at the center of another dispute that

24   Texas and other sovereigns have with the federal government

25   over gender identity and what it means with regard to

1    educational facilities in schools and this particular guidance

2    from the Department of Education that they cite as authority

3    for this rule is actually one that has been enjoined by this

4    Court in the litigation to which I alluded a moment ago.

5    Footnote 57 is a letter, a letter from the director of HHS.

6           And so, Your Honor, to sum it up, the legal basis for

7    this rule that is cited by the agency, to say it's weak is an

8    overstatement.  It's virtually non-existent.  If the federal

9    government can produce voluntary materials, statements of

10   interest, letters, guidelines like this and then cite it as

11   authoritative for reinterpreting a word from 1972 that

12   Congress never gave it the authority to interpret, then it

13   really turns our system of law completely on its head.  So

14   whatever the inclinations of HHS may be, the legal footing for

15   what its doing is virtually non-existent.

16          What is the impact on Texas and the other sovereigns

17   in this case?  As we articulate in our complaint -- Well,

18   before I say that, let me just make clear for the Court that

19   HHS acknowledges in the rule that this rule impacts virtually

20   every medical provider across the country.  The one caveat

21   that they note would be that medical providers who accept only

22   Medicare Part B would not fall within the ambit of this rule

23   but medical providers who accept only Medicare Part B are

24   virtually non-existent in today's medical community.  So these

25   let's just acknowledge form the outset that this touches the

1    entire of the medical profession.

2         The problem is that HHS doesn't have the right to

3    touch the standards of care in the medical profession.  That

4    doesn't belong to them at all.

5         As we articulate in our Amended Complaint, this is

6    ECF 21 at ECF page 23, the U.S. Supreme Court has itself has

7    acknowledged that the state has a significant role to play in

8    regulating the medical profession.  That's from *Gonzales*

9    *against Carhar* in 2007 and that includes maintaining high

10    standards of professional conduct in the practice of medicine.

11    That's from the *Barsky* case in 1954.

12         The federal government has no right or ability to

13    determine what the standard of care is in any particular state

14    any more than it has the right to determine what the rules of

15    professional ethics and conduct are for lawyers.  That's why

16    these -- these things are regulated by the states.  That's why

17    the states themselves issue individual licenses.  This is our

18    Republican form of government and our notion of federalism

19    operating at its finest.  I can't walk into Louisiana and

20    practice law unless the Louisiana Bar gives me permission.

21    That's their sovereign right.  And the same thing goes with

22    medical professionals.  If you want to practice medicine in

23    Texas or any other state, it is the state that licenses you,

24    it's the state that holds you accountable, it is the state

25    that sets the standard of care; not HHS.  But HHS has come in

```
1    with this rule and declared outright that certain medical
2    viewpoints and standards of care are now outmoded.  The words
3    they use on page 31429 is that you if you have a professional
4    medical opinion or a standard of care with regard to gender
5    transition, related treatments or procedures, that would not
6    be -- that would allow a medical professional to say no on any
7    number of bases, that is, quote, "outdated and not based on
8    current standards of care," says the federal government in
9    this particular rule.  Again, I'm looking at page 31429.
10           Now, what's staggering about this particular
11   statement is there is no acknowledgment whatsoever by the
12   agency that this would conflict with the regulation of the
13   practice of medicine or of nursing or the medical -- the
14   healing arts in general, because, you know, for example,
15   Texas, Your Honor, has myriad licenses for different forms of
16   healing arts where this could impact people other than those
17   with an M.D.  But there's no acknowledgment by the agency of
18   that whatsoever.  And on page 31429 they drop footnote 229
19   which they takes us to footnote 263.  And I want to point out
20   what they cite on -- in footnote 263 which is on page 31435.
21   Their basis for stating that all other medical opinions are
22   outdated and not based on current standards of care is citing
23   the World Professional Association For Transgender Health, who
24   I looked up, because I regularly engage in the practice of law
25   on a full-time basis.  For an annual fee of $210 I can be a
```

1  member of that organization.  And I'm not a doctor.  I don't

2  have any medical training.  I have no business treating

3  individuals in a medical capacity.

4          And they also cite the Institute of Medicine of the

5  National Academies.  Where's -- I mean, let's at least give it

6  an honest try if you're going to rewrite standards of care.

7  How about the American Medical Association?  Or how about the

8  fact that when we are dealing with individuals who are

9  suffering with these conditions, who are diagnosed as having

10  gender identity disorder or what is now called gender

11  dysphoria the DSM 5, that we are dealing with a mental

12  disorder, the American Psychological Association would be on

13  reasonable basis to cite.  But that would be unreasonable,

14  back to my original argument, Your Honor, because this belongs

15  to the states.  The federal government does not have the right

16  on to tell doctors how to practice law and even if in some

17  wild scenario it did, what's abundantly clear, Your Honor, is

18  that Congress never delegated to HHS the authority to set

19  standards of care for the medical profession and healing arts.

20  That is significantly missing from any congressional text,

21  whether we are talking about Title IX or whether we are

22  talking about the Affordable Care Act in 2010.  It is

23  completely missing.

24          So, in terms of commandeering this rule, Texas and

25  the other sovereigns, or actually ever sovereign in this

1    country, standards of medical care, its right to regulate the
2    profession, we believe that the federal government is
3    significantly overreaching.
4          We articulate in our Amended Complaint on page 23 the
5    Texas standard that doctors are to execute -- excuse me --
6    independent medical judgment.  We articulate the provisions in
7    Texas law under the Occupational Code, the Health & Safety
8    Code.  We mention for the convenience of the Court the Texas
9    Medical Board which is the government agency charged with
10   licensing and governing the medical profession in Texas that
11   this rule and the declarations with regard to the standard of
12   care and what doctors and other medical professionals can and
13   can't do usurps that authority of Texas and we would say
14   unlawfully.
15         In addition, Your Honor, the rule invades Texas and
16   the other states' relationship with it's employees and I will
17   touch on this briefly in two particular fashions.
18         Number one, Texas, like I would guess every other
19   state, strives to accommodate the various religious and
20   conscientious beliefs of its employees.  Even if we did not,
21   which we very much do, Title VII requires of that of
22   employers.  If you fall under Title VII you must reasonably
23   accommodate the religious beliefs of your employees whether
24   it's, you know, wearing a yamaka or working on Sunday, the
25   case law is full of the imposition on the government to bend

1    over backwards to reasonably accommodate.  How on earth can an

2    employer like Texas accommodate the religious and conscious

3    beliefs of its medical employees when the federal government

4    at the same time is telling us there is no accommodation for

5    religious beliefs with regard to gender transition procedures?

6         There is no quarter whatsoever under our regime for

7    the rules that we're imposing.  It places Texas as an employer

8    in an impossible position because you have one federal law

9    telling us to accommodate, promote, and diverse society and on

10   the other hand saying there is no room for you if you have

11   this set of beliefs.  You cannot play.  So that's -- that's

12   bone additional invasion.

13        And then also it goes to the question of benefits.

14   Texas, like most employers, provides benefits to its employees

15   and that that includes healthcare coverage and that is a

16   matter that is between the employer and its employees.

17        As we showed the Court in our filing last night, ECF

18   No. 60, the declaration we just received from our ERS agency,

19   Texas has 556,500 participants in our health insurance plan.

20   That is a very large number of individuals that we provide

21   for, insure, and have a contractual relationship with.  This

22   rule seeks to change those contractual terms and invades

23   Texas's sovereign choice to provide certain types of coverage

24   or not provide certain types of coverage, whether that be with

25   regard to abortion or in this instance gender transition

1    procedures.

2          Finally, Your Honor, I will touch very briefly on the

3    end spending clause arguments that Texas and the other

4    sovereigns raise although I will say I don't think the Court

5    has to reach that constitutional question if it finds that the

6    rule violates or does not survive the APA challenges here.

7          Texas, like every other state in the union, is

8    engaged in cooperative federalism with the federal government

9    as it pertains to Medicare and Medicaid programs.  And the

10   Supreme Court has made very clear that when that cooperative

11   federalism dynamic is upon us the terms of that cooperative

12   federalism are viewed in a contractual sense and there has to

13   be a knowing and voluntary understanding as to what the terms

14   are when in this instance the states engage in this

15   cooperative federalism with the federal government.

16         Medicare came into existence around I believe 1965.

17   The statutory term at issue here came into existence around

18   1972 as it pertains to Title IX.  There is no way, Your Honor,

19   that Texas or any other sovereign would have any idea that

20   when we engaged in the Medicaid program that the

21   interpretation now thrust upon us by Health & Human Services

22   would be, as they say it is, and I won't belabor the terms.

23         But the Supreme Court has made it clear that it is

24   not even just lawyers, it's the state officials that are

25   governing the program.  Those lay people must be able to

1    clearly understand that's the language that the Supreme Court

2    used in the *Arlington Central* case in 2006, clearly understand

3    from the language of the law itself the conditions to which

4    they are agreeing.

5            Your Honor, even if we go back to just 2010 and the

6    Affordable Care Act, there's nothing in the Affordable Care

7    Act that would allow us to clearly understand that the

8    definition now being thrust upon us by the defendants is

9    clearly upon us so, we do not believe that the federal

10   government can survive the spending clause challenge and the

11   language retirement on that, Your Honor, is stringent.  I

12   mean, Congress has to really spell it out.  If you look at the

13   *Sossamon* case, S-O-S-S-A-M-O-N that we cite in our brief, that

14   was a case where Texas agreed to -- I can't even remember the

15   program -- but something along the lines if "all appropriate

16   relief" was the language to which Texas agreed and the Supreme

17   Court said that that agreement did not waive our sovereign

18   immunity, that a government official could not clearly

19   understand from all appropriate relief that monetary rewards

20   or penalties, the waiver of sovereign immunity, would result

21   from that.  That's how stringent and exacting this standard is

22   under the spending clause, so we don't believe there is any

23   way that the defendants are survive that challenge in the

24   alternative.

25           The last thing I will say and then I will sit down,

1    Your Honor, has to do with the scope of any injunction or
2    injunctive relief that may come from the Court.  Because this
3    is a promulgated rule by an agency, that rule is either valid
4    or it's not and that rule that is a federal rule that applies
5    to everybody is valid or it's not and it doesn't -- the HHS
6    did not seek to draw jurisdictional lines and we cite to this
7    in our reply brief, some of the legal standard, that's ECF No.
8    56 at ECF pages 20 through 21.  Any relief that the Court is
9    to agree with the Plaintiffs must have a nationwide flavor to
10   it because it's a nationwide rule, regardless of who the
11   particular parties are that are before the Court.
12           Thank you, Your Honor.
13           **THE COURT:**  Thank you.
14           **MR. GROGG:**  Good morning, Your Honor.  May it please
15   the Court.  Adam Grogg for the federal defendants.  We are
16   here this morning, Your Honor, on plaintiff's motions for
17   preliminary injunction and as Your Honor knows and as the
18   Supreme Court has made quite clear, a preliminary injunction
19   as an extraordinary form of relief and we respectfully submit
20   that it is not warranted under these circumstances.
21           First and most importantly, Plaintiffs have failed to
22   demonstrate irreparable injury or that the balance of equities
23   the tips in their favor.
24           Second, they are unlikely to succeed in establishing
25   that this Court has jurisdiction over this premature action.

1          And third if the Court were to reach the merits,

2    which it should not, Plaintiffs are unlikely to establish that

3    the regulation that they challenge, which was promulgated by

4    the Department of Health & Human Services after a robust

5    notice and comment process, is contrary to the statute or to

6    the Constitution.

7          I'll start with irreparable injury.  The Supreme

8    Court has made clear in cases like *Winter v. Natural Resources*

9    *Defense Counsel* that irreparable injury is a prerequisite to

10   the issuance of a preliminary injunction.  Crucially, *Winter*

11   also confirms that in order to succeed on their present

12   motions Plaintiffs have to put forward more than mere

13   speculation about possible injuries.  Rather, they have to

14   show that irreparable injury is likely in the absence of an

15   injunction.  And from cases like *Lyons* from 1983 from the

16   Supreme Court, which we've also cited in our briefs, we know

17   that the threat of irreparable injury must be real,

18   substantial, and immediate.  Likely.  Not merely possible.

19   Real immediate.  The injuries the Plaintiffs allege are none

20   of these things.

21          Plaintiffs are concerned primarily about the finding

22   of unlawful discrimination under Section 1557 of the

23   Affordable Care Act by the Department of Health and Human

24   Services and concomitant termination of federal financial

25   assistance under the statute or also about damages liability

1    at the conclusion of private lawsuits.

2            But these are speculative possibilities.  That's over

3    three key reasons:

4            First, the Plaintiffs miscast the rules scope and

5    effects.

6            Second, Plaintiffs ignore the rule's built in

7    protections from medical judgment and religious and conscious

8    based views.

9            And, third, Plaintiffs ignore the rule's built in

10   procedures for enabling HHS on the basis of concrete facts

11   gathered through a comprehensive investigation and considering

12   all the circumstances including any defenses that might be

13   applicable to determine whether a violation of Section 1557

14   has occurred.

15           Let me just pause at the moment at the outset to

16   underscore what I believe is the parties' agreement on the

17   rather narrow aspects of the dispute given the various

18   provisions of the rule.  Specifically, most provisions of the

19   rule are not at issue here.  At issue here is only sex

20   discrimination under the rule, not discrimination based on

21   race or national origin, and similarly, the Plaintiffs' claims

22   center on certain aspects of how HHS has interpreted the

23   statute's prohibition on sex discrimination.

24           Even so, Plaintiffs miscast the rule's scope and

25   effects.  First, the department has repeatedly confirmed that

1    under the rule scientific or medical reasons can justify

2    distinctions based on sex.  In other words, borrowed from the

3    familiar *McDonald Douglas* framework that the rule embodies, a

4    healthcare provider's sound medical judgment can be a

5    legitimate non-discriminatory reason for any alleged

6    occurrence of discrimination.  Plaintiffs are therefore wrong

7    to assert that the rule seeks to override medical judgment.

8         My colleague this morning, Mr. Nimocks, on behalf of

9    the State Plaintiffs, spoke or said he found it surprising

10   that HHS did not acknowledge that it was attempting to

11   establish a national standard of care or regulate the

12   licensing procedures for physicians in the various states of

13   the union.

14        It's not surprising that HHS didn't do that

15   because HHS -- or it didn't acknowledge that because HHS did

16   not do that.  In this rule HHS did not seek to set out a

17   national standard of care with regard to any issue.  And,

18   again, as we've emphasized in our briefs and as the Department

19   emphasized in the rule making scientific or medal reasons can

20   justify discriminations on the base of sex.  We are not

21   attempting -- the Department is not attempting to invade the

22   physician/patient relationship like the State plaintiff laws

23   the state Plaintiffs have put forward here and emphasized this

24   morning.  The rule safeguards that relationship.

25        Second, as with medical judgment, the rule respects

1    religious views.  The rule expressly incorporates applicable

2    federal statutory protections for religious freedom and

3    conscious such that no part of the rule can be applied so as

4    to -- and here I will paraphrase some of the relevant

5    provisions at issue.  No part of a rule can be applied so as

6    to require any individual to perform or assist in the

7    performance of any part of a health service program if doing

8    so would violating his religious beliefs or moral convictions,

9    that's the Church Amendment and specifically Subsection D.

10           No part of the rule can be applied so as to

11   substantially burden a person's exercise of religion unless

12   doing so is the least restricted means of furthering

13   governmental interest.  That's the Religious Freedom

14   Restoration Act, or RFRA.  No part of the rule can be applied

15   so as to discriminate against any institutional or individual

16   healthcare entity on the basis that that health care entity

17   does not provide, pay for, provide coverage of, or refer for

18   abortions consistent with the Weldon Amendment.  Because the

19   rule incorporate these laws, the Church Amendment, the Coats

20   Amendment as well, the Weldon Amendment, and RFRA.  It simply

21   does not attempt to force doctors to violate their religious

22   beliefs nor, as we have explained in our brief, does the rule

23   prevent employers from providing their employees with

24   reasonable religious accommodations.

25           Third, the rule does not require any covered entity

1   to perform or to provide insurance coverage for any particular

2   medical service but instead ensures that services are provided

3   and covered in non-discriminatory ways.  Given this,

4   Plaintiffs' claims stemming from the rules definition of "sex

5   discrimination" as encompassing discrimination on the basis of

6   termination of pregnancy are particularly unfounded.

7          The rule does note state nor has the department ever

8   stated that the rule requires covered entities to perform or

9   cover abortions.  Indeed, that's consistent with the fact that

10  rule incorporates the federal statutory protections for

11  provider's religious beliefs that we've just discussed and

12  with the fact that the rule does not preempt the state

13  Plaintiffs' laws prohibiting coverage or funding of abortions.

14  We cited these laws and yet Plaintiffs have failed entirely to

15  address them.  Their claims concerning abortion can go no

16  further.

17         Indeed, given these aspects of the rule, all of

18  Plaintiffs' allegations of irreparable injury fail.  The crux

19  of Plaintiffs' theory of irreparable injury is that Plaintiffs

20  face the possibility of losing their departmental funding and

21  that to avoid a fund cut off under the rule non-state

22  Plaintiffs will be forced to provide medical services and

23  health insurance coverage for services that violate their

24  medical and religious judgment and that the state Plaintiffs

25  will be prevented from following their own healthcare laws and

```
 1    policies.  In fact, as I've already explained, the rule does
 2    no such things.  Moreover, and this goes to both the lack of
 3    irreparable injury and the fact that Plaintiffs' claims are
 4    not ripe.
 5           Setting aside a Plaintiffs' incorrect theories about
 6    what the rule actually requires, Plaintiffs' claimed injuries
 7    are still speculative.  Rather than challenging the
 8    application of the rule in a particular instance, Plaintiffs
 9    seek to challenge aspect of the rule in the abstract.  But
10    without a concrete allegation of discrimination, none of the
11    facts that an investigation into such an allegation would
12    uncover are known, including with regard to the particular
13    medical service or insurance coverage for such service that
14    was refused.  For example, the medical necessity of that
15    service for that specific patient.  The provider's or
16    insurer's reasons for denying the service or coverage and any
17    relevant defenses and any facts on which those defense might
18    turn that might under the rule's expressed terms shield the
19    covered entity from liability.
20           Further factual development therefore is necessary to
21    understand whether any of the Plaintiffs are violating the
22    rule and without that development the hypothetical
23    possibilities of a finding of unlawful discrimination and the
24    termination of federal financial assistance are speculative,
25    unlike in *Abbott Labs*, for example, therefore, the issues here
```

1    are not purely legal.

2            Those aspects of this case also distinguish it from

3    Your Honor's recent ripeness holding in the Texas' and

4    challenge to the Department of Education interpretation

5    concerning transgender students access to healthcare that my

6    colleagues -- opposing counsel has already discussed this

7    morning.

8            I also -- I will take as one example the -- one of

9    the examples put forward by counsel for the private Plaintiffs

10   this morning.  With regard to physicians, a particular

11   physician's medical judgment about the ethicacy and

12   appropriateness of puberty blocking medication in children.

13   It seems rather remarkable that the Plaintiffs here would seek

14   to set forth that medical judgment devoid of any factual

15   circumstances, devoid of any specific patient, devoid of any

16   understanding about the need for those services or any

17   concerns that might properly be raised, discussed, and

18   considered in the course of an actual encounter with a patient

19   and a provider.  Rather than await that kind of situation and

20   understand the facts that would undergird any allegation of

21   discrimination that might hypothetically and speculatively

22   issue forth from that encounter, Plaintiffs are seemingly to

23   ask the Department and/or this Court for a blanket

24   pre-enforcement judgment that their views are appropriate.

25            That doesn't seem consistent with how the courts

1    addressed similar circumstances.  For example, in the medical

2    malpractice realm, for example, you would not see a doctor, I

3    don't believe, coming in and seeking from a court a blanket

4    pre-enforcement declaration that certain of her policies and

5    practices were valid under a state law concerning medical

6    profession.

7            For all of these reasons we firmly believe that this

8    Court cannot proceed to adjudicate the merits of Plaintiffs'

9    claims without further factual development.

10           There's a second reason as well that Plaintiffs'

11   claims are not justiciable and that is with regard to the

12   specific statutory scheme under Section 1557 that would

13   channel challenges like Plaintiffs' through an administrative

14   process before the agency with judicial review available

15   therefore.  That kind of scheme was addressed in the doctrine

16   established by the Supreme Court in cases like *Thunder Basin*

17   and *Elgin*.  We acknowledge and respect, Your Honor, that in

18   the decision regarding the Department of Education

19   interpretation that Texas has brought that you also rejected

20   the Government's *Thunder Basin* argument.  For the reasons

21   stated in our briefs here and, for example, by the *Highland's*

22   district court, also cited in our briefs, we respectfully

23   disagree and we believe that Plaintiffs must press their

24   claims not in a pre-enforcement action like this one but

25   rather pursuant to the comprehensive scheme of administrative

1      and judicial review that Congress has authorized by

2      incorporating in Section 1557 the enforcement mechanisms under

3      Title VI, Title IX, Section 504, and the Age Act.

4              The administrative process under Section 1557 is

5      designed to allow this the Department to make case-by-case

6      determinations as to whether unlawful discrimination has

7      occurred and in so doing to adequately assess the myriad

8      factual and legal intricacies upon which discrimination

9      allegations turn and that are relevant to any applicable

10     defenses as well.  Such determinations and assessments simply

11     are not possible on the limited record here.

12             For all of these reasons then the Court should not

13     reach the merits of Plaintiffs' claims.  Plaintiffs have not

14     established irreparable injury, Plaintiffs' claims are not

15     ripe, Plaintiffs lack standing for many of the similar

16     reasons, as we have explained in our briefs, and this Court

17     lacks jurisdiction given Section 1557's comprehensive remedial

18     scheme.

19             Nonetheless, I will turn briefly to Plaintiffs'

20     claims on the merits.  We again acknowledge Your Honor's

21     conclusion in the Department of Education case that the term

22     "sex" unambiguously refers to biological or chromosomal

23     differences between men and women only.  Again, we

24     respectfully disagree and would point Your Honor to contrary

25     conclusions reached by other courts.

1            But this case presents a different question.  Here
2    the issue is whether Congress in Section 1557 of the
3    Affordable Care Act has specifically spoken to the issue of
4    whether that provision's prohibition on sex discrimination
5    reaches discrimination reaches discrimination against those
6    whose birth assigned sex differs from their gender identity.
7    We know from, for example, the Supreme Court's decision in
8    *Jackson* that Title IX's prohibition on sex discrimination
9    which Section 1557 incorporates is to be broadly construed
10   because discrimination is a term that covers a wide range of
11   unequal treatment.
12           We know from the Supreme Court's decision in *Oncale*
13   which held that Title VII's prohibition against sex
14   discrimination encompasses same sex sexual harassment that,
15   quote:
16           "Statutory prohibitions often go beyond principle
17   evil to cover reasonably comparable evils and it is ultimately
18   provisions of our laws, rather than the principle concerns of
19   our legislators, by which we are governed."
20           And we know from the Supreme Court's decision in
21   *Price Waterhouse* that discrimination on the basis of sex is
22   not limited to preferring males over females or vice versa but
23   includes differential treatment based on sex-based
24   considerations, including sex stereotyping.  Here Section 1557
25   prohibits sex discrimination in federally financed health

1    programs and activities but the statute does not define

2    discrimination on the basis of sex or instruct how one's sex

3    is to be determined in the event of a conflict between genetic

4    or anatomical makeup and one's gender identity or in the event

5    the different indicators point in different corrections.  In

6    Section 1557 therefore Congress has not directly spoken to the

7    precise question of whether discrimination against transgender

8    individuals is prohibited and of *Chevron's* second step the

9    Department's interpretation in the rule is reasonable and

10    certainly not manifestly contrary to the statute.

11              Counsel for the private Plaintiffs addressed at some

12    length this morning the Department's rationale and the rule

13    for looking at the various statutes Section 1557 incorporates

14    and understanding how any contours or exemptions in those

15    statutes ought to be applied into the healthcare context.  I

16    think the key thing for the Court to understand is that when

17    Section 1557 was enacted three of the four statutes that

18    Section 1557 referenced already applied to any healthcare

19    activities or programs that received federal funds.  The new

20    work, as the Department explained in the request for

21    information and again I believe in the notice of proposed rule

22    making, the new work that are Section 1557 was doing was in

23    the field of sex discrimination.  Prior to Section 1557

24    Title IX only applied to Title IX's prohibition on sex

25    discrimination only applied to educational programs and

1  activities.  When Congress enacted Section 1557 it prohibited

2  sex now on the basis -- prohibited discrimination on the basis

3  of sex in health programs and activities and so the Department

4  was required in understanding what Congress was doing there

5  to take account of the fact that Congress was extending a

6  prohibition on sex discrimination from one field into other

7  and to understand therefore whether and how to incorporate

8  exemptions specific to the educational realm that the Congress

9  had provided in Title IX.  Those same kinds of concerns were

10 not present, for example, under Title VI because Title VI

11 prohibition against race discrimination had already applied.

12 So, as we've explained in our briefs and as the Department

13 explained in the rulemaking, given significant differences

14 between the educational context and the healthcare context,

15 the Department reasonably determined that it would look to the

16 specific exemptions in the Affordable Care Act itself rather

17 than import wholesale the exemptions specific to the education

18 context from Title IX.

19        Your Honor, for all the reasons I've already

20 discussed, we submit that the Department's interpretation of

21 "sex discrimination" in the rule is reasonable under *Chevron*.

22        If Your Honor reaches a contrary conclusion here, as

23 Your Honor did in the Department of Education case, the

24 parties agree that the Court need go no further and should go

25 no further and we've explained that rationale in our briefs,

1  such cases like *Northwest Austin* from the Supreme Court.

2       In any event, Plaintiffs' spending clause argument

3  that Mr. Nimocks touched on briefly this morning is

4  fundamentally the same as the *Chevron* argument.  We understand

5  that the documents differ, but it's just the ways in which

6  they've put forth that argument make clear that if this Court

7  were to accept the Plaintiffs' *Chevron* argument it, of course,

8  would not need to reach the spending clause argument.

9       If the Court, on the other hand, were to reject the

10 Plaintiffs' *Chevron* argument then we would submit that it

11 would necessarily have to reject the same kinds of assertions

12 about what "sex" means or meant the Plaintiffs put forward

13 under the guise of the spending clause.

14       Plaintiffs' remaining constitutional challenges

15 likewise hinge on the rule's prohibition of discrimination on

16 the basis of gender identity or on their unfounded assertions

17 about the rule's requirements with regard to abortion.  In any

18 event, as we've explained in our brief, the rule does not

19 violate the First Amendment.  It specifically does not seek to

20 override or regulate what medical advice doctors or other

21 healthcare providers can provide to patients or express to

22 anyone else and Plaintiffs have not met their heavy burden

23 under the Fifth Amendment, whether impressing a facial void

24 for vagueness challenge or in asserting a novel substance and

25 due process claim.

1          Your Honor, for all of these reasons we respectful

2     request that the Court deny Plaintiffs' motions for

3     preliminary injunction.  Yet, if the Court were to grant an

4     injunction, the Supreme Court has made quite clear that it

5     must extend no further than necessary to provide complete

6     relief to these Plaintiffs.

7          Mr. Nimocks respectfully I think got it precisely

8     backward when he said that scope of any injunction must be

9     considered regardless of the Plaintiffs before the Court.

10    That's wrong.  The scope of any preliminary injunction must

11    extend no further than is necessary to prevent irreparable

12    injury to these Plaintiffs, the named Plaintiffs, that are

13    before us today.

14          We do not contest, as Your Honor is well aware from

15    the Department of Education case, that in appropriate

16    circumstances district courts do enter nationwide injunctions,

17    but the question of -- the question here is not one of whether

18    an injunction would apply nationwide.  The question is whether

19    the -- the proper question is whether it should extend to

20    non-Plaintiffs.  And the Fifth Circuit, for example, in the

21    Texas immigration challenge found that it was appropriate for

22    that district court to extend relief to non-Plaintiffs because

23    doing so, that court found, was the only way of preventing

24    irreparable harm to the named Plaintiffs.  Here Plaintiffs

25    have put forward no such arguments and nor, we would

1    respectfully submit, can they.  Plaintiffs simply cannot show

2    that in order to protect their own interests, which is the

3    relevant question before the Court if the Court were to issue

4    an injunction, Plaintiffs cannot show that it is necessary to

5    protect their interests to extend relief to non-Plaintiffs.

6           With that, Your Honor, I'm happy to answer any

7    questions either now or next.

8    **THE COURT:**  Okay.  If I could just ask you a few

9    questions.  The -- so the private Plaintiffs or at least the

10    Franciscans and the others say that they have a categorical

11    exclusion in their insurance policy to covering both abortion

12    services and transition services and that they do that for

13    religious reasons.  If they continue that policy in place

14    after January 1 of 2017 will they be in compliance with the

15    rule or not in compliance with the rule?

16    **MR. GROGG:**  For all the reasons we've explained, Your

17    Honor, those kinds of determinations, even with regard to the

18    very specific provision of the rule that you're referencing

19    which says that any categorical exclusion or limitation that

20    is specific to all services pertaining to gender transition is

21    facially invalid under the rule.

22           For all the reasons we explained, however we still

23    believe that those kinds of determinations need to be made on

24    a case-by-case basis informed by the facts in front of the

25    Court.

1          This is particularly relevant, given as Your Honor

2   referenced, the Franciscan Alliance Plaintiffs have asserted a

3   RFRA protection to changing their health insurance policy.

4   Understanding whether they would succeed on RFRA claim would

5   similarly require certain facts, specifically with regard to

6   the least restricted means analysis and those kinds of fact,

7   we would submit, are not before the Court.  We have though

8   acknowledged in our briefs that other the Plaintiffs here,

9   Franciscan Alliance, seemingly on the basis of their

10  allegations, has alleged having the kind of categorical

11  exclusion or limitation that the rule prohibits and yet we

12  would say that understanding whether that prohibition violates

13  the rule would require additional factual development.

14          THE COURT:  And the additional factual development

15  you say goes to other means that might be available to provide

16  this kind of treatment.  What do you need to know to make that

17  decision?

18          MR. GROGG:  To be clear, to provide coverage for

19  these kinds of treatments after services.

20          THE COURT:  Yes.

21          MR. GROGG:  I think it's particular to the RFRA

22  defense that's been asserted here and so understanding whether

23  the rule, if it were applied, so as to require Franciscan

24  Alliance to revise its health insurance policy.

25          THE COURT:  Well, you say if it were applied.  You

1    are telling me it does apply to require -- In other words, you

2    are saying -- As I understand your position, you are saying

3    that if -- and I'm going to ask them about their policy in a

4    minute -- but if, as I understand their policy, they have a

5    categorical exclusion for coverage for these services, you're

6    telling me that that violates the rule on its face while in

7    certain circumstances it might be permitted and it might not

8    be permitted.  So why do you say -- why do you phrase it that

9    way?

10            MR. GROGG:  Sorry.  I -- I didn't mean to introduce

11   confusion.  What I just meant to say was that under the least

12   restrictive means analysis in RFRA the question is whether

13   requiring Franciscan Alliance to change its healthcare policy

14   is the least restrictive means of furthering a compelling

15   governmental interest and the facts that might inform that

16   analysis and that aren't present here would be with regard to,

17   for example, and there are other examples as well perhaps, but

18   whether a particular patient that had alleged that Franciscan

19   Alliance policy was discriminatory under the rule and under

20   that specific provision of the rule had alternative means of

21   accessing coverage for that particular service.  And it's

22   these kinds of facts in that circumstance that would be

23   required and it's those similar kinds of facts that in all the

24   circumstances that the Plaintiffs have put forward here that

25   would we think require additional development before these

1   claims can be adjudicated.

2        THE COURT:  The Franciscans have a policy forbidding

3   providing abortions it sounds like.  Can they continue their

4   categorical policy of banning abortions after January 1, 2017?

5        MR. GROGG:  So the January 1st 2017 date is relevant

6   to the provisions of the rule concerning health insurance

7   coverage, so I take it to be that that's -- that's your

8   question.

9        THE COURT:  Okay.  Well, let me ask you this.  The

10  rule was promulgated, what, May 16th, 2016?

11       MR. GROGG:  That's correct.

12       THE COURT:  Is that right?  Okay.

13       MR. GROGG:  Yes, sir.

14       THE COURT:  So from May 16, 2016, forward can the

15  Franciscans categorically ban abortion-related procedures?

16       MR. GROGG:  Right.  I just wanted to clarify because

17  I do think generally it's useful to be rather specific about

18  the rules requirements with regard to providing services and

19  providing coverage.

20       THE COURT:  Yes.  I'm sorry.

21       MR. GROGG:  But as I said, actually in this

22  particular instance, Your Honor, it's academic.  The rule does

23  not state and the Department has never stated that the rule

24  requires any covered entities to provide or perform abortions.

25  In this regard --

1      THE COURT:  Even if they provide D&C and D&E in other

2  contexts, non-abortion, non-termination of pregnancy context?

3      MR. GROGG:  That's right.  I think again it's also

4  distinctly relevant to this inquiry that the rule incorporates

5  existing federal statutory provisions like the Weldon

6  Amendment that say that no -- We've quoted the language in our

7  brief, Your Honor, but that would ensure that the rule by its

8  own terms cannot be applied in the ways that you've just

9  described and the Plaintiffs alleged.

10      THE COURT:  All right.  And so -- But as it relates

11  to their provision of treatment services related to gender

12  transition, a categorical ban for that kind of treatment would

13  be barred by the rule?

14      MR. GROGG:  So that -- that is not --

15      THE COURT:  For the Franciscans.

16      MR. GROGG:  For Franciscan Alliance.  So again, here

17  I think it's important to distinguish between the rule's

18  effects with regard to the provision of services and the

19  provision for health insurance coverage.

20      THE COURT:  I understand.  I'm asking about services.

21      MR. GROGG:  Services.  So while the rule does have a

22  categorical -- say that any categorical health insurance

23  exclusion for gender transition services is a facial violation

24  of the rule, absent applicable religious defense, the rule

25  does not have a parallel -- parallel provision in the regard

1    of -- with regard to provision of services.  And so this is

2    where --

3              THE COURT:  Can you say that one more time?

4              MR. GROGG:  Sure.  I'm sorry.  It was my fault -- my

5    fault for swallowing my words.  The rule does in the provision

6    of health -- with regard to the provision of health insurance

7    coverage say that a categorical ban is a facial violation of

8    the rule.  And I'll pause there for a second just to note that

9    the Department has explained its rationale there and the

10   Plaintiffs we would say mischaracterize what the Department's

11   rationale is.  That provision of the rule concerning health

12   insurance coverage understands that if the healthcare -- if

13   the healthcare policy on its face singles out a particular

14   kind of treatment for an exclusion or limitation that that is

15   evidence of discrimination on its face.

16             Switching though to Your Honor's question which is

17   about the provision of services related to gender

18   transition --

19             THE COURT:  But hold on.  I'm sorry you switched --

20   I'm sorry for you to switch my questions.  Stay that again.  A

21   categorical exclusion of treatment is evidence on its face of

22   discrimination?

23             MR. GROGG:  A categorical exclusion of -- in a health

24   insurance policy --

25             THE COURT:  In a policy.

1          MR. GROGG:  Yes.

2          THE COURT:  All right.

3          MR. GROGG:  For providing transition-related -- it's

4    all transition-related services.  So, for example, Mr. Nimocks

5    referenced a declaration that the State Plaintiffs filed at I

6    think ten thirty or eleven p.m. last night with regard to the

7    Texas State Employees Health Benefits Program.  We, of course,

8    have not quite had ample time to review that declaration and

9    yet you will note that the declaration speaks specifically to

10   Texas's health benefits plans exclusion with regard to

11   services pertaining to gender transition surgery and is not,

12   according to the declaration or the declaration rather is

13   silent with regard to other treatments for gender dysphoria

14   including counseling and hormone therapy and things like that.

15   So it seems to us that this then confirms that Texas has not

16   alleged having the kind of categorical band in health

17   insurance coverage that the rule prohibits.

18          In services the rule does not have a similar

19   prohibition on categorical bans.  The rule rather requires the

20   standard kind of analysis that would go into any claim of

21   discriminatory treatment and would look to -- If a patient

22   came to a Franciscan Alliance hospital seeking some aspect of

23   gender transition services and if the Franciscan Alliance

24   hospital declined to provide those services -- And again,

25   these are all hypotheticals at this point, no allegations like

1    these are actually before the Court in this case -- then the

2    Department would look to understand whether Franciscan indeed

3    provides similar kinds of services in other circumstances and

4    it would required an nuanced fact-specific analysis in coming

5    to understand whether that particular complainant, that

6    particular patient, has adequately alleged discrimination

7    under the rule and under Section 1557.

8        **THE COURT:**  And so if the Franciscans have a

9    religious belief that providing transition related services

10   designed to change the sex or the gender of the patient, they

11   have a religious belief against that and they ban all services

12   related to that -- Now, they provide similar therapies and

13   similar medicines in other circumstances but not for the

14   purposes of transitioning, that a categorical ban by any

15   member of their hospital system in doing that for religious

16   beliefs, can they leave the courtroom today with a commitment

17   from you that that categorical ban would not subject them to

18   either liability or put them in violation of the rule?

19       **MR. GROGG:**  I don't believe that on the present

20   record either we or the Court have enough facts to understand

21   how -- whether a violation of Section 1557 has been adequately

22   stated.  We are in sort of a bizarre posture here where the

23   Plaintiffs are attempting to show that their policies are

24   discriminatory under the rule and this Court and the

25   Department is put in the position of trying to understand

1    whether those allegations are sufficient.  But outside the

2    context of a particular factual scenario which would take into

3    account the specific service that was declined, any reasons

4    given for that service --

5              THE COURT:  But don't we know the reasons that they

6    are declining them if they are saying that it violates our

7    religious tenants, our sincerely held religious beliefs, don't

8    we know the reasons that they are declining them?

9              MR. GROGG:  So we certainly understand certain

10   aspects of Franciscan's religious beliefs from what they've

11   put forward before this Court.  That's correct.  With regard

12   to other reasons, I was referring to the Plaintiffs' and

13   counsel's indication of medical judgment.

14             THE COURT:  But just -- that's a different question

15   than I asked --

16             MR. GROGG:  On the original question only Your Honor

17   is asking.  Yes, I still think that the Department and the

18   Court would need to look to what the particular service was,

19   what the patient's provider had said about the medical

20   necessity of that for that patient and all of the

21   circumstances surrounding an allegation of actual

22   discrimination, an allegation of actual -- an actual violation

23   of the rule and those kind of facts are just simply not before

24   the Court right now.

25             THE COURT:  So if the patient or the patient's other

1  advisors conclude that this patient in needs transition

2  services and that patient goes to the Franciscans and the

3  Franciscans say we do not do this, period, categorically, it

4  is against our religion, what other facts do you need to know

5  to determine whether they would be in violation of the rule or

6  not?

7          MR. GROGG:  So I think it would hinge on the

8  particular service or circumstance.  So if --

9          THE COURT:  Well, but they are you saying it's any

10  service.  Any -- We will provide no service --

11          MR. GROGG:  Sure.  And so we need to understand what

12  kind of services they do provide in other sets of

13  circumstances.  The Plaintiffs have --

14          THE COURT:  But why is that important?

15          MR. GROGG:  Because the question under Section 1557

16  and the rule is whether services have been provided in a

17  discriminatory manner, whether services have been denied or

18  limited on account of sex and in understanding that you would

19  need to have a comparator.  You would need to understand how

20  Franciscan would provide services under different

21  circumstances.

22          Plaintiffs have focused repeatedly on an example

23  given in the rule makings regulatory impact analysis section

24  with regard to his direct needs that is meant to provide an

25  example of certain policy changes that might need to happen.

1    But again, I think -- and sorry to repeat myself, Your Honor,

2    but there are -- I think this Court is well aware from facing

3    any number of cases involving discrimination how fact

4    intensive those cases can be and all of the facts that would

5    attend an actual complainant coming before the Department or

6    in a private lawsuit and alleging that one of the of

7    Plaintiffs here had acted in a discriminatory manner would

8    certainly inform application of the rule in those

9    circumstances.

10        THE COURT:  What sort of guidance goes the rule, the

11   preamble to the rule, or anything else that you have produced

12   provide the private Plaintiffs with sufficient information for

13   them to make a decision on whether post January 1 their

14   insurance policy, which categorically excludes this, would be

15   in violation of the rule?

16        MR. GROGG:  I would point Your Honor to the rule's

17   specific incorporation of RFRA and that goes both with regard

18   to the obvious points that RFRA would apply under these

19   circumstances and with regard to any assurances that the

20   Plaintiffs might have to make with regard to their compliance

21   under Section 1557 and the rule.  The rule contemplates

22   addressing those kinds of issues and questions on a

23   case-by-case basis as the Department made clear throughout the

24   rule making.

25        THE COURT:  But what they are saying in their briefs

1    and what the private Plaintiffs have said today is they need

2    to know now whether they will be in violation of this rule or

3    not and they want a ruling by next week or the week after and

4    so what can they look to now to determine whether if they keep

5    this policy in place that their religious freedom claim will

6    protect us?

7         MR. GROGG:  Again, without repeating myself, I feel

8    that these kinds of questions often come up before courts

9    where covered entities would seek an advanced ruling on

10   whether their conduct is or is not in violation of any given

11   law and the doctrines of ripeness and standing, and in this

12   particular posture irreparable injury, prevent courts from

13   litigating those questions until a concrete dispute arises.

14        THE COURT:  Okay.  And so that's -- I mean, that's --

15   essentially, your view is that, at least as it relates to the

16   Franciscans and perhaps special imposition of the APA, that

17   they need to either stand on their currents policy, the

18   current coverage, which they believe violates their religion

19   and wait to see if they're sued or they need, if they're

20   worried about it, if they are worried about losing the billion

21   dollars in federal funding, they need to change the policy.

22        MR. GROGG:  Yes, with just two caveats, if I can add

23   them quickly.  One is we'd note that the statutes themselves

24   that are incorporated in Section 1557 include what's called a

25   pinpoint provision with regard to the termination of federal

```
 1   financial assistance, so the Plaintiffs have come forward

 2   saying that the states stand to lose all of their Medicaid and

 3   Medicare funding, for example, and ditto with -- the same with

 4   the private Plaintiffs.  The statute instead sets forth a much

 5   more tailored analysis that would look to terminate any

 6   federal financial assistance prospectively only and again it's

 7   the conclusion of a lengthy administrative process designed to

 8   understand the kinds of facts that we've been describing this

 9   morning.

10           But anyway, any termination of any federal financial

11   assistance would be limited to the particular entity that was

12   found to be discriminating, so I just want to make clear that

13   the assertions by Plaintiffs of a potential loss of all

14   federal financial assistance are not only speculative for the

15   reasons that we've described but also just are not consistent

16   with the pinpoint provision and the statute provision.

17           THE COURT:  Will you address Mr. Nimocks's argument

18   about the displacing of the state statute or the state's

19   control of medical standards of conduct?

20           MR. GROGG:  Certainly.

21           THE COURT:  Do you believe that the rule supercedes,

22   for instance, the Occupational Code and then the other codes

23   that he referenced both in his writing and then some today

24   here?

25           MR. GROGG:  It's -- The Department never set out to
```

1    establish a national standard of care with regard to any issue

2    in this rulemaking.  The Plaintiffs' theory, to the contrary,

3    rests entirely on a discussion in the rulemaking that we've

4    already described somewhat this morning explaining that

5    provision of the rule that prohibits any categorical

6    exclusions or limitations for gender -- transgender services

7    in the health insurance context.  And the Department did

8    acknowledge in the context of that discussion and again in

9    explaining why in the health insurance realm it viewed any

10   facial categorical bans on all coverage for gender transition

11   services as discriminatory.  But the rule does not do what

12   Mr. Nimocks asserted that it does.  It does not purport to

13   override medical judgment.  It specifically respects Medical

14   judgment and scientific reason.  It does not purport to tell

15   doctors that they are prevented from advising their patients,

16   rather it ensures that they are able to advise their patients

17   without any interference from discrimination.  So, no, Your

18   Honor, the simple answer is that this rule does not establish

19   a national standard of care.

20        **THE COURT**:  Mr. Nimocks says that in Texas the --

21   either the medical board or the Occupational Code provide that

22   a doctor's medical judgment prevails, that that's the driving

23   factor in determining whether treatment should be provided or

24   not provided and then you said in your argument, I wrote down

25   that you said medical judgment or science can justify

1   distinction.  So is -- Am I misunderstanding what you have

2   said?  In other words, is there a conflict between what he is

3   saying in terms of medical judgment by the physician's

4   controls and you saying medical judgment by the physician can

5   justify distinction?

6          MR. GROGG:  I understand the question.  I think it's

7   a little difficult for me to make a sort of a clearcut

8   conclusive answer on the basis of what we've seen of these

9   state laws.  That's again because the rule never purported to

10  set out a national standard of care and the rule instead

11  respects medical and scientific judgment.  I note again just

12  by analogy, for example, the medical malpractice realm.  It

13  seems that what Mr. Nimocks is saying and what the rule is

14  saying are compatible in terms of protecting medical judgment

15  and yet understanding how it applies in any given particular

16  circumstance.  I don't hear Mr. Nimocks to be saying that in

17  any, for example, medical malpractice case in the State of

18  Texas that if a doctor says my medical judgment told me that,

19  you know, X was the appropriate standard of -- or course of

20  treatment here, that that's the end of inquiry and the entire

21  case goes away.

22          So, again, it's hard for me to judge but on the basis

23  what of what I've understood from the state party's briefs and

24  what Mr. Nimocks said this morning, I don't see a conflict

25  between those laws and a rule that did not purport to set out

1  a national standard of care in this field or others.

2      THE COURT:  So if a Texas physician believes

3  medically, scientifically, that these conditions are never --

4  should never be treated in a medical fashion, that there

5  should never be transition treatment services, transition

6  related services, they should only be dealt with by

7  psychologists and psychiatrists, would he be in violation of

8  the rule?

9      MR. GROGG:  I think it's very difficult to image a

10  doctor coming forward and saying under all circumstances with

11  any patient given -- presenting in front of me of any

12  characteristics, any age --

13      THE COURT:  Can I stop you there?

14      MR. GROGG:  Sure.

15      THE COURT:  Did you not get any comments from

16  physicians saying that that was their belief?

17      MR. GROGG:  I -- I'm sorry, Your Honor.  I don't

18  know.  I -- I can get further information for the Court, if

19  that would be useful, but --

20      THE COURT:  Well, you said you can't image and I'm

21  just wondering if you've got physicians saying that you ought

22  to be able to imagine --

23      MR. GROGG:  It would seem that the ways in which the

24  rule protects medical and scientific judgment accord with how

25  physicians would approach applying their medical and

1    scientific judgment, i.e. on a case-by-case basis, given the

2    particular patients before them, given the particular

3    symptoms, the particular descriptions that the patient is

4    providing.

5        THE COURT:  Would a physician be able to say under no

6    circumstances will I engage in this type of treatment services

7    on anyone under the age of 18, that's my medical judgment, my

8    medical belief, under the sage of 18, while they are juvenile?

9        MR. GROGG:  Certainly.  And standing here before you

10   as a non-doctor, I can certainly understand the ways in which

11   that medical judgment would be, might be appropriate.  The

12   rule in its application on a case-by-case basis would address

13   that particular circumstance and seek to understand how the

14   physician applied his or her medical judgment in that

15   scenario.  So I -- the -- In the same way that I think blanket

16   pre-enforcement declarations about what conduct is or is not

17   discriminatory are difficult for the agency and the for the

18   Court to make in the context of this record at this stage and

19   in this case, which again does not involve an allegation by a

20   patient, for example, that any of these Plaintiffs have

21   engaged in discriminatory behavior under the statute or the

22   rule.

23        For all of those reasons --

24        THE COURT:  And that would -- Your view in that

25   regard would apply even if I took it from 18 to 8, a physician

1    says categorically my medical belief is that I will not under

2    any circumstances provide treatment related services for

3    anybody under 8 years old?

4              MR. GROGG:  Where I was going with this was to say

5    that I think that assessing a claim of discrimination under

6    those circumstances would quite clearly pay careful attention

7    to the medical judgment asserted.  I as a non-doctor --

8              THE COURT:  But it wouldn't put the medical judgment

9    as the primary driver --

10             MR. GROGG:  I think -- I mean, I think in the way a

11   discrimination case or discrimination claim would unfold the

12   medical judgment would absolutely be the primary driver there.

13   You know, again, this is all hypothetical, so it's rather --

14             THE COURT:  I understand.

15             MR. GROGG:  -- difficult to speculate and again it

16   undergirds the kinds of inquiries that Plaintiffs are asking

17   this Court to make and the difficulties associated with them.

18   But the way that the hypothetical Your Honor has posited would

19   occur I guess would be if a patient came into -- an 8 year old

20   patient came in to a physician --

21             THE COURT:  Well, it would be parents bringing the 8

22   year old --

23             THE INTERPRETER:  Parent and child came in to a

24   physician and the patient said or the parent said that the

25   patient was presenting symptoms of gender dysphoria, that

1     would begin a lengthy and vitally important dialog between the

2     physician, the patient, the parent where the physician under

3     the rule would have every freedom that the patient -- excuse

4     me -- that the provider had before Section 1557 was enacted

5     and before the rule became applicable to explain all of the

6     valid scientific and medical reasons why certain courses of

7     treatment might be appropriate and why others absolutely would

8     not be an appropriate.  We do not -- The Department does not

9     intend the rule to intrude on that process but rather to

10    ensure that throughout in that example that Your Honor has

11    posited or in any number of others that the application of

12    that judgment is not interfered with by unlawful

13    discrimination.

14          THE COURT:  All right.  Were categorical exclusions

15    of this nature, either for insurance coverage or for treatment

16    services, permitted when Medicare and Medicaid was first

17    enacted?

18          MR. GROGG:  I can't speak to all law.  I may not

19    even -- and I apologize, Your Honor, be able to the speak to

20    all federal law, but the -- I think where Your Honor is going

21    with this would run into the fact that until Section 1557 was

22    enacted as part of the Affordable Care Act in 2010, there was

23    no prohibition against -- federally prohibition against sex

24    discrimination in federally financed healthcare.  Title IX --

25          THE COURT:  Let me ask you this then.  Before May of

```
 1   2016 were the Franciscans or even the state, were they in
 2   compliance with 1557 in terms of the insurance coverage that
 3   they provided?
 4        MR. GROGG:  Because Section 1557's prohibition
 5   against sex discrimination in federally financed healthcare
 6   went into law when the Affordable Care Act was passed in
 7   2010 --
 8        THE COURT:  Right.
 9        MR. GROGG:  -- certainly Plaintiffs had every
10   opportunity, pursuant to the private causes of action that the
11   Department has recognized Section 1557 incorporates to assert
12   that any such insurance policy with a categorical exclusion
13   was unlawful under the statute.  Plaintiffs have not indicated
14   to us or to the Court, I don't believe, that any such actions
15   came forward.
16        THE COURT:  So you believe that before May of 2016,
17   that this year, that the categorical exclusion that all of the
18   Plaintiffs appear to have, I am going to ask them about that
19   in a minute --
20        MR. GROGG:  And we would certainly contest that,
21   but --
22        THE COURT:  Okay.  That's why I need to ask them
23   that.  But let's just assume -- well, the Franciscans for
24   sure; right?
25        MR. GROGG:  Right.
```

1          THE COURT:  So let's just stay with the Franciscans.

2          MR. GROGG:  Sure.

3          THE COURT:  Before May of 2016 they were not in

4     compliance with 1557?

5          MR. GROGG:  With --

6          THE COURT:  With the categorical exclusion.

7          MR. GROGG:  It is certainly the case that the rule --

8     and that provision of the rule becomes effective, as Your

9     Honor has noted, on January 1st, 2017, that the rule has made

10    such categorical exclusions unlawful.  Whether such

11    categorical exclusions were unlawful prior to the passage of

12    the rule I think would depend upon how private Plaintiffs or

13    on potentially I guess HHS in its enforcement authority would

14    have interpreted sex discrimination under the statute.  But

15    Plaintiffs I think quite conspicuously here have not

16    challenged the statute and to the extent that Your Honor's

17    questioning is related to the spending clause claims, noting

18    again that the parties seem to agree that depending on Your

19    Honor's approach under the APA it's not necessary and perhaps

20    not prudent even to reach the spending clause claim, but

21    there's a particular oddity here in that the Plaintiffs have

22    not challenge the statute and instead have only challenged the

23    regulation and yet they're -- they're raising the contention

24    that the regulation violates or is in excess of Congress's

25    spending power.  It's sort of doctrinally a little difficult

1    and Plaintiffs have certainly I don't believe come forward

2    with any case where a regulation has been struck down under

3    this -- a regulation that is of course executive action has

4    been struck down under the spending clause.

5         THE COURT:  All right.  Okay.  Does the rule

6    incorporate the religious exemptions in Section 504 or

7    Title -- some of the other -- where is my --

8         MR. GROGG:  You mean the other statutes --

9         THE COURT:  Yes.

10        MR. GROGG:  -- that Section 1557 incorporates the Age

11   Act, Section 504, Title XI?

12        THE COURT:  Right.  I've misplaced the statute.  I've

13   got it up here somewhere.

14        MR. GROGG:  Yeah.  So -- And I can reference the

15   specific provision of the rule, but for the reasons that we've

16   discussed and explained, the Department did, given that those

17   statutes, those three other statutes already applied to

18   federal financed activity -- healthcare activities and

19   programs, the Department did bring those other exemptions in,

20   given that they already had been applied to federally financed

21   healthcare programs and activities.  Title IX presents a

22   different question because until the Affordable Care Act

23   passed the prohibition on sex discrimination did not apply

24   broadly to all federally financed healthcare programs and

25   activities but there's a specific provision of the regulations

1   that addresses any exceptions under Title VI, the Age Act, and

2   Section 504.

3        THE COURT:  But is there an interpretive distinction

4   to make from the fact that you have done that in the other

5   provisions and you specifically did not in the Title IX

6   provision?  Is it limited to just because Title IX applied to

7   the education context or is there something more to take,

8   there's something -- there's some less protection to at least

9   the private Plaintiffs than there is under the other

10  provision?

11       MR. GROGG:  So I -- The agency has explained in the

12  rulemaking why differences between the education context and

13  the healthcare context necessitated different approach,

14  including with regard to people's access to educational

15  institutions, their choices to attend religious educational

16  institutions, but again I think the sort of fundamental point

17  is that those -- that any statutory exemptions that had

18  applied in the Title VI, Section 504, and the Age Act contexts

19  already also applied to the federally financed healthcare

20  activities and programs Section 1557 reaches and so Title --

21  bringing the prohibition on sex discrimination from Title IX

22  into the healthcare context required a more nuanced analysis.

23       THE COURT:  And remind me of why the choice in

24  education is different than the choice in healthcare

25  provision.

1          MR. GROGG:  The agency explained that particularly

2     this question applied -- I'm sorry -- this analysis applies

3     generally but it may be particularly acute in emergency

4     circumstances.

5          THE COURT:  Are there emergency circumstances of

6     transition related treatment?

7          MR. GROGG:  Not -- Standing here as a lawyer and not

8     a doctor, not that I know of, although I can imagine perhaps a

9     situation where someone who was undergoing gender transition

10    and, for example, had been prescribed hormones that were

11    required to be taken, you know, on a daily basis if that

12    patient was an emergency situation and brought into a hospital

13    for extended treatment there might be a question about whether

14    those hormones would need to be provided during the course of

15    that treatment.  But again, it's hard for me as a non-doctor

16    to speculate on that.

17          The basic point though about the difference between

18    the healthcare and education context is as explained by the

19    agency there is, you know, often a -- a choice.  In fact, I

20    would imagine typically a choice on the part of a parent, of a

21    child, to attend a religious educational institution, in other

22    words, a sort of knowing decision made that -- where all the

23    relevant factors can be considered.  In the healthcare context

24    it's rather different.  There's often not, and the agency

25    looked at this, too, particularly in the context of the number

```
1    of healthcare mergers, hospital mergers that have resulted

2    from the Affordable Care Act.  It may well be that there is

3    not a choice on the part of a patient to go to a religious

4    hospital or a non-religious hospital and so there is not

5    the -- there's not the same dynamic the agency explains that

6    would motivate Congress to provide those kinds of exceptions

7    in specifics to the educational realm as would -- you know,

8    and that Congress did not provide those exceptions in the

9    Section 1557 statute specifically.

10         THE COURT:  But don't you -- Doesn't that argument

11   lag a little bit, given that you in your regulation have

12   recognized that Title IX is different, that it applies, of

13   course, to education facilities, and you provide in your

14   definitions that where Title IX uses the phrases "student,"

15   "employer," and one other that's escaping me, we now replaced

16   that with "individual," and so don't you by regulation take

17   care of that problem?

18         MR. GROGG:  Well, I think that that speaks to

19   the sort of nuanced careful way in which the Department

20   approached Section 1557's new work of bringing prohibition on

21   sex discrimination into the healthcare context.  Section 1557

22   incorporates the grounds prohibited under Title IX, Title VI,

23   the Age Act, Section 504, and so it's up to the agency to

24   understand how to implement that statutory requirement in, you

25   know, the particular context of healthcare programs and
```

1    activities and so in understanding the grounds that Title IX

2    prohibits discrimination on the basis of the agency certainly

3    looked to the ways in which any words in that statute might

4    have to be interpreted somewhat differently in the specific

5    healthcare context and again looked to the specific exemptions

6    in the statutory scheme at issue here, the Affordable Care

7    Act.  Section 1557 did not add any new -- add an exception in

8    any regard and so the agency had to take a nuanced approach.

9              THE COURT:  Okay.  Let me ask you this.  I just have

10   a question on the definition section 92.4.

11             MR. GROGG:  Uh-huh.

12             THE COURT:  We defines "sex stereotypes" to include

13   gender -- gendered expectations related to the appropriate

14   roles of a certain sex.  Is "sex," there a certain sex?  Is

15   that a binary view of the term "sex" in this definition?

16             MR. GROGG:  I don't think so necessarily, Your Honor.

17   I think the definition of "sex stereotyping" and the inclusion

18   of "sex stereotyping" and "gender identity" is ground in --

19             THE COURT:  Well, I understand the "sex stereotyping"

20   generally.  I'm saying in your definition the very last word

21   is the word "sex" and are you saying there that that is not a

22   binary definition of sex?

23             MR. GROGG:  I think not.

24             THE COURT:  Okay.

25             MR. GROGG:  I think that it speaks to any number of

1    ways on which sex can be determined.  Is sex determined at

2    birth?  Is it determined on the basis of --

3          THE COURT:  And how does sex get assigned at birth?

4          MR. GROGG:  It's an interesting and sometimes with

5    certain newborn children difficult question.  There is

6    therefore -- I think this underscores the ways in which

7    Congress has not spoken to the exact question at issue here.

8    So, for example, in the *G.G.* case before the Fourth Circuit

9    with which Your Honor is aware, that Court noted that there

10   was a difference between the gender reflected on G.G.'s

11   driver's license and the gender reflected on G.G.'s birth

12   certificate, I think.  And it's these kinds of scenarios --

13         THE COURT:  But I'm just asking as it relates to the

14   birth certificate how does that get assigned?  Is there a

15   uniformed which in which that is assigned?

16         MR. GROGG:  I'm not aware, Your Honor.  I don't know.

17   My guess is that there are particular state codes that would

18   determine that that would look to the medical judgment of the

19   medical providers in understanding that, but I'm not -- I'm

20   not aware.

21         THE COURT:  Okay.  I'm sorry.  I'm going long and

22   I've kept you long.  Anything else you would like to say that

23   I've not given you a chance to say?

24         MR. GROGG:  I'd like to conclude, Your Honor, by just

25   reaffirming that we are here on Plaintiffs' motions for

1    preliminary injunction --

2         THE COURT:  Yes.

3         MR. GROGG:  -- an extraordinary remedy.  If the Court

4    were inclined to reach the merits, notwithstanding our

5    arguments to the contrary, we would assert the Court's

6    injunction should be narrowly tailored specific to prevent any

7    alleged irreparable injuries pending adjudication on the

8    merits.

9         THE COURT:  Thank you very much.

10        MR. GROGG:  Thank you very much, Your Honor.

11        THE COURT:  So who wants --

12        MR. RIENZI:  May I?

13        THE COURT:  Yes.  Very good.  Can I just ask you some

14   questions before you --

15        MR. RIENZI:  You're the Judge, Your Honor.  You can

16   do it.

17        THE COURT:  I know you get the final word, and so

18   just let me get a few questions out of the way and then I will

19   give you uninterrupted rebuttal argument.  But I am kind of

20   running out of time.

21        Is it true that the Franciscans categorically ban

22   through their insurance coverage all transition-related

23   services?  Coverage.

24        MR. RIENZI:  Yes, it's true.  It's in Sister Jane Ray

25   Cline's declaration and it is true not only for insurance.

1    But Mr. Grogg said he wasn't aware of doctors who would have a

2    categorical view on this.  Sister Jane Ray's declaration

3    attaches Franciscan's policy.  It's categorical they won't

4    provide.  The CMDA declaration from Dr. Stevens attaches

5    CMDA's policy.  It's categorical.  They think it's always

6    wrong.

7              THE COURT:  Okay.  That was my next question --

8              MR. RIENZI:  So yes.

9              THE COURT:  -- was CMDA.

10             MR. RIENZI:  Yes.  And also the declaration for Dr.

11   Hoffman who primarily -- primarily or exclusively, I forget,

12   I'd have to go look -- treats children says if children needed

13   it for some medical problem like precocious puberty, yes, I

14   do, but I would not do it for a child to stop normal onset of

15   puberty for gender transition period -- gender transition

16   period full stop, so the fact of the matter is:  Yes, yes,

17   yes, the private Plaintiffs here say we have categorical views

18   that we can't do this.

19             THE COURT:  And the same for abortion?

20             MR. RIENZI:  And the same for abortion coverage.

21             THE COURT:  Yes.

22             MR. RIENZI:  Coverage and treatment.

23             THE COURT:  And CMDA as well.

24             MR. RIENZI:  CMDA as well.  I don't know if their

25   abortion statement is attached but I am 99.99% sure CMDA has a

1    blanket we think abortion is wrong policy.

2         THE COURT:  If you would just follow up and make sure

3    that's there because I'm not sure.

4         MR. RIENZI:  Yes.

5         THE COURT:  CMDA is at risk of what in terms of --

6    Are they at risk of financing?  Because you have clearly

7    identified financing that Franciscans are at risk of?

8         MR. RIENZI:  Yes.

9         THE COURT:  What about CMDA?

10        MR. RIENZI:  SO CMDA is different.  CMDA is an

11   association of doctors.  They are not on their own what's

12   called a covered entity under this rule which I think we all

13   sort of blew past.  It's in the briefs.  But to be a covered

14   entity you have to receive federal financial assistance in

15   some way.  The Government in the rule said that they expect

16   virtually every doctor in the country to be a covered entity.

17   So CMDA is a just an association of doctors.  It is not itself

18   a covered entity.  It doesn't on it's own receive federal

19   funding.  It is making claims on behalf of its members, so

20   it's raising an associational claim on behalf of its members.

21        THE COURT:  Okay.  All right.  Thank you.

22        I'll ask that of the state.  In terms of the

23   provision of actual services, abortion services, abortion

24   related services or transition related services, how does the

25   rule impact you or -- I guess you're impacted -- how are you

1    impacted now since that part of the rule would have been in

2    effect on May 16 and May 26 of 2016?

3         MR. RIENZI:   Sure.   So we're impacted by the rule

4    because the Government's rule says we can't discriminate based

5    on gender identity and it makes clear over-and-over again that

6    the Government understands refusal to provide gender

7    transition, including categorical refusal, to be

8    discrimination.

9         Now, one of the distinctions Mr. Grogg offered you

10   was he said, Well, we said that clearly about the refusal to

11   give insurance coverage, but that is -- that is

12   discrimination, but we haven't said that about providing the

13   services.   Your Honor, that doesn't even pass the rational

14   basis test; right?   In other words, if it is discriminatory to

15   say I will never pay money for someone's gender transition,

16   how on earth can they come back and say that they don't think

17   it's discrimination to say I will provide services?   Either

18   it's discriminatory to exclude them or it's not, but it's, at

19   the very least, arbitrary to say, Well it is discriminatory if

20   you exclude them in insurance but it's not discriminatory over

21   here.   And the rest of the rule provides several examples

22   which I quoted earlier to tell us what do they mean by

23   "discrimination"; right?   And they mean if they provide

24   hysterectomies for one reason but not gender transition they

25   think that's discrimination.   They've said that and they have

1    said that they expect the rule to be interpreted to have the

2    maximum effect possible, that they wrote what they wrote in

3    order to guide covered entities and tell us what to do.  So

4    our understanding is that under the rule we violate the rule

5    when we refuse to do this and when we do that we are creating

6    liability for ourselves.

7         I appreciate Mr. Grogg's pointing to the pinpoint

8    provision, but that's not the only provision; right?  The

9    directors are allowed to get whatever remedies he or she

10   thinks are just; right, necessary to remedy the violation.  We

11   have to make statements and false claims liability could come

12   with treble damages including recoupment of the money they

13   have given us in the past.  So I'd love it if it's pinpointed

14   and set to a small thing and it's just going forward but

15   that's just not -- their authority is broad.  That's not the

16   authority in the rule.  There authority is broader than that

17   and therefor the chill and the danger to us are broader than

18   that.  Every day our doors are open.  We are at risk of

19   generating claims and creating problems and risking our

20   funding.

21        The Government presented a long argument, a long

22   argument, that I would suggest was 99 percent all about RFRA;

23   right?  The Government's argument they said, Well, let's wait.

24   Wait until it happens to you and then we'll sort it out.  Wait

25   until we can think about what the restrictive means would be

1    on your insurance.  Wait until we can figure out, well, how

2    important was it that that procedure was given; right?  They

3    want us to wait on all those things.

4         Those are all arguments about RFRA, which if I can

5    leave to one side I'd like to return to.  But I just point out

6    none of them are arguments that, A, this rule doesn't control

7    our conduct right now; it does.  And they don't deny that.

8    This rule governs our conduct right now.  That's enough for

9    standing.  That's enough for ripeness.  Most importantly,

10   that's not for the APA claim; right?  Their argument is about,

11   Well, let's see how it sorts out in a particular factual

12   circumstance.  Those things have nothing at all to do with the

13   APA analysis whether it was lawful to issue this reg this way

14   in the first place.  So, on all of those arguments about,

15   Well, wait until the hammer falls, they have knowing to do

16   with the APA claim.  They are just arguments for why you

17   should do it under RFRA later.

18        I don't want to keep going.  I have arguments for why

19   they are wrong about RFRA but --

20        THE COURT:  Let me ask this one more question and

21   then I will let you make your final summation and that is

22   where all -- or what are the states that you all, the

23   Franciscans -- Let me ask about the Franciscans.  What all

24   states do you all operate in?

25        MR. RIENZI:  Illinois, Indiana, and I believe they

1    may operate a small facility in Michigan, although I would

2    need to double check that.  CMDA though, frankly, has members

3    all across the country.

4              THE COURT:  So in all the states.

5              MR. RIENZI:  In all states; right.  And some of them

6    are in private practices.  Many of them work for other

7    entities, which to go to Mr. Nimock's point, is also part of

8    why we've think if the law is an invalid illegal law the

9    answer ought to be it's enjoined nationwide.  It shouldn't be

10   the case that CMDA members are going to employers who are

11   facing this pressure from the Government.  If the law is

12   illegal, the law is illegal.

13             THE COURT:  All right.  Any final summation?

14             MR. RIENZI:  Yes, Your Honor.  So again, I understood

15   most of Mr. Grogg's argument about wait and see wait and see

16   to be a RFRA argument.  Again, it's not a standing argument

17   and it's not a ripeness argument.  Why?  Because there is no

18   doubt we must comply right now.

19             The rule talks about needing to change policies.  The

20   rule talks about concrete costs for changing policies.  All

21   those things are more than enough for standing and ripeness.

22   It controls our conduct now.  They say, Well, we should figure

23   out the religious stuff some other day; right?  We should

24   figure out the religious stuff some other day.

25             Let's me just focus on the insurance piece for a

1    second.  The argument was, well, even though our rule says

2    Franciscan's in facial violation of federal law, in facial

3    violation of federal law, you can't give them relief.  Why?

4    Well, because maybe later when we sort this out we may figure

5    out that we think it wasn't the least restrictive means or it

6    wasn't that compelling for somebody to get the services.  So

7    we can't sort out insurance stuff until we've got an actual

8    person in front of us bringing the claim.  That's the

9    argument.

10           Contrast that with the contraceptive mandate

11   litigation, which I frankly forget if it ever showed up in

12   front of Your Honor.  It's been in front of probably more than

13   a hundred federal judges nationwide.  It's going on for more

14   than five years.  It's essentially been my -- what I've done

15   for the past five years of my life.  All of those cases -- all

16   of those cases are certainly before an actual person comes in

17   and complains that my insurance policy didn't cover

18   contraception; right?  Many of them were at the preliminary

19   injunction stage.  The Government, at least in the many cases

20   that I have handled on the on the contraceptive mandate never

21   said we can't figure out RFRA now, we have to wait for an

22   actual person.  What they said every time was let me tell you,

23   Judge, why this passes compelling interest and this is the

24   least restrictive means.  They did it in court and court and

25   court all across the country.  They've made that argument,

1    went up to the Supreme Court in *Hobby Lobby,* went up to the

2    Supreme Court again in *Zubic.*   None of them involving a

3    specific individual who said, Gosh, I wish this was in my

4    plan.   It's just simply not the case that you need that to do

5    the RFRA analysis.   To do the RFRA analysis you need us to

6    file a preliminary injunction motion, which we did,

7    establishing the substantial burden on our religion, which we

8    did.   The Government had a statutory obligation to answer that

9    and argue about why it passed the strict scrutiny test, which

10   they failed to do.   The Supreme Court in *Gonzalez v. Car Part*

11   was crystal clear that at the preliminary injunction stage, as

12   sat in every other stage in RFRA, strict scrutiny is the

13   Government's burden.   They could have come forward and said

14   here is why it passes strict scrutiny for us to force

15   Franciscan to do that, But they took a pass.   Having taken a

16   pass, they're lose at the preliminary injunction stage.

17         A few other -- a few other points, Your Honor.   I

18   appreciate the repeated references to medical judgment from

19   the Government, but I would just point out that like in the

20   brief they're all heavily caveated.   Can justify if it's

21   legitimate medical judgment, non-discriminatory medical

22   judgment, can, reasonable, non-discriminatory.   They

23   repeatedly say that the rule does not state that it forces

24   anybody to provide abortions.   Does not -- We have never

25   stated in and the rule doesn't state.   Well, fine.   But the

1    rule makes it illegal to discriminate based on, quote:

2    "Termination of pregnancy."  And the rule tells us that the

3    way the Government figures out discrimination is that if we

4    provide a service for one thing but not for another.  That's

5    what the rule says.  And so we look at the world and we say,

6    Well, sure, some medical judgments are okay, but we've put

7    ours on the table and we have the right know are we breaking

8    the law or not and the Government doesn't want to tell us.

9         Where the Government points in its rule and says,

10   Well we respect -- we respect medical judgment, and they

11   specifically say this in the context of health programs that

12   are different for men and women, for example.  They say they

13   respect medical judgment but they don't say they respect all

14   medical judgment.  They certainly don't say they respect our

15   medical judgment.  And even in the context of programs that

16   distinguished between men and women, something that health

17   programs have done nor a lot of really good reasons for a very

18   long time because men and women do have physical differences

19   and, you know, heart treatments for men and women are

20   different and so forth.  Even there the Government said, Well,

21   it will be tested based on whether it's based on the best

22   available science.  This is at 31405.  And elsewhere they say

23   that they are going to use the constitutional test from *United*

24   *States v. Virginia* saying that it's got to be exceedingly

25   persuasive evidence to overcome intermediate scrutiny.  So

1   they are not simply saying doctors you get to practice

2   medicine and use your best medical judgment, which is what

3   Texas's law says and which is on what all practices are.

4   Instead, they've are saying maybe.  Maybe we will respect your

5   medical judgment, maybe not, and we're not going to tell you

6   now.

7               They refer to the grounds prohibited for

8   discrimination under Title IX.  Again, Congress could have

9   just said on the base of sex there.  Instead, it incorporated

10  Title IX.  It said 20 U.S.C. 1681 et seq, right, as in "and

11  the stuff that comes after."  The religious exemption is right

12  in 1681, so you don't have to go to et seq.  The abortion

13  exemption is a few provisions later.  But Congress knew what

14  it was doing and it was simply not among the grounds

15  prohibited for discrimination under Title IX.  That was not --

16  The available grounds prohibited for discrimination simply did

17  not include things that forced a religious organization to

18  violate its beliefs.  The grounds prohibited simply did not

19  include anything that would force anybody to provide an

20  abortion.  And those two crystal clear exemptions in Title IX

21  show precisely what the Government could do and could have

22  done if it were serious about saying, no, we're never going to

23  make anybody give abortion, because they could have just taken

24  the very simple one line from Title IX and said, Yep, we

25  understand that's part of our thing and we're not doing that;

1    right?  We're not forcing anybody to violate that.  And they

2    could have said the same thing about religion.

3            But instead they wrote their several hundred page

4    rule, their 50 page brief and, frankly, Your Honor, they

5    danced around the issue.  They don't want to actually commit

6    because they say, as Mr. Grogg was explaining, Well, it would

7    depend on whether it's in a rural area near hospital mergers;

8    right?  They're holding out the probably.  They want to

9    reserve the right to later decide that maybe they can force us

10   to provide abortions or maybe they can force us to provide

11   gender transition surgeries.

12           If they are willing to just be clear, gosh, it was

13   really easy to do that.  Congress gave them the language.

14   They chose not to do it on purpose.  They say in their brief

15   that they did it because they didn't want blanket exemptions,

16   they want to sort it oust of it later.  The contraceptive

17   mandate cases make very clear course you can sort this out now

18   at least on a preliminary injunction and give us relief and,

19   at the very least, at least on the Administrative Procedures

20   Act, which again has nothing to do with those sorts of

21   details.

22           I'm will be very brief.  I just want to make sure I'm

23   not missing anything.  The last point I think, Your Honor.

24   The Government made some arguments about ripeness and talked

25   about the *Abbott Labs v. Gardner* case.  Another case that they

1    cite on that ground in their brief is the *Susan B. Anthony*

2    *List v. Driehaus* case from a couple of terms ago.  In both of

3    those cases the Government set down a rule that people had to

4    follow and it changed their behavior now.  In *Abbott Labs* the

5    Court said, Well, it's going to change how Abbott Labs labels

6    its products now.  It affects them now.  The same thing is

7    true here unless Franciscan is willing to violate its

8    religious beliefs.  The regulate us now.  They don't deny that

9    they regulate us now.  They say, Well, you don't know how bad

10   the consequences will be because maybe no one will ever come

11   and hit you with a hammer.

12        For ripeness and standing purposes we have enough

13   where our actions are subject to the rule, our actions are

14   certainly infused with constitutional grounds like in *Susan B.*

15   *Anthony List*, and it's simply not the case that the Government

16   can impose that on us, force us to follow it, give us a 100

17   pages of guidance and then say, Oh, well but we still don't

18   know for sure, so you can't come to court.  It's a final rule,

19   it's final agency action, and we ought to be able to challenge

20   it.  At the very least, we ought to be able to get preliminary

21   injunctive relief.

22        Thank you, Your Honor.

23        **THE COURT:**  Mr. Nimocks.

24        **MR. NIMOCKS:**  Your Honor, I hate to do this, but

25   could I beg Court's indulgence for a brief bathroom break?

1        THE COURT:  I have to leave in ten minutes, so if you

2   can run and come back and finish what you want to say --

3        MR. NIMOCKS:  No.  I was going to take a longer

4   period.  Ten minutes is fine.

5        THE COURT:  Yes.  But let me just ask you.  How do

6   you all have to change your policies and procedures either

7   now, post May 2016 or post January 2017?

8        MR. NIMOCKS:  I think -- I think most notably as a

9   sovereign, Your Honor, I would point the Court to the

10  declaration that was filed that we received yesterday and we

11  filed yesterday evening and I -- The language employed in the

12  declarations says that Health Select -- this is in paragraph

13  6 -- Health Select excludes coverage for gender reassignment

14  surgery related services.

15        And I've also -- I think that that's a scrivener's

16  error, Your Honor, because I've looked at the actual policy

17  which uses this language:

18        "Gender reassignment surgery and related services" is

19  the actual language from the policy and this is in Health

20  Select of Texas, the Master Benefit Plan Document Effective

21  January 1 of 2016.  The language I recite -- And that's

22  available online, but we could also provide that to the Court

23  and I don't think we provided a citation to that in our

24  briefing, and so I apologize to both the Court and my opposing

25  counsel for that.

1          But my point is this:  Texas has a categorical

2     exclusion on the gender reassignment --

3          **THE COURT:**  Services.

4          **MR. NIMOCKS:**  -- services

5          **THE COURT:**  Surgery or services?

6          **MR. NIMOCKS:**  Both.  Both.  Gender reassignment

7     surgery and related services which I interpret to be related

8     to gender reassignment.  So -- the Court -- The Court may not

9     understand the process but surgery is in this dynamic is the

10    last resort, so there's a lot of types of treatment and

11    protocol that is gone through before you get to the point of

12    actually having a physical reassignment surgery, so it's

13    not -- it's not -- when we say "and related services," we are

14    talking about all the services that start and go up to the end

15    result of the surgery.  And so --

16         **THE COURT:**  Pretext bans that.

17         **MR. NIMOCKS:**  Yes, sir.  That is correct.

18         **THE COURT:**  Anything related to --

19         **MR. NIMOCKS:**  Gender reassignment.

20         **THE COURT:**  Gender reassignment.

21         **MR. NIMOCKS:**  Yes, sir.  And even if that wasn't the

22    case, Your Honor, the exclusion that we have based on what --

23    the colloquies that have happened this morning, mean that

24    Texas has a problem in that we have to change our insurance

25    policies, how we do business, in order to comply with the

1    expectations of HHS because notwithstanding, and I agree with

2    Professor Rienzi, some of the references to medical judgment.

3    The problem here, Your Honor, is that HHS dove head first into

4    medical judgment.  I mean, when it says -- when it makes an

5    absolutely declaration that certain medical viewpoints are now

6    outdated and not compliant with standards of care as they see

7    them, they are making an medical judgment assessment.  They

8    could have said in the rule we are worried about invidious

9    discrimination and if there is any evidence that somebody --

10   of a medical provider provided invidious discrimination and

11   refused service based on anything other than medical judgment,

12   that's where we kick in.  They could have done that.  But they

13   did not.  They made a valve judgment and assessment on

14   standards of care.

15          And when it comes to the categorical ban, I know the

16   Franciscans have doctors and medical providers who absolutely

17   won't do anything under any circumstances, I think the more

18   important question is not whether there exists physicians that

19   have a categorical ban, but it's the right to make that

20   decision.  What about a doctor who is willing to go down this

21   path and goes down the path and doesn't like what he or she

22   sees and changes their mind?  Do they have the right to say

23   I'm not going to do that anymore?  Or to get in?  That's --

24   that's the critical right that Texas and the other state law

25   protects.  The right to make that judgment.  The right to say

```
1    I'm going to practice this type of medicine or I'm not going
2    to practice this type of medicine.  You don't have to have
3    planted your flag right now, but HHS has made that value
4    assessment.  They have declared certain decisions outmoded and
5    outdated and incompliant and where that's why they cross the
6    sovereign line I think particularly with regard to Texas and
7    others and invade medical judgment standard and I think it
8    confronts with the Court has heard this morning from Mr. Grogg
9    on evaluating things, you know, circumstantially on a
10   base-by-case basis.  They won't come out and say when the
11   medical judgment prevails.  They wouldn't say in it the rule.
12   As a matter of fact, they say in the rule on page 31393 that
13   they will revaluate each situation on a case-by-case basis.
14   DOJ cited this in their brief on ECF page 35 of ECM number 50.
15   No.  They've should defer to the state authority.  And this
16   gets into the clear statement doctrine with -- I think there's
17   been a little bit of confusion this morning, Your Honor, and I
18   want to be very clear about it.  The clear statement doctrine
19   applies in both a spending clause context but also generally
20   to promulgations of Congress in terms of when it's giving an
21   agency something and we -- we argue this in our replay brief.
22   Congress did not delegate or make a clearly statement to HHS
23   that it ever intended HHS to get involved in making medical
24   decisions or establishing a national medical standard of care.
25   If HHS was going to do that and go beyond questions of
```

1    invidious discrimination but say certain medical viewpoints

2    are valid and others are not, that required a clear statement

3    from Congress in either the Affordable Care Act or in Title IX

4    or something else.  And so beyond questions of the spending

5    clause per se, one of the powers that HHS is exercising is

6    devoid of an underlying clear statement from Congress and

7    that's something that we articulate in our brief.  So before

8    the Court even gets to questions of *Chevron* deference, and

9    this is what we call *Chevron* step zero in our brief, there has

10   to be a clear statement and, secondly, the Court is allowed to

11   ask the question:  Would Congress delegate this type of power

12   to this particular agency.  Well, when the regulation of the

13   medical practice is a state central function, that's a huge

14   assumption to say that Congress intended HHS to regulate

15   medical standards of care and would delegate that to HHS.  The

16   evidence of that is totally lacking, Your Honor, in any of the

17   statutory regime and so that's -- I realize I have taken your

18   question and I have given you a very lengthy answer but --

19          THE COURT:  I need to ask you something else though.

20   There is a footnote in your brief that excepts Louisiana and

21   it is note No. 3 in your reply brief and you state that the

22   state Plaintiffs' coverage excludes transition treatments

23   except Louisiana.  What -- I'm not sure I follow what you are

24   trying to convey in that note or what Louisiana does or does

25   not do.

```
 1          MR. NIMOCKS:  You're looking at footnote 3 in the
 2   replay brief, Your Honor?
 3          THE COURT:  Yes.  ECF 56.
 4          MR. NIMOCKS:  I am -- Are you -- I don't see what you
 5   are referencing in the footnote itself.  Are you looking at
 6   the body of the brief?
 7          THE COURT:  Let's see here.
 8          MR. NIMOCKS:  I don't see a citation to anything with
 9   regard to Louisiana.
10          THE COURT:  Maybe it's --
11          MR. NIMOCKS:  Maybe it's the fact I don't have them
12   cited in there.
13          THE COURT:  Maybe that's what I was -- I don't know
14   what I was thinking.  In addition state Plaintiffs
15   categorically exclude coverage for gender transition
16   procedures and/or sex change operations and then footnote 3
17   and there's Texas, Arizona, Kansas, etcetera.  Is there
18   anything I should take from the fact that Louisiana is not
19   there?
20          MR. NIMOCKS:  No, sir.  The best explanation I could
21   provide you speculating and hindsight is that it was an
22   oversight on my part that I thought I had all my states in
23   there --
24          THE COURT:  Oh, I see.  Oh, okay.  That's fine.  But
25   let me do this.  Let me -- Since I'm literally running out of
```

1   time, I'm going to give you some uninterrupted time to present

2   your final -- any final summation you would like to present.

3        **MR. NIMOCKS:**  Your Honor, I have -- I have largely

4   said most of what I wanted to say in reply.

5        There's a couple of additional things that I will add

6   though from my notes.  On the question of irreparable harm,

7   and I think the Court is aware of this, you may have been

8   alluding to this with your question, Your Honor, but when a

9   state is precluded from engaging its own potential, the Fifth

10  Circuit has been very clear that is irreparable harm as a

11  matter of law and so that is the quintessential basis for

12  Texas and the other sovereigns.

13       I wanted to -- Mr. Grogg mentioned the spending

14  clause and I wanted to address that briefly.

15       The spending clause claim does go to the question of

16  what the -- what language Congress did or did not use and I

17  think assumes that if the Court were to assume or to accept

18  the Department of Justice's argument that cases like *Oncale*,

19  O-N-C-A-L-E, and *Price Waterhouse* expanded the window of the

20  language of Title IX so broad as to permit them to do what

21  they're doing, the Government still has an underlying spending

22  clause problem, and so that's where I think looking at the

23  text of Congress and the spending mechanism still becomes a

24  problem for the Government as it pertains to the sovereign

25  Plaintiffs.  So I still think that even if the Court were to

1    take the most expansive view of the text of Congress and

2    embrace everything that the Department of Justice is arguing,

3    it doesn't answer the spending clause question which does go

4    to the text that Congress used.  So we're not -- we're not

5    saying that HHS violated the spending clause.  We are saying

6    that if Court believes that Congress gave HHS the power its

7    welding, it didn't do enough though to survive a spending

8    clause challenge so just to be very clear.

9            And then I would like to -- to be very clear, this is

10   my primary statement but kind of adopt for purposes here some

11   arguments that Professor Rienzi made as it pertains to

12   questions of religious accommodation because I think that even

13   though the analysis is a little different, the principle

14   remains --

15           **THE COURT:**  The Title VII argument you mean?

16           **MR. NIMOCKS:**  The Title VII argument.  That's exactly

17   right.  So IF the Court could take judicial notice of the --

18   of the state employees, we have individuals that have within

19   Texas and the other Plaintiff states that have the same

20   religious briefs or like those of Franciscan Alliance and so

21   the protections that they have under Title VII are akin to

22   shows under RFRA, and so that religious freedom question still

23   exists here as to Texas and the other sovereign Plaintiffs as

24   employers and our duty to accommodate them.  So I think that

25   the religious freedom questions that Professor Rienzi

1    eloquently articulated do have application as to the

2    sovereigns as well.

3         THE COURT:  And the argument there is that as the

4    state you employee people who have similar beliefs to the

5    Franciscans and so if they refuse to participate in transition

6    related services, take it from there.  And you as the state

7    say federal law requires you to do it or we don't know whether

8    it does or not --

9         MR. NIMOCKS:  That's exactly --

10        THE COURT:  We're going to make you do it because we

11   don't want to be -- we don't lose all our funding.

12        MR. NIMOCKS:  That state run or controlled healthcare

13   facilities require the administration and providing this

14   service or this treatment and you as a state employee inside

15   these facilities must administer said treatment.  You don't

16   have a choice.  We are -- we are required to do it.  Then we

17   are -- we are violating our duty to that employee who -- and

18   so the state is caught between a rock and a hard place because

19   you have conflicting federal laws that, you know, come -- come

20   to bear in that particular circumstance.  So, yes.

21   Absolutely, Your Honor.

22        THE COURT:  Okay.  Anything else?

23        MR. NIMOCKS:  No, Your Honor.  That will be it for

24   the State.

25        THE COURT:  Okay.  Yes?

1        MR. RIENZI:  Your Honor, you are asking for a cite.

2   And I know we're out of time, shall I give it so I avoid

3   filing something late.  Dr. Steven's declaration paragraph 17

4   and paragraph 20.  They've are both in the appendix.  They

5   talk about CMDA's commitment opposing abortion and --

6        THE COURT:  Okay.  Very good.

7        MR. NIMOCKS:  Your Honor, I'm sorry.  One brief

8   additional thing.  I just want to remind the Court that we did

9   submit declarations with our reply brief outlining

10  investigations that the Government has into Texas so I think

11  that mitigates in favor of our argument about Texas -- the

12  nature of Texas's coverage and it's coming in conflict with

13  the rule.

14       THE COURT:  Yes.

15       MR. NIMOCKS:  Thank you, Judge.

16       THE COURT:  Thank you all very much.  It is pleasure

17  to hear the arguments from you all and I appreciate you coming

18  down on this busy -- what must be a busy time in your lives,

19  so I will get a ruling out as quickly as I can.

20

21

22

23

24

25

1        I, **DENVER B. RODEN**, United States Court Reporter for the

2    United States District Court in and for the Northern District

3    of Texas, Fort Worth Division, hereby certify that the above

4    and foregoing contains a true and correct transcription of the

5    proceedings in the above entitled and numbered cause.

6        **WITNESS MY HAND** on this 23rd day of December, 2016.

7

8

9                                    /s/ Denver B. Roden

10                                   **DENVER B. RODEN, RMR**
                                     *United States Court Reporter*
11                                   1050 Lake Carolyn Parkway #2338
                                     Irving, Texas  75039
12                                   *drodenrmr@sbcglobal.net*
                                     **Phone:**  (214) 753-2298
13

14

15

16

17

18

19

20

21

22

23

24

25